CC TO JUDGE ____ pm

1

**HONORABLE ROBERT S. LASNIK**

2

3

4

5

_____ FILED  _____ ENTERED

6

_____ LODGED _____ RECEIVED

7

MAR 0 7 2002  PM

AT SEATTLE

8

CLERK U S DISTRICT COURT

**UNITED STATES DISTRICT COURT** WESTERN DISTRICT OF WASHINGTON

DEPUTY

**WESTERN DISTRICT OF WASHINGTON**

9

**AT SEATTLE**

10

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | NO. C00-1806L |
| Plaintiff, | **EFO DEFENDANTS' MOTION FOR** |
| vs. | **SUMMARY JUDGMENT AND ARGUMENT** |
| | **IN SUPPORT THEREOF** |
| CYBERSPACE.COM, LLC, *et al.*, | NOTE ON MOTION CALENDAR: |
| Defendants. | FEBRUARY 21, 2002 |

11

12

13

14

15

16

17

18

CV 00-01806 #00000122

19

20

21

22

23

24

25

26

27

28

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone: (206) 624-6334
fax  (206) 624-6348

1

# TABLE OF CONTENTS

2

**TABLE OF AUTHORITIES** ................................................. iii

**PRELIMINARY STATEMENT** ............................................. 1

**STATEMENT OF MATERIAL, UNCONTROVERTED FACTS** ................... 2
    1.   Defendants Eisenberg, Olympic and French Dreams ............. 2
    2.   Cyberspace is Formed ....................................... 3
    3.   Cyberspace's Services ....................................... 4
    4.   Direct Mail Marketing by Cyberspace ......................... 4
    5.   Legal Review of Direct Mail Pieces .......................... 7
    6.   Customer Service ........................................... 7
    7.   Usage of the Cyberspace Services ............................. 9
    8.   Subscriber Complaints ....................................... 9
        a.   Lucinda Schoomer - First Data Bank ..................... 9
        b.   Charles Coram - Coram's Steak & Eggs ................. 11
        c.   Jack Robrecht - F.E. Booker Co. ........................ 12

**ARGUMENT** ............................................................. 13
    I     STANDARDS FOR SUMMARY JUDGMENT ....................... 13
    II    THE EFO DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER
        OF LAW ............................................... 15
        1.   Standards of Proof under Section 5(a) of the FTC Act .............. 15
        2.   Plaintiff Cannot Show Probable Deception ...................... 15
            a.   Representing to Subscribers that They Were Obligated to Pay
                Cyberspace Charges ................................... 16
            b.   Representing that the Check is A Refund, Rebate, Receivable or
                Other Payment for Services ............................ 16
            c.   Representing that Subscribers Could Cash the Check without
                Disclosing the Effect of Doing So ....................... 17
        3.   The FTC Cannot Show that Consumers Acted Reasonably in the
            Circumstances ........................................ 18
        4.   The FTC Cannot Show that Defendants' Practices Are Likely to Cause
            Harm to A Reasonable Relying Consumer ..................... 20

**CONCLUSION** ........................................................... 21

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - ii

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

1          **TABLE OF AUTHORITIES**

2     **Cases**

3     *Anderson v. Liberty Lobby, Inc.,*
         477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) ........................ . 14
4
      *Bagdadı v. Nazar,*
5        84 F.3d 1194, 1197 (9th Cır. 1996) .........  .............. ......... ...... ...14

6     *Beyene v. Coleman Sec. Servs., Inc.,*
         854 F.2d 1179, 1181 (9th Cir. 1988) ................................. ........ ...14
7
      *Celotex Corp. v. Catrett,*
8        477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) ................ ........ 13, 14

9     *Columbia Pictures Indus. Inc. v. Professional Real Estate Investors, Inc.,*
         944 F.2d 1525, 1529 (9th Cir. 1991), *aff'd,*
10       508 U.S. 49, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993) ................................ 14

11    *Dorıs Savitch,*
         50 F.T.C. 828, 834 (1954), *aff'd sub nom.*
12       *Savitch v. FTC,* 218 F.2d 817 (2d Cir. 1955)............................................ 19

13    *FTC v. J.K. Publications, Inc ,*
         99 F.Supp.2d 1176, 1201 (C.D.Ca. 2000) ......  ........................... ..........15
14
      *General Ins. Co. of Am. V. Fort Lauderdale Partn.,*
15       740 F. Supp. 1483 (W.D. Wa 1990) ................................................ 16

16    *Golenıa v. Bob Baker Toyota,*
         915 F. Supp. 201 (S.D. Ca 1996) ............................................ ...16
17
      *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc ,*
18       896 F.2d 1542, 1550-51 (9th Cir. 1990) ............................................ 14

19    *Leon A. Tashof,*
         74 F.T.C. 1361, 1401 (1968), *enforced sub nom.*
20       *Tashof v. FTC,* 437 F.2d 707 (D.C. Cir. 1970) ................................ ..... 19

21    *Mattel, Inc.,*
         79 F.T.C. 667, 671-672 (1971) ................................................. .19
22
      *Northwest Motorcycle Ass'n v  U.S. Dept  of Agric.,*
23       18 F.3d 1468, 1471 (9th Cir. 1994) ...........  ................ .................13

24    *Orkın Exterminatıng Co., Inc. v. FTC,*
         849 F. 2d 1354, 1363-66 (11th Cir. 1988) ...........................  ..... .... ...15
25
      *Shannahan v. U.S.,*
26       47 F. Supp. 2d 1128 (S. Dist. Calif. 1999)........................................... 14

27    *Southwest Sunsites, Inc. v. FTC,*
         785 F.2d 1431, 1435 (9th Cir. 1986) ........................................... 15, 18
28

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - ıiı

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washıngton 98154
phone: (206) 624-6334
fax (206) 624-6348

1   *Thompson Med. Co.,*
    104 F.T.C. 648, 792 n. 15 (1984) *aff'd sub nom.*
2   *Thompson Medical Co. v. FTC,* 1986-1 Trade Cas. ¶67,103 (D.C. Cir. 1986) . . . . . . . . .  . . . . 19

3   *Topper Corp.,*
    79 F.T.C. 681, 686-687 (1971) . . . . . . . . . . . . . . .  . . . . . .  . . . . .  . . . . . . . . . . . . . .  . . . . . 19
4
    *United States v. Dibble,*
5   429 F.2d 598, 601-02 (9th Cir.1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  . . . . . . . . . . . . . . . . 14

6   *Ward Laboratories, Inc.,* 55 F.T.C. 1337 (1959), *aff'd sub nom.*
    *Ward Laboratories, Inc. v. FTC,* 276 F.2d 952 (2d Cir.), *cert  denied* 364 U.S. 829 (1960) . . . 19
7

8
    **Statutes**
9

10  15 U.S.C. § 45(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15

11  15 U.S.C. § 45(n) . . . . .  . . . . . . . . . . .  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

12

13

14  **Federal Rules of Civil Procedure**

15  Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  . . . . . . . . . . . . . 1

16  Fed. R. Civ. P. 56(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

17

18

19

20

21

22

23

24

25

26

27

28

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L  - iv

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone: (206) 624-6334
fax  (206) 624-6348

# PRELIMINARY STATEMENT

Defendants Ian Eisenberg, French Dreams and Olympic Telecommunications, Inc.[1] submit this memorandum of law in support of their motion for summary judgment pursuant to Fed. R. Civ. P. 56.[2]

Plaintiff alleges that defendants violated Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), by offering small businesses and consumers a subscription to dial-up internet service by means of a check promotion. In deceptive trade practice cases, the FTC almost always alleges that the defendant made material misrepresentations or that the service or product was ineffective. The FTC makes no such claim here. In this case, all promotional material contained multiple disclosures and the service was available as promised

The FTC's claim of deceptive trade practices stems from the FTC's speculation that consumers and small businesses may not have read the clear disclosures provided to them by defendants and subscribed to the service unknowingly. A deceptive trade practice requires a representation, omission or practice that is likely to mislead a consumer acting *reasonably* in the circumstances, and a showing that consumers reasonably could not have avoided harm. In this case, all that was required was that subscribers read the disclosures. Their failure to do so was

---

[1] Defendants Eisenberg, French Dreams and Olympic will be referred to as the "EFO" defendants. Defendants Coto and Heberd will be referred to as the "Heberd defendants" "Defendants" without qualification refers to all defendants. Defendants Cyberspace and Electronic Publishing Ventures have defaulted.

References to deposition testimony will be identified by the deponent's name and the transcript page or exhibit number (*e.g.*, "Reese, p. X" or "Reese, Ex. X"). References to an affidavit or declaration submitted in support of this motion will be noted by the name of the affiant or declarant and the paragraph or exhibit number (*e.g*, "Eisenberg Aff., ¶X" or "Dichter Decl. Ex. X").

All deposition transcripts and exhibits are attached to the Jacobs Declaration as Exhibits B (Schoomer), C (Coram), D (Robrecht) and E (Reese), with relevant exhibits following each deposition.

[2] On March 6, 2002, counsel for the FTC, the EFO defendants and the Heberd defendants conferred with respect to this motion as well as similar motions being made simultaneously by the other parties. The parties were unable to resolve the issues raised by the motions. (Jacobs Decl. ¶7).

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No C00-1806L - 1

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

1  not reasonable, and harm, if any, reasonably -- indeed, easily -- could have been avoided.

2       The undisputed facts show that all terms of service were disclosed plainly and fully, that

3  the promised services were available under the terms stated, and that there is no competent

4  evidence that defendants' practices were deceptive or violated the FTC Act.

5

6  **STATEMENT OF MATERIAL, UNCONTROVERTED FACTS**

7      1.    <u>Defendants Eisenberg, Olympic and French Dreams</u>

8       Defendant Ian Eisenberg owns a number of companies. Until the Cyberspace venture at

9  issue herein, Mr. Eisenberg's companies primarily provided or supported audiotext services, *i.e.*,

10  enhanced telephone services often accessed through 900 numbers. (Eisenberg Aff., ¶2).

11       Mr. Eisenberg is the sole owner of defendant Olympic. Both prior to and during the time

12  of the Cyberspace venture, Olympic was a billing aggregator. (Eisenberg Aff., ¶3). A billing

13  aggregator is an intermediary between a company offering a service and the local telephone

14  company. Olympic, like all billing aggregators, has billing and collections agreements with most

15  of the telephone companies, and all the major local exchange carriers ("LEC's", which also are

16  referred to as local telephone companies). Olympic formats the computerized records of the

17  company offering the service, prepares them for billing and sends them to the numerous

18  telephone companies that actually send out the bill pages. The telephone companies remit all

19  sums collected to Olympic, which in turn distributes the proceeds (less its fee and other sums) to

20  the company offering the services. Olympic also instructs the telephone companies to issue

21  credits to end users to satisfy complaints. (Eisenberg Aff., ¶3)

22       In 1998 Olympic was providing this service for a company called yp.net. Yp.net enrolled

23  consumers in an on-line version of the yellow pages. Businesses subscribed by cashing a check.[3]

24

25

26  _____

27      [3]Such promotions are common, and often are used by airlines, long distance carriers and
banks. Joel Dichter, one of the EFO defendants' attorneys, recently received a check promotion
28  from Chase Bank that is discussed below. (Dichter Decl. ¶¶2-3 and Ex.. A).

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
Case No. C00-1806L - 2

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax. (206) 624-6348

1   (Eisenberg Aff., ¶4).  An employee of Olympic, Don Reese,[4] showed Mr. Eisenberg the yp.net

2   promotion and urged him to create a similar promotion.  Having no direct marketing experience,

3   Mr. Eisenberg was reluctant to do so.  For a number of months thereafter, Mr. Reese continued to

4   press the issue.  (Eisenberg Aff., ¶5).  In mid-1998, Mr. Reese arranged for Mr. Eisenberg to

5   meet defendant Heberd.  Defendant Heberd had decades of experience in direct mail  marketing.

6   Mr. Eisenberg and Mr. Reese showed Mr. Heberd yp.net's mail promotion, and the two

7   companies agreed to explore a joint venture for a similar promotion.  (Eisenberg Aff., ¶6).

8          Defendant French Dreams, Mr. Eisenberg's company, and defendant Coto, Mr. Heberd's

9   company, formed defendant Electronic Publishing Ventures ("EPV").  French Dreams and Coto

10   each owned fifty percent of EPV.  EPV in turn owned defendant Cyberspace.  (Eisenberg Aff.,

11   ¶7).

12

13          2.     Cyberspace is Formed

14          Cyberspace's first marketing venture was an electronic yellow pages promotion similar to

15   that of yp.net.  In 1998, Cyberspace began making arrangements to offer internet service to which

16   businesses and consumers would subscribe by cashing a promotional check.  (Eisenberg Aff.,

17   ¶¶8-9).

18          Each of the defendants generally was responsible for a different portion of the operation.

19   _____

20          [4]Prior to June, 1999, Mr. Reese was the billing manager for Olympic and other companies

21   owned by Mr. Eisenberg.  (Reese Dep., p. 34 (the Reese transcript and pertinent exhibits are
    attached to the Jacobs Declaration as Exhibit E)).  He also was the vice president of one of those

22   companies.  (Reese, p. 11).  In 1999, Mr. Reese became the Secretary and Chief Operating
    Officer of Olympic and various other companies owned by Mr. Eisenberg.  (Reese, p. 11 and

23   Eisenberg Aff., ¶¶20-22).  Mr. Reese denies ever being the Secretary of *any* of Mr. Eisenberg's

24   companies.  (Reese, pp. 172-73).  It is likely that he denies this because his role as a corporate
    officer makes him vulnerable to being named as a defendant in this action.

25          In fact, Mr. Reese lied when he denied being an officer of any of Mr. Eisenberg's
    companies.  Not only is there a corporate resolution naming him secretary of Olympic in June,

26   1999 (Eisenberg Aff., Ex. B), there is another corporate resolution naming Mr. Reese secretary of

27   U.S. Networks, another Eisenberg company.  (Eisenberg Aff., ¶¶21-22 and Ex. B and C).
    Minutes of a subsequent meeting of the U.S. Networks Board of Directors were signed by

28   Mr. Reese as Secretary of that company.  (Eisenberg Aff., ¶22 and Ex. D).

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - 3

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax: (206) 624-6348

1   Defendant Heberd obtained mailing lists, created the promotions, had attorneys specializing in

2   direct marketing review the materials, and arranged for mailing. Defendant Heberd's employees

3   also handled the day to day bookkeeping and accounting for Cyberspace. Defendant Olympic

4   was to provide most customer service and would be the billing aggregator for Cyberspace.

5   (Eisenberg Aff., ¶10).

6

7         3.    Cyberspace's Services

8         Cyberspace entered into a contract with Starnet Services, L.L.C., an internet service

9   provider, through whom Cyberspace customers would access the internet. (Eisenberg Aff., ¶11).

10   At the time, Starnet, a recognized company in the industry, provided service through local

11   telephone numbers in most but not all of the United States. In order to provide toll free internet

12   access throughout the United States, Cyberspace also entered into an agreement with GTE, which

13   had local access numbers for areas not covered by Starnet.[5] (Eisenberg Aff., ¶11). Subscribers to

14   Cyberspace's services received unlimited internet access usually billed at $19.95 per month for

15   consumers and $29.95 per month for small businesses. (Eisenberg Aff., ¶12). This service

16   included e-mail service with an "@cyberspace.com" address[6] and a personal web page.

17   (Eisenberg Aff., ¶12).

18

19         4.    Direct Mail Marketing by Cyberspace

20         In January, 1999, Cyberspace began mailing promotional materials, including the

21   promotional checks. Of 4.4 million offers mailed to consumers between January, 1999 and

22

23      [5]There does not appear to be any dispute that Cyberspace, through Starnet and GTE,
offered nationwide internet access via a local access number, that this access was available to

24   anyone who cashed the check, or that it was unlimited monthly usage.

25      [6]E-mail services were accessed on line, in the same way that a Hotmail user accesses e-
mail on line. Some consumers and businesses wanted a cyberspace.com address because of the

26   name. (Eisenberg Aff., ¶13). Such subscribers did not have to use the Cyberspace internet

27   service to retrieve their e-mail. For example, someone with high speed internet access who was
willing to pay $19.95 or $29.95 per month for a cyberspace.com e-mail address likely would

28   never use Cyberspace's internet access. (Eisenberg Aff., ¶13).

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - 4

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone. (206) 624-6334
fax. (206) 624-6348

1   March, 2000, 3.3 million were sent to small businesses and 1.1 million to consumers. The last

2   promotion was mailed on March 15, 2000. During the course of the entire promotion, five

3   percent of the consumers and businesses who received checks cashed them and subscribed to

4   Cyberspace's internet service (4.69 percent of small businesses and 6.49 percent of consumers).

5   (Eisenberg Aff., ¶¶23-25).

6          Cyberspace sent a number of different promotions to businesses and consumers. All of

7   these promotions were created by defendant Heberd or his employees. Most of the direct mail

8   pieces were similar. Virtually all included a check in the amount of $3.50.[7]   (Eisenberg Aff., ¶14

9   and Ex. A). The direct mail pieces had several disclosures. The first was in an insert in the

10  envelope. A typical disclosure stated,

11                          CYBERSPACE INTERNET SERVICES

12         As an internet provider, we want to give all our customers the best internet service to
       keep them on the top of the business world.

13
       This alone makes Cyberspace a real bargain for internet service. However, our valued
14     customers receive other benefits as well, including 56K connections for very fast dial-up
       access to the internet, "user friendly" internet Installation software on a CD-ROM, a free
15     web browser, local dial-up numbers in most major cities, an e-mail address, and 4MB of
       web space. We provide all this for the low, low price of only $29.95 per month, which,
16     when the enclosed check is endorsed and cashed or deposited, will be billed conveniently
       to the customer's local phone bill. (The enclosed check is real! Cash it with our best
17     wishes!) Consequently, the enclosed check is our way of introducing individuals to this
       internet service and initiating a subscription as easily and conveniently as possible. With
18     this many benefit, Cyberspace customers can begin taking full advantage of conducting
       business on the internet, that vast, new ... and growing ... market of individuals ready to
19     buy products and services on-line. Smart business people know that no market should
       ever be ignored, and the internet certainly cannot be ignored for too long. Its
20     "interactive" features draw customers in and command their attention like no other
       advertising media can.
21
       A Cyberspace internet account can be a real "shot in the arm" for any business needing
22     sales enhancement.

23     Once you've established an internet presence with Cyberspace, you are encouraged to
       consider further enhancements. This will maximize your investment and insure that your
24     advertising message is presented as professionally and persuasively as possible.

25     There is nothing more important in today's hectic, fast-paced business world than
       providing customers with absolutely the best service possible.
26

27  ────────────────

28         [7]A small number of test mailings contained checks in different amounts.

1    We're certain you'll be pleased with Cyberspace. But if you're not 100% satisfied, we'll
       give you a full refund. Call our toll-free number within 30 days of your account
2    activation, and we'll return your fee. No questions asked. And don't forget: Service first
       is our Number One Priority. We want our customers to know that whenever there is a
3    problem that they can call us toll free at 1-888-285-5196. Cyberspace: Serving your
       business needs ... now ... tomorrow ... and into the next century!

4

(Eisenberg Aff., ¶14 and Ex. A, fifth page, Bates Stamped FTC-1384).

5

6    The promotions had a check and a check stub. A typical check stub stated,
       Endorsement and deposit constitute agreement to utilize services pursuant to the
7    following terms. ISP services offered by Cyberspace.com, LLC., an independent reseller
       of ISP and enhanced website design and hosting services offered by Cyberspace.com,
8    LLC. Licensed dba of Cyberspace.com. Not affiliated with any local or long-distance
       telephone company. Basic service includes 56K connection for very fast dial-up access to
9    the internet, utilizing a user friendly internet installation by way of a CD-ROM including
       a web browser, local dial-up numbers in most major cities, a personal e-mail address and
10   4MB of web space. Endorsement and deposit by payee constitute a valid request for
       service described hereon. Fee for internet services is $29.95 per month, billed through
11   Olympic on local phone bill or by mail. 30 day money back guarantee. This agreement
       shall be governed by and interpreted in accordance with the laws of the state of Delaware.
12   NO VERBAL STATEMENT, OTHER WARRANTY, OR GUARANTEE EXPRESSED
       OR IMPLIED, INCLUDING THAT OF MARKETABILITY, BENEFITS, RESULTS
13   FOR ANY PARTICULAR PURPOSE IS BEING MADE. THE PROVIDER, ITS
       RESPECTIVE AGENTS', RESELLERS', AND EMPLOYEES' LIABILITY IN
14   PERFORMING THEIR RESPONSIBILITIES UNDER THIS AGREEMENT, ARISING
       OUT OF ANY CLAIM OR ERROR OR OMISSION OR FAILURE TO PERFORM
15   ANY SERVICE SHALL BE LIMITED ONLY TO THE FEES PAID FOR THAT
       SERVICE OFFERED IN THIS AGREEMENT. SOME STATES DO NOT ALLOW
16   THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL
       DAMAGES SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO
17   YOU. THIS DOCUMENT GIVES YOU SPECIFIC RIGHTS AND YOU MAY ALSO
       HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE. You will be
18   notified of any future rate changes in advance. Internet services accrue on a month-to-
       month basis, at the rates in effect, until canceled by the client and/or Cyberspace.com,
19   LLC. Any refund due will be prorated. © 1999 Cyberspace.com, LLC. All rights
       reserved. 1-888-285-5196.

20

21   (Eisenberg Aff., ¶14 and Ex. A, third page, Bates Stamped FTC-1382).

22         Finally, each check had a disclosure on the back, directly above the endorsement. A

23   typical disclosure stated,

24   This solicitation check must be cashed or deposited within thirty days of issuance.
       Endorsement and deposit constitute agreement of desire to utilize service and agreement
25   pursuant to terms attached. NOTICE: Payee agrees to terms of $29.95 monthly, due and
       payable in advance. Payee acknowledges that they are qualified and, in fact, do authorize
26   these charges to appear on their phone bill as listed on reverse. Payee acknowledges that
       cancellation of subscription and refund in full, is effected by calling toll-free number
27   attached within thirty days of service activation.

28   (Eisenberg Aff., ¶14 and Ex. A, third page, Bates Stamped FTC-1382).

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - 6

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

1   Once a solicitation check was deposited, Cyberspace mailed a CD-ROM to the

2   subscriber. (Eisenberg Aff., ¶17). Most computers come with browsers already loaded. A

3   subscriber could have entered a Cyberspace local access number into the browser already loaded

4   onto the computer; however, the CD-ROM also gave consumers an e-mail program and dozens

5   of utility programs. (Eisenberg Aff., ¶17).

6   Finally, when a subscriber negotiated a check, Cyberspace would activate service; that is,

7   it would permit access by the consumer. Cyberspace paid a fee to Starnet for each subscriber

8   even if the subscriber never logged on. (Eisenberg Aff., ¶18).

9

10   5.   Legal Review of Direct Mail Pieces

11   On behalf of Cyberspace, Mr. Heberd retained Lewis Rose, Esq., at the time a partner in

12   Arent Fox and a noted authority in the field of direct marketing laws and regulations, to review

13   all promotions that were mailed. (Eisenberg Aff., ¶15). Mr. Eisenberg did not see many of the

14   promotions before they were mailed, but was assured by Mr. Heberd that all were approved by

15   counsel. (Eisenberg Aff., ¶15).

16   The promotions underwent further review by the LEC's. Under the terms of Olympic's

17   billing and collections agreements with the LEC's, all promotions had to be submitted to the

18   LEC's for approval prior to billing. (Eisenberg Aff., ¶16).

19

20   6.   Customer Service

21   Olympic's responsibilities included customer service.[8] Don Reese, who was Olympic's

22   billing manager until June, 1999, and thereafter its Secretary and Chief Operating Officer, was

23

24   _____

[8]At various times, other entities also provided customer service for the Cyberspace
25   ventures. The LEC's provided customer service when a subscriber called with a question about
the charge on the subscriber's telephone bill. Capital Gains, a company owned by defendant
26   Heberd, and two other companies, Pinnacle and Integretel, also provided customer service to
insure that subscribers would have faster access to customer service representatives. (Reese
27   Dep., pp. 63, 81, 87, 128). Finally, written complaints from regulators were handled by the
Heberd organization or by Lewis Rose, Esq. (Eisenberg Aff., ¶19).
28

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No C00-1806L - 7

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone: (206) 624-6334
fax: (206) 624-6348

1   responsible for the customer service function.[9] Mr. Reese[10] testified that his goal was to "provide

2   the best customer service possible. . . ." (Reese Dep., p. 83). Cyberspace assisted in setting up

3   customer service facilities at the Heberd organization in California to handle customer service

4   overflow and worked with Heberd employees to insure that there would be adequate staff and

5   hours of operations. (Reese Dep., p. 131). Mr. Reese had numerous discussions with employees

6   at the Heberd organization to insure that there were bilingual operators at the California customer

7   service facility. (Reese Dep., p. 131-32, Ex. 183 -84, 191). Mr. Reese also monitored how well

8   customer service at Olympic and in California were handling call volumes. (Reese Dep., pp.

9   133-34, Ex. 186). Mr. Reese had the ability to and did listen in on Olympic customer service

10  calls and complained to the appropriate supervisor if the customer service representative did not

11  perform his or her job properly. (Reese, p. 90).

12      The Heberd organization handled complaints from regulatory bodies. Mr. Reese insisted

13  on receiving copies of those complaints and monitored and critiqued the responses to those

14  complaints. (Reese Dep., pp. 136-38, Ex. 189). Mr. Reese even critiqued the "hold" message on

15  the customer service lines. (Reese Dep. pp. 138-39, Ex. 190). Mr. Reese also monitored the

16  customer service offered by Pinnacle. (*Id.* pp. 142–44 and Ex. 192).

17

---

18  [9]Although Mr. Reese denied having any customer service responsibility prior to June,
    1999 (Reese Dep., p. 125), he admitted having this responsibility thereafter and also testified he
19  had the same duties at Olympic both before and after his June, 1999 promotion. (Reese, p. 125
    and 33-34).
20

21      [10]To the extent that Mr. Reese offers exculpatory evidence concerning the Eisenberg
    defendants, his statements must be credited first because he is the FTC's own witness.
22  Mr. Reese has flown from his home in Arizona to Washington, D.C. to meet with the FTC and
    has spoken to various FTC attorneys and investigators repeatedly. (Reese, p. 119).
23  Additionally, Mr. Reese has made no secret of his animus against Mr. Eisenberg, and has no
    motive to lie on Mr. Eisenberg's behalf. In April, 2001, Mr Eisenberg fired Mr. Reese. (Reese,
24  p. 10). Mr. Reese and Mr. Eisenberg are in arbitration over the proceeds of the sale of a
    nightclub they owned jointly after Mr. Eisenberg loaned Mr. Reese almost all of the cost of
25  Mr. Reese's half ownership in the club (a debt Mr. Reese has yet to repay). Mr. Reese has
    written to the arbitrator that Mr. Eisenberg is "destructive" and "malicious", that Mr. Eisenberg
26  "purposely and maliciously destroyed the business for no other reason than to be vindictive" and
    that "[i]t is time he be punished for his actions." (Reese Dep., Ex. 201). Thus, to the extent that
27  Mr. Reese offers testimony favorable to Mr. Eisenberg, such testimony cannot be disputed.
28

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - 8

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone: (206) 624-6334
fax (206) 624-6348

1      7.     <u>Usage of the Cyberspace Services</u>

2        The FTC's belief that consumers were deceived apparently stems from two sources:

3 consumer complaints, which are inadmissible for proof of the matter asserted (*see* footnote 10),

4 and records from Starnet, which provided the internet access to Cyberspace. We do not believe

5 that the Starnet records are admissible and do not comment on their specific contents here.

6        We do note that in response to broad interrogatories and document requests, the FTC has

7 not disclosed any evidence as to the "normal" or expected usage of an internet service. (Jacobs

8 Decl., ¶¶2-3). Cyberspace's subscribers could have been logging on twice as often for twice as

9 long as AOL or Mindspring's subscribers. Because the FTC has no evidence of what an internet

10 service provider's usage should have been, it cannot show that Cyberspace's usage in any way

11 deviated from a "norm".

12

13      8.     <u>Subscriber Complaints</u>[11]

14        The FTC has deposed three subscribers. All three subscribers admitted that the

15 disclosures were clear and that if anyone had read the disclosures the check would not have been

16 deposited. (The transcripts of these depositions are attached to the Jacobs Declaration as Ex. B

17 (Schoomer); Ex. C (Coram) and Ex. D (Robrecht). Exhibits from each deposition are found

18 directly behind each transcript).

19

20        a.     <u>Lucinda Schoomer - First Data Bank</u>

21        In 1999 and at the present time Lucinda Broaddus Schoomer has been the facilities

22 manager for First Data Bank. (Schoomer Dep., pp. 10, 7). Ms. Schoomer testified that she

23

24

---

25        [11]The FTC also has written complaints from subscribers. While such complaints have
been admitted into evidence for limited purposes (*FTC v. Figgie International, Inc.* 994 F.2d 595
26 (9th Cir. 1993), at 608-09; *FTC v. Pioneer Enterprises, Inc.*, 1992 WL 372350 at *3(D. Nev.,
1992), they have never been admitted into evidence for the truth of the matter asserted in the
27 complaint. For this reason, the three subscriber depositions constitute the entirety of the FTC's
28 admissible evidence.

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone: (206) 624-6334
fax. (206) 624-6348

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No C00-1806L - 9

1   works with but does not supervise the company's accounts payable and receivable departments.[12]

2   (*Id.*, pp. 10-11, 60-61)

3   According to Ms. Schoomer, when the company receives a check it is given to the

4   accounts receivable department. If the check has an account number on it, that number is logged

5   so that the check can be credited to the proper account. If the check does not have an account

6   number on it, it is logged, a copy is made, and accounts receivable works "internally to determine

7   where to apply the funds." (*Id*, p. 12, 54). While the company is required to match all checks to

8   the vendors sending the check, the fact that any Cyberspace check could not have been matched

9   to an existing vendor could be explained because it likely "fell through the cracks."[13] (*Id.*, pp.

10  120-21).

11  In October, 1999, Ms. Schoomer was asked in writing by an accounts payable clerk to

12  approve payment for charges on the company's October, 1999 telephone bill. (*Id.*, p. 15 and Ex.

13  23). The written request specifically stated, "see pg. 3 there is a charge on 1018 for $30.85

14  (Cyberspace?)". (*Id.*)  Ms. Schoomer approved payment for that bill, including the Cyberspace

15  charge. (Schoomer Dep., p. 21 and Ex. 23).

16  The company was billed for Cyberspace service for five months, from June, 1999 through

17  November,1999. Neither accounts payable nor Ms. Schoomer questioned the charge until

18  October, 1999. Ms. Schoomer testified that she probably did not notice the charge on earlier bills

19  because she did not review them with sufficient care. (Schoomer Dep., pp. 31-32).

20  After reviewing the October bill, Ms. Schoomer called Ameritech to question the

21  Cyberspace charge. Ameritech gave her another 800 number to call. Ms. Schoomer did not

22  know which number she called, which company she called or to whom she spoke.[14] (*Id*, pp. 73-

23

24  _____

25  [12]She was not asked to describe that working relationship or the basis for her claimed
    knowledge of the procedures of those departments. (*Id.*)

26  [13]Ms. Schoomer did not have a copy of any Cyberspace check that might have been
27  deposited. (*Id.*, pp. 50-51).

28  [14]For these reasons, what allegedly was said to her during this call is inadmissible.

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - 10

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

1   74). After the bank received a Cyberspace bill for November, which the bank also paid, the

2   Cyberspace service was canceled.[15] (*Id.*, pp. 36-37).

3          Ms. Schoomer admitted that there was nothing deceptive about the check itself, if the

4   information on it actually had been read. (*Id.*, p. 67). Ms. Schoomer has a high school

5   education. (*Id.*, p. 96).  Ms. Schoomer testified that she personally receives check promotions at

6   home, recognizes them as junk mail, and regularly throws them away   (*Id.*, p. 56).  She also

7   testified that two people must review every check prior to the check being deposited, and that if

8   either of them had read the disclosures, "it would not have been deposited."[16] (*Id.*, p. 65).

9

10                 b.     Charles Coram - Coram's Steak & Eggs

11         At all relevant times, Charles Coram has been the president of Coram's Steak & Eggs.

12  (Coram Dep., pp. 9-10). Mr. Coram testified that he did not recall ever seeing or endorsing the

13  Cyberspace check negotiated by his company, that he or his brother could have endorsed it, and

14  that any of several people could have deposited it. (*Id.*, pp. 11-12, 35-37).  He did not recall

15  whether or not he received a CD-ROM containing the Cyberspace software. (*Id.*, p. 22).  He

16  testified that in November, 1999, while reviewing the company's Bell South bill, he noticed the

17  Cyberspace charge. (*Id.*, pp. 13-14, 16).  He called a toll free number for customer service and

18  believes that he spoke to someone at Olympic. He was told that the problem would be

19  "resolved". (*Id.*, pp. 17-18, 20). Mr. Coram testified that the problem was not "resolved" and he

20  made several additional calls before contacting the Public Service Commission.[17] (*Id.*).

21

22         [15]Ms. Schoomer claimed that her company had not received a refund for any of the paid

23  charges, but was not asked how she knew this. (*Id.*) Recall that she does not supervise either

    accounts payable or accounts receivable. (*Id.*, pp. 10-11, 60-61).

24
         [16]Ms. Schoomer also admitted that it was possible that the company had received a CD-

25  ROM containing the program to install the Cyberspace browser. (*Id.*, p. 66).

26         [17]As noted immediately below, Mr. Coram's January telephone bill reflected a credit for

27  the sums billed. Although Mr. Coram did not believe that the problem was resolved after his call

    in November, in all likelihood, the January credit was a direct result of that call. Depending on

28  how his local telephone company processes bills, the November call probably occurred too late

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - 11

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

1   The company was billed for four months in 1999, and on the January, 2000, telephone

2   bill received a credit for the substantially the amount billed.   (*Id.*, pp.22 and 47)

3   The company processes one or two checks a day for each of its two locations, ninety

4   percent (90%) of which are personal checks written by diners on a local bank.  Only ten percent

5   are business checks. (*Id* , pp. 31-32).   During the deposition Mr. Coram was asked to read the

6   information above the endorsement line of the check.  He admitted that he understood that

7   signing the check would bind him to an agreement.[18]  (*Id.*, pp. 37-38).  He also believed that the

8   disclosure over the endorsement would have been understandable to his brother, the only other

9   person who endorses checks. (*Id.*, pp. 38-39).  Mr. Coram testified that at home he receives

10  check solicitations, that he understood how they worked, and that he certainly never cashed any

11  of them. (*Id.*, pp. 42-43).

12

13              c.     Jack Robrecht - F.E. Booker Co

14  At all relevant times, Jack Robrecht was the accounting manager of F.E. Booker Co.

15  (Robrecht Dep., pp. 5, 8-9). Unlike the other deponents, Mr. Robrecht recalled receiving and

16  depositing the Cyberspace check, which he assumed was a rebate check despite the fact that there

17  is nothing on the check to indicate that it was a rebate. (*Id.*, pp. 9-10, 43-44, Ex. 33). He

18  assumed - but did not know - that he had received nothing else in the envelope except the

19  check.[19]  (*Id.*, pp. 13, 49-50). Mr. Robrecht reviews the company's telephone bill on a monthly

20  ────────────────────

21  to affect the December bill, so that a credit resulting from the November call would have appear
    on his next telephone bill, which was sent in January.

22

23  [18]Much of the language on the back of the actual check endorsed by the company was not
    legible due to copying and faxing. (*Id* , pp. 35-36, 53 and Ex. 29). Mr. Corum was given a copy

24  of a similar promotion and after reading it, fully understood that depositing the check would
    subscribe the depositor to internet service. (*Id.*, pp. 44-46). He also fully understood the

25  disclosures on sample check stubs and inserts. (*Id* )

26  [19]In a letter to the Florida Public Service Commission (Ex. 34), Mr. Robrecht

27  affirmatively stated that there was nothing but a check in the envelope, but during his deposition
    he admitted that this was a presumption on his part. (*Id.*)

28  Note also that Mr. Robrecht did not remember if he received a CD-ROM in the mail and

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - 12

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

1   basis. (*Id.*, p. 15). He first noticed a Cyberspace charge the second time it appeared, on a

2   telephone bill received in September for August, 1999  (*Id.*, p. 17, Ex. 34, p. 2)  He called Bell

3   South, then Olympic, which referred him to Cyberspace. (*Id.*, pp. 18-19). He left a message and

4   received a return call. (*Id.*, p. 20). During that call he canceled the service but was told that he

5   owed the amounts already billed to the company. (*Id.*, p. 21).

6          Mr. Robrecht testified that in 1999 he received between ten and fifty checks per month

7   and always matched each check with a customer to determine why the company had received the

8   money. (*Id.*, pp. 35-36). The company's deposit slip shows that on the day that the Cyberspace

9   check was deposited, Mr. Robrecht received only three checks. (*Id.*, p. 90). He admitted that he

10   should have realized that Cyberspace did not owe the company any money. He also admitted

11   that if he had read the disclosure above the endorsement line, he would not have deposited the

12   check. (*Id.*, p. 46). Reading the disclosure during the deposition, Mr. Robrecht agreed that it

13   was clear and understood that by depositing the check, the payee was signing up for internet

14   services. (*Id.*, pp. 46-47).

15          The company was billed for four months in 1999. (*Id.*, pp. 29-30).  All but one month

16   was credited to the company's account. (*Id.*, p. 34).

17

18                                **ARGUMENT**

19    I      STANDARDS FOR SUMMARY JUDGMENT

20          The purpose of summary judgment is to avoid unnecessary trials when there is no dispute

21   as to the facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agric.,* 18 F.3d

22   1468, 1471 (9th Cir. 1994). To prevail on a summary judgment motion, the moving party must

23   demonstrate the absence of any genuine issue of material fact and that it is entitled to judgment

24   as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S 317, 323, 91 L. Ed. 2d 265, 106 S. Ct.

25   2548 (1986). Once the moving party has met its burden, the party opposing the motion may not

26   rest upon the mere allegations or denials of his pleadings but must set forth specific facts

27   _____

28   stated that software likely would have been routed to another employee. (*Id.*, p. 22, 59).

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
Case No C00-1806L - 13

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone: (206) 624-6334
fax: (206) 624-6348

1    showing that there is a genuine issue for trial.[20] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

2    248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24,

3    91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *Bagdadi v Nazar,* 84 F.3d 1194, 1197 (9th Cir. 1996).

4      A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson*

5    *v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). A dispute

6    about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return

7    a verdict for the nonmoving party." *Shannahan v. U S.,* 47 F. Supp. 2d 1128 (S. Dist. Calif.

8    1999). To make such a showing, the nonmoving party must go beyond the pleadings and

9    designate admissible material facts showing that there is a genuine issue for trial such that a

10   reasonable jury could find in their favor by the appropriate standard of proof. *Anderson,* 477 U.S.

11   at 255.

12     In determining whether there is a genuine issue of material fact and that the moving party

13   is entitled to judgment as a matter of law, Fed. R. Civ P. 56(c), the party opposing summary

14   judgment must come forward with specific, admissible evidence to support all necessary

15   elements of his claims. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S.*

16   *Ct. 2548 (1986).* Unsupported speculation, suspicions, beliefs and conclusions, as well as

17   inadmissible evidence, are insufficient to meet this burden. *Columbia Pictures Indus. Inc. v.*

18   *Professional Real Estate Investors, Inc.,* 944 F.2d 1525, 1529 (9th Cir. 1991), *aff'd,* 508 U.S. 49,

19   123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993).

20   ///

21   ///

22   ///

23   ///

24

---

25     [20]Although the parties may submit evidence in an inadmissible form--namely,
     depositions, admissions, interrogatory answers, and affidavits--only evidence which might be
26   admissible at trial may be considered by a trial court in ruling on a motion for summary
     judgment. Fed. R. Civ. P. 56(c) ; *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc ,* 896
27   F.2d 1542, 1550-51 (9th Cir. 1990); *Beyene v. Coleman Sec. Servs., Inc., 854 F 2d 1179, 1181*
28   *(9th Cir. 1988); see United States v. Dibble,* 429 F.2d 598, 601-02 (9th Cir.1970).

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - 14

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

II      THE EFO DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER
        OF LAW

1.      Standards of Proof under Section 5(a) of the FTC Act

Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a), provides in relevant part that "Unfair

methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or

affecting commerce, are hereby declared unlawful." The Ninth Circuit has held that the

appropriate standard by which to measure conduct is whether "there is a representation, omission

or practice that is *likely* to mislead the consumer acting *reasonably* in circumstances, to the

consumers *detriment.*" *Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1435 (9th Cir. 1986)

(emphasis in original). The Court further explained,

> First, the FTC must show probable, not possible, deception ("*likely* to mislead," not
> "*tendency and capacity to mislead*). Second, the FTC must show potential deception of
> "consumers acting reasonably in the circumstances," not just any consumers. Third, the
> new standard considers as material only deceptions that are likely to cause injury to a
> reasonable relying consumer, whereas the old standard reached deceptions that a
> consumer might have considered important, whether or not there was reliance.

785 F.2d at 1436 (emphasis in original).

Moreover, the FTC must show that consumers could not reasonably have avoided injury.

Section 5(n) of the FTC Act, 15 U.S.C. § 45(n) states in pertinent part,

> The Commission shall have no authority under this section or section 57a of this title to
> declare unlawful an act or practice on the grounds that such act or practice is unfair *unless
> the act or practice causes or is likely to cause substantial injury to consumers which is
> not reasonably avoidable by consumers themselves* and not outweighed by countervailing
> benefits to consumers or to competition.

15 U.S.C. § 45(n), emphasis added; *see also Orkin Exterminating Co., Inc. v FTC*, 849 F. 2d

1354, 1363-66 (11th Cir. 1988); *FTC v J.K. Publications, Inc*, 99 F.Supp.2d 1176, 1201

(C.D.Ca. 2000).


2.      Plaintiff Cannot Show Probable Deception

As the Ninth Circuit has stated, the FTC must show that defendants' conduct was "*likely*

to mislead," not merely that it had the "*tendency and capacity to mislead*". In its complaint,

Plaintiff alleges three ways in which it claims that defendants' conduct was likely to mislead.

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - 15

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

1

2

        a.     Representing to Subscribers that They Were Obligated to Pay Cyberspace Charges

3       First, plaintiff alleges that "in numerous instances, defendants have represented, expressly

4 or by implication, that consumers who receive defendants' charges on a bill are legally obligated

5 to pay for those charges", when "consumers have not agreed to be charged and are not legally

6 obligated to pay defendants' charges". *Complaint,* ¶¶23 and 24.

7       In fact, the only consumers billed by Cyberspace were those who endorsed and deposited

8 checks that clearly and repeatedly disclosed the effect of doing so. Having read the disclosure on

9 the back of the check during their depositions, none of the FTC's three consumer witnesses was

10 in any doubt as to the ramifications of cashing the check. These disclosures appeared three

11 times: (1) above the endorsement line, (2) on the back of the check stub and (3) in the enclosed

12 circular. Thus, the terms of the agreement were spelled out clearly

13       Failing to read a contract is not a basis for rescinding the contract. *Golenia v. Bob Baker*

14 *Toyota,* 915 F. Supp. 201 (S.D. Ca. 1996); *General Ins. Co of Am. V. Fort Lauderdale Partn ,*

15 740 F. Supp. 1483 (W D Wa 1990). Once subscribers negotiated the check, Cyberspace was

16 entirely within its rights to represent to subscribers that the subscriber was legally obligated to

17 pay for those charges. This is particularly true here because Cyberspace had performed under the

18 contract. There is no question that Cyberspace made internet access available to subscribers.

19 Cyberspace already had paid Starnet for that access whether it was used or not. Further, these

20 consumers, all of whom testified that they scrutinized their phone bills, in one case to determine

21 the reason for a 75 cent charge on a several hundred dollar business telephone bill (Robrecht, pp.

22 64-65, Ex. 36), had several months in which to note the charge on their phone bill and cancel the

23 service. Thus, if Cyberspace represented to consumers that they were obligated to pay

24 Cyberspace charges, such representations were accurate, not deceptive.

25

26

        b.     Representing that the Check is A Refund, Rebate, Receivable or Other Payment for Services

27       The second way in which plaintiff alleged that Cyberspace engaged in deceptive practices

28 was by representing, "expressly or by implication, that defendants' solicitation check is a refund,

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No C00-1806L - 16

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax: (206) 624-6348

1   rebate, receivable, or other payment for services based on a prior or ongoing business

2   relationship." *Complaint*, ¶26. There simply is no evidence supporting this allegation.

3        There is no evidence whatsoever that defendants represented or implied or even that

4   consumers mistakenly understood that the check was a refund, receivable or other payment for

5   services. The FTC alleges that some check stubs contained the word "rebate" once. Even if this

6   were the case, "rebate" was surrounded by the clear disclosures on the endorsement line, the back

7   of the stub and in the insert. None of the consumers deposed by the FTC could testify that he or

8   she received a check containing the word "rebate".[21]

9        Thus, there simply is no evidence that any act or omission by defendants led consumers to

10   believe that this was a rebate, and again, there is no evidence of a deceptive trade practice.

11

12

13
                    c.    Representing that Subscribers Could Cash the Check without
                          Disclosing the Effect of Doing So

14        The final way in which plaintiff alleges that defendants engaged in deceptive practices

15   was by representing or implying that subscribers could negotiate the check without clearly and

16   conspicuously disclosing the terms of the offer. *Complaint*, ¶¶29 and 30. In this case all

17   evidence is to the contrary.

18        As shown above, clear and conspicuous disclosures were made directly above the

19   endorsement line, on the back of the check stub and in the insert. All three consumers who were

20   deposed read the disclosures and agreed that they were clear and understandable. All three

21   agreed that the problem was or had to have been that no one bothered to read the disclosure. If

22   they received this at home they would have recognized it as junk mail and discarded it

23   (Schoomer, pp. 56, 65-67; Coram, pp. 37-38 and 42-43; Robrecht, pp. 46-47).

24        It should be noted that the FTC has taken the position that a check promotion is not

25

26

---

27      [21]Ms. Schoomer could not produce the check sent to her company, and the Robrecht and
Coram checks did not contain the word rebate. (Schoomer, p. 50; Coram, Ex.29; Robrecht., Ex.

28   34).

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - 17

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

1    deceptive if the disclosure is on the front of the check.[22]  The FTC has not disclosed any

2    objective or empirical data suggesting that disclosures are more noticeable on the front of the

3    check than on the back of the check.  Considering that a subscriber may look at the front of the

4    check but in this case had to endorse the back of the check directly below the disclosure,

5    disclosure on the back of the check would have to be more readily noticed than the same

6    disclosure on front.

7           Moreover, the direct mail offer received by Mr. Dichter from Chase also has the

8    disclosure only on the back of the check.  (Dichter Decl., Ex. A).  Far from being rare or a ploy,

9    placing the disclosure on the back of the check apparently is viewed as more clear and

10   conspicuous by one of the nation's largest financial institutions.

11          Insofar as there is no evidence to support this count of the Complaint, there is no basis for

12   finding that defendants engaged in deceptive trade practices as alleged.

13

14           3       The FTC Cannot Show that Consumers Acted Reasonably in the Circumstances

15          To prevail, the FTC also must show that there has been likely "deception of 'consumers

16   acting reasonably in the circumstances,' not just any consumers." *Southwest Sunsites,,* 785 F.2d

17   at 1436.  This is the single weakest part of the FTC case.

18          Fully three quarters of the promotions were mailed to small businesses.  The FTC

19   informally has advised that it considers the fact that the promotion was targeted to businesses as

20   evidence of deceptive intent, because (the FTC suspects) businesses will deposit checks as a

21   matter of course without examining them.

22          There is no evidence to support this suspicion.  In fact, Mr. Robrecht and Ms. Schooner,

23   two of the consumer witnesses, who testified on behalf of small businesses, described elaborate

24

25   _____

26   [22]In July, 2001, the FTC entered into a settlement agreement with yp.net (the company for
     which Olympic did billing and collection, and which gave Mr. Reese the idea of using a check
27   promotion to market internet services).  In that settlement, the FTC agreed that yp.net could
     continue using check promotions if there was a disclosure on the face of the check.  (Jacobs
28   Decl., ¶4 and Ex. A, III(A), p. 5).

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No C00-1806L - 18

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

1  procedures used by these businesses for handling checks.[23]  As each of the consumer witnesses

2  testified, when their business receives checks it must determine the origin of the check.  If a

3  business does not do so its accounts receivable will be inaccurate and it will dun its customers for

4  bills that already have been paid.  Both Ms. Schoomer and Mr. Robrecht described in detail how

5  incoming checks must be accounted for and applied properly.  Thus, a business is more, not less

6  likely to scrutinize a check prior to depositing it [24]

7        Moreover, this standard requires the court to consider a consumer acting reasonably in the

8  circumstances, not just a generic consumer.  It is fair to presume that small business owners have

9  more business knowledge and savvy than the average consumer.  Just as the FTC has held that a

10  less deceptive practice is unlawful because it is aimed at a particularly vulnerable portion of the

11  population,[25] the Court also should commensurately raise the bar for a promotion largely aimed

12  at a far more sophisticated sector of the population.

13        –To the more limited extent that the promotion was mailed to consumers, we note that all

14  three consumers who were deposed were familiar with check promotions, had received them at

15  home, and considered them junk mail they would have discarded.  (Schoomer, pp. 56, 65-67;

16  Coram, pp. 37-38 and 42-43; Robrecht, pp. 46-47).  Check promotions are neither new nor

17  unique.  Consumers are or should be aware that cashing such checks have consequences, and

18  ignoring the probability of such consequences is not reasonable.  Any claim that consumers were

19

20        [23]The business of the third witness receives only two to four checks per week, ninety

21  percent of which are personal checks written by diners.  (Coram, 31-32).

22        [24]This is corroborated by Cyberspace's experience, in which a substantially smaller

23  percentage of businesses than consumers negotiated the check (4.69 percent vs. 6.49 percent).

24        [25]*Thompson Med. Co.*, 104 F.T.C. 648, 792 n. 15 (1984) *aff'd sub nom.  Thompson

    Medical Co. v. FTC*, 1986-1 Trade Cas. ¶67,103 (D.C. Cir. 1986); *Topper Corp* , 79 F.T.C. 681,

25  686-687 (1971); *Mattel, Inc.*, 79 F.T.C. 667, 671-672 (1971); *Leon A. Tashof*, 74 F.T.C. 1361,

    1401 (1968), *enforced sub nom.  Tashof v FTC*, 437 F.2d 707 (D.C. Cir. 1970); *Ward

26  Laboratories, Inc* , 55 F.T.C. 1337 (1959), *aff'd sub nom  Ward Laboratories, Inc  v. FTC*, 276

27  F.2d 952 (2d Cir.), *cert. denied* 364 U.S. 829 (1960);

    *Doris Savitch*, 50 F.T.C. 828, 834 (1954), *aff'd sub nom.  Savitch v. FTC*, 218 F.2d 817 (2d Cir.

28  1955).

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - 19

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

1  deceived despite acting reasonably in the circumstances is speculative and belied by the

2  testimony of the FTC's own witnesses.

3      Finally, it should be noted that only five percent (5%) of all businesses and consumers

4  who were sent a check negotiated it.  Even allowing for some mail not reaching its intended

5  recipient, this shows that up to ninety five percent (95%) of the recipients declined the offer.  The

6  only reason to decline the offer was that it was understood but the service was not wanted.  If this

7  had not been the case, and if there had been a widespread misperception that this was "free

8  money", a far higher percentage of the recipients would have negotiated the check.

9      Up to ninety five percent of all recipients necessarily understood and declined the offer.

10  If the offer was understandable to such an overwhelming proportion of the recipients, any

11  misunderstanding by the remaining five percent was not reasonable.  What is "reasonable" must

12  be measured by the actions of the ninety five percent of the recipients that rejected the offer, not

13  the five percent who accepted it.  Finally, even if this were not the case, there is evidence that the

14  remaining five percent were in any manner confused by the offer.

15

16      4.    The FTC Cannot Show that Defendants' Practices Are Likely to Cause Harm to A

17  Reasonable Relying Consumer

18

19      For all of the reasons set forth above, the FTC cannot show any misstatements, acts or

20  omissions by Cyberspace on which a consumer could have relied to his or her detriment. It

21  cannot show that reliance on what the FTC considers express or implied deception would have

22  been reasonable  For the reasons set forth above, the FTC cannot meet the third prong of the test.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Case No. C00-1806L - 20

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

1

## CONCLUSION

2      As shown above, there are no disputed issues of fact. We respectfully submit that as a

3  matter of law, the EFO defendants are entitled to judgment and the complaint should be

4  dismissed.

5
       DATED this 7th day of March, 2002.
6
                                          Respectfully Submitted,
7
                                          NEWMAN & NEWMAN,
8                                         ATTORNEYS AT LAW, LLP

9
                              By:         _____
10                                        Derek A. Newman, WSBA No. 26967
                                          Roger M. Townsend, WSBA No. 25525
11                                        1001 Fourth Avenue Plaza, Suite 2560
                                          Seattle, Washington 98154
12
                                          Joel R. Dichter (*Pro Hac Vice*)
13                                        Jane B. Jacobs (*Pro Hac Vice*)
                                          Kathryn S. Diemer
14                                        Klein, Zelman, Rothermel & Dichter, L.L.P.
                                          485 Madison Avenue, 15th Floor
15                                        New York, NY  10022

16                                        Attorneys for
                                          FRENCH DREAMS INVESTMENTS, N.V.
17                                        OLYMPIC TELECOMMUNICATIONS, INC., and
                                          IAN EISENBERG
18

19

20

21

22

23

24

25

26

27

28

EFO DEFENDANTS'                                        NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
MOTION FOR SUMMARY JUDGMENT                                    1001 Fourth Avenue Plaza, Suite 2560
                                                                 Seattle, Washington  98154
Case No. C00-1806L - 21                                            phone  (206) 624-6334
                                                                    fax  (206) 624-6348

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 7th day of March, 2002, I caused the foregoing **MOTION FOR SUMMARY JUDGMENT AND ARGUMENT IN SUPPORT THEREOF** to be served via the methods listed below on the following parties

**Via Fedex to:**

Ernest Leonard, Esq
Friedman & Feiger
5301 Spring Valley Road
Dallas, TX 75240

**Via Fedex to:**

Collot Guerard, Esq.
Federal Trade Commission
600 Pennsylvania Avenue, NW, Room 238
Washington DC 20580

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct and that this declaration was executed on March 7, 2002, at Seattle, Washington.

DIANA AU
Diana Au

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 3200
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348