CC TO JUDGE ___pm___

HONORABLE ROBERT S. LASNIK

FILED ———ENTERED
———LODGED———RECEIVED

MAR 07 2002 PM

AT SEATTLE
CLERK U S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | NO C00-1806L |
| Plaintiff, | **DECLARATION OF JANE B. JACOBS IN SUPPORT OF THE EFO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs | |
| CYBERSPACE COM, LLC, FRENCH DREAMS, COTO SETTLEMENT, ELECTRONIC PUBLISHING VENTURES, L L C , OLYMPIC TELECOMMUNICATIONS, INC , IAN EISENBERG and CHRIS HEBERD, | |
| Defendants | CV 00-01806 #00000124 |

Jane B Jacobs declares as follows

1       I am a member of the firm of Klein, Zelman, Rothermel & Dichter, L L P , which represents defendants Ian Eisenberg, French Dreams and Olympic Telecommunications (the "EFO" defendants) in the above-captioned action   I am over eighteen years of age, competent to testify to the matters stated in this declaration, and make this declaration from personal knowledge of those matters

2       During the course of this litigation, the EFO have served various discovery requests, including interrogatories and document requests, upon plaintiff FTC   I have reviewed plaintiff's responses to these discovery requests   For example, on January 24, 2002, defendants served on plaintiff various interrogatories, including that plaintiff describe with particularity the

**DECLARATION OF JANE B. JACOBS IN SUPPORT OF THE EFO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
00049593,1

1

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington 98154
phone (206) 624-6334
fax (206) 624-6348

1

2   facts supporting each major allegation in the complaint   In addition, the EFO defendants

3   requested,

> Please produce all non-privileged communications, notes, memorandum, reports,
> receipts and any other document that was generated or obtained by any means in
> connection with the facts and allegations of the complaint

6       3    None of the documents or responses to interrogatories included any

7   information concerning the rates at which subscribers to any internet service used that service to

8   log onto the internet, that is, there was no information concerning normal, average, or expected

9   levels of usage by customers of internet service providers other than defendant Cyberspace.

10   Similarly, plaintiff has not identified any experts witnesses on whom it intends to rely who could

11   provide such information

12       4    One of the documents produced by the FTC to the EFO defendants'

13   discovery requests is a Stipulated Final Judgment and Order for Permanent Injunction and Other

14   Equitable Relief as to Defendants YP net, Telco Billing, Publication Management, William

15   O'Neal and Gregory Crane that was filed with the United States District Court for the District of

16   Arizona on July 30, 2001   A copy of that document is attached hereto as Exhibit A

17       5    During discovery, plaintiff deposed three individuals who, on behalf of

18   their companies, filed a complaint with a local regulatory body   These consumers were Linda

19   Schoomer of First Data Bank, Charles Coram of Coram's Steak & Eggs, and Jack Robrecht of

20   F E Booker Co   The transcript of Ms Schoomer's deposition is attached hereto as Exhibit B,

21   the transcript of Mr  Coram's deposition is attached hereto as Exhibit C, the transcript of

22   Mr Robrecht's deposition is attached hereto as Exhibit D

23       6    On February 8, 2002, I attended and took part in the deposition of Don

24   Reese   The transcript of Mr Reese's deposition is attached hereto as Exhibit E

25       7    On March 6, 2002, counsel for the FTC, the EFO defendants and the

26   Heberd defendants conferred by telephone with respect to the issues raised by this motion as well

27   as similar motions being made simultaneously by the other parties   The parties were unable to

28   resolve the issues raised by the motions

**DECLARATION OF JANE B. JACOBS  IN**
**SUPPORT OF THE EFO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**
00049593,1

2

1

2       I certify and declare under the penalty of perjury under the laws of the State of New York

3   that to my knowledge the foregoing is true and correct

4       Executed this 6th day of March 2002, at New York, New York

5

6

7                                    Jane B  Jacobs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF JANE B. JACOBS  IN
SUPPORT OF THE EFO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**
00049593,1

NEWMAN & NEWMAN, ATTORNEYS AT LAW, LLP
1001 Fourth Avenue Plaza, Suite 2560
Seattle, Washington  98154
phone  (206) 624-6334
fax  (206) 624-6348

3

FILED ___ LODGED
RECEIVED ___ COPY

JUL 3 0 2001

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
DEPUTY

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA, PHOENIX DIVISION

|  |  |
|---|---|
| Federal Trade Commission, ) | CV- No. 00-1210 PHX SMM |
| ) | |
| Plaintiff, ) | **STIPULATED FINAL JUDGMENT** |
| ) | **AND ORDER FOR PERMANENT** |
| v. ) | **INJUNCTION AND OTHER** |
| ) | **EQUITABLE RELIEF** |
| ) | **AS TO DEFENDANTS YP.NET,** |
| YP.Net, Inc., et al., ) | **TELCO BILLING, PUBLICATION** |
| ) | **MANAGEMENT, WILLIAM** |
| Defendants. ) | **O'NEAL, AND GREGORY CRANE** |
| ) | |

Plaintiff, Federal Trade Commission ("FTC" or "Commission"), having filed its

Complaint for permanent injunction and other relief in this matter, pursuant to Sections

5(a) and 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a)

and 53(b), and the parties having agreed to settle this action without adjudication or

admission of any issue of fact or law, therefore, pursuant to stipulation of the parties, it is

hereby **ORDERED, ADJUDGED, and DECREED** as follows:

## FINDINGS

1.     This Court has jurisdiction of the subject matter of this case and of the

parties hereto.

2.     Venue is proper as to all parties in the District of Arizona under 15 U.S.C.

§ 53(b), and 28 U.S.C. §§ 1391(b) and (c).



3.    The alleged activities of Defendants (as "Defendants" are defined below) are in or affecting commerce, as defined in the FTC Act, 15 U.S.C. § 44.

4.    The Complaint states a claim upon which relief may be granted against Defendants under Sections 5(a) and 13(b) of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a) and 53(b). There have been no findings or admissions of any wrongdoing by the Defendants.

5.    The Commission and Defendants, by and through their counsel, have agreed that the entry of this Order resolves all matters arising from the allegations of the Complaint in this action. This Order supersedes all prior Orders in this matter.

6.    Defendants waive all rights to seek judicial review or otherwise challenge or contest the validity of this Order.

7.    Entry of this Order is in the public interest.

## ORDER

### Definitions

1.    "Defendants" means Gregory B. Crane, William D. O'Neal, YP.Net, Inc., Telco Billing, Inc., d/b/a Yellow-Page.Net, and Publication Management, Inc.

2.    "Document" is equal in scope and synonymous in meaning to the usage of the term in Federal Rule of Civil Procedure 34(a), and includes writings,

2

drawings, graphs, charts, photographs, audio and video recordings, computer records, and any other data compilations from which information can be obtained.

3. "Internet" means a worldwide system of linked computer networks that use a common protocol (TCP/IP) to deliver and receive information. The "Internet" includes, but is not limited to, the following forms of electronic communication: file transfers, electronic mail, the World Wide Web, newsgroups, Internet Relay Chat, audio, and video.

4. "LEC" or "local exchange carrier" means the local telephone company from which a consumer or entity receives its telephone bill.

5. "Solicitation check" means any check that, if deposited or cashed by the consumer, signs the consumer up for any Internet-related goods or services, sold by Defendants.

6. "Web site" is a set of electronic documents, usually a home page and subordinate pages, readily viewable on computer by anyone with access to the Internet, standard software, and knowledge of the web site's location or address.

7. "Web page" is a single electronic file or document displayed on the World Wide Web that includes at least the following elements: copy, graphics, layout, and internal technical design.

3

8. "Internet-related Services" means any product or service that assists persons to access, use, browse, advertise on, communicate through, or do business on the Internet, including, but not limited to: design, hosting and maintenance of web pages and web sites, providing Internet access or e-mail accounts, and establishing domain names and virtual domain names.

9. "Receiver fees" means fees and costs incurred by the former Temporary Receiver, Lawrence J. Warfield, and his representatives, including attorneys and consultants.

## PROHIBITED CONDUCT

## I.

## INJUNCTION AGAINST MISREPRESENTATIONS

IT IS THEREFORE ORDERED that in connection with the advertising, promotion, offering for sale, sale or provision of any goods or service, Defendants are hereby permanently restrained and enjoined from making or assisting in the making of, expressly or by implication, orally or in writing, any false or misleading statement or representation of material fact, including, but not limited to, representations that:

A. Consumers can obtain a monetary rebate from Defendants without incurring any obligations to Defendants; and

B. Defendants have a prior or ongoing business relationship with consumers.

4

## II.

## INJUNCTION AGAINST USING REBATE CHECKS TO SOLICIT CUSTOMERS

**IT IS FURTHER ORDERED** that Defendants are hereby permanently restrained and enjoined from sending consumers any solicitation check that uses the term "rebate," or any term that represents that Defendants have a prior or ongoing relationship with consumers, if that is not the case.

## III.

## REQUIRED DISCLOSURES

**IT IS FURTHER ORDERED** that in connection with the advertising, promotion, offering for sale, sale or provision of any goods or service, Defendants are permanently restrained and enjoined from failing to disclose, clearly and conspicuously:

A.     On the front of any solicitation check, or on the front of any stub attached to the check, a statement that notifies the payee that the check is part of a "solicitation" or that by cashing the check, the payee will become obligated to pay for a good or service;

B.     On the back of the solicitation check, and above the endorsement line, a statement that notifies the payee of the amount and frequency of the charge that Defendants will impose if the payee deposits or endorses the check;

5

C.    In connection with any solicitation check that uses a "walking fingers" logo,

the statement in close proximity to the logo, in each place where the logo appears:

"Not affiliated with any local or long distance phone company", or "Not affiliated

with any phone company". *Provided however,* that if Defendants do in fact

become affiliated with any telephone company, in such statement, Defendants may

indicate the specific company affiliation as follows: "Affiliated with [name of

telephone company], but may not be affiliated with your phone company"; and

D.    In a letter or statement attached to or enclosed with the solicitation check,

all the material terms associated with depositing or endorsing the solicitation

check, including: 1) a statement that Defendants will impose a charge if the payee

deposits or endorses the check; 2) the amount, billing method, and frequency of

the charge; 3) a description of the goods or services provided for the charge; and 4)

an explanation of how to cancel and obtain a full refund within one hundred

twenty (120) days of depositing the check, including a customer service telephone

number for inquiries and/or cancellations.

## IV.

## REQUIRED CONFIRMATIONS AND CANCELLATIONS

IT IS FURTHER ORDERED that Defendants shall send all consumers

who deposit solicitation checks from Defendants after the date of this Order, a

written communication, sent by mail, confirming their agreement to purchase

6

Defendants' services. Defendants shall send this communication within eighty

(80) days after the date that a consumer deposited the solicitation check. The

communication shall clearly and conspicuously state: 1) the good or service

purchased; 2) the billing method and price; 3) the procedures for cancelling and

obtaining a full refund within one hundred twenty (120) days of depositing the

solicitation check; and 4) the name, address, and telephone number that will appear

on the consumer's Internet yellow page listing.

## V.

## CONSUMER NOTICES

**IT IS FURTHER ORDERED that:**

A.      YP.Net shall, within thirty (30) days of the entry of this Order, mail a

written notice and Refund Application, in the forms appended as Attachments A

and B to this Order, to all YP.Net's current customers that signed up for YP.Net's

services after April 1, 2000 by cashing a solicitation check sent before July 14,

2000.

B.      Consumers shall have forty-five (45) days from the date YP.Net sent the

notice to mail back a completed Refund Application, in the form appended as

Attachment B to this Order. YP.Net shall provide a pre-addressed envelope with

the notice and Refund Application.

C.      Within sixty (60) days of receiving refund requests, YP.Net shall issue to

7

each consumer the $25.00 refund referenced in Attachments A and B, provided that the consumer has not already received a refund.

D.     Within fifteen (15) days after they have mailed the notices, YP.Net shall submit an affidavit to the FTC, which shall, at a minimum, affirm the following: 1) the means used by Defendants to generate the list of consumers eligible to receive a notice; 2) the means used by Defendants to ensure that consumers' addresses are accurate; and 3) the number of notices sent and the dates on which they were sent.

E.     Within thirty (30) days after it has mailed the notices, YP.Net shall submit an affidavit to the FTC, which shall affirm the following: 1) the number of notices returned by the Post Office as undeliverable; and 2) with respect to any such returned notices, the reasonable efforts made by YP.Net, such as calling the telephone number that was billed or obtaining updated information through the U.S. Post Office or other national databases, to obtain valid addresses for those consumers and mail notices to such addresses.

F.     Within sixty (60) days of the issuance of the refunds YP.Net shall provide a report to the FTC describing the actions taken by YP.Net in compliance with this Section of the Order; the report shall also include a list of the names of consumers who received refunds, their addresses, and the amount of refunds they received, as well as the list of consumers who could not be contacted by mail or telephone. This report shall also contain a list of any customers whose refund request was

8

denied, and the reason for the denial.

## GENERAL REQUIREMENTS

### VI.

### Acknowledgment of Receipt of Order by Defendants

IT IS FURTHER ORDERED that, within five (5) business days after receipt by Defendants of this Order as entered by the Court, each Defendant shall submit to the Commission a truthful sworn statement, in the form shown on Attachment C to this Order, that shall acknowledge receipt of this Final Order.

### VII.

### Distribution of Order by Defendants

IT IS FURTHER ORDERED that, for a period of three (3) years from the date of entry of this Order, each Defendant shall:

A.     Provide a copy of this Order to, and obtain a signed and dated acknowledgment of receipt, or proof of service, from each officer, director, and each individual serving in a management capacity, whether designated as employees, consultants, independent contractors, or otherwise, immediately upon employing or retaining any such persons, for any business where:

(1) A Defendant is the majority owner of the business or directly or indirectly manages or controls the business, and where

(2) The business uses solicitation checks; and

9

B.  Maintain and upon reasonable notice, make available to representatives of

the Commission, the original signed and dated acknowledgments of the receipt, or

proof of service, of copies of this Order, as required in Subsection (A) of this

Paragraph.

### VIII.

### Record Keeping Provisions

IT IS FURTHER ORDERED that, for a period of three (3) years from the

date of entry of this Order, Defendants, in connection with any business where:

(1) A Defendant is the majority owner of the business or directly or

indirectly manages or controls the business, and where

(2) The business uses solicitation checks

are hereby restrained and enjoined from failing to create, and from failing to retain

for a period of three (3) years following the date of such creation, unless otherwise

specified:

A.  Books, records, and accounts that, in reasonable detail, accurately and fairly

reflect the cost of goods or services sold, revenues generated, and the disbursement

of such revenues;

B.  Records accurately reflecting: the name, address, and telephone number of

each person employed by such business, including independent contractors; that

person's job title or position; the date upon which the person commenced work;

10

and the date and reason for the person's termination, if applicable. The businesses subject to this Paragraph shall retain such records for any terminated employee for a period of two (2) years following the date of termination;

C.     Records containing the names, addresses, phone numbers, dollar amounts paid, quantity of items and services purchased, and description of the items and services purchased, for all consumers to whom such business sold, invoiced, or shipped any goods and services;

D.     Records that reflect, for every consumer complaint or refund request, received:

     1.  The consumer's name, street address, telephone number, and dollar amount paid by the consumer;

     2.  The complaint or refund request, if any, and the date of the complaint or refund request;

     3.  The basis of the complaint, if any, including the name of any salesperson complained against, and the nature and result of any investigation conducted concerning the complaint;

     4.  Each response by Defendant and the date of the response;

     5.  Any final resolution and the date of the resolution; and

     6.  In the event of a denial of a refund request, the reason for the denial; and

E.     Copies of all sales scripts, training materials, advertisements, or other

11

marketing materials used by Defendants; *provided* that copies of all sales scripts, training materials, advertisements, or other marketing materials utilized shall be retained for three (3) years after the last date of dissemination of any such materials.

## IX.

### Compliance Reporting by Defendants

IT IS FURTHER ORDERED that, in order that compliance with the provisions of this Order may be monitored:

A.   For a period of three (3) years from the date of entry of this Order, each Defendant shall notify the Commission of the following:

1. Any changes in Defendant's business address, mailing addresses, and telephone numbers, within twenty (20) days of the date of such change;

2. Any changes in the employment status (including self-employment) of any individual Defendant, within ten (10) days of such change. Such notice shall include the name and address of each business that the individual Defendant is employed by, or operates, a statement of the nature of the business, and a statement of the individual Defendant's duties and responsibilities in connection with the business or employment;

3. Any change in the structure of each Defendant, such as creation, incorporation, dissolution, assignment, sale, merger, dissolution of

12

subsidiaries, filing of a bankruptcy petition, or change in the corporate name or address, or any other change that may affect compliance obligations arising out of this Order, within thirty (30) days of the effective date of any change;

B.    Within one hundred eighty (180) days after the date of entry of this Order, each Defendant shall provide a written report to the FTC, sworn to under penalty of perjury, setting forth in detail the manner and form in which it has complied and is complying with this Order.  This report shall include, but not be limited to:

1. Each individual Defendant's then current employment and business address, mailing addresses, and telephone numbers; the individual Defendant's title and responsibilities for each such employer or business;

2. Each corporate Defendant's then current business addresses and telephone numbers, a description of the business activities of each such employer or business, including a description of its marketing methods and goods and services sold, and a list of the names of all current officers and managers;

3. A copy of each acknowledgment of receipt of this Order obtained by each Defendant pursuant to Section VII of this Order;

4. A statement describing the manner in which each Defendant has complied and is complying with this Order;

13

C.    Upon written reasonable request by a representative of the Commission,

each Defendant shall submit additional written reports (under oath, if requested)

and produce documents on fifteen (15) days notice with respect to any conduct

subject to this Order;

D.    For the purposes of this Order, each Defendant shall, unless otherwise

directed by the Commission's authorized representatives, mail all written

notifications to the Commission to:

> Associate Director
> Division of Marketing Practices
> Federal Trade Commission, Room 238
> 600 Pennsylvania Avenue, N.W.
> Washington, D.C.  20580
> Re: FTC v. YP.Net, Inc., et al., CV- No. 00-1210 PHX SMM

E.    For purposes of the compliance reporting required by this Paragraph, the

Commission is authorized to communicate directly with Defendants unless or until

a Defendant informs the Commission that the Defendant is represented by counsel

and would prefer that the Commission communicate directly with the Defendant's

counsel.

## X.

### Commission's Authority to Monitor Compliance

IT IS FURTHER ORDERED that the Commission is authorized to

monitor Defendants' compliance with this Order by all lawful means, including,

14

but not limited to, the following:

A.     For a period of three (3) years from the date of entry of this Order, the Commission is authorized, without further leave of court, to obtain discovery from any person in the manner provided by Chapter V of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 26-37, and the Local Rules of this Court, including the use of compulsory process pursuant to Fed. R. Civ. P. 45, for the purpose of monitoring Defendants' compliance with any provision of this Order;

B.     The Commission is authorized to use representatives posing as consumers or suppliers to Defendants, Defendants' employees, or any other entity managed or controlled in whole or in part by Defendants, without the necessity of identification or prior notice, as allowed by federal law; and

C.     Nothing in this Order shall limit the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49 and 57b-1, to determine whether Defendants have violated any provision of this Order or Section 5 of the FTC Act, 15 U.S.C. § 45.

## XI.

### Access to Business Premises

**IT IS FURTHER ORDERED** that, for a period of three (3) years from the date of entry of this Order, for the purpose of further determining compliance with this Order, Defendants shall permit representatives of the Commission, within four

15

(4) business days of receipt of written notice from the Commission:

A.    Access during normal business hours to any office, or facility storing

documents, of any business where:

> (1) A Defendant is the majority owner of the business or directly or
>
> indirectly manages or controls the business, and where
>
> (2) The business uses solicitation checks.

In providing such access, Defendants shall permit representatives of the

Commission to inspect and copy all unprivileged documents relevant to any matter

contained in this Order; and shall permit Commission representatives to remove

such documents relevant to any matter contained in this Order for a period not to

exceed two (2) business days so that the documents may be inspected, inventoried,

and copied; and

B.    To interview the owners, officers, directors, and employees, including all

personnel involved in responding to consumer complaints or inquiries, and all

sales personnel, whether designated as employees, consultants, independent

contractors or otherwise, of any business to which Subsection (A) of this

Paragraph applies, concerning matters relating to compliance with the terms of this

Order. The person interviewed may have counsel present, and counsel for

Defendants may be present as well.

16

## XII.

## COMPENSATION OF RECEIVER: RETURN OF DOCUMENTS

**IT IS FURTHER ORDERED** that:

A.    All Receiver fees, allowed by the Court, shall be paid by Defendant YP.Net.

B.    The Receiver shall return to Defendants all documents removed from

Defendants' premises, and any copies thereof.

## XIII.

## EXONERATION OF BOND

**IT IS FURTHER ORDERED** that the bond posted by Defendant Crane

pursuant to the Preliminary Injunction is hereby exonerated.

## XIV.

## COSTS

**IT IS FURTHER ORDERED** that each party shall bear its own costs and

attorneys' fees incurred in connection with this action.

## XV.

## RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of

this matter for the purpose of enabling the parties to apply to the Court at any time

for such further orders and directives as may be necessary or appropriate for the

interpretation or modification of this Order, for the enforcement of compliance

17

therewith, or for the punishment of violations thereof.

## XVI.

## <u>COMPLETE SETTLEMENT</u>

The parties hereby consent to entry of the foregoing Order which shall

constitute a final judgment and order in this matter.  The parties further stipulate

and agree that the entry of the foregoing Order shall constitute a full, complete and

final settlement of this action.   Defendants waive any rights they may have under

the Equal Access to Justice Act, 28 U.S.C. § 2412.

SO ORDERED, this 26 day of July, 2000, at 10:40 am,
Phoenix, AZ.

_____
United States District Judge

FOR  DEFENDANTS                          FOR THE COMMISSION

_Angelo Tullo_ chairman           _Mark P. Mora_

Angelo Tullo                                     Tracey L. Brown
Chairman of the Board                     Michael P. Mora
for Defendant YP.Net, Inc               Attorneys for the Plaintiff
                                                          Federal Trade Commission

18

George L. Paul
Randy Papetti
Counsel for Defendant YP.Net

Daniel Madero
Director of Operations
for Defendant Telco Billing, Inc.

George L. Paul
Randy Papetti
Counsel for Defendant Telco Billing, Inc.

Allen B. Bickart
for Defendant Publication Management, Inc.

Defendant William D. O'Neal

Tyrell Taber
Counsel for William D. O'Neal

Defendant Gregory B. Crane

Burton M. Bentley
Counsel for Gregory B. Crane

19

**ATTACHMENT A**

**YELLOW-PAGE.NET CUSTOMER NOTICE**

Re:    Billing for Yellow-Page.Net Internet yellow page services.

Date:

Dear Advertiser:

As a Yellow-Page.Net customer, you are currently being billed $12.50 a month by Yellow-Page.Net for your Internet yellow page preferred listing either on your telephone bill or by direct invoice. Concerns have been raised about whether customers intended to sign up for our services or were signed up by an unauthorized representative of your company. We are, therefore, writing to ensure that you (or a representative of your company or organization) previously authorized charges for our services.

According to our records, we mailed you a promotional Instant Cash Rebate Sign Up Check. When the check was deposited, we began to bill you. If, however, your company or organization did not knowingly authorize these charges, you may be eligible for a $25.00 refund. If you would like to submit a refund request, please complete the Refund Application and Declaration. Submitting a Refund Application and Declaration will cancel your Yellow-Page.Net listing, and prevent future charges from appearing on your telephone bill.

We apologize for this notice, but want to ensure that you are one of our satisfied customers. If you have any questions about this notice or would like to discuss our many services, please call our Customer Service Center at 1-800-300-3209 or visit our Web site at www.YP.Net.

Thanks.

_____

Yellow-Page.Net
4840 East Jasmine Street
Mesa, Arizona 85205

20

## ATTACHMENT B

## CUSTOMER REFUND APPLICATION AND DECLARATION

In order to obtain any refund for Yellow-Page.Net's services please complete the declaration below:

I, _____, hereby state and affirm as follows:
      [Name]

1.　My name is (please print) _____, I hold
　　the title of_____ at the company or organization of
　　_____, which has been charged for Yellow-Page.Net services.

2.　The charges to date total $_____.

3.　The charges date from_____ to _____.

4.　The charges appeared on bills for phone number:(     )_____-_____.

5.　My company or organization has not been issued a refund from Yellow-Page.Net,
　　or its telephone company.

6.　My company or organization would like to terminate any relationship with
　　Yellow-Page.Net, stop any future billing, and obtain a refund of $25.00.

7.　The individual at my company or organization who cashed the promotional
　　Instant Cash Rebate - Sign Up Check from Yellow-Page.Net did not know that
　　doing so signed the company up for Yellow-Page.Net's services or was
　　unauthorized to act on behalf of my company or organization.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____　　　DATED this ___ day of _____,2001.

[Signature]

Address:_____　　　Contact Phone No.: (   )____-_____
　　　　_____　　　Contact Fax No.:    (   )____-_____
　　　　_____　　　Contact E-mail:    _____

21

## ATTACHMENT C

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA, PHOENIX DIVISION

|  |  |
|---|---|
| Federal Trade Commission, | ) CV- No. 00-1210 PHX SMM |
| Plaintiff, | ) **DECLARATION OF** |
| v. | ) **DEFENDANT** |
| YP.Net, Inc., et al., | ) |
| Defendants. | ) |

I, _____, hereby state and affirm as follows:
[Name]

1.    My name is _____, and I am a

defendant in FTC v. YP.Net, Inc., et al., which has been filed in the District of Arizona.

2.    On _____, I received a copy of the Order, which was

signed by the Honorable _____ and entered by the Court on _____

_____ 2001.

A true and correct copy of the Order I received is appended to this Declaration.

I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct.

_____
Signature

22

# In The Matter Of:

## FEDERAL TRADE COMMISSION   v. CYBERSPACE.COM, LLC. ET AL.

---

## LUCINDA SCHOOMER
### January 30, 2002

---

*For The Record, Inc.*
*Court Reporting and Litigation Support*
*603 Post Office Road*
*Suite 309*
*Waldorf, MD  USA  20602*
*(301) 870-8025    FAX: (301) 870-8333*

Original File 20130SCH ASC, 133 Pages
Min-U-Script® File ID 0387192754

## Word Index included with this Min-U-Script®

FEDERAL TRADE COMMISSION v.
CYBERSPACE.COM, LLC, et al.
Case 2:00-cv-01806-RSL   Document 124   Filed 03/07/02   Page 29 of 184
LUCINDA SCHOOMER
January 30, 2002

**Page 1**

[1]         UNITED STATES DISTRICT COURT
[2]     FOR THE WESTERN DISTRICT OF WASHINGTON
[3]         CASE NO  COO-1806
[4]
[5] FEDERAL TRADE COMMISSION,          )
[6]             Plaintiff,             )
[7]     vs                            )
[8] CYBERSPACE COM, LLC, FRENCH DREAMS, )
[9] COTO SETTLEMENT, ELECTRONIC PUBLISHING )
[10] VENTURES, LLC  OLYMPIC TELECOMMUNICATIONS, )
[11] INC , IAN EISENBERG  and CHRIS HEBARD  )
[12]             Defendants            )
[13]         Wednesday, January 30, 2002
[14]
[15]     8425 Woodfield Crossing Boulevard
[16]     Suite 500
[17]     Indianapolis, Indiana
[18]
[19]
[20]
[21] The above-entitled matter came on for deposition
[22] pursuant to notice at 2 00 p m
[23]
[24]
[25]

**Page 2**

[1]             APPEARANCES
[2]
[3] FOR THE PLAINTIFF
[4]
    Mr  Brad Winter
[5] Federal Trade Commission
    600 Pennsylvania Avenue, N W
[6] Suite 238
    Washington, DC  20580
[7] (202) 326-2597
[8]
    FOR THE DEFENDANTS French Dreams
[9] and Ian Eisenberg
[10]
    Ms  Kathryn S  Diemer
[11] Campeau Goodsell Diemer
    a Law Corporation
[12] 38 West Santa Clara Street
    San Jose, California  95113
[13] (408) 295-9555
[14]
    FOR THE DEFENDANTS COTO Settlement
[15] and Chris Hebard
[16]
    Mr  Ernest Leonard
[17] Friedman & Feiger
    5301 Spring Valley Road
[18] Suite 200
    Dallas, Texas  75240
[19] (972) 788-1400
[20]
[21]
[22]
[23]
[24]
[25]

**Page 3**

[1]     FEDERAL TRADE COMMISSION
            INDEX
[2]
[3] Plaintiff's Exhibit 21          .  6
    Renotice of Depositions
[4]
    Plaintiff's Exhibit 22          .. 9
[5] Subpoena
[6] Plaintiff's Exhibit 23          14
    accounts payable slip, purchase order, phone bill
[7] Pages CLS-0015019  CLS-0015015, CLS-0015017,
    CLS-0015029, CLS-0015018
[8]
    Plaintiff's Exhibit 24          38
[9] letter to the Better Business Bureau
    Pages CLS-0015001, CLS -0015002
[10]
    Plaintiff's  Exhibits 25 and 26      46
[11] letter to the Better Business Bureau
    Pages E 0024585  E 0024586
[12] letter to the Better Business Bureau
    Pages H-0008140, H-0008141
[13]
    Defendants' Exhibit 27          ..57
[14] beginning with a sample type check
    Pages CS 00024, CS 00025, CS 00026, CS 00027,
[15] CS 00028
[16]
            EXAMINATION BY
[17]
[18] MR  WINTER            7
[19] MR  LEONARD          .   50
[20] MS  DIEMER           81
[21] MR  WINTER           113
[22] MR  LEONARD          114
[23] MR  WINTER           126
[24] MS  DIEMER           127
[25] MR  LEONARD          128

Page 4

[1]                    **PROCEEDINGS**

[2]

[3]      Whereupon,

[4] LUCINDA SCHOOMER,

[5] a witness, called for examination, having been

[6] first duly sworn, was examined and testified as

[7] follows

[8]      **MR. WINTER:** Good morning

[9]      **MS. SCHOOMER** Good morning

[10]     **MR. WINTER:** We're here pursuant to a third-

[11] party subpoena in FTC versus Cyberspace com, LLC,

[12] French Dreams, COTO Settlement. Electronic

[13] Publishing Ventures, LLC, Olympic Telecommunications,

[14] Inc , Ian Eisenberg and Chris Hebard in

[15] the United States District Court for the Western

[16] District of Washington, C00-1806.

[17]     My name is Brad Winter, I represent the Federal

[18] Trade Commission, the plaintiff in this matter I

[19] note for the record that defense counsel have not

[20] appeared for this deposition  Ms  Schoomer, what

[21] time do you currently have?

[22]     **MS. SCHOOMER.** 2 10 p m , Eastern Standard

[23] Time

[24]     **MR. WINTER·** At this time I'd like to recess

[25] the deposition briefly to allow you to check with

Page 5

[1] your reception out front and make sure that defense

[2] counsel is not waiting for us  Can we go off the

[3] record? Thank you

[4]     (A brief recess was taken )

[5]     **MR WINTER·** Ms  Schoomer, have you had an

[6] opportunity to check with reception for defense

[7] counsel?

[8]     **MS. SCHOOMER:** Yes, I have, and they've not

[9] arrived

[10]     **MR. WINTER.** I note for the record that this

[11] deposition was noticed pursuant to a Notice of

[12] Deposition that was initially issued on January the

[13] 15th calling for this deposition to begin today,

[14] January the 30th, commencing at 2 00 PM

[15]     The deposition was then renoticed, the schedule

[16] was changed at the request of defense counsel, such

[17] that two other depositions were moved earlier in

[18] time  The time for this deposition remains

[19] unchanged, but one consequence of defense counsel's

[20] request to move up this deposition is that I don't

[21] have the luxury of waiting any longer for counsel

[22] to appear  I'd like to go off the record just

[23] briefly again

[24]     (A brief recess was taken )

[25]     **MR. WINTER:** We've just recessed briefly and

Page 6

[1] I've made a courtesy phone call to my office and

[2] the two lead attorneys on this case have conferred

[3] and neither of them have heard from defense counsel

[4] with any indication that they would be delayed in

[5] arriving at this deposition

[6]     A few moments ago, before we recessed the

[7] deposition, I made reference to the *Renotice of*

[8] *Deposition* that had been previously circulated

[9] I'd now like to have that marked and introduced on

[10] the record

[11]     (Plaintiff's (Schoomer) Exhibit 21 was marked

[12] for identification.)

[13]     **MR WINTER·** Exhibit No  21 has now been

[14] marked  It is captioned a "Renotice of Deposition"

[15] and notes in part that this deposition will occur,

[16] quote, on January 30th, 2002, commencing at 2 00

[17] p m. with Lucinda Schoomer at First DataBank, Inc ,

[18] Suite 500, 8425 Woodfield Crossing Boulevard,

[19] Indianapolis, Indiana 46240  Ms  Schoomer, is

[20] that the address where we are currently

[21]     **MS. SCHOOMER**  Yes, it is

[22]     **MR WINTER.** And what is today's date?

[23]     **MS. SCHOOMER:** January 30th, 2002.

[24]     **MR. WINTER:** What time do you have?

[25]     **MS. SCHOOMER.** 2:15 p.m., Eastern Standard

Page 7

[1] Time.

[2]     **MR. WINTER**  Thank you, Ms  Schoomer, for

[3] agreeing to appear

[4]                    **EXAMINATION**

[5]                    **BY MR. WINTER.**

[6]     **Q** Could you please now state your full name for

[7] the record?

[8]     **A:** Lucinda Schoomer

[9]     **Q:** In 1999 were you using a different last name?

[10]     **A:** Yes, I was using the name Broaddus

[11]     **Q:** Who was your employer in 1999?

[12]     **A·** First DataBank

[13]     **Q·** And today are you still employed by First

[14] DataBank?

[15]     **A** Yes, I am

[16]     **Q·** In 1999 was First DataBank selling a product

[17] line called Medi-Span, Inc?

[18]     **A.** Yes

[19]     **Q:** Was one of your company's phone numbers (317)

[20] 469-5200?

[21]     **A:** Yes, it was

[22]     **Q:** Are you here today to testify about your

[23] company's relationship as a consumer with

[24] Cyberspace?

[25]     **A.** Yes.

Page 8

[1]     Q. Here are a couple of ground rules for the
[2] deposition as we proceed As a deposition we'll
[3] have an exchange of questions and answers
[4] Generally I'll ask the questions and you can answer
[5] the questions
[6]     We have a court reporter here, as you can see
[7] Because she's recording in written form the answers
[8] that you give, I will ask that you verbalize your
[9] answers such that a nod of the head also needs a
[10] "yes" or a "no" along with it so that she has a
[11] written record of your response
[12]     Similarly, it's difficult, I suspect, for her
[13] to record two of us talking at once, so I'll ask
[14] her to let us know if she has trouble getting down
[15] what we're saying and I'll ask you to let me finish
[16] my questions before you begin with your answer
[17]     If at any time I ask a question which you don't
[18] understand, please tell me and I'll ask a better
[19] one Similarly, if I ask a question and you answer
[20] it, I'm going to assume that you understood it, is
[21] that fair?
[22]     A  Yes
[23]     Q. Let me know if you'd like to take a break and
[24] we'll take one at the next opportunity I'll
[25] expect that we'll take at least one break during

Page 9

[1] the deposition but that depends in part on how
[2] things go today
[3]     MR  WINTER· I'm going to ask the court
[4] reporter to mark the next exhibit in today's
[5] deposition The exhibits are continuing from a
[6] previous deposition and this I believe will be
[7] Exhibit No  22 (Schoomer), which is the subpoena
[8] and notice in this action
[9]     (Plaintiff's (Schoomer) Exhibit 22 was marked
[10] for identification )
[11]     Q: I'm handing you what's been marked as Exhibit
[12] No  22 (Schoomer) Do you recognize this document?
[13]     A  Yes, this is the subpoena that you sent
[14]     Q  Do you see that the subpoena requests you
[15] appear for a deposition at First DataBank on
[16] Wednesday, January 30th, at 2 00 p m ?
[17]     A. Yes
[18]     Q· And are you appearing today pursuant to that
[19] subpoena?
[20]     A  Yes, I am
[21]     Q  And, once again, what date and time is it right
[22] now?
[23]     A  It is 2 20 p m , Eastern Standard Time, on
[24] January 30th, 2002
[25]     Q  Do you see that the subpoena also requests for

Page 10

[1] you to produce certain documents?
[2]     A: Yes
[3]     Q: Are the documents that you are producing in
[4] response to the subpoena the copies that you have
[5] sent already to my office?
[6]     A: Yes, they are
[7]     Q. Thank you
[8]     MR. WINTER: For the record I note that the
[9] witness is also making available today the
[10] originals for inspection by those who attend
[11] today's deposition
[12]     Q. Let's move back in time to 1999
[13]     A  Okay
[14]     Q  What was your job title in 1999?
[15]     A· Facility manager
[16]     Q: Is that your job title today?
[17]     A· Yes, it is
[18]     Q: How many years have you had the functions of a
[19] facility manager?
[20]     A· Twelve years
[21]     Q· What are your duties as a facility manager?
[22]     A. I administrate the phone system. I am in
[23] charge of all construction and furniture changes.
[24] I manage the mailroom I do purchasing of all
[25] supplies and equipment other than computer

Page 11

[1] equipment  I'm in charge of all service matters
[2] related to the building and any equipment. I
[3] manage the mailroom and I manage the reception
[4] function
[5]     Q· As a part of your management of the mailroom do
[6] you supervise the employees in the mailroom?
[7]     A· Yes
[8]     Q· Are you familiar with the operation of the
[9] mailroom by virtue of your role as facility
[10] manager?
[11]     A· Yes
[12]     Q: You also mentioned that your duties include
[13] supplies and equipment, did I get that right?
[14]     A· Yes
[15]     Q· As a part of managing supplies and equipment do
[16] you work with accounts receivable?
[17]     A· Very closely
[18]     Q  As facility manager do you work with accounts
[19] payable?
[20]     A· Yes, very much
[21]     Q: Let's take each of these in turn
[22]     A. Yes
[23]     Q: As facility manager can you describe briefly
[24] the business process when a check is received in
[25] the mail?

Page 12

[1] A. All of the checks are sorted from the incoming
[2] mail when it arrives first thing in the morning
[3] Those checks are then given to an accounts
[4] receivable clerk who logs them in. Most checks
[5] have a customer's account number that are
[6] associated with it and that is logged Any checks
[7] that aren't customer related go in on a separate
[8] deposit and are deposited before I believe it's
[9] noon of that day
[10] If they receive a check that they don't know
[11] the association, such as a rebate or a refund of
[12] some type, they'll deposit it, make a copy of it,
[13] and then work internally to determine where to
[14] apply the funds
[15] Q. You mentioned rebates and refunds Does the
[16] mailroom routinely receive rebate and refund
[17] checks?
[18] A: In 1999 that was fairly common
[19] Q. In 1999 about how many checks did the mailroom
[20] receive a day, I'm just asking about an order of
[21] magnitude here, tens, hundreds?
[22] A If it's a Monday it could be a hundred checks
[23] By Friday it could be as few as 30
[24] Q: Based on your perspective as the facility
[25] manager how are bills paid here at First DataBank,

Page 13

[1] how were they paid in 1999?
[2] A If you need to spend company money, you must
[3] first generate a purchase order A purchase order
[4] has to be signed by someone who has authority to
[5] spend money in the appropriate account Once that
[6] purchase order's approved, then you can work with
[7] the company that you're purchasing from to obtain
[8] whatever product or service you're seeking
[9] When you have received that service or product
[10] you sign off on the purchase order indicating what
[11] you've received, the date you received it, and that
[12] purchase order then goes back to the finance
[13] department and they know when the bill comes in
[14] that it's approved to go ahead and pay the bill
[15] Q: As facility manager do you sometimes receive
[16] copies of the purchase orders to approve?
[17] A. Yes, in fact I've generated quite a few of
[18] those purchase orders myself
[19] Q. And after you generate a purchase order do you
[20] sometimes also receive then the bills to
[21] individually approve?
[22] A: The bills would go directly to the accounts
[23] payable department If the amount didn't match
[24] what I had indicated on the purchase order, then
[25] they would forward it to me for approval

Page 14

[1] MR. WINTER: I'll ask the court reporter to
[2] mark the next exhibit, which will be Exhibit 23
[3] (Schoomer), which is a multipage document
[4] (Plaintiff's (Schoomer) Exhibit 23 was marked
[5] for identification )
[6] Q: I'm now handing you what's been marked as
[7] Exhibit No 23 (Schoomer), a multipage document
[8] The first page, CLS-0015019, is an accounts payable
[9] slip, the second page, CLS-15015, is a purchase
[10] order, and the last part, CLS-15017, CLS-15029, and
[11] CLS-15018 are a phone bill Do you recognize the
[12] pages in this document?
[13] A: Yes, I do
[14] Q. Did I just describe them accurately?
[15] A: Yes, you did
[16] Q. Are the pages in Exhibit 2 organized the way
[17] they were when you first saw this document back in
[18] 1999?
[19] A: I'm not sure I understand, "Exhibit 2"?
[20] Q: I'm sorry, let me clarify that question Are
[21] the pages in Exhibit 23 organized the way they were
[22] when you first saw this document back in 1999?
[23] A. Yes, they are
[24] Q: Starting with the first page, CLS-0015019, of
[25] Exhibit 23 (Schoomer), do you recognize this page?

Page 15

[1] A Yes, I do
[2] Q· What is it?
[3] A. It's an accounts payable slip Did you want me
[4] to describe what it is?
[5] Q: My first question about the accounts payable
[6] slip would be who prepared this accounts payable
[7] slip?
[8] A. The slip was prepared by our accounts payable
[9] clerk and her name is Theresa Davis
[10] Q· When did Theresa Davis prepare this slip?
[11] A: On October 27th, 1999
[12] Q· Was the slip prepared at or near the time the
[13] events that it discusses?
[14] A: What events are you referring to?
[15] Q: What does the slip discuss?
[16] A: The slip says that there are additional charges
[17] on our phone bill that she does not understand and
[18] she is asking for me to approve payment of those
[19] charges
[20] Q: Which phone bill is Theresa Davis talking about
[21] in her accounts payable slip?
[22] A: She's referring to the phone bill for October
[23] Q: And what again is the date of this slip?
[24] A: The date on the accounts payable slip is
[25] October 27th, 1999

Page 16

[1] Q: So was the accounts payable slip prepared in
[2] the same month as the phone bill that she's raising
[3] a question about?
[4] A: Yes
[5] Q Was this accounts payable slip prepared in the
[6] regular course of business?
[7] A I m not sure I understand what you're asking
[8] Q Was it a part of Theresa Davis's job to prepare
[9] the accounts payable slip that you have?
[10] A Yes
[11] Q Are accounts payable slips prepared in the
[12] ordinary course of business of First DataBank?
[13] A She uses these when she needs to send a
[14] purchase order or other correspondence back to a
[15] department with a question about an invoice
[16] Q: Does Theresa Davis send you accounts payable
[17] slips such as that found on the first page of
[18] Exhibit 23 regularly or routinely?
[19] A Routinely under given circumstances, yes
[20] Q As a part of your job as facility manager have
[21] you seen other accounts payable slips other than
[22] this one shown on the first page of Exhibit 23?
[23] A Yes, I have
[24] Q Have you seen many of them?
[25] A Yes

Page 17

[1] Q Directing your attention to the second page of
[2] Exhibit 23, the purchase order, who prepared this
[3] document?
[4] A I prepared this document
[5] Q When did you prepare it?
[6] A I prepared this in January of '99 This is a
[7] standing purchase order Standing purchase orders
[8] are created in the first fiscal month of the year
[9] and they indicate that we will be receiving a bill
[10] on a continuing basis for a specified period of
[11] time for example a monthly bill like our local
[12] phone service that we're going to get every month
[13] would be assigned a standing PO acknowledging that
[14] we are expecting to receive twelve or a year's
[15] worth of billing on this one purchase order so that
[16] we're not writing a purchase order every time we
[17] receive an invoice
[18] Q. Directing your attention to a part of the
[19] second page of Exhibit 23 (Schoomer), which is also
[20] CLS-0015015, it says "total" and bears some
[21] initials Do you recognize these initials or the
[22] writing there?
[23] A You mean where it says "okay to pay"?
[24] Q Do you recognize that writing?
[25] A Yes, that's my handwriting

Page 18

[1] Q: And when did you complete that writing? Was
[2] that also in January or was that at a later date?
[3] A: No, that was in it looks like the date is
[4] November 30th of '99
[5] Q: So is it fair to say that you complete the top
[6] part of the purchase order at the beginning of the
[7] year for each of the twelve months and then you
[8] customize that form by filling it in with the
[9] details of each particular month?
[10] A Yes You can see where the accounts payable
[11] person has Xd out the "$1,426" and written in the
[12] actual amount that that month's bill was
[13] Q: For what month does this particular purchase
[14] order apply?
[15] A: This is October of 1999
[16] Q: Do you prepare purchase orders such as this one
[17] in the ordinary course of your business at First
[18] DataBank?
[19] A. Yes
[20] Q Directing your attention to the remaining pages
[21] of Exhibit 23 (Schoomer), these are pages
[22] CLS-15017, CLS-15029, and CLS-15018, do you
[23] recognize these pages?
[24] A Yes, this is our monthly Ameritech bill
[25] Q. When was this Ameritech bill prepared?

Page 19

[1] A: The billing date is listed as October 19th of
[2] 1999
[3] Q. And what are the dates of the events described
[4] in the bill?
[5] A It's for service provided September 20th
[6] through October 19th, 1999
[7] Q Does the bill reflect information specific to
[8] First DataBank?
[9] A: Yes, it does
[10] Q: What type of information is that?
[11] A: All charges related to our long-distance
[12] service, including information, any applicable
[13] taxes, charges for all of the trunks that we
[14] carry
[15] Q Why does First DataBank receive these bills
[16] from Ameritech?
[17] A. Because Ameritech provides us with a local dial
[18] tone and a number of trunks for calling in and out
[19] Q. What's the purpose of the phone bill in
[20] relation to these services that Ameritech provides?
[21] A: I'm not sure I understand your question
[22] Q. Why does Ameritech send you a bill?
[23] A: Because they've provided us with a service and we
[24] are now paying them for the service they provided
[25] Q: Are the Ameritech bills kept by First DataBank

Page 20

[1] in the ordinary course of business?

[2] **A:** Yes, they are

[3] **Q:** Was the Ameritech phone bill incorporated in

[4] with your company's business records as it's shown

[5] here in Exhibit No 23?

[6] **A.** Yes

[7] **Q:** Does First DataBank rely on the information

[8] presented in the phone bill as accurate?

[9] **A.** Yes

[10] **Q.** Does First DataBank have a financial interest

[11] in assuring the accuracy of the phone bill?

[12] **A:** We're trusting Ameritech to give us a very

[13] accurate phone bill, yes

[14] **Q:** Is it a part of your job to review the phone

[15] bills from Ameritech for accuracy?

[16] **A.** Yes

[17] **Q.** Do you find that the phone bills are usually

[18] accurate?

[19] **A** Yes

[20] **Q** To the best of your knowledge is this phone

[21] bill attached as a part of Exhibit No 23

[22] (Schoomer) accurate aside perhaps from the

[23] reference to the billing by Cyberspace?

[24] **A** Yes

[25] **Q:** In a few minutes you can discuss in detail what

Page 21

[1] you did with these documents Right now I want to

[2] skip forward and ask you what you did with them

[3] after you were finished using them?

[4] **A.** Theresa Davis sent me the purchase order with

[5] the accounts payable slip She was asking for a

[6] variance approval on the white copy I signed

[7] "okay to pay," my initials and "November 30th,

[8] 1999," and then I sent the entire group of papers

[9] back to her

[10] **Q.** So is it correct that you sent all of the pages

[11] in what's now Exhibit 23 (Schoomer) to Theresa

[12] Davis?

[13] **A:** Yes, I did

[14] **Q** Did you also provide all of the pages which now

[15] comprise Exhibit 23 (Schoomer) in response to the

[16] subpoena?

[17] **A.** Yes, I did.

[18] **Q:** How did you collect the pages which are now

[19] Exhibit 23 (Schoomer) to produce them in response

[20] to the subpoena?

[21] **A.** I asked Theresa Davis to help me find these

[22] records in our 1999 fiscal year files

[23] **Q·** Are you personally familiar with the 1999

[24] fiscal files?

[25] **A:** Yes, I am

Page 22

[1] **Q:** Where did you retrieve these documents that

[2] comprise Exhibit 23 (Schoomer)?

[3] **A.** They had been boxed for off-site storage and

[4] they were in the box marked "A "

[5] **Q:** Were they in the files for 1999?

[6] **A·** Yes

[7] **Q:** Did you personally retrieve these documents

[8] from the files?

[9] **A** Yes, I did

[10] **Q** Do you recognize these documents in Exhibit 23

[11] (Schoomer) as the same documents that you sent to

[12] Theresa Davis back in 1999?

[13] **A:** Yes

[14] **Q:** Are the pages in Exhibit 23 originals or are

[15] they photocopies?

[16] **A.** They're photocopies

[17] **Q·** Who made the photocopies?

[18] **A.** I photocopied the originals and sent them to

[19] the FTC.

[20] **Q·** In response to the subpoena?

[21] **A.** In response to the subpoena, yes

[22] **Q** Okay At the time that you made the

[23] photocopies did the photocopy machine appear to be

[24] functioning properly?

[25] **A.** Yes

Page 23

[1] **MR. WINTER.** I note again for the record that

[2] the witness has also made the originals available

[3] for inspection to any present at this deposition

[4] **Q:** Do you remember seeing the originals that you

[5] sent to Theresa back in 1999?

[6] **A** Yes

[7] **Q:** Have you had an opportunity to look at the

[8] photocopy that's now been labeled as Exhibit 23

[9] (Schoomer)?

[10] **A:** Yes, I have

[11] **Q:** To the best of your belief is the photocopy a

[12] true and accurate reproduction of the original?

[13] **A:** Yes

[14] **Q:** The next topic is to discuss now the content of

[15] Exhibit No 23 Why did you initially receive

[16] Exhibit 23?

[17] **A·** Why did I receive this from Theresa Davis?

[18] **Q:** My question is back in 1999 you received

[19] Exhibit 23 from Theresa Davis and now I'm asking

[20] you about the circumstances

[21] (Telephone rings )

[22] **MR. WINTER:** Can we go off the record?

[23] (2 42 p m )

[24] (A brief recess was taken )

[25] (3 05 p m )

Page 24

[1]   MR WINTER· We are back on the record and
[2] we ve been joined by defense counsel I'll ask
[3] that they identify themselves for the record
[4]   MS DIEMER: My name is Kathryn Diemer, Campeau
[5] Goodsell & Diemer, and I represent Ian Eisenberg
[6] and French Dreams.
[7]   MR. LEONARD. And this is Ernest Leonard
[8] representing Chris Hebard and COTO Settlement
[9] Trust And, counsel, just to get it clear, we have
[10] an agreement that going forward any objections will
[11] be waived other than form and responsiveness? That
[12] may be what the 9th Circuit requires but I'd like
[13] to get that agreement on the record
[14]   MS. DIEMER  I may be wrong, but as probably
[15] the only 9th Circuit attorney out here, I can just
[16] assure you that that's true, but I'm happy to enter
[17] into such a stipulation, and I do regularly
[18] practice in the 9th Circuit
[19]   MR. WINTER  I'm not sure we can make that
[20] agreement in part because after you joined us we
[21] gave you the opportunity to review the transcript
[22] and at least one of you mentioned interposing an
[23] objection in a part of the transcript that had
[24] already passed, I believe it was on Page 24
[25]   MR LEONARD: No, I said going forward

Page 25

[1]   MR WINTER. Right, and so my first question is
[2] was that objection made retroactively back on Page
[3] 24?
[4]   MS DIEMER  I'm asking that that objection be
[5] made
[6]   MR WINTER  Okay
[7]   MS DIEMER: I am asking that it be done  In
[8] my opinion starting a deposition without other
[9] counsel, without making sure — and I understand
[10] that there was difficulty here because you didn't
[11] necessarily know which office to call, or whatever,
[12] but you know, there's a due process issue when you
[13] have indications that other counsel will be here
[14] and that you knew people were flying from other
[15] places and there might be some difficulties, and I
[16] understand that there's a tight schedule, but on
[17] the other hand, I would ask that that objection be
[18] interposed
[19]   It's my belief that there's no need to make
[20] such a stipulation  I don't think a stipulation
[21] going forward would — the fact that I made an
[22] objection or wish to make an objection would have
[23] any effect on our stipulation right, left or
[24] center, but I'm happy to address that issue if you
[25] have a question

Page 26

[1]   MR. LEONARD: I just want to make sure that by
[2] agreement we're not going to be waiving any
[3] objections other than form and responsiveness going
[4] forward
[5]   MR. WINTER·  I think as to objections going
[6] forward it's governed by the federal rules and
[7] applicable 9th Circuit law
[8]   MR. LEONARD. Okay, is that something you're
[9] willing to stipulate as well, like most of the time
[10] you do at the beginning of a deposition?
[11]   MR. WINTER: Most of the time at the beginning
[12] of a deposition I stipulate the deposition is
[13] governed by the federal rules and the applicable
[14] law, which would be the 9th Circuit
[15]   MR. LEONARD. Okay, is this difficult, can we
[16] just stipulate that all objections will be
[17] preserved other than form and responsiveness,
[18] because if you don't stipulate I'm going to make
[19] every objection I can right now because I'm not
[20] going to risk anything, but it will make it go a
[21] lot smoother if we do the normal practice and agree
[22] that all objections are preserved other than form
[23] and responsiveness.
[24]   MS. DIEMER: Off the record.
[25]   (Off the record discussion.)

Page 27

[1]   MR. WINTER. We're back on the record  It's
[2] 3 10 We went off the record for the appearance of
[3] defense counsel in this case  Defense counsel have
[4] also had an opportunity to review the transcript of
[5] what transpired before they arrived  Defense
[6] counsel has had the opportunity and have interposed
[7] an objection  We also have a request for a
[8] stipulation that objections are preserved going
[9] forward except as to form and responsiveness, and
[10] as plaintiff's counsel I'm prepared to make that
[11] stipulation consistent with my understanding of the
[12] federal rules and the applicable law
[13]   MR LEONARD: And we so stipulate
[14]   MS. DIEMER: Be happy to so stipulate
[15]   MR. WINTER: Anything further before we proceed
[16] with the deposition?
[17]   MR. LEONARD: Right Chris Hebard and COTO
[18] Settlement object to every question that was asked
[19] before we entered the room We got here about
[20] 2 40 The deposition was noticed at 2:20 (sic)
[21] The record doesn't reflect that the weather is not
[22] as best as possible and the traffic was thick
[23] getting here, as well as being in an unfamiliar
[24] city and the possibility of getting turned around
[25] I do have my cell phone with me, it was on, and a

Page 28

[1] quick call to my office would've given counsel my
[2] cell number or they would've called me and I was
[3] very accessible when I was on the cell phone,
[4] although I did not know the number to call here, so
[5] for those reasons we object to every question that
[6] was asked without us being here
[7]     MR. WINTER· Counsel, I believe you stated that
[8] the deposition was noted for 2 20 and the
[9] deposition notice states that it was noticed for
[10] 2 00
[11]     MR. LEONARD: If I said "2 20" I meant 2 00
[12]     MR. WINTER: All right
[13]     MS. DIEMER. I'll join in Mr Leonard's
[14] objections. We did have to fly from out of town
[15] I understand you might have had difficulty calling
[16] my personal office, Campeau Goodsell Diemer;
[17] however, had you called Klein Zelman Rothermel &
[18] Dichter, who represents Eisenberg defendant as
[19] well, they would've gotten ahold of me on my cell
[20] phone and we would have been able to tell you that
[21] we were on our way and trying to find our way
[22] through the thickets of Indianapolis
[23]     MR. WINTER: All right The plaintiff's
[24] position has been previously stated on the record
[25] Insofar as the schedule for these three depositions

Page 29

[1] was compressed at defendants' request, leaving
[2] insufficient time for the customary courtesy I
[3] would typically allow for a late arrival, I will
[4] also note that I, too, arrived by plane today
[5] traversing, I suspect, through the same airport
[6] over the same roads as you did and I'm glad to see
[7] you here now I'd like to continue with the
[8] deposition
[9]     MR. LEONARD: Okay, let me just add, during a
[10] break I'm going to give you my cell phone and if
[11] you have one, I'd like to get it too so if we get
[12] separated tomorrow in Florida we can contact each
[13] other and won't have this problem again
[14]     MS DIEMER: Be glad to join in that
[15]     MR. WINTER: I endorse that suggestion.
[16] Insofar as your office, Kathryn, I had a
[17] conversation with Jane Jacobs and she indicated to
[18] me that you would be calling me back about this
[19] deposition and I never received a call from you
[20]     MS. DIEMER: Oh, well, I would have called you
[21] had I known that Jane was busy telling you that I
[22] was planning on calling you, but I did not in fact
[23] call you because I didn't know I was supposed to,
[24] in fact I would've been hard-put to call you
[25] because I don't know your number, but had you

Page 30

[1] called Jane this morning she would have told you,
[2] she has my cell phone number, and in fact I spoke
[3] with her in the Indianapolis Airport And I would
[4] take only one exception to your earlier statement
[5] It was not my understanding that the compression
[6] was at the request of my clients I understand it
[7] was Mr Leonard's clients If I'm wrong, I'm
[8] wrong I don't think it matters, I don't think we
[9] need to debate it
[10]     MR WINTER. That's consistent with my
[11] understanding I did, incidentally, counsel, check
[12] with my office to hear it they'd heard from your
[13] office about any delay and asked them to check
[14] further Why don't we proceed
[15]     MR. LEONARD: Go ahead
[16]     (Time is 3 14 p m )
[17]     Q· Ms Schoomer, we were discussing Exhibit No 23
[18] before the break From whom did you receive the
[19] documents in Exhibit No 23?
[20]     A. I received them from Theresa Davis
[21]     Q Why did Theresa Davis forward the documents to
[22] you?
[23]     A As she's indicated on the accounts payable
[24] slip, there's a variance on the purchase order and
[25] she wants for me to sign off on the white copy that

Page 31

[1] that variance is all right She also notes that
[2] there is a charge from Cyberspace for 30 85 in
[3] question is what that is If you look at the
[4] actual copy of the purchase order you'll see
[5] that —
[6]     Q. That's Page CLS-0015015?
[7]     A: Yes
[8]     Q. What do you notice when you look at that page?
[9]     A: I've put a statement here of "Monthly fee over
[10] 1426 needs approval" and that is something that's
[11] very common on all of my standard purchase orders
[12] so that if there is a variance over a certain
[13] amount for that month's bill, it then gets sent
[14] back to me to approve that variance, and that's
[15] what she is doing with this She is sending it to
[16] me wanting me to sign off on it only because it's
[17] over the amount that I've indicated
[18]     Q: What is the amount that Cyberspace charged
[19] First DataBank in October of '99?
[20]     A $30 85
[21]     Q. How many months total did Cyberspace charge
[22] First DataBank?
[23]     A: Five months
[24]     Q: Which months were those?
[25]     A: July through November

Page 32

[1]    Q· Before the October audit reflected in Exhibit
[2] 23 were you aware of Cyberspace charges on earlier
[3] bills?
[4]    A: No, I was not
[5]    Q· Why not?
[6]    A: Well, a couple of reasons  First of all, a
[7] variance no larger than what this one was, a lot of
[8] times I'll just sign off on that  The bill is
[9] expected to be around 1300 to $1500, so on this
[10] particular bill it's, what, about $30 off? That
[11] wasn't a big deal  I would've normally just signed
[12] off on it  If it had been $200 more, that would've
[13] caught my attention
[14]        Another thing is the Cyberspace charge was
[15] clear on the back page of the bill and not with the
[16] regular phone charges, and so I probably took
[17] little to no notice of that on each bill
[18]    Q  When you did take notice of it on the October
[19] bill, what brought it to your attention?
[20]    A  Well, actually it's Theresa Davis that first
[21] noticed it  You'll notice on Exhibit 23, the first
[22] page she's got a note on here "There's a charge
[23] for $30 85 to Cyberspace" and she's questioning
[24] that charge and it was then that I looked through
[25] the bill and found the charge she was referring to

Page 33

[1] and realized that I had no idea who Cyberspace com
[2] was
[3]    Q  After you realized that you had no idea who
[4] Cyberspace com was, what did you do next?
[5]    A  I called Ameritech to say "What is this charge
[6] on my bill?"
[7]    Q  How did you call Ameritech?
[8]    A  On the front page of the Ameritech bill it
[9] gives an 800 number, a toll-free number for
[10] Ameritech local service and that's the number I
[11] called
[12]    Q  After you called that number what did you do
[13] next?
[14]    A  Well, when I questioned them about the charge
[15] they told me that this was actually a separate
[16] company and that any dispute over this bill would
[17] have to be taken up with this company and they gave
[18] me the number
[19]    Q· What did you do with that number?
[20]    A  I called it and asked them about these charges
[21] for Cyberspace com
[22]    Q  Who did you speak with?
[23]    A  I assume a customer support role
[24]    Q  How did the person you spoke with identify
[25] himself or herself?

Page 34

[1]    A: It was a man and I don't specifically remember.
[2]    Q. What did you discuss with the man?
[3]    A: I asked him what the charge was for and he said
[4] it was for internet service and I told him I
[5] seriously doubted that because we had a different
[6] internet service
[7]    Q  Before you go further and tell me about this
[8] conversation, based on the first part of the
[9] conversation that you've related, who did you
[10] believe that you were speaking with?
[11]    A: Whoever answered the phone, I told that person
[12] I wanted to ask about a charge on my Ameritech bill
[13] for Cyberspace.com and that person was discussing
[14] these charges with me and so I just assumed I was
[15] talking to Cyberspace.com.
[16]    Q: What do you remember about the conversation you
[17] had with this man from Cyberspace com?
[18]    A· I remember that he was very confident that we
[19] owed him the money and he refused to give me a
[20] refund
[21]    Q  What, if any, questions did you ask the man?
[22]    A. I asked the man why he thought we had our
[23] internet service through him and he said because we
[24] have a contract and I said I needed a contact name
[25] within my company that he had the contract with so

Page 35

[1] that I could find out who had generated these
[2] charges and he said he didn't have a name and I
[3] said to him that I would then need a copy of the
[4] contract and he said that we had a copy of the
[5] contract, it was our cancelled check  He went on
[6] to explain that when we signed the check that he
[7] sent to us that was actually signing the contract
[8] with him
[9]    Q: Have you seen a copy of this check?
[10]    A· No, I have not
[11]    Q: Did you ask the man anything further about this
[12] check?
[13]    A. I asked him to fax me a copy of it so that I
[14] could see that our bank had cleared the check, and
[15] he said I haven't got time to dig up every $3
[16] cancelled check that people have cashed, that if I
[17] wanted a copy of it I could request it from my own
[18] bank
[19]    Q· What was his tone like when he was explaining
[20] these things to you?
[21]    A. He was arrogant and not very helpful and he was
[22] quite adamant about not refunding my money  In
[23] fact, he said he didn't care whether we were using
[24] his service or not, we signed the contract by
[25] cashing the check and we owed him the money

[1] legitimately

[2]   Q   You mentioned a refund  Did you request a
[3] refund?

[4]   A: I asked him to refund the money that we had
[5] paid since July

[6]   Q: And at this point how much money was that?

[7]   A: At this point it was four months worth at

[8] $30 85, so about $122

[9]   Q. Which months had you paid at the time you had
[10] the conversation?

[11]   A  Actually, we had only paid three months of that
[12] and the fourth month being due on the current bill

[13]   Q  So the first month of payment was which month?

[14]   A. July  We had paid July, August and September

[15]   Q  And you called him about which month?

[16]   A: The October bill

[17]   Q: What happened with the November bill?

[18]   A: The November bill was the Cyberspace
[19] charge  He told me that he would cancel our
[20] service and that was the best he could do and that
[21] we would have to pay the November bill because we
[22] still owed him that

[23]   Q  Did Cyberspace ever send First DataBank a
[24] refund?

[25]   A  Never

[1]   Q: For any months?

[2]   A: No

[3]   Q  And so how many months did First DataBank pay
[4] Cyberspace?

[5]   A: We ended up paying them a total of five months

[6]   Q  What, if any, services did First DataBank use
[7] in return —

[8]   A. None

[9]   Q. — for those payments?

[10]   A  (Shakes head negatively )

[11]   Q: Did First DataBank receive an installation CD
[12] for the Internet service?

[13]   A: The man said one was sent, but I can't find
[14] anyone who remembers receiving it

[15]   Q: In 1999 did First DataBank have a need for
[16] Cyberspace's internet service?

[17]   A: No

[18]   Q  Why is that?

[19]   A: We already had an internet provider and that
[20] provider was providing a great deal more service
[21] than what Cyberspace could've provided us

[22]   Q: What kind of service did your pre-existing
[23] internet service provider give First DataBank?

[24]   A: We had a T1, which is an enormously larger
[25] gateway to the internet than what Cyberspace

[1] could've provided us with

[2]   Q. Does First DataBank have any company policies
[3] or practices about signing up for new internet
[4] service?

[5]   A· Specifically about internet service?

[6]   Q: Let me back up and ask you the more general
[7] question  Does First DataBank have any company
[8] practices about signing up for free services or
[9] accepting gifts?

[10]   A. As employees we're not supposed to accept gifts
[11] to receive services

[12]   Q: After speaking with the Cyberspace
[13] representative did you contact anyone else?

[14]   A. I called the Better Business Bureau and they
[15] said that company was being run out of Dallas and
[16] they encouraged me to write a letter, which I did

[17]   MR. WINTER. I'll ask the court reporter to
[18] mark our next exhibit, Exhibit 24 (Schoomer)

[19]   (Plaintiff's (Schoomer) Exhibit 24 was marked
[20] for identification )

[21]   MS DIEMER. Mr Winter, is it your position
[22] that you previously provided this document to us in
[23] any form or shape?

[24]   MR. WINTER  This document was produced by the
[25] witness pursuant to the subpoena  The subpoena

[1] requested production of these documents at today's
[2] deposition  The witness voluntarily agreed to send
[3] these documents to me in advance of the deposition,
[4] which she did, which allowed me to make the copies
[5] that I've now handed to you

[6]   MS. DIEMER. But there is no way that you
[7] provided this document particularly in any previous
[8] responsive discovery?

[9]   MR. WINTER. This document was received
[10] recently in my office  I would have to check with
[11] my counsel on the case, but I'm not aware that it
[12] was provided to you previously

[13]   MS. DIEMER. Because I have some issues if you
[14] plan to use this deposition for evidence at trial,
[15] if you're planning to introduce documents which
[16] were not produced appropriately for discovery and
[17] you previously had documents and had awareness of
[18] these documents, I'm just trying to determine
[19] whether y'all first had these through the subpoena
[20] to Ms Schoomer or previously

[21]   MR. WINTER. This document was made available
[22] to me through the subpoena to Ms Schoomer that's
[23] reflected in the Bates label document that bears
[24] CLS-0015001

[25]   MR. LEONARD· Okay, also let me ask, this

Page 40

[1] document was not in the originals you handed to me
[2] Do you have them anywhere else?
[3]     MS SCHOOMER I have the original
[4]     MR LEONARD· Okay I thought you handed me
[5] all of the originals
[6]     MS. SCHOOMER: I thought you were just asking
[7] for the Ameritech bills This is the original
[8] letter
[9]     MR. LEONARD· Is there any other originals that
[10] you ve produced to the FTC?
[11]    MS. SCHOOMER No
[12]    MR. LEONARD: So this is it?
[13]    MS SCHOOMER. I think so
[14]    MR. WINTER. Counsel, you can confirm by
[15] comparing the stack
[16]    MR. LEONARD. I'm working through that
[17]    MR WINTER: All right
[18]    Q  The document has been marked as Exhibit No  24
[19] (Schoomer), a letter to the Better Business Bureau
[20] I've now handed Exhibit 24 (Schoomer) to you Do
[21] you recognize this document?
[22]    A  Yes, I do
[23]    Q  What is it?
[24]    A  This is the letter that I wrote to the Better
[25] Business Bureau

Page 41

[1]    Q  When did you write this letter?
[2]    A  December 3rd, 1999
[3]    Q  Was that at or near the time of the events that
[4] you describe in the letter?
[5]    A· Yes, it was just after these events I've just
[6] described
[7]    Q  As you wrote the letter did you have personal
[8] knowledge about what you discussed in the letter,
[9] generally?
[10]   A. Yes
[11]   Q  Did you prepare this letter as a part of your
[12] duties here as facility manager at First DataBank?
[13]   A  Yes, I did
[14]   Q  Was this letter prepared in the regular course
[15] of business of First DataBank?
[16]   A  Yes
[17]   Q  After you prepared the letter who did you send
[18] it to?
[19]   A. I sent it to the Better Business Bureau with
[20] copies to Ameritech and Cyberspace com
[21]   Q. Did you receive a reply from the Better
[22] Business Bureau?
[23]   A. Yes, I did, they sent a letter back saying that
[24] they had received my letter and thanking me for it
[25] and saying that if I wanted to file a formal

Page 42

[1] complaint, this was the process
[2]    Q: Are those pages the ones that you just made
[3] available to defense counsel —
[4]    A: Yes
[5]    Q  — and the ones he's looking at right now?
[6]    A: Yes.
[7]    Q  All right  Exhibit 24 (Schoomer) is a
[8] photocopy, is that correct?
[9]    A: Yes, that's correct.
[10]   Q· Okay, is it a photocopy of the letter that you
[11] received back with the Better Business Bureau
[12] correspondence?
[13]   A. Yes
[14]   Q· Where did you store the originals of your
[15] letter as it was returned by the Better Business
[16] Bureau?
[17]   A· This letter has been in my file ever since I
[18] received it from the Better Business Bureau
[19]   Q: Who pulled it from your file to produce
[20] pursuant to the subpoena?
[21]   A. I did
[22]   Q: Did you make the photocopies?
[23]   A. Yes, I did
[24]   Q. Do you remember seeing the original of your
[25] letter?

Page 43

[1]    A· Yes
[2]    Q  Have you had an opportunity to review the
[3] photocopy which is Exhibit No  24?
[4]    A  Yes
[5]    Q  To the best of your knowledge is the copy that
[6] is Exhibit 24 an accurate and true reproduction of
[7] the original?
[8]    A· Yes
[9]    Q: Your letter begins "We would like to file a
[10] complaint about the company Cyberspace.com Their
[11] method of obtaining subscriptions to their internet
[12] service is designed to flow nearly undetectable
[13] through most Finance departments " Did I read that
[14] correctly?
[15]   A. Yes, you did
[16]   Q  When you wrote that statement did you believe
[17] it to be true?
[18]   A: Yes.
[19]   Q: Do you still believe it to be true today?
[20]   A· Yes
[21]   Q: Why is that?
[22]   A· Because the way our accounts receivable
[23] department works and the way many businesses
[24] operate their accounts receivable departments,
[25] checks are collected and deposited because you're

Page 44

[1] interested in getting the money in the bank and
[2] we're not expecting to receive a check and have
[3] that check be a contract
[4]     MS. DIEMER: I would like to object on the
[5] basis of lack of foundation, hearsay, and I just
[6] didn't want to interrupt you, so I would like that
[7] to be interposed in advance of the question that
[8] was just responded to, the answer
[9]     Q: Turning to Page 2 of Exhibit 24, the bottom of
[10] the first paragraph concludes with a sentence that
[11] says "As long as we had cashed their check they
[12] felt they were within their rights to collect
[13] subscription money from us "
[14]     MS. DIEMER: Objection, hearsay, calls for a
[15] conclusion, inappropriate, lack of expertise in the
[16] area
[17]     Q: My question to you is did I read that statement
[18] correctly?
[19]     A Yes
[20]     MS. DIEMER: Mr Winter, —
[21]     MR. WINTER: Yes, counsel?
[22]     MS DIEMER. If — Fine, go ahead if that was
[23] the question you were asking That was not what I
[24] understood the question to be that you just asked,
[25] so my mistake

Page 45

[1]     MR. WINTER: Well, no, I'm happy to recognize
[2] your objection to my question or —
[3]     MS. DIEMER: Yeah, it sounded to me like you
[4] asked a question, I objected, you asked a different
[5] question, I don't want to reobject each time  I
[6] can have her reread the objections, just repeat the
[7] objections if you would prefer
[8]     MR. WINTER: We can treat your objections as
[9] you elaborated them to the question that you
[10] thought I was asking —
[11]     MS. DIEMER: As continuing
[12]     MR. WINTER: — as continuing to the question
[13] that I just asked
[14]     MS. DIEMER: Sure
[15]     MR WINTER. All right So at this point why
[16] don't we have the court reporter read back the last
[17] question
[18]     MS. DIEMER. Thank you
[19]     (The requested portion of the record was read
[20] by the reporter )
[21]     Q. Why did you write that in your letter?
[22]     A. I wrote that because that's what the man told
[23] me on the phone, that I cashed his check and he had
[24] the right to charge me because I had signed a
[25] contract by cashing the check

Page 46

[1]     MR. WINTER: I'll ask the court reporter to
[2] mark Exhibit 25, which is another copy of the
[3] letter to the Better Business Bureau but one
[4] bearing the Bates label E-0024585, and ask the
[5] court reporter to mark Exhibit No 26, which is
[6] another copy of the letter to the Better Business
[7] Bureau except it bears a fax line and the Bates
[8] number H-0008140, this will be Exhibit No 26
[9] (Schoomer), I believe
[10]     (Plaintiff's (Schoomer) Exhibits 25 and 26 were
[11] marked for identification )
[12]     MS DIEMER: Mr Winter, are you telling us
[13] these are all identical?
[14]     MR. WINTER I've identified them for the
[15] record for what they purport to show It's up to
[16] the witness to discuss them I'm having them
[17] marked for identification
[18]     MS. DIEMER: Okay
[19]     MR. LEONARD  Do I get a copy of the last one?
[20]     MR WINTER. Certainly, counsel
[21]     MS DIEMER. I don't have the one with the fax
[22] line, the H Thank you
[23]     MR LEONARD· I have H, E and CLS
[24]     MS DIEMER  Exhibit 26 is the one with the
[25] unreadable fax line on my copy Is it readable on

Page 47

[1] the one you're seeing?
[2]     MS. SCHOOMER  No, it's kind of sliced off
[3] You can see "Corporate Offices" and that's about
[4] it
[5]     MS. DIEMER· Okay
[6]     MR. WINTER. Do both defense counsel have
[7] copies of all of the exhibits?
[8]     MR. LEONARD: Yes
[9]     MS. DIEMER: So far
[10]     Q· Looking at Exhibit No 25, —
[11]     A: Yes.
[12]     Q· — do you see in the lower right-hand corner
[13] where it bears the numbers on the first page
[14] E-0024585?
[15]     A Yes
[16]     Q: Do you see on the second page it's labeled
[17] E-0024586?
[18]     A. Yes
[19]     Q. Do you know what this designation represents?
[20]     A: The number that you just read to me?
[21]     Q: Yes
[22]     A: I think it's a number that identifies each
[23] individual page.
[24]     Q: All right Turning to Exhibit No 26, do you
[25] see the first page where it's designated H-0008140?

---

**Page 48**

[1] **A.** Yes

[2] **Q·** Do you see the second page where it's

[3] designated H-0008141?

[4] **A.** Yes

[5] **Q** Do you know where these designations came from?

[6] **A** Are you asking me do I know who assigned the

[7] number?

[8] **Q** Did you provide a copy of your letter to the

[9] Better Business Bureau to me that had this label on

[10] it H?

[11] **A** No, that number wasn't — No

[12] **Q** These numbers on Exhibits 25 and 26 beginning

[13] with E and H are not found on your original copies

[14] of the documents, is that right?

[15] **A.** Not to my knowledge

[16] **MR LEONARD:** Counsel, do you want to stipulate

[17] what Bates numbers are so we can move this along?

[18] I don't mean to interrupt, but since we're under a

[19] time compression here, anything we can do to help

[20] you would be nice

[21] **MR WINTER** Thank you for the offer, counsel,

[22] I don't need to stipulate

[23] **MR LEONARD.** Okay

[24] **MR. WINTER·** Unless you want to stipulate that

[25] these documents were produced from your client's

---

**Page 49**

[1] files

[2] **MR LEONARD** Well, I think we already did

[3] admissions I'm not sure if this was one of them,

[4] but I'm not sure what your point is I don't want

[5] to interfere with your deposition, I'm just worried

[6] about time

[7] **MR WINTER.** Well, I'm asking since you've

[8] offered to stipulate, are you willing to stipulate

[9] that these documents — that "E" stands for

[10] Eisenberg and this document was produced —

[11] **MR. LEONARD·** I can't stipulate on the spot,

[12] but this is the type of stuff that you normally do

[13] in pretrial matters where federal courts typically

[14] require you to work out those stipulations, so

[15] doing it with a witness with no knowledge of it,

[16] I'm not sure what that's proving I suggest we

[17] just do it at the appropriate time, you know,

[18] pretrial conferences

[19] **MS DIEMER.** I have a different suggestion

[20] Let's take a really quick break and run to the

[21] ladies' room You guys can run to the men's room.

[22] **MR WINTER·** We'll leave the pretrial practice

[23] for the pretrial and we'll take a break now at your

[24] request

[25] **MS DIEMER:** Thank you

---

**Page 50**

[1] (A brief recess was taken )

[2] **MR. WINTER** Ms Schoomer, we're back on the

[3] record now and I don't have any further questions

[4] for you at this time

[5] **EXAMINATION**

[6] **BY MR. LEONARD:**

[7] **Q·** Ms Schoomer, my name is Ernest Leonard I

[8] appreciate the hospitality you've shown us here

[9] today I represent Chris Hebard and COTO

[10] Settlement, we're two of the several defendants in

[11] this lawsuit First of all do I understand that

[12] you do not have a copy of the check that was

[13] deposited for $3 50?

[14] **A:** No, I don't

[15] **Q·** Have you looked through your records to find

[16] it?

[17] **A·** Yes

[18] **Q:** Do you have any knowledge of who may have

[19] endorsed or signed that check?

[20] **A·** Yes, I checked with our accountant and he said

[21] he did remember the check because he was never able

[22] to determine whose department to credit it to

[23] **Q.** What's his name?

[24] **A** Lance Jennings

[25] **Q:** Is there anyone else besides Mr Jennings who

---

**Page 51**

[1] would have authority to endorse checks?

[2] **A:** I'm not sure who has that authority

[3] **Q** So there may be more than Mr Jennings?

[4] **A** I'm sure there are because we have a two-hands

[5] policy where every transaction involving money has

[6] to have two people who touch it

[7] **Q** When you say "two-hands," that's not two

[8] signatures, but two —

[9] **A.** No, that means two people have handled the

[10] transaction

[11] **Q:** And Mr Jennings says he remembers this check?

[12] **A** Yes

[13] **Q.** What specifically did he say about that,

[14] remembering this check?

[15] **A:** Because he remembers me asking about

[16] Cyberspace com and so he called the bank to see if

[17] they could produce the check Apparently they have

[18] it on electronic file I was unable to obtain a

[19] copy in time for this session today but I

[20] understand one is obtainable in the future if I

[21] want one

[22] **Q** Did Mr Jennings say that he remembered signing

[23] the check?

[24] **A:** No

[25] **Q·** I'm not sure I understand then what he

---

**Page 52**

[1] remembers about the check.

[2] A: He remembers calling the bank to see if we

[3] could get a copy of the check

[4] Q· When would this event have occurred?

[5] A: This would've occurred in October when I was

[6] trying to verify what the man told me at

[7] Cyberspace com

[8] Q: October of 1999?

[9] A. Yes

[10] Q So he remembers in October of '99 trying to get

[11] a copy of the check?

[12] A: Yes

[13] Q Other than that did he tell you whether he

[14] remembered anything else about this transaction?

[15] A: I asked him, he said no

[16] Q: Okay Now you said "two-hands policy," I'm not

[17] sure I understand what that means, could you

[18] elaborate?

[19] A When it comes to handling money, especially

[20] checks written out to the company, one person fills

[21] out the deposit, another person checks the deposit,

[22] and it's a very simple way to eliminate simple

[23] forms of fraud

[24] Q: Or checks that are sent to you by mistake,

[25] right?

**Page 53**

[1] A. I'm not sure I understand what you're asking

[2] Q· Well, did I recall from your earlier testimony

[3] that you handle several hundred checks a week here?

[4] A: Yes

[5] Q. And is it possible that occasionally you may

[6] have a check that was written out maybe on the

[7] wrong invoice or something that gets to you?

[8] A. "Written out on the wrong" —

[9] Q: Well, I'm just asking, do you ever receive any

[10] checks of these several hundreds that were just

[11] sent to you by mistake?

[12] MR. WINTER: Objection You can answer

[13] A: Not that I'm aware of

[14] Q· So of the hundreds and hundreds of checks that

[15] come through every week there are no mistakes where

[16] people just may have perhaps wrote the wrong amount

[17] or wrote out a bill for one customer but put

[18] another customer's name on it, just human error?

[19] A: Well, if it was made out to another company, we

[20] wouldn't have cashed it

[21] Q: Well, let's start with that Do you ever get a

[22] check that maybe was put in the wrong envelope,

[23] sent to the wrong company?

[24] A: If we have I'm not aware of it

[25] Q: But would that be something the two-hands

**Page 54**

[1] policy is put in place for, to catch things like

[2] that so you're not depositing wrong checks?

[3] A. I think the very first person would've

[4] noticed —

[5] Q. You would think, but you have two hands to

[6] notice to make sure that human error doesn't occur

[7] a second time, right?

[8] A. I would think with two hands touching it it

[9] would be very hard to slip something through, yes

[10] Q. What about where someone writes the wrong

[11] amount on the check, they're writing invoices, it's

[12] midnight or whatever, and they write a check to you

[13] but put the wrong amount for maybe another bill,

[14] what's your procedure there where that would be

[15] caught?

[16] A: When a customer sends us a check in payment for

[17] one of our products we're matching up a customer

[18] number with the amount that they owe us

[19] Q. Okay

[20] A. If they write us a check for an amount other

[21] than what they owe us, we hold the check and call

[22] the customer

[23] Q. Is that something the two-hands policy catches

[24] also, —

[25] A Yes

**Page 55**

[1] Q — is designed to catch?

[2] A. Yes

[3] Q. And do you know if that's ever happened?

[4] A. That sounds like something that would happen

[5] frequently

[6] Q Sure, because you get hundreds of checks every

[7] week

[8] A. Right

[9] Q. Okay During a break we were chatting

[10] informally here and counsel for the FTC had been

[11] mentioning about, you know, telephone solicitations

[12] and so forth Do you have personal experience with

[13] receiving let's start with telephone solicitations

[14] at home?

[15] MR WINTER· Objection

[16] Q: Go ahead

[17] A: Can you repeat the question?

[18] Q· Yes, do you ever get telephone calls that

[19] interrupt you during dinner with, you know,

[20] telephone solicitation?

[21] A I did until January

[22] Q· And that's when you, what, put a block on it?

[23] A· No, the State of Indiana passed a new law

[24] Q: Okay, what about junk mail, do you get junk

[25] mail?

Page 56

[1]  A  All the time
[2]  Q  What do you do with your junk mail?
[3]  A. Throw it away
[4]  Q· Have you ever gotten what's known as
[5] solicitation checks?
[6]  MR. WINTER: Objection
[7]  A  I don't know what that is
[8]  Q  Well, for example, maybe a long-distance
[9] carrier wanting you to switch from your current one
[10] to them and so there's a check that says "sign this
[11] check, deposit it, and we'll switch your long-
[12] distance for you "
[13]  A  Are you talking about personally?
[14]  Q  Personally
[15]  A  Yes
[16]  Q· So you're familiar with solicitation checks?
[17]  A. Personally
[18]  Q· Right
[19]  A. At home
[20]  Q  Yes, that's what I'm asking
[21]  A  Yes
[22]  Q  And what do you do with those?
[23]  A  Throw them away
[24]  Q  Because you don't feel the need to run out and
[25] get an extra two or three bucks, do you?

Page 57

[1]  A  Sometimes it's 25 or 50 I personally do not
[2]  Q  Okay
[3]  MR LEONARD: I'm going — What number are we
[4] on on exhibits?
[5]  (Off the record discussion )
[6]  (Defendants' (Schoomer) Exhibit 27 was marked
[7] for identification )
[8]  Q  Ms Schoomer, you have Exhibit 27 in front of
[9] you?
[10]  A  Yes, I do
[11]  Q  And this I'll represent is a sample type check
[12] and I do not expect you've ever seen this document
[13] before
[14]  A  No
[15]  Q  When you get checks at your company, before you
[16] deposit them in the bank, are they actually
[17] endorsed?
[18]  A  Yes
[19]  Q  And describe how they're endorsed
[20]  A  They're endorsed with a stamp
[21]  Q· Okay, and someone physically stamps it?
[22]  A  Yes
[23]  Q  And they turn the check over on the backside
[24] and physically stamp it?
[25]  A. Yes

Page 58

[1]  Q. Turn with me to the third page of this exhibit
[2]  MR. WINTER· Counsel, I want to inquire about
[3] your representation that this is a sample As I
[4] understand it, the defendants here have produced
[5] perhaps 20 different mailings that have variations
[6] between them Are you representing that this is
[7] just "a" sample or a sample of a particular mailing
[8] that would've been sent specifically to First
[9] DataBank?
[10]  MR. LEONARD  I'm representing it as "a"
[11] sample
[12]  Q  Are you at the third page?
[13]  A. Yes
[14]  Q: Do you see where there's an endorsement? In
[15] your company where would that stamp be placed?
[16]  MR. WINTER: Objection
[17]  Q: Go ahead
[18]  MR. WINTER· You can answer.
[19]  Q· In fact, let me do this, I'm going to give you
[20] a pen, could you draw a square about the size of
[21] that stamp where you would put the stamp?
[22]  MR  WINTER. Objection
[23]  A  (Witness complies )
[24]  Q: Okay, and actually how big is the stamp, could
[25] you actually draw a square out so we can see the

Page 59

[1] size of it?
[2]  A. (Witness complies )
[3]  Q  Okay
[4]  A· It may be a little bit larger than that
[5]  Q  Where you drew that square, if you could turn
[6] back to the page, you see what's above it, the term
[7] where it says "This solicitation check must be
[8] cashed or deposited within 30 days of issuance"?
[9]  A· Uh-huh
[10]  Q  "Endorsement and deposit constitute agreement
[11] of desire to utilize service and agreement pursuant
[12] to terms attached"?
[13]  A: Uh-huh
[14]  Q. Now, again, you don't know what the check
[15] actually looked like, do you?
[16]  A  No
[17]  Q: Do you oversee the people who actually endorse
[18] the checks?
[19]  A  No, I don't
[20]  Q: You don't?
[21]  A: No
[22]  Q· Okay, who does?
[23]  A: That would be our staff accountant, Lance
[24] Jennings
[25]  Q· Okay, I was reviewing your testimony earlier on

---

Page 60

[1] your duties and you're facility manager, right?

[2] **A.** Yes

[3] **Q** But that has nothing to do with the accounting

[4] department, right?

[5] **A:** In what way?

[6] **Q·** Well, do your duties cover the accounting

[7] department at all with this company?

[8] **A.** I am a manager in the finance department I

[9] work with the accounts receivable and accounts

[10] payable departments because I spend a lot of money

[11] **Q.** You work with The actual physical

[12] responsibility of endorsing and depositing checks,

[13] whose department is that under?

[14] **A:** I'm not sure of the exact department name, but

[15] it amounts to our accounts receivable

[16] **Q:** The accounts receivable department, is

[17] Mr Jennings the head of that department?

[18] **A:** No, he is accounts payable

[19] **Q:** He is accounts payable So accounts receivable

[20] would actually endorse the check —

[21] **A.** Yes

[22] **Q** — and deposit it into the bank?

[23] **A:** Yes

[24] **Q.** And who is the head of the accounts receivable

[25] department today?

---

Page 61

[1] **A.** I think her name is Lori Mercer

[2] **Q:** And was Ms Mercer in charge of the accounts

[3] receivable department in 1999?

[4] **A.** Yes

[5] **Q** Does Ms Mercer work under you?

[6] **A:** No

[7] **Q** Who supervises her?

[8] **A** She and I both report directly to the director

[9] of finance

[10] **Q:** And what's his name?

[11] **A.** Jim Schultz

[12] **Q:** Jim Schultz So do you have any responsibility

[13] over Ms Mercer's department?

[14] **A** No

[15] **Q:** Now, when I asked you to draw a square, I think

[16] you indicated it may not be that size or so forth,

[17] you drew a square there Is that just based upon

[18] generally what you've seen and how checks come

[19] through?

[20] **A:** I ordered the stamp for them

[21] **Q:** You ordered the stamp, but as far as the

[22] placement on the check and where they actually

[23] stamp it, how do you have that knowledge?

[24] **A:** I'm 40 something years old and generally use a

[25] stamp or sign above the line and in my experience

---

Page 62

[1] over the many years that I've worked that is where

[2] the stamp goes

[3] **Q:** So you're basing that on your general

[4] experience, —

[5] **A:** Yes

[6] **Q:** — but you don't actually know if that's the

[7] policy here at your company, do you?

[8] **A:** You're asking me too general of a question

[9] I'm really not sure what you're asking

[10] **Q·** Well, let me rephrase it then

[11] **A.** Okay

[12] **Q** And by the way, I'm going to ask you if there's

[13] any time — you've been very good at this If

[14] there's any time you don't understand my question,

[15] just ask me to rephrase it —

[16] **A:** Okay.

[17] **Q:** — because it's important that you understand

[18] my question so we get a responsive answer

[19] Do you have personal knowledge that your

[20] company First DataBank in fact endorses checks

[21] where you indicated on this exhibit? What Exhibit

[22] No are we on?

[23] **A:** 27

[24] **Q·** 27

[25] **A·** And the question was do I have knowledge —

---

Page 63

[1] **Q** Do you have personal knowledge that in fact

[2] your company endorses the check as you've indicated

[3] with your handwriting on Exhibit 27?

[4] **A·** Yes

[5] **Q.** And what is that personal knowledge based upon?

[6] **A:** Observing the physical checks before they go in

[7] for deposit

[8] **Q** Okay You see there's a tag on this Page 2? I

[9] say a tag, a stub, there's a perforated line

[10] **A:** Yes.

[11] **Q:** Yes If you could look at that just very

[12] briefly, maybe the first line and that's it, first

[13] sentence, it says "Endorsement and deposit

[14] constitute agreement to utilize services pursuant

[15] to the following terms," do you see that?

[16] **A:** Uh-huh

[17] **Q:** If in fact a check that was similar to this was

[18] the one that was sent to you and deposited, why did

[19] the two-hands policy not catch this?

[20] **MR WINTER:** Objection

[21] **A.** Catch what?

[22] **Q:** The fact that this was a solicitation check and

[23] by signing it you were entering into a contract

[24] **A:** Well, because in the business world you don't

[25] normally operate with solicitation checks, they

---

Page 64

[1] would not have been looking for a solicitation
[2] check
[3] Q So would you agree with me that when they are
[4] putting an endorsement on there that they should
[5] have looked at this?
[6] MR. WINTER· Objection
[7] A No, I wouldn't agree with that If
[8] solicitation checks were normal in the business
[9] world they would have their guard up when
[10] depositing these checks The type of checks that
[11] we receive that are noncustomer related checks are
[12] refunds rebates, this type of nature, but they are
[13] not solicitations
[14] Q: I'm going to get to that in a minute
[15] Certainly, though, if you had received a check of
[16] this nature at your house you would've, what,
[17] thrown it away?
[18] A: I personally would've thrown it away
[19] Q All right, so you would agree with me that had
[20] somebody actually read this before stamping on the
[21] back and depositing it in the bank it should not
[22] have been cashed, right?
[23] MR. WINTER· Objection
[24] Q: Go ahead
[25] MS. SCHOOMER: I'm sorry, when you say

Page 65

[1] "objection," then I forget the question
[2] MR LEONARD· Yeah
[3] MS SCHOOMER. If you could repeat it
[4] MS DIEMER Can you read it back?
[5] MR LEONARD: Yeah, why don't you read it back
[6] MS SCHOOMER Could you?
[7] MS DIEMER And you can always ask for that
[8] MS. SCHOOMER: Oh, okay
[9] (The requested portion of the record was read
[10] by the reporter )
[11] A Correct.
[12] Q· Okay, either one of the two hands who touched
[13] this either one of them could've caught this and
[14] read it right?
[15] A. It anyone had read this before depositing it,
[16] it would not have been deposited
[17] Q: Now a question was asked earlier about whether
[18] or not you got a fulfillment CD or actually
[19] whether — Let me rephrase that question
[20] A question was asked earlier whether or not you
[21] had received I guess a CD related to this internet
[22] service, do you remember that question?
[23] A· Yes
[24] Q And I think you indicated that you don't know?
[25] A: I have asked everyone who might have received

Page 66

[1] it and the answer is no, we can't find anyone who
[2] remembers receiving it
[3] Q: Well, your company actually receives a number
[4] of sample type CDs, don't they?
[5] A. Yes, they do
[6] Q: And the policy of the company is to throw them
[7] away, right?
[8] A. Yes
[9] Q· So it's very possible that this CD was sent to
[10] you, correct?
[11] A Correct
[12] Q: You're not saying it wasn't sent?
[13] A Can't prove it one way or another, have no
[14] idea
[15] Q: And by the way, looking at the page on Exhibit
[16] 27 again, certainly if this was sent to your house
[17] and you had seen this, there's nothing misleading
[18] about this, is there?
[19] MR. WINTER: Objection
[20] A I feel like you're comparing apples with
[21] oranges The mail I receive at my house I look at
[22] very differently than the mail that I receive at
[23] work
[24] MR LEONARD· Objection, nonresponsive
[25] Q. My question is if you had received this check

Page 67

[1] and you had actually looked at it and read it,
[2] there's nothing misleading about this check, is
[3] there?
[4] MR WINTER: Objection
[5] A· Can you repeat the question again?
[6] MR LEONARD. Yeah, go ahead
[7] (The requested portion of the record was read
[8] by the reporter.)
[9] A: If I had actually read it, no
[10] Q: You mentioned rebates, refunds earlier in the
[11] context of other checks
[12] A. Uh-huh
[13] Q· I'm not sure I understand what you mean by
[14] that
[15] A. It is not uncommon for us to generate some type
[16] of refund or rebate with an existing vendor or
[17] supplier
[18] Q· Okay, and that's an existing customer relation,
[19] right?
[20] A Yes
[21] Q. So if you get a check there from an existing
[22] supplier you recognize as a refund or a rebate —
[23] A: Yes
[24] Q — you deposit it?
[25] A. Yes

Page 68

[1] **Q:** Do any of those rebates have any terms or
[2] conditions that you agree to do something?
[3] **A:** No
[4] **Q** How do you know it's an existing vendor or
[5] business that you work with?
[6] **A.** We've never received a refund or a rebate from
[7] someone that we weren't already doing business
[8] with
[9] **Q** Okay How many vendors do you have at this
[10] company?
[11] **A.** Oh, my gosh, are you talking about people who
[12] supply services and products to our company?
[13] **Q.** I'm using that term in the broadest sense
[14] **A.** How many vendors do we have?
[15] **Q** More than a hundred?
[16] **A:** Probably
[17] **Q:** More than a thousand?
[18] **A** Probably not
[19] **Q:** Okay, and when you receive any rebate or refund
[20] check, is part of the two-hands policy involved
[21] making sure it is an existing vendor?
[22] **A.** Noncustomer checks go in on a separate deposit
[23] and we normally deposit the money having made a
[24] copy of the check and then it is sent internally to
[25] discover whose account it applies to

Page 69

[1] **Q** So with respect to every rebate or refund check
[2] is there a determination made that this in fact is
[3] an existing supplier or vendor?
[4] **A** If we're receiving a rebate or a refund, it's
[5] an assumption that we've already got a relationship
[6] with that company and we're just looking to
[7] discover which account it applies to
[8] **MR. LEONARD:** I'm going to object,
[9] nonresponsive
[10] **Q:** My question is do you in fact with every refund
[11] and rebate check determine whether or not it is
[12] from an existing vendor or supplier?
[13] **A.** Are you asking me if we determine that before
[14] we deposit the check?
[15] **Q** Well, let me ask it that way first, what about
[16] before you deposit the check?
[17] **A:** No, we're depositing the check first
[18] **Q** What about after you deposit the check?
[19] **A.** After we deposit the check we take the copy
[20] that we've made and determine whose account it
[21] applies to
[22] **Q** And have you ever had any instances where you
[23] couldn't determine that account?
[24] **A:** I don't know
[25] **Q** Was that the procedure you followed with

Page 70

[1] respect to Cyberspace?
[2] **A:** Yes
[3] **Q:** You assumed it was a rebate or a refund?
[4] **A:** Yes
[5] **Q:** And I assume then that if someone had sent you
[6] a check, a noncustomer check by accident, it
[7] would've been deposited and then straightened out
[8] later?
[9] **MR. WINTER.** Objection
[10] **A.** If it was made out to our company
[11] **Q:** Right
[12] **A.** Yes
[13] **Q:** So if for whatever reason someone accidentally
[14] sent you a $10 check or a hundred dollar check, the
[15] policy here at First DataBank is essentially
[16] deposit it first and try to figure it out later?
[17] **A.** Yes, with one exception If it were a large
[18] amount, we would not have deposited the check until
[19] we found out where it applied
[20] **Q** Sure Now, you mention a conversation with
[21] somebody that you had talked to who I think you
[22] mentioned was arrogant and a few other words like
[23] that I'm not sure I understood how you got in
[24] contact with them
[25] **A** Ameritech gave me the number

Page 71

[1] **Q·** And Ameritech is your phone company?
[2] **A.** They're our local phone service provider
[3] **Q·** And they gave you the number If you would,
[4] could you turn with me back to Exhibit 23? If
[5] you'd turn with me to — I've misplaced mine Can
[6] I walk over to look at yours?
[7] **MR. WINTER:** You can use mine, counsel, then
[8] you won't have to stand over the witness
[9] **Q:** There is a phone number here, there's two phone
[10] numbers
[11] **A:** Uh-huh
[12] **Q.** We're on the third page
[13] **A** Uh-huh
[14] **Q.** One of them's for Ameritech, the other is for
[15] Olympic?
[16] **A** Uh-huh
[17] **Q.** Why didn't you call this number here for
[18] Olympic Telecommunications?
[19] **A:** I called Ameritech because the charge was on
[20] our Ameritech bill
[21] **Q·** Now, when you looked at this were you able to
[22] determine that that $30 85 was the amount that you
[23] couldn't match up?
[24] **A:** I never referred to anything with
[25] Cyberspace com on the front page. What I was

**Min-U-Script®**       For The Record, Inc. -- (301)870-8025

Page 72

[1] looking at was on the last page of the bill
[2] Q: So you just didn't notice the number for —
[3] A. No
[4] Q: — Olympic Telecommunications?
[5] A No, I did not
[6] Q Did you ever call that line, the phone number
[7] for Olympic Telecommunications?
[8] A. Well, that may have been the number that
[9] Ameritech gave me
[10] Q. But you don't know?
[11] A. I don't know
[12] Q: So you may have been talking to Olympic, you
[13] may have been talking to Cyberspace, you're just
[14] not sure who you were talking to?
[15] A: I don't have a distinct memory of the name of
[16] the company that they gave when they answered the
[17] phone
[18] Q Okay Now, the bill itself says "Questions?
[19] Call" and then they have this number It's
[20] possible that you called another number besides
[21] this 1-800-368-0404 number, right?
[22] A I don't see where it says "Questions? Call "
[23] Q Okay, do you see where it says "Olympic
[24] Telecommunications"?
[25] A Oh, I see, okay

Page 73

[1] Q And it says "Questions? Call"?
[2] A And you're still on the first page of the
[3] Ameritech bill?
[4] Q I am, Page 1 of 3, which is the third page of
[5] the exhibit
[6] MS DIEMER. Are we saying Page 15017 in the
[7] bottom right-hand corner?
[8] MS SCHOOMER· That's the one I'm looking at
[9] A Okay, and your question is which number did I
[10] call?
[11] Q. Yeah, I'm saying it's possible that you did not
[12] in fact call that number that's listed there for
[13] Olympic Telecommunications, right?
[14] A The first person I called was Ameritech and the
[15] number I called was the one listed here for
[16] Ameritech I called the number that the Ameritech
[17] rep gave me over the phone Whether that matches
[18] up with the number listed here under "Olympic
[19] Telecommunications," I don't know
[20] Q. So you just don't know one way or the other if
[21] you called that number?
[22] A. I don't know
[23] Q Okay, and you're not sure what company it was
[24] that answered the phone, right?
[25] A· I don't have a distinct memory of the name

Page 74

[1] the company when they answered the phone.
[2] Q· You don't have a distinct — Do you have any
[3] memory whatsoever?
[4] A. In general?
[5] Q: Well, I asked you if you have any memory as to
[6] what company it was that answered the phone and you
[7] answered it in kind of a qualifying manner, I'm
[8] trying to determine is there anything that would
[9] keep you from answering that question just flat-out
[10] "No, I don't remember what the name of the company
[11] was"?
[12] MR. WINTER: Objection
[13] A Well, I thought I answered it based on the way
[14] you were asking me
[15] Q· Okay, I just need a "yes" or "no," do you
[16] remember the name of the company that answered the
[17] telephone?
[18] A No
[19] Q· Okay Are you sure it was a man you talked
[20] to?
[21] A Yes
[22] Q. How many conversations did you have with him?
[23] A. Just the one that I remember
[24] Q· Now if in fact they did refund the money to
[25] you, would you have the same complaints that you

Page 75

[1] have now?
[2] A: If they refunded the $154 and whatever now
[3] would I be a satisfied customer?
[4] Q· No, would you have the same problems and ill
[5] feelings that motivated you to write a —
[6] MR. WINTER· Objection.
[7] Q — complaint to the Better Business Bureau?
[8] A. I would still have a problem with the way they
[9] do business, yes
[10] Q: But you would've received a refund and it could
[11] very well have been just recognition that there was
[12] a mistake and it was corrected, right?
[13] A Well, at this point we've got the time that it
[14] took several of us employees to figure out what was
[15] going on with the account, the time that it took me
[16] to make all of the phone calls, write the letter,
[17] follow up with the Better Business Bureau, the time
[18] I'm spending here today and so forth I think
[19] they're into us for more than $150
[20] Q. That's not my question.
[21] A Well, I guess I've misunderstood your question
[22] Q· My question was if the gentleman whose name you
[23] do not remember whose company you do not remember
[24] had simply agreed to a refund when you first called
[25] him and sent your check back —

Page 76

[1] A. If at that time he had offered a refund, I
[2] would've been fine

[3] Q Sure, you would've just recognized this as a
[4] mistake that was made and —

[5] A Yes

[6] Q. — it was corrected?

[7] A. Yes

[8] Q. So would it be fair to say that the genesis of
[9] your ill-will right now toward Cyberspace is the
[10] way you were treated by this gentleman, —

[11] MR. WINTER: Objection

[12] Q — you know, the way he responded to your
[13] complaint?

[14] A· You mean because of his manner?

[15] Q. His manner and his actions of not refunding it
[16] to you

[17] A. His refusal to refund is the sole basis

[18] Q· That's your sole complaint right now, right?

[19] A. The fact that his manner was not very customer-
[20] service oriented, I can get over that The fact
[21] that he wouldn't refund my money, that precipitated
[22] all of this action

[23] Q. When did you first have any conversations,
[24] writing, oral, face-to-face, by telephone or
[25] otherwise with anybody with the Federal Trade

Page 77

[1] Commission?

[2] A I don't know what the exact day was It was
[3] sometime in December

[4] Q· Of when?

[5] A. Of 2001

[6] Q So just a month ago?

[7] A. A lady whose name I don't remember

[8] Q· Collot Guerard?

[9] A. No.

[10] Q: Did she call you or did you call her?

[11] A: She called me.

[12] Q. And what did she say?

[13] A: She said that she wanted to discuss — she
[14] wanted to know if I would answer questions
[15] regarding our relationship with Cyberspace com

[16] Q: And by "answer questions" did you understand
[17] that to mean give a deposition?

[18] A Not initially

[19] Q: And what initially did you understand that to
[20] mean?

[21] A: That she just wanted to ask two or three
[22] questions about Cyberspace com

[23] Q. Right then over the phone?

[24] A: Yes

[25] Q. And did she ask you those questions?

Page 78

[1] A. Yes

[2] Q: What did she ask and what did you tell
[3] her?

[4] A: Specifically I don't remember She asked
[5] generally were we charged some amount of money on
[6] our Ameritech bill from Cyberspace com and I said
[7] yes

[8] Q· What else in that conversation?

[9] A: To tell you the truth, more than that, I don't
[10] remember specifically

[11] Q· Okay When was the next conversation or
[12] communication you had with anybody at the Federal
[13] Trade Commission?

[14] A: Specifically I don't remember

[15] Q: Well, was it before today?

[16] A. Yes, I've received several phone calls from
[17] them

[18] Q. Do you remember anybody you talked to?

[19] A Yes

[20] Q: Who?

[21] A. Well, the lady who called, I spoke with her

[22] twice

[23] Q· Okay

[24] A. And then Brad Winter, I've spoken with him at
[25] least three or four times

Page 79

[1] Q: And this lady, did she identify herself as an
[2] attorney?

[3] A I don't remember her giving her —

[4] Q: Okay, and what was the subject matter of your
[5] conversations?

[6] A: She was questioning me about the charges from
[7] Cyberspace com on my Ameritech bill

[8] Q And what about your conversations to
[9] Mr Winter, what did you talk to him about?

[10] A About the same matter

[11] Q. Did he tell you the questions he would be
[12] asking you today?

[13] A Specifically?

[14] Q: Yes

[15] A· No

[16] Q· Did he talk in general terms about what he was
[17] going to ask you today?

[18] A. In general terms, yes.

[19] Q: When was the last time prior to today that you
[20] talked to Mr Winter?

[21] A: I spoke with him yesterday

[22] Q: And what about?

[23] A. Directions from the airport

[24] Q. Other than that anything else?

[25] A: I wanted to make sure that he got my fax

**Page 80**

[1]   Q: What fax?
[2]   A  I faxed him the Ameritech bill
[3]   Q· Is that one of the exhibits?
[4]   A: Yes, Exhibit 23
[5]   Q. Exhibit 23?
[6]   A: Yes
[7]   Q: Was that not part of the original document
[8] production you gave him?
[9]   A  I think I omitted a page  There's like a back
[10] page, CLS-0015029
[11]   Q· Did you talk to anybody with the FTC regarding
[12] the documents you produced?
[13]   A  Yes, with Mr Winter
[14]   Q  Did you go over them and explain what they
[15] were —
[16]   A  Yes
[17]   Q  — and what they were about? How long were
[18] your conversations with Mr Winter, the three or
[19] four that you had?
[20]   A  I didn't time them, so I don't know
[21]   Q  More than an hour?
[22]   A  No
[23]   Q  More than ten minutes?
[24]   A  Yes
[25]   MR LEONARD: I'll pass the witness

**Page 81**

[1]   MS DIEMER  Okay
[2]                 EXAMINATION
[3]                 BY MS DIEMER.
[4]   Q  Ms Schoomer, my name is Kathryn Diemer but
[5] everybody calls me Katie and I know that people
[6] have given you cautions, but if I use a word that
[7] you don't know, please tell me  If I use a word
[8] you do know but in a context or a manner or way
[9] that you don't feel that you understand that, that
[10] happens a lot with us attorneys, would you please
[11] let me know?
[12]   A. Okay
[13]   Q  And I know you've been good with everybody else
[14] but I just wanted to make that very clear
[15]   A. Okay
[16]   Q  I don't know a lot about First DataBank  What
[17] does First DataBank do?
[18]   A: Well, it's hard to answer in just one sentence
[19]   Q: You don't have to
[20]   A: Okay  We provide drug information  We compile
[21] drug databases, store them electronically  We
[22] provide those databases in various forms to
[23] pharmacists, hospitals, universities, insurance
[24] companies, anyone who needs any type of drug
[25] information, whether it's pricing, wholesale,

**Page 82**

[1] retail, manufacturer's pricing, how drugs interact
[2] with each other, how drugs interact with food,
[3] diseases, vitamins, that sort of thing
[4]   Q: Okay, and how is your product provided to your
[5] customers?
[6]   A. Electronically, either over the internet or on
[7] CD
[8]   Q: And how would somebody come about being a
[9] customer of First DataBank?
[10]   A  They would attend a trade show and talk with
[11] someone at the trade show about our product and if
[12] they showed interest then our sales representative
[13] would contact them after the show
[14]   Q  So your business here, not you personally, but
[15] the business of First DataBank is a business that
[16] people have established relations in?
[17]   A: Yes
[18]   Q: So you pretty much know who your customers are?
[19]   A  Yes
[20]   Q· How many people does First DataBank employ?
[21]   A  About 500
[22]   Q  Okay, and everybody kind of knows who the
[23] accounts are would be my guess?
[24]   A  Generally
[25]   Q  Generally I'm not saying everybody knows,

**Page 83**

[1] you know, Joe's Pharmacy is a First DataBank
[2] customer, but most people might know that the local
[3] hospital, which I think I drove by several times
[4] today, is probably a customer?
[5]   A  In very general terms we know that pharmacists,
[6] hospitals, insurance companies, universities, et
[7] cetera, use our data
[8]   Q· How expensive — My guess is your product
[9] runs — you know, there's different pricing ranges,
[10] but —
[11]   A  Huge
[12]   Q: — could you give me I mean like the lowest
[13] amount that you might get charged, a big amount,
[14] what would it be?
[15]   A. Well, that's such a relative term  Our
[16] cheapest products are probably in the hundred
[17] dollar range and our most expensive products are in
[18] the tens of thousands of dollars
[19]   Q: And do you bill for your product on a monthly
[20] cycle or a quarterly cycle, something like that?
[21]   A· All of the above.
[22]   Q: Okay, so you actually wouldn't expect to get
[23] small, little checks very often?
[24]   A· Not necessarily
[25]   Q. Okay

Page 84

[1] A. A mom-and-pop pharmacy who's just buying a
[2] small publication called a CSI, Controlled
[3] Substance Inventory, they're going to buy that
[4] every two years because the government requires
[5] that inventory, that product is $20
[6] Q Okay, so there are smaller checks?
[7] A: Yes
[8] Q: Okay
[9] A: At the end of a quarter if there's a balance
[10] due, it might be a small amount, if they've prepaid
[11] and then they had to give an inventory of their
[12] hospital beds or something and then we'll settle
[13] with them at the end of the quarter
[14] Q: Because one of my questions is how many checks
[15] do you see for 3.50 coming through here? My
[16] assumption was, based on what you said, not a whole
[17] lot?
[18] A. There aren't a lot, no
[19] Q Okay, and the reason I ask that is because we
[20] are talking about a check for 3 50
[21] A. Well, are you asking about customer-related
[22] checks or noncustomer-related checks?
[23] Q And I was going to ask you that next You said
[24] at the beginning of the week you get more checks
[25] and at the end of the week you get fewer, that

Page 85

[1] makes sense to me
[2] A. That's because the mail on Monday is much
[3] heavier than the mail on Friday
[4] Q Because you have Saturday?
[5] A: And Sunday
[6] Q Yeah And so when you get your checks on
[7] Monday, you have, what, a hundred or so pieces of
[8] mail?
[9] A At least, yes — Oh, pieces of mail?
[10] Q. Yes
[11] A. Several hundred pieces of mail
[12] Q: How much mail do you get? Do you get one of
[13] those sort of banker's boxes, things with handles
[14] from the Postal Service?
[15] A: Big tubs, yes, we get at least two of those on
[16] Monday
[17] Q And included in those big tubs, what sort of
[18] things are included in there?
[19] A: Advertising, business mail, checks, magazines
[20] Q: Am I correct in understanding that you are the
[21] person who supervises the mailroom employees?
[22] A. Yes.
[23] Q: So it's your job to make sure that there are
[24] procedures that the people in the mailroom follow
[25] when they get the two or three buckets of mail from

Page 86

[1] the post office every day?
[2] A: Yes
[3] Q: What time does your mail come in?
[4] A: It's delivered at 8 30
[5] Q That's a good deal, I want that for my office
[6] A. We pay for that
[7] Q· We're not allowed to
[8] A: It's called Caller Mail We pay for it several
[9] hundred dollars a year from the post office and
[10] then we pay a courier to go pick it up
[11] Q: So you get your say three boxes —
[12] A: Tubs
[13] Q: Tubs, tubs I think is what we're going with
[14] here, tubs of mail Is there one person who sorts
[15] the mail or is there more than one person?
[16] Actually, let me ask you, how many people are in
[17] the mailroom?
[18] A· Boy, that's hard to answer directly, three
[19] people are trained to sort mail
[20] Q: Okay
[21] A: It could be any one of those persons depending
[22] on what day of the week it is
[23] Q Okay, and is it one specific person each day
[24] but you rotate it among the three people?
[25] A. Yes

Page 87

[1] Q· Okay, and are those three people who have the
[2] job or been trained to open the mail, are those
[3] three people the same three people you had back in
[4] the fall of 1999?
[5] A. No
[6] Q. Are any of the three people the same people
[7] that you had?
[8] A: I'm not sure
[9] Q: Is it a pretty high turnover job?
[10] A· It can be The one employee that I'm thinking
[11] of may have been off on maternity leave during that
[12] time
[13] Q: I'm very sympathetic to that So in 1999 were
[14] you the person training the mailroom personnel?
[15] A: Yes
[16] Q. Okay What is it that you train them to do
[17] with the mail? Do they sort it?
[18] A: They sort the mail
[19] Q· And your instructions to them are "sort the
[20] mail"?
[21] A. Yes
[22] Q: What is the paradigm that they use to sort the
[23] mail, what do you tell them about how to sort the
[24] mail?
[25] A You want a one or two-sentence answer to that?

FEDERAL TRADE COMMISSION v. LUCINDA SCHOOMER
CYBERSPACE.COM, LLC. ET AL.

Case 2:00-cv-01806-RSL   Document 124   Filed 03/07/02   Page 51 of 184
January 30, 2002

Page 88

[1]   Q: An explanation I don't want you to tell me
[2] every single thing that you tell them, I'm sure it
[3] takes awhile, but, you know, what sort of general
[4] instructions, what sort of methodology do they
[5] follow in sorting the mail?
[6]   A. Checks are sorted out and those go to accounts
[7] receivable Pieces of mail addressed to specific
[8] people are sorted into the mail cart
[9]   Q  So somebody stands there and they take the
[10] pieces of mail that are directed to a specific
[11] person and they put them in one pile?
[12]   A. Right
[13]   Q  And how do you know that there are no checks in
[14] there, do they slit the envelopes open first?
[15]   A  It's not usually necessary It's like handling
[16] money, you learn to recognize checks very quickly.
[17]   Q: Okay, so you tell them that if they get a piece
[18] of mail and it's addressed to an individual person,
[19] that they don't slit that open?
[20]   A  Correct
[21]   Q  Okay, now, if it is a piece of mail that is to
[22] the accounting department or to an unidentified
[23] person, then they would slit open the mail, is that
[24] correct?
[25]   A  Not necessarily

Page 89

[1]   Q. Okay, what differentiates whether they open it
[2] or not?
[3]   A  They open it if they can't figure out who it
[4] goes to, but if it's a check it's usually very
[5] obvious that it's a check Checks have a very
[6] specific look
[7]   Q  And, you know, there's a lot of — I'm a
[8] lawyer, I basically have a small business and I
[9] know we get a lot of mail that is junk mail that
[10] doesn't have a specific person that are trying to
[11] sell you some service My guess is you guys get
[12] that too here at First DataBank, and at First
[13] DataBank when you get that is there a specific
[14] instruction as to what should be done with those
[15] types of materials, things that look like offers of
[16] sales?
[17]   A  Actually, most of the offers of sales that
[18] you're describing that are basically "Please buy my
[19] product" are usually addressed to a specific
[20] person
[21]   Q  Okay, what if a piece of mail comes in and the
[22] piece of mail contains a CD and some other
[23] materials about a service if it's not addressed to
[24] a specific person?
[25]   A. If it's obviously a CD, those usually go to our

Page 90

[1] IS department
[2]   Q. Okay, and is there one specific person in the
[3] IS department who would get that?
[4]   A: That's a group of three people, or was back in
[5] 1999
[6]   Q: Is it smaller now or bigger?
[7]   A: Just different
[8]   Q  Okay
[9]   A. CDs that are sent in the mail are usually AOL,
[10] those types of solicitations. "Here, download this
[11] encyclopedia," normally those hit the trash because
[12] as a business we don't use those
[13]   Q  Now, you said usually those are AOL or "buy an
[14] encyclopedia " Have you ever sat and sorted out
[15] and figured out how many of those letters including
[16] CDs are in fact from AOL?
[17]   A  We probably get one a day from AOL
[18] specifically
[19]   Q. And I understand that, I get that mail, too, I
[20] think we all do, but you're saying it's generally
[21] from AOL or someone like that Have you ever
[22] actually tried to figure out how much of it is from
[23] AOL and how much of it's from companies like
[24] Cyberspace com?
[25]   A. No

Page 91

[1]   Q. And so as I understand it, if it was a piece of
[2] mail that was not addressed to a specific person,
[3] then it would be slit open?
[4]   A  Yes
[5]   Q  And if there was a check in it, what would
[6] happen?
[7]   A  It would go to accounts receivable
[8]   Q  Okay, and how big is your accounts receivable
[9] department? Let me rephrase that How many people
[10] deal with checks which are received in the mail
[11] each day?
[12]   A. Four
[13]   Q  Are they the same four people now that they
[14] were back in the fall of 1999?
[15]   A  I would say at least three of those were
[16] employees there in 1999
[17]   Q  Do you supervise any of those four people who
[18] might have received a check?
[19]   A. No
[20]   Q. You've been here at First DataBank for a long
[21] time
[22]   A  Twelve years
[23]   Q: That's a long time in my book And have you
[24] ever spoken with the accounts receivable folks
[25] about what to do or policies about checks that are

Page 92

[1] included with other materials like CDs or
[2] advertisements?
[3]    A. I don't ever recall getting a check that had a
[4] CD with it or advertising
[5]    Q Okay, let me ask you about that As I
[6] understand it, you don't open the mail?
[7]    A Personally?
[8]    Q Yes
[9]    A I've done that many times
[10]    Q Okay What percentage of the time do you open
[11] the mail personally?
[12]    A In 1999?
[13]    Q Now
[14]    A: Now? Not very often
[15]    Q: Okay, 1999
[16]    A. 1999, if that was the year that gal was on
[17] maternity leave, I would've done it quite often
[18]    Q: Do you know if that was the year that gal was
[19] on maternity leave?
[20]    A. Not specifically, no
[21]    Q: So in 1999, assuming this woman was not on
[22] maternity leave, how many days would you have
[23] opened the mail personally?
[24]    A: An average of one day a week
[25]    Q. And in the one day a week when you opened the

Page 93

[1] mail you don't recall ever having received a letter
[2] which included a check and other material like a
[3] CD?
[4]    A Not the way you've described it
[5]    Q Okay, well, I'm not trying to describe it some
[6] funny way I mean, you've gotten the letters at
[7] home, I've gotten the letters at home, we've all
[8] gotten letters that have a CD in them, so have you
[9] ever opened the mail and received a letter when you
[10] were opening the mail here at First DataBank where
[11] you opened the letter and in the letter was a check
[12] plus a CD?
[13]    A. Never
[14]    Q. Have you ever opened a letter here at First
[15] DataBank where you opened the letter and there was
[16] a check plus some other descriptive material
[17] written, like a brochure?
[18]    A If you're talking about sales material, no
[19]    Q And when you're the person opening the mail, is
[20] it just you doing it?
[21]    A: Yes
[22]    Q: All right, and when you open the mail, you only
[23] open the mail where there's not a person named, is
[24] that correct?
[25]    A. Or it's not an obvious check

Page 94

[1]    Q: Okay
[2]    MS. DIEMER. Where's 27? Does anybody have 27
[3] floating around? I just want to look at it for a
[4] second
[5]    Q: Okay If you look at the first page of 27
[6] which is CS-00024 in the bottom right-hand corner,
[7] that says "To the order of," it says "Auto, Women
[8] of Power," okay? I know you don't work for Women
[9] of Power, I know that you work here at First
[10] DataBank, but if something arrived that looked like
[11] this, would this be the sort of outside envelope
[12] that would be opened or not opened?
[13]    MR. WINTER: Objection
[14]    A. Not opened If you can see this "To the order
[15] of," that's one of the clues that this is a check
[16]    Q: Okay, so it would be something that would be
[17] opened?
[18]    A. No, if it looks like it's a check, it's going
[19] to be sent to accounts receivable and they would
[20] open it
[21]    Q All right, and do you know what kind of
[22] training accounts receivable has concerning the
[23] opening of mail?
[24]    A: Training in opening envelopes?
[25]    Q. No, I'm asking more about, do you have any

Page 95

[1] involvement with the process that accounts
[2] receivable uses when it receives a piece of
[3] unopened mail?
[4]    A. No, I'm not involved in that process
[5]    Q. Have you ever been involved in it in the twelve
[6] years you've been here at First DataBank?
[7]    A. It's not a part of my job responsibility
[8]    Q: Oh, I fully understand that, I'm just trying to
[9] find out if at any point in the twelve years that
[10] you've been here it has been part of your job
[11] responsibilities
[12]    A: No
[13]    Q: You've been at First DataBank for twelve years
[14] Please describe for me when you came here what you
[15] were hired as, was it your current position or have
[16] you moved up over time?
[17]    A: I've moved up
[18]    Q. Okay, would you please describe for me as best
[19] you can where you started and the path you took?
[20]    A: I started in a very simpler position, the title
[21] was "Communications Coordinator," some nondescript
[22] title like that I did basically the same thing
[23] less some of the duties that I have right now
[24]    Q: Okay
[25]    A: I was not supervising people then, I didn't

Page 96

[1] manage the phone system then, I didn't manage
[2] construction projects then, but I did almost all of
[3] the purchasing and the maintenance and so forth
[4]    Q. So you started out doing purchasing and
[5] maintenance and then you've added supervision of
[6] the mailroom and you've added supervision of the
[7] phone system and you've added other supervision, is
[8] that correct?
[9]    A  I used to do some of the mailroom
[10] responsibilities that I now supervise
[11]    Q  Am I safe in assuming that First DataBank has
[12] grown in the last 12 years?
[13]    A  Quite a bit
[14]    Q· When you first joined First DataBank how big
[15] was it?
[16]    A. 90 employees
[17]    Q  What is your general educational background?
[18]    A· High school education
[19]    Q  And when did you graduate from high school?
[20]    A  1970
[21]    Q  And after you graduated from high school did
[22] you seek employment?
[23]    A  Yes
[24]    Q  And what employment did you locate and obtain?
[25]    A· Right out of high school?

Page 97

[1]    Q. Yes
[2]    A  I worked at a grocery store
[3]    Q  Okay, and was your job financial in working
[4] with the grocery store?
[5]    A  No
[6]    Q· What did you do for the grocery store?
[7]    A. I sliced meat
[8]    Q  How long did you slice meat in the grocery
[9] store?
[10]    A: Six months
[11]    Q· And after you sliced meat in the grocery store
[12] did you seek other employment?
[13]    A  Oh, yes
[14]    Q  I'm right there with you, I have to say  After
[15] you ended slicing meat did you seek further meat-
[16] slicing opportunities —
[17]    A· No
[18]    Q  — or other —
[19]    A  Something else.
[20]    Q· What was your next job?
[21]    A  I don't remember the exact next job I had
[22]    Q  Did you go seek further employment and you
[23] found another job?
[24]    A  Yes
[25]    Q  And do you have an idea what that was?

Page 98

[1]    A  I've done a lot of other things  I don't
[2] remember the very next thing I did after that first
[3] job
[4]    Q: Okay, could you give me some background about
[5] what you've done because I'm trying to find out
[6] what your background was before you came here to
[7] First DataBank
[8]    A: Before I came to First DataBank?
[9]    Q· Sure, work backwards
[10]    A: All right, that might be easier  I was a
[11] stay-at-home mother and I babysat for children in
[12] the infant to two-year-old and I did that for about
[13] ten years, and before that I wrote auto estimates
[14] for a British auto repair shop
[15]    Q  Here in Indiana?
[16]    A: Yeah, people bring in their Jaguars and so
[17] forth to get repaired
[18]    Q· I'm sorry, I was lost as to why there would be
[19] British people interested in car repairs
[20]    A. British cars
[21]    Q  Thank you Clearly, I don't have one of those,
[22] otherwise I would know this  All right  So you
[23] wrote auto estimates for a British car place
[24]    A: Repair place, yes
[25]    Q· Okay

Page 99

[1]    A. And I worked in a warehouse, I was the receiver
[2] in a warehouse, I was responsible for all of the
[3] incoming merchandise and all of the paperwork
[4]    Q. Mail, the mail, did you receive mail there at
[5] the warehouse?
[6]    A. No
[7]    Q· Okay  Before the warehouse?
[8]    A  I managed a dry-cleaners
[9]    Q· Okay
[10]    A: I roofed houses, I've been a maid in a motel,
[11] that lasted a week
[12]    Q  Meat-slicing was looking good that week
[13]    A: Uh-huh  Those are the high points
[14]    Q· Okay  What I'm also trying to find out is have
[15] you gone to any further education since you
[16] graduated?
[17]    A· No
[18]    Q· Okay, you haven't taken any community college
[19] courses or anything like that?
[20]    A· No
[21]    Q. So your knowledge of how business works is from
[22] your experiences that you've just described?
[23]    A· Yes
[24]    Q: Okay  At any of the jobs that you had before
[25] you came here to First DataBank, did they involve

---

Page 100

[1] the processing of mail?

[2] A. No, this is the only job where I've been

[3] involved in the processing of mail

[4] Q. Do you supervise Theresa Davis?

[5] A No

[6] Q Why did Ms Davis ask you about the charge

[7] contained on Page 1, why did she send Page 1 of

[8] Exhibit 23, the 15019, why did she send that to

[9] you?

[10] A. Because I'm the one that generated that

[11] purchase order

[12] Q And what is the company's policy whenever

[13] someone in accounts receivable — No, she's in

[14] payable, isn't she?

[15] A Yes

[16] Q: When someone in accounts payable comes across a

[17] discrepancy between a purchase order and the actual

[18] billing statement, is there a company policy about

[19] how to handle that?

[20] A. There are a number of ways that that can be

[21] handled The reason she sent this to me was

[22] because I wrote on the purchase order "Monthly fee

[23] over 1426 needs approval," and so when she received

[24] an invoice for 1463 18 she sent it to me with the

[25] accounts payable slip on the front and you see

---

Page 101

[1] where she's checked "Need variance approval, check

[2] on white copy"

[3] Q. You were not the person who asked the bank for

[4] the check, —

[5] A. No.

[6] Q — for the copy of the check? Okay, that was

[7] the gentleman whose name —

[8] A· Lance Jennings

[9] Q: Thank you Is Mr Jennings still employed

[10] here?

[11] A: Yes

[12] Q: When you looked at this in October of 1999,

[13] what was the first thing you did, was it to call

[14] Ameritech?

[15] A. Yes

[16] Q· And you called Ameritech and they gave you this

[17] other telephone number?

[18] A: Yes

[19] Q And you called this rude guy?

[20] A: Yes

[21] Q: When you called and the guy answered the phone,

[22] were you expecting to hear "Cyberspace com"? Did

[23] you think you would've noticed if they didn't say

[24] "Cyberspace com"?

[25] A. I think I would've noticed but I have not a

---

Page 102

[1] distinct memory, so I don't know how they answered

[2] the phone

[3] Q: Do you have any idea how long you talked to

[4] him?

[5] A. 10 or 15 minutes

[6] Q: It sounds to me like he kind of irritated you

[7] A Yes

[8] Q: How often do you have to call customer service

[9] people about contracts or other issues here at

[10] First DataBank?

[11] A. That's not uncommon at all

[12] Q. How often in a week? How often this week?

[13] Well, we're not very far into this week, you might

[14] want to use last week

[15] A: I've already called somebody once this week

[16] Q: Okay, last week how many did you call?

[17] A: Two

[18] Q: So you call customer service people fairly

[19] frequently?

[20] A· Yes

[21] Q· In 1999 was it about the same frequency?

[22] A It was more frequent in 1999

[23] Q: Okay, and did this man stand out in your mind

[24] that you spoke with because of his rudeness?

[25] A. Yes

---

Page 103

[1] Q: And he T'd you off?

[2] MR. WINTER: Objection

[3] A. I don't think that's an accurate description

[4] Q: What would you describe it as?

[5] A He frustrated me, but I'm not sure what you

[6] mean by T'd me off

[7] MR. LEONARD: Ticked

[8] Q. And after you were annoyed, how soon after he

[9] frustrated you, what was the next thing you did, do

[10] you remember?

[11] A. The very next thing that I did?

[12] Q. Did you go tell somebody how he had irritated

[13] you?

[14] A I think the next thing I did was I went and

[15] tried to confirm what he said, I went and asked

[16] Lance Jennings "Can you document, did we deposit a

[17] $3 check and can you get a copy of it from the

[18] bank?"

[19] Q: Did you talk about how this guy had been very

[20] frustrating to you?

[21] A: No My recollection of it was I simply tried

[22] to verify that what the man said was true, if we

[23] really did have a contract with him, I needed to

[24] find out

[25] Q: Okay That must not have taken very long to go

---

Page 104

[1] ask Lance that
[2] A. I asked him and then he probably got back to me
[3] within a day or two
[4] Q Okay, and how many more conversations do you
[5] think you had about this matter?
[6] A With anyone?
[7] Q In late 1999 before you wrote this letter to
[8] the Better Business Bureau
[9] A I probably had several conversations with
[10] internal employees
[11] Q What was the nature of those conversations?
[12] A Documenting how the whole situation came about
[13] and how the situation could be rectified
[14] Q Did you mention how irritating this gentleman
[15] on the phone had been to anybody?
[16] A· That probably came up at some point, but you
[17] keep bringing it up and I have to tell you I don't
[18] usually transfer one person's irritation to
[19] another, that would not have been the primary
[20] focus
[21] Q No, I didn't assume it was, but when somebody's
[22] notably irritating, we often say something to other
[23] coworkers like "Boy, I can't figure out what this
[24] is and the guy I talked to was a real jerk," —
[25] MR. WINTER Counsel, —

Page 105

[1] Q· — that's kind of how people talk about it and
[2] I'm trying to figure out if that's why it's
[3] sticking in your mind
[4] A No, it seems to be primary in your questions
[5] but it was not the primary thing with this event
[6] Q. Uh-huh
[7] A The primary thing to me was "How did we get
[8] charged for this? Why are we stuck paying it?"
[9] Q Have you ever worked in any other finance
[10] departments, Ms Schoomer?
[11] A No
[12] Q So I want you to look at Exhibit 26 Would you
[13] read the second sentence for me?
[14] A Of the first —
[15] Q: The letter, the second sentence of the first
[16] paragraph
[17] A· "Their method of obtaining subscriptions to
[18] their internet service is designed to flow nearly
[19] undetectable through most finance departments."
[20] Q How would you know that? You've never worked
[21] in any other finance department, have you?
[22] A But most of the people I work with have
[23] Q. So they would know that, wouldn't they?
[24] A. Yes
[25] Q Did they share with you that they thought this

Page 106

[1] was what was going on?
[2] A. Uh-huh
[3] Q: So they told you that, that's where you got
[4] this opinion?
[5] MR. WINTER Objection.
[6] A: I got this opinion because it flowed nearly
[7] flawlessly through our department that way and when
[8] I asked around I found that the processes we're
[9] using in our company were also processes that had
[10] been used in the companies that the other people
[11] had worked in
[12] Q. Did you ask anybody outside of this company?
[13] A: Specifically about this?
[14] Q: Yes
[15] A: Did I call people in other finance departments
[16] to try and back this up, no.
[17] Q: How many people in this finance department did
[18] you ask?
[19] A. Three
[20] Q. Who?
[21] A. Lance Jennings, Theresa Davis and my boss, Jim
[22] Schultz, and probably Lori Mercer, who is the head
[23] of accounts receivable
[24] Q: How often do you write the Better Business
[25] Bureau about a transaction here at First DataBank?

Page 107

[1] A Oh, I believe this is my first
[2] Q. And only so far?
[3] A: Probably, yes
[4] Q Twelve years and this is it?
[5] A. Uh-huh
[6] Q Okay Did you hope that the Better Business
[7] Bureau would take action against Cyberspace com?
[8] A: Yes
[9] Q· Did you hope they might in fact sue them?
[10] A. I hoped that somehow they would get my money
[11] back for me
[12] Q You wrote this letter in anticipation that the
[13] Better Business Bureau would take some kind of
[14] legal action to get your money back?
[15] A· I guess I didn't think about how they would do
[16] it, I just wanted them to get my money back.
[17] Q: Would it have been okay with you if they did
[18] that?
[19] A: Sure.
[20] MR. WINTER. Objection
[21] Q Did you anticipate that that might happen?
[22] A I never really thought about how they would do
[23] it
[24] Q· You said earlier in your deposition when
[25] Mr Winter was asking you questions that you didn't

Page 108

[1] need Cyberspace com's services because First
[2] DataBank has a much better service than they could
[3] have provided.
[4]     MR. WINTER: Objection
[5]     A Uh-huh
[6]     Q How do you know that?
[7]     A: What I was trying to convey is the volume of
[8] internet traffic that we need is much larger than a
[9] company like Cyberspace com was providing
[10]     Q: What do you know about Cyberspace com?
[11]     A: Well, until we found them on the bill, nothing
[12]     Q Did you find out more information from
[13] Mr. Winter when you talked to him?
[14]     A: No
[15]     Q. Did you find out more information from the lady
[16] at the FTC when you talked to her?
[17]     A More information about Cyberspace?
[18]     Q Cyberspace com
[19]     A And the internet service that they provide?
[20]     Q Anything about Cyberspace com
[21]     A Not really
[22]     Q· Have you ever investigated Cyberspace com?
[23]     A. No
[24]     Q Know anything about them other than that they
[25] showed up on your bill?

Page 109

[1]     A Correct
[2]     MR WINTER: Objection.
[3]     Q It's correct, what's correct?
[4]     A· I didn't hear of Cyberspace com until they
[5] showed up on my bill
[6]     Q So you didn't actually know whether or not
[7] Cyberspace com could've provided you this service?
[8]     A. I know that when we went shopping for internet
[9] service providers and looked at who could provide
[10] the type of service that we were looking for at
[11] that volume, that there were only three or four
[12] people in Indianapolis that we felt could provide
[13] adequate service to us and that company's name was
[14] not on the list
[15]     Q· When did you do that?
[16]     A. When did I do what?
[17]     Q When did you look into internet service here in
[18] Indianapolis?
[19]     A: Well, that would've been back in the mid '90s
[20]     Q: Before 1999?
[21]     A Yes
[22]     Q. Okay Now, my notes aren't perfect and I don't
[23] have my little computer where I can read along, so
[24] I'm not trying to put words in your mouth, so if
[25] I'm not saying this right, I want you to correct

Page 110

[1] me
[2]     A. Okay
[3]     Q: And this will hopefully save Mr. Winter from
[4] exercising his voice by objecting to this question
[5] since I'm sure to put it incorrectly. I'm trying
[6] to recall, you said at one point in response to
[7] some questions that when you get a check you match
[8] the check to the customer number
[9]     A: Uh-huh
[10]     Q. Who does that?
[11]     A: The accounts receivable clerk
[12]     Q: Okay, have you ever done that job?
[13]     A: No
[14]     Q· How many people do that job?
[15]     A: Four
[16]     Q: Those are the same four in accounts receivable?
[17]     A. Yes
[18]     Q: Okay Now, if they are unable to match the
[19] customer number for the check, they hold the check?
[20]     A. If it's not a customer-related check, it's
[21] given to Lance Jennings and he makes out the
[22] deposit slip and figures out who the rebate went
[23] to
[24]     Q: What percentage of the checks go to
[25] Mr Jennings and are held because they can't match

Page 111

[1] the customer number?
[2]     A: I don't know
[3]     Q: You say that the noncustomer checks are
[4] separately deposited
[5]     A. Uh-huh.
[6]     Q What is the volume, do you know, of noncustomer
[7] checks versus customer checks?
[8]     A. We might receive two or three rebate checks a
[9] month
[10]     Q So they're relatively uncommon?
[11]     A: Yes
[12]     Q· So Mr Jennings — Am I saying his name right?
[13]     A: Yes
[14]     Q: Good Mr Jennings, when he got this check for
[15] 3 50, he's the guy who looks at noncustomer checks?
[16]     A· Yes
[17]     Q: Which come in at the rate of one or two per
[18] month, is that correct?
[19]     MR. WINTER: Objection
[20]     A: I do not know the exact count
[21]     Q: But approximately?
[22]     A. I was guessing He told me when I asked him
[23] that in 1999 it was not uncommon to get a rebate or
[24] a refund check
[25]     Q: And what did you understand "not uncommon" to

Page 112

[1] be?

[2]   A: That he was probably receiving several a week

[3]   Q   Okay, so he's getting maybe two or three per

[4] week?

[5]   A   (Nods head affirmatively)

[6]   Q: Okay, and two or three where he couldn't match

[7] it up with a customer number So Mr Jennings is

[8] getting two or three checks a week, and it was

[9] apparently more back in 1999 than it currently

[10] is —

[11]   A. Uh-huh

[12]   Q: — which he couldn't match up with a customer

[13] number? How many of the checks do you think that

[14] he receives, that Mr Jennings receives, in this

[15] category had something like we see on Exhibit 27 on

[16] the page marked CS-00026, an eleven-line statement

[17] of writing, eleven lines of writing above where it

[18] says "Endorse Here"?

[19]   MR. WINTER: Objection

[20]   A: I don't know'

[21]   Q   How often when you open the mail if there's a

[22] check inside have you seen a check in your own

[23] experience here at First DataBank where there is

[24] approximately twelve lines of writing above the

[25] endorsement place on the check?

Page 113

[1]   A: I have seen checks before that had writing over

[2] the endorsement

[3]   Q: How many, how often, is it common or uncommon?

[4]   A   It's common enough that it didn't seem that

[5] unusual

[6]   Q. Okay

[7]   MR WINTER: Counsel, whenever you get to a

[8] good stopping point —

[9]   MS. DIEMER: This is a fine time

[10]   (Off the record discussion)

[11]   (A brief recess was taken)

[12]

[13]                REDIRECT EXAMINATION

[14]                BY MR. WINTER:

[15]   Q   Earlier you testified about a telephone

[16] conversation you had after Ameritech gave you a

[17] phone number

[18]   A   Uh-huh

[19]   Q: And that call you had was with a man

[20]   A: Uh-huh

[21]   Q   Who do you believe that that man worked for?

[22]   A   Cyberspace com

[23]   Q   Why do you believe that?

[24]   A: Because he was discussing my account with me

[25]   Q. Which account was he discussing?

Page 114

[1]   A: I told him that I was calling to discuss

[2] charges that his company had put on my Ameritech

[3] bill and he was discussing that account with me

[4]   MR. WINTER. No further questions at this time

[5]

[6]                RECROSS EXAMINATION

[7]                BY MR. LEONARD:

[8]   Q: Well, could it have been Olympic, whose

[9] number's on the bill?

[10]   A. It could've been It was my assumption because

[11] he was discussing that account with me that I had

[12] reached the right company

[13]   Q   In other words, you just knew you were talking

[14] to somebody who was talking about a Cyberspace

[15] account?

[16]   A: Uh-huh

[17]   Q. If you could look back to Exhibit 27, which is

[18] the copy of the check to Women of Power If you

[19] would turn to the third page that we had been

[20] looking at and if you'll recall I asked you a

[21] number of questions about the writing on here  I

[22] did not ask you questions about the next page  If

[23] you could flip over, this is a copy of one side of

[24] an insert and the second page is the backside of

[25] that copy, the next page

Page 115

[1]   A   The last page?

[2]   Q:   Right  In fact, one of them has on the bottom

[3] of the insert CS-00027, the other CS-00028, do you

[4] see that?

[5]   A. Yes

[6]   Q   And understanding you've never seen this

[7] document before, but assume with me that this was

[8] an insert that was enclosed with the same envelope

[9] that the check was included in, would you agree

[10] with me that this is something that one of the two

[11] hands who were handling this matter should have

[12] looked at and pulled out with the check?

[13]   MR. WINTER. Objection

[14]   A: You're saying theoretically if this was sent to

[15] my company with a check, would that have been

[16] noticed?

[17]   Q: Yes, I'm having to say that because we don't

[18] have a copy of the check or the actual what your

[19] company had, so I'm asking you to assume that this

[20] insert was included  Is this something that you

[21] would've expected someone in the accounts

[22] receivable department to have pulled out and looked

[23] at before they endorsed the check and simply

[24] deposited it in their bank?

[25]   MR. WINTER: Objection

**Page 116**

[1] A If we received the check and if this
[2] information was accompanying the check, yes,
[3] someone would have noticed it
[4] Q. And wouldn't you agree with me, Ms. Schoomer,
[5] that you'd view this as a red flag, that this was
[6] essentially solicitation or junk mail?
[7] MR. WINTER. Objection.
[8] A: No, I don't agree with that
[9] Q: You don't think that having an insert here that
[10] says "Serving your business communication needs"
[11] with a $3 50 check should tell a reasonable person
[12] that this is essentially a solicitation?
[13] MR. WINTER: Objection
[14] A I'm just glancing at this and I've never seen
[15] it before and my first impression is I must be
[16] doing business with you already. What's standing
[17] out to me is "Cyberspace Internet Services" and
[18] "Serving your business communication needs," sounds
[19] like we're already doing business, you're sending
[20] me money, my first impression is this is not a
[21] solicitation, we've already got business going on
[22] Q How many internet services do you use here?
[23] A. One
[24] Q· Okay, so you knew if you saw something that
[25] said "Cyberspace Internet Service" that you would

**Page 117**

[1] know that this is not somebody you're currently
[2] doing business with, right?
[3] A. Someone in the IS department would notice that
[4] probably, yes, but they're not the one handling the
[5] check
[6] Q We've been talking in terms of customer checks
[7] and noncustomer checks, right?
[8] A. Uh-huh.
[9] Q· And customer checks are people who use your
[10] services who pay you for your service and
[11] noncustomer checks are anyone else?
[12] A. Noncustomer checks can be from a wide variety
[13] of sources
[14] Q· Anybody who's not a customer?
[15] A. Yes
[16] Q And do I understand that during 1999 you
[17] estimate that you received two or three noncustomer
[18] checks a week?
[19] A. Uh-huh
[20] Q. And so let's walk through this You get
[21] hundreds of pieces of mail a week, and I may not
[22] remember your testimony about how many of those
[23] were checks
[24] A: I don't know that we came up with an exact
[25] total.

**Page 118**

[1] Q: Okay, give me an estimate in 1999 about how
[2] many checks a week you got
[3] A: Three to 500
[4] Q: Three to 500 and all but two or three of those
[5] were from customers, right?
[6] A. Uh-huh
[7] Q· And those were matched up with customer
[8] invoices and handled appropriately, right?
[9] A. Yes
[10] Q So of the two or three remaining out of three
[11] or 400, those are the only ones that you had to
[12] determine what to do with them, right?
[13] A· Yes
[14] Q. I'm curious, Ms Schoomer, if you're only
[15] talking two or three noncustomer checks a week
[16] why — Who is the individual's name again?
[17] A: Lance Jennings
[18] Q. — why Mr Jennings wouldn't have given a
[19] little more than a cursory look at to determine
[20] what — and notice the solicitation offer on the
[21] check
[22] A Well, you know, I think if the check was for
[23] several hundred dollars he would've made a
[24] concerted effort, but a $3 check on a busy day
[25] isn't your highest priority In 1999 we were

**Page 119**

[1] preparing — I mean, this is October, we were
[2] preparing for Y2K, everybody was overloaded with
[3] work that time of year With the best of
[4] intentions, I don't think a $3 check was his first
[5] priority
[6] Q But we're only talking two or three checks a
[7] week that all he had to do was look at it and give
[8] it more than two seconds glance to see if it's a
[9] solicitation check, right?
[10] MR. WINTER. Objection
[11] A: I can't answer for Mr Jennings
[12] Q· Okay Certainly, if you were in Mr. Jennings'
[13] position you would hope that you would give it more
[14] than a two or three second glance before you just
[15] stamped the back and gave it to the bank, right?
[16] A: I'm not sure what your question is
[17] Q: Well, don't you think that a reasonable person,
[18] if you're only talking two or three noncustomer
[19] checks a week, a reasonable, prudent person would
[20] have done more than give it a two or three second
[21] glance over it and stamp it on the back?
[22] MR. WINTER: Objection.
[23] A· I don't know how to answer your question
[24] You're asking me to speculate on another person's
[25] job process I know how busy I was in 1999 in

Page 120

[1] October

[2] **Q·** So you don't know what Mr Jennings' job

[3] process was back then?

[4] **A** I can't speculate for you on how much time he

[5] should or shouldn't spend looking at all of the

[6] material that comes with the check

[7] **Q** So if I were to ask you questions about the

[8] processes that Mr Jennings used, you know, in

[9] opening the mail and looking at it and how much

[10] time he spent with it and whether he really looked

[11] at it for two seconds or 20 seconds, that would be

[12] pure speculation on your part, right?

[13] **A** Yes, it would be

[14] **Q** Now you also had mentioned about when you would

[15] get these noncustomer checks, rebates, refunds,

[16] eventually they would be matched with the customer,

[17] right?

[18] **A** No

[19] **Q:** I'm sorry, with the vendor, with the vendor

[20] **A** Yes

[21] **Q** So that we have a clean record let me rephrase

[22] it You had testified earlier that when First

[23] DataBank would get these noncustomer rebate checks

[24] that eventually they would be matched with the

[25] vendor, right?

Page 121

[1] **A** Yes

[2] **Q** Is there an explanation as to why over this

[3] four or five month period this $3 50 check was

[4] never matched?

[5] **A** Here again I just think it fell through the

[6] cracks because it wasn't a lot of money

[7] **Q** Okay, well, you know, it occurs to me that we

[8] are speculating and assuming that there was even a

[9] check in existence, right?

[10] **A** That's why I've asked for a copy from the bank

[11] **Q** And you never got one, did you?

[12] **A** I only recently asked for a copy Back up,

[13] back up You need to repeat your question because

[14] I'm not sure exactly what time reference

[15] **Q** Any time reference I think I asked you before

[16] you have never seen that check, right?

[17] **A** No

[18] **Q** You have never seen the check, correct?

[19] **A·** Correct

[20] **Q** For all you know, somehow First DataBank could

[21] have been inadvertently signed up for this internet

[22] service through another means other than signing a

[23] check, right?

[24] **A** I don't think so, no

[25] **Q.** Well, we're just in the realm of speculation,

Page 122

[1] aren't we?

[2] **A** In the —

[3] **MR. WINTER·** Objection

[4] **A** You're asking me what?

[5] **Q·** Well, isn't it true that when we're talking

[6] about how First DataBank came to be signed up for

[7] Cyberspace Internet Service, all we're doing is

[8] assuming and speculating that a check was signed?

[9] **A.** No

[10] **Q·** But you've never seen the check?

[11] **A·** No

[12] **Q** Okay, what information do you have that a check

[13] was actually signed and deposited?

[14] **A:** I went to Lance Jennings and said "Is it

[15] possible that we signed and deposited this check?"

[16] and asked him to check with the bank and he said

[17] "Yes, one for that amount was signed and

[18] deposited "

[19] **Q** Okay, and what did he tell you about that

[20] check? Did he tell you the date of the check?

[21] **A** I didn't ask

[22] **Q** Did he tell you the name on the check?

[23] **A** I didn't ask

[24] **Q** So he said a check in the amount of $3 50 was

[25] deposited in the bank?

Page 123

[1] **A** Yes

[2] **Q:** And anything else besides that?

[3] **A.** I don't know of anything else with a certainty

[4] **Q.** Okay, and that's what I'm trying to get at,

[5] we're really in the realm of speculation, aren't

[6] we —

[7] **MR. WINTER.** Objection

[8] **Q.** — without having the check in front of you?

[9] **A:** I will say this, this guy is really sharp and

[10] he's very, very detail-oriented

[11] **Q:** You're talking about?

[12] **A.** Lance Jennings

[13] **Q** And he's the man that you think stamped this

[14] without reading it?

[15] **A.** What I'm telling you is this would be an

[16] extreme frustration to him to let this fall through

[17] the cracks It is my impression that he got a copy

[18] of the check to see for himself from the bank, but

[19] that was back in '99 I personally did not see it

[20] **Q** And you don't even know if he got it, you're

[21] just assuming, right?

[22] **A:** Yes

[23] **Q:** Okay, and again we're speculating?

[24] **A:** Yes

[25] **Q·** Now it's also possible that somehow First

---

Page 124

[1] DataBank was accidentally signed up for internet
[2] service through another means, isn't it, you just
[3] don't know?
[4]   MR. WINTER: Objection
[5]   A: How would that happen?
[6]   Q: I don't know We're speculating here, but I'm
[7] just saying isn't it possible that First DataBank
[8] could've been accidentally signed up for this
[9] internet service through another means?
[10]   MR WINTER: Objection
[11]   A. How would we do that?
[12]   Q I don't know
[13]   A. Well, I don't know how you would do that I
[14] don't know how to answer your question
[15]   Q. Well, you said Mr Jennings is a very detailed
[16] person, yet somehow in his responsibility of
[17] endorsing and handling two or three rebate checks a
[18] week he managed to stamp a check without reading
[19] it, so I'm saying that seems unlikely, so isn't it
[20] possible that Cyberspace's services could've been
[21] signed up through another means also?
[22]   MR. WINTER: Objection
[23]   A. Are you asking me is it possible that a
[24] detailed, oriented, conscientious person could ever
[25] possibly make a teeny, little mistake, yes, that's

Page 125

[1] possible
[2]   Q: I guess what I'm asking you, wouldn't you agree
[3] with me that, without you having the check in front
[4] of you, without you having looked at it and
[5] confirmed what it was that was signed and
[6] everything, that all that we're really doing today
[7] is speculating?
[8]   MR. WINTER: Objection
[9]   A You mean I'm here after hours giving a
[10] deposition on speculation?
[11]   Q Wouldn't you agree that's essentially what
[12] you're doing without having seen the check?
[13]   A. Someone speculated a charge on my phone bill
[14] that I was forced to pay
[15]   Q That's not my question My question is —
[16]   A: Well, I'm not sure what you're trying to get me
[17] to say here
[18]   Q: I'm not trying to get you to say anything
[19] except to testify truthfully You've not seen the
[20] check, so isn't it true that you're speculating as
[21] to its existence?
[22]   A The bank says it exists
[23]   Q: The bank told Lance Jennings who told you that
[24] it exists?
[25]   A: Yes

Page 126

[1]   Q: Okay, other than that, you don't even know that
[2] this check even exists?
[3]   A: I have not seen the check
[4]   Q: And other than this bank telling Lance Jennings
[5] who told you, you have no other evidence that this
[6] check exists, right?
[7]   A: Correct
[8]   MR. LEONARD: Pass the witness
[9]   MS. DIEMER. I don't have any questions
[10]   MR. WINTER· I have one follow-up question, one
[11] follow-up line of questions
[12]
[13]         **FURTHER REDIRECT EXAMINATION**
[14]             **BY MR. WINTER:**
[15]   Q: In addition to the bank telling you about this
[16] check, is there another man who's told you about
[17] this check?
[18]   A· The man at Cyberspace com told me about the
[19] check
[20]   Q: What did the man at Cyberspace com tell you
[21] about the check?
[22]   A: He said that cashing —
[23]   MS. DIEMER. Objection, calls for speculation,
[24] hearsay, calls for facts not in evidence
[25]   Q. You can answer

Page 127

[1]   A: The man at Cyberspace com told me that signing
[2] and cashing the check constituted signing a
[3] contract and that's why he had the right to charge
[4] us every month for internet service
[5]   MR. WINTER· No further questions
[6]   MS. DIEMER  I have one
[7]   MR. WINTER. All right
[8]   MR. LEONARD  Sure.
[9]
[10]         **FURTHER RECROSS EXAMINATION**
[11]             **BY MS. DIEMER.**
[12]   Q: When he said "the man from Cyberspace.com" and
[13] you said "the man from Cyberspace com," it's the
[14] rude man who we don't actually recall where he was
[15] from but we think it's from Cyberspace com, is that
[16] correct?
[17]   MR. WINTER: Objection
[18]   A· Well, I wouldn't have phrased it that way
[19]   Q. Obviously you didn't, but my understanding is
[20] you're not a hundred percent positive what the
[21] person said who answered the phone?
[22]   A· The man at the phone number that Ameritech gave
[23] me the number of
[24]   Q: Thank you And because I'm a lawyer and when
[25] we say we'll just ask one question it's always not

---

Page 128

[1] true, did you write yourself any notes about these
[2] conversations you had, any, you know, scribbles on
[3] a little piece of paper and do you have those
[4] anywhere?
[5]    A· On a normal day I would've taken notes In
[6] October of 1999 we were so covered up I did not
[7] take notes on that I wish I had, believe me I
[8] would love to give you names, dates, times, but I
[9] don't have any
[10]    Q   That's okay, I just wanted to make sure that by
[11] some horrible oversight that hadn't happened
[12]    A  No
[13]    MS DIEMER· I don't have any more questions
[14]    MR. LEONARD  Let me be clear on one point
[15]

**FURTHER RECROSS EXAMINATION**
**BY MR. LEONARD:**

[18]    Q· This man from Cyberspace did not tell you the
[19] check existed, he just told you he was too busy, he
[20] wasn't going to dig through the file for it, right?
[21]    A  Right
[22]    MR LEONARD  That's all
[23]    MS DIEMER· Do you have any more questions,
[24] Mr Winter, because I have an off-the-record
[25] question?

Page 129

[1]    MR WINTER. I don't have any further questions
[2] but I'll give you notice that the plaintiff FTC is
[3] making a request for a copy of this check which we
[4] believe to be in the possession of either
[5] Cyberspace com or one of the other defendants in
[6] this action and to the extent you have that check
[7] we'd ask that you produce it
[8]    MR. LEONARD  Well, we look forward to seeing
[9] it ourselves
[10]    MR WINTER: Housekeeping matter
[11]    MR. LEONARD: Are we off the record?
[12]    MR. WINTER: Before we go off the record, just
[13] to memorialize how we're leaving things, I
[14] understand we're leaving the exhibits in the
[15] custody of the court reporter I understand
[16] further that the witness reserves the right to sign
[17] her transcript
[18]    MS SCHOOMER· Yes
[19]    MR. WINTER: And that you'll circulate or have
[20] circulated copies of the transcript and the
[21] exhibits after they become available and are
[22] approved by the witness Any other housekeeping
[23] matters?
[24]    MS DIEMER· No
[25]    MR LEONARD: No

Page 130

[1]    (The deposition concluded at 5 30 p m )

Page 131

[1]        CERTIFICATION OF REPORTER
[2] CASE NUMBER        COO-1806
[3] CASE TITLE       Federal Trade Commission vs
[4] Cyberspace com LLC, French Dreams, COTO
[5] Settlement, Electronic Publishing Ventures, LLC,
[6] Olympic Telecommunications, Inc , Ian Eisenberg,
[7] and Chris Hebard
[8]
[9]    I HEREBY CERTIFY that the transcript
[10] contained herein is a full and accurate transcript
[11] of the notes taken by me at the hearing on the
[12] above cause before the FEDERAL TRADE COMMISSION to
[13] the best of my knowledge and belief
[14]    DATED  February 3, 2002
[15]
[16]        Marjorie A  Addington
[17]
[18]    CERTIFICATION OF PROOFREADER
[19]
[20]
[21]    I HEREBY CERTIFY that I proofread the
[22] transcript for accuracy in spelling, hyphenation,
[23] punctuation and format
[24]
[25]        MARJORIE A  ADDINGTON

**Page 132**

[1]         CERTIFICATE OF DEPONENT

[2]     I hereby certify that I have read and

[3] examined the foregoing transcript, and the same is

[4] a true and accurate record of the testimony given

[5] by me

[6]     Any additions or corrections that I feel are

[7] necessary, I will attach on a separate sheet of

[8] paper to the original transcript

[9]

[10]

[11]             LUCINDA SCHOOMER

[12]

[13]         I hereby certify that the individual

[14] representing himself/herself to be the above-named

[15] individual, appeared before me this _____ day of

[16] _____, 2002, and executed the above

[17] certificate in my presence

[18]

[19]

[20]             Notary Public in and for

[21]

[22]

[23] MY COMMISSION EXPIRES

[24]

[25]

**Page 133**

[1]   WITNESS  LUCINDA SCHOOMER

[2]   DATE JANUARY 30, 2002

[3]   CASE FTC v CYBERSPACE COM, et al

[4]   Please note any errors and the corrections thereof

[5]   on this errata sheet The rules require a reason

[6]   for any change or correction It may be general,

[7]   such as "To correct stenographic error," or "To

[8]   clarify the record," or "To conform with the

[9]   facts "

[10]

[11]         **PAGE LINE CORRECTION REASON FOR CHANGE**

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

TO: _Lucinda B._

I NEED THE FOLLOWING TO PROCESS
ATTACHED INVOICE _____

NEED P.O. _____

NEED YELLOW COPY _____

NEED APPROVAL ON
YELLOW COPY _____

NEED VARIANCE APPROVAL ✓ _on white copy_

NEED ADDT'L CHARGE APPROVAL _____

OTHER _____

DATE: _____ 10/27/99 _____

THANKS, THERESA DAVIS

MEMO: All pg. 3
then is a charge on 10/8
for $30.85 (Cyberspacein)?

Exhibit 23 -Lucinda Schoomer

CLS-0015019

**First DataBank**
8425 Woodfield Crossing Blvd; PO Box 40930
Indianapolis, IN 46240-0930
Phone: (317) 469-5200   Fax: (317) 469-5253

No. 35558

**PURCHASE ORDER** | **CHECK REQUEST**

Order Date: _1-99_
Date Required:
Ship to:

Date Check Required:
Special Instructions: _October 1999_

Vendor Code: _1/9619_
Vendor Name: _AMERITECH_
Address: _PO Box 45020_
_CAROL STREAM IL 60197-4520_

Acct# 309469 1116 1161
STANDING PO

| Description | Quantity Recd | Date Recd | Recd by | Quantity Ordered | Price | Total |
|---|---|---|---|---|---|---|
| MONTHLY LOCAL PHONE SERVICE | | | | | | 7896 00 |
| 1-99 THROUGH 12-99 | | | | | | 1,463.18 |
| Monthly fee over $1462 00 NEEDS APPROVAL | | | | | | |
| person add this | | | | | | |
| PO's | | | | | | |

PAID
CK# 67001340
12/10/99

Tax
Shipping
TOTAL $ 1,463.18

| Major | Dept | Proj | Fam | Prod | Fr/Med/Lng | Amount |
|---|---|---|---|---|---|---|
| ACCR NOV | | | | | | |

TOTAL

Authorized by: _Amanda Buehler_   Date: _1-8-99_

CLS-0015015

 **Ameritech.**

FIRST DATA BANK
8425 WOODFIELD CRSG
WEST BLDG SUITE 500
INDIANAPOLIS, IN 46240

**Page** 1 of 3
**Account Number** 317 469-1116 116 1
**Billing Date** Oct 19, 1999

**Web Site** www.ameritech.com

**Invoice Number** 317469111610

# Monthly Statement
## Sep 20 - Oct 19, 1999

### Bill-At-A-Glance

| | |
|---|---|
| Previous Bill | 1,328 06 |
| Payment - Thank You! | 1,328 06CR |
| Adjustments | .00 |
| Balance | 00 |
| Current Charges | 1,463.18 |
| **Total Amount Due** | **$1,463.18** |
| Amount Due in Full By | Nov 9, 1999 |

### Billing Summary

#### Questions? Call.

| | |
|---|---|
| Ameritech Local Service<br>1-800-480-8088 | 1,432.33 |
| Olympic Telecommunications<br>1-800-368-0404 | 30.85 |
| **Total of Current Charges** | **1,463.18** |

### Ameritech Local Service

**Monthly Service - Oct 19 thru Nov 18**

| | |
|---|---|
| Monthly Charges | 1,271 95 |

**Information Charges**

| | |
|---|---|
| 25 Call(s) placed to 1+411 | |
| 5 Call(s) placed to 1+555-1212 | |
| 30 Call(s) billed at $.40 each | 12 00 |
| 13 Call(s) placed to National Directory<br>Assistance 1+411, billed at $.95 each | 12 35 |
| 1 Call(s) placed using Information Call<br>Completion billed at $.25 each | 25 |
| **Total Information Charges** | **24.60** |

**Other Charges and Credits**
This section of your bill reflects charges and credits resulting from account activity

| Item<br>No | Description | Quantity | USOC | Monthly<br>Charges |
|---|---|---|---|---|
| | Effective Oct 10, 1999, your<br>Bill reflects a decrease of<br>$8 48 in your Monthly<br>Service charges. Charges are<br>prorated from Oct 10, 1999<br>thru Oct 18, 1999 | | | |
| 1 | Monthly Service | | | 1.94CR |

**Local, State and Federal Charges**

| | |
|---|---|
| 9-1-1 Emergency System<br>Billed for Indianapolis/Marion Cnty | 6 40 |
| Number Portability Surcharge | 38 88 |
| Telecommunications Relay System | 1 26 |
| **Total Local, State and Federal Charges** | **46 54** |

**Taxes**

| | |
|---|---|
| Federal at 3% | 34 19 |
| State at 5% | 56 99 |
| **Total Taxes** | **91.18** |
| | |
| **Total Ameritech Local Service Charges** | **1,432.33** |

### News You Can Use - Summary

• LOCAL TOLL INFO   • LONG DISTANCE INFO
• URGENT PAYMENT INFO   • LNP INTEREST CREDIT
See "News You Can Use" for additional information

Repair Service 1-800-480-8088

**CLS-0015017**


· Ameritech.

FIRST DATA BANK
8425 WOODFIELD CRSG
WEST BLDG SUITE 600
INDIANAPOLIS, IN 46240

**Page** 2 of 3
**Account Number** 317 469-1116 116 1
**Billing Date** Oct 19, 1999

**Invoice Number** 317469111810

## News You Can Use

**LOCAL TOLL INFO**
Our records show that you have AMERITECH
as your carrier for local toll service.

**LONG DISTANCE INFO**
Our records show that you have selected AT&T
as the presubscribed carrier for all of your long distance services.

**URGENT PAYMENT INFO**
To insure the timely and accurate application of payments, please
use the remittance document provided on the account summary
page. If the payment document is not included with your
payment, please include the 14 digit account number to which the
payment should be credited. (Example: 414 555-0000 123 1).
Reference to the "Invoice Number" found on the summary page
will delay the payment application process.

**LNP INTEREST CREDIT**
Your Local Number Portability (LNP) charge this month includes a
credit for interest on an LNP overpayment refunded to you on your
last bill. This interest credit is $.04 per line, $.20 per ISDN Prime
' ity and $.36 per PBX trunk. This lowers the charge this month
    .4 per line, $1.20 ISDN and $2.16 PBX. The normal charge of
$.28 per line, $1.40 ISDN or $2.52 PBX will be on your next bill

CLS-0015029

 Printed on Recycl



FIRST DATA BANK
8425 WOODFIELD CRSG
WEST BLDG SUITE 500
INDIANAPOLIS, IN 46240

**Page** 3 of 3
**Account Number** 317 469-1116 116 1
**Billing Date** Oct 19, 1999

**Questions?** 1-800-368-0404

**Invoice Number** 317469111610

## Important Information

This portion of your bill is provided as a service to the company
identified above. Please review all charges appearing in
this section. If you have any questions or concerns, call the
telephone number shown above.

## Current Charges

**Miscellaneous Charges and Credits**

This section of the bill reflects charges and/or credits applied
to your account.

| No | Date | Description | |
|----|------|-------------|---|
| **CYBERSPACE.COM** | | | |
| **For Services on 317 469-5200** | | | |
| 1 | 10-08 | CYBERSPACEIN | 29.95 |

**Taxes**

| | |
|---|---|
| Federal at 3% | .90 |

**Total Olympic Telecommunications Charges**     30 85

CLS-0015018

U092 T (3 99)

Printed on Recyclable Paper

# In The Matter Of:

*FEDERAL TRADE COMMISSION   v.*
*CYBERSPACE.COM, LLC. ET AL.*

*CHARLES CORAM*
*January 31, 2002*

*For The Record, Inc.*
*Court Reporting and Litigation Support*
*603 Post Office Road*
*Suite 309*
*Waldorf, MD  USA  20602*
*(301) 870-8025    FAX: (301) 870-8333*

Original File 20131COR.ASC, 64 Pages
Min-U-Script® File ID 2471460559

# Word Index included with this Min-U-Script®

**Page 1**

[1]        UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF WASHINGTON
[2]            CASE NO C00-1806-L
[3]
    FEDERAL TRADE COMMISSION,
[4]
        Plaintiff,
[5]
    vs
[6]
    CYBERSPACE COM LLC,
[7] FRENCH DREAMS, COTO SETTLEMENT,
    ELECTRONIC PUBLISHING VENTURES, LLC,
[8] OLYMPIC TELECOMMUNICATIONS INC,
    IAN EISENBERG, and
[9] CHRIS HEBARD
[10]    Defendants
[11]
[12]
[13]        Thursday, January 31, 2002
[14]
[15]
[16]        Corams' Steak & Eggs
[17]        804 South Tyndall Parkway
[18]        Panama City, Florida
[19]
[20] The above-entitled matter came on for deposition
[21] pursuant to notice at 10 47 a m
[22]
[23]
[24]
[25]

**Page 2**

[1] APPEARANCES
[2] ON BEHALF OF THE FEDERAL TRADE COMMISSION
    BRAD WINTER, ESQ
[3] Federal Trade Commission
    600 Pennsylvania Avenue NW
[4] Suite 238
    Washington, DC 20580
[5] (202)326-3272 Fax (202)326-3395
[6] ON BEHALF OF CHRIS HEBARD AND COTO SETTLEMENT
    ERNEST LEONARD, ESQ
[7] Friedman & Feiger
    5301 Spring Valley Road, Suite 200
[8] Dallas, Texas 75240
    (972)788-1400 Fax (972)788-2667
[9]
    ON BEHALF OF FRENCH DREAMS AND IAN EISENBERG
[10] KATHRYN S DIEMER, ESQ
    Campeau Goodsell Diemer
[11] A Law Corporation
    38 West Santa Clara Street
[12] San Jose, California 95113
    (408)295-9555 Fax (408)295-6606
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 3**

[1]
[2]
[3]        FEDERAL TRADE COMMISSION
[4]            INDEX
[5] WITNESS        EXAMINATION.
[6] Charles Coram     By Mr Winter - 4
[7]            By Ms Diemer - 23
[8]            By Mr Leonard - 39
[9]            By Mr Winter   51
[10]            By Ms Diemer - 57
[11]            By Mr Leonard - 59
[12]
[13] EXHIBITS FOR ID   DESCRIPTION
[14] 28     7     Subpoena
[15] 29     10     Check
[16] 30     12     Six-page Composite
[17] 31     43     Five-page Composite
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 4**

[1]                  **PROCEEDINGS**
[2] Whereupon,
[3] CHARLES CORAM,
[4] a witness, called for examination, having been first
[5] duly sworn, was examined and testified as follows
[6]                  **DIRECT EXAMINATION**
[7]                  **BY MR. WINTER:**
[8]     Q  Good morning. We're here pursuant to a
[9] third party subpoena in the case of FTC versus
[10] Cyberspace com LLC, French Dreams, Coto Settlement,
[11] Electronic Publishing Ventures, LLC, Olympic
[12] Telecommunications, Ian Eisenberg, and Chris Hebard,
[13] C001806 in the Western District of Washington.
[14]     My name is Brad Winter. I represent the
[15] Federal Trade Commission, the plaintiff, in this
[16] action
[17]     Defense counsel, may we have your
[18] identification on the record?
[19]     MR. LEONARD: Earnest Leonard on behalf of
[20] Chris Hebard and Coto Settlement, two of the
[21] defendants
[22]     MS DIEMER· Kathryn Diemer on behalf of
[23] Ian Eisenberg and French Dreams
[24]                  **BY MR. WINTER**
[25]     Q. Mr Coram, can you please state your full

**Page 5**

[1] name for the court reporter?
[2]     A. Charles Harrison Coram.
[3]     Q: Mr Coram, what is the name of your
[4] company here?
[5]     A: Corams' Steak & Eggs
[6]     Q· In 1999 was one of your company's phone
[7] numbers (850)763-3447?
[8]     A· Yes, it was
[9]     Q: Are you here today to testify about your
[10] company's relationship as a consumer with
[11] Cyberspace?
[12]     A: I am.
[13]     Q· Before we proceed any further, let me tell
[14] you about some of the ground rules for this
[15] deposition The deposition is a question and answer
[16] period. I'll ask the questions, and you can answer
[17] those questions
[18]     Perhaps, when I'm finished asking
[19] questions, these attorneys may also have some
[20] questions for you And then we'll see where we go
[21] from there
[22]     MR. LEONARD: Counsel, I assume we're
[23] doing it with the same stipulation as
[24] yesterday, waiving — preserving objections
[25] except for form and responsiveness

**Page 6**

[1]     MR. WINTER: It's my understanding those
[2] are preserved consistent with the rules
[3]                  **BY MR. WINTER,**
[4]     Q· When you give your answer, please try to
[5] verbalize it, because the court reporter, no matter
[6] how good she is, can't take down a nod of the head
[7] or an uh-huh, so a yes or no is helpful to her
[8]     A: Okay
[9]     Q. Also it's difficult for her to record two
[10] of us speaking at the same time So try to let me
[11] finish my question before you start your answer
[12]     A: Yes, sir
[13]     Q  If at any time I ask a question and you
[14] don't understand it, please let me know, and I'll
[15] ask you a better one
[16]     A: Okay.
[17]     Q: Conversely —
[18]     MS. DIEMER. Is that a promise?
[19]     MR. WINTER: That's an effort we'll try to
[20] make here
[21]                  **BY MR. WINTER·**
[22]     Q: That means, conversely, that if I ask you
[23] a question, and you answer it, then I am going to
[24] assume that you understood it Is that fair?
[25]     A: Yes, sir

**Page 7**

[1]     Q. If at any time during the questioning,
[2] either from me or from anyone else, you'd like to
[3] take a break, just let us know
[4]     A. Okay
[5]     Q: I'm handing you a copy of what has been
[6] marked as Exhibit Number 28, Coram, the exhibit
[7] numbers —
[8]     MS. DIEMER: Are you going to start asking
[9] questions? Can I add a couple more cautions?
[10]     If one of us asks a question, Mr Coram,
[11] and we use a word you do not understand in that
[12] question, will you please let us know that?
[13]     THE WITNESS· Yes, ma'am
[14]     MS. DIEMER. And if one of us asks a
[15] question, Mr Coram, in which we use a word
[16] with which you are familiar but with which we
[17] have used it in a way you are not familiar —
[18] lawyers do that a lot — if you would, please
[19] let us know
[20]     THE WITNESS: I will do that.
[21]     MS. DIEMER: In addition to that, do you
[22] understand that when we ask you questions, if
[23] you answer that question without telling us
[24] that you didn't understand something, that we
[25] are entitled to believe and to assume that you

**Page 8**

[1] understood the question?

[2] THE WITNESS· Yes, ma'am

[3] MS. DIEMER All right

[4]                    BY MR. WINTER.

[5] Q: I'll now hand you what has been premarked

[6] as Exhibit Number 28, Coram. We've continued the

[7] numbering from previous depositions, so this is the

[8] first in today's deposition Exhibit 28 is a copy

[9] of the subpoena

[10] Do you recognize this document?

[11] A Yes, sir

[12] Q: I note that it calls for your deposition

[13] to begin on this day but at a different time, and

[14] that we changed that time to accommodate counsel.

[15] A. Yes, sir

[16] Q We thank you for that.

[17] I also see that the subpoena calls for the

[18] production of documents Are the documents you're

[19] producing the documents you sent earlier to my

[20] office?

[21] A Yes, sir That's the documents that I

[22] have faxed to you

[23] Q Thank you I received those, and I have

[24] now shared a copy, the copy that I have, with

[25] counsel

**Page 9**

[1] MR LEONARD: Counsel, so the record is

[2] straight, you showed me, I think, three phone

[3] bills Is that all that was received pursuant

[4] to the document subpoena?

[5] MR WINTER· In response to the document

[6] subpoena we received the documents and then our

[7] office Bates labeled them And the Bates label

[8] ranges from CC0015001 — or, I'm sorry, correct

[9] that. CC0015100 through CCC0015115

[10] MR. LEONARD: Thank you

[11] MR WINTER: That's the complete range of

[12] the document production It doesn't,

[13] obviously, include the fax cover sheet —

[14] MR LEONARD: I understand

[15] MR WINTER. — that type of transmittal

[16] material

[17]                    BY MR. WINTER·

[18] Q. Mr Coram, what is your title here at

[19] Corams' Steak & Eggs?

[20] A: The official title, I'm president of

[21] Corams' Steak & Eggs,

[22] Q. As president are you involved in the

[23] day-to-day operation of Corams' Steak & Eggs?

[24] A Yes, sir

[25] Q· About how many years have you been

**Page 10**

[1] operating as president?

[2] A Between five and six

[3] Q And in addition to this Corams' Steak &

[4] Eggs restaurant that we're at today, do you have

[5] other facilities?

[6] A: Yes, sir We have a facility at 2729 West

[7] 23rd Street in Panama City

[8] Q· Do you have day-to-day supervision of that

[9] steak and eggs, as well?

[10] A. Yes, sir

[11] Q As a part of your day-to-day

[12] responsibilities, do you supervise the handling of

[13] the finances here?

[14] A Yes, sir

[15] Q· Do you supervise the cashing and

[16] depositing of checks?

[17] A: Yes, sir

[18] Q: And do you supervise any contracts that

[19] Coram would enter into?

[20] A. Yes, sir As president I have to sign any

[21] contract that we handle

[22] Q I'm going to hand you what is marked as

[23] Exhibit 29, Coram It is a one-page document which

[24] is also labeled H0006637.

[25] Do you recognize any part of Exhibit

**Page 11**

[1] Number 29?

[2] A. I recognize the for deposit only stamp on

[3] the back

[4] Q: All right Let's start more generally

[5] What does Exhibit 29 look to be to you? What do you

[6] recognize on it?

[7] A. It looks like a check

[8] Q. A photocopy of a check?

[9] A: A photocopy of a — to me it looks like a

[10] computer-generated check

[11] Q: A copy of the front and back of the check?

[12] A Yes, sir

[13] Q: And you see on the back of the check?

[14] A: Yes, sir

[15] Q· Do you see where it's stamped or where the

[16] words appear Corams' Steak & Eggs, Inc. for deposit

[17] only?

[18] A· Yes, sir

[19] Q: Is that the part of the exhibit that you

[20] recognize?

[21] A: Yes, sir

[22] Q: What do you recognize that to be?

[23] A That's either the stamp that we have or an

[24] exact copy of the stamp that we have that we stamp

[25] the back of the checks before we deposit them

---

Page 12

[1] Q: How does Corams' Steak & Eggs routinely
[2] process the checks that are deposited?
[3] A: We make our deposits on a daily basis to
[4] the bank So they are normally entered in on the
[5] deposit slip and made on a daily basis
[6] Q: Do you recall seeing this particular check
[7] before?
[8] A: I do not
[9] Q: Do you know who stamped this check for
[10] deposit?
[11] A I don't know I have — I have someone
[12] that pulls the cash register — or eleven o'clock at
[13] night, and then my brother has access to it, too
[14] So he may very well have done that
[15] Q: So there are a couple of individuals who
[16] have the responsibilities for stamping and
[17] depositing checks?
[18] A: If — yes
[19] Q: And these are individuals that work for
[20] you here at Corams' Steak & Eggs?
[21] A: Yes
[22] Q: I'm handing you next what has been marked
[23] as Exhibit 30, Coram It is a multi-page document
[24] in two parts which bears Bates Number H0006629
[25] through H0006634 Hand this to you and give you an

Page 13

[1] opportunity to read that
[2] A I recognize that, yes, sir
[3] Q: What do you recognize Exhibit 30 to be?
[4] A: That's the packet that I sent to the
[5] Public Service Commission concerning Internet
[6] service being provided by Cyberspace at the 804
[7] South Tyndall Parkway Drive location
[8] Q: Now, breaking down the exhibit into parts,
[9] the first page, is that the letter that you sent to
[10] the commission?
[11] A: Yes, sir
[12] Q: And the second and remaining pages, what
[13] are those?
[14] A: That's just a copy of the Bell South bill
[15] for November of '99
[16] Q When did you write this letter about?
[17] A Somewhere around the 12th of December
[18] 1999, and according to the fax date time stamp on
[19] the cover of the sheet where I mailed it to or where
[20] I faxed it to Public Service Commission, it says
[21] 12-13-99
[22] Q. When you wrote this letter in late 1999,
[23] were you describing events that had recently
[24] occurred?
[25] A: Yes, sir. I had noticed in the course of

Page 14

[1] paying the bills that there was an Internet service
[2] fee on there
[3] Q: Let me get to those details in just a
[4] minute —
[5] A: Okay
[6] Q: — and ask you a couple of other
[7] preliminary questions
[8] Is this your signature —
[9] A Yes, sir, it is
[10] Q: — that is there on the letter?
[11] After you signed the letter, what did you
[12] do with it?
[13] A. I faxed it to the Public Service
[14] Commission
[15] Q: And so the fax line starts 12-13-99 Does
[16] that appear to the be the fax line from your
[17] machine?
[18] A. Yes, sir
[19] Q: Above that —
[20] A. It was actually — I faxed it from the
[21] 23rd Street location, so you see the telephone
[22] number, 872-0784. That's the second number at the
[23] 23rd Street location. So that's where I mailed it
[24] or faxed it from
[25] Q: And then turning a minute to the phone

Page 15

[1] bill portion of Exhibit 30, what is the date of this
[2] phone bill?
[3] A: November — I can't make out
[4] Q. November of '99?
[5] A: Yeah, November of '99 I can't make out
[6] if that is 21 or 23
[7] Q: What type of information does the phone
[8] bill contain?
[9] A: It is basically a summary of the charges
[10] that you bill for, your basic service It tells
[11] you, you know, your line protection plan and then
[12] any additional services that are submitted to Bell
[13] South from an outside provider
[14] Q. Was the phone bill incorporated in your
[15] letter to the Florida Public Service Commission as
[16] it is shown here in Exhibit 30?
[17] A. Yes, sir
[18] Q: Do you generally rely on the information
[19] contained in the phone bills to be accurate?
[20] A: Yes, sir
[21] Q: Does Coram Steak & Eggs have a financial
[22] interest in seeing that the phone bill is accurate?
[23] A: Yes, sir
[24] Q: And why is that?
[25] A: Everything we save on bills is profit. We

**Page 16**

[1] operate on a small margin of profit. So anyplace we
[2] can save money, we try to save money
[3]    Q  To the best of your knowledge is this
[4] phone bill accurate aside from, perhaps, the
[5] Cyberspace charge?
[6]    A  Yes, sir
[7]    Q  I see in the letter that there is a phrase
[8] that says — on the fourth line — and I contacted
[9] Olympic last month
[10]    A  Yes, sir
[11]    Q  What month, about, would that have been?
[12]    A  That would have been November
[13]    Q  Let me rewind you back in time, then, to
[14] at least November or perhaps beforehand and ask you
[15] now about the first time that you heard about
[16] Cyberspace
[17]    A  Here again I'm relying on memory, but I
[18] believe it was in November, whenever I was getting
[19] ready to pay bills, I saw that on there
[20]    Q  You saw what on where?
[21]    A  I saw the 29 95 charge for Internet
[22] service
[23]    Q  And you saw that on the phone bill
[24]    A  Yes, sir And knowing that I didn't have
[25] a computer over here, I was a little suspicious why

**Page 17**

[1] I would have Internet service over here
[2]    Q  You don't have a computer at the Corams'
[3] Steak & Eggs
[4]    A  I have a computer at the 23rd Street
[5] location But I do not have a computer at the 804
[6] South Tyndall Parkway All the accounting and
[7] everything is done from 23rd Street
[8]    Q  So when you were suspicious about this
[9] charge for computer-related service, what did you do
[10] next?
[11]    A  There was a contact number on the bill, so
[12] I called it And I think I was told at that time,
[13] whoever answered the phone, that they were the
[14] billing agency for Cyberspace, that they didn't —
[15] that they weren't one in the same So that — I
[16] mean the impression that I got is that, you know, I
[17] contacted them And then they would contact
[18] Cyberspace, and that it would be resolved
[19]    Q  Okay How many phone calls did you make
[20] total?
[21]    A  Several And, you know, I don't remember
[22] the exact sequence of events there I called one
[23] time And I believe it said· Hey, office hours or
[24] business hours are from this time to this time
[25]    Q  Yes

**Page 18**

[1]    A:  I want to think that I got a phone number
[2] for Cyberspace, and then I called that And then I
[3] got kind of sequential steps through, you know,
[4] punch one, punch two, punch one And then basically
[5] I came back to the main menu
[6]    Q:  Okay.
[7]    A:  But I do know, whenever I got up with
[8] Olympic, they told me it could be resolved, and then
[9] it wasn't And I don't really remember if I tried
[10] to contact Cyberspace again and had difficulty or
[11] not But, anyway, at that point I decided I would
[12] go to the Public Service Commission and get it
[13] resolved one way or the other And, you know, I was
[14] being charged a late charge on the phone bill based
[15] on that
[16]    Q:  Who was charging you the late charge?
[17]    A:  Bell South
[18]    Q·  Bell South Are these charges that appear
[19] on this November bill which is attached as part of
[20] Exhibit 30?
[21]    A.  Yes, sir.
[22]    Q.  All right
[23]    A:  They do It's a nine-dollar — it's on
[24] page — well, it's the third page of the packet. I
[25] guess it's page 2 of the phone bill Down towards

**Page 19**

[1] the bottom it says other charges and credits
[2]    Q  Is that the page that also has in the
[3] lower corner H0006631?
[4]    A  Yes, sir, it is
[5]    Q.  All right That's where the nine-dollar
[6] late charge appears
[7]    A.  Yes, sir, and the 21 cent interest on that
[8] unpaid
[9]    Q:  Right Also on the phone bill you see the
[10] charge from Cyberspace
[11]    A.  Yes, sir
[12]    Q·  And where does that appear?
[13] Well, first, can you tell me how much was
[14] that charge?
[15]    A.  29 95 And then the federal tax and the
[16] state tax and everything else bumped it up to 33 77,
[17] and that's on page H0006634.
[18]    Q:  Which is the last page of Exhibit 30
[19]    A·  Yes, sir
[20]    Q:  You referred earlier to a phone number
[21] that you called when you tried to call Olympic.
[22] What number is that?
[23]    A.  That was the 800 number It's listed on
[24] the top of the page that we're looking at now And
[25] I can't make it out on this copy, but I think it was

Page 20

[1] 800-368-8304

[2] Q It's difficult to see on this copy

[3] A. Yes, sir

[4] Q· On the copy that you had at the time —

[5] A: It was plain.

[6] Q. And when you called that number, who did

[7] you reach?

[8] A I got — here again, relying on memory, I

[9] believe they answered as Olympic Telecommunications

[10] Q. All right. And is it after that phone

[11] conversation that you then tried the number for

[12] Cyberspace with the ones and the twos that you

[13] mentioned?

[14] A. I believe it was after — just prior to

[15] sending this to the Public Service Commission

[16] Because I talked to Olympic the month before, and I

[17] had been assured that, you know, that it would be

[18] resolved. And then I called back, and the — it

[19] hadn't been

[20] And I can't remember if I had difficulty

[21] getting up with them or what. But then I — that's

[22] when I tried the Cyberspace number

[23] Q You specifically recall a conversation

[24] that you had with Cyber — with the people who

[25] answered at the Cyberspace number?

Page 21

[1] A· I don't remember all the details — oh,

[2] no, Cyberspace?

[3] Q Cyberspace

[4] A. No, sir

[5] Q· That's my question now

[6] A. I never got Cyberspace I got the

[7] computer generated, you know, for this issue punch

[8] one And then it basically — I just revolved right

[9] back around to the main screen again

[10] Q· Do you recall did the Cyberspace voice

[11] mail system give you an option to cancel the

[12] service?

[13] A I don't think it did, because that was my

[14] sole intent was, you know, to cancel it, and, you

[15] know, get it resolved

[16] Q: You mentioned earlier about the

[17] conversation you did have with the Olympic

[18] representatives about taking care of this When was

[19] that conversation?

[20] A. It had to be prior to me receiving the

[21] phone bill dated November the 23rd, because

[22] that's — when I got that, that's when I realized

[23] that it hadn't been corrected

[24] Q. How many months total were you billed by

[25] Cyberspace and/or Olympic?

Page 22

[1] A. I believe four months before it was

[2] resolved I think October, November, December, and

[3] then in late January is when it all got resolved

[4] after — or on the January bill I think is when I

[5] saw evidence of it being resolved, where they had

[6] credited the account and where it was being

[7] indicated on the Bell South bill that those charges

[8] were under dispute

[9] Q. Do you know why they were indicated to be

[10] in dispute?

[11] A. Because I had called Bell South and kind

[12] of explained to them that I didn't have a computer

[13] over here and that I wasn't paying for Internet

[14] service for a place that I didn't have a computer

[15] Q: Do you recall receiving a CD from

[16] Cyberspace?

[17] A: I do not.

[18] Q· To the best of your knowledge, did Corams'

[19] Steak & Eggs ever use Cyberspace Internet service?

[20] A· No, sir

[21] MR. WINTER Thank you I have no further

[22] questions at this time

[23] MS DIEMER: You went first yesterday

[24] It's my turn

[25] Mr Coram, my name is Kate Diemer, as I

Page 23

[1] think I probably said about three times here so

[2] far I have a few questions for you

[3] **CROSS EXAMINATION**

[4] **BY MS. DIEMER.**

[5] Q: First of all, have you ever spoken to

[6] Mr Winter before today?

[7] A· Yes, ma'am

[8] Q: When did you first speak to Mr Winter?

[9] A. Approximately three weeks ago

[10] Q: Was that the first contact you had from

[11] anyone at the Federal Trade Commission?

[12] A. No, ma'am About two days — and, here

[13] again, I'm guessing

[14] Q. Best estimate is good

[15] A: Sometime in the week before I spoke with

[16] him, I had spoken with a female attorney in his

[17] office

[18] Q. And this was someone who told you that

[19] they were an attorney, and it was a woman

[20] A. Yes, ma'am

[21] Q: Do you remember that person's name?

[22] A. I do not.

[23] Q. And how long was that — was that the

[24] first contact you had with the Federal Trade

[25] Commission?

Page 24

[1] A Yes, ma'am.

[2] Q. And the woman attorney from the Federal

[3] Trade Commission, how long was your conversation

[4] with her?

[5] A: Probably two minutes

[6] Q And what was the nature of that

[7] conversation?

[8] A Basically that they were looking into

[9] Cyberspace That they had, I guess, information

[10] that I had filed a complaint with the Florida Public

[11] Service Commission and wanted to know if I would

[12] provide them with the information concerning that

[13] Q Okay Did she talk to you about the

[14] information from the Public Service Commission?

[15] A. She did not

[16] Q Okay I assume your reply was yes

[17] A. Yes, ma'am, it was

[18] Q And after you replied yes, was that the

[19] end of the conversation with her, or did it

[20] continue?

[21] A· I don't think there was any substantial

[22] conversation after that I think she said, you

[23] know, we're looking into it Somebody from the

[24] office will be getting back with you You know,

[25] it's just kind of a — I guess a touchy feely call

Page 25

[1] to see if I was receptive to it

[2] Q. Okay And the next contact that you had

[3] with the Federal Trade Commission, who was that

[4] with?

[5] A I believe it was with Mr Winter

[6] Q So other than the lady attorney that you

[7] spoke with and Mr. Winter, those are the only people

[8] from the Federal Trade Commission that you discussed

[9] anything to do with Cyberspace com or your phone

[10] bill, is that correct?

[11] A. Yes, ma'am

[12] Q Okay. So the conversation with Mr Winter

[13] that was the follow-up to the first one as to

[14] whether you would be willing, when did that happen?

[15] A· Like I say, I think about three weeks ago

[16] Q· Okay And how long a conversation was

[17] that?

[18] A Probably five minutes

[19] Q And what were the topics discussed in

[20] that?

[21] A I believe at that point — you know, I

[22] mean, we were talking basically about the public

[23] service complaint and everything. And he wanted to

[24] know if I had documents relating to that And I

[25] told him yeah. And he wanted to know if I would fax

Page 26

[1] them to him — or mail them to him.

[2] Q: Uh-huh

[3] A: And I told him I would And I don't

[4] remember if he mentioned then about possibly a

[5] deposition or not, or if that was, you know, one of

[6] the later discussions But I think basically that

[7] was it, did I have the documents, and would I

[8] provide them

[9] Q Okay And when you had that conversation

[10] with Mr Winter, did he indicate to you anything

[11] about what the FTC was trying to get out of you to

[12] support its case, you know, they're trying to

[13] prosecute, we want to know this kind of information,

[14] do you have that kind of information?

[15] A· I mean, I don't think he defined exactly

[16] what he was looking for He wanted to know if I had

[17] anything related to that.

[18] Q. Uh-huh

[19] A: And I think it was pretty much centered

[20] specifically on my involvement in it.

[21] Q Okay And how long a conversation was

[22] that, again?

[23] A I think about five minutes

[24] Q: What was the next contact you had with

[25] anyone from FTC?

Page 27

[1] A: I think, again, that was with Mr Winter

[2] Q· Uh-huh

[3] A. And I think that dealt with the deposition

[4] that — you know, it was being scheduled and what

[5] dates were most convenient for me, trying to arrange

[6] a schedule

[7] Q. Was any other topic discussed?

[8] A: I don't believe there was I mean other

[9] than, you know, little more conversation about the

[10] documents, but, I mean, the same topic.

[11] Q Have you had any further conversations

[12] since the scheduling conversation with Mr Winter?

[13] A· I had one from him yesterday confirming

[14] the deposition and then two today concerning the

[15] delay in Atlanta and the fact that you-all had

[16] arrived and were on your way

[17] Q· Did you ever talk about what kind of

[18] things we might talk about here, what the defense

[19] attorneys might ask, anything like that?

[20] A· I don't believe we did

[21] Q. All right

[22] A: He did mention, you know, that, you know,

[23] the defense would be here, and they would have

[24] questions. But as far as any specific type

[25] questions, I don't think we —

Page 28

[1]  Q. Did he ever indicate to you specifically
[2] what kind of questions he was going to ask you?
[3]  A: No, I don't think so. I think, you
[4] know — I think he said basically, A, we're going to
[5] go over what you sent me
[6]  Q. How is mail processing handled here?
[7] I assume that at this location of Corams'
[8] Steak & Eggs and at the other location of Corams'
[9] Steak & Eggs that you receive mail on a daily basis,
[10] is that correct?
[11]  A. That is correct
[12]  Q And how is that mail receipt handled at
[13] this steak and eggs and then — well, let me go
[14] back I'll make it easier.
[15]  Is the mail processed in the same way in
[16] both locations?
[17]  A. Basically, yes, ma'am
[18]  Q. Okay How is it handled at this one?
[19]  A. The mailman actually brings it in We
[20] don't have a box So he brings it in He will
[21] normally either hand it to a waitress, or he'll get
[22] her attention and go set it beside the cash
[23] register And then they bring it back, and they'll
[24] lay it on the desk at either location
[25]  Q: Okay And once it's laid on the desk, who

Page 29

[1] opens it?
[2]  A Normally either me or my brother
[3]  Q Okay Is your brother also an officer of
[4] Corams' Steak & Eggs?
[5]  A He is vice president
[6]  Q: Okay So are you and your brother the
[7] only two people that open the mail?
[8]  A: Generally I mean there may be an
[9] exception where somebody else would, but normally —
[10]  Q: Okay
[11]  A Normally we're the only ones that open it
[12]  Q. Okay And when you open the mail — well,
[13] am I right in assuming that in addition to the
[14] normal, ordinary business mail that you receive
[15] here, that you receive what might be called junk
[16] mail?
[17]  A. Yes, ma'am, a lot of it
[18]  Q: Okay And what, when you get that junk
[19] mail, do you do with it? Do you open it and then
[20] throw it away or just toss it?
[21]  A: Well, they're getting pretty slick with
[22] the way they send it. If it's obviously junk mail,
[23] then it's tossed
[24]  Q: Okay
[25]  A: If it's questionable, then we open it

Page 30

[1]  Q: And I have the impression you and your
[2] brother probably speak frequently
[3]  A: Yes, ma'am.
[4]  Q. Kind of run these two locations together?
[5]  A: Yes, ma'am
[6]  Q: So if something came in the mail that was
[7] unusual, you would talk to your brother about it, he
[8] would talk to you about it?
[9]  A. Probably, yes, ma'am
[10]  Q: Okay And when you receive the mail, am I
[11] correct in understanding that the vast majority of
[12] Corams' Steak & Eggs' revenues are derived from the
[13] restaurant business, that is traffic that comes into
[14] your dining area, sits, and eats, and pays, and then
[15] leaves?
[16]  A: Yes, ma'am
[17]  Q: As opposed to, for example, catering? Do
[18] you-all do any catering?
[19]  A: No, ma'am, we don't do catering
[20]  Q: Do you accept checks at your locations?
[21]  A. We accept local checks
[22]  Q: Okay
[23]  A: And a couple of the business checks that
[24] we do quite a bit of business with We'll accept
[25] company checks.

Page 31

[1]  Q: So if you did like a rotary, if a rotary
[2] met in one of your places — I don't know if it
[3] does I just know that they do meet in places like
[4] this Therefore, if the rotary came or business
[5] people that come all the time from a nearby
[6] business, that that person's check you might take.
[7]  A: Yes
[8]  Q: Is that a fairly limited number of checks?
[9]  A Yeah, yeah It's normally — I mean, we
[10] normally process one or two checks a day
[11]  Q: Okay. And in terms of the one or two
[12] checks per day — is it one or two checks for both
[13] locales or —
[14]  A. For each location.
[15]  Q: Okay
[16]  A. Two at each location.
[17]  Q: So two to four a day for the operation
[18]  A: Yes, ma'am
[19]  Q: For the whole operation as opposed to an
[20] individual site
[21]  A. Yes, ma'am
[22]  Q: Okay And do you have those two — of
[23] those two to four checks for the entire operation
[24] that are processed, you know, how often are they
[25] personal local checks versus these business checks?

**Page 32**

[1] A· Probably 90 percent of them are personal
[2] checks
[3] Q: So the business check is really a rarity?
[4] A: Yes, ma'am
[5] Q: And it's a very limited number of
[6] businesses
[7] A Yes, ma'am
[8] Q Do you feel most of your cashiers are
[9] familiar with which business would have a right to
[10] cash a check?
[11] A. Yes, ma'am.
[12] Q. Are those businesses pretty much all local
[13] Florida businesses?
[14] A. Yes, ma'am
[15] Q· Okay So if a check doesn't have Florida
[16] something in the greater Panama City — I'm sorry
[17] I have been a number of places this week I'm
[18] having a little difficulty with the double Ps here
[19] today
[20]    So if it didn't say Panama City or the
[21] greater Panama City area of Florida, your cashiers
[22] would be reluctant to put it in your cash registers?
[23] A Yes, ma'am.
[24] Q Okay Who stamps the check in your
[25] operation with the Corams' Steak & Eggs, Inc for

**Page 33**

[1] deposit?
[2] A That would be either my brother or myself
[3] Q Nobody else?
[4] A· There may be a rare occasion, if we were
[5] both out of town. But I'm telling you, that's —
[6] Q Very unusual.
[7] A Yeah, that's foggy I mean, it just
[8] doesn't happen very often
[9] Q Okay Normally when you get personal
[10] checks, the personal checks probably don't have any
[11] writing above the place where you endorse
[12] A. The personal checks don't, no
[13] Q Okay The business checks, do they have a
[14] paragraph?
[15] A Some —
[16] Q· Some of them do
[17] A Some of the business checks will And one
[18] thing that — there are times when we'll get a
[19] rebate check —
[20] Q: Okay
[21] A. — from various — you know, from a
[22] different manufacturer or whatever The pay
[23] telephone out here is a prime example
[24] Q: Okay
[25] A That's — we get limited revenue from that

**Page 34**

[1] based on how much comes in
[2] Q: You guys own your telephone
[3] A: We don't own the telephone
[4] Q: Oh, you don't own the telephone
[5] A: A company puts it in. Pay telephone
[6] stations right now are — they are a very fluid
[7] business I mean, the guy that owns it this month,
[8] may not own it next month
[9] Q· Right
[10] A. And that's a really small amount.
[11] *Basically what it does, is it reimburses for the*
[12] *electricity*
[13] Q: And you get a check for that every month
[14] A: Supposed to It's — there again, it
[15] depends on — you know, as they change owners —
[16] Q: Yeah
[17] A: — then there may be a lag there now
[18] We finally got to the point that we just
[19] quit fighting that battle
[20] Q: Okay Well, how much money are we talking
[21] about?
[22] A. On a good month, five dollars.
[23] Q: Okay All right. Is it usually an
[24] individual or corporation that owns that?
[25] A It is normally a small corporation

**Page 35**

[1] Q And in those small corporation checks, do
[2] they normally have a paragraph of writing above
[3] where the endorsement is?
[4] A One of them that we did business with did,
[5] but I think that's the only one that I recall having
[6] it
[7] Q· Okay This check that you have provided
[8] us a copy with, which is marked as Exhibit 29, Bates
[9] Stamp Number 80006637 — you have to take my word
[10] for it, since I think I'm holding the copy
[11]    You can hand it to him. Thank you very
[12] much, Mr Winter
[13]    (Discussion held off the record )
[14]    MS. DIEMER: Can you read the question
[15] back, and I'll just say it again a different
[16] way?
[17]    (Requested material read by court
[18] reporter )
[19]    MS DIEMER: We'll start again now
[20]            BY MS. DIEMER:
[21] Q: Looking at this check that is copied or
[22] Xerox of which is provided on Exhibit 29, Bates
[23] Number H0006637, if you look at the part of the
[24] check that says endorsement or endorse and then says
[25] Corams' Steak & Eggs, Inc My copy it's a little

Page 36

[1] bit difficult to read that top paragraph Can you
[2] take a shot at it for me, sir?
[3]　A: Mine is really blurry, too
[4]　Q: I believe —
[5]　A: It says this something check —
[6] No, I really can't I'm telling you —
[7] endorsement and deposit
[8]　Q. I believe the second sentence may say
[9] endorsement and deposit constitute agreement
[10]　A. Yeah, I can see that in there
[11]　Q: And then it is some words that I can't
[12] really read And then it goes on an agreement —
[13] and in the next line, agreement pursuant to terms
[14] attached. And it goes on a couple — I can't read
[15] the next line Payee agrees, is the next line,
[16] to —
[17]　A Qualified and something
[18]　Q: Yeah And then payee acknowledges that
[19] they are qualified, the next line Something about
[20] authorize in the line after that Does that seem to
[21] be along the same lines that you're seeing?
[22]　A: Yes, ma'am
[23]　Q: If you're the person opening the mail and
[24] you get a check and you go to stamp Corams', you get
[25] a check and the check is not a Florida check — this

Page 37

[1] checks says it's from Chapel Hill, North Carolina
[2] And you turn it over and go to stamp it, and it's
[3] got a paragraph like that, are you going to read
[4] that paragraph?
[5]　A. It's probably going to depend on what is
[6] going on at that time
[7]　Q: Uh-huh
[8]　A: On a $3 90 check, I honestly can't tell
[9] you whether I would or not I do not recall
[10] stamping this check
[11]　Q Okay
[12]　A. So —
[13]　Q: Do you think you would absolutely recall?
[14]　A: Yeah, I believe I would. I believe I
[15] would
[16]　Q You would recall stamping something that
[17] says you endorse this and you're binding yourself to
[18] a contract?
[19]　A: I believe if I had stamped it, I would
[20] recall it
[21]　Q: Let me ask you something
[22]　A. If I had read that and then stamped it,
[23] yes, ma'am
[24]　Q: Reading just what we can read here —
[25]　A: Okay

Page 38

[1]　Q: — is it your understanding of what we can
[2] see there that endorsing this check constitutes
[3] agreeing to something?
[4]　A: I would think if you read that and
[5] understood it, yes, ma'am, it would constitute
[6] agreeing to something
[7]　Q So where it says endorsement and deposit
[8] constitute agreement, that part we agree is the
[9] language in the second line, reading that would make
[10] you — would lead you to believe, sir, that by
[11] stamping Corams' Steak & Eggs you would be entering
[12] into an agreement?
[13]　A: Yes, ma'am. But I — yes, ma'am
[14]　Q I understand that you don't recall
[15] stamping this check
[16]　A: I don't And I — I don't think I would
[17] enter into an agreement via a check, if I was going
[18] to enter into an agreement. All the other
[19] agreements that I have here are, you know, basically
[20] the standard agreement It's just not on the back
[21] of the check or whatever
[22]　Q: Right So if you had seen this and you
[23] had been the person who had seen Coram — who had
[24] seen this document and read those words, what would
[25] you have done with it?

Page 39

[1]　A: I would have probably thrown it away
[2]　Q: Do you know your brother pretty well?
[3]　A: Yes, ma'am
[4]　Q: And do you think he, if he read those
[5] words, endorsement and deposit constitute agreement,
[6] that he would act the way you would in throwing it
[7] out?
[8]　A. I think he probably would have, yes,
[9] ma'am
[10]　Q: And you and your brother are the only
[11] people who open the mail here pretty much with rare
[12] exception?
[13]　A: Pretty much, yes, ma'am
[14]　MS. DIEMER: I don't think I have any more
[15] questions for you, sir
[16]　THE WITNESS: Okay
[17]　MR. LEONARD: I have a few, sir
[18]　　　　**CROSS EXAMINATION**
[19]　　　　**BY MR. LEONARD**
[20]　Q: Do you keep records here of deposits — of
[21] checks that you deposit?
[22]　A. Yes, sir We get a — there is a carbon
[23] copy of it — oh, of the checks?
[24]　Q: Correct.
[25]　A: No, sir No, sir On the deposit slip.

Page 40

[1] I mean, we annotate the name on the check
[2] Q: You talked earlier about checks. And I
[3] think you mentioned a few rebate checks you might
[4] get And you mentioned the pay phone which is
[5] outside the building
[6] A· Yes, sir
[7] Q: Besides that, what other rebate checks
[8] does this business get?
[9] A. The distributors, the food distributors at
[10] various times will run certain rebates on certain
[11] items
[12] Q· Would it be fair to say that when you
[13] received those rebate checks for food distributors,
[14] that you recognize the name of the company on the
[15] check?
[16] A. Well, not necessarily, because the way
[17] food distributors work, I buy from a distributor
[18] here. Daffin (phonetic)
[19] Q· What?
[20] A. Daffin Food Service, Mercantile and Food
[21] Service out of Marianna So a lot of the items that
[22] they purchase, they put their name brand on, all
[23] right And the rebate will come, not from them, but
[24] from the people that they buy from They will
[25] provide documentation, "Hey, Corams' Steak & Eggs

Page 41

[1] bought 42 pounds of black pepper "
[2] Q Is it pretty apparent from the name of the
[3] company that issues those types of rebate checks
[4] that it's a food service?
[5] A. Normally it is, yes, sir
[6] Q Okay What are the range of the — the
[7] amounts of those type of rebate checks?
[8] A· They're normally under $25
[9] Q· So we mentioned food supplier and the pay
[10] phone
[11] A Yes, sir.
[12] Q· Are there any other rebate checks you can
[13] think of that you receive?
[14] A· No, sir
[15] Q And when you receive these rebate checks,
[16] do you keep any ledger or other record that says I
[17] received a rebate check for seven dollars from such
[18] and such egg supplier?
[19] A· No, sir, we don't
[20] Q: You simply just deposit it, stick it in
[21] and —
[22] A We add it in to the general revenue and
[23] deposit it
[24] Q So if we were to look through the past few
[25] years of your books, there is no way we could figure

Page 42

[1] out how much different suppliers have given you in
[2] rebates, right?
[3] A: No, sir
[4] Q: Are you familiar with the marketing
[5] mechanism known as a solicitation check?
[6] A: I am now, yes, sir
[7] Q: Prior to — prior to this, have you ever
[8] seen a solicitation check?
[9] A. I have received some at home
[10] Q: Right
[11] A. From, you know, one of these $5,000
[12] instant credit or something, you cash the check, and
[13] it becomes a credit card bill or something But
[14] that's about the extent of it.
[15] Q: What about asking you to switch long
[16] distance carriers? Have you ever received any of
[17] those?
[18] A: Most of that is over the phone
[19] Q· Okay
[20] A· I don't receive much of that in the mail
[21] Q: Now, in any event, when this check was
[22] received and mistakenly endorsed, you had
[23] received — by then, received at least a few
[24] solicitation checks at your house.
[25] A: Yes, sir, I had.

Page 43

[1] Q You're familiar with the way that works —
[2] A Yes, sir
[3] Q. — that type of marketing?
[4] A· (Nods head )
[5] Q· And you certainly never made that mistake
[6] by endorsing the check at home, right?
[7] A No, sir
[8] Q· And do I understand your testimony to be
[9] correct that this really was a mistake, that this
[10] should not have been — the check should not have
[11] been deposited?
[12] A Yes, sir
[13] Q: I'm going to hand you another document,
[14] which I'll ask the court reporter to mark
[15] (Discussion held off the record )
[16]              BY MR. LEONARD·
[17] Q. Mr Coram, I'm handing you Exhibit 31, and
[18] I'm going to represent to you that you have not seen
[19] this document before This is a type of a
[20] solicitation check that Cyberspace sent out, but it
[21] doesn't appear to be the same one that you received.
[22] But with that — with that stated, I would like you
[23] to look to the third page of that document, which is
[24] the back of that check
[25] A. Yes, sir

Page 44

[1] Q: If you could just glance over the language
[2] before the endorsement
[3] A. Yes, sir
[4] Q: Ms Diemer asked some questions about the
[5] exhibit, I believe it was 30, that was illegible I
[6] want to ask you the same questions about this type
[7] of document Is there anything unclear about the
[8] terms of that —
[9] Is that the wrong exhibit number?
[10] MR. WINTER: Excuse me, Counsel, it's 29
[11] MR. LEONARD: I'm sorry. It's Exhibit 29,
[12] which is the illegible document
[13] BY MR LEONARD
[14] Q· Is there anything unclear about the terms
[15] that are listed above the endorsement line?
[16] A· No, sir
[17] Q So if you saw this check and looked at it,
[18] you would be pretty clear it's — you would be
[19] signing up for Internet service if you sign it,
[20] right?
[21] A· Yes, sir
[22] Q· And then also if you could look — and you
[23] don't need to read the entire part, but there is
[24] a — this is the side of this, the language on the
[25] side that is below a perforated tear line

Page 45

[1] A Yes, sir
[2] Q· If you could just, perhaps, look at the
[3] first line or two Is that also clear to you that
[4] that is a — that you would be signing up for
[5] Internet service by signing and endorsing the check?
[6] A: Yes, sir
[7] Q: In fact, if you — would it be fair to say
[8] that if you were to receive this, look at it, you
[9] would only sign it if, in fact, you wanted Internet
[10] service?
[11] A· Yes, sir
[12] Q: Could you look with me at the next two
[13] pages of this document And I'll represent this is
[14] an insert that went into many of these checks, this
[15] type of form insert And it's a two-page front and
[16] back of it If you open an envelope that had a
[17] check in it that had an insert like that in it,
[18] would you agree that that would be sort of, I guess,
[19] a red flag that this is probably not just a rebate
[20] check, that this might be something else?
[21] MR. WINTER: Excuse me, Counsel, are you
[22] representing that that insert was actually
[23] included in what was sent to Corams' Steak &
[24] Eggs?
[25] MR. LEONARD: No I think my predicate

Page 46

[1] was clear It's a form of an insert that was
[2] in many of the checks that were sent out by
[3] Cyberspace
[4] BY MR. LEONARD:
[5] Q: So my question is, would it be fair to
[6] say, if you opened the check up and saw an insert
[7] like this, it would be sort of a red flag that this
[8] is not a rebate check, this is a solicitation check?
[9] A: Yes, sir
[10] Q: Now, you had earlier mentioned about most
[11] junk mail you throw away without opening it, but
[12] some you open it because, I think you said,
[13] something like they're getting more tricky as far as
[14] trying to get you to open it, right?
[15] A: Yes, sir
[16] Q: And one of the things that — is it fair
[17] to say that one of the things you've experienced or
[18] seen is envelopes that say check enclosed or
[19] something like that — or words to that effect that
[20] would get you to open it?
[21] A Well, no, that's not what I was referring
[22] to Some of them — I mean, it's harder — some of
[23] them are now writing on there and something else, so
[24] it looks like a personal letter
[25] Normally, if it's obviously junk mail,

Page 47

[1] then I file it in the garbage can.
[2] Q. Okay
[3] A. And if it says check enclosed, then I
[4] normally tear it up and throw it away
[5] Q. And do I understand your testimony to be
[6] that you really don't know how this check managed
[7] to, I guess, slip through the cracks and get
[8] endorsed and deposited into your bank?
[9] A: I do not
[10] Q· Whatever — what was the result of your
[11] dealings with Olympic and Bell South? Did you
[12] eventually get refunded?
[13] A I did.
[14] Q: In full?
[15] A. I finally got it — close enough that I
[16] was satisfied, if it wasn't in full
[17] Q: Okay
[18] A. My main goal was to get it off the phone
[19] bill You know, I didn't want Internet service
[20] without a computer. That was my main goal. That
[21] happened. I was happy.
[22] Q. So if I remembered your testimony correct,
[23] you had called the line on Olympic that was on your
[24] phone bill, right?
[25] A: Yes, sir.

**Page 48**

[1] Q: And it was pretty clear, there it was, any
[2] problems call Olympic, this number, right?
[3] A· Yes, sir
[4] Q. And the person who answered the phone, did
[5] he tell you that he was not going to refund the
[6] money?
[7] A No The guy that answered the phone —
[8] and, here again, I'm assuming it was the guy, this
[9] was a while ago
[10] Q It could have been a girl?
[11] A It could have been Whoever answered the
[12] phone, I was speaking with them, and they said
[13] Hey, we are basically the collection agency. We are
[14] not Cyberspace, you know We will take your
[15] information, and we will relay it, da, da, da. You
[16] shouldn't have any more problems
[17] I hung up the phone thinking everything
[18] was hunky-dory
[19] Q Now, if everything was hunky-dory, and the
[20] next month there was a credit to the account and it
[21] was off, you wouldn't have any problems, would you?
[22] A. No, sir, I probably wouldn't have
[23] Q· You would just recognize that somehow a
[24] mistake was made, they fixed their mistake, right?
[25] A· Yes, sir, I would have been happy My

**Page 49**

[1] sole goal, you know, was just to get it off there
[2] I didn't want to pay for a service that there was no
[3] way possible that I could use over here
[4] Q But the problem, if I understand you, was
[5] that, for whatever reason, they didn't take care of
[6] it and required you filing a complaint and writing
[7] letters right?
[8] A. Yes, sir
[9] Q· So would it be fair to say that — well,
[10] would you describe that as customer service
[11] problems?
[12] A Well, from my perspective, yes, sir, it
[13] was You know, I had a specific action that I
[14] wanted them to take, and they didn't take it
[15] Q. The same way as if one of your waitresses
[16] out here were rude to a customer and the customer
[17] would be upset, right?
[18] A Yes, sir
[19] Q· So would it be fair to say that the real
[20] problem that you had with Cyberspace was not that
[21] there is anything false and misleading about the
[22] solicitation check, but that they didn't handle
[23] their customer service right and fix the mistake
[24] that was made, is that a fair assessment?
[25] MR WINTER: Objection

**Page 50**

[1] MR. LEONARD: He just needs to make an
[2] objection.
[3] MR. WINTER: I made an objection You're
[4] welcome to answer the question.
[5] THE WITNESS: Looking on it in hindsight,
[6] that's all I wanted To begin with — when it
[7] first got started, I was a little upset that an
[8] Internet service or a fee for an Internet
[9] service had just all of a sudden appeared on
[10] the phone bill And I didn't have a computer
[11] over here
[12] And then I went through the little, you
[13] know, we're their collection agency We're not
[14] the company And I don't remember how I got a
[15] number to Cyberspace, but I did
[16] But whenever I was talking with Olympic,
[17] you know, they were kind of saying, You know,
[18] we're just a messenger, don't blame us, but
[19] we'll take care of it You know, we'll make
[20] sure it is taken care of And then it wasn't
[21] And then I think whenever I called back
[22] and I actually called Cyberspace, I got the
[23] little round robin on the phone service So I
[24] was a little irate there, and that's probably
[25] what drove me to go the Public Service

**Page 51**

[1] Commission
[2] BY MR. LEONARD
[3] Q So it would be fair to say that your real
[4] complaint here is not that the solicitation check
[5] was false or misleading, but that there was a
[6] mistake made that was made and that you didn't get
[7] customer service on that end, on the back end?
[8] A· Probably, from my perspective, that was my
[9] major complaint
[10] MR. LEONARD: Okay. Pass the witness
[11] MS DIEMER: No questions.
[12] Mr Winter
[13] MR. WINTER: I do. Go off the record for
[14] a minute
[15] (Discussion held off the record.)
[16] MR. WINTER: All right. We'll go back on
[17] the record I have a few questions to you to
[18] follow up
[19] **REDIRECT EXAMINATION**
[20] **BY MR. WINTER:**
[21] Q. First you were asked some questions about
[22] conversations that you and I had. And, as I recall,
[23] you mentioned that I — that you had mailed some
[24] documents to my office or you mentioned the word
[25] mailing

Page 52

[1]   A. I did mail them, and you —
[2]   Q. That's right
[3]   A. And then in a subsequent conversation you
[4]  had not received them, so I faxed them to you.
[5]   Q. Okay
[6]   MR. WINTER And, Counsel, just to clarify
[7]  the record, the documents that you have are
[8]  from the fax copies that he sent. We have not
[9]  yet received the mail copies Because we're in
[10]  a federal building in DC, they're being routed,
[11]  I think, through Ohio, so no telling when the
[12]  mail copy will arrive
[13]   MS. DIEMER. I'm sorry I'm just sorry
[14]  for you
[15]   MR WINTER: Just want to make sure you
[16]  know that you have what I got —
[17]   MR. LEONARD· Thank you
[18]   MR. WINTER. — as opposed to also what he
[19]  tried to send And my thanks to Mr Coram for
[20]  sending them the second time
[21]                BY MR WINTER·
[22]   Q: A second topic that you were asked about
[23]  was the rebate checks that you at Corams' Steak &
[24]  Eggs receive for the pay telephones out front
[25]   A: Yes, sir

Page 53

[1]   Q· At one point in your answer I recall you
[2]  saying at some point that you quit fighting that
[3]  battle or words to that effect
[4]   A· Yes, sir
[5]   Q. My question is, in 19 — well, my first
[6]  question is What is the year that the Cyberspace
[7]  charges began appearing on your bills?
[8]   A. 1999
[9]   Q· In 1999 was Corams' Steak & Eggs still
[10]  receiving rebate checks from the companies that were
[11]  involved with the pay telephone out front?
[12]   A: Yes, sir, sporadically
[13]   Q And in 1999 was Corams' Steak & Eggs
[14]  receiving refund check from various food
[15]  distributors?
[16]   A Yes, sir
[17]   Q: Defense counsel also showed you a copy of
[18]  Exhibit 29 That's the photocopy of the actual
[19]  check that Corams' Steak & Eggs received
[20]   A· Yes, sir
[21]   Q: And you had some difficulty reading the
[22]  language, in part I'm sure because it's a poor
[23]  photocopy
[24]   A: Yes, sir
[25]   Q. How else would you describe that language

Page 54

[1]  that she asked you to read?
[2]   MR. LEONARD: Objection, vague
[3]   MR. WINTER: You can still answer
[4]   THE WITNESS: Okay Well, it was — I
[5]  mean, it's just kind of legalese, just kind of
[6]  mumbo jumbo, I guess I mean, it's just — I
[7]  really don't know how to explain it
[8]                BY MR. WINTER.
[9]   Q: Let's talk about the language in the other
[10]  contracts. Does Corams' Steak & Eggs enter into
[11]  contracts with other suppliers?
[12]   A: Yes, sir
[13]   Q: And how are those contracts prepared?
[14]   A It's basically a full form contract. I
[15]  mean, it's not — you know, it's not that small of
[16]  print It's not confined to that size paper or
[17]  anything
[18]   Q When you say "that size paper," are you
[19]  referring to —
[20]   A. The size of the check, yes, sir
[21]   Q. What size are the contracts that Corams'
[22]  Steak & Eggs —
[23]   A. Well, they're normal 8 by 11 sheets of
[24]  paper or whatever
[25]   Q: The other defense counsel then showed you

Page 55

[1]  Exhibit Number 21 — excuse me
[2]   MS. DIEMER: 31
[3]                BY MR. WINTER
[4]   Q: — 31, the check to Women of Power
[5]   A: Yes, sir
[6]   Q Do you recall ever seeing this document
[7]  before today?
[8]   A: No, sir
[9]   (Discussion held off the record )
[10]   MR WINTER: On page 3 of Exhibit 31, the
[11]  Women of Power check, on page 3 is a photocopy
[12]  of a back of a check, and there is language
[13]  next to it that counsel asked you about
[14]   THE WITNESS. Yes, sir
[15]                BY MR. WINTER:
[16]   Q: Have you ever seen this language before at
[17]  Corams' Steak & Eggs before today?
[18]   A· I have not
[19]   Q. Counsel also asked you about your
[20]  telephone call with Olympic What do you remember
[21]  about that phone conversation?
[22]   MR. LEONARD: Objection, overly broad
[23]   THE WITNESS. Basically, you know, that I
[24]  did get ahold of somebody, and then I explained
[25]  the situation to them. I remember them saying

Page 56

[1] that they were separate from Cyberspace That
[2] they were just a collection agency or billing
[3] agency or, you know, words to that effect And
[4] then, you know, that they took the information.
[5] And I felt fairly confident that they were
[6] going to take care of the problem
[7] **BY MR. WINTER:**
[8] **Q** Okay Did they explain to you how you
[9] were signed up for Cyberspace service to begin with?
[10] **A** Not that I recall
[11] **Q** Where did you learn that?
[12] **A** I believe when this was all done, that we
[13] received a letter from Cyberspace basically saying
[14] issue has been resolved I don't have a copy of
[15] that letter But that's — you know, I mean,
[16] that's — recollection is fuzzy. But that's why I
[17] believe we received some explanation, either from
[18] the Public Service Commission — which may very well
[19] have been at the end of that that they forwarded
[20] that I am just about positive that it was from the
[21] Public Service Commission that I heard about the
[22] $3 50 check or $3 90 check or whatever it was
[23] **Q.** When you were talking with Olympic and
[24] they told you what they would do about the problem,
[25] what did you understand that to be?

Page 57

[1] **A·** That the service would be terminated, and
[2] that a credit would be applied
[3] **Q** You may have testified earlier that it was
[4] your main goal to get this off the bill or words to
[5] that effect
[6] **A** Yes, sir, get the service terminated
[7] **Q·** Why was that your main goal?
[8] **A** I just didn't want to pay for a service
[9] that I wasn't going to use I mean, I knew I didn't
[10] have a computer over here And all — the only
[11] Internet service I have is my personal account, and
[12] I really didn't see a need for the business to have
[13] Internet service
[14] **MR. WINTER.** No further questions
[15] **MS. DIEMER:** I have just a couple, sir
[16] **RECROSS EXAMINATION**
[17] **BY MS. DIEMER·**
[18] **Q** Looking back on all this, how do you think
[19] this check got deposited?
[20] **A·** Honestly?
[21] **Q** Honestly
[22] **A.** I think that it came in, and he thought —
[23] "he" being my brother — thought that it was the
[24] rebate check for the telephone And he stamped it
[25] and sent it in

Page 58

[1] **Q:** Okay Now, I understand that the
[2] Exhibit 29 — I understand that the legend above
[3] where Corams' Steak & Eggs is endorsed is difficult
[4] to read However, we managed to parse a few words
[5] out when you and I were speaking earlier today on
[6] the record And you understood, am I correct, that
[7] those words we were able to parse out, even of this
[8] bad telecopy — you know, photocopy, that this was
[9] trying to — that the endorsement of that check
[10] would create a contract or was trying to create a
[11] contract
[12] **A** Yes
[13] **Q·** Okay When you talked to the people at
[14] Olympic, were they polite?
[15] **A.** As far as I recall, yeah, they were
[16] **Q:** And did you have the impression they were
[17] going to try to solve your problem?
[18] **A:** The first time I called, yes, I do
[19] **Q.** Did you call them again?
[20] **A:** I think I did But, you know, I'm not
[21] absolutely sure I don't know if whenever I saw
[22] that charge there I wasn't just so fired up that I
[23] went straight to the Public Service Commission or
[24] not
[25] **Q:** Okay And if they had been successful in

Page 59

[1] resolving the charge, giving you the credit, that
[2] would have been fine with you
[3] **A:** That was my goal all along —
[4] **Q.** Okay
[5] **A.** — was getting my money back and terminate
[6] the service
[7] **Q·** And eventually you did that, even though
[8] it took some more time
[9] **A:** It was over with and done before I had any
[10] knowledge of the check
[11] **Q:** Okay
[12] **A** And the more I think about it, the more I
[13] believe that the response from the Public Service
[14] Commission is the one that said, hey, this is what
[15] got the whole ball rolling
[16] **MS. DIEMER·** Thank you.
[17] **MR. LEONARD·** One question, sir
[18] **RECROSS EXAMINATION**
[19] **BY MR. LEONARD.**
[20] **Q·** You were testifying from a question by
[21] Mr Winter regarding Exhibit 29, which is the actual
[22] check And he asked you about the blurry language
[23] above the endorsement line, and you said besides
[24] being blurry, you thought it was a bunch of legalese
[25] and mumbo jumbo

**Page 60**

[1]        However earlier when we talked about the
[2]  Exhibit 31, which was the check I gave you which you
[3]  had not seen before, when I asked you about language
[4]  above there you said it was clear —
[5]        A: Yeah — yes, sir, I did.
[6]        Q: And this was not legalese and mumbo jumbo,
[7]  is it?
[8]        A: Well, I guess to the layman it would be
[9]  I mean, I understood what it said
[10]       Q: Right
[11]       A  Okay I mean, that's not something that I
[12]  would write or anything else That looked like a
[13]  legal something that they had had an attorney or a
[14]  legal department draw up That's what I meant by
[15]  legal mumbo jumbo
[16]       Q: I want to be clear because when you said
[17]  legalese or mumbo jumbo, I think you were laughing
[18]  or smiling, and the record can't reflect your smile
[19]  But you're not suggesting that by legalese and mumbo
[20]  jumbo you didn't understand that it was a
[21]  solicitation offer.
[22]       A: Had I read that, I would have understood
[23]  it, yes, sir
[24]       MR LEONARD. All right No further
[25]  questions.

**Page 61**

[1]       MR. WINTER  No further questions
[2]       MS DIEMER: No further questions, sir
[3]       MR. WINTER: That ends the questioning
[4]       THE WITNESS: Off the record.
[5]       (Discussion held off the record )
[6]  (Deposition concluded at 12 05 p m )
[7]
[8]                                    ~
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 62**

[1] WITNESS· CHARLES CORAM
[2] DATE  JANUARY 31, 2001
[3] CASE  FTC V  CYBERSPACE COM, ET AL
[4] Please note any errors and the corrections thereof
      on this errata sheet  The rules require a reason
[5] for any change or correction.  It may be general,
      such as "To correct stenographic error," or "To
[6] clarify the record," or "To conform with the facts "
[7]          ERRATA SHEET
[8] PAGE LINE  CORRECTION          REASON FOR CHANGE
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 63**

[1]              CERTIFICATE OF DEPONENT
[2]
[3]        I hereby certify that I have read and
[4]  examined the foregoing transcript, and the same is a
[5]  true and accurate record of the testimony given by
[6]  me
[7]        Any additions or corrections that I feel
[8]  are necessary, I will attach on a separate sheet of
[9]  paper to the original transcript
[10]
[11]
[12]              CHARLES CORAM
[13]
[14]        I hereby certify that the individual
[15]  representing himself/herself to be the above-named
[16]  individual, appeared before me this _____ day of
[17]  _____, 2002, and executed the above
[18]  certificate in my presence
[19]
[20]
[21]              NOTARY PUBLIC IN AND FOR
[22]
[23]
[24] MY COMMISSION EXPIRES
[25]

5194958.

## Check Description

**Co Name:** CORAMS STEAK & EGG
**Address:** 804 S TYNDALL PKWY
**City:** PANAMA CITY
**State:** FL
**Zip:** 32404

---

Cyberspace com, LLC
PMB 330
1148 Pulaski Hwy
Bear DE 19701 1304
1 888 285 5195

**FIRST UNION NATIONAL BANK**
CHAPEL HILL, NC 27514

5194958

*********THREE DOLLARS AND 50/100*** **********   .50

860-763-3447

050 035 September 20 1999 $3.53 02

PAY
TO THE
ORDER
OF

AUTO ********** 3-DIGIT 324
Corams Steak & Egg        160005244   3267   3267  15  09-30-99
804 S Tyndall Pkwy
Panama City  FL  32404-6930

⑆5194958⑆ ⑈053101561⑈ 20799000058000⑆      ⑇000000350⑇

---

CORAMS STEAK & EGGS, INC
FOR DEPOSIT ONLY

160005244   09-30-99
160005244   3267  2767  15  09-30-99

---

**DEPOSITION EXHIBIT**
29 CORUM

H-0006637

# In The Matter Of:

## FEDERAL TRADE COMMISSION   v.
## CYBERSPACE.COM, LLC. ET AL.

---

### JACK ROBRECHT
### January 31, 2002

---

### For The Record, Inc.
### Court Reporting and Litigation Support
### 603 Post Office Road
### Suite 309
### Waldorf, MD  USA  20602
### (301) 870-8025    FAX: (301) 870-8333

Original File 20131ROB ASC, 104 Pages
Min-U-Script® File ID·0619884156

## Word Index included with this Min-U-Script®

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

FEDERAL TRADE COMMISSION,

Plaintiff,

CASE NO  C00-1806

vs

CYBERSPACE COM, LLC

FRENCH DREAMS,

COTO SETTLEMENT,

ELECTRONIC PUBLISHING VENTURES  LLC

OLYMPIC TELECOMMUNICATIONS, INC

IAN EISENBERG, and CHRIS HEBARD

Defendants

The Deposition of JACK ROBRECHT taken by

the attorney for the Plaintiff, pursuant to Notice before

Angela E  Harrell, CP, Registered Professional Reporter and

Notary Public, State of Florida on the 31st day of January,

**Page 2**

[1]              APPEARANCES
[2] FOR THE PLAINTIFF       BRAD WINTER, ESQUIRE
               Federal Trade Commission
[3]            600 Pennsylvania Avenue, N W
               Suite 238
[4]            Washington, DC 20580
[5] FOR THE DEFENDANT       ERNEST LEONARD, ESQUIRE
      COTO SETTLEMENT &      Friedman & Feiger, LLP
[6] CHRIS HEBARD       5301 Spring Valley Road
               Suite 200
[7]            Dallas, Texas 75223
[8] FOR THE DEFENDANT  KATHRYN S  DIEMER, ESQUIRE
      IAN EISENBERG &      Campeau, Goodsell, Diemer
[9] FRENCH DREAMS      38 West Santa Clara Street
               San Jose, California 95113
[10]
[11]
[12]           INDEX OF WITNESS
[13] JACK ROBRECHT

[14]  Direct Examination By Mr Winter          4
[15]  Cross-Examination By Mr Leonard          35
[16]  Cross-Examination By Ms Diemer           56
[17]  Redirect Examination By Mr Winter        87
[18]  Recross-Examination By Ms Diemer         97
[19]
[20]     CERTIFICATE OF OATH          101
[21]     CERTIFICATE OF REPORTER      102
[22]
[23]
[24]
[25]

**Page 3**

[1]              INDEX OF EXHIBITS
[2] Exhibit No              PAGE

[3]  32    Subpoena                       7
[4]  33    Copy of Cyberspace check        9
[5]  34    Letter to Florida Public Service  11
           Commission, 9/24/99
[6]
     35    August 1999 BellSouth bill      25
[7]
     36    September 1999 BellSouth bill   30
[8]
     37    November 1999 BellSouth bill    31
[9]
     38    December 1999 BellSouth bill    32
[10]
     39    January 2000 BellSouth bill     32
[11]
     40    Composite of Cyberspace materials  47
[12]
     41    Deposit slip                    66
[13]
     42    Excerpt pages from United Airlines  75
[14]        Hemispheres magazine
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 4**

[1] WHEREUPON,

[2] JACK ROBRECHT

[3] was called as a witness, and after having been first duly

[4] sworn, was deposed and testified as follows

[5]

[6]            DIRECT EXAMINATION

[7]            BY MR. WINTER:

[8]     Q: Good afternoon

[9]     A: Good afternoon

[10]    Q: We're here today pursuant to a third party

[11] subpoena issued in FTC versus Cyberspace com, LLP; French

[12] Dreams, Coto Settlement, Electronic Publishing Ventures,

[13] LLP; Olympic Telecommunications, Inc; Ian Eisenberg and

[14] Chris Hebard Case number C00-1806 in the United States

[15] District Court for the Western District of Washington

[16]     My name is Brad Winter I represent the Federal

[17] Trade Commission, the plaintiff in this action  Defense

[18] Counsel, may we have your identification for the record?

[19]     MR. LEONARD: My name is Ernest Leonard. I

[20] represent two of the defendants, Chris Hebard and Coto

[21] Settlement Trust

[22]     MS. DIEMER: My name is Kathryn Diemer and I

[23] represent Ian Eisenberg and French Dreams

[24]     MR. LEONARD: Counsel, I assume we have the same

[25] stipulations that objections will be preserved other

JACK ROBRECHT
January 31, 2002

Case 2:00-cv-01806-RSL   Document 124   Filed 02/07/02   FEDERAL TRADE COMMISSION v.
CYBERSPACE.COM, LLC. ET AL.

Page 5

[1] than form and responsiveness?

[2] MR. WINTER: Yes, and we'll go through the ground

[3] rules in a minute

[4] **BY MR. WINTER:**

[5] Q: Mr Robrecht, before we get to that Could you

[6] please state your full name for the record?

[7] A: My name is Jack Robrecht

[8] Q: Who is your current employer, Mr Robrecht?

[9] A. FE Booker Company

[10] Q. In 1999 were you also employed by F E Booker

[11] Company?

[12] A: Yes, sir, I was

[13] Q: In 1999 was one of your company's phone numbers

[14] (850)432-1441?

[15] A: Yes, it is At that time I think the area code

[16] was 904, but subsequently it has been changed to 850 What

[17] year that occurred, I do not know

[18] MS. DIEMER: I'm sorry, what was it before?

[19] THE WITNESS: 904

[20] MS. DIEMER. Thanks

[21] **BY MR. WINTER.**

[22] Q. Are you here today to testify about your

[23] company's relationship as a consumer with Cyberspace?

[24] A. Yes, I am

[25] Q Before we proceed any further with the

Page 6

[1] deposition, let me give you some ground rules for the

[2] deposition A deposition is a question and answer period

[3] So I'll be the one asking the questions and you can give the

[4] answers After I've asked questions the other Counsel may

[5] have questions for you and then we'll see where we go from

[6] there

[7] A Okay

[8] Q If at any time I ask a question that you do not

[9] understand, please let me know and I'll ask a better

[10] question. Conversely, if I ask a question and you answer

[11] it, I'm going to assume that you understood the question

[12] Is that fair?

[13] A: That's fair

[14] Q As you can see, we have a court reporter here

[15] today and she's going to record in writing what transpires,

[16] which means that we need your answers verbally A nod of

[17] the head or a colloquialism or expression like uh-huh

[18] doesn't translate very well So please try to articulate

[19] your answers with yes and no

[20] A. I understand

[21] Q: If at any time during the questions from me or

[22] anyone else present you would like to take a break, just let

[23] us know and we will do that at the first available

[24] opportunity

[25] A: Okay

Page 7

[1] Q: During the questioning period you may hear one or

[2] more of us say objection If you hear that, you are welcome

[3] to continue to try to answer the question as best you're

[4] able

[5] A: Okay

[6] MR. WINTER: As Counsel suggested earlier, we do

[7] have a stipulation in effect Do either of you want to

[8] add anything to these ground rules?

[9] MR. LEONARD: No

[10] MS. DIEMER: No

[11] (Exhibit 32 was marked for identification)

[12] **BY MR WINTER**

[13] Q: Let me hand you the first exhibit in today's

[14] deposition. We're continuing the numbering from a previous

[15] deposition so we will not start at one Instead I believe

[16] our first exhibit will be 32 I'm now handing you a copy of

[17] what's been marked as Exhibit 32 Robrecht Do you recognize

[18] this document?

[19] A: Yes, I do I have it right here in front of me

[20] Q: You have a copy of the original there in front of

[21] you, is that right?

[22] A. That is correct

[23] Q. Referring your attention to the one that's been

[24] marked as the exhibit, that's the one that we'll look at for

[25] the remainder of these questions so that it can remain with

Page 8

[1] the court reporter at the conclusion of the deposition Is

[2] this a copy of the subpoena that you accepted which brings

[3] you to testify here today?

[4] A: Yes

[5] Q: I note that the deposition states that we aim to

[6] start Friday at noon and we've changed that date and time to

[7] accommodate Counsel and we thank you for that

[8] answers and that's why you did that

[9] Q The subpoena also calls for the production of

[10] documents, correct?

[11] A: Correct

[12] Q: Are the documents that you're supplying in

[13] response to this subpoena the documents that you've sent

[14] already to my office?

[15] A Yes, they are

[16] Q: I've received those documents and I thank you for

[17] sending them along I will share a copy with Counsel The

[18] documents are labeled CJR-0015200 through CJR-0015247 In

[19] addition today, the witness has produced an additional

[20] document and has been kind enough to let us copy that That

[21] will be CJR-0015248

[22] Let's move back in time to 1999 What was your

[23] title with FE Booker at that time?

[24] A: Accounting manager

[25] Q: What is your title today?

Page 9

[1]   A   Still the accounting manager

[2]   Q   As the accounting manager what were your duties

[3]   in 1999?

[4]   A   To oversee all the financial responsibilities of

[5]   the company

[6]   Q   Did your responsibilities include cashing checks

[7]   that were sent?

[8]   A   Yes, cashing — well, actually depositing checks

[9]   Q   How did you first learn about Cyberspace?

[10]   A   I received a $3 50 check through the company mail

[11]   which appeared to me to be a rebate check, which I

[12]   subsequently deposited into our operating account

[13]   (Exhibit 33 was marked for identification)

[14]             BY MR. WINTER:

[15]   Q   I'm handing you a copy of Exhibit 33 So I am

[16]   handing you what's been marked as Exhibit 33 Robrecht, a

[17]   one-page document which is labeled H-0006731 I'll give you

[18]   a minute to study that document Do you recognize any part

[19]   of Exhibit 33?

[20]   A   That's the check I received on that particular

[21]   day If I can look at my record that I have to see if

[22]   that's the same check number

[23]   Q   Before we have you look at your records, we'll

[24]   start by looking at what you see on 33

[25]   A   Right This appears to be — that's our stamp on

Page 10

[1]   the back of the check and that appears to be the same check

[2]   that we received

[3]   Q   Okay For the record, I note that the witness

[4]   has brought with him to the deposition the originals of the

[5]   documents which were produced and the witness has graciously

[6]   agreed to make those available for inspection

[7]   A   But those are copies of the originals I brought

[8]   the original deposit slip and it has copies of the check

[9]   that we deposited that particular day. I mean, obviously I

[10]   can't have the original of the check

[11]   Q   Right You have, as I understand it, the

[12]   originals of your records?

[13]   A   Right, correct That's the deposit that I made

[14]   on that particular day that makes up what's on that deposit

[15]   slip That's how we keep our records

[16]   Q   Okay So while Counsel is inspecting your

[17]   originals, we're going to proceed with your copies and it's

[18]   the copies that we've marked as exhibits In the event they

[19]   have particular questions about any perceived discrepancy

[20]   between your originals and the copies, we'll take that up in

[21]   the event that they detect that.

[22]   A   Okay

[23]   Q   So returning attention to Exhibit 33, which

[24]   appears to be a photocopy of the check to FE Booker, is it

[25]   a copy of the front and the back of the check?

Page 11

[1]   A   Yes, I believe it is because it has our deposit

[2]   stamp on the back of it.

[3]   Q   Does this appear to be a copy then of the check

[4]   that you received that you were referring to a moment ago in

[5]   your testimony?

[6]   A   Yes, sir It's even got the same date stamp on

[7]   it as far as my deposit records

[8]   Q   When you received this check, what did you do

[9]   with it?

[10]   A   I processed it as far as putting the funds into

[11]   the bank

[12]   Q   How did you process it?

[13]   A   By stamping the check and writing it on my

[14]   deposit slip and subsequently deposited it into our

[15]   operating account

[16]   (Exhibit 34 was marked for identification)

[17]             BY MR. WINTER:

[18]   Q   I'm handing you what's been marked as Exhibit 34

[19]   Robrecht, a two-page document labeled H-6727 through H-6728,

[20]   a letter and an attached page

[21]   MS. DIEMER: You said marked as Exhibit 34?

[22]   MR. WINTER: It's been marked as Exhibit 34 and

[23]   here are copies for Counsel

[24]   MS. DIEMER: Thank you

[25]

Page 12

[1]             BY MR. WINTER:

[2]   Q   Let me give you an opportunity to read this

[3]   letter

[4]   A   Yes, sir This is my letter and also the

[5]   attachments that I mailed to the Florida Public Service

[6]   Commission

[7]   Q   Let me ask you in detail about that The first

[8]   page of Exhibit 34, H-6727, is that the page that's the

[9]   letter?

[10]   A   Correct

[11]   Q   And the second page, H-6728, is that the

[12]   attachment to your letter?

[13]   A   Yes, sir

[14]   Q   What does the attachment comprise?

[15]   A   Well, the attachment is a page from our billing

[16]   records, our telephone billing records

[17]   Q   All right What else is contained in the

[18]   attachment?

[19]   A   A copy of the rebate check that we received from

[20]   Cyberspace

[21]   Q   You wrote this letter, right?

[22]   A   Yes, sir

[23]   Q   Did you write this letter as a part of your

[24]   business here at FE Booker Company?

[25]   A   Yes, sir As I explained the situation to my

**Page 13**

[1] boss, he prompted me to take further action

[2]   Q   Referring to the second paragraph of this letter,
[3] the first sentence reads, "As I stated on the phone, we had
[4] received a $3 50 rebate check Cyberspace com, LLC without
[5] any letter or brochure of explanation about their services
[6] or even how we could use them " Did I read that correctly?

[7]   A: Yes, sir

[8]   Q: When you wrote that sentence, what did you mean
[9] by that?

[10]   A. I was trying to clarify to the Florida Public
[11] Service Commission that I received a $3 50 rebate check and
[12] I presume that that's all there was to it, that I received
[13] nothing else in regards to any services that they would
[14] provide to us

[15]   Q: When did you write this sentence or this letter?

[16]   A: Well, I wrote this sentence to clarify to the
[17] Florida Public Service Commission that I had already
[18] contacted Olympic Telephone Company, which they informed me
[19] that by cashing that check, I applied for an Internet
[20] service

[21]   Q: Okay We'll get to the communication you had
[22] with them in just a minute  Let me ask a better question,
[23] which is when did you write this letter?

[24]   A: On September the 24th after my phone conversation
[25] with Mr Roland

**Page 14**

[1]   Q: About when did you receive the rebate check from
[2] Cyberspace com?

[3]   A  That would have been back in July, the middle of
[4] July — July the 12th

[5]   Q: So you wrote this letter within a couple of
[6] months of receiving the rebate check?

[7]   A. Correct, after I discovered the charge on our
[8]   bill

[9]   Q  Turning a minute to the attachment to your
[10] letter, the top of the second page, you mentioned that was
[11] the phone bill  Why did you include this particular page of
[12] the phone bill?

[13]   A: To clarify to the agent that this was billed to
[14] us as an unwanted charge and to show him that we were indeed
[15] billed for something that we had not ordered

[16]   Q  Who billed this to you?

[17]   A: Well, I'm assuming Cyberspace did or Olympic
[18] Telephone did, one or the other I can clarify that later
[19] with how I discovered who Olympic Telephone Company was and
[20] who Cyberspace was

[21]   Q: Okay We'll talk about your conversation
[22] That's important  But before we get there, a couple more
[23] questions about the document

[24]   A. Okay

[25]   Q: Why did you include the second part of the

**Page 15**

[1] attachment, the Cyberspace check?

[2]   A. Just to show them what the — because that was
[3] part of my records and I was just showing them what I had
[4] received from Cyberspace

[5]   Q: Were both of these parts of the attachment, the
[6] phone bill that you've included and the Cyberspace check,
[7] parts of your records?

[8]   A: Correct

[9]   Q: Were these parts of your records included with
[10] the letter that you sent to Florida as they're shown here in
[11] Exhibit 34?

[12]   A: Yes, sir As a matter of fact, I show them as
[13] enclosures at the bottom of the letter

[14]   Q: When you included the phone bill or part of the
[15] phone bill in your letter to the Florida Public Service
[16] Commission, did you review the phone bill in entirety before
[17] you included this part?

[18]   A. I'm trying to understand the question I
[19] basically review the phone bill on a monthly basis as we
[20] receive them and, yes, that would have been part of my job
[21] to review the entire phone bill and, yes, I would have
[22] reviewed this as part of reviewing the whole phone bill

[23]   Q. Why do you review the phone bill?

[24]   A: Well, obviously to make sure the charges are
[25] correct

**Page 16**

[1]   Q. Does FE Booker have a financial interest
[2] in ensuring that the phone bill is accurate?

[3]   A: Yes They don't want to pay for something they
[4] didn't order or charge

[5]   Q: And for the most part do you find the phone bills
[6] to be accurate?

[7]   A: Yes Occasionally you will find a long distance
[8] charge or a charge on the phone bill that's incorrect, but
[9] you take steps at that time to get it corrected

[10]   Q: Is that what you were doing here, was to get the
[11] Cyberspace bill corrected?

[12]   A: Well, this was the second step after I had
[13] contacted Cyberspace to get it corrected

[14]   Q: Okay We can set Exhibit 34 aside for a bit and
[15] let me back up and ask you questions about the conversations
[16] that you've had So going back in time to after you
[17] submitted the Cyberspace check to the bank, what's the next
[18] thing that you learned about Cyberspace?

[19]   A: Well, their charge turned up on our phone bill

[20]   Q: Which phone bill was that?

[21]   A: BellSouth phone bill, the office telephone bill

[22]   Q: Do you recall which month?

[23]   A: The first month that I discovered it was August

[24]   Q: What did you do after you discovered the August
[25] charge?

**Page 17**

[1] A: I'm sorry That was not the August bill. It was
[2] the September bill There was an August charge for
[3] Cyberspace on the September bill

[4] Q All right.

[5] A: So it would have been the September bill was the
[6] first time that I was made aware of this charge

[7] Q. What did you do after you were first made aware
[8] of the Cyberspace charge?

[9] A I called BellSouth

[10] Q How did you call BellSouth? What number did you
[11] dial?

[12] A. Well, I dialed the number that's in the phone
[13] book as far as — or on the front of the bill to clarify the
[14] charges that's been made to your account

[15] Q· After you called BellSouth, what did you do next?

[16] A. I asked them what this charge was for because I
[17] was unsure what the charge was for

[18] Q· What did they reply, if anything?

[19] A: They told me that this was a charge put on our
[20] bill by Olympic Telecommunications and I needed to call them
[21] to find out why they put that charge on our BellSouth bill

[22] Q Do you recall anything else from the conversation
[23] with BellSouth?

[24] A No, sir

[25] Q· What did you do next?

**Page 18**

[1] A I called Olympic Telecommunications to clarify
[2] why they were charging our BellSouth bill

[3] Q How did you call Olympic Telecommunications?

[4] A There is an 800 number on the phone bill which
[5] the BellSouth operator referred me to

[6] Q Is that the number you called?

[7] A. Yes, it is

[8] Q· When you called that number, how do you know you
[9] actually reached Olympic Telecommunications?

[10] A· As I recall they answered the phone that way

[11] Q. What did you tell the Olympic Telecommunications
[12] representative?

[13] A· I asked them why I was being charged for this

[14] Q Do you recall their answer?

[15] A: They said that Cyberspace had, I guess — I don't
[16] know what the terminology is — billed through them for
[17] their Internet service

[18] Q: Do you recall them using the phrase, they were a
[19] billing aggregator?

[20] A I remember asking them I would like to have this
[21] charge taken off our bill They said, well, sir, we cannot
[22] help you We're only a billing service

[23] Q. What else did Olympic tell you?

[24] A. Well, I tried to proceed it a little further to
[25] try to find out more information from them Since they do

**Page 19**

[1] the billing for them, they should know what type of business
[2] it is and what services they had to offer and so on and so
[3] forth, because this office did not order this Internet
[4] service and they were very uncooperative with me They just
[5] kept saying, well, sir, we can't help you You're going to
[6] have to contact Cyberspace

[7] Q: Did you contact Cyberspace?

[8] A: Yes, I did

[9] Q How did you do that?

[10] A: By phone

[11] Q· At what number did you dial? How did you find
[12] that number?

[13] A The number that they gave me

[14] Q· They being Olympic?

[15] A: They being Olympic Telecommunications gave me
[16] their phone number

[17] Q: So is it correct that you called Olympic and they
[18] gave you the number for Cyberspace and that's the number
[19] that you called?

[20] A. Correct.

[21] Q· When you called the number that they gave you for
[22] Cyberspace, how do you know that you truly reached
[23] Cyberspace?

[24] A. That's the way they answered the phone

[25] Q. Do you remember a name of a person that you spoke

**Page 20**

[1] with at Cyberspace?

[2] A. No, sir, I got a recording

[3] Q: What do you remember the recording talking about?

[4] A. The recording asked me to give general
[5] information as far as my name, my company — I'm trying to
[6] recall what all was asked That was the gist of the message
[7] I got was to leave my name and number where they could call
[8] me back

[9] Q· Did you leave a message?

[10] A: Yes, I did

[11] Q Did they call you back?

[12] A Yes, they did

[13] Q: Who called you back?

[14] A: I don't remember who it was, but it was somewhere
[15] about two days later They didn't call back immediately.

[16] Q: When they called back, how did they identify
[17] themselves?

[18] A As Cyberspace

[19] Q: When the Cyberspace person called back, what did
[20] they say?

[21] A: Well, word for word I don't think I can recall,
[22] but the gist of the conversation was that since we cashed
[23] the $350 (sic) check, we had ordered the Internet services
[24] and I asked them to give us a credit on our phone bill to
[25] remove them and they said they could not do that

**Page 21**

[1] **Q.** How big was the check that they said that you
[2] cashed?

[3] **A:** A $3 50 check.

[4] **Q:** What did they say cashing the check meant?

[5] **A:** That I had signed up — by cashing the check, I
[6] had signed up for an Internet service

[7] **Q:** Was this the first time you realized that by
[8] cashing a check you had signed up for Internet service?

[9] **A:** Yes, sir

[10] **Q:** What did you do after you heard this from the
[11] Cyberspace person?

[12] **A** I asked them to remove it from our bill and any
[13] charges that they have made to our bill.

[14] **Q:** What, if anything, was their response?

[15] **A:** That they were sorry, they could not remove it
[16] They could stop our service, but any prior charges they
[17] would not remove, that we were responsible for them

[18] **Q:** What else did you discuss with the Cyberspace
[19] person?

[20] **A·** I asked them, well, how do I access this Internet
[21] service?

[22] **Q:** What did they say?

[23] **A.** I don't really recall what their answer was to
[24] me They basically, you know, led me to believe that I owed
[25] this Internet service bill and that they were not going to

**Page 22**

[1] remove the charges And I asked about software and they
[2] said, well, we furnish software I said, well, I did not
[3] receive software

[4] **Q:** Do you recall receiving a CD in the mail?

[5] **A:** No, sir

[6] **Q:** Did the Cyberspace person further describe the
[7] software?

[8] **A.** No, sir

[9] **Q:** What else did you talk about with the Cyberspace
[10] person?

[11] **A:** Well, I don't really remember word for word what
[12] we had said, but the gist of the whole phone call from them
[13] was that I had signed up for Internet service by cashing
[14] that check and we were responsible for paying the bills up
[15] to that point and they were not going to give us a credit

[16] **Q:** I understand this was a conversation that
[17] occurred a couple of years ago About when was this
[18] conversation?

[19] **A:** Well, it was on or before the 24th of September
[20] It would have been shortly thereafter

[21] **Q:** That was September of 1999?

[22] **A:** Right.

[23] **Q** So without asking you to recall precise words
[24] from a conversation that was a couple of years ago, were
[25] there other topics in this conversation with the Cyberspace

**Page 23**

[1] person?

[2] **A:** No, there wasn't anything else All I was
[3] looking for was a credit off the bill and I wasn't looking
[4] for, you know, software or how to access it or whatever We
[5] didn't order it, didn't want it. I just wanted it off my
[6] bill

[7] **Q·** So were you also looking for an explanation as to
[8] how you were signed up for this service you didn't order?

[9] **A.** No, no I didn't order it, didn't want it

[10] **Q:** I understand

[11] **A.** After that I went to my boss

[12] **Q:** Let me stop there and then we'll move forward

[13] Do you recall either from your conversation with Cyberspace
[14] or Olympic, one of their representatives telling you that
[15] you couldn't stop the Internet service for a six month
[16] period?

[17] **MR LEONARD·** Objection, leading

[18] **MS. DIEMER:** Join

[19] **THE WITNESS.** No

[20] **BY MR. WINTER:**

[21] **Q:** Did either — did the Cyberspace representative
[22] offer to refund the money on previous bills?

[23] **MR. LEONARD.** Objection, leading

[24] **MS. DIEMER** I join in the objection, please

[25] **THE WITNESS.** No

**Page 24**

[1]

[2] **Q:** After you finished the conversation with the
[3] Cyberspace representative, what did you do next?

[4] **A** I went to my boss and explained to him exactly
[5] what the situation was with Cyberspace, that they would not
[6] give us any credit off our phone bill

[7] **Q:** What did you do in relation to Cyberspace after
[8] you spoke with your boss?

[9] **A.** My boss told me to contact the Florida Public
[10] Service Commission and file a complaint

[11] **Q:** Was the discussion with your boss that led —

[12] **A:** (Interposing) Correct

[13] **Q:** — to the creation of Exhibit 34?

[14] **A:** Absolutely

[15] **Q** After you wrote the letter, which is Exhibit 34,
[16] what did you do with it?

[17] **A:** With the letter?

[18] **Q:** Yes

[19] **A:** I do have a copy attached to my phone bill on
[20] that particular month as a record of why I did not pay that
[21] fee on my September bill

[22] **Q:** You kept a copy of a draft of this letter, right?

[23] **A:** Correct

[24] **Q:** The final copy that has your letterhead and your
[25] signature, what did you do with that original?

Page 25

[1] A. I mailed it to the Florida Public Service
[2] Commission
[3]   MR. WINTER  Off the record
[4]   (Off the record discussion)
[5]        BY MR. WINTER:
[6]   Q. You said that you mailed a copy of the original
[7] of Exhibit 34 Robrecht to the Public Service Commission?
[8]   A  Correct
[9]   Q: Before you mailed it, you were very familiar with
[10] the contents of that document, right?
[11]  A  Correct
[12]  Q  Have you had an opportunity today to look at this
[13] photocopy of that letter, which is Exhibit 34?
[14]  A. Yes, I have
[15]  Q  To the best of your belief is the photocopy in
[16] Exhibit 34 a true and accurate reproduction of the original
[17] that you sent to the Florida Public Service Commission?
[18]  A: Yes, it is
[19]  (Exhibit 35 was marked for identification)
[20]        BY MR. WINTER:
[21]  Q. I'm handing you what has been marked as Exhibit
[22] No 35 Robrecht  It is a multipage exhibit in two parts
[23] It runs CJR-0015201, a cover sheet, and then begins on the
[24] next page with a BellSouth bill and runs through CJR-0015209
[25] and that part is — it appears to be the August phone bill

Page 26

[1] from BellSouth  Here's a copy of Exhibit 35  Do you
[2] recognize Exhibit 35?
[3]  A: Yes, I do
[4]  Q  Beginning with the first page, which is also
[5] CJR-0015201, is this sometimes called a cover sheet?
[6]  A. Yes, that's exactly what it's called
[7]  Q. Who prepares these cover sheets?
[8]  A: I do  That's my handwriting on it
[9]  Q: Why do you prepare them?
[10]  A  To basically keep our records in a better filing
[11] order, give us the cover sheet so that you don't have to
[12] look around to find out who the payee and so on and so forth
[13] is if you have to make adjustments  These cover sheets are
[14] from when we were doing the bookkeeping by hand and it was a
[15] lot of things that we needed to put on these things  Now,
[16] we're doing them by computer  We just still use them to
[17] help with filing our invoices
[18]  Q  Focusing on how you used them in 1999, did you
[19] generally prepare a cover sheet for each invoice or bill
[20] that came in?
[21]  A. Absolutely and we still do  I haven't found a
[22] better way to file our invoices
[23]  Q  Attached to the first page of Exhibit 35 are a
[24] series of subsequent pages  Do you recognize these pages?
[25]  A· That would be our August BellSouth bill

Page 27

[1]   Q: Was the cover sheet prepared at or near the time
[2] that you received the BellSouth bill?
[3]   A: Yes That's the payment date that's on the — it
[4] should match  That's a check stub and the account number is
[5] on the bottom as far as the telephone number, which is the
[6] account number  This is — the checks are printed in three
[7] parts  This is one part  We send another part with the
[8] check to the vendor and this is the bottom part  We just
[9] keep it for our records to show what check number went with
[10] that invoice
[11]   Q: So part of the cover sheet incorporates
[12] information from the attached phone bill?
[13]   A. Correct
[14]   Q: When you incorporate the information from the
[15] phone bill, do you rely on it being correct?
[16]   A: Well, it's checked
[17]   Q: You check it as a part of your job?
[18]   A: Right
[19]   Q: Because —
[20]   A· Or assign a clerk to do it for me
[21]   Q  And FE Booker has these checked because they
[22] have a financial interest in seeing that they owe the money
[23] that they are being billed?
[24]   A. Absolutely  All bills are checked
[25]   Q: Turning your attention to Page 7 of the bill,

Page 28

[1] which is on CJR-0015208
[2]   A: Okay
[3]   Q: Do you see a charge from Cyberspace?
[4]   A: Yes, I do
[5]   Q: There may have been some uncertainty earlier when
[6] I asked you the question  Do you recall when the first
[7] instance was when Cyberspace billed FE Booker?
[8]   MS. DIEMER  Objection, asked and answered  You
[9] may answer, sir
[10]   THE WITNESS: I think I stated earlier that
[11] August — I mean the September bill is when I first
[12] noticed it
[13]        BY MR. WINTER:
[14]   Q  Okay  Perhaps I misunderstood  Can you explain,
[15] you first noticed it in September?
[16]   A: September, right
[17]   MS. DIEMER: Objection, asked and answered  It
[18] was very clear
[19]   MR. WINTER: Well, Counsel, I missed it  I'm
[20] entitled to ask and you've preserved your objection.
[21]   THE WITNESS. I missed it on this bill. I missed
[22] this charge on this bill  In September I caught it
[23]   MR. LEONARD: I object to that statement as
[24] unresponsive
[25]

JACK ROBRECHT
January 31, 2002

Case 2:00-cv-01806-RSL   Document 124   Filed 02/07/02   Page 96 of 184   FEDERAL TRADE COMMISSION   v.
CYBERSPACE.COM, LLC. ET AL.

Page 29

**BY MR. WINTER.**

[2] Q: Let me ask you a question then

[3] A: Okay

[4] Q: What's the first month that Cyberspace billed

[5] FE. Booker Company?

[6] A: Would you say that again so I understand it?

[7] Q: Certainly I'll rephrase the question When do

[8] you think that Cyberspace first billed FE Booker Company?

[9] A· It would have been on this bill, August the 14th

[10] Q: The August bill?

[11] A: This is the August bill, which they billed back

[12] for September the 16th, and it appears interstate services

[13] now — I mean Internet services

[14] MR. WINTER: Could you read that answer back for

[15] me, please?

[16] (The previous answer was read back)

[7] **BY MR. WINTER.**

[8] Q. In the August bill didn't they bill back for

[9] July 16th?

[10] A. Correct That's on this bill right here

[11] Q Okay

[22] A. That was their billing date and we did not

[23] receive this billing information until — there is our stamp

[24] when we received the bill on August the 12th — August the

[25] 20th is when we received this bill They billed on July the

Page 30

[1] 16th, which appears on the August the 14th bill

[2] MR. LEONARD: Objection to everything after the

[3] word yes as nonresponsive

[4] **BY MR. WINTER:**

[5] Q: Then it was the following month that you first

[6] noticed the Cyberspace charge? Do I have that right, the

[7] September — it was the following month —

[8] A: That was in September

[9] Q. — the September bill that you first noticed the

[10] Cyberspace charge?

[11] A Correct

[2] Q· Okay How many months after September did

[13] Cyberspace bill FE Booker Company?

[14] A. Two more months

[15] (Exhibit 36 was marked for identification)

[16] **BY MR. WINTER:**

[17] Q. I'm handing you a copy of what's been marked as

[18] Exhibit 36 Robrecht Do you recognize Exhibit 36?

[19] A: Yes, I do

[20] Q: What is it?

[21] A: It is the September billing for our BellSouth

[22] telephone bill, along with the cover sheet.

[23] Q: Was this cover sheet and the attached phone bill

[24] prepared in the same manner as Exhibit 35?

[25] A: Yes, it was However, I did not pay the charge

Page 31

[1] for Cyberspace to BellSouth

[2] Q: Okay But the cover sheet — you still filled

[3] out this cover sheet?

[4] A: Correct That's still my handwriting

[5] Q: And you attached the September phone bill to your

[6] business records?

[7] A: Correct

[8] Q Does the September bill reflect a charge from

[9] Cyberspace?

[10] A. Yes, it does It's on Page 4, for August the

[11] 16th on the September 14th bill

[12] (Exhibit 37 was marked for identification)

[13] **BY MR. WINTER:**

[14] Q· Let me hand you Exhibit 37 Robrecht Do you

[15] recognize Exhibit 37?

[16] A: Yes This is November's cover sheet and

[17] November's statement from our invoice — from BellSouth for

[18] our telephone services

[19] Q Okay We have skipped October I'll get to

[20] questions about October in a minute Focusing on November,

[21] did you prepare Exhibit 37 in the same manner that you did

[22] Exhibit 35 and Exhibit 36?

[23] A. Yes

[24] Q: Did Cyberspace bill FE Booker Company in

[25] November?

Page 32

[1] A. Yes, they did November the 14th, it was on the

[2] October 14th billing for the same amount as the previous

[3] month

[4] Q: Are you looking at a particular page?

[5] A· I'm looking at Page 5

[6] Q: Which is also CJR-0015224?

[7] A· Correct, which also states that these charges are

[8] under investigation

[9] MR. LEONARD: Object to the last statement as

[10] nonresponsive

[11] (Exhibit 38 was marked for identification)

[12] **BY MR. WINTER·**

[13] Q: Let me hand you Exhibit 38 Robrecht Do you

[14] recognize Exhibit 38?

[15] A: Yes, sir, I do

[16] Q· What is it?

[17] A: This is our December BellSouth billing and cover

[18] sheet

[19] Q: Were the cover sheet and BellSouth billing in

[20] Exhibit 38 prepared in the same manner as Exhibits 35, 36

[21] and 37?

[22] A: Yes, it was

[23] (Exhibit 39 was marked for identification)

[24] **BY MR. WINTER:**

[25] Q Let me hand you Exhibit No 39 Robrecht Do you

Page 33

[1] recognize Exhibit 39?

[2] A: Yes, I do It is our BellSouth billing for the

[3] company for October the 14th of 1999 and January the 14th,

[4] year 2000

[5] Q Does Exhibit 39 also include your cover sheet?

[6] A Yes, it does

[7] Q: Under this cover sheet, you've included two

[8] month s bills, is that right?

[9] A Yes, sir

[10] Q: That's different than the other exhibits we've

[11] looked at?

[12] A This is correct

[13] Q: Other than that difference, did you prepare this

[14] cover sheet and incorporate these phone records in the same

[15] manner as you did the previous exhibits, specifically

[16] Exhibits 35, 36 and 37?

[17] A: Yes, I did

[18] Q: And 38?

[19] A. Yes

[20] Q Why did you include the October bill with the

[21] January bill later in your records?

[22] A Okay There was a check issued in October for

[23] the proper amount and for some reason it got lost in the

[24] mail or got lost and never got recorded. So subsequently,

[25] we — when it showed up on the December bill, we basically

Page 34

[1] thought we had paid it We checked the bank and it hadn't

[2] cleared yet We checked with BellSouth They said, we'll

[3] give it another month, maybe it will show up So we turned

[4] around and then paid October in January of 2000 because of

[5] the mix-up in the lost check

[6] Q Okay So was the lost check unrelated to this

[7] Cyberspace matter?

[8] A Yes

[9] MS DIEMER: Objection, speculation

[10] BY MR. WINTER

[11] Q: Are you familiar with the content of these phone

[12] bills that have now been introduced as exhibits in your

[13] deposition?

[14] A Yes

[15] Q Have you gone through the phone bills to try to

[16] calculate the amount of money that Cyberspace has charged

[17] FE Booker?

[18] A Yes, I have

[19] Q: What's the bottom line? Does Cyberspace still

[20] owe money to the F.E. Booker Company?

[21] A: Yes, sir They owe us one month of $33 77 that

[22] was not credited off of our bill

[23] Q Did you have any further conversations with

[24] Cyberspace representatives after the last conversation that

[25] we discussed previously?

Page 35

[1] A. No, sir They made it pretty much clear up front

[2] that they were not going to do anything as far as the

[3] charges was concerned. There was no purpose for me to

[4] pursue that any further

[5] MR. WINTER: Thank you I have no further

[6] questions at this time

[7] MS. DIEMER: Objection, calls for speculation. I

[8] understand he's answered

[9] **CROSS-EXAMINATION**

[10] BY MR. LEONARD:

[11] Q: Mr Robrecht, my name is Ernest Leonard and I

[12] represent two of the defendants in this action by the FTC,

[13] Mr Chris Hebard and Coto Settlement Trust. I have a few

[14] questions for you, sir

[15] A: Okay

[16] Q: Do you know about how many checks a month your

[17] company, F E Booker, receives?

[18] A: It varies from month to month On average since

[19] we are a medium-size construction company, it's not very

[20] many

[21] Q: Could you give me a ballpark average?

[22] A. I would say anywhere from ten to 20

[23] Q: Was that the same back in 1999?

[24] A. I don't really recall Some years are better

[25] than other years, you know I would have to go back and

Page 36

[1] look at that year to recall

[2] Q: But it would have been in that general ballpark

[3] ten to 20?

[4] A I can't say that for sure

[5] Q: It wouldn't have been more than 50, would it?

[6] A: No

[7] Q Okay And are you the only person who endorses

[8] checks when they are received or is there someone else with

[9] the FE Booker Company that's delegated that

[10] responsibility?

[11] A Right now — I think in that year and years

[12] after, yes, I have been

[13] Q: So 1999 about the time this Cyberspace check came

[14] through, you would have been the only person responsible for

[15] endorsing the checks?

[16] A: Correct

[17] Q: When you received your ten to 20, but no more

[18] than 50 checks a month during that period of time, did you

[19] have a procedure whereby you would match the check up with

[20] the customer or whoever, I guess, the accounts payable?

[21] A· Correct

[22] Q: And every check you attempted to match up to

[23] determine why you received that money, right?

[24] A. Correct

[25] Q: And were there any types of checks that you were

**Page 37**

[1] not able to match up?

[2]    A: No

[3]    Q: Well, you weren't able to match up the Cyberspace

[4] one when you endorsed it, right?

[5]    A: Well, I did not check to see That is not part

[6] of our accounts receivable

[7]    Q· Okay What I'm asking is, you didn't match up

[8] the Cyberspace check to see if Cyberspace was an accounts

[9] payable that owed you money; right — or I'm sorry, an

[10] accounts receivable that owed you money, right?

[11]    A: Oh, yes, I would have done that

[12]    Q: In fact, you determined or you should have

[13] determined that Cyberspace did not owe you money, right?

[14]    A: This is correct

[15]    Q· So during 1999 on a typical month, how many type

[16] checks came in of that category where they came from

[17] somebody that you could not determine that they owed you

[18] money?

[19]    A: Well, there is one on that particular receipt

[20] That's the rebate check for Microsoft for $25

[21]    Q· My question is more general  In a typical month,

[22] how many of these type of checks did you receive during

[23] 1999?

[24]    A: I would say it's very few

[25]    Q· So you would agree with me, wouldn't you, that a

**Page 38**

[1] check like the Cyberspace check that came in where you were

[2] unable to match with an accounts receivable was really a

[3] rare event?

[4]    A: Correct

[5]    Q. Now, you mentioned Microsoft  Is that your

[6] Internet service provider?

[7]    A. No

[8]    Q· Okay  Did you have any business relationship

[9] with Microsoft at that time?

[10]    A. Other than using their software in the office

[11]    Q: Okay So they were not your Internet service

[12] provider, but you used Microsoft software?

[13]    A: Correct

[14]    Q: Under a licensing agreement?

[15]    A. Yes, sir

[16]    Q: Did you pay monthly amounts to them or annual

[17] amounts to them?

[18]    A: Annual amounts to them

[19]    Q  Can you think of any — well, strike that You

[20] recognized when you saw that Microsoft check, you recognized

[21] that that was somebody that you had an existing business

[22] relationship with, right?

[23]    A· It appeared to me to be a rebate check

[24]        BY MR. LEONARD:

[25]    Q: Objection, nonresponsive  My question is when

**Page 39**

[1] you received the Microsoft check, you recognized Microsoft

[2] as a company that you did business with, right?

[3]    A: Correct

[4]    Q: Other than the $3.50 Cyberspace check, can you

[5] think of any check during 1999 that you received from a

[6] company that you did not do business with?

[7]    A. There is no way I could answer that without

[8] looking at my records

[9]    Q: I'm asking for your best memory  Sitting here

[10] today, can you think of any other check that you received

[11] from a company that FE  Booker Company did not do business

[12] with?

[13]    A: I'm sure there would be some occasions

[14]    Q: But you can't think of any sitting here today?

[15]    A: Not without looking at my records, I can't

[16]    Q. Okay Do you receive marketing materials known

[17] in the vernacular as junk mail here at FE Booker Company?

[18]    A· Yes, sir

[19]    Q: Are you the person who handles the mail that

[20] comes in that regard?

[21]    A  No, sir

[22]    Q  Do you know what the policy of FE Booker

[23] Company is towards junk mail?

[24]    A: No, sir

[25]    Q. Well, do you ever get junk mail in your duties

**Page 40**

[1] and role with FE Booker Company?

[2]    A: Yes

[3]    Q  What do you do with it?

[4]    A  Sometimes I review, if I'm interested in it, and

[5] other times I throw it away

[6]    Q· And I assume you also get junk mail at the house

[7] personally?

[8]    A  Yes, sir.

[9]    Q: Probably more than you want, right?

[10]    A: Correct

[11]    Q  What do you do with it then?

[12]    A. Same thing. Look at the stuff that's

[13] interesting, throw the stuff away that's not

[14]    Q. Have you ever seen what's known as solicitation

[15] checks in junk mail before?

[16]    MR. WINTER. Objection You're welcome to

[17] answer

[18]    THE WITNESS: I've seen checks where if you buy

[19] something, you get back $40,000 or something  I mean,

[20] they're ridiculous amounts

[21]        BY MR. LEONARD:

[22]    Q  Well, have you ever, for example, something from

[23] a long distance carrier saying, would you please switch your

[24] long distance service to us and here's a $10 check if you

[25] do?

FEDERAL TRADE COMMISSION v.
CYBERSPACE.COM, LLC, et al. Case 2:00-cv-01806-RSL   Document 124   Filed 03/07/02   Page 99 of 184

JACK ROBRECHT
January 31, 2002

Page 41

[1]  A: I don't recall
[2]  Q: Can you think of or are you familiar with
[3]  marketing efforts like that where they give you a little —
[4]  a small amount check that you can deposit? For another
[5]  example, like credit cards, sign here or something like that
[6]  they give you an amount to deposit and by depositing it,
[7]  you're signing up for services?
[8]  A Not that I recall
[9]  Q You're completely unfamiliar with that marketing
[10]  approach?
[11]  A Yes, I am
[12]  Q Now, I would like you to look with me at Exhibit
[13]  34, second page, please
[14]  A. Okay
[15]  MR. LEONARD: Off the record
[16]  (Off the record discussion)
[17]          BY MR. LEONARD:
[18]  Q: Mr Robrecht, are you on the second page of
[19]  Exhibit 34?
[20]  A: Correct
[21]  Q. Did I understand your testimony before that you
[22]  are able to identify this image of a check on the bottom of
[23]  this page as the check that you, in fact, deposited into the
[24]  bank?
[25]  A. Yes, sir

Page 42

[1]  Q: I would like you to compare that to Exhibit 33,
[2]  the top part of it, because this is a cleaner copy, and I
[3]  want to ask you questions about this check I want to make
[4]  sure you look at it and if you can tell me if you're
[5]  comfortable that they are the same check
[6]  A. It's got the same check number on it
[7]  Q You don't see anything that would indicate that
[8]  the top of Exhibit 33 is any different?
[9]  A: Well, this particular check has the bank's
[10]  information on it where it's been processed This one does
[11]  not This come out of my records as the photocopy of the
[12]  check I made before I put it into the bank
[13]  Q Okay What I want to do is I want to ask you
[14]  questions about this check, but I would like to be able to
[15]  use Exhibit 33 because it's a cleaner copy
[16]  A. Okay, I understand
[17]  Q Do you see anything, comparing the two documents,
[18]  that would tell me that's not accurate to do that?
[19]  A. No no
[20]  Q Okay I also want to ask you about this letter,
[21]  if you would, the first page of Exhibit 34 Could you put
[22]  that in front of you? In here you're writing to the Florida
[23]  Public Service Commission, Consumer Affairs Department. Is
[24]  that the state agency in the State of Florida responsible
[25]  for consumer problems?

Page 43

[1]  A. Yes, sir
[2]  Q: And if you could look at the second paragraph in
[3]  the first line, you refer to a $3 50 rebate check.
[4]  A: Yes, sir
[5]  Q: Is that the same check on Exhibit 33 that you're
[6]  referring to?
[7]  A: Yes, sir
[8]  Q: If you look on the second, third and fourth lines
[9]  of that same paragraph, you're again using the phrase rebate
[10]  check Do you see that?
[11]  A: Yes, sir
[12]  Q. Then also on the second — or I'm sorry, the
[13]  third to the last line of the paragraph two, you again
[14]  use — you called this a rebate check Do you see that?
[15]  A: Yes, sir
[16]  Q: And then finally I notice on the very bottom you
[17]  enclosed, you say, a copy of the $3 50 rebate check.
[18]  A: Yes, sir
[19]  Q: So if my math is right six times in this letter
[20]  to the state governmental agency you used the phrase rebate
[21]  check?
[22]  A. Yes, sir
[23]  Q: Could you look with me, sir, on Exhibit 33 and
[24]  could you tell me if you see the word rebate anywhere on
[25]  that entire page?

Page 44

[1]  A: No, sir
[2]  Q. In fact, it doesn't say rebate at all, does it?
[3]  A: No, sir
[4]  Q: What it does say, if you could look with me at
[5]  the bottom of, which is the back of the check, you see where
[6]  there is the endorsement and there is a stamp?
[7]  A Yes, sir
[8]  Q: Is that FE Booker Company's endorsement stamp?
[9]  A: Yes, sir
[10]  Q: At the very top line of that word it's called a
[11]  solicitation check, isn't it?
[12]  A. Yes, it is
[13]  Q. Why did you feel the need to tell the state
[14]  agency that this was a rebate check?
[15]  A: It was my feeling that that's what it was
[16]  Q: Well, what was that feeling based upon?
[17]  A The amount of the check, $3 50
[18]  Q: It wasn't based upon anything written in this
[19]  check, was it?
[20]  MR. WINTER: Objection
[21]          BY MR. LEONARD:
[22]  Q: Go ahead
[23]  A: I still stand on I thought it was a rebate check,
[24]  and that's how I deposited it
[25]  Q: Okay You were under the misunderstanding that

Page 45

[1] it was a rebate check, correct?

[2] MR. WINTER: Objection

[3] THE WITNESS: Well, it was my belief that it was

[4] a rebate check That's the only answer I can give you

[5] **BY MR. LEONARD:**

[6] Q: Other than this vague belief that you had —

[7] MR. WINTER. (Interposing) Objection

[8] MR. LEONARD: Could I finish, Counsel, before you

[9] make your objection?

[10] **BY MR. LEONARD·**

[11] Q. Other than this vague belief you had is there

[2] anything on Exhibit 33 that you could point to that will

[13] show that this is a rebate check?

[14] MR. WINTER: Objection

[15] THE WITNESS: Other than my assumption that it

[16] was a rebate check

[17] **BY MR. LEONARD:**

[18] Q Okay Did you read the language above the

['9] endorsement line before you deposited the check?

[20] A. Obviously I did not

[21] Q: Have you read it since?

[22] A. Yes, I have

[23] Q: And would you agree with me that if you had read

[24] that line or that language there, you would not have cashed

[25] the check?

Page 46

[1] A. No, sir

[2] MR. WINTER: Objection

[3] **BY MR. LEONARD:**

[4] Q. Is that, no, you would not or, no, you don't

[5] agree that you wouldn't have cashed it?

[6] A: No, I don't agree that I would have cashed it

[7] Q Let me rephrase it because I'm not sure I

[8] ......... that ... .... .... ... ... .... .... I was probably a little

[9] inartful If you had read this, if you had this language

[10] above the endorsement on Exhibit 33, would you have cashed

[11] the check?

[12] MR. WINTER: Objection

[13] THE WITNESS: Sir, a $3 50 check, I didn't think

[14] that it was worth my time to read that endorsement

[15] **BY MR. LEONARD:**

[16] Q: Objection, nonresponsive I'm really asking for

[17] a yes or no answer My question is, if you had read the

[18] language above the endorsement stamp on Exhibit 33, would

[19] you have cashed the check?

[20] A: No, sir

[21] Q Is there any — looking at this now, is there

[22] anything unclear about this language — strike that Let me

[23] rephrase that. Reading this language now above the

[24] endorsement line on Exhibit 33, would you agree with me that

[25] it's pretty clear that this is soliciting you to sign up for

Page 47

[1] services?

[2] A. Yes, sir

[3] (Exhibit 40 was marked for identification)

[4] **BY MR. LEONARD:**

[5] Q: I'm going to hand you a document which has been

[6] marked as Exhibit 40 Robrecht And I'll represent to you

[7] I'm pretty certain you've never seen that document before

[8] But this is a sample of one of the several types of

[9] solicitations that went out by Cyberspace and I think it is

[10] different — it appears to be different slightly from the

[11] one that you received

[12] So based upon that predicate, first of all, could

[13] you turn to the third page of that exhibit, which I think

[14] you're on Do you remember if your check had a stub like

[15] that?

[16] A. Huh-uh (negative)

[17] Q: You don't remember?

[18] A: No, I remember It did not have a stub like

[19] that

[20] Q. Okay This was three years, right?

[21] A. Yes, sir

[22] Q. Okay How can you be so certain that your check

[23] did not have a stub attached to it when you received it?

[24] A: This is bringing my attention to the endorsement

[25] Q: Which is what the language above the endorsement

Page 48

[1] line is doing as well, correct?

[2] A: Correct But this is putting it into a better

[3] light as far as, if I have to tear off this stub, I would

[4] pay more close attention to it

[5] Q: You would agree if a stub was attached to your

[6] check, it would have alerted you and you probably wouldn't

[7] have deposited it?

[8] MR. WINTER. Objection

[9] THE WITNESS: It would have made me pay closer

[10] attention to the check, yes, sir

[11] **BY MR. LEONARD:**

[12] Q Now, you testified earlier that you didn't read

[13] the language above it because it was only $3 50

[14] A Correct

[15] Q· If you gave such little attention to the check

[16] three years ago, how are you so certain about your memory

[17] that the check had no stub attached to it?

[18] A: Well, if it had a stub on it like that, I would

[19] have remembered

[20] Q: So you don't have an actual memory? You're

[21] basically relying on what you think you would have done

[22] under the circumstances?

[23] MR WINTER: Objection.

[24] THE WITNESS: No, sir, I think I have a memory

[25] that that was not — that was not tore off the check.

Page 49

[1]                        BY MR. LEONARD.
[2]     Q· Well, let's talk about the memory What time of
[3] day did you receive the envelope with the check enclosed in
[4] it?
[5]     A It probably would have been somewhere around one
[6] o'clock in the afternoon
[7]     Q· That's because that's when the mail comes?
[8]     A That's when it's processed, sent to my office
[9]     Q How many other envelopes were included in that
[10] stack?
[11]     A Well the mail is opened before I get it
[12]     Q· Okay About how many other mail pieces did you
[13] get that day?
[14]     A. I can't remember that.
[15]     Q: What day of the week was it?
[16]     A: Well, I can't remember that either
[17]     Q: Okay And because that's two and a half years
[18] ago, right?
[19]     A Yes, sir
[20]     Q So when you've testified that you don't — that
[21] there was not a check attached to it, isn't it really based
[22] upon what you think you would have done with that stub — I
[23] said check and I meant stub Is your memory really based
[24] upon what you think you would have done and not a clear,
[25] precise concise memory of an event that happened two and a

Page 50

[1] half years ago?
[2]     MR. WINTER: Objection
[3]     THE WITNESS: I don't know My consensus is if I
[4] would have noticed that attached to the check, I would
[5] have paid more close attention to the check
[6]                        BY MR. LEONARD:
[7]     Q Thus, you don't think it was attached to it on
[8] that basis, right?
[9]     A. Right.
[10]     Q Now, look with me to the next two pages and I'll
[11] represent this is two sides of an insert to that, at least
[12] with respect to this mail-out, was included in the envelope
[13] Have you ever seen that before?
[14]     A Not that I recall, no, sir
[15]     Q· Did the envelope that you had contain an insert
[16] like this?
[17]     A. Not that I recall
[18]     Q· If it had contained an insert like this, would
[19] you agree that that would have alerted you that this is not
[20] a rebate check, but a solicitation check?
[21]     MR. WINTER: Objection
[22]     THE WITNESS: I don't know how to answer that
[23] question without responding to it because all I had is
[24] a check I had no inserts, no tear-off There was a
[25] check in an envelope just like it was for Microsoft

Page 51

[1]                        BY MR. LEONARD:
[2]     Q: I'm asking more about your mental processes and
[3] how you operated Would you agree with me that had the
[4] envelope contained an insert like that, that you would have
[5] likely recognized this as a solicitation check and not a
[6] rebate check?
[7]     MR. WINTER Objection
[8]     THE WITNESS. I don't know
[9]                        BY MR. LEONARD:
[10]     Q Would you at least agree with me that's somewhat
[11] more of a red flag as far as this might not be simply a
[12] rebate check?
[13]     MR. WINTER: Objection
[14]     THE WITNESS: I would agree with that, along with
[15] I agree that that was a red flag too
[16]                        BY MR. LEONARD:
[17]     Q: You're pointing to the stub opposite the previous
[18] page, right?
[19]     A. Correct
[20]     Q· What were you thinking when you saw that check
[21] from a company called Cyberspace com? Actually let me
[22] rephrase that question Have you ever heard of the name
[23] Cyberspace com?
[24]     A: No, sir
[25]     Q. So you received a check from a company called

Page 52

[1] Cyberspace com?
[2]     A. Yes, sir
[3]     Q: That you did not recognize?
[4]     A. Right
[5]     Q: You did recognize Microsoft?
[6]     A: Yes, sir
[7]     Q. So what were you thinking or why did you think it
[8] was a rebate check if it was a company that you didn't
[9] recognize?
[10]     A: Okay I need to clarify that a little bit as far
[11] as the way the mail procedure works
[12]     Q: Sure
[13]     A: The secretary picks up the mail, opens it and
[14] then it is routed through her to me
[15]     MR. WINTER· I object as nonresponsive
[16]     MR. LEONARD: Let him finish his answer before
[17] you object
[18]     MR. WINTER: Well, you haven't let him finish his
[19] answers when he was answering your questions
[20]     MR. LEONARD: No, that's not true Could you
[21] please continue, sir?
[22]     THE WITNESS: And that check was in there by
[23] itself with the Microsoft check and I thought it was a
[24] rebate check.
[25]

Page 53

BY MR. LEONARD:

[2] Q: So you got, what, a stack of checks handed to
[3] you?

[4] A: No, sir. It was in my daily mail with invoices
[5] and correspondence and anything else I would have received
[6] that particular day

[7] Q: What about the envelope, was the envelope
[8] attached?

[9] A. No, sir

[0] Q. So your secretary took it out of the envelope,
[11] right?

[2] A Yes, sir

[3] Q: So you never saw — you never actually saw the
[4] envelope, opened it up and saw what was inside, you saw the
[5] check that came out of the envelope?

[6] A: No, sir, but her instruction is to paper clip
[7] everything that comes in that envelope with whatever
[8] together

[9] Q That's your instructions to her?

[20] A: No That's Mr Booker's instructions to her

[21] Q: Did you ever talk to her about whether or not she
[22] actually did that in this case?

[23] A No, sir

[24] Q: What's her name?

[25] A. Her name is Tonya Miller

Page 54

[1] Q: Okay So I was asking — back to the question
[2] I'm trying to understand what you were thinking when you saw
[3] a check from a company that you didn't recognize Why did
[4] you assume it was a rebate check?

[5] MR. WINTER: Objection, asked and answered

[6] BY MR. LEONARD:

[7] Q: That's not a form objection, Counsel You can

[8] A. Why did I think it was a rebate check?

[9] Q. Yes, you never heard of Cyberspace com What
[11] were you thinking?

[2] A: I thought someone had bought something and this
[13] was a rebate check on what they had purchased

[4] Q Someone, meaning with this company?

[5] A Yes, sir

[6] Q: Who is responsible for purchasing services at
[7] this company?

[8] A: That depends on what department they work in

[9] Q: And that would fall — would that fall within the
[20] accounts payable department?

[21] A: Well, again the Microsoft and the Cyberspace
[22] would fall under the category of Charlie Hamrick He's our
[23] programmer here

[24] Q: Did you talk to anyone in the office, hey, do you
[25] know who Cyberspace com is?

Page 55

[1] A. No, sir

[2] Q: When you see the word Cyberspace, that tells you
[3] it's kind of high tech, right?

[4] A: Well, it tells me it's something to do with
[5] computers

[6] Q. Who is responsible for things to do with the
[7] computers here?

[8] A: Charlie Hamrick.

[9] Q You didn't ask Charlie Hamrick about this, right?

[10] A: No, sir

[11] Q: You assumed that maybe Charlie Hamrick bought
[12] some good or services from Cyberspace com and was getting a
[13] rebate?

[14] A: Well, again the checks go through Mr Booker. He
[15] knows what Charlie buys He knows what I buy He sent it
[16] to me for processing

[17] Q: You never talked to either Mr Booker or Charlie
[18] Hamrick about this check, right?

[19] A: No, sir, I didn't have to

[20] Q What was the reaction from Mr Booker when he
[21] found out about this Internet service that this company had
[22] been subscribing to for several months?

[23] A: He was unhappy about it

[24] Q Was he also unhappy at you for signing a
[25] solicitation check and endorsing it without reading it?

Page 56

[1] A: No, sir

[2] Q. Did he ever mention — ask you why you signed
[3] this check?

[4] A No, sir

[5] MR. LEONARD: That's all the questions I have

[7] CROSS-EXAMINATION
[8] BY MS. DIEMEP.

[9] Q: It's my turn now I have a number of questions,
[10] sir

[11] A. Okay

[12] Q: Mr Robrecht, Tonya is the name of the lady who
[13] opens the mail?

[14] A. Yes At that particular time, yes

[15] Q. So back in 1999 and August through, say,
[16] December 1999 Tonya was opening the mail?

[17] A: Correct

[18] Q: Had Tonya been with the company a long time?

[19] A: I don't recall her starting date, but Tonya has
[20] been here about three years

[21] Q Okay And Tonya is still apparently with the
[22] company?

[23] A. Yes, she is

[24] Q: Is she still the person who opens the mail?

[25] A: No

FEDERAL TRADE COMMISSION, v.
CYBERSPACE.COM, LLC. ET AL.
Case 2:00-cv-01806-RSL   Document 124   Filed 03/07/02   Page 103 of 184

JACK ROBRECHT
January 31, 2002

Page 57

[1]  Q: Do you have anything to do with supervising
[2] Tonya?
[3]  A: I did at that time
[4]  Q. And did you have any specific instruction to
[5] Tonya as her supervisor in the fall of 1999 concerning the
[6] processing of mail?
[7]  A: Yes
[8]  Q Okay What were those instructions?
[9]  A For her to open all the envelopes that had to do
[10] with company business, not personal, and to paper clip the
[11] contents all together and put it in a stack of what
[12] department it went to
[13]  Q How much mail does the FE Booker Company get or
[14] let me rephrase that Approximately how much mail was Tonya
[15] opening in the fall of 1999, say August 1999, when she was
[16] opening it? Are we talking a couple of inches, an inch, a
[17] bucket, a couple of buckets?
[18]  A. Mail around here varies I would say an average
[19] day's mail would be about three inches thick
[20]  Q Okay Do you know whether Tonya slits it open
[21] and then goes through and takes out the contents?
[22]  A Yes She slits it open and takes out the
[23] contents
[24]  Q· When I said that, I didn't misspeak, but I
[25] perhaps wasn't clear When she processes the mail, do you

Page 58

[1] know if she takes the stack, puts it in front of her,
[2] somehow opens the envelopes and puts them — divides what is
[3] personal and — it's late, I'm sorry Let's do this step by
[4] step
[5]  New question Do you know if she starts the
[6] process by separating the mail into personal, business?
[7]  A Correct
[8]  Q: Okay Once she's got two stacks, the personal
[9] stack and the business stack, she leaves the personal stack
[10] alone Is my understanding correct?
[11]  A: Correct
[12]  Q All right Now, she's got the stack in front
[13] of — Tonya has the stack in front of her, in approximately
[14] August of 1999, of the mail for the business Is the next
[15] thing that she does is slit each envelope and put it aside
[16] until she's done slitting all the envelopes or do you know
[17] what she does?
[18]  A. No, I do not
[19]  Q Or does she slit each one and then take it out?
[20]  A I think the procedure with her then was to open
[21] the envelope, take the contents out, paper clip it together
[22] and put it in various stacks
[23]  Q My question here —
[24]  A (Interposing) One by one, slit the envelope, take
[25] the contents out, stack. Slit the envelope, clip the

Page 59

[1] contents and stack.
[2]  Q: Do you know if that's what she did or whether she
[3] did it slit, slit, slit, slit, open, open, open?
[4]  A: I mean, if she got bored and wanted to change the
[5] sequence, yes, she could have done it that way
[6]  Q· Okay Now, how many CDs do you normally get in
[7] the mail each day?
[8]  A: CDs?
[9]  Q· Yeah
[10]  A I wouldn't know The CDs are not sent to me
[11]  Q: Okay So if a CD comes in, it would usually go
[12] to Mr Hamrick?
[13]  A. Sure
[14]  MS. DIEMER: Off the record a second
[15]  (Off the record discussion)
[16]  BY MS. DIEMER:
[17]  Q: Do you know whether Tonya, as a help or an aid to
[18] you, separates the checks from any other material or if she
[19] puts the check on top of the other material?
[20]  A: If there was a check in the envelope, she would
[21] put it on top, definitely if there was other —
[22]  Q: (Interposing) Material?
[23]  A: — material in the envelope
[24]  Q Okay Do you know if she would pull a tear stub
[25] off of it possibly?

Page 60

[1]  A: I don't think she would, no, ma'am
[2]  Q: You don't think so, you just don't know?
[3]  A: Well, she's not instructed to do that.
[4]  Q: Okay Is she instructed not to do that?
[5]  A. I don't think that's ever come up I don't think
[6] she would detach something
[7]  Q: Okay Now, sir, as I understand it, you are the
[8] only person who uses the endorsement stamp?
[9]  A: Right
[10]  Q: Okay If you're out for the day, does somebody
[11] else endorse the checks?
[12]  A. No
[13]  Q· As I understand it, you get between ten and 20
[14] checks a month?
[15]  A: Correct
[16]  Q: When you personally receive the checks in order
[17] to process them and put them on what is marked as Exhibit
[18] 33, are you the person who always prepares the deposit slip
[19] for the First American Bank?
[20]  A. During that period of time, yes, sir
[21]  Q: And is this your handwriting?
[22]  A: Yes, it is
[23]  Q How many people work for FE. Booker Company?
[24]  A About that period of time, probably about 30
[25]  Q: How many work here now?

JACK ROBRECHT
January 31, 2002

Case 2:00-cv-01806-RSL   Document 124   Filed 03/03/02   Page 104 of 184   FEDERAL TRADE COMMISSION v.
CYBERSPACE.COM, LLC. ET AL.

Page 61

[1]   A. About the same

[2]   Q: Okay And do you as the comptroller of the FE

[3] Booker Company — does the FE Booker Company perform

[4] accounting services for any other companies?

[5]   A: No

[6]   Q: Okay They don't perform any services for a

[7] doctor's office?

[8]   A. No

[9]   Q And the handwriting on the Exhibit 34, this is

[10] yours here?

[1]   A. Right That's how I sign my correspondence

[2]   Q. When Mr Winters was asking you questions, you

[3] said that when you had the conversation with Cyberspace —

[4] I'm not trying to put words in your mouth, but my

[5] recollection of what you said to him was the person, I'm

[6] sorry, the person at Olympic led me to believe I owed the

[7] bill What specifically did he say that made you form that

[8] conclusion, to the best of your recollection?

[9]   A. I did say Olympic Communications

[20]   Q: It might have been Cyberspace That's why I was

[21] confused by that

[22]   A: Okay

[23]   Q· Do you think it was — now that you've thought

[24] about it for a few minutes and I asked the question — do

[25] you believe that was a conversation you had with someone at

Page 62

[1] Cyberspace, not someone that you spoke with at Olympic?

[2]   A: I believe that it was at Cyberspace and not

[3] Olympic

[4]   Q: Okay Now, I'm going to ask you to look at what

[5] has been marked as Exhibit 35 I want to look at the

[6] last page which is Bates stamped CJR-0015209

[7]   A: All right

[..]   ...T· ...:..... ll from Telecom USA Central?

[9]   A: Uh-huh (affirmative)

[10]   Q: Is that a business that you have a regular

[11] contractual relationship with?

[12]   A: No

[13]   Q: Do you know who they are?

[14]   A. They are a billing service for, I guess,

[15] Telecommunications US Central

[16]   Q: Okay Do you know how come this is attached to

[17] the back of your phone bill?

[18]   A: Yes It was phone calls that was made that was

[19] chargeable to our account

[20]   Q: CJR-001529 is next in order past Exhibit 35,

[21] Bates stamp number 001528, is that correct?

[22]   A. Page 7

[23]   Q: Yeah Yeah, it's the one before

[24]   A: Yes

[25]   Q: That's all I needed to know

Page 63

[1]   MR. WINTER: Objection Which exhibit are you

[2] referring to?

[3]   MS. DIEMER: Exhibit 35 The page I just asked

[4] him about is the page after the page in which Olympic's

[5] name shows up That was the question and he said yes

[6]   BY MS. DIEMER:

[7]   Q: If you would look at Exhibit 38, please, and I

[8] ask you to look at what has been — I think I gave you the

[9] wrong one I really meant 37 I apologize

[10]   If you would look at the fifth page of Exhibit

[11] 37, which is marked Bates CJR-0015222

[12]   A: Okay

[13]   Q: Who wrote the markings that are handwritten on

[14] that page?

[15]   A: The Star 69?

[16]   Q. Uh-huh (affirmative)

[17]   A. I did

[18]   Q. Why did you write Star 69 there?

[19]   A: I was verifying what those charges were for

[20]   Q: So you pressed the star button on the phone and

[21] the number 69 to find out where those calls were to?

[22]   A No, ma'am

[23]   Q· Why is that there then? What did you do to

[24] verify those charges?

[25]   A. Okay The star 69 is a number that you call to

Page 64

[1] see where your last call come from

[2]   Q: Okay

[3]   A So that was basically to verify numbers

[4]   Q: Okay

[5]   A. Someone in the office hit star 69 to verify a

[6] call

[7]   Q: Okay

[8]   A: We were getting a lot of ... a ... ... ...

[9] and someone was trying to find out who was calling us So

[10] you hit star 69 and it in turn gives you the last phone

[11] number that called

[12]   Q Then there is obviously a charge?

[13]   A. Right

[14]   Q: Is there a company policy that if you do not

[15] recognize a charge on a bill, that you're required to call

[16] and find out about it?

[17]   A. Oh, yes, yes

[18]   Q· Okay So you were required to go find out why

[19] there were all these 75 cent charges totaling up $9 75 on

[20] the bill that's identified as Exhibit 37, page 15222, is

[21] that correct?

[22]   A: That is correct

[23]   Q Okay So when we look at the August 1999

[24] BellSouth bill, the one which you stated that you missed the

[25] Cyberspace charge —

Page 65

[1]  A. Yes, ma'am
[2]  Q — was that something that you should have caught
[3] because you look carefully at these bills each time?
[4]  A. Yes, it was
[5]  Q And you look carefully enough to verify a 75 cent
[6] charge?
[7]  A. Correct
[8]  Q You use your time to make sure that even a 75
[9] cent charge is a charge owed by your company?
[10]  A Absolutely
[11]  Q Now, let's look back at the check, which is
[12] marked as Exhibit 33, Bates stamp number H-0006731
[13]  A. All right
[14]  Q Okay Now, this was for $3 50?
[15]  A Correct
[16]  Q Now, when the checks came to you from Tonya, you
[17] looked at them in 1999, is that correct?
[18]  A Correct
[19]  Q. Before you put them on your exhibit?
[20]  MR. WINTER: Counsel, that's never been made an
[21] exhibit All of us referred to it Perhaps you would
[22] like to make it one
[23]  MS DIEMER: I would like to make it an exhibit
[24] I haven't made one all day It's time for it
[25]  MR. WINTER. It would be 41, I believe

Page 66

[1]  (Exhibit 41 was marked for identification)
[2]  BY MS. DIEMER
[3]  Q So when you received the check, you then in 1999
[4] prepared the handwritten copy of Exhibit 41, is that
[5] correct?
[6]  A Uh-huh (affirmative)
[7]  Q And when you prepared the exhibit, you then hand
[8] write in the amount of the check, is that correct?
[9]  A' Correct
[10]  Q· Okay In this case for Exhibit 41, you hand
[11] wrote in Cyberspace ak-53200?
[12]  A Right
[13]  Q· $3 50, is that correct?
[14]  A Right
[15]  Q Okay Now, when you did this, you took the time
[16] to look at the check and to write down ak-53200 Can you
[17] tell me where you found that number?
[18]  A The 53200?
[19]  Q Yeah
[20]  A That's our account number we charged it back to
[21]  Q· What's that account number?
[22]  A· That's our office expense
[23]  Q: So you found a number to match the Cyberspace com
[24] check to, you used the general office expense account
[25] number?

Page 67

[1]  A: No
[2]  Q: That's not a general office account expense
[3] number?
[4]  A: Yes, that is a general office expense account
[5] number
[6]  Q: Let me ask you something When you get the —
[7] when the check comes in, you have the check in front of you,
[8] do you turn it over, stamp it and then fill in the
[9] information from the front on the deposit slip or do you
[10] look at the front of the check, fill in the deposit slip and
[11] then turn it over and stamp it?
[12]  A: Would you rephrase that again?
[13]  Q· Sure When you get the check, you're sitting at
[14] your desk, the mail has come, Tonya — the mail has come,
[15] Tonya has opened it She has brought it to you, paper
[16] clipped with whatever materials are there It's on your
[17] desk You have in front of you the deposit slip which you
[18] are going to write by hand So that's all correct? I need
[19] a yes or no Is that all correct? I've got it right so
[20] far?
[21]  A: That's correct
[22]  Q: At that point in time, as you look at the check,
[23] do you turn it over, stamp it with your endorsement stamp or
[24] while you have the front of the check there, do you fill out
[25] the deposit slip?

Page 68

[1]  A Yeah, right I fill out the deposit slip from
[2] the front of the check.
[3]  Q: And then you turn it over and endorse it?
[4]  A. Right
[5]  Q: Okay When you're in the process of filling out
[6] the deposit slip, do you make an effort as you fill it out
[7] to match each check up with a customer account or with an
[8] account to which it belongs to so you can properly post it
[9] in your books?
[10]  A It was my assumption at that time that both the
[11] Microsoft and the Cyberspace checks were a rebate and that's
[12] where they would have normally been charged
[13]  Q Okay I understand that that was your assumption
[14] with this particular situation What I'm asking you is in
[15] general, as you looked at the check, a check comes in — you
[16] get, you said, between ten and 20 a week Okay?
[17]  A. No, ten or 20 a month
[18]  Q: I'm sorry I misunderstood So each day as you
[19] get your mail, there is maybe a check or a couple of checks,
[20] is that correct?
[21]  A. Correct
[22]  Q: Did you usually aggregate checks and only go to
[23] the bank once a week?
[24]  A No
[25]  Q: You went to the bank depending on how much money

Page 69

[1] you had to deposit?

[2]   A: Correct

[3]   Q: So as you sit at your desk, you get a check, one,
[4] maybe two, is that correct?

[5]   A: Correct

[6]   Q: As you get this check and you look at it, at any
[7] given time, approximately how many accounts does FE Booker
[8] have where it might be receiving payment?

[9]   A: Now, we're talking about office expenses now My
[10] guess is 40 of them

[1]   Q: So normally do you get checks from people where
[2] you spent office monies? How often does that happen in a
[3] month?

[4]   A. Again, rebate checks come in very rarely I
[5] happened to have two of them that particular day

[6]   Q: It was kind of unusual for a rebate check to come
[7] in?

[8]   A: Right

[9]   Q: And how many other checks that were not payment
[10] directly for services provided by the FE Booker Company
[11] did you generally receive? Were the vast majority of those
[12] ten to 20 checks a month checks from people that FE Booker
[13] had provided services to?

[24]   A: Correct

[25]   Q: So it's the rare check that's for a small amount

Page 70

[1] that is what you might think was a rebate, is that correct?

[2]   A: That's correct

[3]   Q: Okay And when you got the FE Booker Company
[4] check, did you assume when you got — let me strike that
[5] Had you created in your system an account number for which
[6] to match up rebate checks?

[7]   A: No, ma'am

[8]   Q: Okay So the number is your deposit
[9] slip, the ak-53200, is that correct?

[10]   A. Correct

[11]   Q: And what is that number?

[12]   A· That's our office expense account number for —
[13] that's on our P & L statement

[14]   Q: Okay So in order to post an expense or a cost,
[15] you have created the ak-53200 number so it shows up on your
[16] profit and loss statement appropriately, is that correct?

[17]   A: Right, as office expense

[18]   Q: Okay And in this case although you were
[19] receiving monies, you used this number?

[20]   A Again, since it's my feeling that both of these
[21] were a charge to the office expense account, I was crediting
[22] these back to the office account because they were rebates
[23] from the original purchase

[24]   Q: So you didn't take any time to think about which
[25] category this check might go into?

Page 71

[1]   A: No, I've been doing this for 30 years

[2]   Q· Okay

[3]   A· And there wasn't any sense in taking the time and
[4] the effort to try to go back and look at an invoice from
[5] Cyberspace to see whether we got a rebate I just knew if
[6] we had bought something, that it was charged to the office
[7] account

[8]   Q Well, it's worthwhile to track down — to spend
[9] your time to track down a 75 cent charge, but it's not
[10] worthwhile to track down a $3 50 charge, is that correct?

[11]   A: Well, there was a group —

[12]   Q That's a yes or no question, sir

[13]   A: All right Well —

[14]   MR. WINTER. If you can answer that question yes
[15] or no I object to the form of the question

[16]   MS. DIEMER: That's incorrect. That's a yes or
[17] no question

[18]   MR. WINTER. Objection to the form

[19]   MS. DIEMER: He can answer it either way

[20]   (The pending question was read back)

[21]   THE WITNESS: That's not a fair question

[22]                    BY MS. DIEMER:

[23]   Q: That's a yes or no question, sir

[24]   A: I don't have an answer because it wasn't a fair
[25] question

Page 72

[1]   Q: You only answer questions you perceive as fair,
[2] sir?

[3]   MR. WINTER. Objection

[4]   THE WITNESS I have no comment on that

[5]                    BY MS. DIEMER:

[6]   Q: You're refusing to answer the question, sir?

[7]   MR. WINTER. Just try to answer the question as
[8] best you're able Don't let my objections — I
[9] objections are for the record You should try to
[10] answer as best you can

[11]   THE WITNESS: Well, it's not a 75 cent charge
[12] It's a $9 75 charge

[13]                    BY MS. DIEMER:

[14]   Q: All right So if I phrase the question, it's
[15] worth your time to look up a $9 75 charge, but it's not
[16] worth your time to look up a $3 50 charge, would you be able
[17] to answer it then?

[18]   MR. WINTER: Objection

[19]                    BY MS. DIEMER:

[20]   Q: It's a yes or no, Mr Robrecht

[21]   A: I know it's yes or no, but it's not a yes or no
[22] answer to it for the reason why I looked at this Because
[23] it was a whole group of them and we needed to identify who
[24] was doing it in the office and for what reason

[25]   Q. But the whole group was worth $9 75, wasn't it?

Page 73

[1]   A: Correct
[2]   Q: So Mr Robrecht, it was worth your time to
[3]   look at a $9 75 item, but it wasn't worth your time to look
[4]   at a $3 50 item, is that correct? Yes or no
[5]   A. Rephrase that question
[6]   (The pending question was read back)
[7]   THE WITNESS: Yes, it was worth my time to look
[8]   at the $9 75 charge
[9]   BY MS. DIEMER:
[10]  Q  Where is the cutoff, Mr Robrecht, between $9 75
[11]  and $3 50?
[12]  A. It all depends on what you're investigating
[13]  Q  Something on your phone bill, Mr Robrecht?
[14]  A. This is true
[15]  Q: So if you're investigating a charge on your phone
[16]  bill, is it acceptable to look — where is the line between
[17]  $9 75 and $3 50, Mr Robrecht? If somebody is giving you
[18]  money, it doesn't matter, but if you're paying it, it
[19]  matters? Is that what you're sitting here telling us?
[20]  A: No
[21]  Q  Okay
[22]  A  No
[23]  Q  Okay Have you ever heard of the phrase there is
[24]  no such thing as a free lunch, Mr Robrecht?
[25]  A  Yes

Page 74

[1]   Q: Do you think that's true?
[2]   MR. WINTER  Objection
[3]   THE WITNESS. No, I don't think that's true
[4]   BY MS. DIEMER
[5]   Q  I m going to ask you to look at — I want to ask
[6]   you something Have you ever — I'm going to mark this as
[7]   an exhibit I'm going to mark the original in the magazine
[8]   and give you the magazine, but I only want to mark the page
[9]   I don't think anybody really wants a copy of the entire
[10]  magazine I'll mark it with another sticker so it shows
[11]  which page it is
[12]  MR. WINTER: Counsel, if you're doing that, isn't
[13]  the entire magazine then the exhibit?
[14]  MS  DIEMER: Sure I'm happy to make it that
[15]  way I'm happy to make the entire magazine Exhibit 43
[16]  Robrecht with Exhibit 42 Robrecht the page that we
[17]  need I m just concerned that if we tear it out, part
[18]  of what I want to ask questions about will get torn I
[19]  tried five different magazines before I finally just
[20]  took the magazine from United They claim that you're
[21]  allowed to do that. I did actually inquire, having
[22]  ripped a page out of five different ones
[23]  MR. WINTER: You should obviously use whatever
[24]  you need If it's just a problem with the whole
[25]  evidence rule, we can stipulate it's a page from the

Page 75

[1]   magazine But if you want the whole magazine, you're
[2]   welcome to it
[3]   MS. DIEMER: I'll make Exhibit 43 the entire
[4]   magazine I don't think we need a copy — we can
[5]   probably stipulate we do not need an entire copy of the
[6]   magazine attached to the transcript
[7]   MR. WINTER: I'll need a copy of all the
[8]   exhibits
[9]   MS  DIEMER: If you want to do that, that's fine.
[10]  I'm saving you the copying charges
[11]  MR. WINTER: Let's go off the record and resolve
[12]  this
[13]  (Off the record discussion)
[14]  (Exhibit 42 was marked for identification)
[15]  MS. DIEMER: I'm going to put on the record, now
[16]  that we have clarified how we're going to handle this
[17]  particular exhibit, we have agreed that Exhibit 42 will
[18]  be the front and back page, the same single page, front
[19]  and back, which is an advertisement in the United
[20]  Airlines Hemispheres magazine and that we will
[21]  stipulate that we do not need to worry about the whole
[22]  evidence rule because we'll stipulate that the
[23]  advertisement is part of the whole magazine when
[24]  originally produced for this deposition, even though as
[25]  an exhibit attached to this deposition, we are not

Page 76

[1]   including the entire magazine
[2]   MR. WINTER: And because the advertisement is a
[3]   stand-alone advertisement It doesn't refer elsewhere
[4]   to any other pages in the magazine as best we can tell
[5]   MS. DIEMER: I believe that that is correct
[6]   MR. WINTER: I believe that based on that belief,
[7]   I'm entering the stipulation
[8]   BY MS. DIEMER:
[9]   Q: All right I'm going to ask you to look at the
[10]  ripped out copy I'll ask you to look at what's been marked
[11]  as Exhibit 42 On the right-hand side, down at the bottom
[12]  right, it says GlobalCall prepaid calling card. It says up
[13]  to 200 free minutes with purchase, is that correct?
[14]  A. Yes
[15]  Q: Do you believe that if you use this calling card,
[16]  that you would get 200 free minutes with no other
[17]  obligation?
[18]  MR WINTER: Objection
[19]  THE WITNESS: As long as you used it before the
[20]  date expired
[21]  BY MS. DIEMER:
[22]  Q. Okay I'm going to ask you to look at what is in
[23]  the bottom left corner in the fine print.
[24]  A: Oh, God
[25]  Q: Where it says IDT You see that? I'm

Page 77

[1] standing — let the record reflect that I'm standing up
[2] because of the difficulty of removing the pages from the
[3] magazine So I'm not trying to be intimidating Do you
[4] feel intimidated by me standing here?
[5]   A: No I just can't understand why they do that
[6] because it's — okay
[7]   Q: All right I'm going to ask you to read for me
[8] what it says there
[9]   A: Without my glasses?
[10]   Q: No, no, you can go get your glasses, sir, if you
[11] have them available to you
[12]   A: Okay
[13]   Q: I'm not asking you to read it without your
[14] glasses
[15]   MR. WINTER: Should we go off the record?
[16]   MS DIEMER: We should while he gets his glasses
[17]   (Off the record discussion)
[18]   THE WITNESS. I do not have my glasses with me,
[19] however, I do have this
[20]                        BY MS. DIEMER:
[21]   Q: Will that work for you, sir?
[22]   A. Yes My glasses are at home
[23]   Q: I'm not intending to try to make you read
[24] something
[25]   A. I understand

Page 78

[1]   MR. WINTER: For the record, what is that?
[2]                        BY MS. DIEMER.
[3]   Q: Is that a magnifying glass, sir?
[4]   A: Yes Do you want me to read it aloud?
[5]   Q   Yes
[6]   A· "There is a $1.49 monthly charge Pay phone bill
[7] surcharge may apply Rate and service charges are subject
[8] to change without notice Credit card or certified check
[9] required for activation Free minutes are based upon 6 9
[10] cents per minute domestic rate Amount of free minutes
[11] depends upon the amount of the initial charge on the
[12] account Free minutes offers — free minutes offer ends
[13] February 28, 2002 GlobalCall is a registered service
[14] trademark and IDT is a trademark of IDT Corporation IDT
[15] Corporation, New York Stock Exchange, IDT, a global leader
[16] in discount telecommunications 2001, IDT Corporation All
[17] rights reserved "
[18]   Q. Okay. Thank you, sir Is it your understanding
[19] after reading that, that if you use the GlobalCall prepaid
[20] calling card that you would be entering into a contractual
[21] relationship with IDT?
[22]   A: To a certain point
[23]   Q Okay And let me ask you now about what has been
[24] marked as Exhibit 33 Robrecht This is my copy If you
[25] could look at the original, I would appreciate it

Page 79

[1]   A: Okay
[2]   Q: I would like you to look at the portion of the
[3] exhibit which is below the tear line and read the second
[4] sentence starting with the word endorsement
[5]   A: "Endorsement and deposit constitutes agreement
[6] and desire to utilize service and agreement pursuant to
[7] terms attached."
[8]   Q. Okay Would you read the next two sentences?
[9]   A: Is that the terms? "Notice payee agrees to terms
[10] of $29 95 monthly due and payable in advance Payee
[11] acknowledges that they may qualify and, in fact, do
[12] authorize charges to appear on their phone bill as listed on
[13] reverse "
[14]   Q Okay Does that actually say, "Notice, payee
[15] agrees to terms of $29 95 monthly due and payable in
[16] advance Payee acknowledges that they are qualified and, in
[17] fact, do authorize these charges to appear on their phone
[18] bill as listed on reverse "
[19]   MR. WINTER: Objection
[20]   MS. DIEMER· He misstated two words and I was
[21] trying to clarify
[22]   MR. WINTER: Misread
[23]                        BY MS. DIEMER.
[24]   Q. He misread
[25]   A: Well, my magnifying glass is not long enough and

Page 80

[1] I couldn't keep moving it
[2]   Q. I thought that's what was happening So I was
[3] trying to clarify it Clearly, the document will speak for
[4] itself, but I wanted to clarify the record about that
[5]   A Right
[6]   Q Do you understand —
[7]   A. May I ask a question?
[8]   Q: No I'm sorry so the way this goes is
[9] is we ask the questions and you answer Perhaps afterward
[10] then
[11]   A: Okay
[12]   Q: I'm going to ask — strike that As you look at
[13] Exhibit 33, document Bates stamp number H-0006731, the
[14] language that I just had you read, sir, does that indicate
[15] to you that endorsement of this check obligates the company,
[16] entity or person endorsing it to enter or it does cause them
[17] to enter into an agreement to pay and receive charges on
[18] their phone bill monthly?
[19]   A: Yes, to a certain extent
[20]   Q When you say to a certain extent, what do you
[21] mean, sir?
[22]   A· That you should have the right to get out of it
[23] if you felt like you were tricked into subscribing for the
[24] services
[25]   Q Okay So where does it say that you have the

**Page 81**

[1] right to get out if you felt like you were tricked? What
[2] gives you that indication, sir?

[3] A. Well, I don't — it says here that it's on the
[4] reverse What's on the reverse?

[5] Q: Well —

[6] A: (Interposing) What is on the reverse?

[7] Q: So you believe that there would be a reference to
[8] the reverse So earlier you said that this was what looked
[9] like a tear sheet, you believe there was something on the
[10] other side of the check that might give you that right?

[11] A. I don't know If what he had shown me earlier
[12] was beside the check, why are they referring to the reverse?

[13] Q Well, that's not the question I asked, sir

[14] A: Okay

[15] Q: What I asked you was, from what you have in front
[16] of you on Exhibit 33, what tells you that you have the right
[17] to get out of this contract if you feel you've been tricked?

[18] A On that little endorsement I see nothing

[19] Q. Do you see anything anywhere on the document, on
[20] Exhibit 33?

[21] A No

[22] Q: Okay So nothing about the document tells you
[23] that if you feel you have been tricked, that you can get out
[24] of the contract, is that correct?

[25] A That's correct

**Page 82**

[1] Q: Okay Do you sign contracts on behalf of the
[2] FE Booker Company, sir?

[3] A No

[4] Q Have you ever signed contracts on behalf of
[5] yourself personally?

[6] A Yes

[7] Q: Have you ever seen a contract that says I get to
[8] get out of this if I feel I've been tricked?

[9] A: I don't recall

[10] Q. Okay Mr Robrecht, you mentioned during one of
[11] the breaks that you've been working here for 30 years?

[12] A: Yes, ma'am

[13] MR WINTER: Objection I think he said that on
[14] the record

[15] BY MS. DIEMER:

[16] Q: Oh, if you said it on the record, great Then
[17] have you mentioned here today that you have worked here for
[18] 30 years — over 30 years?

[19] A No, ma'am I've worked here for 25 years, but I
[20] have had prior experience in other firms

[21] Q Okay

[22] A But I've been doing accounting for over 30 years

[23] Q Did you graduate from high school, sir?

[24] A Yes, I did

[25] Q Did you attend college?

**Page 83**

[1] A: Yes, I did.

[2] Q: Did you graduate from college?

[3] A: Yes, I did

[4] Q: When did you do that?

[5] A: In 1970

[6] Q: And after you graduated from college — where was
[7] that by the way?

[8] A: In West Virginia

[9] Q: Which college?

[10] A. Mountain State

[11] Q: I actually have a friend who teaches there

[12] A: You do?

[13] Q: Yes, I do And when you graduated from Mountain
[14] State in 1970, did you then seek further education or did
[15] you go out to seek employment?

[16] A: No, I went out to seek employment

[17] Q: And did you find employment?

[18] A: Yes, I did

[19] Q: And where did you find employment?

[20] A: At a CPA firm

[21] Q: Okay Did you graduate? What was your degree
[22] in, sir?

[23] A It was in accounting and — well, it was an
[24] associate's degree from Mountain State, accounting and
[25] computers, computer programming

**Page 84**

[1] Q: So how long did you attend Mountain State?

[2] A: Three years, three full years There was no
[3] break

[4] Q: Right, okay And after you obtained your
[5] associate's degree, you said that you then sought
[6] employment And what did you seek employment doing, working
[7] in a CPA firm, is that what I understand?

[8] A: Right

[9] Q: How long did you work at the CPA firm?

[10] A: Seven years

[11] Q: So from approximately 1970 to 1977?

[12] A: Right

[13] Q: And what was the name of the CPA firm?

[14] A: William McAbee

[15] Q: And, sir, when you worked at the William McAbee
[16] firm, what did you do for them?

[17] A I did write-up work for about 30 different
[18] clients

[19] Q: What is write-up work, sir?

[20] A It's doing their — preparing their financial
[21] statements, taking their records and putting them in the
[22] financial statements

[23] Q: Okay After you left William McAbee, did you
[24] seek further education or did you seek further employment?

[25] A: I seeked (sic) further employment with this firm

**Page 85**

[1] **Q:** Okay So since 1977 you've been employed by the
[2] FE Booker Company?
[3] **A:** Yes
[4] **Q:** Was FE Booker one of the McAbee firm's clients?
[5] **A.** No
[6] **Q:** Did you move at that time? Is McAbee here in the
[7] Pensacola area?
[8] **A.** Yeah, yeah
[9] **Q:** Okay And in your job here did you start as
[10] comptroller?
[11] **A.** Yes
[12] **Q:** And you've been the comptroller ever since?
[13] **A:** Right.
[14] **Q:** Have your job duties changed in the meantime,
[15] markedly?
[16] **A:** No
[17] **Q:** All right. Let me take one quick glance through
[18] my notes, but I think that that's all I have
[19]    Oh, I did have another question You mentioned
[20] that in Exhibit 39, which is the bill that includes two
[21] months worth of payment, that there was a problem where a
[22] check got lost and it was not recorded?
[23] **A:** Yes
[24] **Q:** Now, how often did that happen?
[25] **A.** That a check is lost in the mail?

**Page 86**

[1] **Q:** Yeah
[2] **A:** If it's going to Jacksonville, quite often They
[3] have very bad mail service Four or five times a year
[4] **Q.** Okay
[5] **A:** Just as a guess
[6] **Q:** Okay
[7] **A·** Mail service does lose checks
[8] **Q·** I find it is probable, sir And my guess would
[9] be that Mr Winters believes that in a big way right now I
[10] believe that that is all the questions I have, sir Oh, I
[11] did have one more
[12]    Did you seek further education at any time since
[13] leaving Mountain State?
[14]    **A·** I did attend some continuing education classes
[15] when I was at Bill McAbee's firm Over the years I probably
[16] attended four different classes
[17]    **Q** Refreshers about accounting matters, correct?
[18]    **A.** Right
[19]    **MS. DIEMER:** Okay That's all the questions I
[20] have Thank you very much
[21]    **THE WITNESS:** Thank you
[22]    **MR. WINTER:** I have a few follow-up lines of
[23] questions
[24]    **THE WITNESS:** Okay
[25]

**Page 87**

[1]                **REDIRECT EXAMINATION**
[2]                    **BY MR. WINTER:**
[3]    **Q:** Let's start with Exhibit No. 34. Do you see
[4] that?
[5]    **A:** Okay
[6]    **Q:** All right Counsel asked you about the number of
[7] times that you used the phrase rebate check in this letter
[8] Do you remember those questions?
[9]    **A.** Yes, I do
[10]    **Q:** I want to call your attention to the middle of
[11] the second full paragraph in Exhibit No 34, the sentence
[12] that begins since this office Can you find that sentence?
[13]    **A:** Okay
[14]    **Q:** Can you read that sentence for me, please?
[15]    **A.** "Since this office routinely deposits rebate
[16] checks from various vendors for products we purchase in our
[17] business, it appeared", it had appeared — I'm sorry
[18]    **Q:** It's late
[19]    **A:** "It had the appearance of a standard rebate
[20] check."
[21]    **Q:** Okay Looking next to the second page of Exhibit
[22] 34, the bottom half, is this — is this the Cyberspace check
[23] that had the appearance of a rebate check?
[24]    **A:** Yes
[25]    **Q:** Why is it that it appeared — that it had the

**Page 88**

[1] appearance of a rebate check?
[2]    **A:** Again, I have to fall back, it was $3 50, there
[3] was nothing stated on it that it was a rebate check. In my
[4] opinion it was a rebate check
[5]    **Q** At about the same time you received this check
[6] from Cyberspace, did you receive any other rebate checks?
[7]    **A.** Yes
[8]    **Q·** Let's look to now Exhibit No — which I th
[9] Counsel referred to, and which was finally then marked as an
[10] exhibit
[11]    **MS. DIEMER:** I think all three of us referred to
[12] it
[13]                    **BY MR. WINTER:**
[14]    **Q:** I'll refer to it expressly now. Do you have a
[15] copy of Exhibit 41 in front of you?
[16]    **A:** Yes, I do
[17]    **Q.** Can you tell me generally what is Exhibit 41?
[18]    **A:** Exhibit 41 is the copy of my deposit slip for
[19] July the 12th of 1999, that I deposited three separate
[20] checks into our money market account — or operating
[21] account
[22]    **Q:** Did you prepare this slip and deposit these
[23] checks as a —
[24]    **A.** Yes, I did.
[25]    **Q:** Let me finish

Page 89

[1]    A: Sure
[2]    Q· Sometimes I pause a bit in the question. Did you
[3]  prepare these slips and deposit these checks as a part of
[4]  your duties here at FE Booker Company?
[5]    A: Yes, I did
[6]    Q  And is Exhibit 41 that you have, is that a
[7]  photocopy of the actual deposit slips that you made?
[8]    A. No Yes, I'm sorry, it is  I do have a second
[9]  receipt in my book. However, this has been stamped by the
[10]  bank as being received  So this is the original deposit
[11]  slip
[12]    Q  Exhibit 41 is a photocopy of the original?
[13]    A. Right
[14]    Q  Who made the photocopy?
[15]    A: I did
[16]    Q. And when you made the photocopy, did the
[17]  photocopy machine appear to be working?
[18]    A. Yes
[19]    Q  And so to the best of your understanding, is
[20]  Exhibit 41 a true and accurate reproduction of the original
[21]  that you copied from the photocopy machine?
[22]    A. Yes, it is
[23]    Q· What does Exhibit 41 show in relation to the
[24]  deposits that you made?
[25]    A: I don't really understand the question

Page 90

[1]    Q  Let me ask you a better one  How many deposits
[2]  did you make with the deposit slip that is Exhibit 41?
[3]    A. I made one deposit
[4]    Q  Okay  How many checks were involved with that
[5]  one deposit?
[6]    A  Three
[7]    Q: Who were those checks from?
[8]    A: One of them was for payment for work that we done
[9]  at Baptist Hospital on four different jobs that totaled up
[10]  to $8,312 28, which was one check
[11]    Q· The second check that you deposited as shown on
[12]  Exhibit 41?
[13]    A. It was a rebate check that I received — that the
[14]  company received from Microsoft
[15]    Q  What was the third check deposited in Exhibit 41?
[16]    A  Again, the check was what I thought was a rebate
[17]  check from Cyberspace for $3 50
[18]    Q· The next topic I have is a different line of
[19]  questions offered by the other Counsel  She asked you
[20]  questions about the difference in your treatment of
[21]  investigating some charges for star 69
[22]    A. Correct
[23]    Q. And do you remember she asked you questions about
[24]  how you treated the charges from Cyberspace?
[25]    A: Yes, I do

Page 91

[1]    Q: Taking first your investigation of the charges of
[2]  star 69, what were the circumstances involving that
[3]  investigation?
[4]    A: The circumstances were that there was a number of
[5]  them which led me to investigate why those charges were
[6]  being made  There was 75 cents that added up to $9 75
[7]    Q  Was that $9 75 that added up to an amount that
[8]  was being charged to FE Booker Company or a refund?
[9]    A. That was an amount being charged to FE Booker
[10]  Company
[11]    Q  Turning now to your investigation on the
[12]  Cyberspace charge, what were the circumstances involved with
[13]  that investigation?
[14]    A. I don't think I know how to answer that
[15]  particular question  I don't understand it
[16]    Q  All right  Let me ask a better one. Why, when
[17]  the $3 50 Cyberspace check came in, did you take the
[18]  investigation, if any, that you took?
[19]    A: I don't think I understand that question either
[20]  When the $3 50 Cyberspace check came in, what sort of
[21]  investigation did I do at that time about it? Forgive me,
[22]  it's late
[23]    Q  Let me try to ask you a clear question
[24]    A. Okay
[25]    Q. When did you first investigate the Cyberspace

Page 92

[1] charges?
[2]    A. That was on the September billing for the
[3]  previous month  As I indicated before, for what reason I
[4]  did not see the charge the prior month  We're all human
[5]  We all make mistakes  I did not see it on the prior one  I
[6]  seen it on the September one and for a $3 50 charge, I
[7]  didn't see there wouldn't be any problem with the company
[8]  taking that off of our bill, but they were very reluctant to
[9]  do that
[10]    Q: As another topic, Counsel showed you a new
[11]  Exhibit 42, which was the advertisement which was undated,
[12]  but it has an offer that expires in February of 2002  Does
[13]  the advertisement have an offer that it says it expires in
[14]  2002?
[15]    A: Yes
[16]    Q: This advertisement doesn't refer to Cyberspace in
[17]  any way, does it?
[18]    A: No, sir, not that I recall  I don't see their
[19]  name on there anywhere
[20]    Q. Have you ever seen the advertisement before it
[21]  was shown to you today?
[22]    A: No, I haven't
[23]    Q· Counsel asked you to read a part of that
[24]  advertisement and you went to go look for your glasses,
[25]  right?

**Page 93**

[1] A: Correct

[2] Q: And when you didn't find your glasses, you did

[3] find a magnifying glass?

[4] A. Correct

[5] Q: How would you describe the part of the

[6] advertisement that she asked you to read?

[7] A. Very small You would have to have 20/20 vision

[8] to read it

[9] Q: Let's look at one of the exhibits previously

[10] marked as No 33 Do you have Exhibit 33? Counsel also

[11] asked you to read this language on Exhibit 33 —

[12] A. Correct

[13] Q: — which is above the endorsement line on the

[14] back of the check.

[15] A: Correct

[16] Q How would you describe this language?

[17] A: It's very small also

[18] Q Because it's very small, what does one have to

[19] have to read it?

[20] MS DIEMER. I would object to that It calls

[21] for not only speculation, but it asks him to contradict

[22] what he actually did here today, which was read it

[23] without this I asked him to read it into the record

[24] He read it without having the magnifying glass

[25] MR. WINTER: So you're now testifying?

**Page 94**

[1] MS. DIEMER. Yes, but you are asking him to say

[2] something which is an implication, which is not true

[3] That is unfair to him Earlier today, during this

[4] deposition, he was asked to read from this document

[5] He read from the document without getting his

[6] magnifying glass We did not discover that there might

[7] be a difficulty in reading without glasses until we

[8] asked him to read the IDT advertisement,

[9] So if you're going to sit here and say, do you

[10] need a magnifying glass for him to read that, you would

[11] be inviting the witness to testify falsely, since he

[12] just did it without I suggest to you that that is

[13] inappropriate and not very nice

[14] MR. WINTER: Counsel, your testimony on the

[15] record notwithstanding, I think the witness has done an

[16] able job today in defending himself And we can

[17] clarify this in this manner

[18] BY MR. WINTER.

[19] Q: At any point in today's testimony did you use

[20] your magnifying glass to read this language off the check?

[21] A. Yes, I just now did here earlier

[22] Q: Counsel asked you about your years of accounting

[23] experience and I believe you testified that you had about 30

[24] years of experience, is that right?

[25] A: Right

**Page 95**

[1] Q: In your 30 years of experience, have you had an

[2] opportunity to see the contracts that FE Booker Company

[3] enters into?

[4] A: Yes

[5] Q What do those contracts typically look like?

[6] MS. DIEMER: Objection. Vague, ambiguous,

[7] overbroad, inadequate foundation, hearsay

[8] MR. WINTER: Counsel, your objections are noted

[9] for the record, but at this point, given their length,

[10] I'm going to ask if you joined the stipulation earlier

[11] that all objections other than to form were reserved?

[12] MS. DIEMER: I did, however I have the right to

[13] object You're asking me not to object, Mr Winter?

[14] MR. WINTER: I'm certainly not I'm asking you

[15] to clarify what your objections are Do you believe

[16] that they're now adequately stated on the record?

[17] MS. DIEMER: I believe they're adequately stated

[18] I believe they're covered by the stipulation as well,

[19] but I always believe it's good to be careful

[20] MR. WINTER: Given that you've now had that

[21] opportunity to state your objections, I'm going to have

[22] the court reporter read that question back

[23] (The pending question was read back)

[24] THE WITNESS. They were contracts to build

[25] buildings with, contracts for no payments There has

**Page 96**

[1] been other contracts I can't remember right now off

[2] the top of my head

[3] BY MR. WINTER:

[4] Q. Have you seen contracts for services?

[5] A: What kind of services?

[6] Q: Have you seen contracts for providing phone

[7] service, for example?

[8] A. I can't re , t 've The phone serve i i uill i

[9] when I started working here I don't think BellSouth puts

[10] out any formal contracts

[11] Q. Have you seen any contracts of FE Booker

[12] Company that required you to use a magnifying glass to read

[13] them?

[14] A: Oh, sure

[15] Q: Which type of contracts are those?

[16] A: Probably a note, payment — a note, a promissory

[17] note

[18] Q: Under what sorts of circumstances do you use your

[19] magnifying glass?

[20] A. When I can't read something

[21] Q: What usually leads you to believe that you can't

[22] read?

[23] A. Something that the print is small enough that it

[24] would require 20/20 vision to read it

[25] Q: Other folks around here use magnifying glasses

Page 97

[1] sometimes too?

[2] A Some of the folks do Some of the folks have

[3] glasses I am nearsighted and occasionally, since I've

[4] gotten up in years, I need them for small print. I need

[5] something you can rely on

[6] Q I understand, and when you need that to rely on,

[7] you have the magnifying glass?

[8] A. Yeah, at the office I do But at home I have a

[9] pair of prescription glasses with bifocals on them, which I

[10] use for distance And if I want to read something that I

[11] need 20/20 vision for, I have those But it's inappropriate

[12] for me to wear distance glasses at the office because I can

[13] see normal, what I call normal size print, without having to

[14] use glasses And it would be very painful to use distance

[15] glasses on something close up It would give me a headache

[16] MR. WINTER: Certainly, I understand I don't

[17] have any further questions for you at this time

[18] MS DIEMER: I do

[19]

[20]                    RECROSS-EXAMINATION

[21]                       BY MS DIEMER

[22] Q· Are you an expert in printing, sir?

[23] A. No, ma'am

[24] Q Have you ever worked in a print shop?

[25] A. No, ma'am

Page 98

[1] Q Have you ever done any typesetting?

[2] A. No

[3] Q Okay Do you consider yourself to be an expert

[4] in marketing?

[5] A· No

[6] Q: Do you consider yourself to be an expert in

[7] anything to do with the marketing of services?

[8] A: No, ma'am

[9] Q: Anything to do with direct mail or advertising or

[10] junk mail?

[11] A No, ma'am

[12] Q: Okay If you saw this advertisement that is

[13] marked as Exhibit 42, if it came to your home in an

[14] envelope, what would you do with it?

[15] MR. WINTER: Objection

[16] THE WITNESS: I probably wouldn't respond to it

[17]                       BY MS. DIEMER:

[18] Q. Sir, up until the point today where I asked you

[19] to read the exhibit marked 42, did you go and get your

[20] magnifying glasses?

[21] A: No

[22] MS DIEMER Okay I have no further questions

[23] THE WITNESS. I wasn't asked to read anything

[24] aloud, was I?

[25] MS. DIEMER Yes

Page 99

[1] MR. WINTER: Well, now we've got Counsel

[2] testifying again. Do you have further questions for

[3] the witness?

[4] MS. DIEMER: No

[5] MR. WINTER: I don't have further questions for

[6] the witness either

[7] MS. DIEMER: Thank you very much for your time

[8] MR. WINTER· Thank you Before we go off the

[9] record, just more or less a couple of housekeeping

[10] items We would like to leave the exhibits in the

[11] custody of the court reporter

[12] MS. DIEMER: That's fine with me

[13] MR. WINTER: We understand that the court

[14] reporter will prepare the transcript The witness

[15] reserves the right to review and sign the transcript

[16] after review, and then we'll ask you to circulate it to

[17] all the parties

[18] MS. DIEMER: The only other thing I would just

[19] say is what I'm going to attempt to do here is actually

[20] cut out this advertisement and also just attach the

[21] cover page of the magazine so we know where it came

[22] from

[23] MR. WINTER That will be fine Does the cover

[24] page list a date?

[25] MS. DIEMER: Yeah, I believe it does

Page 100

[1] MR. WINTER. I looked for it earlier We can

[2] read that into the record and whatever it shows is

[3] fine

[4] MS. DIEMER: How about if I include this page

[5] that says January departments?

[6] MR. WINTER· The table of contents and the first

[7] page?

[8] MS DIEMER: Yes

[9] MR. WINTER. That seems fine

[10] MS DIEMER: So for the record, we have agreed

[11] that the cover page of one part of the table of

[12] contents which lists the date of the magazine and the

[13] actual, both sides of the page which has the exhibit

[14] tagged, constitute the entire Exhibit No 42

[15] MR. WINTER: Right That's it

[16] (Whereupon, the deposition was concluded )

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 101

[1]         CERTIFICATE OF OATH

[2] STATE OF FLORIDA            )

[3] COUNTY OF ESCAMBIA          )

[4]   I, Angela E Harrell, certify that JACK ROBRECHT

[5] personally appeared before me and was duly sworn

[6] WITNESS my hand and official seal this 10th day of

[7] February 2002

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 102

[1]         CERTIFICATE OF REPORTER

[2] STATE OF FLORIDA               )

[3] COUNTY OF ESCAMBIA )

[4]    I, Angela E Harrell, Registered Professional

[5] Reporter, certify that I was authorized to and did

[6] stenographically report the foregoing deposition, and that

[7] the transcript is a true record of the testimony given by

[8] the witness, that the witness did not waive reading and

[9]  ,

[10] I further certify that I am not a relative, employee,

[11] attorney, or Counsel of any of the parties, nor am I a

[12] relative or employee of any of the parties' attorney or

[13] Counsel connected with the action, nor am I financially

[14] interested in this action

[15]

[16]

[17]

              Angela E Harrell, CP

[18]      Registered Professional Reporter

[19]

[20]

[21]

[22]

[23]

[24]

[25]

[1]

Page 103

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the
foregoing transcript, and the same is a true and accurate record
of the testimony given by me
Any additions or corrections that I feel are necessary,
I will attach on a separate sheet of paper to the original
transcript
          JACK ROBRECHT
I hereby certify that the individual representing
himself/herself to be the above-named individual, appeared before
me this
    day of     , 2001, and executed the
above certificate in my presence
          NOTARY PUBLIC IN AND FOR
MY COMMISSION EXPIRES

Page 104

WITNESS  JACK ROBRECHT
DATE     JANUARY 31, 2002
CASE     FTC v CYBERSPACE
Please note any errors and the corrections thereof on this errata
sheet  The rules require a reason for any change or correction
It may be general, such as "To correct stenographic error," or
"To clarify the record," or "To conform with the facts "
PAGE  LINE     CORRECTION  REASON FOR CHANGE

## Check Description

Co Name: F E BOOKER CO
Address: PO BOX 1473
City:     PENSACOLA
State:    FL
Zip:      32597

749548

**CYBERSPACE.COM, LLC**
1148 Pollside Hwy.
Clark, DE 19704-1008
1-800-250-0100

TEL  850-432-1441
DATE  June 07, 1999

PAY   *Three Dollars & Fifty Cents*                    $3.50

                        050012959  07-15-99  593  2022  02
                                                          15

PAY
TO THE    3-DIGIT 325
ORDER OF  F E Booker Co
          PO Box 1473
          Pensacola, FL 32597-1473

          140122         3387  3250  15  07-14-99
          FIRST UNION NATIONAL BANK
          CARE HILL, NC 27514

          VOID AFTER 90 DAYS

*749548*  053101551 2079900058000*  *0000000350*

Ex 33 - Robrecht

H-0006731

10/14/99



# FE Booker Company

P.O. Box 1473 - Pensacola, FL 32597-1473 - Office:(850)432-1441 FAX:(850)434-2710

**GENERAL CONTRACTORS**



RECEIVED
SEP 28 1999
Division of Consumer Affairs

24 September 1999

Florida Public Service Commission
Consumer Affairs Department
2540 Shumard Oak Blvd.
Tallahassee, Florida 32399-0867

Attn: Randy Roland

Re: Olympic Telecommunications/Cyberspace.Com

Dear Mr. Roland:

Per our phone conversion this date and at your request I am writing a letter of explanation and also sending you information requested regarding this incident, and it's fraudulent appearance.

As I stated on the phone, we had received a $3.50 rebate check from Cyberspace.Com,LLC without any letter or brochure of explanation about their services or even how we could use them. <u>Just a rebate check</u>. Since this office routinely deposits rebate checks from various vendors for products that we purchase in our business, it had the appearance of a standard rebate check. However it was discovered only when we started being charged $29.95+ taxes monthly on our business telephone for internet service that we had not ordered. After calling Olympic Telecommunications we learned that the $3.50 rebate check we received had an endorsement on the back of the check stating something like, <u>upon cashing this check that we had signed up for their internet service.</u>

During the same phone call with Olympic Telecommunications we questioned them about their unethical business practices, they were insulting and stated that there was nothing they or we could about the two months worth of charges already billed on our business telephone before we received even the first bill. It appears that they are timing their billing schedule to cycle two times before the business realizes they were hit the first time.

We would appreciate you looking in to this matter for us.

Very truly yours,

F. E. BOOKER COMPANY

Jack Robrecht
Comptroller

Enclosed  1- Copy of telephone bill
          2- Copy of $3.50 rebate check

H-0006727



F E BOOKER CO
Account Number:  850 432-1441 330 0560
Bill Period Date:  Sep 14, 1999

For Olympic Telecommunications Inc Billing Questions, Call 1.800 368-0404

## Detailed Statement of Charges

### *Miscellaneous Charges and Credits*                                   *Amount*

850 432-1441
### *Service Provider - CYBERSPACE.COM*

**Date**

1. 08/16  INTERNET SVC ...........................................  **       29.95**
Total Miscellaneous Charges and Credits ..........................       29.95

The above total does not include the following taxes:.

| | |
|---|---|
| Federal Tax ............................... | $0.92 |
| State/Local Tax ........................... | $0.06 |
| Florida Gross Receipts Surcharge ......... | $0.74 |

### *Taxes*                                                              *Amount*
*Taxes on Unregulated Services*

2. Federal Tax .............................................  **       .92**
3. State Tax ...............................................  **      2.16**
4. Florida Gross Receipts Surcharge .......................  **       .74**
Total Taxes on Unregulated Services .......................        3.82
Total Taxes ...............................................        3.82



** Unregulated Charge

This portion of your bill is provided as a service to Olympic Telecommunications Inc.

AT    A0054    H-0006728

# In The Matter Of:

*FEDERAL TRADE COMMISSION   v.*
*CYBERSPACE.COM, LLC. ET AL.*

---

*DON REESE*
*Vol. 1, February 8, 2002*

---

*For The Record, Inc.*
*Court Reporting and Litigation Support*
*603 Post Office Road*
*Suite 309*
*Waldorf, MD   USA   20602*
*(301) 870-8025    FAX: (301) 870-8333*

Original File 20208REE ASC, 152 Pages
Min-U-Script® File ID: 2895114854

**Word Index included with this Min-U-Script®**

**Page 1**

[1]        FEDERAL TRADE COMMISSION

[2]

[3]              INDEX

[4]

[5] WITNESS          EXAMINATION

[6] Don Reese, Vol I      Michael Goodman - 5

[7]

[8]

[9]

[10]

[11] EXHIBITS    FOR ID    DESCRIPTION

[12] 176      36      E-20363

[13] 177    55    E-20415 through E-20416

[14] 178    83    DR-3744 through DR-3745

[15] 179    103    E 25346 through E25355

[16] 180    115    Cover letter and resume of

[17]              Don M  Reese

[18] 181    123    E mail chain regarding churn

[19]              rates

[20] 182    126    E-mail chain regarding

[21]              customer service

[22] 183    129    E-mail chain regarding Cyber

[23]              overflow

[24] 184    131    E-mail chain regarding

[25]              Cyberspace overflow calls

**Page 2**

[1] EXHIBITS     FOR ID DESCRIPTION - continued

[2] 185    132    E-mail chain regarding

[3]              Cyberspace overflow calls

[4] 186    134    E-mail chain regarding call

[5]              loads for customer service

[6] 187    135    E-mail chain regarding Mr

[7]              Robopoupos of Eastern Shoes

[8] 188    135    E-mail chain regarding "Angry

[9]              Business in Maryland"

[10] 189    137    E-mail chain regarding

[11]              Tennessee Regulatory

[12]              Authority

[13] 190    138    E-mail chain regarding Cyber

[14]              transfers

[15] 191    139    E-mail chain regarding

[16]              SurfISP

[17] 192    140    E-mail from Gene Hirai

[18]              regarding Pinnacle/Cyberspace

[19]              customer service

[20] 193    149    E mail chain regarding

[21]              Customer Service overflow

[22] 194    149    E-mail chain regarding

[23]              Cyberspace Usage Analysis

[24] 195    149    E-mail chain regarding

[25]              Cybercrap com

**Page 3**

[1]        UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF WASHINGTON

[2]

[3] FEDERAL TRADE COMMISSION,          )
            Plaintiff,          )

[4]

      v                   ) Case No  C00-1806-L

[5]
   CYBERSPACE COM, LLC,          )
[6] FRENCH DREAMS,              )
   COTO SETTLEMENT,          )
[7] ELECTRONIC PUBLISHING VENTURES, LLC, )
   OLYMPIC TELECOMMUNICATIONS, INC ,   )
[8] IAN EISENBERG,              )
   and                    )
[9] CHRIS HEBARD,              )
            Defendants          )

[10]

[11]

[12]

[13]

[14]

[15]            Friday, February 8, 2002

[16]

         909 First Avenue
[17]         Suite 90
         Seattle, Washington

[18]

[19]

[20]

[21]

[22]

[23]

      The above-entitled matter came on for deposition
[24] pursuant to notice, at 9:00 a.m

[25]

DON REESE
Vol. 1, February 8, 2002

Case 2:00-cv-01806-RSL   Document 124   Filed 03/04/02   FEDERAL TRADE COMMISSION   v.
CYBERSPACE.COM, LLC. ET AL.

Page 4

[1] APPEARANCES

ON BEHALF OF THE FEDERAL TRADE COMMISSION

[2]      Mr Michael A Goodman, Attorney

         Ms Collot Guerard, Attorney

[3]      600 Pennsylvania Avenue NW

         Washington, DC 20580

[4]      (202) 326-3071

[5]

ON BEHALF OF THE DEPONENT

[6]      Mr William R Zoberst, Attorney

         Plaza 600 Building

[7]      600 Steward Street, Suite 305

         Seattle, WA 98101-1257

[8]      (206) 386-7393

[9]

ON BEHALF OF CHRIS HEBARD

[10]     Mr Ernest Leonard, Attorney

         Friedman & Feiger

[11]     5301 Spring Valley Road, Suite 200

         Dallas, TX 75240

[12]     (972) 788-1400

[13] ON BEHALF OF IAN EISENBERG

         Kathryn S Diemer, Attorney

[14]     Campeau Goodsell Diemer

         38 W Santa Clara Street

[15]     San Jose, CA 95113

         (408) 295-9555

[16]

         Jane B Jacobs, Attorney

[17]     Klein, Zelman, Rothermel & Dichter

         485 Madison Avenue

[18]     New York, New York 10022

         (212) 935-6020

[19]

[20] ON BEHALF OF OLYMPIC TELECOMMUNICATIONS

         Mr Derek A Newman, Attorney

[21]     Newman & Newman

         1001 Fourth Avenue Plaza, Suite 2560

[22]     Seattle, WA 98154

         (206) 624-6334

[23]

[24] ALSO PRESENT

         Mr Ian Eisenberg

[25]

Page 5

[1]                    PROCEEDINGS

[2] (The witness was duly sworn )

[3]      DON REESE, VOL I

[4] having been first duly sworn, was examined and testified as

[5] follows

[6]                    EXAMINATION

[7]               BY MR. GOODMAN:

[8]      Q: Mr Reese, will you state your name, please

[9]      A. Don Martin Reese, III

[10]     Q: What's your Social Security number?

[11]     A: 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

[12]     Q: When is your birthday?

[13]     A. 3-5-64

[14]     Q  What's your address, your home address?

[15]     A. My current home address is 3302 North 7th Street,

[16] No  359, Phoenix, Arizona 35014

[17]     Q: Before we get started with the substance, there are

[18] just a few preliminary questions I want to ask so that we can

[19] establish some ground rules for the deposition

[20]       The first is Will you agree to let me finish

[21] a question before you answer it?

[22]     A: Yes

[23]     Q: Will you agree to answer verbally because that's

[24] the only kind of answer that the court reporter can take

[25] down?

Page 6

[1]      A: Yes

[2]      Q: Will you agree that if you don't understand a

[3] question, you will ask me to clarify it?

[4]      A: Yes

[5]      Q: Will you agree that if you don't hear a question,

[6] you will ask me to repeat it?

[7]      A: Yes

[8]      Q  Will you tell me if you are having trouble hearing

[9] what I'm saying?

[10]     A: Yes

[11]     Q. You can ask for a break when you need one, and we

[12] will accommodate that The same goes for the court reporter

[13] We have been pretty good about that this week, and I'm sure

[14] we will continue today

[15]       From time to time, attorneys may object to a

[16] question You should wait until the attorneys are done

[17] speaking before you answer Is that okay?

[18]     A· Yes

[19]     Q: You will have the opportunity to read and review

[20] your transcript I just want to let you know that you will

[21] have a chance to read through it

[22]     MR. ZOBERST. Perhaps this would be an

[23] opportune time to get that request on the record We do

[24] request review and signature

[25]     Q  Are you taking any medications today that could

Page 7

[1] affect your ability to answer the questions truthfully?

[2] A. No

[3] Q  Do you agree to testify truthfully?

[4] A  Yes

[5] Q  We have had a continuing stipulation this week that

[6] objections are reserved except as to the form of the question

[7] and responsiveness of the answer That will continue today

[8] Later on in the deposition, if you want to

[9] change an answer that you gave earlier or add to an answer,

[10] that's okay Just say so and say what you want to add or

[11] change Is that all right?

[12] A  Yes

[13] Q. Mr Reese, have you met with anyone from the FTC

[14] prior to this deposition today?

[15] A. Yes

[16] Q  Who have you met with?

[17] A: Yourself, Michael Goodman, Collot Guerard; and

[18] various members of the staff I don't remember their names

[19] Alexandra, and I don't know her last name, Chuck, and a few

[20] others  I don't remember their names

[21] MR. LEONARD· What's the last name of the last

[22] person?

[23] THE WITNESS  I don't know their last names

[24] Q  When was that meeting?

[25] A  January 12th or thereabouts

Page 8

[1] Q. What did we talk about at that meeting, just

[2] generally?

[3] A  Generally the history of Cyberspace and billing

[4] Q  Did you have any telephonic conversations with

[5] Collot or me before today's deposition?

[6] A  Yes

[7] Q  Approximately how many times would you say that we

[8] have spoken on the phone?

[9] A: A dozen

[10] Q  Have you met with any other attorneys representing

[11] any other parties in this matter?

[12] A  Yes

[13] Q· Who have you met with?

[14] A  Larry Friedman, Eugene Leonard — Ernest Leonard

[15] That's it for attorneys

[16] Q  What did you meet with Mr Friedman and Mr Leonard

[17] about?

[18] A  Primarily LEC billing, Olympic Telecommunications

[19] in particular

[20] Q  Did you have any telephonic conversations with

[21] Mr Friedman or Mr Leonard?

[22] A· Yes, Mr Friedman

[23] Q  Approximately how many times did you speak with

[24] Mr Friedman?

[25] A  Two

Page 9

[1] Q· Did you meet with any other attorneys representing

[2] any parties in this matter?

[3] A: No

[4] Q  Did you have any telephonic conversations with any

[5] attorneys representing any other parties in this matter?

[6] A: Yes

[7] Q  Who have you spoken with?

[8] A. Katie Diemer

[9] Q: When did you speak with Katie Diemer?

[10] A: Generally November sometime

[11] Q: Of 2001?

[12] A. 2001, yes

[13] Q: How many conversations on the phone did you have

[14] with Ms Diemer?

[15] A· One

[16] Q· What did you speak about?

[17] A: I was advised to be cautious in my trusting of

[18] Collot Guerard

[19] Q: Did you speak about anything else?

[20] A· No

[21] Q: Did you have any other telephonic conversations

[22] with any other attorneys representing any other parties?

[23] A· Not that I recall

[24] Q: Mr Reese, what's your employment background

[25] starting after college?

Page 10

[1] A: In 1990 I went to work for TDS, which stands for

[2] Telephone and Data Systems, TDS Telecom, in Madison,

[3] Wisconsin  I was a carrier access billing systems analyst

[4] I worked there for five years

[5] I then relocated to Seattle, where I responded

[6] to an advertisement in the paper for somebody with billing

[7] background similar to mine That ended up being for U S

[8] Network Services, Ian Eisenberg's company I worked for

[9] Mr Eisenberg and a couple dozen or so of his companies for

[10] approximately six years until April of 2001

[11] Later in 2001, I got a position with yp netinc

[12] in Phoenix, Arizona, as director of operations

[13] Q: Why did you leave U S Network in April of 2001?

[14] A: I was terminated

[15] Q: Why were you terminated?

[16] A: The reason given to me was that Eisenberg told me

[17] that he couldn't stand seeing my fucking face

[18] Q: Can you tell me a little bit about your

[19] responsibilities at the TDS position?

[20] A. It was reviewing usage reports, which was sort of

[21] auditing the billing system and looking for problems, billing

[22] problems, increases — dramatic increases or decreases in

[23] billing levels and just the accuracy of invoicing

[24] Q  Can you tell me about the jobs that you did while

[25] working for U S Network?

Page 11

[1]   A. I started off as a billing services manager, I
[2]  think I don't remember the title At that point it was
[3]  primarily to review billing aggregator reports back to U S
[4]  Network Services for accuracy It was particularly
[5]  Integretel, the company that was reporting that I was
[6]  reviewing I did that for a year or so
[7]     My responsibilities continued to increase We
[8]  formed a company called "Common Concerns" that I was made
[9]  vice president of In June of '99, Danny McGinnes left the
[10] company He was a co-owner and officer of various Eisenberg
[11] entities When he left the company, the position of chief
[12] operating officer was offered to me for approximately two
[13] dozen companies, the position I held until April of 2001
[14]    Q· During what time period were you COO?
[15]    A: June of '99 to April of 2001
[16]    MS JACOBS: Could I have those dates again?
[17]    THE WITNESS: June of '99 until April 2001
[18]    Q: For which companies were you chief operating
[19] officer?
[20]    A. There are more than I'm going to be able to
[21] remember here U S Network Services, Mirage Marketing,
[22] Payroll Master, Ruby Corp , Audio Bridge of Illinois, Audio
[23] Bridge of Wyoming, Olympic Telecommunications, Aerostar,
[24] Aeroweb, Island Telephone, Ecco — E-C-C-O, No Charge — I
[25] take No Charge back.

Page 12

[1]   I'm leaving out some I just can't think of
[2]  the rest of them right now
[3]    Q: Did Mr Eisenberg own any of those companies?
[4]    A: He owned all of those companies
[5]    Q As far as you know, was he the only owner of all of
[6]  those companies?
[7]    A: In April of 2001, he was Up until June of '99,
[8]  Danny McGinnes held a very small ownership percentage in many
[9]  of those companies, but I don't know which they were
[10]    Q: Did Mr McGinnes give up his ownership share when
[11] he left the company?
[12]    A. I don't know what their arrangement was My
[13] understanding is that he did give up his shares, the details
[14] of which I'm not familiar
[15]    Q· In April of 2001, your testimony was that
[16] Mr Eisenberg owned all of each of those companies?
[17]    A Yes
[18]    Q Did Mr Eisenberg also have a role in the work
[19] performed by those companies?
[20]    A· Yes
[21]    Q. What role did he have?
[22]    A. He was the decision-maker, guiding the direction
[23] the companies went in
[24]    MS. JACOBS I'm sorry I'm having a problem
[25] hearing

Page 13

[1]   THE WITNESS He was the decision-maker He
[2]  gave orders
[3]    Q: Is that true for all the companies you listed?
[4]    A: Yes
[5]    Q· When you say "decision-maker for all the
[6]  companies," did he make every decision for these companies,
[7]  or did he delegate the decision-making responsibility?
[8]    A: He made the high-level strategic decisions, I
[9]  guess What was the second part of your question?
[10]    Q· Whether he delegated decision-making authority to
[11] anyone else
[12]    A: To a degree, yes
[13]    Q: Were you someone who was delegated some
[14] responsibility for decision-making?
[15]    A: I guess I'm not sure how you are using
[16] "decision-making " I carried out orders for Mr Eisenberg
[17]    Q: Did you give orders to anyone else?
[18]    A. I managed, yes
[19]    Q. Did you manage Mr Eisenberg?
[20]    A: No
[21]    Q. What did U S Network do you while you worked
[22] there?
[23]    A: Until August of 1995, it was a provider of phone
[24] sex services Those operations were transferred from U S
[25] Network Services to Mirage Marketing in August of '95 After

Page 14

[1] that date or after that point in time, U S Network Services
[2] primarily had relationships with long-distance carriers,
[3] Frontier, World Com, AT&T, and others
[4]    Q: When you say "relationships," what do you mean?
[5]    A. Purchased transport services
[6]    Q: Can you explain that in layman's terms?
[7]    A: Yes If you were to make a 900 phone call, dial a
[8]  900 number from your home, that call has to be transported to
[9]  the provider, in this case Mirage Marketing in Seattle Your
[10] long-distance carrier at your house has nothing to do with
[11] it It's the phone sex provider's choice of who carries that
[12] call
[13]     U S. Network used MCI and Sprint to carry 900
[14] phone calls It then resold those services, the transport
[15] services, to Mirage Marketing, who was the company that
[16] provided the actual entertainment program at the end of the
[17] call
[18]    Q: What did Mirage Marketing do while you worked
[19] there?
[20]    A Audiotext services, which includes phone sex
[21] mostly
[22]    Q: Did Mirage Marketing do anything else?
[23]    A. Not that I recall Its primary function was phone
[24] sex
[25]    Q: All the companies that Mr Eisenberg own that you

Page 15

[1] worked for, did they share a common business address?

[2]    A   The vast majority of them, yes

[3]    Q. What was the address?

[4]    A   2722 Eastlake Avenue East, Seattle, Washington

[5] 98102

[6]    Q   Which companies that you worked for did not have

[7] that address?

[8]    A   Nocharge com, I'm unsure about it It may have had

[9] an address at the Eastlake address, or it may have had an

[10] address in the Queen Anne area of Seattle

[11]    Q   Any other Eisenberg companies that were located

[12] elsewhere?

[13]    A   Eastland of Orlando was in Orlando, Florida It

[14] was formed there, but it wasn't an active company I guess

[15] that's it for his wholly owned companies

[16]    Q   Did he partially own other companies?

[17]    A   Yes

[18]    Q   Which companies did he partially own?

[19]    A   I don't know the names of these companies, but

[20] there was one in Taiwan, one, I believe, in Thailand that was

[21] in the formation stages when I left the company There was

[22] one in Columbia, South America There was one in New York

[23] There was one in Puerto Rico, San Juan Tel, I think it was

[24] There were others that either Eisenberg owned

[25] as an individual or were owned by other entities of his such

Page 16

[1] as Electronic Publishing Ventures, Cyberspace, Surfnet,

[2] Splashnet, Essex, Yellowpage com I'm not sure about that

[3] last one, if it was a stand-alone company or not French

[4] Dreams, I believe, was wholly owned by Ian

[5] That's all I can think of at the moment

[6]    Q   Did you work for any of the companies that you just

[7] listed?

[8]    A   Define "work for "

[9]    Q   Did you do work for the companies that you just

[10] listed?

[11]    A   Further define that, please

[12]    Q   Were you the chief operating officer of any of

[13] those companies?

[14]    A   No

[15]    Q   Were you paid by any of those companies?

[16]    A   No

[17]    Q   Did you perform any services for any of those

[18] companies?

[19]    A. Yes

[20]    Q   What services did you provide?

[21]    A   The same staff was used for all the companies I

[22] have listed so far In the course of a day, ten minutes here

[23] or there may have been spent dealing with an issue related to

[24] Cyberspace or any of the companies Too numerous to mention

[25] specific

Page 17

[1]    MR. LEONARD   I object to the responsiveness

[2] of the answer

[3]    Q· Was the same staff used for the companies that were

[4] overseas as well as domestic?

[5]    MR. LEONARD   I object to the form of that

[6] question as leading Counsel, I assume this witness is not a

[7] hostile witness to the FTC I need to preserve leading

[8] objections

[9]    MS. JACOBS. Join

[10]    MR. LEONARD. I'm just clarifying Is that

[11] the case?

[12]    MR GOODMAN: Yes

[13]    Q. What services did you provide to the companies

[14] wholly — what services did you provide to the Eisenberg

[15] companies that you just listed?

[16]    MS. JACOBS: He just listed companies in

[17] Taiwan, Thailand You mean those also?

[18]    MR. GOODMAN. Yes

[19]    MR. LEONARD: I object as overly broad and

[20] vague

[21]    THE WITNESS· Can I answer?

[22]    Q   Yes

[23]    A: As chief operating officer of many of Ian's wholly

[24] owned companies, I managed the staff of people that worked in

[25] the office in Seattle Those same people were used

Page 18

[1] frequently for the non-wholly owned companies of

[2] Mr Eisenberg's

[3]    For example, computer servers were configured

[4] and built here in Seattle by technical members of the staff

[5] and then shipped to Taiwan to be used in the facility there

[6] I didn't program a server, but I oversaw the staff of people

[7] who did those sorts of things

[8]    That's general management services, I guess

[9]    Q   Did Mr Eisenberg's overseas companies have

[10] employees overseas?

[11]    A: Yes

[12]    Q: What did those people do?

[13]    MS. JACOBS. Object to the question as being

[14] overly broad

[15]    THE WITNESS: Having never visited those

[16] locations, I don't know specifically

[17]    Q: Did you manage the staffs overseas?

[18]    A: No

[19]    Q: Were there any companies owned by Mr Eisenberg

[20] that had a business address of 2722 Eastlake that you did not

[21] work for?

[22]    A. Restate the question

[23]    Q   Were there any Eisenberg companies located at 2722

[24] Eastlake in Seattle that you did not work for?

[25]    A. Any Eisenberg companies? Probably There are so

Page 19

[1] many Eisenberg companies that I can't recall all of them

[2] **Q:** So your answer is maybe?

[3] **A:** I don't know

[4] **Q:** You don't know? Okay

[5] What goods or services were offered by the

[6] Eisenberg companies located at 2722 Eastlake that you did

[7] work for?

[8] **MS. JACOBS:** Objection, overly broad

[9] **THE WITNESS** As I stated earlier, Mirage

[10] Marketing provided audiotext programs Payroll Master

[11] provided payroll services for the other Eisenberg companies

[12] Olympic Telecommunications provided LEC billing for some of

[13] the Eisenberg companies, wholly owned and some of the

[14] Eisenberg companies partially owned and other parties

[15] unrelated U S Network Services had carrier agreements

[16] Aeroweb provided adult websites Aerostar

[17] provided 900 programs, 900 adult phone sex programs Island

[18] Telephone Company and Ecco Worldwide provided international

[19] audiotext programs Audio Bridge of Illinois, Audio Bridge

[20] of Wyoming, and there may have just been an Audio Bridge by

[21] itself, those all provided local audiotext programs In

[22] other words, they were intrastate audiotext programs

[23] That's all the companies I can think of

[24] **Q:** Can you tell me again what Payroll Master does

[25] **A:** Provided the payroll services and benefits — it

Page 20

[1] had the contractual relationships with health care providers

[2] The insurance, all that came through Payroll Master All the

[3] employees at the 2722 Eastlake Avenue address received their

[4] paycheck from Payroll Master

[5] **Q.** Did Payroll Master do any other business?

[6] **A.** Not that I'm aware

[7] **Q:** Did Mirage Marketing do any work for the EPV

[8] subsidiaries? Let me back up

[9] Who were the EPV subsidiaries?

[10] **A.** Cyberspace, Surfnet, Splashnet Those are all

[11] LLCs That's it for EPV

[12] **Q:** What does "EPV" stand for?

[13] **A:** Electronic Publishing Ventures

[14] **Q** Was Essex an EPV subsidiary?

[15] **A:** I don't remember

[16] **Q** Did Mirage Marketing do any work for the EPV

[17] subsidiaries?

[18] **A** Define "work"

[19] **Q:** Did Mirage Marketing perform any services for the

[20] EPV subsidiaries?

[21] **A:** Yes

[22] **Q:** What services did it provide?

[23] **A.** I would like to clarify services," I guess All

[24] the employees received paychecks from Payroll Master All

[25] the employees did various tasks for all of the different

Page 21

[1] companies listed so far. Their time was allocated, I guess,

[2] from an accounting perspective on the books, and I'm not

[3] familiar with how that was done

[4] When you ask did Mirage Marketing provide

[5] services, contractually, no Did the same employees do work

[6] on EPV companies as Mirage and Olympic and everything else?

[7] Yes

[8] **MR. LEONARD:** Object to that answer as being

[9] nonresponsive

[10] **MS. JACOBS:** I join

[11] **Q:** How many employees approximately worked in 2722

[12] Eastlake?

[13] **A.** At what date?

[14] **Q:** Approximately how many when you began working

[15] there?

[16] **A:** 15

[17] **Q:** What did those 15 employees do at the time that you

[18] started working at 2722 Eastlake?

[19] **A:** Each individual employee?

[20] **Q:** Well, generally. You don't have to go employee by

[21] employee

[22] **MS. JACOBS:** Object as vague

[23] **THE WITNESS:** Whatever was necessary to run

[24] the phone sex business

[25] **Q:** Can you describe what that would include? What was

Page 22

[1] necessary?

[2] **A.** Advertising — which reminds me Pacific Rim

[3] Advertising was one of the companies I have not listed so

[4] far

[5] Print ad in various adult magazines There

[6] was a technical staff that programmed servers,

[7] telecommunications equipment, customer service to handle

[8] calls, customer service, slash, operators to set up accounts

[9] for the phone sex accounts, accounting That's it

[10] **Q.** Did the employees at 2722 Eastlake provide

[11] services that you just described to more than one of

[12] Eisenberg's companies?

[13] **A.** Yes

[14] **Q:** Who was responsible for allocating the time of the

[15] employees?

[16] **A:** Lia Yagelowich

[17] **Q:** Do you know how she allocated the time of the

[18] employees?

[19] **A.** No

[20] **Q:** Do you know if anyone in a position above

[21] Ms Yagelowich would direct her regarding how employees' time

[22] was allocated?

[23] **MS. JACOBS:** I object as speculation He

[24] already indicated he didn't know how she did it

[25] **THE WITNESS:** Would you repeat the question,

**Page 23**

[1] please?

[2]   Q  Do you know if anyone in a position higher than

[3] Ms Yagelowich directed her as to how to allocate employees'

[4] time?

[5]   A  I don't know

[6]   Q·  I'm going to show you —

[7]   A  I have remembered another company Pacific

[8] Northwest Telecom is another wholly owned Eisenberg company

[9]   Q  What did that company do?

[10]   A  It owned all the hardware that these other

[11] companies used, all the servers, computers, hard assets, hard

[12] — technical assets, I guess

[13]   Q  Was it located at 2722 Eastlake?

[14]   A  Yes

[15]   Q.  Were you the chief operating officer of that

[16] company?

[17]   A  Yes

[18]   Q  I'm going to show you what's been marked Exhibit

[19] 140 Take whatever time you need to read over the document

[20]   A  (Reading document )

[21]   Q  Exhibit 40 is Bates-stamped H-5428 It's dated

[22] September 16th, 1998 It appears to be a printout of an

[23] e-mail

[24]   A  Okay

[25]   Q.  Mr Reese, just as an aside, I'm going to be

**Page 24**

[1] showing you a variety of documents today and asking you to

[2] look them over Just give me some sign when you are done

[3] reading, and I'll go ahead with my questions

[4]   A·  Okay

[5]   Q  Can you describe what this document is?

[6]   A:  It appears to be a follow-up summary e-mail based

[7] on a previous discussion between the recipients of the

[8] e-mail

[9]   Q  Who is the author of the e-mail as indicated on the

[10] exhibit?

[11]   A·  Gene Hirai

[12]   Q  Mr Reese, one of the recipients in the To field of

[13] this e-mail is Mirage@usnetwork com Do you know who

[14] received e-mail at that account?

[15]   A  No

[16]   Q  Did you receive a copy of this e-mail?

[17]   A  My e-mail address is in the To field, so yes

[18]   Q  Which one is your e-mail address?

[19]   A  Donr@usnetwork com

[20]   Q  Did you have any other e-mail addresses?

[21]   A  At U S Network?

[22]   Q  No, in general

[23]   A  In general? Yes

[24]   Q.  What other e-mail addresses did you have?

[25]   A  Donmreese@yahoo com  I believe Don@usnetwork com,

**Page 25**

[1] Reese@usnetwork.com  That's all I can think of

[2]   Q  Do you know whether this e-mail refers to any of

[3] the EPV subsidiaries?

[4]   A  It doesn't specifically list one

[5]   Q:  Could you read the four sentences after Item No 4

[6] Read them out loud

[7]   A·  "Would appreciate some help on the joint venture

[8] agreement  Would help if you can chip in and tell us what

[9] Mirage is bringing to the table and what the payout schedule

[10] will be  Appreciate your input  Contact Dan or myself "

[11]   Q·  Do you know what joint venture this is referring

[12] to?

[13]   A:  Yes

[14]   Q  What joint venture is it referring to?

[15]   A:  Essex

[16]   Q:  How can you tell?

[17]   A·  From Bullet Point No  2 above in the e-mail

[18]   Q:  Can you explain how Bullet Point No  2 indicates

[19] that it involves Essex?

[20]   A  Yes  Because it discusses InfoSpace and YPPA

[21]   Q:  How do those indicate that it involves Essex?

[22]   A.  Essex and its subsidiary or — there was a company,

[23] yellow-page com, which was related to Essex  I don't

[24] remember exactly how, if it was a subsidiary, DBA, or what it

[25] was  It was an on-line Yellow Page directory-listing

**Page 26**

[1] company  To provide that service it needed the services of

[2] InfoSpace or a company like InfoSpace, and it desired to have

[3] membership in YPPA  I believe "YPPA" stands for Yellow Page

[4] Publishers Association

[5]   Q:  What services did InfoSpace provide?

[6]   A:  A database of businesses nationally

[7]   Q:  Was it like a Yellow Pages?

[8]   A.  Yes.

[9]   Q:  So was it available to the public?

[10]   A:  InfoSpace has its own Yellow Page product, and they

[11] resell their database to other companies who want to have an

[12] on-line Yellow Page presence

[13]   Q·  Who owned Essex?

[14]   A  Earlier I said that Essex was not under EPV, but

[15] I'm thinking now that it was  So the owner of Essex was

[16] Electronic Publishing Ventures

[17]   Q·  Was EPV the sole owner of Essex?

[18]   A.  Yes

[19]   Q:  Do you know who owned EPV?

[20]   A:  EPV was owned by two other business entities

[21]   Q:  What were the names of those entities?

[22]   A:  French Dreams and Coto Settlements

[23]   Q.  Do you know who owned Coto Settlement?

[24]   A.  I'm not sure what kind of company Coto Settlement

[25] was, if it was a company or a trust  I believe Chris Hebard

Page 27

[1]   Q. You believe Chris Hebard owned Coto Settlement?
[2]   A: I don't know
[3]   Q Why did you mention Chris Hebard's name in regard
[4] to Coto Settlement?
[5]   A: He had something to do with Coto Settlement because
[6] he brought that company to the table in the discussions that
[7] occurred prior to this e-mail in front of me
[8]   Q· What do you mean by "he brought Coto to the table"?
[9]   A· This e-mail is a summary of a meeting that occurred
[10] between many of the recipients addressed on the e-mail
[11]   Q. Were you part of that meeting?
[12]   A  Yes
[13]   Q. Was Mr Eisenberg part of that meeting?
[14]   A. Yes
[15]   Q. Was Mr Hebard part of that meeting?
[16]   A. Yes
[17]   Q: What can you recall about that meeting?
[18]   A. Overall it was a discussion on how to form the
[19] structure of the companies that were about to provide the
[20] Yellow Page services mentioned in this e-mail or implied in
[21] this e-mail
[22]   Q: The services provided by Essex?
[23]   A. Yes
[24]   Q: When was that meeting?
[25]   A  Late summer or early fall of '98

Page 28

[1]   Q: Where was the meeting held?
[2]   A: In Chris Hebard's office in Santa Barbara,
[3] California
[4]   Q  Did anyone participate by phone at the meeting?
[5]   A  No
[6]   Q  At this meeting there was you, Mr Hebard,
[7] Mr Eisenberg  Were there other people there?
[8]   A  Yes
[9]   Q. Item No 4, the second sentence that you read,
[10] said, "Would help if you can chip in and tell us what Mirage
[11] is bringing to the table and what the payout schedule will
[12] be " Do you know what this reference to Mirage and what
[13] "Mirage is bringing to the table" means?
[14]   A: Yes
[15]   Q· What can you tell me about that?
[16]   A. Gene Hirai worked in Chris Hebard's office in Santa
[17] Barbara  In this e-mail he is referring to the Eisenberg
[18] companies in general as Mirage
[19]   Q. Was it common for people to use the word "Mirage"
[20] to refer to Ian Eisenberg's companies generally?
[21]   A  Yes
[22]   Q  Is it a reference that you used?
[23]   A: No
[24]   Q. Is it a reference that Mr Hebard used?
[25]   A. Yes

Page 29

[1]   Q: Were you the chief operating officer at any point
[2] of a company called "Olympic Telecommunications"?
[3]   A: Yes
[4]   Q: Who owned Olympic Telecommunications?
[5]   A  At what point in time?
[6]   Q. Who owned it at the beginning of its existence?
[7]   A: Ian Eisenberg and Danny McGinnes
[8]   Q: Did one of them have a majority share?
[9]   A. Yes
[10]   Q: Who was that?
[11]   A. Ian Eisenberg
[12]   Q· Did anyone at any point acquire 100-percent
[13] ownership of Olympic Telecommunications?
[14]   A: Yes
[15]   Q  Who acquired a 100-percent share of Olympic?
[16]   A: Ian Eisenberg
[17]   Q: Do you know when that was?
[18]   A: Approximately June of 1999
[19]   Q  Did he ever sell off any part of his 100-percent
[20] share, if you know?
[21]   A. I don't know
[22]   MS JACOBS  Objection  Who is "he"?
[23]   Q. Did Mr Eisenberg ever sell off any portion of his
[24] 100-percent share after he acquired a 100-percent share?
[25]   A: I don't know

Page 30

[1]   Q: Where is Olympic located?
[2]   A. Today?
[3]   Q: Yes, today
[4]   A  I don't know
[5]   Q· Where was it located when you were chief operating
[6] officer?
[7]   A. At 2722 Eastlake Avenue East in Seattle
[8]   Q  Did it ever have any other address while you worked
[9] there?
[10]   A. Yes
[11]   Q. What other address did it have?
[12]   A. I'm not sure I remember the exact address  It was
[13] on 6th Avenue in Seattle
[14]   Q: Did it have any other addresses besides the 6th
[15] Avenue address and the Eastlake Avenue address?
[16]   A: Not that I'm aware of
[17]   Q· When did Olympic move from 6th Avenue to Eastlake
[18] Avenue?
[19]   MS. JACOBS: Objection  Assumes facts not in
[20] evidence
[21]   Q: Did Olympic move from 6th Avenue to Eastlake
[22] Avenue?
[23]   A: Yes
[24]   Q: When did that happen?
[25]   A. Approximately mid 1996

Page 31

[1] Q Were you working for Olympic at that time?

[2] A· Yes

[3] Q What did Olympic do to earn money while you worked

[4] there?

[5] A It provided LEC billing services for other

[6] companies

[7] Q Can you explain in layman terms what that means?

[8] A Yes Olympic Telecommunications had billing

[9] collections contracts with the local phone companies around

[10] the country, the Baby Bells and others Those contracts

[11] allowed Olympic to bill charges for other companies — those

[12] contracts allowed Olympic to provide billing services for

[13] other companies to bill other companies' charges on the local

[14] phone bill

[15] Q Who were Olympic's clients?

[16] A All of them?

[17] Q Is it a big number?

[18] A A dozen maybe

[19] Q Were any of the clients of Olympic companies owned

[20] by Mr Eisenberg?

[21] A Yes

[22] Q· Were any of Olympic's clients companies not owned

[23] by Mr Eisenberg?

[24] A Yes

[25] Q Approximately how many of its clients were owned by

Page 32

[1] Mr Eisenberg?

[2] A Define "owned "

[3] Q Approximately how many of the 12 or so that you

[4] said were clients were wholly owned by Mr Eisenberg?

[5] A Four

[6] Q· Was YP Net a client of Olympic?

[7] A Yes

[8] Q What services did YP Net provide or offer?

[9] A. They were an on-line directory-listing provider

[10] Q How did YP Net market its services?

[11] A: Through solicitation checks

[12] Q Did you ever see YP Net's solicitation checks?

[13] A Yes

[14] Q Did Mr Eisenberg ever see a YP Net solicitation

[15] check, if you know?

[16] A. He did

[17] Q Did you discuss YP Net's solicitation check with

[18] Mr Eisenberg?

[19] A He discussed it with me

[20] Q What can you tell me about his discussion with you?

[21] A. He saw a copy of it sitting on my desk one time and

[22] started the discussion, "What is this? It's a great idea "

[23] Along those lines

[24] Q Can you remember when that discussion was?

[25] A When?

Page 33

[1] A: Yes

[2] A. 1998, mid '98

[3] Q So that was before the meeting that we talked about

[4] earlier at Chris Hebard's office?

[5] A. Yes

[6] Q: When you began working at Olympic, what were your

[7] responsibilities for Olympic?

[8] A. I actually formed the company

[9] Q You formed Olympic?

[10] A That was my responsibility, to get that company up

[11] and running

[12] Q: When you say you formed it, what do you mean?

[13] A: Went out and negotiated the billing and collection

[14] contracts with the various local phone companies

[15] Q: Did you negotiate contracts on behalf of specific

[16] clients?

[17] A. No

[18] Q· So the contracts were between Olympic and the phone

[19] companies?

[20] A Yes

[21] Q: Did anyone ask you to form Olympic?

[22] A. Yes

[23] Q: Who asked you to form Olympic?

[24] A: Ian Eisenberg and Danny McGinnes

[25] Q: Did your responsibilities at Olympic change over

Page 34

[1] time?

[2] A: My responsibilities did not

[3] Q: Did your job title change over time?

[4] A: Yes

[5] Q: How did your job title change?

[6] A: It turned into chief operating officer from a title

[7] that I don't know was completely defined before, billing

[8] manager

[9] Q Can you remember when you were made chief operating

[10] officer?

[11] A: In June of 1999

[12] Q. How did you take on the title of chief operating

[13] officer?

[14] A. It was offered to me

[15] Q: Who offered you that title?

[16] A. Ian Eisenberg

[17] Q· Who was the chief operating officer before you?

[18] A: Danny McGinnes

[19] Q. Do you know why you replaced Danny McGinnes as

[20] chief operating officer?

[21] A: It was offered to me, and I accepted

[22] Q Did Danny McGinnes leave the company once you were

[23] made chief operating officer?

[24] A: Prior

[25] Q How long prior to your being named chief operating

Page 35

[1] officer did he leave the company?

[2]  A. Two hours

[3]  Q. Do you know why Mr McGinnes left the company?

[4]  A  I know what Ian Eisenberg told me was the reason

[5]  Q  But you don't have any independent knowledge?

[6]  A  No I wasn't present

[7]  Q. What did Ian Eisenberg tell you?

[8]  A. He sent out an e-mail to the company, saying that

[9] Danny McGinnes was taking a leave of absence About the time

[10] I was in the middle of reading that e-mail, Ian walked into

[11] my office and said that Danny quit

[12]  Q  Did Mr McGinnes ever return to Olympic following

[13] his leave of absence?

[14]  A. I don't believe he took a leave of absence I

[15] believe he left the company for one reason or another

[16] permanently

[17]  Q  After he left he didn't return as an employee of

[18] Olympic?

[19]  A. No

[20]  Q: Did Mr Eisenberg have a title at Olympic, a job

[21] title?

[22]  A. President

[23]  Q  Do you know what his responsibilities were as

[24] president of Olympic?

[25]  A: Overall strategic management of the company

Page 36

[1]  Q· Did anyone at Olympic have the ability to veto

[2] decisions made by Mr Eisenberg?

[3]  A  No

[4]  Q: Would it be fair to say that he had the ultimate

[5] decision-making authority?

[6]  A  Yes

[7]  Q· Did Olympic have a board of directors?

[8]  A. Not that I'm aware

[9]  Q: Did you ever attend any meetings of the board of

[10] directors of Olympic?

[11]  A: No

[12]  MR. GOODMAN: I would like to get this marked

[13] as an exhibit It's Exhibit 176. It's Bates-stamped

[14] E-20363

[15]  (Exhibit Number 176 was marked for

[16] identification )

[17]  THE WITNESS  (Reading document ) I have read

[18] it

[19]  BY MR. GOODMAN·

[20]  Q. Mr Reese, what's the title of this document?

[21]  A. "Minutes of Special Board of Directors Meeting of

[22] Olympic Telecommunications, Inc "

[23]  Q: Can you read the first paragraph of this document

[24]  A: "A special board of directors of Olympic,

[25] Telecommunications, Inc , was held on Tuesday, June 15th,

Page 37

[1] 1999, at 11 00 a m at the corporate offices at 2722 Eastlake

[2] Avenue East, Suite 200, Seattle, Washington "

[3]  Q: Can you read the next paragraph

[4]  A: "The following individuals were present at the

[5] meeting  Ian Eisenberg, president, Don Reese,

[6] Lia Yagelowich "

[7]  Q. Did anyone sign this document?

[8]  A: Yes

[9]  Q: Who signed this document?

[10]  A: Ian Eisenberg, President

[11]  Q  Do you recognize the signature at the bottom as

[12] belonging to Mr Eisenberg?

[13]  A  Yes

[14]  Q: Do you recall being present at this meeting?

[15]  A: No

[16]  Q· Was Electronic Publishing Ventures a client of

[17] Olympic?

[18]  A. No

[19]  Q  Were any of the EPV subsidiaries clients of

[20] Olympic?

[21]  A  Yes

[22]  Q. Which EPV subsidiaries were clients of Olympic?

[23]  A. Cyberspace, Surfnet, and the Essex, slash,

[24] Yellowpage com company — companies

[25]  Q: Did each of them receive the same services from

Page 38

[1] Olympic as clients of Olympic, or did they receive different

[2] kinds of services from Olympic?

[3]  A. Can you reask that, please?

[4]  Q. Did Olympic provide the same kinds of services to

[5] each of the EPV subsidiaries that were clients?

[6]  MR. LEONARD  Objection, leading

[7]  MS JACOBS  Join

[8]  Q. Let me try to rephrase the question  What services

[9] did Olympic provide to Cyberspace?

[10]  A: LEC billing services

[11]  Q  Can you give me some specifics as to what that

[12] means?

[13]  A: Olympic took Cyberspace — received Cyberspace

[14] billing transactions, formatted them appropriately, sent them

[15] off to the various local phone companies around the country,

[16] got approval to bill for Cyberspace, provided customer

[17] service for Cyberspace, reconciled revenues for the

[18] Cyberspace billing records

[19]  MS JACOBS: Can we go off the record for a

[20] minute?

[21]  MS GUERARD: Yes

[22]  MR. GOODMAN. We will go off the record

[23]  (Pause in the proceeding )

[24]

[25]  MR GOODMAN  Mr Newman has just received a

Page 39

[1] call from the Court, I guess, that we have a teleconference
[2] in the next ten minutes, I believe about a discovery issue
[3] If anyone wants to add to the record on this, please do so
[4]     MS. JACOBS We contacted the Court last night
[5] and asked to be heard about an unspecified discovery dispute
[6] concerning the deposition today Apparently this call — I
[7] left a message, and this is the callback from the Court
[8]     MR. GOODMAN· Let's go back off the record
[9]     (Pause in the proceeding )
[10]    (Questions and Answers on Page 40, Lines 8
[11] through 18, read by the reporter )
[12]                BY MR. GOODMAN
[13]    Q  Mr Reese, do you have anything to add to your
[14] answer?
[15]    A  No
[16]    Q: Did Olympic provide similar services to Surfnet?
[17]    A  Yes
[18]    Q  Were there any differences in the services that
[19] Olympic provided to Surfnet, compared to the services that
[20] Olympic provided to Cyberspace?
[21]    A  No
[22]    Q· What about for Essex? Did it provide the same
[23] services to Essex as it provided to Cyberspace?
[24]    A  Yes
[25]    Q  Were there any differences?

Page 40

[1]    A  No
[2]    Q  Mr Reese, I'm going to use a phrase that — the
[3] "EPV Venture" in a couple of questions I want to explain
[4] what I mean by that just at the start By "EPV Venture," I
[5] mean the EPV subsidiaries, Olympic Telecommunications,
[6] Mr Hebard, and Mr Eisenberg
[7]    If there is at some point at which you are
[8] unclear by what I mean by "EPV Venture" or you want to
[9] correct me and say that term does not apply —
[10]    MR. LEONARD· Are you saying Olympic as an EPV
[11] Venture?
[12]    Q  As part of the term "EPV Venture," I'm including
[13] Olympic, but if you don't think that's appropriate, I won't
[14] include Olympic
[15]    A  Okay
[16]    Q  Would you say that it is appropriate to include
[17] Olympic in "EPV Venture"?
[18]    MS JACOBS Objection, vague
[19]    THE WITNESS. No
[20]    Q  Let me amend the term "EPV Venture " It will just
[21] be the EPV subsidiaries, Mr Hebard, and Mr Eisenberg Are
[22] you clear with that?
[23]    A  Yes
[24]    Q  Mr Reese, what percentage of your time was spent
[25] working on the EPV Venture?

Page 41

[1]    MS JACOBS Object That would include what
[2] amount of time he spent working on Mr Hebard and
[3] Mr Eisenberg
[4]    MS DIEMER  Mr Goodman, just to make it
[5] clear, you said you weren't going to use "EPV Venture"
[6] because it was going to mean one thing, and instead you were
[7] going to say "EPV subsidiaries " I don't know that that's
[8] clear because you then turned around and used the phrase "EPV
[9] Venture," not what you said you were going to use
[10]    Q: Let's try a new approach Mr Reese, what
[11] percentage of your time was spent working on the EPV
[12] subsidiaries?
[13]    A  15 percent
[14]    Q. Was that throughout the time you worked at 2722
[15] Eastlake?
[16]    A. No
[17]    Q: Did the percentage of your time change from when
[18] you started to when you left?
[19]    A: Yes
[20]    Q  How did it change?
[21]    A: When I started working at 2722 Eastlake, there were
[22] no EPV ventures, so it constituted zero percent of my time
[23] As time went on, the amount of time of mine that was taken up
[24] increased to where it peaked in mid 2000 or late 2000, at
[25] which time the program was stopped, and so my time on that

Page 42

[1] subsequently dropped
[2]    Q: During the peak time what percentage of your time
[3] was spent working on the EPV subsidiaries?
[4]    A  20 percent
[5]    Q: Can you tell me what percentage of Mr Eisenberg's
[6] time was spent working on the EPV subsidiaries?
[7]    A  Again, at what point in time?
[8]    Q  During the peak time that you mentioned in 2000
[9]    A· Half, 50 percent
[10]    Q: Do you recognize the name John Biddinger?
[11]    A: Yes
[12]    Q: Did he work at 2722 Eastlake?
[13]    A. He was not on the payroll, no No, he didn't work
[14] there
[15]    Q: Did he have an office at 2722 Eastlake?
[16]    A. No
[17]    Q  Did he have a position with any of the EPV
[18] subsidiaries?
[19]    A. He was listed as president in the early days of the
[20] program
[21]    Q: Of which program?
[22]    A  It was either EPV or Cyberspace I don't know
[23] which of the two
[24]    Q  Do you know what his responsibilities were as
[25] president?

---

Page 43

[1] A. Virtually nothing

[2] Q: By "virtually nothing," can you be more specific?

[3] A. He did nothing

[4] Q: As president of Cyberspace or EPV, he did nothing?

[5] A. That's correct

[6] Q Do you know how he was chosen to be the president?

[7] A: He was sort of recruited, I guess, by

[8] Danny McGinnes

[9] Q: Was he an acquaintance of Mr McGinnes?

[10] A: Yes

[11] Q Do you know how long he served as president?

[12] A: Three months approximately

[13] Q. Do you know who replaced him?

[14] A. Yes

[15] Q: Who replaced Mr Biddinger?

[16] A: Lia Yagelowich

[17] Q: Do you know what her responsibilities were as

[18] president?

[19] A: Mostly signing her name

[20] Q: Where did she sign her name?

[21] A. It was on the marketing materials

[22] Q: What marketing materials are you referring to?

[23] A The solicitation checks

[24] Q: Who used solicitation checks as marketing material?

[25] A. I'm sorry Who used?

---

Page 44

[1] Q: Yes

[2] A. I'm not sure I understand your question

[3] Q Did any of the EPV subsidiaries use solicitation

[4] checks as marketing material?

[5] A: Yes

[6] Q Which EPV subsidiaries used solicitation checks as

[7] marketing material?

[8] A. All of them

[9] Q: Essex used solicitation checks?

[10] A. Essex, slash, Yellowpage com I'm uncertain as to

[11] the exact structure of their — Cyberspace, Surfnet,

[12] Splashnet

[13] Q. Do you know who came up with the idea for the EPV

[14] subsidiaries to use solicitation checks as marketing

[15] material?

[16] A. Yes

[17] Q Who came up with that idea?

[18] A Ian Eisenberg

[19] Q. How do you know it was Mr Eisenberg?

[20] A: Olympic had been billing for a client,

[21] Yellow-page net, and Mr Eisenberg became aware of their

[22] marketing material It was on my desk in my office That's

[23] where the idea came from

[24] Q. Once Mr Eisenberg saw the marketing material on

[25] your desk for Yellowpage net, what happened next for using

---

Page 45

[1] similar material with the EPV subsidiaries?

[2] MS JACOBS. I object to the use of "similar

[3] material " Assumes facts not in evidence

[4] MR. GOODMAN· I'm sorry I couldn't hear you

[5] MS. JACOBS: I'm objecting because nobody has

[6] testified the material is similar Assumes facts not in

[7] evidence

[8] THE WITNESS. Could you ask the question

[9] again, please

[10] MR. GOODMAN Could you read that back please?

[11] (Question on Page 44, Lines 24 through 25, and

[12] Page 45, Line 1, read by the reporter )

[13]

[14] THE WITNESS: Mr Eisenberg thought it was a

[15] great marketing idea Sometime after that in the following

[16] couple of — two to three weeks, Mr Hebard entered the

[17] picture I don't know how Eisenberg and Hebard hooked up,

[18] but they had agreed to become partners in this

[19] Mr Eisenberg, Mr McGinnes, and myself went

[20] to California and met up with Mr Hebard, Gene Hirai, Diane

[21] Capasso, Wayne Chua, Buff Warn, W-A-R-N, and others, I guess,

[22] to talk about how to structure the companies

[23] Q: Do you remember when that meeting was?

[24] A: Late in the summer or fall of '98

[25] Q Did you discuss with Mr Eisenberg why he thought

---

Page 46

[1] the Yellowpage net material was a great idea?

[2] A: We discussed, at the time he saw the marketing

[3] material on my desk, that client of Olympic They were a

[4] sizable client of Olympic, being Yellowpage net, maybe even

[5] the largest of Olympic's, and we discussed how well it was

[6] going That's really all I remember of the conversation

[7] Q: Did he tell you why specifically he thought it was

[8] a great idea?

[9] A. I just remember he said, "This is genius "

[10] Q Did Mr Eisenberg and Mr Hebard ever meet in

[11] Seattle to discuss the EPV subsidiaries?

[12] A: Yes

[13] Q: How often did they meet in Seattle to discuss the

[14] EPV subsidiaries?

[15] A· Infrequently

[16] Q· Was it more than once?

[17] A: I think it was twice

[18] Q: Did employees in Mr Hebard's office and employees

[19] in Mr Eisenberg's office communicate with each other

[20] regarding the EPV subsidiaries?

[21] A: Yes

[22] Q· By what form did they communicate?

[23] A: E-mail and telephone conference calls

[24] Q: How often, if you know, would there be conference

[25] calls between Mr Hebard's employees and Mr Eisenberg's

---

**Min-U-Script®**        For The Record, Inc. -- (301)870-8025

**Page 47**

[1] employees?

[2] A. Daily

[3] Q. Were you a part of these conference calls at any

[4] time?

[5] A. Yes

[6] Q. Did you take part in these conference calls daily?

[7] A. Yes

[8] Q. What was discussed during these conference calls?

[9] A. Everything. Too numerous to mention. Every aspect

[10] of running the business, every aspect of billing, every

[11] problem that came up.

[12] Q. Did Mr. Hebard and Mr. Eisenberg have conference

[13] calls that they participated in?

[14] MS. JACOBS: Are you asking the witness to

[15] speculate?

[16] Q. Mr. Reese, were you ever involved in conference

[17] calls with Mr. Hebard and Mr. Eisenberg?

[18] A. Yes

[19] Q. How often were there conference calls that the two

[20] of them participated in that you were a part of?

[21] A. Daily

[22] Q. What was discussed during the conference calls that

[23] Mr. Hebard and Mr. Eisenberg and you were involved in?

[24] A. Again, a lot of things, but specific topics I

[25] remember included complaints, attorney general complaints,

**Page 48**

[1] technical issues with call centers in both locations, the IVR

[2] machines to handle the calls, bill paying, who would handle

[3] which tasks, various disagreements between Eisenberg and

[4] Hebard.

[5] Q. What can you tell me about the disagreements

[6] between Mr. Eisenberg and Mr. Hebard?

[7] MS. JACOBS: Objection, vague.

[8] THE WITNESS: They were frequent.

[9] Q. What did Mr. Eisenberg and Mr. Hebard disagree

[10] about, if you know?

[11] A. They disagreed about everything. They disagreed

[12] about which bills should be paid. They disagreed about whose

[13] staff was performing better than the other's. They disagreed

[14] about how much money should be spent on future mailers. They

[15] accused each other of stealing from the other. Just

[16] bickering.

[17] Q. Did employees of Mr. Hebard and employees of

[18] Mr. Eisenberg communicate by e-mail?

[19] MS. JACOBS: Are you asking him to speculate?

[20] Q. Do you know whether employees of Mr. Hebard's and

[21] employees of Mr. Eisenberg communicated by e-mail?

[22] A. Yes, they did.

[23] Q. How often, do you know, did they communicate by

[24] e-mail?

[25] A. Daily

**Page 49**

[1] Q. Did you receive e-mails from employees of

[2] Mr. Hebard?

[3] A. Yes

[4] Q: Did you send e-mails to employees of Mr. Hebard?

[5] A. Yes

[6] Q. Did the e-mails that you exchanged with employees

[7] of Mr. Hebard involve similar topics as the conference calls

[8] that you participated in?

[9] MS. JACOBS: Objection, vague.

[10] MR. LEONARD: Objection, leading.

[11] MS. JACOBS: I'll join that.

[12] THE WITNESS: Would you reask the question,

[13] please?

[14] Q: What topics were written about in e-mails that you

[15] exchanged with employees of Mr. Hebard?

[16] A: Complaint issues and user complaints, who would

[17] handle them, how to handle them, billing record formatting,

[18] file exchanges, marketing materials exchanges.

[19] Q: Anything else?

[20] A. Not that I can think of right now.

[21] Q: You mentioned that one topic was end-user

[22] complaints. Can you be more specific about what you mean by

[23] that?

[24] A. End users being defined as people who received a

[25] bill from Olympic on behalf of Cyberspace, Surfnet, Splash,

**Page 50**

[1] Essex. Those complaints range from simple calls into the

[2] call center, somebody wanting to cancel service, to escalated

[3] complaints where an end user writes a letter, whether there

[4] are lawyers involved, whether there is a regulator involved,

[5] attorney general, whether a local phone company is involved

[6] or not, and they're wanting a resolution on the complaint.

[7] Q: Did you personally receive complaints from end

[8] users?

[9] A. Not directly.

[10] Q: Did you ever have an opportunity to review end-user

[11] complaints?

[12] A. Yes

[13] Q: How did you have the opportunity to review end-user

[14] complaints?

[15] A. Well, I was the contact for the local phone

[16] companies. So when they had complaints or they had monthly

[17] cramming report complaints that they would send to Olympic, I

[18] would review those and delegate those out or handle some

[19] myself, investigate some myself. I would review escalated

[20] complaints that came into the call center. They came from a

[21] number of different sources.

[22] Q: Did you review complaints from the end users

[23] themselves?

[24] A. Yes

[25] Q. What did the end users complain about?

Page 51

[1] A That they had been billed for something that they
[2] didn't order
[3] Q. Did they have other complaints?
[4] A: It was primarily along that same vein, that they
[5] thought that the marketing material was a scam, and they
[6] didn't order it They are not going to pay for it, deny all
[7] knowledge
[8] Q Did you ever discuss end-user complaints with
[9] Mr Eisenberg?
[10] A. Yes
[11] Q. What can you tell me about those discussions?
[12] A: They ranged from reducing those by having effective
[13] customer service So some conversations involved having
[14] enough bodies in the place to answer all the calls that were
[15] coming in to overflowing to other call centers to reviewing
[16] more closely complaints where there was a regulator involved
[17] or being a regulator complaint
[18] We used to look over the packages sent to
[19] Seattle from the California office Some of the written
[20] complaints were handled in California, and those were sent to
[21] Seattle. So we would review those
[22] Q· Did you review those packages of complaints from
[23] California with Mr Eisenberg?
[24] A: Yes
[25] Q. Do you know whether Mr Eisenberg ever read a

Page 52

[1] complaint from a consumer?
[2] A. Yes
[3] Q. How often would you say Mr Eisenberg reviewed
[4] complaints from consumers, if you know?
[5] A: I would say that he reviewed written complaints a
[6] few times a week and listened to oral complaints daily by
[7] listening in on CSRs as they handled customers on the phone
[8] Q· What does "CSR" stand for?
[9] A: Customer service rep
[10] Q. Correct me if I'm wrong, but I think you said that
[11] one end-user complaint — one kind of end-user complaint was
[12] the end user saying, I'm being billed for an unauthorized
[13] charge
[14] MS JACOBS: Object
[15] MR. LEONARD: I'm going to object as a leading
[16] question
[17] THE WITNESS I haven't heard a question yet
[18] Q: Is it accurate to say that you reviewed complaints
[19] from end users concerning the complaint that the end user was
[20] being billed for a charge that they didn't authorize?
[21] MS. JACOBS Objection, leading
[22] MR. LEONARD: Same objection
[23] THE WITNESS That's fair, yes
[24] Q: Do you recall reviewing those kinds of complaints?
[25] A Yes

Page 53

[1] Q: Did you discuss those kinds of complaints with
[2] Mr Eisenberg?
[3] A: Yes
[4] Q Did you discuss escalated complaints with
[5] Mr Eisenberg?
[6] A: Yes
[7] Q: What can you tell me about the escalated
[8] complaints?
[9] MS. JACOBS: Object as leading
[10] THE WITNESS Can you be more specific?
[11] Q. What complaints were expressed in escalated
[12] complaints?
[13] A. They were varied Everything from having, for
[14] example, a hotel chain having all of their hotels being
[15] billed So you might have a corporate lawyer writing a
[16] letter saying, We want credits for this chain of hotels or
[17] restaurants to letters from the local phone companies
[18] threatening to terminate billing and collections contracts
[19] because of the voluminous number of complaints to individual
[20] consumers writing complaints It's the whole spectrum
[21] Q: Did you discuss these complaints with
[22] Mr Eisenberg?
[23] A. Yes
[24] Q How often did you discuss these complaints with
[25] Mr Eisenberg?

Page 54

[1] A: Ongoing Several times a week
[2] Q. Did all the EPV subsidiaries begin sending out
[3] marketing material at the same time?
[4] A: No
[5] Q· Which subsidiary sent out marketing material first?
[6] A: Essex
[7] Q: When did Essex begin sending out marketing
[8] material?
[9] A: Two to three months after the meeting that we had
[10] in Santa Barbara, which was in the fall of '98. So late '98
[11] or early '99
[12] Q: Which was the second EPV subsidiary to begin
[13] sending marketing material?
[14] A: Cyberspace
[15] Q: Which was third?
[16] A: Surfnet
[17] Q: Which was forth?
[18] A. Splashnet
[19] Q: Were there any other EPV subsidiaries that sent out
[20] marketing material?
[21] A. No
[22] Q Did you discuss with Mr Eisenberg the reason for
[23] sending out marketing material for more than one EPV
[24] subsidiaries?
[25] A: I don't understand the question

FEDERAL TRADE COMMISSION v.

DON REESE

CYBERSPACE.COM, LLC, et al.    CV-00-1806-RSL    Document 124    Filed 03/07/02    Page 134 of 184    Vol. 16 February 8, 2002

Page 55

[1]    Q. Do you know why more than one EPV subsidiary sent

[2]    out marketing material?

[3]    A. Yes

[4]    Q What was the reason?

[5]    A Originally to sort of diversify risk from

[6]    regulators

[7]    Q What do you mean by that?

[8]    A The theory was having a lot of smaller companies

[9]    sending out — marketing similar programs but no single

[10]   company becoming too large, therefore, sort of going under

[11]   the radar, I think was the term used

[12]   Q Whose idea was this?

[13]   A Originally Ian Eisenberg's

[14]   Q When you say "originally," does that mean — later

[15]   on was it someone else's idea?

[16]   A No It means later on that Hebard joined him in

[17]   that idea or concurred or went along with it

[18]   Q I'm going to show you a document. This will be

[19]   Exhibit 177 It's Bates-stamped E-20415 through E-20416

[20]   (Exhibit Number 177 was marked for

[21]   identification )

[22]          BY MR. GOODMAN

[23]   Q Mr Reese, do you have Exhibit 177 in front of you?

[24]   A Yes

[25]   Q. Please take a moment to review it, and let me know

Page 56

[1]    when you are done

[2]    A (Reading document )

[3]    MS. JACOBS. I object This is

[4]    attorney-client communication

[5]    MR GOODMAN. I don't see that it's an

[6]    attorney-client document

[7]    MS JACOBS "To Joel Dichter," who's my

[8]    partner

[9]    MS DIEMER The attorney in this case

[10]   MS. GUERARD· This was sent to Mr Dichter

[11]   after the business fell apart It was also produced by the

[12]   Eisenberg defendants to the FTC It was printed out by an

[13]   assistant to Mr Dichter when she was with the FTC, when she

[14]   produced those documents

[15]   MS. JACOBS With more than a hundred boxes of

[16]   documents that were turned over

[17]   MS DIEMER. If it's an inadvertent

[18]   production, I don't believe you can use it

[19]   Q Mr Reese, are you done reviewing the document?

[20]   A I'm ready Go ahead

[21]   Q What steps, if any —

[22]   MS JACOBS Again, I object to this document

[23]   being any part of the record based on the attorney-client

[24]   privilege, and it's inappropriate to use it for purposes of

[25]   the deposition

Page 57

[1]    Q· Mr Reese, what steps, if any, were taken by the

[2]    EPV subsidiaries to make their marketing material look

[3]    different from each other?

[4]    MS. JACOBS· Objection, assumes facts not in

[5]    evidence

[6]    Q Mr Reese, did the EPV subsidiaries have marketing

[7]    material — did each of the EPV subsidiaries use a

[8]    solicitation check as marketing material?

[9]    A. Yes

[10]   Q Mr Reese, do you have any independent knowledge

[11]   outside from this document of what steps, if any, were taken

[12]   to make the EPV subsidiaries' marketing material look

[13]   different from each other?

[14]   MS. JACOBS: Same objection, assumes facts not

[15]   in evidence

[16]   THE WITNESS. Well, it was the same marketing

[17]   piece It was a solicitation check They were different

[18]   colors They were different designs They were different

[19]   company names Some had different amounts $3 50, $7 50,

[20]   $10 00 There were efforts to make the checks look

[21]   different They were different

[22]   Q· Mr Reese, if you know, who brought the idea of

[23]   using a promotional check to the EPV subsidiaries?

[24]   A. The EPV subsidiaries came after the idea of the

[25]   promotional check

Page 58

[1]    Q. Do you know who brought the idea of the promotional

[2]    check to the EPV subsidiaries?

[3]    MS. JACOBS: Objection, that misconstrues his

[4]    testimony

[5]    Q. I'll ask a different question, Mr Reese Who

[6]    designed the marketing material for the EPV subsidiaries?

[7]    A You mean the graphics? The graphics were designed

[8]    by a guy named Frederick something I don't know his last

[9]    name The text was a more collaborative effort between

[10]   Hebard and Eisenberg

[11]   Q: Hebard and Eisenberg individually or their offices?

[12]   A· Together Well, the drafts would come out of

[13]   Hebard's office, and they were reviewed by Eisenberg

[14]   afterwards for accuracy or changes or anything like that

[15]   Q: Were they reviewed by Eisenberg personally or by

[16]   Eisenberg's office?

[17]   A Both

[18]   Q. How do you know?

[19]   A: Because I constituted part of the office, and I was

[20]   in Eisenberg's physical office when he would review these

[21]   things or he would come into my office with these scribbled

[22]   notes and toss them on my desk.

[23]   Q: Did you review the material as well?

[24]   A: Yes

[25]   Q: Once Mr Eisenberg and members of his staff

Page 59

[1] reviewed the marketing material, what did you do with it?

[2] What did Mr Eisenberg's office do with the material?

[3]   A. Well, it was used to be submitted to phone

[4] companies for approval where necessary It was used for

[5] training in the call center for the customer service reps

[6] That's it

[7]   Q. Mr Reese, what happened to the marketing material

[8] that Mr Eisenberg made notes on, made scribbles on?

[9]   A. I don't know

[10]   Q. Do you know whether any notes made by Mr Eisenberg

[11] were incorporated into the material that was mailed out to

[12] consumers?

[13]   A I can't specifically recall what changes there

[14] were, that were made

[15]   Q. Do you know whether Mr Hebard and Mr Eisenberg

[16] discussed changes to the marketing material over the

[17] telephone?

[18]   A: Yes

[19]   Q. Yes, you know, or yes, they did discuss it?

[20]   A: Both

[21]   Q: Were you ever a part of these telephonic

[22] conversations?

[23]   A: Yes

[24]   Q: How often were you a part of discussions between

[25] Mr Hebard and Mr. Eisenberg over the phone about the

Page 60

[1] marketing material?

[2]   A. First, marketing materials didn't constitute all of

[3] the conversations, so that's a tough question to answer

[4] Maybe you can ask it a different way

[5]   Q: How often did you participate in telephonic

[6] conversations between Mr Hebard and Mr Eisenberg during

[7] which the marketing material was discussed?

[8]   A: I don't know the answer to that because I don't

[9] know how often they discussed marketing material when I

[10] wasn't there As a percentage, I can't answer

[11]   Q: How often did you participate in these telephonic

[12] conversations when you were there?

[13]   A: I participated in telephonic conversations daily,

[14] but daily conversations didn't necessarily include marketing

[15] On those days that marketing conversations made up the

[16] content of the phone conversations, I participated in most of

[17] the time

[18]   Q. Mr Reese, what copy tests, if any, did Mr Hebard

[19] and Mr Eisenberg arrange to be conducted on the marketing

[20] material?

[21]   MR LEONARD· I'm sorry I'm having trouble

[22] hearing your question and your answers too Could you both

[23] speak up just a little bit?

[24]   Q  What copy tests, if any, did Mr Hebard and

[25] Mr Eisenberg arrange to be conducted on the marketing

Page 61

[1] material?

[2]   A: What's a copy test?

[3]   Q: Did Mr Hebard and Mr Eisenberg arrange for any

[4] tests to be conducted to determine whether recipients of the

[5] marketing material understood the marketing material?

[6]   A· Yes

[7]   Q· What tests were conducted?

[8]   A: My recollection is there was an economic firm or

[9] something thereabouts that was hired to go into shopping

[10] malls and randomly present the solicitation materials to

[11] consumers and ask them various questions after they had read

[12] the marketing materials

[13]   Q: When was that done, if you know?

[14]   A. Towards the end It was done after they received

[15] notice of an FTC investigation

[16]   Q  By "towards the end," what do you mean?

[17]   A: The end of billing Billing ended in October of

[18] 2000, I believe, October or November, right in that time

[19] frame So a few months before then, mid 2000

[20]   Q. Were the EPV subsidiaries still mailing out

[21] marketing material to consumers at that point?

[22]   A. I don't recall

[23]   Q. Do you know whether any changes were made to the

[24] marketing material following that test?

[25]   A I don't recall any changes being made

Page 62

[1]   Q. Do you know whether any other tests were conducted

[2] on the marketing material besides that test?

[3]   A: What do you mean by "test"?

[4]   Q. What did Mr Eisenberg and Mr Hebard do to

[5] determine — what did they do, if anything, to determine

[6] whether the people receiving the marketing material

[7] understood the marketing material?

[8]   A. That was the only test that I'm aware of where the

[9] goal was specifically to determine if consumers understood

[10] what the terms and conditions and the whole marketing package

[11] meant

[12]   Q: Were any other tests conducted that had a different

[13] goal?

[14]   A  Yes

[15]   Q. What tests were conducted that had a different

[16] goal?

[17]   A  There were different types of solicitation pieces

[18] designed and their success rate or conversion rate tracked

[19] So it's a measurement That's a test

[20]   Q: What do you mean by "conversion rate"?

[21]   A  The percentage of people who cashed the check,

[22] divided by the number of checks mailed out

[23]   Q· Did anyone have the responsibility of tracking the

[24] conversion rate of the different versions of the

[25] solicitations?

Page 63

[1] A: Yes

[2] Q: Who had that responsibility?

[3] A. Wayne Chia

[4] Q: Was Wayne Chia employed by any of the EPV

[5] subsidiaries?

[6] A No

[7] Q Do you know who employed Mr Chia?

[8] A EPV itself and Capital Gains

[9] Q What is Capital Gains?

[10] A That's a company I presume owned wholly by

[11] Chris Hebard

[12] Q. Do you know whether Mr Chia ever sent information

[13] about the conversion rate to 2722 Eastlake?

[14] A Yes

[15] Q. What information did Mr Chia send to 2722

[16] Eastlake?

[17] A He e-mailed spreadsheets weekly with —

[18] containing — the spreadsheets contained the tracking number

[19] that equated to a version of a solicitation check, the number

[20] of checks mailed out, the number of checks cashed by day as

[21] reported from the bank that — issuing the checks, and the

[22] corresponding conversion percentage

[23] Q Did you ever see these spreadsheets?

[24] A Yes

[25] Q Did you ever discuss these spreadsheets with

Page 64

[1] Mr Eisenberg?

[2] A. In part, yes

[3] Q. What do you mean by that?

[4] A The conversion percentages contained in those

[5] spreadsheets were one of the topics of discussion of the

[6] conference calls and/or e-mails going back and forth

[7] Q Back and forth?

[8] A Between the California office and the Seattle

[9] office

[10] Q Mr Reese, did you ever suggest changes to the

[11] marketing material of the EPV subsidiaries?

[12] A I don't recall Ask the question again, please

[13] Q Did you ever suggest changes to the marketing

[14] material of the EPV subsidiaries?

[15] A I stand by my other answer I don't recall

[16] MR. GOODMAN Exhibit 163

[17] Q Mr Reese, I'm showing you Exhibit 163

[18] A (Reading document)

[19] Q This exhibit is Bates-stamped DR-5169

[20] A Okay I have read it

[21] Q Mr Reese, this document purports to be a printout

[22] of an e-mail sent by you on December 14th, 1999 Can you

[23] please read the fourth paragraph out loud

[24] A "We need to market to consumers with at $10 or $25

[25] solicitation fulfillment all in one mailer It is my humble

Page 65

[1] opinion that this is the only way we will achieve what we are

[2] trying to do by March 31st, 2000 "

[3] Q. What are you suggesting in the first sentence of

[4] that paragraph?

[5] A I'm suggesting that the design of this particular

[6] marketing program isn't working and it's not working because

[7] a two-step process where the consumer was getting an initial

[8] solicitation check, then later a fulfillment CD where they

[9] would log on with that CD and then get mailed more money

[10] I'm suggesting that that all be reduced to a

[11] one-step process where the solicitation check is sent out

[12] with a CD, eliminating the second step

[13] Q· What was the goal, if you can recall, of your

[14] suggestion?

[15] A. To increase usage The whole e-mail is about —

[16] the whole Hot Box program was about increasing usage

[17] Q I would like you to read the third paragraph of

[18] your e-mail out loud

[19] A· "Another reason I don't think we are seeing much

[20] success, and the more complex reason, is because I think

[21] businesses are getting this fulfillment package and simply

[22] tossing it in the trash Let's face it, the only reason we

[23] have conversion on the first check is because AR" — accounts

[24] receivable — "doesn't pay attention If this is true, this

[25] model will never work. Again, I think the fact that we

Page 66

[1] target businesses further exaggerates this phenomenon "

[2] Q: What was the basis for your statement that "the

[3] only reason we have conversion on the first check is because

[4] accounts receivable doesn't pay attention"?

[5] A. What's the basis? What do you mean?

[6] Q Why did you think that was true?

[7] A Deductive logic There were a lot of customers who

[8] didn't know they were customers Obviously they didn't know

[9] what they were — AR didn't know what that check represented

[10] Q. Did you ever see any complaints that brought this

[11] to your attention?

[12] A· Brought what to my attention?

[13] Q That as you put it, that you had customers who

[14] didn't know they were customers?

[15] A: Yes, I did see those complaints

[16] Q: What can you tell me about those complaints?

[17] A. That was the number-one reason people would call

[18] and cancel service Same thing as DAK, denies all knowledge

[19] I can tell you that was our frequent complaint

[20] Q Did you discuss that kind of complaint with

[21] Mr Eisenberg?

[22] A: It was the subject of discussion of many

[23] conversations

[24] Q With Mr Eisenberg?

[25] A: Yes

Page 67

[1] **Q.** Mr Reese, who decided when to send marketing
[2] material for the EPV subsidiaries?
[3] **A** Eisenberg and Hebard
[4] **Q·** Did anyone else have authority to determine when to
[5] send marketing material?
[6] **A** No
[7] **Q** Who decided how much marketing material to send at
[8] any given time?
[9] **A·** Eisenberg and Hebard
[10] **Q** Did Mr Hebard and Mr Eisenberg have authority to
[11] determine how much marketing material to send?
[12] **A** Yes
[13] **MR. LEONARD** Objection, leading
[14] **Q:** Did anyone else have authority to determine how
[15] much marketing material to send?
[16] **A.** No
[17] **Q:** What differences, if any, were there in
[18] Mr Hebard's view versus Mr. Eisenberg's view about how much
[19] marketing material to send?
[20] **MR. LEONARD:** Objection, calls for
[21] speculation
[22] **Q:** If you know
[23] **A** That's a big question That was the source of many
[24] of the fights between the two
[25] **Q** What do you mean by that?

Page 68

[1] **A.** Hebard was more interested in selling the company
[2] Eisenberg was more interested in making it bigger Hebard
[3] wanted to keep the company Cyberspace at a flat level of
[4] 100,000 users and just market enough pieces to sustain that
[5] Eisenberg wanted to market harder, more aggressive That's
[6] what the two would fight about
[7] **Q:** How did you know that those were the views of
[8] Mr Hebard and Mr Eisenberg?
[9] **A:** Because I was on e-mails and in the room during
[10] conference calls when those discussions took place
[11] **Q:** Were you part of discussions regarding what version
[12] of a subsidiary's marketing material to send?
[13] **A.** I don't recall
[14] **MR. GOODMAN** Exhibit 148
[15] **Q** Mr Reese, is this an example of the kind of e-mail
[16] discussion between Mr Hebard and Mr Eisenberg regarding
[17] mailing decisions that you mentioned before?
[18] **A:** Yes, it appears to be, from reading it
[19] **Q:** Mr Reese, once the solicitation checks were
[20] negotiated by the recipient, they were cashed or deposited,
[21] what happened to them after that, if you know?
[22] **A·** The recipient or the check?
[23] **Q** The check
[24] **A.** The check will be cleared by the bank and then sent
[25] to Scanning America, which was the name of an imaging company

Page 69

[1] in Kansas City or something They would scan the image into
[2] an electronic format, the front and the back of the check,
[3] then forward both the hard-copy cancelled check and the
[4] scanned image to Ian's office
[5] **Q.** Did anyone working in Mr Hebard's office or
[6] Mr Eisenberg's office ever make any jokes about the name of
[7] this scanning company?
[8] **A** Yes
[9] **Q.** What jokes can you recall?
[10] **A·** I don't remember who, but the comment being, being
[11] careful to get the N's right versus them being M's
[12] **Q** If the N's were mistaken for M's, how would that
[13] read?
[14] **A.** "Scamming America "
[15] **Q:** Mr Reese, which of the EPV subsidiaries, if any,
[16] used LEC billing to bill consumers?
[17] **A** All of them
[18] **Q.** Who made the decision to use LEC billing for the
[19] EPV subsidiaries?
[20] **A.** That was part of the initial discussion plan in
[21] Santa Barbara when the whole program was discussed That was
[22] the only option
[23] **Q.** Were Mr Hebard and Mr Eisenberg present at that
[24] meeting?
[25] **A:** Yes

Page 70

[1] **Q** Was Olympic Telecommunications the billing
[2] aggregator for any of the EPV subsidiaries?
[3] **A:** Yes
[4] **Q** Which EPV subsidiaries was Olympic the billing
[5] aggregator for?
[6] **A.** Essex, Cyberspace, and Surfnet
[7] **Q:** Did Olympic enter into any agreements with these
[8] EPV subsidiaries?
[9] **A:** Yes
[10] **Q:** Were those billing services agreements?
[11] **A.** Yes
[12] **Q** Did 2722 Eastlake play a role in LEC billing for
[13] any of the EPV subsidiaries?
[14] **A.** I don't understand that question
[15] **Q.** Who made the decision to use Olympic as a billing
[16] aggregator for three of the EPV subsidiaries?
[17] **A·** It had to be Chris and Ian
[18] **Q** Why do you say that?
[19] **A:** Because they were 50/50 partners, and it required
[20] both of their consent
[21] **Q:** What role, if any, did employees of Mr Eisenberg
[22] have in achieving LEC billing for the EPV subsidiaries?
[23] **A:** Well, first, Olympic had to exist Then once a
[24] billing services agreement was executed, Olympic had to
[25] submit approval forms and whatever paperwork required by each

FEDERAL TRADE COMMISSION v.
CYBERSPACE.COM, etc., et al.                    Case 2:00-cv-01806-RSL   Document 124   Filed 03/07/02   Page 138 of 184

DON REESE
Vol. 1, February 8, 2002

Page 71

[1] local phone company to get their approval of the program
[2] Q What role did you play?
[3] A In what?
[4] Q In the LEC billing process for the EPV
[5] subsidiaries
[6] A I was the main contact for the local companies, I
[7] guess the point of contact
[8] Q Did you have conversations with any employees of
[9] any phone company regarding the EPV subsidiaries?
[10] A Yes
[11] Q What conversations did you have with phone company
[12] employees regarding the EPV subsidiaries?
[13] A I had discussions with Vice President Dick Oxler at
[14] SPC Communications about the high level of complaints that
[15] Olympic was having I had discussions with Annette Drummonds
[16] of Bellsouth regarding the marketing material for Cyberspace
[17] I had discussions with Mary Halula at — at that time was US
[18] West — regarding Essex I had discussions with Marie Dwyer
[19] at Verizon in New York City regarding Cyberspace complaints
[20] That's all that spring to mind at the moment
[21] Q What can you tell me about the discussions that you
[22] had with Annette Drummonds at Bellsouth regarding the
[23] Cyberspace marketing material?
[24] A Bellsouth didn't like the way the original check
[25] piece was I don't remember specifically what it was about

Page 72

[1] it Changes had to be made to the solicitation piece in
[2] Bellsouth's territory to satisfy Bellsouth Like I said, I
[3] don't remember exactly what those changes were
[4] Q. Did Cyberspace make the changes requested by
[5] Bellsouth?
[6] A Yes
[7] Q What can you tell me about the conversation you had
[8] with the vice president of SPC, I think it was?
[9] A That conversation had to do with Olympic's
[10] charge-back and/or complaint levels being too high, and if we
[11] didn't — Mr Eisenberg was in my office during this
[12] conversation He wanted us to — he, being Dick Oxler —
[13] wanted Olympic to come up with an action plan to reduce
[14] complaints and adjustments or else lose the right to bill in
[15] that territory
[16] Q· Can you recall when this conversation took place?
[17] A No
[18] Q Do you know what year it was?
[19] A I think it was early in 2000, first half of 2000
[20] That's about as specific as I can be
[21] Q. You mentioned that Mr Eisenberg was in the room
[22] during this call Was this a speakerphone conversation so
[23] that he could participate?
[24] A Yes
[25] Q Did this discussion concern any of the EPV

Page 73

[1] subsidiaries?
[2] A What do you mean by "the EPV subsidiaries"?
[3] Q. Did the call concern Cyberspace, Essex, Surfnet, or
[4] Splashnet?
[5] A As companies or individuals as companies?
[6] Q: The companies There were complaint levels that
[7] you were discussing with this vice president
[8] A. Yeah. It was a concern because losing a billing
[9] contract means you are out of business in that territory
[10] Q: Did those complaints relate to a specific EPV
[11] subsidiary?
[12] A. The conversation with Dick Oxler had to do with
[13] Olympic complaints in general on the aggregate, but
[14] Cyberspace made up the vast majority of those complaints
[15] Q· If you know, what percentage of the complaints of
[16] Olympic's involved Cyberspace?
[17] A 70 percent or so
[18] Q: Was it typical for vice presidents of phone
[19] companies to call Olympic to talk about complaints?
[20] A: That was the only experience I had
[21] Q. What can you tell me about the conversation you had
[22] with Marie Dwyer? This was at Verizon, I think
[23] A. Verizon generated monthly reports for, I assume,
[24] all aggregators, and Here's your cramming complaints for the
[25] month Marie Dwyer called me on a couple of occasions,

Page 74

[1] saying, Olympic's cramming complaints are higher — are very
[2] high relative to the number of transactions you are billing
[3] What's going on there? Similar conversations that I had with
[4] the guy from SPV, What are you going to do about it?
[5] Q: Were the cramming complaints from Verizon that
[6] Olympic received separated into Olympic's clients?
[7] A. No I retract that Yes, the spreadsheet did have
[8] a column in it that had the subject name
[9] Q: Can you recall whether you ever reviewed a
[10] spreadsheet from Verizon regarding Cyberspace cramming
[11] complaints?
[12] A I reviewed the spreadsheets, so I would have had to
[13] have reviewed the Cyberspace part of it So yes
[14] Q. Can you remember whether Olympic ever received a
[15] spreadsheet specific to Cyberspace?
[16] A I don't remember
[17] MR GOODMAN: Let's go off the record
[18] (Pause in the proceeding )
[19] (Lunch recess )
[20]
[21]              BY MR. GOODMAN:
[22] Q We are back on the record
[23] MR GOODMAN: Exhibit 124
[24] THE WITNESS (Reading document )
[25] Q: Okay Mr Reese, do you have Exhibit 124 in front

Page 75

[1] of you?

[2]  A  Yes

[3]  Q: It's Bates-stamped DR-7797 through DR-7799 Have

[4] you had a chance to review this document?

[5]  A· Yes

[6]  Q  I would like you to turn to the second page,

[7] DR-7798 Do you recognize this document?

[8]  A· Yes

[9]  Q· What is it?

[10]  A  This is a printout of the Excel files that

[11] Marie Dwyer would e-mail me

[12]  Q. Can you identify the different fields of this

[13] document?

[14]  A: Well, the left appears to be the states in Verizon

[15] territory The next field — I'm not sure It looks like it

[16] appears to be some numeric equivalent to that state Then

[17] the billing aggregator, which is Olympic Then the subkick,

[18] which is Cyberspace.Then the text code, which says,

[19] "Internet " Then I'm assuming it is the complaint date or

[20] adjust date

[21]    The next field is the amount adjusted The

[22] next field appears to be the billing date or the date on that

[23] particular transaction or bill date  I don't know for sure

[24] The next field appears to be the area code, which would be

[25] the NPA followed by the NXX followed by the phone number So

Page 76

[1] those last three fields combined make up the telephone number

[2] that was billed

[3]  Q: Looking at the whole document together, can you

[4] identify what kind of report this is?

[5]  A: It is a cramming report for the month of February

[6]  Q: For what company?

[7]  A: Produced by Verizon for Olympic and the subkick,

[8] Cyberspace

[9]  Q: For what year?

[10]  A: 2000

[11]  Q  Can you tell what month?

[12]  A· February

[13]  Q· What does "cramming" mean in the LEC billing

[14] context?

[15]  A. It means the billing — unauthorized, recurring

[16] charges billing

[17]  MR. LEONARD: Recurring charges?

[18]  THE WITNESS: Miscellaneous charges  That's a

[19] type of billing record

[20]  Q: What cramming reports, if any, did Olympic receive

[21] regarding the EPV subsidiaries?

[22]  A. Obviously the one in my hand, and each month I got

[23] a similar spreadsheet e-mailed to me from Verizon

[24]  Q  Did you receive these reports personally?

[25]  A: Yes

Page 77

[1]  Q: What did you do with them after you received them?

[2]  A: I would forward them to several parties

[3] Wayne Chia, to ensure that these phone numbers were

[4] terminated, ceased, no more billing happened for these phone

[5] numbers, future billing ceased  I would forward them to

[6] someone in customer service to make sure that these accounts

[7] were updated in the customer service system as being

[8] cancelled

[9]    If necessary, I would have replied to Verizon

[10] with an explanation of what I did do to handle this complaint

[11] so that they had it checked off their list

[12]  Q  Did you receive cramming reports from other phone

[13] companies?

[14]  A. Yes

[15]  Q  From which phone companies, if you can recall?

[16]  A. SPC, which makes up Ameritech, Southwestern Bell,

[17] and Pacific Bell sent a similar report  I don't know if they

[18] entitled it "cramming report" or not, but it was similar to

[19] this

[20]  Q: Would you receive reports about other kinds of

[21] complaints in addition to cramming?

[22]  A. Yes

[23]  Q  From which phone companies?

[24]  A. All of them reported in one way or another  It

[25] just varied on the frequency or the formality of it

Page 78

[1]  Q: The reports that you received from the phone

[2] companies, were they sent to Olympic or to Olympic's clients?

[3]  A. Olympic

[4]  Q. Could Olympic identify which client the complaints

[5] concerned?

[6]  A· Yes

[7]  Q. Did Olympic receive complaints about Cyberspace in

[8] these reports?

[9]  A. Yes

[10]  Q: Did Olympic receive complaints about Essex, slash,

[11] Yellowpage.com in these reports?

[12]  A: Yes

[13]  Q. Did Olympic receive reports about Surfnet?

[14]  A. Yes

[15]  Q: In addition to cramming complaints or cramming

[16] reports, what other kinds of reports would you receive from

[17] the phone companies?

[18]  A. Some would send escalated complaint reports  GTE

[19] and Bellsouth frequently did that Any sort of complaint

[20] that was elevated beyond a customer service rep in their

[21] organization, they would generate a report and then impose a

[22] fine to the aggregator for up to $2,000 per complaint

[23]    There were some complaints that we got where

[24] people alleged slamming, for example, even though that was

[25] inaccurate in this discussion

FEDERAL TRADE COMMISSION v.
CYBERSPACE.COM, LLC. ET AL.
Case 2:00-cv-01806-RSL   Document 124   Filed 03/07/02   Page 140 of 184

DON REESE
Vol. 1, February 8, 2002

Page 79

[1] Q What discussions, if any, did you have regarding
[2] reports from phone companies about the EPV subsidiaries?
[3] A With who?
[4] Q With anyone
[5] A I would have addressed it with the appropriate
[6] persons at the client's company that was responsible for
[7] this If it was Cyberspace, then I made the Cyberspace
[8] client aware If it were Company XYZ, I would make Company
[9] XYZ aware
[10] Q Did you discuss reports from the phone companies
[11] with Mr Eisenberg?
[12] A He was made aware
[13] Q How was he made aware?
[14] A By my e-mailing or verbally saying, If we don't
[15] keep complaints down, we will lose the billing in this
[16] territory He was also involved in that conversation with
[17] Dick Oxler
[18] Q Did you discuss escalated complaints with
[19] Mr Eisenberg?
[20] A Not all of them but some in general, yes
[21] Q. Can you recall what kinds of complaints formed the
[22] basis of the escalated complaints that you received?
[23] A Escalated complaints in a local phone company tend
[24] to come from important end users For example, if you have a
[25] university that's being billed or a government entity that's

Page 80

[1] being billed, those were always escalated within a LEC
[2] Q For example, a university, what complaint would
[3] they have about the EPV subsidiaries, if any?
[4] A They shouldn't be being billed They didn't need
[5] — the University of Kentucky didn't need dial-up access from
[6] Cyberspace
[7] MR LEONARD Can I ask you to raise your
[8] voice just a little bit?
[9] THE WITNESS Sure
[10] Q Mr Reese, what e-mails, if any, did you send
[11] regarding complaint levels from the EPV subsidiaries?
[12] A. I can't recall specifically
[13] Q Do you recall whether you sent any e-mails
[14] regarding complaint levels?
[15] A Yes It was an ongoing battle to keep complaints
[16] below the threshold imposed by the phone companies, which
[17] would allow Olympic to continue to bill I'm sure there were
[18] many e-mails on the subject
[19] Q Did you send these kinds of e-mails to
[20] Mr Eisenberg?
[21] A Yes
[22] Q Can you recall whether he ever replied to these
[23] e-mails?
[24] A I can't recall specifically
[25] Q Can you recall whether you had any conversations

Page 81

[1] with him regarding these e-mails?
[2] A. Not specifically
[3] Q. Can you recall if you ever had conversations with
[4] him regarding complaint levels?
[5] A Yes Again, the conversation with Dick Oxler and
[6] the ongoing battle to keep Olympic's billing and collections
[7] agreements active
[8] Q Did you discuss the ongoing battle with
[9] Mr Eisenberg?
[10] A. Yes
[11] Q Did any of the EPV subsidiaries use any other
[12] billing aggregator besides Olympic?
[13] A: Yes
[14] Q Which EPV subsidiaries used a different billing
[15] aggregator?
[16] A. Splash used Integretel
[17] Q· Do you know why Splash used a different billing
[18] aggregator?
[19] A. Yes
[20] Q· Why did Splash use a different billing aggregator?
[21] A. A couple of reasons One, to diversify risk so
[22] that if the billing was lost at Olympic for a territory, that
[23] it could be billed at Integretel The other reason being
[24] Hebard and Eisenberg not trusting each other, and Hebard
[25] wanted revenues coming somewhere other than from a company

Page 82

[1] that Eisenberg owned
[2] Q: When you say "diversify risk," can you tell me a
[3] little bit more about what that means?
[4] A· In this case it means because Olympic was in
[5] trouble with the phone companies for having such high
[6] complaint levels that if there were a billing services
[7] agreement elsewhere, that in the event that Olympic lost a
[8] territory that those end users could be billed through
[9] Integretel so that the EPV revenue stream wasn't interrupted
[10] Q: Did Olympic ever lose its ability to bill with any
[11] phone company?
[12] A· Yes
[13] Q Which phone companies did Olympic lose the ability
[14] to bill with?
[15] A· I'm not sure if it was one or all of the SPC
[16] companies Southwestern Bell was terminated I don't recall
[17] specifically By the time I was asked to leave the
[18] companies, two or three of them had been terminated
[19] Q· Why were they terminated?
[20] A· I think Southwestern Bell was because of
[21] complaints After that it may have been because they were —
[22] Olympic was delinquent in making its payments
[23] Q· What kind of complaints did Southwestern Bell
[24] receive that resulted in the termination of the billing?
[25] A. It was Dick Oxler following up on his threat That

Page 83

[1] phone conversation was the first warning There were several
[2] warnings after that If you don't get your complaint levels
[3] down, you will be terminated And eventually that happened
[4]    Q What did Olympic do, if anything, to reduce the
[5] number of complaints?
[6]    A Provide the best customer service possible in order
[7] to keep the end user from complaining beyond that point
[8]    Q· Did Olympic act on that to reduce complaint levels?
[9]    A It tried to
[10]    Q: Did Olympic lose any billing contracts nonetheless?
[11]    A Yes
[12]    Q: Could a phone company, if you know, cut off billing
[13] for a specific client of Olympic's?
[14]    A. Did you say "could they"?
[15]    Q. Yes
[16]    A Yes
[17]    Q: Did that ever happen to the EPV subsidiaries?
[18]    A. Yes
[19]    Q: Can you recall which EPV subsidiary?
[20]    A Essex
[21]    Q· Any others?
[22]    A I don't remember
[23]    (Exhibit Number 178 was marked for
[24] identification )
[25]

Page 84

[1]                    BY MR. GOODMAN.
[2]    Q: This is Bates-stamped DR-3744 through DR-3745
[3]    A· (Reading document ) Okay
[4]    Q· Mr Reese, does this refresh your recollection as
[5] to whether any additional EPV subsidiaries lost their ability
[6] to bill with a phone company besides just Essex?
[7]    A. No, because this isn't relative to Olympic
[8]    Q Did you receive a copy of this e-mail?
[9]    A Yes
[10]    Q: Does it refer to an EPV subsidiary?
[11]    A. Yes
[12]    Q· Which EPV subsidiary?
[13]    A: Splashnet
[14]    Q Which phone company is at issue here?
[15]    A: SPC, which is Pacific Bell, Nevada Bell,
[16] Southwestern Bell
[17]    Q: Can you tell from this e-mail what action SPC is
[18] taking with respect to Splashnet?
[19]    A: They are blocking billing of the subkick, or they
[20] are requesting that Integretel cease blocking of the subkick
[21]    Q Cease blocking?
[22]    A: Cease billing Sorry
[23]    Q. According to this e-mail, SPC was blocking the
[24] Splashnet subkick, is that right?
[25]    MS. JACOBS. Objection, leading

Page 85

[1]    THE WITNESS. Yes Turned off in SPC's edit
[2] process
[3]    Q: What does it mean to — "turned off in the edit
[4] process"?
[5]    A: Each company — in this case Splashnet — is
[6] assigned a subkick, which is a four-digit numeric code that's
[7] associated with the company They just block that code in
[8] their edits so if a billing company tries to submit the
[9] billing records for Splashnet again, it won't make it through
[10] their edits It will just reject it
[11]    Q. What services did the EPV subsidiaries provide to
[12] their customers?
[13]    A. Essex was an on-line directory listing, on-line
[14] Yellow Pages Cyberspace, Surfnet, and Splashnet — I don't
[15] know I keep calling it "Surfnet " I think it's SurfISP is
[16] the actual name — marketed ISP services
[17]    Q· What are ISP services?
[18]    A: Internet service provider, like an AOL
[19]    Q: Do you know how the three EPV subsidiaries that
[20] provided ISP services to its customers actually provided that
[21] service to its customers?
[22]    A. Yes
[23]    Q. How did EPV subsidiaries provide the ISP service to
[24] its customers?
[25]    A: The actual service? The actual dialing up?

Page 86

[1]    Q: Did it provide for the dial-up service itself, or
[2] did it use a vendor for that?
[3]    A. The connection to the Internet would have been —
[4] back up The EPV companies that provided Internet services
[5] did so by reselling a backbone provider's network.
[6]    Q: Whose backbone did it sell to its customers?
[7]    A. MegaPOP and GTE in some areas
[8]    Q: Is MegaPOP a company name?
[9]    A: I think StarNet is the company name MegaPOP may
[10] be a product
[11]    Q You mentioned GTE Did GTE provide a dial-up
[12] service to customers of the EPV subsidiaries?
[13]    A. GTE was a backup If you look at map of the United
[14] States, StarNet's footprint, as it's called, would — only
[15] covered about 70 percent of the nation I don't know if
[16] that's geographically or by population, but it doesn't reach
[17] — not all users are able to access the Internet through a
[18] StarNet point of presence
[19]    Q Which EPV subsidiaries had contracts with StarNet,
[20] if any of them did?
[21]    A I don't think any subsidiaries did
[22]    Q: Which EPV subsidiaries used StarNet?
[23]    A. Cyberspace, SurfISP, and Splashnet
[24]    Q: Did the EPV subsidiaries receive invoices from
[25] StarNet?

Page 87

[1] A· I don't know if it was a subsidiary or EPV itself,

[2] but yes

[3] Q What about from GTE? Did the subsidiaries or EPV

[4] receive an invoice from GTE?

[5] A I don't remember

[6] Q Did any other backbone providers provide backbone

[7] for EPV subsidiary customers?

[8] A Yes In the beginning Interlync did for a short

[9] time, the first few months of the program

[10] Q Who replaced Interlync?

[11] A StarNet

[12] Q Who provided customer service for the EPV

[13] subsidiaries?

[14] A A lot of different entities Everywhere from the

[15] LECs themselves to Olympic to Capital Gains to Integretel to

[16] Pinnacle

[17] Q What customer service did the LECs provide?

[18] A The LECs provided their own customer service for

[19] any charges on their bill page They will handle some calls,

[20] although they are supposed to refer them to the billing

[21] aggregator They don't always do so

[22] Q What customer service did Olympic provide for the

[23] EPV subsidiaries?

[24] A Olympic handled most of the calls

[25] Q· By "calls," what do you mean?

Page 88

[1] A On the Olympic bill page, there was a toll-free

[2] number on that page that when dialed, came in to Olympic's

[3] office on Eastlake Avenue and hit an IVR machine that the IVR

[4] recognized or would see the originating phone number It was

[5] either that or the caller was required to key in their phone

[6] number I don't remember which Then the call routed

[7] appropriately from there, depending on what subkick was being

[8] billed

[9] Q Would the consumer know which client of Olympic's

[10] was billing them?

[11] A: Yes At the top of the page, it would say,

[12] "Olympic Telecommunications " And down below, as the name

[13] would suggest, subkicks would be listed If there were two

[14] Olympic subkicks on the same page, they would have both been

[15] listed on that page

[16] Q Were clients of Olympic the subkicks?

[17] A Yes

[18] Q· Was Olympic a kick?

[19] A. Yes

[20] Q. What does IVR stand for?

[21] A. Something voice response I can't remember

[22] Q Could it be interactive voice response?

[23] A I believe it could, yes

[24] Q Who was responsible for programming the IVR?

[25] A In this case I believe it was a shared effort by

Page 89

[1] Brian Short and Damon Rothstein

[2] Q· Where did they work?

[3] A In Eisenberg's office in Seattle

[4] Q. 2722 Eastlake?

[5] A: Yes

[6] Q. When customers called the toll-free number on the

[7] Olympic bill page and reached the IVR, were they able to

[8] speak with a live customer service representative?

[9] A· If they chose to

[10] Q· It was an option presented by the IVR?

[11] A. Yes

[12] Q: Where were the live customer service

[13] representatives located?

[14] A· Some in Seattle If the Seattle office was too

[15] busy, calls overflowed to Hebard's office in California

[16] and/or to Pinnacle

[17] Q· When you say "in Seattle," where do you mean?

[18] A: 2722 Eastlake

[19] Q Approximately how many CSRs worked at 2722 Eastlake

[20] while you were working there?

[21] A. Over the entire five years?

[22] Q: At any given time

[23] A. It varied over the years from maybe 10, 5 or 10 as

[24] a low number, to 50 or 60 at its peak Maybe more

[25] Q: Did you have any responsibilities concerning

Page 90

[1] customer service provided by Olympic?

[2] A. Not directly I was the chief operating officer,

[3] so various departments in the company were managed in part by

[4] me

[5] Q· What, if anything, did you do to monitor the

[6] customer service representatives?

[7] A: I had the ability to listen in on phone calls, so

[8] periodically I would do that. If I didn't like what I heard,

[9] I guess I would make the supervisor or manager of that area

[10] aware that a particular CSR is not answering questions

[11] appropriately

[12] Q: What would you hear when you listened in?

[13] A. I would hear the CSR talking with whatever end user

[14] was calling in

[15] Q: Could you hear what the CSR was saying?

[16] A Yes

[17] Q Could you hear what the end user was saying?

[18] A Yes

[19] Q· What kinds of reasons did end users call Olympic's

[20] customer service as far as you know?

[21] A. To get charges removed from their phone bills

[22] Q Did the end users give a reason why they wanted the

[23] charge removed?

[24] A Because they didn't want it there in the first

[25] place or they didn't authorize it

Page 91

[1]  Q. When you listened on customer service calls, which
[2] Olympic clients were end users calling about?
[3]  A  The vast majority were Cyberspace or SurfISP and a
[4] few calls for Mirage Marketing
[5]  Q: What, if anything, did Mr Eisenberg do to monitor
[6] or listen in to calls, if you know?
[7]  A· He listened in to phone calls as well
[8]  Q. Did the two of you listen to these calls together?
[9]  A  A few times  Not regularly
[10]  Q  How do you know that he listened in to calls in
[11] addition to the times you listened together?
[12]  A. Because I recall him making comments about calls he
[13] had just heard  There were a few times when I was in his
[14] office and heard on the speakerphone  We would be listening
[15] in on a phone call
[16]  Q. Did any of those calls involve the EPV
[17] subsidiaries?
[18]  A  Yes
[19]  Q: What was the turnover rate among customer service
[20] representatives working at 2722 Eastlake, if you know?
[21]  A. I don't know the exact rate
[22]  Q: What reasons are you aware of that customer service
[23] representatives gave when they left?
[24]  A: There were some that were let go because of poor
[25] performance  There were some that would stop showing up

Page 92

[1] because they didn't like, I guess, the abuse that they were
[2] taking or the nature of the calls that they were handling
[3]  Q: Did Olympic ever use a temp agency to hire customer
[4] service help?
[5]  A: Yeah, I think, for a while
[6]  Q· What reasons can you recall that temp employees
[7] gave for leaving when they left, if any?
[8]  A. It wasn't unusual to have employees work one day
[9] and not come back the next day or work a half a day and say
[10] that this whole thing is a scam and they didn't want to be
[11] involved in it, and they would leave
[12]  MR. ZOBERST: Could you read that back.
[13]  (Answer on Page 92, Lines 8 through 11, read
[14] by the reporter )
[15]
[16]  Q: What e-mails, if any, did you send regarding
[17] reasons temp employees gave for quitting?
[18]  A: I don't remember
[19]  MR  GOODMAN  Exhibit 80
[20]  THE WITNESS  (Reading document ) You want me
[21] to read all of this, or do you want to refer me to a
[22] particular part?
[23]  Q. I want you to have a chance to look through it, and
[24] now I can ask you questions, if you want  This purports to
[25] be a printout of an e-mail  It's Bates-stamped E-20728

Page 93

[1] through E-20731  The questions I have are from the first
[2] page, E-20728
[3]  Can you tell whether you sent any of the
[4] e-mails in this e-mail exchange?
[5]  A. Yes I sent one on Tuesday, November 2nd, 1999, at
[6] 7 15 a m  That looks to be the only one that originated in
[7] this discussion by me
[8]  Q. Can you read the text of your message
[9]  A. Sure  "Although I wasn't asked, my comments are
[10] I disagree completely  Churn rate and customer satisfaction
[11] have very little to do with customer service, technical
[12] support, or LEC experience as we have now and everything to
[13] do with the nature in which this program is marketed
[14]  "Need I remind everyone of the six or seven
[15] state CID investigations?  None of that was caused by poor
[16] customer service or inability to upsell, which I should add
[17] is not possible short of the same LEC approval process
[18]  "I should also add that five or six temp
[19] employees that have been sent to our shop have walked out,
[20] saying, 'This is a, quote, scam'  I doubt that we would be
[21] able to outsource this for long  Don."
[22]  Q: Does this refresh your recollection as to whether
[23] you ever sent any e-mails regarding the reasons temp
[24] employees gave for leaving?
[25]  A: Yes, it does

Page 94

[1]  Q  What is "churn rate," as you use that term in your
[2] e-mail?
[3]  A: Sort of like attrition but was used — I first
[4] heard it used in the Internet business  It may be used in
[5] other businesses  That's where I first became aware of it
[6]  Q. What does it mean?
[7]  A. The percentage of customers cancelling  The number
[8] of customers cancelling compared to the number of new
[9] activations
[10]  Q: What, if anything, did the EPV subsidiaries do to
[11] monitor the churn rate?
[12]  A: I don't know that it was monitored  Jeff Fritz
[13] tried to identify or arrive at what that churn rate was in
[14] some of his accounting reporting
[15]  Q· Where did Jeff Fritz work?
[16]  A: He worked in Chris Hebard's office in Santa
[17] Barbara
[18]  Q: What did he do to track churn rate?
[19]  A: I don't know what he did to track churn rate
[20]  Q: What reports, if any, did you receive about churn
[21] rate of the EPV subsidiaries?
[22]  A: I remember e-mails from Jeff, discussing or
[23] arriving at churn rate figures that he was using at the time
[24] when Eisenberg and Hebard were trying to sell Cyberspace so
[25] that they could present financials accurately to prospective

Page 95

[1] buyers

[2] **Q** How would you characterize the churn rate of the

[3] EPV subsidiaries?

[4] **MS. JACOBS** Object as vague

[5] **THE WITNESS** I don't know Could you be more

[6] specific on the question?

[7] **Q:** Was the churn rate of the EPV subsidiaries, in your

[8] view, similar to the churn rate for other Olympic clients?

[9] **A** I can't answer that question because I don't have

[10] an apples-to-apples — well, other Olympic clients

[11] usage-based charges It's not an apples-to-apples

[12] comparison

[13] **Q** Was the complaint level of the EPV subsidiaries at

[14] a level that Mr Hebard and Mr Eisenberg were concerned

[15] about losing LEC billing abilities?

[16] **MS JACOBS** You are asking him to speak for

[17] Mr Hebard?

[18] **Q** If you know

[19] **A** Yes

[20] **Q** How do you know?

[21] **A** Again, it was the complaint and adjustment levels

[22] were high enough that it was a source of many conversations

[23] I don't remember specific conversations, but I know that

[24] reducing complaints and reducing adjustments were paramount

[25] to longer-term success of the program

Page 96

[1] **Q** I would like you to look at Exhibit 80 again In

[2] your e-mail, you say, "Need I remind everyone of the six or

[3] seven state CID investigations?" What state CID

[4] investigations can you recall?

[5] **A.** Illinois, Wisconsin, North Carolina, Montana,

[6] California, and I think Missouri

[7] **Q** Who were the state investigations directed at?

[8] **A** Wisconsin was Essex North Carolina, I don't

[9] remember if it was Essex or Cyberspace

[10] **Q** Did they all concern the EPV subsidiaries?

[11] **A** Yes

[12] **Q** Who had the responsibility for responding to the

[13] state investigations?

[14] **A.** I think that was a case-by-case decision If it

[15] were an investigation from an attorney general, a lawyer was

[16] used to respond If it were a lower-level jurisdiction or a

[17] perceived lower-level, anyway, PUC or something like that,

[18] Diane Capasso, I think, handled some

[19] I may have written to — I think I wrote to

[20] the California Public Utilities because they had jurisdiction

[21] over Olympic

[22] **MS DIEMER** Ms Guerard, are you trying to

[23] indicate to the witness what he should answer by nodding your

[24] head?

[25] **MS. GUERARD.** I wasn't nodding my head at all

Page 97

[1] I was looking down, trying to stay awake

[2] **MS. DIEMER:** I think you should be careful

[3] **MS GUERARD** Definitely not I was looking

[4] at my computer In fact, I haven't even looked at him for a

[5] while

[6] **Q:** What discussions, if any, did you have with

[7] Mr Eisenberg regarding the state investigations?

[8] **A** I don't recall discussions directly between

[9] Eisenberg and me, but I do recall there being conference

[10] calls on the subjects

[11] **Q** Did you participate in these conference calls?

[12] **A.** Yes

[13] **Q:** Did Mr Eisenberg participate?

[14] **A.** Yes

[15] **Q** What was discussed at these conference calls?

[16] **A.** How to respond to the investigations, who would

[17] respond to the investigations

[18] **Q** Do you know whether the State of Texas ever opened

[19] an investigation into any of the EPV subsidiaries?

[20] **A:** It seems like that happened That may have been

[21] the reason that Olympic lost its B&C agreement in

[22] Southwestern Bell, but I don't remember specifically

[23] **Q** Can you remember whether that was concerning an EPV

[24] subsidiary?

[25] **A:** It would had to have been

Page 98

[1] **Q** Can you remember whether Delaware ever opened an

[2] investigation into any of the EPV subsidiaries?

[3] **A:** I remember there being an issue with the Better

[4] Business Bureau in Delaware Whether that was escalated to

[5] another jurisdiction, I don't recall

[6] **Q:** What other Better Business Bureaus, if any,

[7] contacted the EPV subsidiaries?

[8] **A:** I don't remember Diane Capasso handled most of

[9] those types of complaints

[10] **Q.** Did the State of Missouri open an investigation

[11] into any of the EPV subsidiaries?

[12] **A:** I think the AG's Office did

[13] **MR GOODMAN:** Exhibit 136

[14] **Q.** Mr Reese, I'm handing you what's been marked

[15] Exhibit 136. It's Bates-stamped H-7496 through H-7506 Mr

[16] Reese, take a moment to review this exhibit

[17] **A:** (Reading document.) Okay I have read it

[18] **Q:** Mr Reese, I would like you to look at the first

[19] page, H-7496 Does this form look familiar to you? Maybe

[20] not this complaint specifically but the form that's used?

[21] **A:** No

[22] **Q** I would like you to look at H-7499 Could you tell

[23] me what, in your view, the basis is for this consumer's

[24] complaint?

[25] **A·** (Reading document ) Could you repeat the question

Page 99

[1] now that I have read this?

[2] **Q** In your view, what is the basis for this consumer's

[3] complaint?

[4] **A:** The basis is that they stamped a solicitation check

[5] unknowingly and therefore did not ever really want the

[6] service but got it anyway and that the check was not on the

[7] up and up, I guess

[8] **Q:** Have you seen letters from consumers similar to

[9] this one?

[10] **A.** Yes

[11] **Q:** Would you say you have seen a lot of letters from

[12] consumers similar to this one?

[13] **A:** Yes

[14] **Q.** Who is this letter addressed to?

[15] **A:** It's addressed to Olympic Telecommunications

[16] **Q** What is the address given?

[17] **A:** PO Box 29252, San Antonio, Texas 78229-0252

[18] **Q** Did Olympic Telecommunications have an office in

[19] San Antonio?

[20] **A:** No

[21] **Q.** What happened to correspondence sent to Olympic in

[22] San Antonio?

[23] **A.** It was forwarded to me at the 2722 Eastlake

[24] address

[25] **Q:** What did you do with correspondence like this,

Page 100

[1] forwarded from San Antonio?

[2] **A:** Once upon a time in the early days of Olympic, I

[3] would have handled complaints like this myself and wrote back

[4] to them, but as time went on and the complaints became so

[5] voluminous, they were divvied up to different people to

[6] respond to, in this case Michelle Ferazza

[7] **Q·** I would like you to look back on Page 7499, the

[8] second paragraph of this consumer's letter Could you read

[9] the second and third sentences, please

[10] **A:** "Our employee questioned why we received this check

[11] but did not read the back of it In fact, I doubt any of us

[12] would have taken the time to read the back of a check."

[13] **Q** Do you recall receiving letters from other

[14] consumers that also mentioned the fact that people did not

[15] read the back of the check?

[16] **A:** I recall hearing that claim, yes

[17] **MR GOODMAN** Exhibit 135

[18] **Q.** Mr Reese, I'm showing you Exhibit 135 It's

[19] Bates-stamped H-7414 through 7417 Take whatever time you

[20] need to look through it I'm going to be asking you

[21] questions about the last page, H-7417

[22] **A:** (Reading document ) Okay

[23] **Q** Is Olympic Telecommunications mentioned in this

[24] letter?

[25] **A:** Yes

Page 101

[1] **Q:** What is this consumer's complaint regarding Olympic

[2] Telecommunications?

[3] **A:** That they are being billed for Internet service

[4] that they don't want because they don't have a computer

[5] **Q.** Do you recall seeing other complaints similar to

[6] the one expressed by this consumer?

[7] **A:** Yes

[8] **Q** Did you receive complaints from consumers who did

[9] not have a computer?

[10] **A:** Frequently

[11] **Q:** Those consumers were being billed by the EPV

[12] subsidiaries?

[13] **A:** Yes, through Olympic

[14] **Q:** What discussions, if any, did you have with

[15] Mr Eisenberg regarding consumers who were being billed and

[16] did not have a computer?

[17] **A.** There were all different sorts of conversations

[18] Again, it wasn't necessarily between myself and

[19] Mr Eisenberg It would have been through e-mail

[20] correspondence or conference calls

[21] It ranged from there being jokes about the

[22] fact that these consumers were so forward-thinking that they

[23] purchased their Internet service in anticipation of getting a

[24] computer to actually adding another program offering, that

[25] being selling computers to these people to go along with

Page 102

[1] their Internet service

[2] **Q·** I would like you to look at the third paragraph of

[3] the letter

[4] **A.** Third paragraph?

[5] **Q:** Yes Could you read the second sentence, please

[6] **A** "Neither my husband nor I remember this check, but

[7] we apparently did cash it, thinking it was some sort of

[8] refund " In parentheses it says, "We have had many other

[9] problems with Bell in the past concerning our bills," end of

[10] parentheses "As far as I'm concerned, this is pure

[11] trickery "

[12] **Q:** Do you recall whether you received correspondence

[13] from other consumers similar to this one where the consumer

[14] says they thought it was some sort of refund?

[15] **A·** Yes, I remember that being a common claim

[16] **Q** Is that something that was discussed in the e-mail

[17] correspondence and conference calls you mentioned earlier?

[18] **A.** Yes

[19] **Q.** Was Mr Eisenberg a part of those e-mail

[20] communications and conference calls?

[21] **A:** Yes

[22] **Q.** Mr Reese, if a consumer did not have a computer

[23] and did not have access to a computer, what use could they

[24] make of the services offered by the EPV subsidiaries?

[25] **MS. JACOBS** Are you asking him to speculate?

Page 103

[1]   Q· If you know

[2]   MS JACOBS: Are you asking him to speculate?

[3]   MR GOODMAN  Yes

[4]   THE WITNESS. I can't think of any

[5]   MR GOODMAN  This will be Exhibit 179

[6]   MS JACOBS  So this is a new one?

[7]   MR. GOODMAN: Yes

[8]   (Exhibit Number 179 was marked for

[9]   identification )

[10]              BY MR GOODMAN

[11]   Q  This is Exhibit 179  It's Bates-stamped E-25346

[12] through E-25355

[13]   A  Do you want to just point me where you want me to

[14] look?

[15]   Q. Yes I'll be asking you about Pages 25349 and

[16] 25350

[17]   A  (Reading document ) Okay

[18]   Q  Looking at 25349, who is this letter addressed to?

[19]   A  It is to the FCC

[20]   Q  What correspondence, if any, did Olympic receive

[21] from the FCC?

[22]   A  Regarding this complaint?

[23]   Q  Regarding the EPV subsidiaries

[24]   A  Well, Olympic received, I think, boxfuls of

[25] complaints from the FCC  Olympic, the billing aggregator,

Page 104

[1] would receive complaints for all of the clients it billed

[2] for

[3]   Q· Were some of those complaints related to the EPV

[4] subsidiaries?

[5]   A  Yes

[6]   Q. Who was responsible, if anyone, for responding to

[7] the FCC?

[8]   A  I don't know that any one person — are you asking

[9] for a person?

[10]   Q· Yes

[11]   A  For a long time FCC complaints weren't even

[12] responded to because it wasn't that big a deal if you didn't

[13] Then the FCC became more involved in the billing industry

[14] because of cramming, and they required responses

[15]   Once they started requiring the responses and

[16] the volume was very large, they were mailed to me, and I

[17] would give these to — in this case Michelle Ferazza, to

[18] simply send a form letter back to them

[19]   Q  Who did Michelle Ferazza work for?

[20]   A  Company?

[21]   Q  Yes

[22]   A  She worked for — her paycheck came from Payroll

[23] Master

[24]   Q  Did she work at 2722 Eastlake?

[25]   A  Yes

Page 105

[1]   Q· Could you estimate what percentage of complaints

[2] that Olympic received from the FCC that related to the EPV

[3] subsidiaries, if you know?

[4]   A: 50 to 75, in that range

[5]   Q· Percent?

[6]   A· Yes

[7]   Q: Looking at E-25349 and E-25350, what, in your view,

[8] is the basis for this person's complaint?

[9]   A: The complaint is that since it was a check that was

[10] the promotional piece and this company processes hundreds of

[11] checks, that they didn't necessarily look at the checks, and

[12] therefore, it got processed with all their other ones

[13]   They don't like the idea that a check that

[14] looks like all these other checks that they process activates

[15] service

[16]   Q: Do you recall seeing complaints from customers

[17] similar to this one?

[18]   A: Yes

[19]   Q. Did you discuss complaints similar to this one in

[20] conference calls?

[21]   A: Yes  Like this one, it wasn't endorsed  It was

[22] simply stamped like all checks would be for a business or a

[23] grocery store  There were discussions on, I guess, the

[24] enforceability of the stamped check versus the endorsed

[25]   MS JACOBS  I object  It sounds like an

Page 106

[1] attorney-client conversation

[2]   Q  What is the Bates stamp number of the page where

[3] the stamp —

[4]   A. 25353  These discussions were more of policy,

[5] customer service policy, how to handle it  If it's signed,

[6] the amount of refund would have been — refunds would have

[7] been tougher to get than a stamp

[8]   Q· Could you explain that policy to me?

[9]   A. I don't know that it was ever an implemented

[10] policy  I remember those discussions taking place and how

[11] hard do you want to — do you push collections on a check

[12] that is stamped

[13]   I don't know that we ever got a legal

[14] viewpoint on it, but it was considered

[15]   Q: Who participated in discussions regarding a stamped

[16] check versus a signed check?

[17]   A: All the same individuals who were always on a lot

[18] of these calls  myself, Ian, Chris, Gene Hirai, Jeff Fritz

[19] It varied

[20]   Q  When you are talking about a signed check versus a

[21] stamped check, can you be more specific as to what you mean?

[22]   A  A human signature versus a rubber stamp

[23]   Q· Where on the check would it be signed or stamped?

[24]   A. On the back of the check below the terms and

[25] conditions or the disclosure, whatever it's called  It says

Page 107

[1] on there, "endorsement " I remember that question being

[2] asked, Is a stamp an endorsement?

[3]  MR GOODMAN: Go off the record

[4]  (Pause in the proceeding )

[5]

[6]  **Q**  I would like you to retrieve Exhibit 80 from your

[7] stack

[8]  MR. GOODMAN. We are going back to 80

[9]  **Q·** Do you have Exhibit 80 in front of you?

[10]  **A** Yes

[11]  **Q.** I would like you to look at the e-mail on the top

[12] of Page E-20728

[13]  **A.** Okay

[14]  **Q·** Who is this e-mail from?

[15]  **A** Jeff Fritz

[16]  **Q** Where did he work?

[17]  **A** In Hebard's office in Santa Barbara

[18]  **Q.** Could you read the third paragraph of this e-mail

[19]  **A:** "We just got the MegaPOP invoice for October 75

[20] unique log-ons, 14 personal Web pages "

[21]  **Q:** What, in your view, is a "unique log-on"?

[22]  **A:** A particular end user

[23]  **Q** Could you elaborate?

[24]  **A** Logging on at least one time in a month  In other

[25] words, if an end user logged on a hundred times in a month,

Page 108

[1] it's still one unique

[2]  **Q:** When you say "logging on," what does that mean?

[3]  **A:** They were authenticated on the radio server

[4]  **Q** Whose radio server?

[5]  **A** EPV's

[6]  **Q·** What discussions, if any, did you have with

[7] Mr Eisenberg regarding the number of unique log-ons per

[8] month?

[9]  **A** Well, there were discussions about the lowness of

[10] the number

[11]  **Q.** The lowness of what number?

[12]  **A** The radio server numbers and the StarNet invoices

[13] Unique log-ons on the radio server should equate to the same

[14] number of end users billed on the invoices

[15]  **Q:** Were there conference calls regarding the lowness

[16] of that number?

[17]  **A.** Yes

[18]  **Q** Who participated in those conference calls?

[19]  **A.** Eisenberg, Hebard, Fritz, Hirai, me

[20]  **Q:** What can you recall of those conference calls

[21] regarding usage?

[22]  **A.** That there needed to be a way to increase that

[23] number

[24]  MR. GOODMAN  Exhibit 151

[25]  **Q** Exhibit 151 is Bates-stamped DR-6914 It purports

Page 109

[1] to be a printout of an e-mail from Jeff Fritz dated August

[2] 4th, '99

[3]  Mr Reese, have you had a chance to review

[4] this document?

[5]  **A:** Almost (Reading document ) Okay

[6]  **Q:** Mr Reese, what is the subject of this e-mail?

[7]  **A** Churn

[8]  **Q:** Sorry That fourth line of the document

[9]  **A.** You want the actual subject? Cyber churn data

[10]  **Q:** Could you read the paragraph that begins, "Churn

[11] rate is high "

[12]  **A.** "Churn rate is high  Monthly churn of 23 percent

[13] for July alone  We started July with 24,000 subs and lost

[14] 5,600 of them  Yokes  I have checked onemain.com's IPO

[15] registration statement, and they boasted an average monthly

[16] churn rate of 2 1 percent "

[17]  In parens, "Ian and Dan, when we were talking,

[18] I was mistaken when I said the rate was annualized  It is

[19] not "

[20]  **Q.** Mr Reese, what would you consider to be a high

[21] churn rate in this — what would you consider to be a high

[22] churn rate among ISPs that bill on phone bills?

[23]  **A.** I don't know the answer to that

[24]  **Q:** What discussions were you a part of regarding the

[25] churn rate of Cyberspace?

Page 110

[1]  **A.** Obviously this e-mail and others like it  I don't

[2] remember specifically

[3]  **Q:** Were any of the EPV subsidiaries ever up for sale?

[4]  **A:** Yes

[5]  **Q** Which subsidiaries were up for sale?

[6]  **A.** All of them

[7]  **Q.** Were they all being sold together or individually?

[8]  **A:** There was a broker that was retained to market

[9] EPV — I don't remember if it was EPV, if it was Cyberspace,

[10] if it was SurfISP  All the above, I suspect  Anything is

[11] for sale for the right price

[12]  **Q·** Who was the broker?

[13]  **A:** Tom Millitzer

[14]  **Q:** When did the EPV subsidiaries first become

[15] available to be sold?

[16]  **A:** Sometime late in '99 that idea came along

[17]  **Q.** Can you recall whose idea was it, if you know?

[18]  **A:** I don't remember specifically

[19]  **Q:** What presentations, if any, were you a part of to

[20] potential buyers?

[21]  **A** We were in Dallas  We being myself, Eisenberg,

[22] Hebard, Fritz, Millitzer — in this case the broker — to

[23] attempt to negotiate a sale to Eisa or Edge Holdings or

[24] whatever name of the company it was  That was one of them

[25]  There were a few others  A company in Tacoma

Page 111

[1] that came up to the office on Eastlake, and they sort of got
[2] the dog-and-pony show Log-on America; I don't know if that
[3] was the one or if that was a different one That's a name
[4] that springs to mind
[5]    There were a half a dozen or so The one in
[6] Dallas was the most serious
[7]    Q  Was EPV ever sold?
[8]    A. No
[9]    Q  Were any of the EPV subsidiaries ever sold?
[10]    A  No
[11]    Q  What reasons, if any, did potential buyers give for
[12] not purchasing EPV or any of the EPV subsidiaries?
[13]    A  Well, Edge Holdings was the only one that didn't
[14] seem to scare by the marketing method used
[15]    Q  What concerns did other buyers raise, if any?
[16]    A. During the course of their formal or informal due
[17] diligence, they determined that — I don't know if they
[18] determined — they viewed it as a scam
[19]    Q: Which potential buyers, if any, told you guys that
[20] they thought it was a scam?
[21]    A. I can't remember the names of these companies
[22]    Q  How did you know that some potential buyers thought
[23] it was a scam?
[24]    A  Whoever the company was that came up to the Seattle
[25] office, they were concerned at the marketing — you can just

Page 112

[1] tell by the look on their faces, I guess  I can't remember
[2] all the specifics
[3]    Q  What other reasons, if any, did potential buyers
[4] give for not purchasing the company?
[5]    A  It was always the marketing method that was the
[6] turnoff
[7]    Q  Can you be more specific?
[8]    A  I only recall specific meetings — the one with
[9] Edge in Dallas, the one with the company here, which seems
[10] like it was Log-on America, and then an informal meeting with
[11] some company I don't remember the name of at a trade show in
[12] San Jose I know there were more than that, but that's all I
[13] can recall
[14]    Q. What other reasons, if any, can you recall?
[15]    A: I don't know
[16]    Q  By "the marketing method," what specifically do you
[17] mean?
[18]    A: The solicitation check
[19]    MR. GOODMAN: Exhibit 83 It's Bates-stamped
[20] DR-4683 through 4684
[21]    Q. Mr Reese, did you send the e-mail in the top third
[22] of this page, DR-4683?
[23]    A  It would appear so
[24]    Q  What's the date on this e-mail?
[25]    A. February 4th, 2000

Page 113

[1]    Q: Is this an example of the kind of comments that
[2] were made about forward-thinking consumers?
[3]    A. Yes
[4]    Q  Can you tell from this exhibit whether the BTN/ANIs
[5] listed were people who were billed by one of the EPV
[6] subsidiaries?
[7]    A  I'm sorry Say that again
[8]    Q: Can you tell from this exhibit whether the ANIs
[9] listed were billed by any of the EPV subsidiaries?
[10]    A  It says that these were Cyberspace users or
[11] customers
[12]    Q: What does BTN/ANI stand for?
[13]    A. Billing telephone number and automatic numbering
[14] identification
[15]    Q  You mention in your e-mail at the top of the page
[16] that, "Not a single one of them has ever logged onto our
[17] radio server " How would you know who has logged onto the
[18] radio server?
[19]    A  Because the radio server stores that information
[20]    MR. GOODMAN. Exhibit 95
[21]    MS. JACOBS. Are we done with 83 for the
[22] moment?
[23]    MR. GOODMAN  Yes
[24]    MR. ZOBERST. Is this all one document?
[25]    MR. GOODMAN  Yes

Page 114

[1]    Q: Mr Reese, do you recognize the document, Exhibit
[2] 95?
[3]    A  Yes
[4]    Q: What is it?
[5]    A: This was put together to present to prospective
[6] buyers
[7]    MR. GOODMAN. I'm going to reserve the rest of
[8] my time for redirect
[9]    MR. ZOBERST  I'm at four hours
[10]    MS. DIEMER. So you are saving half an hour
[11] for redirect?
[12]    MR GOODMAN  Yes
[13]    (Pause in the proceeding )
[14]
[15]
[16]                   EXAMINATION
[17]                 BY MS. JACOBS.
[18]    Q  Okay Good afternoon
[19]    A  Good afternoon
[20]    Q: You testified earlier about how long you had worked
[21] for Ian Eisenberg I think you said you started in 1995, is
[22] that correct?
[23]    A  Yes
[24]    MS. JACOBS  I would like to mark this as
[25] Exhibit 180

DON REESE
Vol. 1, February 8, 2002

Case 2:00-cv-01806-RSL   Document 124   Filed 03/05/2003   FEDERAL TRADE COMMISSION   v.
CYBERSPACE.COM, LLC. ET AL.

Page 115

[1]    (Exhibit Number 180 was marked for
[2]  identification )
[3]                     BY MS. JACOBS:
[4]    Q: If you would, turn to the third page, third and
[5]  fourth pages
[6]    A: Okay
[7]    Q: Is this the resume that you used in and around
[8]  December of 2000?
[9]    A I believe so
[10]   Q: Can you tell me what TDS Telecom was?
[11]   A: It was an independent local phone company
[12]   Q: Was that one of Mr Eisenberg's companies?
[13]   A: No
[14]   Q Can you tell me where that was located?
[15]   A. Madison, Wisconsin
[16]   Q. You talked about that earlier today, I believe
[17]   A: Yes
[18]   Q: What is a usage analyst?
[19]   A As I stated earlier, it involved verifying the
[20]  accuracy of the telephone records, going through the billing
[21]  system
[22]   Q. Common Concerns, Inc , you list yourself as vice
[23]  president from 1996 to 1998 Was that a company owned by
[24]  Mr Eisenberg?
[25]   A: Yes I don't know if it was wholly owned

Page 116

[1]    Q: What was Common Concerns?
[2]    A. It was a long-distance carrier
[3]    Q: What market did it serve?
[4]    A: It marketed to gays and lesbians
[5]    MS. GUERARD  Could you slightly raise your
[6]  voice, please?
[7]    MR. LEONARD: I'm having trouble also
[8]    MS. JACOBS: Sorry
[9]    Q. How did it market to that particular segment?
[10]   A. We sent out direct-mail pieces and may have ran
[11]  some print ads as well
[12]   Q Did the company last for two years or more than two
[13]  years?
[14]   A: About two years
[15]   Q. Why was Common Concerns created?
[16]   A: Why was it created?
[17]   Q Yes
[18]   A. It was created to offer chat audiotext services
[19]  under the cover of a long-distance company
[20]   Q. Did it fold in 1998?
[21]   A. No It was sold
[22]   Q: To whom was it sold?
[23]   A I don't remember the names of the buyers
[24]   Q Did you create the company?
[25]   A. What do you mean, "create"?

Page 117

[1]    Q: Well, was it your idea to start the company?
[2]    A No
[3]    Q. Whose idea was it?
[4]    A: Eisenberg's
[5]    Q: Did you file any tariffs that might have been
[6]  needed for this company?
[7]    A: Yes
[8]    Q. You said it also provided chat rooms?
[9]    A The plan was to provide a discount chat if you were
[10]  a Common Concerns customer
[11]   Q: Did it also offer audiotext?
[12]   A. No
[13]   Q Was it limited only to Washington state?
[14]   A: No
[15]   Q: What happened to the profits of Common Concerns?
[16]   A. I have no idea
[17]   Q: Do you know whether any of the profits were
[18]  donated?
[19]   A. Yes, they were
[20]   Q. Do you know what percentage?
[21]   A: It was supposed to be ten percent, as I recall
[22]   Q: I know you have testified to this several times,
[23]  but when did you become COO of the various Eisenberg
[24]  companies?
[25]   A: June of '99

Page 118

[1]    Q: According to your resume, during the year following
[2]  your promotion to COO, you increased the company's bottom
[3]  line by over $1 million That's specifically under Mirage
[4]  Marketing Can you tell us how you did that?
[5]    A: I remember that being told to me by Lia Yagelowich
[6]  When I took over as chief operating officer, the company was
[7]  something like $1 8 million in the hole
[8]    A year later in a discussion with Lia, we had
[9]  talked about the financial gains the company had made I
[10]  think it was still in the hole, but it wasn't in as bad a
[11]  shape as it was before
[12]   Q: What kind of changes did you implement at Mirage?
[13]   A: The efficiencies in every aspect
[14]   Q: Would you agree with me that as COO, it was your
[15]  job to manage the various Eisenberg companies?
[16]   A. In part
[17]   Q: What was the rest of your position? You said "in
[18]  part "
[19]   A: I wasn't the sole manager I shared that
[20]  responsibility with Mr Eisenberg
[21]   Q: I believe earlier you testified that he made
[22]  strategic decisions Did I accurately characterize your
[23]  testimony?
[24]   A: Yes
[25]   Q: In terms of the day-to-day operations of these

---

Page 119

[1] companies, was that more your responsibility than his?

[2] A: Was what more my responsibility?

[3] Q Day-to-day operating decisions, day-to-day

[4] operating issues

[5] A Routine things, yes

[6] Q You worked hard?

[7] A Yes

[8] Q Did a good job?

[9] A Outstanding

[10] Q You were an effective manager?

[11] A In general, yes

[12] Q You live in Arizona now?

[13] A. Yes

[14] Q Who paid for your airfare to come here today?

[15] A: I did

[16] Q When you met with the FCC staff, where did you meet

[17] with them?

[18] A In Washington, D C

[19] Q Who paid your air transportation then?

[20] A: The Federal Trade Commission

[21] Q How long were you in Washington?

[22] A Two days or less

[23] Q When was that again?

[24] A Middle of January

[25] Q Did they pay your hotel expenses?

---

Page 120

[1] A Yes

[2] Q Where did you stay?

[3] A Wyndham

[4] Q Are you here under subpoena? Do you know?

[5] A. Yes

[6] Q Whose decision was it that you would be deposed in

[7] Seattle rather than in Arizona?

[8] Mr ZOBERST I object to that question That

[9] calls for an invasion of the privilege

[10] MS JACOBS It wasn't my intent

[11] Q While you were working for the Eisenberg

[12] companies — that's what I'll refer to as the various

[13] companies over which you were chief operating officer Is

[14] that acceptable to you?

[15] A. Yes

[16] Q In that definition I include the EPV subsidiaries

[17] and EPV, just so we are clear on the definition

[18] A Just so we are clear that I was not chief operating

[19] officer of those companies

[20] Q I understand While you were working — all right

[21] I see your point

[22] During the time that you worked for

[23] Mr Eisenberg — is that a fair way to characterize it? —

[24] did you personally have an ethical problem with the EPV

[25] promotions?

---

Page 121

[1] MS. GUERARD. Objection "Ethical" is

[2] unclear

[3] THE WITNESS No

[4] Q You didn't lay awake nights, staring at the

[5] ceiling, wondering how you could do this, did you?

[6] A How I could do what?

[7] Q: Be engaged in this kind of business practice

[8] A. No

[9] Q Where do you work now?

[10] A YPnet

[11] Q. Do they also market using check promotions?

[12] A Yes

[13] Q: During the time that the EPV subsidiaries were

[14] sending out the check promotions, did you understand that

[15] they had received legal approval?

[16] A: I don't know

[17] Q: Was there ever a time when you or Mr Eisenberg

[18] asked Chris Hebard or anyone on his staff for copies of legal

[19] approvals of these pieces?

[20] A. I don't remember

[21] Q. Did you ever have difficulty obtaining copies of

[22] the marketing materials from Mr Hebard or his organization?

[23] A No

[24] Q: At the time that these promotions were being

[25] mailed, had someone wished to log onto the Internet using the

---

Page 122

[1] Cyberspace offer, was there actually ISP service available to

[2] them?

[3] A: Yes

[4] Q: Was it unlimited access?

[5] A: Yes

[6] Q Do you know whether the price charged for that

[7] Internet access was competitive in the industry?

[8] A: It was probably a little high

[9] Q: We are talking about $19 95 to $29.95 a month for

[10] the most part?

[11] A: I thought it was $29 95

[12] Q: So $29 95 you consider a little high?

[13] A. $5 high

[14] Q: Were efforts made to ensure that you were offering

[15] a quality product?

[16] A: No

[17] Q. Were efforts made to offer DSL as an add-on?

[18] A: Not that I recall

[19] Q Do you remember ever discussing with Mr Hebard and

[20] Mr Eisenberg how to turn the program into a true

[21] consumer-friendly ISP?

[22] A: What do you mean by "consumer friendly"?

[23] Q. Well, why don't I have this marked, and maybe you

[24] can tell me what you meant by it

[25]

---

**Page 123**

[1] (Exhibit Number 181 was marked for
[2] identification.)
[3]                    **BY MS. JACOBS**
[4] Q. Would you take a few minutes to read this
[5] A. Do you want me to read the whole thing?
[6] Q: Yes, please
[7] A: (Reading document.) Okay
[8] Q. Do you recall receiving this e-mail from
[9] Mr Hebard, meaning the first, in time, e-mail that began
[10] this string?
[11] A. Not specifically, but I'm on here
[12] Q: Do you recall writing the response that starts on
[13] Page 1?
[14] A Not specifically
[15] Q. Do you recall now discussions about promoting DSL
[16] as an add-on?
[17] A. I recall other people suggesting that Not me
[18] Q. I'm sorry if I was unclear before I didn't mean
[19] you specifically Do you recall other people suggesting Web
[20] design and Web hosting as additional value add-ons?
[21] A. Yeah
[22] Q How about a premium or sweepstakes to get people to
[23] insert the CD?
[24] A: Yes
[25] Q: Were there discussions about the packaging for the

**Page 124**

[1] CD to make it more likely that a consumer would load it?
[2] A: Yes
[3] Q Did you ever discuss 100 free hours or any number
[4] of free hours to tempt consumers to use the service?
[5] A It's in this e-mail, yes
[6] Q Do you recall it specifically?
[7] A. No
[8] Q: Do you recall specifically changing the packaging
[9] to make it more likely that users would insert the CD?
[10] A: It sounds familiar
[11] Q: How about a premium or sweepstakes? Do you
[12] personally remember discussions about having some kind of a
[13] premium or sweepstakes to encourage people to install the CD?
[14] A: Vaguely
[15] Q. Do you remember any discussions about offering
[16] upgraded Web hosting and e-commerce facilitation?
[17] A Vaguely
[18] Q: Isn't it a fact that throughout the time that these
[19] promotions were being mailed that the company wanted more
[20] people to log on and use the service?
[21] A. No, I wouldn't say that's true
[22] Q. You wouldn't agree with that?
[23] A. Not throughout the entire period, no
[24] Q. What period wasn't that the case?
[25] A: Prior to interest in selling the company

**Page 125**

[1] Q When did interest in selling the company start?
[2] A Late in '99
[3] Q When were the first Cyberspace promotions mailed?
[4] A. Early in '99, February-ish
[5] Q: Are you sure of that date, or is that an
[6] approximate?
[7] A: -ish It's approximate
[8] Q: Did you work hard to see that customer service was
[9] as efficient and effective as it could be?
[10] A At what point in time?
[11] Q. At any time the EPV subsidiaries were mailing the
[12] check promotions
[13] A. I didn't oversee customer service in the beginning
[14] Q: When did you begin to oversee customer service? In
[15] July of '99?
[16] A. Roughly
[17] Q. Beginning in July of '99, did you work hard to
[18] ensure the customer service was as efficient and effective as
[19] possible?
[20] A: No.
[21] Q: No? Did you care?
[22] A Yeah, I cared I wasn't down there in the trenches
[23] every day I was up in my office doing other things and
[24] allowing supervisors to do their jobs
[25] Q. Isn't it a fact that you had numerous conversations

**Page 126**

[1] and e-mails with people about customer service and customer
[2] service problems from July '99 on?
[3] A: Yes
[4] Q: Now, you said earlier that you weren't in charge of
[5] or managing customer service until July '99 Could it have
[6] been a little earlier than that?
[7] A. I don't know that I ever said that I was in charge
[8] of managing customer service
[9] Q: Well, didn't you indicate that you overall had
[10] management authority for the Eisenberg companies?
[11] A: People reported to me
[12] Q Did the supervisors of customer service report to
[13] you?
[14] A. Not directly
[15] Q. Who did they report to directly?
[16] A. Customer service manager
[17] Q: Who did the customer service manager report to?
[18] A: Me There was no organizational chart
[19] Q: I understand that
[20] MS JACOBS I would like to have this marked
[21] as 182 This is very difficult to read, for which I
[22] apologize
[23] (Exhibit Number 182 was marked for
[24] identification.)
[25] MR. ZOBERST: I would like to voir dire him

Page 127

[1] Can you understand what this is?

[2] THE WITNESS: Not yet

[3] MR. ZOBERST Well, if you can't after reading

[4] it, say so

[5] THE WITNESS. (Reading document )

[6] MS GUERARD I have a question On Page 4 of

[7] this document, it indicates "message truncated " Is there

[8] something after —

[9] MS JACOBS. I didn't take anything out

[10] THE WITNESS: Okay I have looked at this

[11]                      BY MS JACOBS.

[12] Q Were you involved in decisions about customer

[13] service in May of '99?

[14] A I don't remember I don't remember this e-mail I

[15] can't tell what this is about

[16] Q Do you recall at any time in '99 or 2000 having

[17] conversations about how best to handle the number of

[18] telephone inquiries you were getting?

[19] A Not specifically

[20] Q· Do you recall conversations about how to handle the

[21] overflow calls?

[22] A Not specifically

[23] Q. Do you remember conversations about bilingual

[24] operators?

[25] A Vaguely

Page 128

[1] Q. Were those conversations about the need to have

[2] people who could handle Spanish-speaking callers?

[3] A Yes

[4] Q: Were there conversations about how calls were

[5] routed in California, customer service calls?

[6] A What do you mean, "routed in California"?

[7] Q. Through their IVR

[8] A It seems like it, yes

[9] Q: Were there discussions of problems with the IVR in

[10] California?

[11] A Yes

[12] Q. Were there discussions of how to fix those

[13] problems?

[14] A I don't know about that because they contracted

[15] that out to some third-party service in California

[16] Q Is that Pinnacle?

[17] A. No I'm talking about their IVR machine

[18] Q I see At some point was customer service

[19] contracted out to Pinnacle?

[20] A Yes

[21] Q Were you involved in those discussions?

[22] A In that I was copied on e-mails, yes

[23] Q. Was the idea behind outsourcing customer service to

[24] improve the quality of that service?

[25] A More so to handle the volume of calls

Page 129

[1] Q: Was Pinnacle more able to handle a higher volume of

[2] calls than Olympic and the Hebard organization were?

[3] A. So they represented I didn't negotiate the

[4] contract with them I didn't find them or anything like

[5] that

[6] Q: Was the intent in contracting with Pinnacle an

[7] attempt to find a company that could be better handle the

[8] volume of customer service calls?

[9] A. The growing pains, yes

[10] Q: Do you recall discussing Pinnacle with Ian?

[11] A. You've got to be more specific than that

[12] Q Do you recall discussing the decision to outsource

[13] customer service to Pinnacle with Ian?

[14] A Not specifically

[15] Q. Do you recall having any conversations with

[16] California to set up how overflow would be transferred from

[17] Seattle to California?

[18] MS GUERARD: Objection as to vague Does

[19] that reference the Hebard organization?

[20] MS JACOBS Yes

[21] THE WITNESS: Vaguely

[22] MS. JACOBS: Mark as 183, please

[23] (Exhibit Number 183 was marked for

[24] identification )

[25] THE WITNESS: (Reading document ) Okay

Page 130

[1]                      BY MS. JACOBS.

[2] Q. Do you recall having e-mail correspondence with

[3] Diane Capasso in or about September of '99 about how to set

[4] up a facility in California for the Hebard organization to

[5] handle overflow calls?

[6] A. I recall what I read here in this e-mail

[7] Q: Do you recall receiving the e-mail?

[8] A· I don't recall specifically receiving this e-mail

[9] Q Do you recall writing the portion under

[10] Donr@usnetwork com wrote?

[11] A I believe I wrote it

[12] Q: Do you recall discussing the hours that the

[13] California overflow customer service facility would be open?

[14] A. I was more informing them of the hours that it

[15] would need to be

[16] Q Did you also inquire about the number of customer

[17] service representatives that would be available?

[18] A· Yes

[19] Q. Did you also discuss with them when they would be

[20] available to take these calls, meaning the date?

[21] A. I don't know

[22] Q· Do you see Ms Capasso's e-mail to you at the top?

[23] A. Yes

[24] Q Is she advising you when they will be available to

[25] take overflow calls?

Page 131

[1]  A: It appears so

[2]  Q  Was the intent behind the Hebard organization

[3]  taking overflow calls to ensure the customers received prompt

[4]  customer service?

[5]  A: In part

[6]  Q  Was it to ensure that the customer service function

[7]  was more efficient?

[8]  A: No

[9]  Q· Was it intended to ensure the customers reached an

[10]  operator more quickly?

[11]  A  Yes

[12]  (Exhibit Number 184 was marked for

[13]  identification )

[14]  BY MS JACOBS.

[15]  Q.  Were there provisions made for having customer

[16]  service agents who could speak Spanish to handle customer

[17]  service calls?

[18]  A: Where at?

[19]  Q. I'm just asking you generally if there were

[20]  provisions made

[21]  A: In Mexico or in Chris's office? Where were you

[22]  talking about?

[23]  Q  I'm asking whether Cyberspace customer service

[24]  calls, the caller spoke Spanish, were provisions made to have

[25]  Spanish operators?

Page 132

[1]  A: I don't know Not in the Seattle office

[2]  Q: Were you ever advised that there were

[3]  Spanish-speaking operators in California?

[4]  A. Apparently on September 27 of 1999, I was by

[5]  Diane Capasso

[6]  Q· Do you recall receiving this e-mail?

[7]  A: No

[8]  Q. Do you recall ever taking the position, in

[9]  litigation on behalf of Ian Eisenberg and French Dreams, that

[10]  the California customer service center had to remain open

[11]  because that was the only place at which Cyberspace customers

[12]  could receive customer service in Spanish?

[13]  A: No, I don't remember that

[14]  Q. You don't recall that? Do you recall being angry

[15]  at Mr Hebard for trying to close the California customer

[16]  service center because that would eliminate any ability to

[17]  deal with Spanish-speaking callers?

[18]  A: No

[19]  Q  Do you recall what the callback feature was on the

[20]  Cyberspace customer service queue?

[21]  A: Callback feature?

[22]  Q  Yes

[23]  A. No

[24]  MS. JACOBS: I would like to have this marked

[25]  as 185

Page 133

[1]  (Exhibit Number 185 was marked for

[2]  identification )

[3]  BY MS. JACOBS.

[4]  Q: Could you read the document that's been marked as

[5]  Exhibit 185

[6]  A: (Reading document ) Okay

[7]  Q  Do you recall receiving this e-mail?

[8]  A: No

[9]  Q: Does this refresh your recollection in any way

[10]  about any callback feature?

[11]  A: No

[12]  Q· Do you know whether it was possible for people on

[13]  hold for customer service to push a button and request that

[14]  they be called back when there was an operator available?

[15]  A: Not out of the Seattle office, I don't remember

[16]  that feature being available

[17]  Q: What about California? Do you know if that was

[18]  available there?

[19]  A: I don't know

[20]  Q  Ms Capasso, by the way, was in California, or was

[21]  she in Seattle?

[22]  A: California

[23]  Q: Did you monitor how many calls were coming into the

[24]  various customer service centers?

[25]  A. Not regularly

Page 134

[1]  Q  Did you ever monitor it?

[2]  A: I may have asked for ACD reports

[3]  Q· What is an ACD report?

[4]  A· It's a report that comes off a PBX or IVR machine

[5]  It tells call accounts, average durations, or something like

[6]  that

[7]  MS. JACOBS· Let's mark this document 186,

[8]  please

[9]  (Exhibit Number 186 was marked for

[10]  identification )

[11]  THE WITNESS: (Reading document ) Okay

[12]  BY MS. JACOBS.

[13]  Q. Do you recall asking Gene Hirai in or about

[14]  November of '99 how they were handling their call load?

[15]  A· I remember this e-mail

[16]  Q. You do?

[17]  A. Yes

[18]  Q: Do you recall talking to him about how they and you

[19]  were handling the call loads for customer service?

[20]  A: In this e-mail, yes

[21]  Q  You testified earlier that you were sometimes

[22]  involved in individual complaints, I believe Am I correct?

[23]  A. From consumers?

[24]  Q: Yes

[25]  A: Involved? Yes

**Min-U-Script®**

FEDERAL TRADE COMMISSION v.
CYBERSPACE.COM, LLC, et al.    Case No. C00-01806-RSL    Document 124    Filed 03/07/02    Page 154 of 184

DON REESE
Vol. 1, February 8, 2002

Page 135

[1]    MS JACOBS I would like to have this marked
[2] as 187
[3]    (Exhibit Number 187 was marked for
[4] identification )
[5]    THE WITNESS (Reading document ) Okay
[6]    BY MS JACOBS·
[7]    Q Do you recall receiving this e-mail in December of
[8] 1999?
[9]    A No, but I remember this person
[10]    Q Do you recall Mr Eisenberg personally getting
[11] involved in this matter?
[12]    A. Yeah, because I think he had Eisenberg's direct
[13] line or something like that
[14]    Q Do you recall Ian telling California to shut down
[15] their IVR because of problems with the IVR?
[16]    A I remember there being problems with the IVR I
[17] don't recall whether Ian instructed them to shut it down
[18]    MS JACOBS I would like to have this marked
[19] as 188
[20]    (Exhibit Number 188 was marked for
[21] identification )
[22]    MS. JACOBS· I'll represent to the parties
[23] that there was text at the very top in the white part, which
[24] was sent to Lew Rose, so I deleted it
[25]    THE WITNESS (Reading document ) Do you want

Page 136

[1] me to read every line or just the gist of it?
[2]    BY MS. JACOBS:
[3]    Q. Well, whatever you feel comfortable with
[4]    A I feel comfort with it
[5]    Q Do you recall this series of e-mail?
[6]    A. Yeah
[7]    Q Do you recall that a company stated that it had
[8] cancelled service repeatedly but was still being billed?
[9]    A: Yes
[10]    Q: Do you recall that Mr Eisenberg concluded that
[11] this was due to a problem in the California IVR?
[12]    A. Yes
[13]    Q Do you recall Mr Eisenberg directing California in
[14] or about January of 2000 to shut down their IVR?
[15]    A No
[16]    Q Would you turn to the second page
[17]    A Yes
[18]    Q Middle of the second page, do you see an e-mail
[19] from Ian saying in capital letters, "GET RID OF THE IVR IN
[20] CALIFORNIA"?
[21]    A Yes
[22]    Q Do you recall Mr Eisenberg taking that position?
[23]    A Not specifically, but apparently he did
[24]    Q Did you personally review regulatory complaints?
[25]    MS GUERARD Clarification Is that

Page 137

[1] complaints to regulatory agencies?
[2]    MS. JACOBS Yes, regulators
[3]    THE WITNESS. To or from regulators?
[4]    Q: Well, they were made to and sent to you by
[5] regulators
[6]    A: Some of them, a sampling
[7]    MS. JACOBS· I would like to have this marked
[8] as 189
[9]    (Exhibit Number 189 was marked for
[10] identification )
[11]    THE WITNESS: (Reading document ) Okay
[12]    MS GUERARD I'm not finished yet, so just
[13] let me finish
[14]    BY MS. JACOBS·
[15]    Q· Do you recall someone named Carrie in Chris
[16] Hebard's organization?
[17]    MS. GUERARD Just a second I'm not done
[18] (Reading document ) Thank you
[19]    Q: Did Carrie work for the Hebard organization?
[20]    A: Yes
[21]    Q. What kind of work did she do for them, if you know?
[22]    A: Customer service
[23]    Q· Did she send written responses to regulators to
[24] Cyberspace complaints?
[25]    A To regulators for Cyberspace complaints? Yes, I

Page 138

[1] believe so
[2]    Q· Did you ask Carrie repeatedly to send you copies of
[3] all complaints that she received?
[4]    A: Eisenberg and I both asked her repeatedly
[5]    Q: In or about March of 2000, did you alert Chris and
[6] Diane that you were not receiving those complaints?
[7]    A: According to this e-mail, I did, yes
[8]    Q· Isn't it a fact that you wanted to see those
[9] complaints to make sure that they were being addressed
[10] properly?
[11]    A. Not so much that as to have the copies in our files
[12] so that if we got a follow-up call from the same customer,
[13] that our reps would be able to reference them in the file
[14] cabinet to see how they were replied to
[15]    Q. Did you ever make recommendations on how to make
[16] the time spent on hold by customer service callers more
[17] pleasant?
[18]    A: Did I?
[19]    Q. Yes
[20]    A: I don't recall
[21]    MS. JACOBS 190
[22]    (Exhibit Number 190 was marked for
[23] identification )
[24]    THE WITNESS. (Reading document ) Okay
[25]    MS. GUERARD· Just one second, please Let me

---

**Page 139**

[1] quickly finish Okay

[2]          BY MS. JACOBS

[3]   Q: Do you recall this e-mail, first of all?

[4]   A: I do now

[5]   Q Do you recall indicating that hearing "All reps are

[6] busy Please hold" repeatedly with no break was irritating?

[7]   A. It was to me

[8]   Q: Did you suggest that hold music be used instead?

[9]   A: I asked if it could be

[10]   Q· Also commented on the sound quality of the ring, is

[11] that correct?

[12]   A Yes

[13]   MS JACOBS. I would like to have this marked

[14] as 191

[15]   (Exhibit Number 191 was marked for

[16] identification )

[17]   THE WITNESS (Reading document ) Okay

[18]          BY MS. JACOBS.

[19]   Q. Do you recall sending or receiving this e-mail?

[20]   A. Not specifically, but I believe I did

[21]   Q Do you recall taking steps in or about June of 2000

[22] to ensure that SurfISP customer service callers would speak

[23] to a Spanish-speaking operator?

[24]   A I made aware that it was a problem if there wasn't

[25] one I didn't take steps to ensure that there ever was one

---

**Page 140**

[1]   Q. Did you make suggestions as to how such callers

[2] could be routed to a Spanish-speaking customer service agent?

[3]   A. No I asked for a number that they could be routed

[4] to

[5]   Q· In about February of 2000, did you meet with

[6] Pinnacle?

[7]   A: I don't remember meeting with Pinnacle, no

[8]   Q: Do you recall the name Cathy Blanchard?

[9]   A No

[10]   MS JACOBS: I would like to have this marked

[11] as 192

[12]   (Exhibit Number 192 was marked for

[13] identification )

[14]   THE WITNESS. (Reading document ) Okay

[15]          BY MS JACOBS.

[16]   Q First of all, do you remember receiving this

[17] e-mail?

[18]   A No

[19]   Q. Does this change your recollection at all about

[20] meeting with Cathy Blanchard, one of the owners of Pinnacle?

[21]   A I didn't meet with Cathy Blanchard

[22]   Q You did not meet with Cathy Blanchard?

[23]   A: No, I did not

[24]   Q· Earlier today you were asked about a board of

[25] directors resolution If I could see that document? It's

---

**Page 141**

[1] 176 Do you see on Exhibit 176 that the meeting was convened

[2] at 11 00 a m ?

[3]   A: Yes

[4]   Q· And it concluded at 11 10?

[5]   A: Yes

[6]   Q· On what date does that document indicate the

[7] meeting was held?

[8]   A June 15, '99

[9]   Q: Is it possible that on the morning of June 15, '99,

[10] you, Ian, and Lia were in the same place and discussed the

[11] resignation of Danny McGinnes and your appointment as the new

[12] COO?

[13]   A. No

[14]   Q: It's not possible?

[15]   A It didn't happen

[16]   Q. I'm asking if it was possible the three of you were

[17] in the same place and discussed this

[18]   MR. ZOBERST: It's argumentative He already

[19] said it didn't —

[20]   THE WITNESS: It didn't happen

[21]   Q How often in the six years that you worked at

[22] Eastlake Avenue were you, Ian, and Lia in the same room?

[23]   A I have no idea

[24]   Q Would it likely be thousands of times?

[25]   A. I have no idea

---

**Page 142**

[1]   Q Did it happen once a day? Once a week?

[2]   A. Once a week.

[3]   Q: You worked there, say, 50 weeks a year for six

[4] years?

[5]   A· You do the math. What's the question?

[6]   Q: I'm asking you That would be 50 weeks a year for

[7] six years?

[8]   A: Okay

[9]   Q· You can definitively state that one of those

[10] occasions was not on the morning June 15, 1999?

[11]   A I can say that the meeting that that document

[12] refers to didn't happen

[13]   Q. I am not the asking that question. I am asking

[14] whether you, Lia, and Ian could have been in the same room

[15] from 11 00 to 11 10 on the morning of June 15, '99

[16]   MR ZOBERST. Argumentative He has answered

[17] the question

[18]   MS. JACOBS. No, he has not answered the

[19] question

[20]   Q· Is that possible?

[21]   MR. ZOBERST Same objection

[22]   THE WITNESS: It's possible

[23]   Q Thank you Going back to Pinnacle, it's your

[24] testimony that you never attended that meeting?

[25]   MS GUERARD: Objection There is no

---

Page 143

[1] indication there is a meeting

[2] THE WITNESS There was no meeting It was a

[3] telephone conference

[4] Q. So you had a telephone conference with

[5] Ms Blanchard?

[6] A· Yes

[7] Q· Was Mr Hirai on the phone?

[8] A Yes

[9] Q Did you discuss the capacity of Pinnacle for

[10] handling customer service calls?

[11] A Yes

[12] Q Did you discuss with her how many customer service

[13] representatives they had?

[14] A Yes

[15] Q. Did you believe that Pinnacle was able to handle

[16] the customer service function more effectively than the

[17] Seattle and California operations had been?

[18] A No That wasn't the question

[19] Q That wasn't the purpose? How much were you paying

[20] customer service representatives?

[21] A· I don't remember

[22] MS GUERARD I want a clarification When

[23] you refer to "you," do you mean the entire organization? The

[24] Seattle organization?

[25] MS JACOBS: Yes

Page 144

[1] Q· Was it more or less than $22 an hour?

[2] A. I would think less

[3] Q Considerably less, correct?

[4] A. It would be less

[5] Q Is it possible you were paying them $10 an hour?

[6] A I wasn't paying them

[7] Q "You" meaning the Eisenberg organization Was it

[8] possible it was less than $10?

[9] A It's possible

[10] Q Do you recall that Pinnacle was going to cost $22

[11] an hour?

[12] A I don't remember that

[13] Q Do you recall that Pinnacle could expand its

[14] capacity if the volume of Cyberspace calls grew?

[15] A. Yes

[16] Q· Was that an advantage to using Pinnacle?

[17] A Over?

[18] Q Over the existing system

[19] A Olympic?

[20] Q Yes

[21] A Yes

[22] Q You testified earlier that complaints from

[23] consumers were often along the lines of they are denying all

[24] knowledge of having subscribed, is that correct?

[25] A Yes

Page 145

[1] Q· In fact, you never saw a complaint where someone

[2] wrote, I read the back of the check, but I misunderstood it,

[3] did you?

[4] A: I'm sorry Ask that again

[5] Q. One kind of complaint was, I knew nothing about

[6] this, and suddenly it appears on my phone bill, correct?

[7] A Correct

[8] Q. Sometimes the complainer remembered that there was

[9] a check that they deposited and sometimes they didn't, is

[10] that correct?

[11] A Correct

[12] Q I'm asking you isn't it correct that you never

[13] received complaints that said, I read the back of the check

[14] before I negotiated it, but I didn't understand it

[15] MS GUERARD: When you say "you," you mean

[16] Mr Reese personally

[17] MS. JACOBS. No I mean the customer

[18] MS GUERARD· In other words, that he never

[19] did, he being Mr Reese —

[20] MS. DIEMER: Is there an actual objection?

[21] MS. GUERARD: Yes It's unclear

[22] MR. LEONARD: I object to these objections,

[23] and I ask that we conduct — the objections need to be

[24] concise, just enough to make a record and nothing more

[25] MS. GUERARD: Objection, vague

Page 146

[1] THE WITNESS I don't understand your

[2] question

[3] Q Did you ever see a complaint where someone said, I

[4] read the back of the check, but I didn't understand what it

[5] said?

[6] A I don't remember

[7] Q You don't remember ever seeing one?

[8] A I don't remember hearing that.

[9] Q: Thank you Did you ever handle 900 pay-per-call

[10] complaints?

[11] A: Yes

[12] Q: Is it common in 900 pay-per-call complaints for a

[13] consumer to deny all knowledge of the 900 call?

[14] A. Yes

[15] Q. If a charge for a 900 call appears on the

[16] consumer's phone bill, isn't it overwhelmingly likely that

[17] the call was placed from that consumer's home?

[18] MS. GUERARD· Objection, vague

[19] THE WITNESS. I don't know if it was placed

[20] from that consumer's home or not

[21] Q If a call appears on a consumer's phone bill, you

[22] don't know whether or not that call — home phone bill, you

[23] don't know whether or not that call was made from the

[24] consumer's home?

[25] A: Made from that phone I don't know if it was

Page 147

[1] consumer that owns that phone

[2]     Q. That's fine I'm asking you if you have a phone

[3] with a given number and a 900 charge appears on the bill for

[4] that phone, can you conclude that the call was made from that

[5] phone?

[6]     A: Yes

[7]     Q. Or one of its extensions?

[8]     A: No From that phone

[9]     Q: If you have an extension in another room in the

[10] house that's on the same line, it would be billed to the same

[11] phone number, wouldn't it?

[12]    A Yes It's not really an extension It's on the

[13] same line

[14]    Q: Despite the fact that calls appear on consumer's

[15] phone bills for 900 pay-per calls, isn't it a fact that

[16] consumers often deny that the call was ever made?

[17]    A: Yes

[18]    Q: They deny all knowledge of the call?

[19]    A. Yes

[20]    Q And in many cases the consumer is wrong?

[21]    A: Is wrong?

[22]    Q· Yes, when they say the call was never made

[23]    A· I guess

[24]    Q: Have you ever come to the conclusion that a

[25] consumer might have lied?

Page 148

[1]     A: Yes

[2]     Q Or committed fraud?

[3]     A: Lied

[4]     Q· Or tried to defraud the company that billed them?

[5]     A: Sure

[6]     Q. In fact, it's fairly common in the 900 industry, is

[7] it not?

[8]     A. It is

[9]     Q: Of course, no one has ever called an adult line in

[10] the history of the world

[11]    MS JACOBS: Let's go off the record

[12]    (Pause in the proceeding )

[13]

[14]    Q· Were efforts made, during the time that the check

[15] solicitations were being mailed, to increase usage of the

[16] Internet service?

[17]    A. Attempts were made

[18]    Q: Were changes made to the fulfillment disk to try to

[19] increase usage?

[20]    A. The changes were made to the sleeve the fulfillment

[21] disk was in

[22]    Q: Do you recall a new master disk being — I'm not

[23] sure if I'm using the right term — burned?

[24]    A Well, they were burned frequently New ones were

[25] with updated numbers in them I'm sorry There was a

Page 149

[1] particular program called "Hot Box" that was geared toward

[2] that endeavor

[3]     Q: Were efforts made to determine whether actual

[4] Internet usage might have been higher than what the radio

[5] servers were reporting?

[6]     A· I'm not sure I understand your question

[7]     Q. Was there ever a time, when the check promotions

[8] were being mailed, that it was determined that MegaPOP was

[9] underreporting usage?

[10]    A No

[11]    Q: I would like to show you Exhibit 193

[12]    (Exhibit Numbers 193 and 194 were marked for

[13] identification )

[14]    MS. JACOBS: I apologize I gave you the

[15] wrong one  193 was not the one I want to go to I'm also

[16] going to mark 195, which is dated December 11, 1999

[17]    (Exhibit No 195 was marked for

[18] identification.)

[19] (Proceeding adjourned at 5 15 p m )

[20]    (Signature reserved )

[21]

[22]

[23]

[24]

[25]

Page 150

[1]        C E R T I F I C A T I O N O F R E P O R T E R

[2]  DOCKET/FILE NUMBER· Case No C00-1806-L

CASE TITLE Federal Trade Commission v Cyberspace com,
[3] LLC , et al

     DATE: February 8, 2002

[4]

[5]

[6] I HEREBY CERTIFY that the transcript contained

     herein is a full and accurate transcript of the notes taken

[7] by me at the deposition on the above cause to the best of my

     knowledge and belief

[8]

        DATED: February 13, 2002

[9]

[10]

        Toni L Ziomas, C S R

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

FEDERAL TRADE COMMISSION v.
CYBERSPACE.COM, LLC, et al.
DON REESE

Case 2:00-cv-01806-RSL   Document 124   Filed 03/07/02   Page 158 of 184
Vol. 13, February 8, 2002

**Page 151**

[1]                CERTIFICATE OF DEPONENT
[2] I hereby certify that I have read and examined the
    foregoing transcript, and the same is a true and accurate
[3] record of the testimony given by me
    Any additions or corrections that I feel necessary,
[4] I will attach on a separate sheet of paper to the original
    transcript
[5]
[6]
[7]                Don Reese
[8] I hereby certify that the individual representing
    himself to be the above-named individual, appeared before me
[9] this _____ day of _____, 2002, and
    executed the above certificate in my presence
[10]
[11]
[12]          NOTARY PUBLIC IN AND FOR
[13]
[14]
[15] MY COMMISSION EXPIRES
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 152**

[1]  **WITNESS: DON REESE**
[2]  DATE  FEBRUARY 8, 2002
[3]  CASE  FEDERAL TRADE COMMISSION VS CYBERSPACE, ET AL
[4]
[5]     Please note any errors and the corrections thereof on this
[6]  errata sheet The rules require a reason for any change or
[7]  correction It may be general, such as "To correct
[8]  stenographic error," or "To clarify the record," or "To
[9]  conform with the facts "
[10]
[11]     **PAGE LINE CORRECTION REASON FOR CHANGE**
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

# In The Matter Of:

*FEDERAL TRADE COMMISSION   v.*
*CYBERSPACE.COM, LLC. ET AL.*

---

*DON REESE, PART 2*
*February 8, 2002*

---

*For The Record, Inc.*
*Court Reporting and Litigation Support*
*603 Post Office Road*
*Suite 309*
*Waldorf, MD   USA   20602*
*(301) 870-8025     FAX: (301) 870-8333*

Original File 20208RE2.ASC, 51 Pages
Min-U-Script® File ID: 2432623005

## Word Index included with this Min-U-Script®

Page 153

[1]
[2]            FEDERAL TRADE COMMISSION
[3]                    INDEX
[4] WITNESS              EXAMINATION
[5] Don Reese           By Ms Jacobs - 156
[6]                By Mr Leonard - 174
[7]                By Mr Goodman - 185
[8]                By Mr Leonard - 198
[9]
[10] EXHIBITS   FOR ID   DESCRIPTION
[11] 196      161      E-mail, 12-15-99
[12] 197      163      E-mail, 2-6-02
[13] 198      164      E mail, 2-16-00
[14] 199      164      E-mail, 2-16-00-02
[15] 200      166      E-mail, 4-07-99
[16] 201      170      Letter, 1-23-02
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 154

[1]
[2]            UNITED STATES DISTRICT COURT
[3]        FOR THE WESTERN DISTRICT OF WASHINGTON
[4] FEDERAL TRADE COMMISSION,        )
[5]        Plaintiff,                )
[6]    vs                            )  Case No C00-1806-L
[7] CYBERSPACE COM, LLC,             )
    FRENCH DREAMS,                   )
[8] COTO SETTLEMENT,                 )
    ELECTRONIC PUBLISHING            )
[9] VENTURES, LLC,                   )
    OLYMPIC TELECOMMUNICATIONS,)
[10] INC ,                           )
    IAN EISENBERG,                   )
[11] and                            )
    CHRIS HEBARD,                    )
[12]
            Defendants  )
[13]
[14]            Friday, February 8, 2002
[15]
[16]            915 Second Avenue
[17]            Suite 2896
[18]            Seattle, Washington
[19]
[20]  The above-entitled matter came on for deposition
[21] pursuant to notice, at 5 30 p m
[22]
[23]
[24]
[25]

Page 155

[1] APPEARANCES
[2] ON BEHALF OF THE FEDERAL TRADE COMMISSION
    Ms  Collot Guerard
[3] Mr  Michael A. Goodman
    Federal Trade Commission
[4] Bureau of Consumer Protection
    600 Pennsylvania Avenue., NW
[5] Washington, DC 20580
[6]
    ON BEHALF OF THE EISENBERG DEFENDANTS
[7] Ms  Jane B  Jacobs
    Klein, Zelman, Rothermel & Dichter
[8] 485 Madison Avenue
    New York, New York, 10022
[9] (212) 935-6020
[10] Ms  Kathryn S  Diemer
    Campeau Goodsell Diemer
[11] 38 West Santa Clara Street
    San Jose, California 95133
[12] (408) 295-9555
[13] ON BEHALF OF CHRIS HEBARD
    Mr  Ernest Leonard
[14] Friedman & Feiger
    5301 Spring Valley Road 200
[15] Dallas, Texas 75240
    (972) 788-1400
[16]
    ON BEHALF OF DEPONENT
[17] Mr  William R  Zobenst
    Attorney at Law
[18] 600 Stewart Street 305
    Seattle, Washington 98101
[19] (206) 386-7393
[20]
[21]
[22]
[23]
[24]
[25]

Page 156

[1]
[2]                    **PROCEEDINGS**
        (5 30 p m.)
[3] (The witness was duly sworn.)
[4]                    **DON REESE**
[5] having been first duly sworn, was examined and
[6] testified as follows
[7]          **EXAMINATION BY MS. JACOBS:**
[8]
[9]     MS. JACOBS: I have no idea how these are
[10] marked
[11]              BY MS. JACOBS.
[12]     Q: Have you read the e-mail chains that start
[13] with Saturday December 11th and Monday February 14th?
[14]     MS. DIEMER: That's 195 is December 11th
[15] and —
[16]     MS. GUERARD: Could we just clarify?
[17]     MR. ZOBERST: 194 and 195
[18]     MS. JACOBS. No, I think it's 194 and 196
[19]     MS. DIEMER: No, 195 is December 11th —
[20]     MS. JACOBS. Thank you
[21]     MS. DIEMER: — at the top
[22]     MS. GUERARD: Will you start with
[23] Exhibit 173 and state what that is
[24]     MS. JACOBS. 173?
[25]     MS. GUERARD· 193 Excuse me. What date is

Page 157

[1] that?
[2]     MS DIEMER: Okay. 193 is Tuesday,
[3] February 8th
[4]     MS. GUERARD: Okay
[5]     MS. DIEMER: 194 is February 14th, and 195
[6] is December 11th
[7]     MS. GUERARD: February 14, 2000 Okay
[8]     MS. DIEMER: February 14th is —
[9]     MS. JACOBS. Okay I got it I got it.
[10]     MS. DIEMER: 194.
[11]     MR. ZOBERST: 194
[12]              BY MS JACOBS·
[13]     Q. Have you read the documents that have been
[14] marked as exhibits 194 and 195?
[15]     A: Yes
[16]     Q· Is it still your testimony that there was
[17] never any investigation of whether MegaPop might be
[18] underreporting usage?
[19]     A: Yes
[20]     Q: I'm not asking you whether or not MegaPop
[21] actually was underreporting usage but whether any
[22] investigation was made as to whether it was
[23] underreporting usage.
[24]     A: I understand
[25]     Q: Okay Can you turn to Exhibit 194

Page 158

[1]     A: Okay
[2]     Q: Do you recall receiving this e-mail?
[3]     A  No
[4]     Q· Do you recall the issues discussed in the
[5] e-mail?
[6]     A. Yes
[7]     Q· Okay. I'd like you to turn to three-quarters
[8] of the way down the page, the paragraph that begins
[9] "More importantly, Seattle has been in touch with
[10] MegaPop "
[11]     A  Okay
[12]     Q· All right Is it your testimony that there
[13] were — let me ask you differently
[14]     Was it ever discovered that Starnet,
[15] MegaPop's underlying provider, was not reporting packet
[16] information to your server?
[17]     A  Yes.
[18]     Q: And did that result in an underreporting of
[19] the number of people who were logging on?
[20]     A. No
[21]     Q. What was the effect of MegaPop or Starnet not
[22] reporting packet information to your server?
[23]     A: It caused the server, the radius server, to
[24] not record all users
[25]     Q· Okay So is it correct that the radius

Page 159

[1] server — let me back up
[2]     Are you referring to the radius server that
[3] was at Starnet or the radius server in another
[4] location?
[5]     A: The radius server at 2722 Eastlake Avenue
[6]     Q: Was the number, the number of log-ins
[7] reported on the Eastlake server artificially low
[8] because of this issue?
[9]     A. Yes This is a more than one-part issue.
[10]     Q: Okay But I'm only asking you about that
[11] part
[12]     Were there changes made to the CD master to
[13] make it more user friendly?
[14]     A· According to this e-mail.
[15]     Q  Do you recall that independently of this
[16] e-mail?
[17]     A· I recall — no, I don't. I don't
[18]     Q: Do you recall, independent of this e-mail,
[19] whether the instructions on the CD were changed to make
[20] them easier to follow?
[21]     A· I remember people complaining that they
[22] couldn't load the CD I don't recall the instructions
[23] were changed to appease those people
[24]     Q: Okay And the people who were complaining
[25] that it was difficult to load, were those people who

Page 160

[1] work for Chris Hebard?

[2] A. Primarily

[3] Q. And did you agree with their complaints about
[4] the CD being easy to load or difficult to load?

[5] A. I was able to make it work

[6] Q In fact, you suggested that one person who
[7] was having a problem might just be an idiot?

[8] A· Probably more than once

[9] Q Yeah Okay Was there a promotion started
[10] on or about February of 2000 to mail a $20.00 check to
[11] increase usage of the internet service?

[12] A There was a program I don't remember the
[13] date

[14] Q. Okay Who suggested that $20.00 incentive?

[15] A: I don't remember who had the original idea.

[16] Q Could it have been Ian?

[17] A· Could have been

[18] MS JACOBS Okay I have a problem. When
[19] these were copied, I only wanted this covered because
[20] it's an attorney-client communication, and
[21] unfortunately, they covered everything which results in
[22] a subject line and nothing else

[23] MR ZOBERST· So you're going to ask him
[24] about a blank sheet of paper?

[25] MS. JACOBS: It would be difficult

Page 161

[1] MS. DIEMER: She is very special

[2] MS. JACOBS What I can do is uncover the
[3] part that wasn't supposed to be covered and then mail
[4] the correct exhibit to everyone

[5] MS GUERARD. I may recognize it I'm
[6] pretty familiar with things

[7] MS JACOBS· Okay Let me take off what
[8] should not be here

[9] (Brief off-record discussion )

[10] MS. GUERARD. What's the date of that, and
[11] what exhibit is that going to be?

[12] MS. JACOBS That is going to be 196, I
[13] believe

[14] MS. GUERARD Can you just give me the date
[15] so I'll have it?

[16] MS DIEMER You can give her the header.

[17] MS. JACOBS Here's the header

[18] MS. DIEMER: There, there And just know
[19] that we're going to replace that

[20] MS. GUERARD: Okay

[21] MS. JACOBS I'd like to have this marked
[22] as Exhibit 196

[23] (Reese Exhibit No 196 marked for
[24] identification )

[25] BY MS. JACOBS.

Page 162

[1] Q: I'd like to you read the uncovered portion of
[2] Exhibit 196

[3] A: Okay

[4] Q May I see? Okay Do you recall receiving
[5] this e-mail?

[6] A. No

[7] Q Do you recall —

[8] A: I believe I received it.

[9] Q Do you recall Ian making the suggestion set
[10] forth in the second e-mail on this page?

[11] A. Not specifically

[12] Q· Do you recall him suggesting that Cyberspace
[13] pay $20 00 to people to try the service?

[14] A· I remember someone suggesting it I don't
[15] remember it specifically coming from Eisenberg

[16] MS. JACOBS: And again, I'm taking this
[17] with me to replace

[18] MS. GUERARD: Okay

[19] BY MS. JACOBS:

[20] Q. Was there ever a concern that people were
[21] going to the Cyberspace Hot Bucks page, entering an ID
[22] and password from the fulfillment to get their Hot
[23] Bucks but not logging in through MegaPop?

[24] A: Sounds familiar

[25] Q: Let me ask you another question Do you

Page 163

[1] recall that there were any people who contacted either
[2] you or the Hebard organization because they wanted an
[3] e-mail address that was whatever at Cyberspace com?

[4] A. No, I don't remember

[5] Q: Do you recall anyone enrolling for the
[6] service other than through a check promotion?

[7] A: There may have been one or two

[8] MS. JACOBS· I'd like to have this marked
[9] as 197

[10] (Reese Exhibit No 197 marked for
[11] identification )

[12] BY MS. JACOBS.

[13] Q· I'd like you to take a look at Exhibit 197.

[14] A: Okay

[15] Q. Was it possible to get the Hot Bucks
[16] fulfillment, the $20 00, without logging on through
[17] Starnet?

[18] A: It was possible.

[19] Q: Do you recall receiving the e-mail that's
[20] been marked as Exhibit 197?

[21] A: It looks like I wrote it.

[22] Q· Excuse me Do you recall writing the e-mail?

[23] A: Vaguely

[24] MS. JACOBS Let's have this marked as 198

[25] While we're at it, why don't we do 199

---

Page 164

[1]     (Reese Exhibits No 198 and 199 marked
[2] for identification.)
[3]     MS. GUERARD. Can you just identify for the
[4] record which one's No 198 and which one is 199
[5]     MS. JACOBS: 198 is — well, they're both
[6] dated February 16th
[7]     MS. GUERARD: Right
[8]     MS. JACOBS. 198 at the top is from
[9] Chris — well, they're both from Chris Hebard
[10]     MS. GUERARD: Does one have two icons?
[11]     MS. JACOBS: Yes, 199 has two icons
[12]     A: Okay
[13]               BY MS. JACOBS
[14]     Q: All right. Do you recall writing the second
[15] or lower e-mail on Exhibit 198?
[16]     A: Vaguely
[17]     Q: Okay Do you recall receiving the e-mail
[18] that's been marked as 199?
[19]     A: No
[20]     Q. Was it your expectation that the $20.00
[21] promotion would increase usage?
[22]     A: My personal expectation?
[23]     Q. Uh-huh
[24]     A: No
[25]     Q: What does "Once completed and verified, we

---

Page 165

[1] should go nuts on the $20 00 promo" mean?
[2]     A. Well, up 'till now, we were testing There
[3] was no point in mailing out the pieces until the
[4] mechanics of it worked.
[5]     Q: What does "Once completed and verified, we
[6] should go nuts on the $20 00 promo" mean?
[7]     A: It means Hebard and Eisenberg wanted to send
[8] out a lot of these things, and I'm saying go for it
[9]     Q: Did you think it would be futile to send out
[10] the $20 00 promotion?
[11]     A: I never personally thought that it would be,
[12] you know, generate hundred of thousands of users
[13]     Q: But you still thought the company should go
[14] nuts mailing them out?
[15]     A: I've answered the question
[16]     Q. No, you haven't actually
[17]     MR ZOBERST: Actually that's argumentative
[18]               BY MS. JACOBS.
[19]     Q: Did you think it would increase usage at all?
[20]     A: Yes
[21]     Q. Were there ever any complaints that people
[22] were charged on their phone bill on two different dates
[23] within the same calendar month for internet services?
[24]     A: Please clarify
[25]     Q: Did any consumer ever complain that there

---

Page 166

[1] were two charges for internet services on their
[2] telephone bill within a single month?
[3]     A: Yes
[4]     Q. Did that necessarily indicate a mistake had
[5] been made?
[6]     A. No.
[7]     MS. JACOBS. I'd like to have this marked
[8] as Exhibit 200
[9]     (Reese Exhibit No 200 marked for
[10] identification )
[11]     A: Okay
[12]               BY MS. JACOBS:
[13]     Q: Do you recall —
[14]     MS. GUERARD: Wait Wait one second I'm
[15] pretty familiar with this
[16]     MS. JACOBS. Collot, you have the whole
[17] case memorized.
[18]     MS. GUERARD. I do. It's an interesting
[19] case. I'm ready
[20]               BY MS. JACOBS:
[21]     Q: Do you recall writing the e-mail in the
[22] center of the first page of this exhibit?
[23]     A: Vaguely
[24]     Q: Okay And in fact, would you agree with me
[25] that it is not unusual to have more than one charge

---

Page 167

[1] appear on the phone bill in the LEC billing world?
[2]     A. It's not uncommon
[3]     Q. And there is nothing — would you agree with
[4] me that both charges on the phone bill can be
[5] legitimate charges or accurate charges?
[6]     A: Yes
[7]     Q: Okay You indicated earlier that Olympic was
[8] receiving cramming complaints The cramming complaints
[9] that you were receiving — let me strike that
[10]     The cramming reports you received from — you
[11] mentioned Bell Atlantic, for example. Could that have
[12] included noninternet services? Could the cramming
[13] reports have included noninternet-related cramming
[14] complaints directed at Olympic?
[15]     MS. GUERARD Do you mean non-EPV?
[16]     MS. JACOBS. No, noninternet
[17]     A. By definition and for Olympic, no.
[18]     MS. JACOBS: I need to see the Bell
[19] Atlantic cramming report
[20]     MS. DIEMER. That's in this pile here, I
[21] believe
[22]               BY MS. JACOBS
[23]     Q At the time that Olympic was billing for
[24] internet services, was it also billing audiotext?
[25]     A: Yes

---

Page 168

[1] Q I'd like to show you Exhibit 124 again,
[2] specifically directing your attention to the state of
[3] Maryland, Olympic Telecommunications, the last three
[4] entries.
[5] A· Okay
[6] Q· Are those internet — are those cramming
[7] complaints concerning internet charges?
[8] A. According to this
[9] Q Let me see it, please
[10] A Two of three of them are
[11] Q. Okay. How about the member's charge?
[12] A: It would appear that that column has been
[13] truncated, and I can't tell
[14] Q Okay I'm sorry You answered this a moment
[15] ago But at the time that Olympic was billing for
[16] internet services, was it also billing for audiotext
[17] services?
[18] A. Yes
[19] Q You do get cramming complaints about
[20] audiotext, or you did at the time?
[21] A We got complaints about a lot of things It
[22] doesn't mean it was cramming Cramming —
[23] Q· No, I asked you specifically —
[24] A: — is an unauthorized charge
[25] Q. I understand that And I'm asking if you

Page 169

[1] received cramming complaints on audiotext billed by
[2] Olympic at the time you were billing for internet
[3] services
[4] A. I'm telling you people made those claims, and
[5] they were inaccurate
[6] Q· I don't doubt that they were But you did
[7] receive complaints that were categorized as cramming
[8] complaints during the time you were billing for
[9] internet services?
[10] A Yes So what?
[11] Q What was Ego, E-G-O?
[12] A. It was a nightclub
[13] Q Did you and Ian own it together?
[14] A. Yes
[15] Q And are you now in arbitration over that?
[16] A Yes
[17] Q Did you make a written submission as part of
[18] that arbitration proceeding?
[19] A: Yes
[20] Q. Is the arbitrator Mr Robbie Russell?
[21] A Robie Russell
[22] Q· Robie Russell
[23] MS JACOBS· I would like to have this
[24] marked as Exhibit 201
[25]

Page 170

[1] (Reese Exhibit No 201 marked for
[2] identification )
[3] A. Yes
[4] **BY MS. JACOBS:**
[5] Q: Did you write this letter?
[6] A. Yes
[7] Q: During the time that you were talking to the
[8] FTC, were you aware that you could be named in this
[9] action?
[10] A. No
[11] Q· Did the FTC ever discuss with you whether or
[12] not you personally were a target of their
[13] investigation?
[14] A: I asked if I was
[15] Q. So then you apparently were aware that you
[16] could be a target of the investigation; is that
[17] correct?
[18] A: No That's why I asked the question
[19] Q What did they tell you?
[20] A: No
[21] Q: They told that you could not be or that you
[22] were not?
[23] A: They said I was not
[24] Q· You were not. Did you suspect that it was
[25] possible for you to be sued personally?

Page 171

[1] A: I don't know That's why I asked the
[2] question
[3] Q: Did they, did the FTC tell you that it was
[4] not possible to sue you personally?
[5] A. I didn't ask if it was possible
[6] Q. Did the FTC ever assure you that you would
[7] not be named in this litigation?
[8] A. I don't recall asking that question so no
[9] Q: Who did you discuss this, the issue of your
[10] personal potential liability, with, whom from the FTC?
[11] A: Collot Guerard
[12] Q· What did she tell you?
[13] A: She said that you're just an operations guy
[14] So they weren't interested in me.
[15] Q: Were you not an officer of Olympic?
[16] A. Yes
[17] Q Were you an officer of any other company?
[18] A: I've answered all those questions earlier
[19] Q· I'm asking you again
[20] A· Yes
[21] Q: Which companies were you an officer of?
[22] A: I'll refer to my earlier testimony
[23] Q. Would you answer the question, Mr Reese.
[24] A: I did earlier
[25] Q No, I don't think you were asked if you were

Page 172

[1] an officer of those corporations You indicated that
[2] you were COO —
[3] **A:** Specifically I was asked —
[4] **Q:** Let me finish.
[5] For example, were you secretary of Olympic?
[6] **A:** No
[7] **Q** What office did you hold in Olympic?
[8] **A:** Chief operating officer
[9] **Q:** Did you ever hold another office, a corporate
[10] office? I'm not talking about a title. I'm talking
[11] about corporate office — president, vice president,
[12] secretary
[13] **A:** Of?
[14] **Q:** Any of the Eisenberg companies
[15] **A:** Chief operating officer
[16] **Q:** That's the only title you ever held?
[17] **A.** Vice president of Common Concerns
[18] **Q:** Were you an officer of any other corporation?
[19] **MS. GUERARD:** That he knew of
[20] **MS. DIEMER:** You don't get to ask
[21] questions
[22] **MS. JACOBS:** You don't get to answer them,
[23] either
[24] **A:** I'm sorry The question?
[25] **BY MS. JACOBS.**

Page 173

[1] **Q:** Were you an officer of any other corporation
[2] that was owned in whole or in part by Ian Eisenberg?
[3] **A:** Besides?
[4] **Q.** Besides the two you just mentioned
[5] **A:** Yes.
[6] **Q:** What were they?
[7] **A:** I was chief operating officer of Olympic
[8] Telecommunications
[9] **Q:** Okay I understand that you held the office
[10] of chief operating officer, the title I understand
[11] that you were a vice president and that you were chief
[12] operating officer of a number of different companies
[13] And I understand that you were a vice president of
[14] Common Concerns Aside from those two titles, did you
[15] have any other title in any company that was owned in
[16] whole or in part by Ian Eisenberg?
[17] **A:** No
[18] **MS. JACOBS:** Thank you I have nothing
[19] else at this time
[20] **WITNESS:** Good
[21] **MR. ZOBERST:** She only got 3 hours and 15
[22] minutes
[23]
[24]
[25]

Page 174

[1] **EXAMINATION BY MR LEONARD**
[2] **BY MR LEONARD**
[3] **Q.** Good afternoon or good evening, Mr Reese
[4] **A:** Good evening
[5] **Q** My name is Ernest Leonard I represent Chris
[6] Hebard and Coto Settlement in this action I don't
[7] have many questions for you
[8] First of all, if you don't mind telling us,
[9] how old a man are you?
[10] **A** 37
[11] **Q.** I noticed looking at the resume that was in
[12] evidence earlier that you graduated from college in
[13] 1988 and then you started with TDS in 1990, is that
[14] correct?
[15] **A.** Yes
[16] **Q.** What did you do in between?
[17] **A:** Job hunted much of the time when it was
[18] during a recession, and I took care of a terminally ill
[19] relative during most of the time
[20] **Q.** Now at TDS, if I wrote down your answer
[21] right, your job was, I believe you said verify accuracy
[22] of charges going to telephone systems Did I have that
[23] right?
[24] **A** Yes, I worked on the carrier-access billing
[25] system

Page 175

[1] **Q** If you don't mind, could you just briefly
[2] explain what that is, for those of us not well versed
[3] in that industry
[4] **A.** It's how the local phone companies recoup
[5] their portion of long distance charges on your phone
[6] bill
[7] **Q:** And TDS essentially served the needs of local
[8] or — strike that
[9] Was the local phone company the customer, the
[10] clients of TDS?
[11] **A.** TDS was a local phone company
[12] **Q:** I understand
[13] **A.** So yes
[14] **Q:** What area were they in?
[15] **A:** They were an independent phone company, a
[16] holding company, rather, that had, at the time I was
[17] there, about 105 different mom-and-pop size telephone
[18] companies around the country
[19] **Q.** Did you have any other duties or
[20] responsibilities with TDS?
[21] **A:** Not that I can remember this far after the
[22] fact
[23] **Q:** Did you have any responsibilities in the
[24] marketing —
[25] **A:** No

FEDERAL TRADE COMMISSION v.
CYBERSPACE.COM, LLC. ET AL.    Case 2:00-cv-01806-RSL    Document 124    Filed 03/07/02    Page 166 of 184

DON REESE, PART 2
February 8, 2002

Page 176

[1]    Q: — of TDS?

[2]    A  No

[3]    Q: Did you have any responsibilities in the

[4] various technological aspects of TDS?

[5]    A  Technological?

[6]    Q: Yes

[7]    A  I worked on the billing system

[8]    Q. Okay Did you have any experience or

[9] training in engineering?

[10]   A  Oh, no

[11]   Q  What about, like, systems analysis?

[12]   A  No

[13]   Q  So you're not what is known vernacularly as a

[14] "techie" or anything?

[15]   A· No

[16]   Q· Now, when you went to work for the Eisenberg

[17] entities — it wasn't quite clear — before you became

[18] COO, what was your — did you have a title?

[19]   A. I think it was director of billing services

[20] was on my business cards

[21]   Q· And was your, the work you did with the

[22] Eisenberg entities similar in nature to the work you

[23] did with TDS?

[24]   A  Sort of distantly related, I guess

[25]   Q  How would you describe in laymen's terms what

Page 177

[1] your work was with the Eisenberg entities before you

[2] became COO?

[3]    A. Auditing or tracking the billing aggregators

[4] that Eisenberg's companies used, their reporting,

[5] making sure they paid back all the money, everything

[6] was reconciled

[7]    Q· So it still pertained to the billing aspects

[8] of the telephone system?

[9]    A: It was end-user billing versus carrier

[10] billing

[11]   Q  Now, when you became COO, how would you

[12] describe your duties as changing? What additional

[13] duties did you take on?

[14]   A  I gained access to much more of the

[15] accounting information, I guess, in his companies  I

[16] took on, became a signatory for, I guess, all the

[17] companies I was COO of  I don't know that my duties

[18] increased dramatically  The title changed

[19]   Q  Did you have any responsibilities over any

[20] marketing functions with the Eisenberg entities?

[21]   A  Very limited. There was an in-house

[22] advertising agency that did more of the advertising,

[23] called Pacific Rim Advertising  I did, ran a few ads,

[24] for example, for Olympic

[25] publications in search of new clients, and some ads for

Page 178

[1] Common Concerns, the long distance company, some ads

[2] for US Network Services, which resold 800 service

[3]    Q: Other than running these few ads, can you

[4] think of anything else you did that was marketing

[5] related with the Eisenberg entities?

[6]    A: Not really, no

[7]    Q: And in fact, would it be fair to say that

[8] your work experience and your career so far really has

[9] not been involved in marketing? In other words, you

[10] don't consider yourself to be a marketing guy, do you?

[11]   A: Not really, no

[12]   Q: With the Eisenberg entities, did you have any

[13] responsibility over any of the technological aspects of

[14] the company?

[15]   A: At a high level. I certainly, I couldn't

[16] configure a server, but I may have directed a tech guy

[17] to do something

[18]   Q: But you gave him instructions about the goal

[19] that was to be accomplished?

[20]   A: Yes

[21]   Q: But you're not now, I guess to use the

[22] vernacular again, a "techie," are you?

[23]   A: No

[24]   Q  I'd like to show you Exhibit 80 which we

[25] looked to earlier  I'm going to direct your attention

Page 179

[1] to the very top of the first part of the first page of

[2] this exhibit, where you mention, "We just got the

[3] MegaPop invoice for October  75 unique log-ons." Do

[4] you see that?

[5]    A: Yes

[6]    Q  What information did you have to base that

[7] conclusion that there were 75 unique log-ons for that

[8] month?

[9]    MR. GOODMAN: Objection. That statement

[10] does not appear to have come from Don Reese.

[11]   WITNESS. I was just about to say that.

[12]   MR. LEONARD: Well, let me take a look at

[13] that

[14]    Thank you very much  You are

[15] right

[16]          BY MR. LEONARD:

[17]   Q: Did you ever do — well, as CEO of the

[18] Eisenberg entities, what information did you have to

[19] determine the number of unique log-ons that you would

[20] have in a given month?

[21]   A. The title of COO didn't give me access to

[22] that any more than anyone else in the company.

[23]   Q: Well, access to what?

[24]   A. Unique log-ons

[25]   Q: What information was available within the

Page 180

[1] Eisenberg entities to determine the number unique
[2] log-ons for a given month?
[3]     A: There would be information on the radius
[4] server, and someone would have had to have manually
[5] run a report, I guess
[6]     Q  Was that within your area of responsibility?
[7]     A. Not, no, not really Ian is much more of a
[8] tech person than I am He oversaw the tech department
[9] more so than me
[10]     Q. We've discussed usage before and number of
[11] unique log-ons. Would it be fair to say that any
[12] information you have would have been given to you by
[13] someone else in the organization?
[14]     A: Yes
[15]     Q: Now, Exhibit 80, which you did, and your
[16] message which you did send on November 2, you mentioned
[17] that in here "I should also add that five of six temp
[18] employees that have been sent to our shop have walked
[19] away saying this is a scam." Do you see that in there?
[20]     A. Uh-huh
[21]     MR. ZOBERST. Point to it
[22]     A: Yes, I see it
[23]          BY MR. LEONARD:
[24]     Q: Did you supervise these temp employees
[25] directly?

Page 181

[1]     A. No.
[2]     Q. Who directly supervised them?
[3]     A· At the time of this e-mail, it was probably
[4] Zinora Carter
[5]     Q: Did Ms Carter report to you or to someone
[6] else?
[7]     A: There wasn't a corporate hierarchy structure
[8] like that. She would have taken direction from me or
[9] Eisenberg.
[10]     Q: Now, did you conduct exit interviews with
[11] these temps who left —
[12]     A: No
[13]     Q: — or was that Ms Carter?
[14]     A: I didn't. I don't know if she did or not
[15]     Q: Do you know where you got that information,
[16] that five of six temps had left believing this was a
[17] scam?
[18]     A  Being told that by whoever the supervisor
[19] was.
[20]     Q: Ms Carter or whoever?
[21]     A: If it was Mr Carter. If it was her I
[22] think it was her at this time
[23]     Q. So to be clear, when you make that statement
[24] in there, you're relying on what the supervisor of the
[25] techs —

Page 182

[1]     A· Yes
[2]     Q· — temps told you what the temps told them,
[3] right?
[4]     A. Yes
[5]     Q· I'm going to hand you Exhibit 163 we looked
[6] at. And I'm going to direct your attention to the
[7] third paragraph and a sentence that says, "Let's face
[8] it, the only reason we have conversion on the first
[9] check is because AR doesn't pay attention." Do you see
[10] that sentence?
[11]     A. Yes
[12]     Q. What was the basis of the information that
[13] you had when you made that statement?
[14]     A: That very few people, very few people who
[15] cashed the check knew that they were signing up for
[16] internet service That basis was on the number of
[17] complaints and overall picture that, comments from
[18] CSR's or the supervisors and the LEC's and everyone
[19] else
[20]     Q· So this was essentially conjecture on your
[21] part, based upon the, this information about usage?
[22]     A: More than conjecture I also listened in on
[23] CSR phone calls, heard what consumers were saying
[24]     Q: Do you remember how many consumers you heard
[25] said that their AR department —

Page 183

[1]     A. You mean about the AR department?
[2]     Q: Right
[3]     A: I think it's more than conjecture but  .
[4]     Q. You make a very specific point there  I'm
[5] trying to —
[6]     A: I was never in any small business that opened
[7] the check to see if their AR person was the one who
[8] opened it
[9]     Q: Did you ever talk directly to anybody who,
[10] any small business owner or representative of a small
[11] business who's making that complaint?
[12]     A: I believe I didn't talk to anybody
[13] personally —
[14]     Q· Right
[15]     A. — but I read complaints that made those
[16] statements
[17]     Q: Okay But you did not actually talk to them,
[18] right?
[19]     A: Not that I remember
[20]     Q: In reading the various complaints, were you
[21] involved in any investigation to determine the validity
[22] of the complaint?
[23]     A: Can you be more specific
[24]     Q· Sure We talked about complaints I guess
[25] you're referring to the written complaints that either

FEDERAL TRADE COMMISSION v.
CYBERSPACE.COM, LLC, et al.    Case 2:00-cv-01806-RSL    Document 124    Filed 03/07/02    Page 168 of 184

DON REESE, PART 2
February 8, 2002

Page 184

[1] came to Olympic or Cyberspace or to a regulatory agency
[2] or better business bureau Is that what you're
[3] referring to?
[4]    A No, I'm referring to complaints in general,
[5] use an example of a written complaint to answer your
[6] earlier question
[7]    Q· Was it your responsibility, as a rule, to
[8] investigate those complaints to determine, or any
[9] complaints, to determine the validity of them?
[10]    A. No
[11]    Q That was someone else's responsibility?
[12]    A. As I said earlier, Diane Capasso handled
[13] more, was the closest person in charge of that task, if
[14] you will
[15]    Q. But to be clear, that wasn't part of your
[16] responsibilities as COO, right?
[17]    A· That was never defined, no
[18]    MR LEONARD· All right Thank you very
[19] much
[20]    WITNESS· Wow Easy
[21]    (A brief recess was taken )
[22]
[23]
[24]
[25]

Page 185

[1]    EXAMINATION BY MR. GOODMAN·
[2]    BY MR. GOODMAN
[3]    Q. Did any of the EPV subsidiaries bill for
[4] 900-number calls?
[5]    A No
[6]    Q Mr Reese, when you came to Washington to
[7] meet with Collot and me, how many days did you meet
[8] with us?
[9]    A About 1 3/4
[10]    Q: Did you arrive in Washington the day you met
[11] with us or the day before?
[12]    A The night before
[13]    Q· Did you return home the second day you met
[14] with us or the day after?
[15]    A The day after
[16]    Q: How many days total did you spend in
[17] Washington?
[18]    A I got there Thursday night, and I left
[19] Sunday, late morning or noon
[20]    Q. In addition to the radius server, what other
[21] records are there of unique log-ons?
[22]    A· They would have to be the Starnet invoices
[23]    Q Did you ever look at the Starnet invoices?
[24]    A Yes
[25]    Q I'm going to show you Starnet Exhibit 4

Page 186

[1]    MR. GOODMAN. So this is Exhibit 4
[2]    MS. DIEMER: I don't have that. Do you
[3] have a copy?
[4]    Let me ask you a question,
[5] Mr Goodman Not to confuses the issue, but do we know
[6] for a fact that this exhibit is a unique Exhibit 4?
[7] Because if it is not, we would be better off bringing a
[8] copy into the record, because I know that when we were
[9] down in Florida, we started at — I want to say 32, 33
[10] or something like that. I know Ms. Guerard mentioned
[11] in one of the earlier depositions that before I became
[12] involved in the case, that everyone had not given each
[13] exhibit a unique number
[14]    I'm concerned that if we do
[15] not know that this exhibit has its own unique number 4,
[16] that there might be confusion in the record
[17]    MS. GUERARD· Well, the only depositions
[18] we've had are the Starnet depositions and the consumer
[19] depositions So if you started a consumer deposition
[20] at other than No  1 —
[21]    MS. DIEMER· Then it should be unique?
[22]    MS. GUERARD: — then it should be a unique
[23] But it's fine with us, if you feel like we should
[24] renumber it as whatever this number would be.
[25]    MS. DIEMER. No, that's all right  I just

Page 187

[1] wanted to make sure because there had been some
[2] colloquy in one of the earlier depositions about the
[3] fact that there was not unique numbering before  I
[4] wanted to make sure that we weren't calling this 4 and
[5] there's like three 4's and then everything is going to
[6] get screwed up
[7]    If that is not so, I know that
[8] starting at the consumer depositions, we did start
[9] uniquely numbering. So if you uniquely numbered it
[10] Star and Star was the first one, we're home free and
[11] it's No 4
[12]    MR. GOODMAN: I think we are home free and
[13] it's No 4
[14]    MS. DIEMER  Okay
[15]    MR. GOODMAN: It's Bates stamped S-10306
[16] through S-10329
[17]    BY MR. GOODMAN·
[18]    Q: Mr Reese, take the time you need to review
[19] this exhibit
[20]    MR. LEONARD: I'm going to object to the
[21] question, to any questions on this exhibit as being out
[22] of the scope of cross-examination
[23]    MS JACOBS: I was going to wait until a
[24] question was asked, but I'll join in that objection
[25]    MS. DIEMER. I think you guys ought to wait

Page 188

[1] until he asks one

[2] **MR. LEONARD:** Well, I think for the record,

[3] I'm objecting to any questions on Exhibit 4

[4] **MS DIEMER.** As beyond the scope of cross

[5] **MR. LEONARD** Correct

[6] **A:** Okay

[7] **BY MR. GOODMAN**

[8] **Q·** Do you recognize the pages of this exhibit?

[9] **A.** Yes

[10] **Q** What are they?

[11] **A** They are the monthly, it appears to be

[12] monthly Starnet invoices intermingled with some GTE

[13] invoices on the, GTE charges on the Starnet network

[14] **Q** Are the number of unique log-ons recorded in

[15] these invoices?

[16] **MS. JACOBS** I'm going to object as being

[17] outside the scope of cross.

[18] **MR LEONARD** Join the objection

[19] **A:** Yes Unique log-ons are on the invoices

[20] **BY MR. GOODMAN:**

[21] **Q·** Tell me a Bates stamp number for one of the

[22] pages that records unique log-ons

[23] **A:** S-00103070

[24] **Q:** What does this page indicate about unique

[25] log-ons?

Page 189

[1] **A:** That there were five of them The price was

[2] $8 25 per user. That's it

[3] **Q·** Can you tell what month this is for?

[4] **MS. JACOBS:** I'm going to continue to

[5] object and, rather than interrupt you with each

[6] question, have a continuing line of objection to any

[7] questions about these bills as outside the scope of

[8] direct.

[9] **MR. GOODMAN:** My position is on cross

[10] Mr Reese was asked —

[11] **MS JACOBS·** I meant cross

[12] **MR. GOODMAN:** On cross, Mr Reese was asked

[13] about the radius server and whether that was the way to

[14] record unique log-ons This is an alternative way to

[15] count unique log-ons So I think it's within scope of

[16] the earlier examination.

[17] **MS JACOBS:** I didn't ask whether the

[18] radius server was a way to count unique log-ons

[19] **MR GOODMAN:** I don't think I have any more

[20] questions about this exhibit

[21] **MS. GUERARD.** You didn't get an answer for

[22] the month

[23] **BY MR GOODMAN:**

[24] **Q** Sorry What month, please?

[25] **A:** Yes, I can determine the month It is July

Page 190

[1] of '99

[2] **Q:** Is the invoice date from July '99, or is the

[3] billing month July '99?

[4] **A.** Invoice date

[5] **Q:** What is the billing month?

[6] **A:** June '99

[7] **Q·** When, if you recall, did the FTC first

[8] contact you?

[9] **A:** Me personally?

[10] **Q:** Yes

[11] **MS. GUERARD** You mean in connection with

[12] this case?

[13] **BY MR GOODMAN**

[14] **Q:** Yes, in connection to this case

[15] **A:** Approximately August 2001

[16] **Q.** Mr Reese, did you testify during

[17] cross-examination that you were not an officer of any

[18] Eisenberg company?

[19] **A·** No, I did not testify to that

[20] **Q:** Can you recall what your testimony was

[21] regarding whether you were an officer of any Eisenberg

[22] company?

[23] **A:** I don't know that I ever completely

[24] understood that question that I was answering  I was

[25] chief operating officer of a number of Eisenberg wholly

Page 191

[1] owned companies as well as vice president of one

[2] company

[3] **Q·** Were you, if you know, ever a secretary of

[4] Olympic Telecommunications?

[5] **A:** I was not

[6] **MR. GOODMAN:** Exhibit 113

[7] **MS. DIEMER:** Is 131 one of the ones that

[8] was used today?

[9] **MR. GOODMAN:** No

[10] **MS. GUERARD:** I don't think so

[11] **BY MR. GOODMAN:**

[12] **Q** Mr Reese, do you have Exhibit 113 in front

[13] of you?

[14] **A:** Yes

[15] **Q:** I'd like you to look at the first page,

[16] E-20368. Does this refresh your recollection as to

[17] whether you were ever secretary of Olympic

[18] Telecommunications?

[19] **A:** No

[20] **Q** Did you ever attend a special meeting of the

[21] board of directors of Olympic on March 2, 1998?

[22] **A·** I don't recall attending such a meeting.

[23] **Q:** Were you ever informed that you were

[24] secretary of Olympic Telecommunications?

[25] **A.** Not that I recall

FEDERAL TRADE COMMISSION v.
CYBERSPACE.COM, LLC, et al. Case 2:00-cv-01806-RSL   Document 124   Filed 03/07/02   Page 170 of 184

DON REESE, PART 2
February 8, 2002

Page 192

[1]   Q. Mr Reese, I'd like you to look at
[2] Exhibit 181, which you should have in front of you
[3] already
[4]   A. 181? Okay
[5]   Q. Do you have Exhibit 181 in front of you?
[6]   A Yes
[7]   MS. DIEMER· Can you wait just a second to
[8] make sure I have 181 in front of me? Thank you I
[9] appreciate that
[10]           BY MR. GOODMAN·
[11]   Q: Mr Reese, I'd like to you ask you a question
[12] about the e-mail at the top of the first page of this
[13] exhibit It purports to be an e-mail from Chris Hebard
[14] to you and Mr Eisenberg, dated September 6, 1999
[15] There's a phrase in this e-mail that says, "Our churn
[16] factor has to do with no usage " Do you see that in
[17] the e-mail?
[18]   A Yes
[19]   Q Do you know what that means?
[20]   A. It means people are canceling because they
[21] don't know that they are users They don't know that
[22] they're subscribing to the service
[23]   Q: Mr Eisenberg, I'd like you to look at
[24] Exhibit 194
[25]   A Mr Reese, you mean

Page 193

[1]   Q: Yeah, sorry
[2]   MS. GUERARD. I got Mr. Eisenberg and
[3] Mr Hebard mixed up so often yesterday
[4]   WITNESS: It's easy to do
[5]   MR GOODMAN: I won't do that again
[6]           BY MR GOODMAN·
[7]   Q· Exhibit 194, Mr Reese
[8]   A· 194?
[9]   Q Yes
[10]   MS DIEMER: Which exhibit are we on? I
[11] missed because of the commentary
[12]   MR. GOODMAN· 194
[13]   MS. DIEMER I'm sorry Mr Reese, it was
[14] cracking me up so I missed the exhibit number
[15]   WITNESS· I get punchy at the end of the
[16] day, too
[17]   MR GOODMAN: I think I've been spending too
[18] much time with Collot
[19]   MS GUERARD: Right
[20]           BY MR GOODMAN·
[21]   Q Do you have Exhibit 194 in front of you,
[22] Mr Reese?
[23]   A Yes
[24]   Q Mr Reese, this e-mail, who is this e-mail
[25] sent to?

Page 194

[1]   A: It is sent to Campbell Angus, George — I
[2] don't even want to begin to try to pronounce that —
[3] Ian Eisenberg, Don Reese, Andrew Kreis
[4]   Q: Can you tell me who Campbell Angus is?
[5]   A. He was with Edge Holdings. I don't remember
[6] his title or what his title was
[7]   Q. How is Edge Holdings involved in the EPV
[8] subsidiaries?
[9]   A· It wasn't involved. They were attempting to
[10] be involved by purchasing the company
[11]   Q· Campbell Angus worked for a company that was
[12] a potential buyer?
[13]   A: Yes
[14]   Q: What about George Stroesenreuther?
[15]   A. He was affiliated with a potential buyer,
[16] also I don't recall in what capacity An accountant
[17] or a lawyer
[18]   Q· I'd like to ask you about a sentence towards
[19] the bottom of the first page of Exhibit 194 It starts
[20] with "In many locations " Do you see that sentence?
[21]   A· Yes
[22]   Q: Could you read that sentence, please.
[23]   A· "In many locations, the account packet
[24] information was not forwarded; and in others, the
[25] information was forwarded long after the session "

Page 195

[1]   Q· Mr Reese, if you know, would the fact that
[2] this information was not forwarded or was forwarded
[3] late, would that affect Starnet's ability to count
[4] unique log-ons for its invoices?
[5]   A· No It would not affect their ability to
[6] count unique log-ons
[7]   MR. GOODMAN. Exhibit 122 and 123
[8]           BY MR. GOODMAN:
[9]   Q: I'll have to give you those.
[10] Mr. Reese, do you have exhibits 122 and 123
[11] in front of you?
[12]   A. Yes
[13]   Q· Take the time that you need to look them
[14] over, and then I'll ask you a couple questions about
[15] them
[16]   A. Okay
[17]   Q: Looking at Exhibit 122, which is Bates
[18] stamped E-20014 through E-20038, do you recognize this
[19] exhibit?
[20]   A: Yes
[21]   Q. What is this exhibit?
[22]   MR. LEONARD· Objection. Outside the scope
[23] of cross
[24]   MS JACOBS. Join
[25]   A These are print screens of the customer

Page 196

[1] service screens that the CSR's used in providing
[2] customer service for the EPV companies
[3]       BY MR. GOODMAN·
[4]    Q· Now I'd like you to look at Exhibit 123
[5] This is Bates stamped P-10917 through P-10927. I'd
[6] like you look at P-10923 Do you recognize this
[7] exhibit?
[8]    MR LEONARD  Objection  Outside the scope
[9] of cross
[10]   MS. JACOBS· Join
[11]       BY MR. GOODMAN.
[12]    Q· Not this page specifically but the exhibit
[13] generally
[14]    A. The exhibit generally, yes
[15]    Q: What is this exhibit?
[16]    MR. LEONARD. Objection. Outside the scope
[17] of cross I'll ask for a continuing objection
[18]    MS. JACOBS: Join in both
[19]    A: These are the scripts, for lack of a better
[20] word, the CSR's would use when they heard a consumer
[21] ask these types of questions
[22]       BY MR. GOODMAN.
[23]    Q: Do you know who wrote these scripts?
[24]    A: Not specifically
[25]    Q: I'd like you to look at question No 9 on

Page 197

[1] P-10924. Could you read the consumer comment and then
[2] the response
[3]    A: The consumer comment type would be "We
[4] received a check and need the account number to apply
[5] this check as payment " And the CSR was to respond
[6] "This check is a promotion. Cyberspace com is offering
[7] your company our internet services  We do not
[8] currently have an account with your company."
[9]    Q. Do you know whether Olympic received any
[10] consumer comments like the one in No 9?
[11]    A. Yes, I do know that.
[12]    Q: Yes?
[13]    A: Yes, it did receive inquiry along those
[14] lines
[15]    Let me clarify Olympic didn't receive this
[16] type of questions Cyberspace would have
[17]    Q: How can you tell?
[18]    A. 'Cause this is the kind of question a company
[19] would have when they received a promotional check and
[20] would call with the check in their hand, not knowing
[21] what it was  Olympic got calls after the check was
[22] cashed.
[23]    Q. Mr Reese, are there any answers that you
[24] gave earlier that you'd like to change or add to?
[25]    A. Probably a lot but I can't think of any now

Page 198

[1]    MR. GOODMAN· That's all my questions
[2]    MR. ZOBERST. Thank you
[3]    MS DIEMER· Thank you
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 199

[1]       EXAMINATION BY MR  LEONARD.
[2]       BY MR. LEONARD·
[3]    Q: Exhibit 4, put that in front of you again,
[4] the Starnet
[5]    MS. GUERARD· Invoices, yes.
[6]    WITNESS: It's not marked  Is that this
[7] one? That's the only one I got, right?
[8]    MS. GUERARD. Well, it is marked
[9]    WITNESS: There it is I see that
[10]       BY MR. LEONARD
[11]    Q: I think a question was asked whether you
[12] recognize it. But when was the last time you've seen a
[13] Starnet bill?
[14]    A: Approximately October of 2001
[15]    Q  That's the last time you've seen any Starnet
[16] invoices such as the types you've seen on Exhibit 4?
[17]    A: Yes
[18]    Q: So when you said under oath that you
[19] recognize that, you're not vouching for its
[20] authenticity or if this really is a real document,
[21] you're just recognizing generally the format, right?
[22]    A: It looks an awfully lot like the ones I used
[23] to see
[24]    Q: Right  But you haven't had an opportunity to
[25] go through these records and verify whether these

**Page 200**

[1] really are true invoices from Starnet, correct?

[2] A. Correct

[3] **MR. LEONARD.** No more questions

[4] (Signature reserved )

[5] (Deposition concluded at 6 50 p m )

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

**Page 201**

[1]

[2]

[3] **CERTIFICATION O F REPORTER**

[4]

[5] **DOCKET/FILE NUMBER:** Case No C00-1806-L

[6] CASE TITLE FTC vs Cyberspace com, et al

[7] **DATE.** February 8, 2002

[8]

[9]

[10]

[11]

[12] I HEREBY CERTIFY that the transcript

[13] contained herein is a full and accurate transcript

[14] of the notes taken by me at the deposition on the

[15] above cause to the best of my knowledge and belief

[16]

[17] **DATED:**

[18]

[19]

[20] JACQUELINE L BELLOWS, CCR

[21]

[22]

[23]

[24]

[25]

**Page 202**

[1]

[2] CERTIFICATE OF DEPONENT

[3] I hereby certify that I have read and examined
the foregoing transcript, and the same is a true and

[4] accurate record of the testimony given by me

[5] Any additions or corrections that I feel
necessary , will attach on a separate sheet of paper to

[6] the original transcript

[7]

[8]

[9] DON REESE

[10] I hereby certify that the individual
representing himself to be the above-named individual

[11] appeared before me this_____ day of
_____, 2002, and executed the above

[12] certificate in my presence

[13]

[14]

NOTARY PUBLIC IN AND FOR

[15]

[16]

[17] MY COMMISSION EXPIRES

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

**Page 203**

[1] WITNESS DON REESE

[2] DATE February 8, 2002

[3] CASE FEDERAL TRADE COMMISSION VS CYBERSPACE, et al.

[4] Please note any errors and the corrections thereof on
this errata sheet The rules require a reason for any

[5] change or corrections It may be general, such as "To
correct stenographic error," or "To clarify the

[6] record," or "To conform with the facts "

[7] PAGE LINE   CORRECTION   REASON FOR CHANGE

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

**Lisa Bluteau**

| | |
|---|---|
| From: | Diane Capasse [d_capasso@yahoo.com] |
| Sent: | Tuesday, September 21, 1999 10:04 AM |
| To: | DonR@usnetwork.com; d_capasso@yahoo.com |
| Cc: | ZinaraC@usnetwork.com; stafford@usnetwork.com; Ian Eisenberg, Jeff Fritz; Gene Hirai |
| Subject: | Re: Cyber Overflow |

Don, we are not ready yet. We are setting up the phone
system now. Should be ready Oct. 4   I need some
information from you
1. A copy of your latest VRU script. Any changes for
the consumer product at $19 95?
2. A number of reps you anticipate we need to assign
to the cyber queue? I will include spanish speakers in
that number

--- DonR@usnetwork.com wrote:
>
>
> Diane,
> I got your voicemail about you guys being ready to
> start taking overflow
> calls for Cyberspace.
>
>      -What is the toll free number that we will transfer
> to?
>
>      -How many CSR's do you have allocated for this?
>
>      -Hours are 6 to 6 - same as B|C
>
> Stafford,
> How will we do this?  Will we automatically overflow
> once so many calls are
> backed up or what?
>
> Don
>
>
>
>

_____

Do You Yahoo!?
Bid and sell for free at http.//auctions.yahoo com

Exhibit 183
1

**Lisa Bluteau**

| | |
|---|---|
| ﹀m: | Diane Capasso [d_capasso@yahoo.com] |
| .it: | Monday, October 11, 1999 5:53 PM |
| To: | DonR@usnetwork com |
| Cc: | Carrie Ortiz; Zinara Carter |
| Subject· | RE Cyberspace Overflow Calls |

The number to transfer to is 888/338-9323
 Zinara is forwarding the spanish scripts to us. Let
me or Carrie know when we can expect calls.

--- DonR@usnetwork.com wrote·
> Have you ever given us an 800 number to transfer to?
>  I don't recall
> Don
>
> -----Original Message-----
> From: Diane Capasso [mailto:d_capasso@yahoo com]
> Sent  Monday, September 27, 1999 2 37 PM
> To· Reese Don
> Cc  Jeff Fritz; Ian Eisenberg; Chris Hebard; Gene
> Hirai
> Subject: Cyberspace Overflow Calls
>
>
> Beginning Oct 4, we will be ready to take cyber
> calls
> here.
﹀ I will include 4 reps (3 are bi-lingual)

 Hours we will provide coverage is 7 00 am - 6 00 pm
 > continual coverage
>
> What do you need to get this going? Our phone system
> will be complete on Friday with the ACD and IVR for
> testing
> I will have a phone number today or tommorrow for
> the
> forwarding number
>
>
>
> _____
> Do You Yahoo!?
> Bid and sell for free at http://auctions.yahoo com
>

=====

_____
Do You Yahoo!?
Bid and sell for free at http.//auctions.yahoo.com

Exhibit 184.

1

## Lisa Bluteau

| | |
|---|---|
| �nom: | Diane Capasso [d_capasso@yahoo.com] |
| ᴏnt: | Monday, November 01, 1999 6:24 PM |
| To: | Gene Hirai; Don Reese (E-mail) |
| Cc: | Chris Hebard (E-mail), Ian Eisenberg, Diane Capasso (E-mail), Carrie Ortiz (E-mail), Luis Vizcarra (E-mail); Jeff Fritz (E-mail) |
| Subject: | Re· FW |

Did you catch the hint? Call me x-101, Carrie x-102 or
Luis at x-132 for updates to the cyberqueue    I will
keep in touch with Joanne and Stacie.

--- Gene Hirai <gene@csgholdings.com> wrote.
> Don,
> As of 12 40P, all is going well, 265 calls w/ 4.18%
> abandons  In my opinion
> the only way this works is if Diane, Carrie or Luis
> keeps an eye on the
> calls in que and whenever the magic number pops up
> in que they contact
> Joanne or Stacie and slow the transfers down.
> Everything else seems to be
> working fine except one of the CSR's just told me
> that she couldn't search
> for a check. Gene
>
> -----Original Message-----
> From: DonR@usnetwork.com [mailto:DonR@usnetwork.com]
> Sent  Monday, November 01, 1999 10 18 AM
  To: gene@capgains.com
  Subject·
>
>                                       ·,
>
>
> Gene,
>
> Is everything working now?  Are you getting too
> many, or not enough calls?
> We seem to be handling the load better today than
> last week.
>
> Don
>
>
>
>


=====

_____
Do You Yahoo!?
Bid and sell for free at http://auctions.yahoo.com

Exhibit 186 - 1

**Lisa Bluteau**

| m:       | Diane Capasso [diane@intcs.net]     |
|----------|-------------------------------------|
| .it:     | Thursday, March 16, 2000 10:44 AM   |
| To:      | Don; chebard@chebard.com            |
| Cc:      | gene hirai                          |
| Subject: | RE [Fwd RE: Tennessee]              |

WE ALMOST HAD A PROBLEM  I called Ed Mimms at the TN REgulatory Agency. He
informed me that he had 2 complaints that did not have responses.
ANI - 9016867546  Canceled - 1.24.00
ANI - 9016867472  Cancelled -  3.14.00

His office was in the process of sending a Registered letter. The contents
of the letter he did not inform me of. Ed Mimms told me if I could resolve
these 2 complaints the registered letter need not be sent. He asked me about
the check promotion and who we marketed to; businesses and consumer

He mentioned something of concern. When he called the main CS number
888.285.5196 this week. He was not taken seriously, laughed at and hung up
on. He doesnt have a name.

I feel he is going to work with me on these 2 complaints  He wants the
signed checks and refunds sent to the billed customers. These will be
 ted
 day and cc to Don

-----Original Message-----
From: chris hebard [mailto:chebard@chebard.com]
Sent: Thursday, March 16, 2000 8:13 AM
To: Diane Capasso (E-mail)
Subject: [Fwd· RE: Tennessee]


Please update me on what happened here. Also, cc DON . Thx
-------- Original Message --------
Subject· RE  Tennessee
Date: Wed, 15 Mar 2000 20:52.41 -0800
From: DonR@usnetwork.com
To: chebard@chebard.com

I think Michelle (our office) and Carrie successfully matched all complaints
with responses.  So the remaining question was/is, what the hell is the guy
talking about?  I thought I saw an email today that Diane was going to call
him - but I don't think I ever heard anything (or if I did I just don't
remember - too much to keep straight anymore!)


  ---Original Message-----
 .om: chris hebard [mailto:chebard@chebard.com]
Sent: Wednesday, March 15, 2000 8:35 PM
To: DonR@usnetwork.com
Subject: Re. Tennessee

Exhibit  189  by Ian

If this isn't resolved to your satisfaction, please call me and I'll get
ınto
  th the staff.

DonR@usnetwork com wrote·

> We need all cyber replıes so we can fıeld these ınquırıes
ıntellıgently.
>
> -----Orıgınal Message-----
> From: Michelle Ferazza
> Sent: Tuesday, March 14, 2000 5.09 PM
> To   'Dıane Capasso'; chebard@chebard.com; Don Reese
> Cc  Carrıe Ortız, Ian Eısenberg, Mıchelle Ferazza;
gene@csgholdıngs.com
> Subject· RE: Tennessee
>
> I trıed askıng for the fıve complaınts Mımms was referrıng to and he
dıdn't
> say,dıdn't want to bother,  he just wanted a number so he could talk
to
> cyberspace
>
> -----Orıgınal Message-----
> From: Diane Capasso [mailto·diane@intcs.net]
> Sent: Tuesday, March 14, 2000 4 31 PM
> To·  chebard@chebard.com; DonR@usnetwork com
> Cc·  Carrıe Ortız; ıan@usnetwork.com; MıchelleF@usnetwork.com;
> gene@csgholdıngs.com
> Subject: RE: Tennessee
>
  Don: Carrie discussed wıth Mıchelle today to fax the reponse letters
  ˌ
her
> as they are completed. Carrie will do that.  AS far as TN is
concerned,
can
> we find out what complaints TN is referring to so theır concern can be
> answered  We can call from here ıf you like
>
> -----Orıgınal Message-----
> From: DonR@usnetwork com [maılto:DonR@usnetwork.com]
> Sent: Tuesday, March 14, 2000 4:12 PM
> To. diane@ıntcs.net, chebard@chebard.com; DonR@usnetwork.com
> Cc· gene@csgholdings.com; MıchelleF@usnetwork.com; ian@usnetwork.com
> Subject: RE: Tennessee
>
> Dıane-
> Exactly my poınt.  How would we know ıf one of these fits the
"accusatıon"
> sınce you never copy us regularly on your responses'?  Thıs ıs
rıdıculous.
> We fax you, daily, anythıng we get; even if ıt does not require a
Cyber
> reply.  Please see to ıt Carrie does this.  I would ask her myself,
but ın
> the past I only get some smart ass comment ın lew of performance
> I thank you in advance for your cooperation.
> -Don
>
  -----Orıgınal Message-----
  From. Dıane Capasso [mailto:diane@ıntcs.net]
> Sent  Tuesday, March 14, 2000 4:10 PM
> To  chebard@chebard.com, DonR@usnetwork.com, ıan@usnetwork.com
> Cc  gene hıraı, MıchelleF@usnetwork.com,·ıan@usnetwork.com

> Subject· RE. Tennessee
>
> I need some specifics please on the Tenn complaint  The only TN
~omplaint

  house now to be responded to is dated March 7. We have 10 days to get
the
> reponse in the hands of TN. Has Michelle checked to see if we have
received
> any TN complaints that are associated with this accusation. WE will be
glad
> to check on our end
>
> -----Original Message-----
> From· DonR@usnetwork com [mailto:DonR@usnetwork.com]
> Sent: Tuesday, March 14, 2000 1:45 PM
> To. diane@intcs.net; chebard@chebard.com
> Cc· ian@usnetwork.com; MichelleF@usnetwork.com
> Subject: FW· Tennessee
>
> Chris / Diane-
>
> I've asked for copies of ALL letters Carrie sends till I'm blue in the
face
> I want these faxed to me each and everytime she writes one so I know
this
is
> being done'  This is the second state in as many days asking for this
> information.
>
> -Don
>
~ > -----Original Message-----
  > From: Michelle Ferazza
  > Sent: Tuesday, March 14, 2000 1:41 PM
> > To·   Don Reese
> > Subject.     Tennessee
> >
> > I just got a call from the TN Regulatory Authority   Mr  Ed Mimms
He's
> > saying he's getting a lot of complaints not responded to by
Cyberspace.
> > He asked for a phone number like the FL guy yesterday.  So Ian had
me
give
> > him 877-507-6587 which I think is Carrie.  I got this number from
Carol
> > and Ian said ok  She says it's the nubmer given to the
Commisssions
> > Anyway, Mimms said he's going to start turning these over to "a
different
> > government agency" if he doesn't start getting responses.
> >

3

**Lisa Bluteau**

| | |
|---|---|
| **From:** | Gene Hirai [gene@csgholdings.com] |
| **int:** | Monday, March 20, 2000 8:09 AM |
| **o:** | DonR@usnetwork.com; Diane Capasso (E-mail) |
| **Cc:** | Diane Capasso (E-mail) |
| **Subject:** | RE: Cyber transfers |

Don,
Would like Diane and if you agree Carole on this call since they deal with
Pinnacle on a day to day basis.  I'm pretty much available all day.  Do you
want me to set up the conference call? Here is Chris's email address.
Chrislivi@pinnacletm.com
Gene

-----Original Message-----
From· DonR@usnetwork com [mailto:DonR@usnetwork.com]
Sent  Friday, March 17, 2000 12:14 PM
To: gene@capgains com
Subject: FW· Cyber transfers


Do you have an email address for Chris Livingston.  It came back
undeliverable to the one I guessed at.

Don

> -----Original Message-----
   From      Don Reese
   Sent·     Friday, March 17, 2000 12:12 PM
> To. 'dduracinski@picphones.com'; 'clivingston@picphones.com'
> Cc: 'gene hirai', Carol McCormick; Pawel Pietzra
> Subject:  Cyber transfers
>
>
>
> Chris / Denise,
>
> There are a couple of things that I'd like to throw out to you to see
if
> they can be improved on.  These have been brought to my attention via
our
> call center as received from end-users.
>
> 1   When all of your operators are busy there is a recording that
says
>      something like, "all reps are busy, please hold"  It repeats
this
>      constantly with no break (i.e. hold music) inbetween.  It
becomes
>      very irritating to listen to if the caller is on-hold for more
than
> about 10
>      seconds  Can this be redone and hold-music put in its place?
>      Ideally, of course, there will never be a need for this as calls
> should
>      be answered immediately.

   2.  Is there anyway of changing the sound quality of the ring the
caller
>      hears that your switch plays back?  We are noticing a fair
amount

1                    Exhibit  190

```
>     of callers simply hang-up when they hear this.  It kind of
sounds
> like
>     a phone line from the 50's or something.  I don't know what
 otions
     are available in this regard, but don't know unless I ask
>
> Anything I can do to help, please let me know.
>
> Don M  Reese
> Olympic Telecommunications, Inc.
>
>
>
```

2

**Lisa Bluteau**

| | |
|---|---|
| ᵀ~om: | Diane Capasso [diane@intcs.net] |
| ıt: | Monday, June 12, 2000 9:32 AM |
| ᵢo: | neilr@usnetwork.com; tracyl@usnetwork com, Ian Eisenberg; gene@csgholdings com, Carol McCormick; DonR@usnetwork.com |
| Cc: | Chris Hebard |
| Subject: | RE. SurfISP |

We cannot publish the 714 number.

Why cant a spanish option be added to the Surf 800 number? That will solve
the problem

-----Original Message-----
From: DonR@usnetwork com [mailto:DonR@usnetwork com]
Sent: Monday, June 12, 2000 11.36 AM
To: diane@intcs net; DonR@usnetwork.com, CarolM@usnetwork com;
gene@csgholdings.com, ian@usnetwork com, tracyl@usnetwork.com,
neilr@usnetwork com
Subject. RE. SurfISP


Let me rephrase, B|C needs a number for their reps to use for those
situations that they answer the phone.

Don

-----Original Message-----
ᵒm: Diane Capasso [mailto:diane@intcs.net]
ıt: Monday, June 12, 2000 9.27 AM
ᵣo. DonR@usnetwork.com, CarolM@usnetwork com; gene@csgholdings com;
ian@usnetwork com; tracyl@usnetwork.com; neilr@usnetwork.com
Subject: RE: SurfISP
Importance  High


We cannot give that number out. It is only for transferring. That would
be
like giving out your 206 number.  Why cant we add a spanish option to
Surfisp? That would solve the problem.

-----Original Message-----
From  DonR@usnetwork com [mailto·DonR@usnetwork.com]
Sent  Monday, June 12, 2000 11:20 AM
To  CarolM@usnetwork com, gene@csgholdings com, diane@intcs.net,
ian@usnetwork com; tracyl@usnetwork.com, neilr@usnetwork com
Subject  RE  SurfISP


Diane - please confirm the number.  I have to give it to B|C as they are
the
ones complaining.

Don

> -----Original Message-----
> From     Carol McCormick
  Sent     Monday, June 12, 2000 11 19 AM
  ᵀo: Don Reese; 'Gene Hirai'; 'diane@intcs.net', Ian Eisenberg, Tracy
⁄ Legler; Neil Richter
> Subject:  RE·  SurfISP
>

Exhibit 191                          1

> Perhaps they could be given 714-426-1945 - that's the spanish number we
> use down here for Cyberspace - it goes to California - Diane spoke to
> Denise and she does have the 714 number but claims that Spanish
  llers
  are not an issue for her  Diane did let her know not to actually give
out
> the number but that transferring to that number is possible  Surf
doesn't
> have a spanish option like Cyberspace - could we add it and have the
calls
> automatically transfer to that number?  Of course that phone is not
> answered with a generic Customer service greeting - they do answer
> Cyberspace  .  Diane and I are waiting for a call from Denise about
> transferring from Pinnacle - the last time I spoke to her about
> transferring I was told her reps did not have the ability to transfer
at
> all.
>
>        -----Original Message-----
>      From        Don Reese
>      Sent  Monday, June 12, 2000. 11:04 AM
>      To:   Don Reese, 'Gene Hirai'; 'diane@intcs.net'; Carol
McCormick;
> Ian Eisenberg; Tracy Legler, Neil Richter
>      Subject:   RE. SurfISP
>
>      Hello - anyone out there?
>
>              -----Original Message-----
>            From·        Don Reese
>            Sent  Monday, June 12, 2000 8:59 AM
>            To     'Gene Hirai', 'diane@intcs net', Carol
  Cormick,
  an Eisenberg; Tracy Legler; Neil Richter
>            Subject     SurfISP
>
>            Gene / Diane,
>
>            What number should bi-lingual SurfISP callers be calling
as
> instructed by Pinnacle and/or B|C?  Currently they are being told to
call
> Cyberspace   We need to fix this ASAP.  Please advise
>
>            Don
>
>                  confidential
>
>
>

2

**Lisa Bluteau**

| | |
|---|---|
| ᵐm: | Gene Hırai [gene@csgholdings.com] |
| ıt: | Tuesday, February 01, 2000 8:20 AM |
| To: | Don Reese (E-mail); Ian Eisenberg |
| Cc: | Jeff Fritz (E-mail); Chris Hebard (E-mail); Diane Capasso (E-mail) |
| Subject: | PINNACLE / CYBERSPACE CUSTOMER SERVICE |

Don and I spoke with Cathy Blanchard (one of the Owners) of Pinnacle.
1. Pinnacle has one inbound customer service center (IA) and seven outbound
centers in NE and MO   Current customer's include Motorola and have had experience w/ LEC's.
2  Don acted as Olympic representative and explained the type of customer
service calls that Cyberspace generates   Cathy understood and said she wouldn't have Agent dissension of trained properly.
3  Currently has 86 PC/Web based stations   We can roll out in one week from
signing a contract.
4. Don, I spoke again w/ Cathy and they have an option on another 100 stations adjacent to current center.  So if Olympic and or cyberspace decided to expand and take over all Olympic customer service we can be up in
two weeks - unless Motorola beats us to the punch and decides to take 100%
of the option facility which is unlikely.
5. I suggest the following: (a). test w/ 6 Agents ($22/hr)  M - F, 6A-2P
PST  (b). if we are happy w/ service we can add additional staff on
Mondays - Tuesdays (busy days) and as needed, and (c). If agreed Diane

  r associate would conduct training.
Thanks,
Gene

Exhibit 192

1

Don M. Reese
3302 N. 7th St. #359
Phoenix, AZ 85014

January 23, 2002

Mr. Robie Russell
76 South Main
Seattle, WA 98104

RE:   Ego, LLC and Super Ego, LLC – Reese Arbitration Submission.

Dear Mr. Russell,

Contained in the attached binder are my claims to the sale proceeds for Ego,
LLC and Super Ego, LLC.  The documentation that follows clearly shows a
destructive, malicious pattern of behavior of my former business partner, Ian
Eisenberg.

Ego was a very popular nightclub in Seattle's Capitol Hill neighborhood.  Its
success was due almost entirely because of my tireless efforts in overseeing
the running the business.  Mr. Eisenberg did very little to try and make the
business succeed.  In fact, I submit to you that he purposely and maliciously
destroyed the business for no other reason than to be vindictive.  As such
Mr. Eisenberg should not receive any money from the sale proceeds
following his numerous breaches of fiduciary duty to the LLC's.

Mr. Eisenberg seems to think he can get away with whatever he wants in life
all the while destroying the lives of those around him.  It is time he be
punished for his actions.

Sincerely,

Don M. Reese

Exhibit 201