CC TO JUDGE _____

_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

MAR 0 7 2002  KN

AT SEATTLE
CLERK U S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | Case No. C00-1806-L |
| v. | |
| CYBERSPACE.COM, LLC, et al, | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST IAN EISENBERG; CHRIS HEBARD; OLYMPIC TELECOMMUNICATIONS, INC.; FRENCH DREAMS INVESTMENTS, N.V.; AND COTO SETTLEMENT AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** |
| Defendants. | |

3-29-02

CV 00-01806  #00000132

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

# ORIGINAL

TABLE OF CONTENTS

I   INTRODUCTION                                                                    1

II   THE PARTIES

A.   The Federal Trade Commission . . . . . .   . . . . . .   . . . . . . . . . . . . . . . . .    . . . . . . 3

B.   The Defendants  . . . . . .  . . .     . . . .  . . . . . .  . . . . . . . . . . . . . . . . .   . . . . . .3

1.   Cyberspace.com, LLC ("Cyberspace") . . .  . . . . . . . . . .  . . . . . . . . . . . 3

2   Electronic Publishing Ventures, LLC ("EPV") . .  . . . . . . . . . . . .  . . . . 3

3   French Dreams Investments, N.V. ("French Dreams"). .  . . . . .  . . . . . . 3

4.   Coto Settlement ("Coto")  . . . . .  . . . .  . . . . . . . . . . . . . . . .  . . . .  . 3

5.   Olympic Telecommunications, Inc. ("Olympic") . . .  . . . . . . . . . . .  . . 4

6   Ian Eisenberg ("Eisenberg")  . . . . . . . . . . . .  . . . . .  . . . . . . . . . . . . 4

7.   Chris Hebard ("Hebard").  . .  . . . . .  . . . . . . . . . . . . . . . . . . .  . . . . . .  . . 4

III   DEFENDANTS' BUSINESS PRACTICES DECEIVED CONSUMERS.  . . . . . . . . . . 4

A   Defendants Used Solicitation Checks To Market Their Internet-Related Services 4

1.   Overview Of The Services Marketed  . . . . . . . . . . . . . . . . . . . . . . . . . .  . . . 4

2.   The Fulfillment. . . . . . . . . . . .  . . . . . . . . . . . . . . . . . . . . . . . . .  . . . . . 5

3.   Billing And Customer Service.  . . . . .  . . . . . . . . . . . . . . . . . . . . . . . 6

4.   Consumers' Usage Of The Internet-Related Services. . . . . . . . . . . . . . .  7

B   Eisenberg and Hebard's Marketing Material Was Deceptive. . . . . . . . . . .  . . . . . .7

1.   Eisenberg And Hebard's Marketing Material And Customer Service
     Representatives Made Representations To Consumers.  . . . . . . . . . . . . .  7

2   Defendants' Representations Were False. . . . . .  . . . . . . . . . . . . .    . . . .9

IV.   THE INDIVIDUAL DEFENDANTS CONTROLLED AND PERSONALLY
      PARTICIPATED IN THE BUSINESS PRACTICES OF THE CORPORATE
      DEFENDANTS FROM THE INCEPTION OF THE BUSINESS VENTURE. . . . . .  . . 10

FTC's Motion for Summary Judgment                                    Federal Trade Commission
and Supporting Memorandum of                                         600 Pennsylvania Ave , NW
Points and Authorities                                                    Washington, DC 20580
C00-1806-L                                                          202-326-3338 (Ms  Guerard)

1    V.    THE INDIVIDUAL DEFENDANTS KNEW THEY WERE BILLING
     CONSUMERS WHO DID NOT REALIZE THEY WERE CUSTOMERS. . . . . . . . . 11

2

     A.    The Individual Defendants Knew About The Type And Volume Of Complaints.11

3

4      B.    Eisenberg and Hebard Knew That Eight States Had Opened Investigations Of
     Their Marketing Methods . . . . .    . . . . . .   . . . . . . .  . . . . . . . . . . . . . . . . . . . . 13

5      C.    The Individual Defendants Kenw That Consumers Were Depositing the Checks
     Without Reading the Terms And Conditions Of The Offer          13

6

7      D.    The Individual Defendants Knew That They Were Billing Consumers Who Were
     Not Using The Service. .  . . . . . .     . . . . .  . . . . . . . . . . . . . . . . . .  . . . . . . . 14

8

9    VI.    EISENBERG AND HEBARD'S BUSINESS PRACTICES HAVE CAUSED MILLIONS
     OF DOLLARS IN INJURY TO CONSUMERS WHO UNWITTINGLY DEPOSITED
10      THE CHECKS AND PAID FOR A SERVICE THEY DID NOT AUTHORIZE, DID
     NOT EVEN KNOW THEY HAD, AND NEVER USED. . . . . . . . . . . . . . .     . . . . 15

11

12    VII.    THE INDIVIDUAL DEFENDANTS PROFITED FROM THEIR DECEPTIVE
     PRACTICES. . .   . . . . . . . . . . . . . . . .    . . . . . .  . . . . . . . . . . . . . . . . . .  . . . . . . . . . 16

13

14    VIII.    SUMMARY JUDGMENT IS APPROPRIATE. . . . . . . . .   . . . . . .  . . . . . . . .   . . . . 16

     A.    The Standard For Granting Summary Judgment.  . . . . . . . . . . .  . . . . . . . . . . 16

15

     B.    Jurisdiction And Venue Requirements Are Met. . . . . . . . . . . . . . . . . . . .  . . . . 17

16

     C.    Defendants' Deceptive Business Practices Violated The FTC Act. . . . . . . .  . . . 17

17

         1.      The FTC Act's Deception Standard. .  . . . . . . . . . . . . . . . . . . .  . . . . . . . . 17

18

         2.      Defendants' Representations Are Deceptive Under FTC Law. . . . . . . . 18

19

         3      Defendants' Deceptive Representations Were Material. . .   . . . . . . . . . . 20

20

     D.    Injunctive and Monetary Relief Against All Defendants Is Appropriate. . . . . . 21

21

         1.      Issues Of Injunctive Relief Have Already Been Resolved. . .   . . . . . . . . 21

22

         2.      The Court Should Order Equitable Monetary Relief To Remedy
             Defendants' Violations Of The FTC Act. . . . . . . . . . . . . . .  . . . . . . . . . 21

23

24    IX.    CONCLUSION.      . . . . . . . . .  . . . . . . . . .  . . . . . .  . . . . . . . . . . . . . . . . . . . . . . 23

25

26

27

28

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms. Guerard)

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION.

By mailing millions of deceptive solicitation checks to consumers nationwide, defendants Ian Eisenberg ("Eisenberg") and Chris Hebard ("Hebard") hoped that enough recipients would overlook the fine print hidden on the back of the check to make their venture lucrative. They were right. As one consumer told Eisenberg "you are clearly banking on the notion that most people won't examine too closely as what the check is for and who its from and will just cash it with their next bank deposit." [Plaintiff's Statement of Uncontroverted Facts (hereafter, "UF"), ¶ 19]. Defendants' marketing scheme, which lasted from the first mailing in November of 1998 through the final round of billing in September of 2000, resulted in at least $27,000,000 in charges placed on the back pages of consumers' telephone bills. The large majority of these consumers negotiated the check without understanding that they were signing up to be charged as much as $29.95 per month for Internet-related services they did not authorize. Even worse, defendants continued to bill even though they knew that less than one percent of the billed consumers ever logged on to the Internet using defendants' service. Not only did Eisenberg and Hebard not wait to bill consumers until they logged on, they also continued to flood the US mails with the same deceptive solicitations that hoodwinked the consumers they were already billing. Defendants' scheme resulted in millions of dollars in unrefunded injury to approximately 257,000 consumers. The individual defendants pocketed more than $2,000,000 in profits.

The defendants' solicitation checks ranged from $3.50 to $7.00. Typically, an invoice-like form was attached to the check, giving defendants' marketing material the appearance of a rebate, refund, or other payment for services based on a prior or ongoing business relationship between the defendants and the check recipients. Defendants buried the terms of the offer in nine lines of minute print on the back of the check, and thirteen lines of minute print on the back of the invoice-like form.

From the earliest possible date, Eisenberg and Hebard knew that recipients of their checks were endorsing the checks without reading the disclosure   Within three weeks of their initial mailing, the State of Wisconsin notified defendants that it had received numerous complaints

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1    about their use of a solicitation check to sign people up for Internet-related services.
2    Subsequently, seven more states contacted defendants regarding their solicitation checks.
3    Throughout the marketing campaign, boxfuls of written complaints swamped their offices;
4    telephone calls overwhelmed defendants' primary call center in Seattle, prompting them to open
5    two backup call centers. In response, defendants made only cosmetic changes to the marketing
6    material, which they constantly dumped into the mail system. And they continued to bill
7    thousands of consumers monthly for a service that they knew only a handful were using.

8         Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, plaintiff Federal Trade
9    Commission ("FTC" or "Commission") now files for summary judgment against each of the
10   named defendants on all three counts of the Commission's Complaint. The first count of the
11   Complaint alleges that defendants violated Section 5 of the Federal Trade Commission Act
12   ("FTC Act") by misrepresenting that consumers who received defendants' charges on a bill are
13   legally obligated to pay for those charges. The second count alleges that defendants
14   misrepresented that their solicitation check was a refund, rebate, receivable, or other payment for
15   services based on a prior or ongoing business relationship. The third count alleges that
16   defendants failed to disclose clearly and conspicuously the material conditions associated with
17   depositing or cashing defendants' solicitation check.

18        Summary judgment is clearly appropriate in this case. The evidence – eight volumes of
19   deposition testimony from consumers, defendants, and various third parties; sworn declarations
20   from 28 consumers and four government attorneys and investigators; the defendants' own
21   business records; and records from banks and other third parties – overwhelmingly establishes
22   that there are no genuine issues of material fact concerning the allegations in the FTC's
23   Complaint. Accordingly, the FTC is entitled to judgment against each of the defendants for their
24   violations of the FTC Act. For its relief, the Commission seeks a monetary judgment against
25   defendants, jointly and severally, for the amount they billed consumers, less credits and refunds
26   already given, and less the aggregate amount of the cashed solicitation checks. The Court has
27   previously entered Stipulated Permanent Injunctions against five of the named defendants, and
28

FTC's Motion for Summary Judgment                              Federal Trade Commission
and Supporting Memorandum of                                   600 Pennsylvania Ave , NW
Points and Authorities                                         Washington, DC 20580
C00-1806-L                        2                            202-326-3338 (Ms. Guerard)

1  the Commission requests that this injunctive relief extend to the two remaining defendants who
2  defaulted.

3  **II.      THE PARTIES.**

4          **A.      *The Federal Trade Commission*:**  The Commission is an independent agency of
5  the United States government created by the FTC Act, 15 U.S.C. § 41 *et seq*.  The FTC is
6  charged, *inter alia*, with enforcement of Section 5 of the FTC Act, 15 U.S.C. § 45(a), which
7  prohibits unfair or deceptive acts or practices in or affecting commerce [UF 1].

8          **B.      *The Defendants*.**

9          **1.      Cyberspace.com, LLC ("Cyberspace").**  Cyberspace is a limited liability
10  company formed in Delaware on September 30, 1998.  Its principal place of business was located
11  at 2722 Eastlake Avenue East, Seattle, Washington, which is also the location of defendant Ian
12  Eisenberg's offices.  Cyberspace did not answer the FTC Complaint, and an Order of Default
13  was entered on December 21, 2000 [UF 8].

14         **2.      Electronic Publishing Ventures, LLC ("EPV").**  EPV is a limited liability
15  company formed in Delaware on October 16, 1998.  EPV used as addresses 2722 Eastlake
16  Avenue East, Seattle, Washington, and 6 Hutton Center, Suite 1100, Santa Ana, California,
17  which is also the location of defendant Chris Hebard's offices.  EPV is 100% owner of
18  Cyberspace, Essex Enterprises, LLC, Surfnet Services, LLC, and Splashnet.net, LLC
19  (collectively, "the EPV subsidiaries").  EPV did not answer the FTC's Complaint, and an Order
20  of Default was entered on December 21, 2000 [UF 9-11].

21         **3.      French Dreams Investments, N.V. ("French Dreams").**  French Dreams is a
22  Curacao corporation.  French Dreams owns 50% of EPV.  It has bank accounts at the Asia
23  Europe Americas Bank in Seattle, Washington; it transferred funds to and received funds from
24  EPV and Cyberspace.  French Dreams singed an agreement dated October 16, 1998, with
25  defendant Coto Settlement entitled "Operating Agreement of Electronic Publishing Ventures,
26  LLC" [UF 12].

27         **4.      Coto Settlement ("Coto").**  Coto is a Cooks Island Trust, which owns 50% of
28  EPV.  Coto was the tax member for the EPV business venture between defendants Ian Eisenberg

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                                              3

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

1   and Chris Hebard.  Coto entered into an agreement dated October 16, 1998, with French Dreams

2   entitled "Operating Agreement of Electronic Publishing Ventures, LLC" [UF 13].

3       **5.      Olympic Telecommunications, Inc. ("Olympic")**.  Olympic is located at 2722

4   Eastlake Avenue East, Seattle, Washington. Olympic is wholly owned by defendant Ian

5   Eisenberg. Olympic has been a billing aggregator since 1996. It entered into "Billing Services

6   Agreements" with Cyberspace, Essex, and Surfnet, by which Olympic arranged to have charges

7   for the Internet-related services provided by these EPV subsidiaries appear on monthly telephone

8   bills of people who cashed or deposited solicitation checks from Cyberspace, Essex, and Surfnet

9   Olympic billed consumers on behalf of the EPV subsidiaries throughout most of the United

10  States. Olympic remitted funds it received from the telephone companies to defendant

11  Cyberspace. Olympic also provided customer service for the EPV subsidiaries [UF 14-16].

12      **6.      Ian Eisenberg ("Eisenberg")**.  Eisenberg has his offices at 2722 Eastlake

13  Avenue East, Seattle, Washington, the business location for many of his companies.  The

14  building is owned by Eisenberg's eight-month old son through a trust.  Eisenberg owns

15  defendants French Dreams and Olympic; he is Olympic's President; and he controls its business

16  practices. Eisenberg received approximately $1.5 million from the EPV venture [UF 17-20].

17      **7.      Chris Hebard ("Hebard")**   Hebard had offices at 6 Hutton Center, Suites 970

18  and 1100, Santa Ana, California. Hebard met with Eisenberg in Seattle on several occasions to

19  discuss the EPV business venture. Hebard owns and controls Coto, as well as a number of other

20  companies at the Hutton Center location, each of which provided services or funding to the EPV

21  venture. Hebard received approximately $1.5 million from the EPV venture [UF 21-23].

22  **III.    DEFENDANTS' BUSINESS PRACTICES DECEIVED CONSUMERS.**

23

24      A.    ***Defendants Used Solicitation Checks To Market Their Internet-Related
            Services.***

25      **1.    Overview Of The Services Marketed**.

26      In the fall of 1998, Eisenberg reviewed the marketing material of a company called

27  Yellow-page.net ("YP.Net"), for which Olympic was the billing aggregator [UF 91]. YP Net

28  used solicitation checks to sign businesses up for a listing in an Internet-based directory.

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                                    4

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms. Guerard)

1   Eisenberg labeled YP.Net's solicitation check "genius" [UF 91]. Soon thereafter, Eisenberg and
2   Hebard launched their business venture. Their first marketing effort was for a service they called
3   "Yellow-page com", which offered businesses a listing in an Internet-based directory [UF 27,
4   91]. "Yellow-page.com" was marketed by Essex, an EPV subsidiary [UF 25]. Essex began
5   mailing the Yellow-page.com solicitation checks in November of 1998 [UF 25]. Eisenberg and
6   Hebard then expanded into a new field: offering Internet access. Initially, Eisenberg and Hebard
7   sent Internet access solicitation checks under the entity name "Cyberspace.com"; later in 1999,
8   they mailed checks under two other names: Splashnet.net and Surfnet Services [UF 25, 27]. The
9   Essex promotion ended in 1999 [UF 25]; the other promotions ended sometime in June or July of
10  2000 [UF 25]. Consumers who signed Eisenberg and Hebard's solicitation checks were billed
11  monthly, $19.95 for consumers and $24.95 or $29.95 for businesses, anywhere between one time
12  and nineteen times [UF 36, 38]. Although the rate of "usage" for the Yellow-page.com listing
13  cannot be determined, less than one percent of the people billed by Eisenberg and Hebard ever
14  used their Internet access service [UF 56]. By the end, Eisenberg and Hebard had mailed
15  millions of solicitation checks [UF 28] and billed more than 257,000 consumers [UF 38], most of
16  whom never knew they were customers until they eventually discovered the EPV charges on their
17  telephone bill [UF 113].

18      Many of the people who cashed or deposited Eisenberg and Hebard's solicitation checks
19  viewed the checks in one of two ways: either they thought the check was a refund, rebate, or
20  other payment for services from a business with which they had a prior or ongoing business
21  relationship [UF 71]; or they cashed or deposited the check without realizing the consequences of
22  doing so [69, 76]. In all instances, the check initiated a business relationship [UF 74].

23      **2.    The Fulfillment**.

24      Eisenberg and Hebard mailed to those who endorsed the solicitation check from
25  Cyberspace, Surfnet, or Splashnet a CD Rom that included a unique username and password, as
26  well as software which, if installed on a computer, allowed consumers to access the Internet via a
27  dial-up connection [UF 30]. Eisenberg and Hebard contracted initially with Interlync, and later

28

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                               5

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

1 with Starnet, two Internet Service Providers, to provide a dial-up connection to the Internet to
2 consumers who installed Eisenberg and Hebard's CD Rom [UF 31].

3       **3.     Billing And Customer Service.**

4       Eisenberg and Hebard used Eisenberg's company, Olympic, to place charges on
5 consumers' telephone bills for three of the four EPV subsidiaries [UF 33]. They resorted to an
6 unrelated billing aggregator, Integretel, for Splashnet, the fourth EPV subsidiary, as a way to
7 diversify the risk of losing the right to bill through local exchange carriers because of high
8 complaint levels [UF 33]. Olympic charges appeared on a separate page of a consumer's
9 telephone bill, which was called the "Olympic bill page" [UF 34, 66]. The Olympic bill page
10 included the name of the EPV subsidiary on whose behalf Olympic was placing the charge, the
11 date and amount of the charge, and a toll-free customer service telephone number, [UF 34, 66,
12 67].

13 Consumers who called Olympic's toll-free number reached customer service representatives
14 ("CSRs") in Eisenberg's Eastlake offices [UF 39]. As telephonic complaints increased,
15 Eisenberg and Hebard passed overflow calls to Hebard's organization in California, and
16 eventually they added a third call center from an outside company [UF 40]. Hebard's group
17 responded to written complaints and inquiries related to the EPV subsidiaries [UF 40].

18       As the initial contact point, Olympic received telephone inquiries from consumers
19 questioning Olympic-related charges on their telephone bills and boxfuls of consumer complaints
20 that were forwarded to Olympic from government agencies and telephone companies [UF 41,
21 112, 130, 131]

22       **4.     Consumers' Usage Of The Internet-Related Services.**

23       Interlync, the first ISP used by the EPV venture, invoiced Eisenberg and Hebard monthly
24 based on the number of consumers issued an username and password, regardless of whether any
25 of these consumers used their EPV username to access the Internet [UF 49]. By contrast, Starnet,
26 which took over for Interlync in June 1999 [UF 31, 47], charged only for those consumers who
27 used their EPV username to access the Internet during a given month (identified as "unique log-
28 ons" in Starnet's invoices to Eisenberg and Hebard) [UF 50].

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                                        6

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1   The number of usernames assigned to consumers who endorsed the solicitation check was
2   exponentially greater than the number of consumers who actually used the service. As a result,
3   Starnet presented a much more favorable billing arrangement for Eisenberg and Hebard than did
4   Interlync  In October 1999, for example, Eisenberg and Hebard billed 90,000 people but had to
5   pay Starnet for only 75 unique log-ons that month [UF 54], in September 2000, defendants billed
6   approximately 15,000 consumers and paid for only 56 unique log-ons [UF 55]. In all, Eisenberg
7   and Hebard billed approximately 247,000 people during the time that Starnet was providing
8   Internet access to those people; according to Starnet's invoices, at most 2,000 of those people
9   ever logged on to the Internet using their EPV username [UF 56]

10   The FTC's position is that usage was low because consumers did not know they had been
11   signed up for Internet access. The FTC position is based on the solicitation check itself, with its
12   fine-print terms buried in numerous lines of text, the boxfuls of consumer complaints and
13   correspondence from regulators and telephone companies produced by defendants; the deposition
14   testimony from defendants themselves; and the sworn declarations and depositions from people
15   billed by Eisenberg and Hebard  These documents show that fewer than one percent of those
16   billed actually logged onto the Internet using their EPV password because only that tiny
17   percentage knew they were signing up for Internet access when they cashed or deposited the
18   solicitation check. The other 99% - the people who cashed or deposited the solicitation check
19   without knowing the consequences of doing so - confirms the deceptiveness of Eisenberg and
20   Hebard's solicitation checks and the inadequacy of the fine-print disclosures.

21   **B.   *Eisenberg and Hebard's Marketing Material Was Deceptive*.**

22   **1.   Eisenberg And Hebard's Marketing Material And Customer Service
           Representatives Made Representations To Consumers.**

23   Defendants' solicitation checks were for small amounts [UF 26]. The front of check
24   included the normal characteristics of a typical check:  the payor (one of the EPV subsidiaries);
25   the payee's name and address; the date and amount; a signature [UF 60]. The check also
26   included the payee's telephone number next to the text "RE". [UF 60]. Below the check,
27   Eisenberg and Hebard attached an invoice-like form with columns and descriptors, such as
28

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                                      7

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1   "invoice number", "reference number", "account number" or "discount taken" [UF 62].
2   Nowhere on the checks or invoice forms do the words "solicitation" or "marketing material" ever
3   appear  Nowhere on the front of the check are the terms of Eisenberg and Hebard's offer [UF
4   64]. Instead, the terms were buried in lines of fine print on the back of the check and invoice-like
5   form [UF 63].

6      Consumers learned for the first time that they were Eisenberg and Hebard's customers
7   when they discovered unrecognized charges on an Olympic billing page, in some cases having
8   unknowingly paid those charges for months [UF 70].  Many consumers who eventually found
9   the charge did not know why they were being billed by Olympic [UF 69].  Bewildered by the
10  charge, consumers telephoned Olympic and learned they were being billed for a service they did
11  not know they had ordered [UF 113]

12     Eisenberg and Hebard, by placing the EPV subsidiary charge on the Olympic page that
13  was included in a telephone bill, represented to consumers that the charge was valid, that the
14  consumer had agreed to the charge, and that the consumer was legally obligated to pay the charge
15  as part of their telephone bill. For many consumers, Eisenberg and Hebard's CSRs reiterated the
16  deception by telling confused callers that they were legally obligated to pay the charge because
17  someone had endorsed a solicitation check [UF 68]. Among the people who were told that they
18  had authorized the charge and had to pay were consumers who deposited the check because the
19  routine practice of their business was to endorse and process all incoming checks immediately
20  without determining what the check was for [UF 76], consumers who did not have a computer
21  [UF 77], consumers who already Internet access through a different provider [UA 78], and
22  consumers who did not have a modem connected to the billed telephone line [UF 79].

23     From the first round of defendants' billing until the last, Eisenberg and Hebard received
24  complaints from consumers nationwide who could not use defendants' services [UF 77, 79, 114].
25  It is clear that those consumers did not knowingly agree to be charged for services they could
26  never use; it is clear that they were duped by defendants' solicitation check; and it is clear that
27  Eisenberg and Hebard knew this was happening and responded by sending out more and more
28  checks to unsuspecting consumers.

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                                      8

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1    For some consumers and businesses, the small amount of the check and the reference to
2  the consumer's telephone number next to the "RE", coupled with the invoice-like form with its
3  business categories and the complete failure of the front of the check and invoice form to include
4  any reference to monetary consequences of cashing or depositing the check, caused those
5  consumers who received the check to believe that it was a refund, rebate, or some payment based
6  on a prior or existing business relationship [UF 71]

7    The solicitation check was a valid check, which consumers could cash [UF 59].
8  However, the essential terms of Eisenberg and Hebard's offer - price and product - were hidden
9  in many lines of fine print [UF 61, 63]. Instead of alerting check recipients of the terms of the
10  check using a conspicuous disclosure on the front of the check and attached form, defendants
11  chose to bury the terms in fine print on the back of both. The financial consequences appear in
12  the middle of the text, and are not printed in capital letters, or in a bigger type size or bolder font
13  than the rest of the statement. The only reason to hide the most important disclosure is increase
14  the likelihood that consumers will endorse the checks without seeing the disclosure

15      **2.    Defendants' Representations Were False**.

16    The representation that consumers were legally obligated to pay the charge, whether made
17  by Eisenberg and Hebard via the Olympic billing page or by their CSRs, was false because
18  consumers who cashed or deposited the check without realizing the consequences of doing so,
19  did not knowingly agree to defendants' offer, and hence had not authorized the charge.

20    The representation that the check was a rebate, refund, or payment based on a prior or
21  existing business relationship was also false. The solicitation check was not a refund, rebate, or
22  payment based on a prior or ongoing business relationship [UF 72]. Hebard and Eisenberg
23  concede that consumers who received their solicitations checks had no prior or ongoing business
24  relationship with the EPV subsidiaries [UF 73]. This concession is significant because Eisenberg
25  and Hebard knew, from the volume of consumer complaints, that consumers were mistaking the
26  solicitation checks for a rebate, refund, or payment based on an prior or existing relationship.
27  One of the scripted answers developed for the CSRs to use when consumers called was "The

28

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                                    9                    Federal Trade Commission
                                                                  600 Pennsylvania Ave , NW
                                                                  Washington, DC 20580
                                                                  202-326-3338 (Ms Guerard)

1    check is a promotion; Cyberspace.com is offering your company our Internet services. We do
2    not currently have an account with your company." [UF 75]

3        By sending checks to consumers nationwide, Eisenberg and Hebard represented that the
4    checks could be cashed. While this representation is not inaccurate, Eisenberg and Hebard's
5    failure to disclose the financial consequences of endorsing the check clearly and conspicuously
6    renders the initial representation on the front of the check false and deceptive.

7        The fact that Eisenberg and Hebard's *modus operandi* was deceit is made even more
8    apparent by the fact that many mail pieces had minor revisions, such as a change in color or
9    graphics, but the changes were principally to see if a certain approach would or would not hurt
10   the business venture [UF 64]. Defendants may claim they made changes to ensure consumers
11   understood the offer - but if they had really wanted consumers to understand, they would have
12   put a disclosure on the front of the check and invoice-like form. Or, they could have deferred
13   billing any consumer until he or she had logged onto the Internet using the EPV password, a
14   route Eisenberg and Hebard never selected [UF 166].

15       In all, perhaps the most common complaint put forth by people being billed by Olympic
16   on behalf of the EPV subsidiaries was the most simple: consumers did not know why they were
17   being billed  [UF 69, 113]. Many consumers had never heard of Olympic or the EPV
18   subsidiaries or recalled the solicitation check until discovering the charge on their telephone bills
19   and calling Olympic's CSRs; many others remembered signing the check only after Olympic's
20   CSRs explained the fine print to the consumers. Whether consumers eventually recollected
21   receiving defendants' solicitation check or not, consumers did not agree to be charged by
22   defendants.

23   **IV.    THE INDIVIDUAL DEFENDANTS CONTROLLED AND PERSONALLY
         PARTICIPATED IN THE BUSINESS PRACTICES OF THE CORPORATE
24       DEFENDANTS FROM THE INCEPTION OF THE BUSINESS VENTURE.**

25       Eisenberg and Hebard set up EPV in such a way that they would each have "exactly equal
26   control" [UF 85]. Eisenberg acknowledged that he and Hebard made a large number of decisions
27   together about the EPV venture [UF 89]. For instance, determined who would be the officers
28   and managers of EPV and the EPV subsidiaries; they selected only employees who were from

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                          10

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

either Eisenberg and Hebard's organizations [UF 103]. They agreed upon their refund policy [UF 105]. They communicated from their respective offices in Seattle and Santa Ana: daily conference calls and emails about all aspects of the business involved Eisenberg and Hebard personally as well as their staff [UF 86, 87]. These discussions addressed the marketing material, consumer complaints, state Attorney General investigations, technical issues that arose with the call centers, who would handle which assignments, disagreements, and outside vendors [UF 86, 87, 104].

Ultimately, the "success" of the EPV business venture depended on Eisenberg and Hebard's solicitation checks. Eisenberg suggested that the EPV venture market services via solicitation checks based on a similar marketing technique used by YP.Net, for which Olympic was placing charges on consumers' telephone bills [UF 90, 91]. Eisenberg and Hebard altered the YP.Net solicitation check, named their offering Yellow-page.com, and the EPV venture was in business. Hebard and people working for him sent samples of proposed marketing material to Eisenberg for his review and approval [UF 93, 94, 95]. Eisenberg and Hebard discussed the marketing material and communicated their decisions regarding the marketing material by telephone, email, letter, post-it, and in person with the employees who were working on this material [UF 96, 97] Eisenberg and Hebard also discussed, and decided upon, the number of solicitation checks to mail and when to mail them. No one other than Eisenberg and Hebard had the authority to determine how much marketing material to mail, or when to mail [UF 99, 100].

V.   **THE INDIVIDUAL DEFENDANTS KNEW THEY WERE BILLING CONSUMERS WHO DID NOT REALIZE THEY WERE CUSTOMERS.**

A.   *The Individual Defendants Knew About The Type And Volume Of Complaints.*

Eisenberg and Hebard's offices received boxfuls of complaints from consumers, government agencies, and telephone companies [UF 130, 131]. As the primary provider of customer service, and as the entity whose toll-free number appeared with charges from the EPV subsidiaries Olympic received a variety of complaints, in writing and by telephone. For instance, it received complaints from consumers who did not have a computer [UF 114], who thought that the solicitation check was a refund [UF 115], who stated they had not authorized the charge, or

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                                11

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms. Guerard)

1   who explained that they were being billed for something they had not ordered [UF 116]. But the
2   primary complaint Olympic received was from consumers who did not know they were
3   customers of an EPV subsidiary [UF 113].

4        Olympic's Chief Operating Officer, Don Reese, discussed Olympic's EPV complaints
5   several times a week with Eisenberg [UF 110, 113, 117]. Eisenberg was also made aware of
6   these complaints through conference calls and emails [UF 114]. Eisenberg reviewed written
7   consumer complaints a few times per week, and heard oral complaints daily by listening in on
8   CSRs' conversations with consumers [UF 118]. Eisenberg personally handled several email
9   complaints [UF 119, 120].

10        Olympic forwarded written complaints to Hebard's organization for handling, and, as a
11   result, Hebard's offices also responded to complaints similar to those received by Eisenberg's
12   group. For instance, Hebard's people answered complaints from consumers who thought the
13   solicitation check was some kind of refund or rebate or who deposited the check inadvertently
14   and did not want the EPV subsidiaries' services [UF 107], or who stated that they had not
15   ordered the EPV subsidiaries' services, or who explained that they did not have time to read all
16   of their mail cover-to-cover [UF 108]. Hebard also received customer service reports regarding
17   the types of issues raised by consumer inquiries so that he could discuss these issues with the
18   venture's legal counsel [UF 109]. When Hebard's offices responded to complaints from
19   regulators, Eisenberg and Reese asked Hebard to forward those complaints and responses to
20   Olympic's Eastlake offices for review [UF 111].

21        Eisenberg and Hebard also knew of the high volume of complaints. Reese told Eisenberg
22   and Hebard in a January 12, 2000 email that "the volume of complaints I am seeing for
23   Cyberspace is well beyond anything I've ever seen." [UF 122]. Reese later warned Eisenberg
24   and Hebard that Olympic was in serious trouble in Texas and California due to the "extraordinary
25   number" of cramming complaints [UF 122]. Olympic received monthly "cramming" reports
26   from telephone companies showing the number of consumers complaining about unauthorized
27   charges by Olympic for the EPV subsidiaries [UF 126] Olympic received correspondence from
28   telephone companies threatening to terminate Olympic's billing contracts because of the high

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                              12

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
202-326-3338 (Ms. Guerard)

1  volume of complaints relating to charges from the EPV subsidiaries [UF 112]. The high volume
2  of complaints was a concern for Eisenberg and Hebard because it threatened their ability to place
3  charges on consumers' telephone bills: every telephone company had a threshold complaint level
4  beyond which they could terminate billing [UF 123]. Eisenberg received emails regarding this
5  threshold, and the EPV venture engaged in an ongoing battle to keep its complaint level below
6  that cut-off [UF 124]. Eisenberg participated in a telephone call from a telephone company vice
7  president in which Eisenberg was warned that Olympic's complaint levels were too high and that
8  an action plan to reduce complaints was necessary [UF 125]. Approximately 70% of Olympic's
9  complaints involved but one EPV subsidiary: Cyberspace.com [UF 125].

10   **B.   *Eisenberg and Hebard Knew That Eight States Had Opened Investigations Of
11        Their Marketing Methods*.**

12      Over the course of the EPV business venture, eight states opened investigations into
13  Eisenberg and Hebard's solicitation checks [UF 132]. The first investigation, by the State of
14  Wisconsin, was prompted by Yellow-page.com, the initial promotion of the EPV venture, shortly
15  after it was first mailed [UF 133]. This was the type of complaint Hebard discussed with
16  Eisenberg [UF 133]. Following its investigation, Wisconsin concluded that two of the EPV
17  subsidiaries– Essex and Cyberspace– violated Wisconsin trade practice law [UF.134].
18  Investigations opened by Montana, California, North Carolina, Illinois, Missouri, Delaware, and
19  Texas involved similar allegations that the EPV subsidiaries' solicitation checks violated the
20  laws of these states [UF 133-145]   Eisenberg and Hebard both knew of these investigations [UF
21  146], and discussed them in conference calls [UF 86; 147].

22   **C.   *The Individual Defendants Knew That Consumers Were Depositing The
         Checks Without Reading The Terms And Conditions Of The Offer*.**

23      Eisenberg and Hebard knew consumers were not reading the disclosures on the checks.
24  Eisenberg and Hebard's organizations received complaints from consumers that they had not
25  read the back of the check before depositing it [UF 150], had processed the check with hundreds
26  of others [UF 152], or had unknowingly stamped a solicitation check [UF 149]. Hebard
27  specifically recognized that some consumers who signed the back of the solicitation checks had
28  not read the disclosure or any other part of the promotion [UF 168]. An email to Eisenberg and

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                          13

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms. Guerard)

1  Hebard included a suggested answer to a possible NBC story about the solicitation checks: "We
2  have processed hundreds of thousands of dollars of refunds for customers who cashed the check
3  without reading the insert or the disclosure on its face and signature block. (this may be the
4  wrong message to send)." [UF 151].  Don Reese stated in an email to Eisenberg and Hebard that,
5  in his view, that only reason the solicitation checks sent to businesses were being cashed was that
6  the accounts receivable department "doesn't pay attention " [UF 148].  His opinion was well
7  supported: it was based on the number of complaints, comments from the CSRs and their
8  supervisors, complaints from telephone companies, and conversations between consumers and
9  customer service representatives [UF 148].  Even the presentation package or offering circular
10 that Eisenberg and Hebard distributed to potential buyers suggested that a number of customers
11 had signed up without realizing that they had ordered Internet service by depositing the
12 solicitation check [UF 160].

13   **D.**   ***The Individual Defendants Knew That They Were Billing Consumers Who***
        ***Were Not Using The Service.***

14      Eisenberg and Hebard knew that only a small fraction of the people they were billing each
15   month were using the EPV installation software to access the Internet; they discussed this low
16   rate of usage in their various conference calls [UF 157] and in emails.  In September 1999,
17   Hebard wrote to Eisenberg and Reese that the EPV "churn factor" was a function of non-usage
18   among people being billed, rather than a function of the quality of the service they offered [UF
19   158].  Jeff Fritz from the Hebard organization circulated an email noting that only 75 of the
20   people being billed logged on to the Internet using EPV software in October 1999 [UF 165];
21   during that same month, Eisenberg and Hebard billed 90,000 customers [UF 54].
22      Potential buyers of the EPV venture expressed concern that so few consumers being
23   billed by the EPV subsidiaries had logged on to the Internet using the EPV software [UF 161].
24   In response to the issue of low usage in talks with potential buyers, Hebard suggested that he
25   contact Starnet, the ISP, and "beg them to bill us for more users." [159].  Hebard never acted on
26   this suggestion; however, neither did Eisenberg and Hebard decide to defer billing consumers

27
28

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                              14

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

until after they had logged on to the Internet; nor did they adopt a suggeston to discontinue billing consumers after a period if they had not used their EPV username [UF 167].

## VI.   EISENBERG AND HEBARD'S BUSINESS PRACTICES HAVE CAUSED MILLIONS OF DOLLARS IN INJURY TO CONSUMERS WHO UNWITTINGLY DEPOSITED THE CHECKS AND PAID FOR A SERVICE THEY DID NOT AUTHORIZE, DID NOT EVEN KNOW THEY HAD, AND NEVER USED.

Consumer injury in this case consists of the total amount consumers were billed, less refunds and credits they received, and less the aggregate amount of the solicitation checks they cashed. Olympic did not know, at its deposition, the total amount it had billed EPV consumers [UF 169]. There are, however, other sources for establishing the amount billed. For instance, Eisenberg and Hebard distributed a written presentation to potential buyers which states that the estimated annualized revenue for the EPV venture as of November 1, 1999, was $32 million [UF 173]. Hebard is certain this figure was accurate [UF 35]. Another source is the customer service database used by Eisenberg and Hebard's CSRs, which captured, *inter alia*, a list of telephone numbers that were billed, the billing amount, the number of times each telephone number was billed, and the amount of refund or credit, if any, that was issued to each telephone number [UF 46]. As the billing aggregator for three of the four subsidiaries, Olympic's database will not reveal the full measure of consumer injury, but it can establish the harm caused by Cyberspace, Surfnet, and Essex [UF 33]. This database appears to show that Eisenberg and Hebard billed consumers at least $27 million between February 1999 and September 2000 [UF 170].

Eisenberg and Hebard did issue refunds. However, their policy was to issue a refund only if billed consumers demanded one, and only for the amount requested by the consumer rather than the total amount billed [UF 176, 177].[1]   Consumers contacted by the FTC state they were

---

[1] This policy is confirmed by information provided by defendants with respect to just one of the subsidiaries, Cyberspace   According to defendants, as of June 18, 2000, there were 224,414 Cyberspace customers who had been billed at least once, and of these, 22,482 had received full refunds and 49,482 received partial refunds [UF 175]. Thus, more than 150,000 Cyberspace consumers never received any refunds. The total refunds paid to those lucky Cyberspace customers who were able to get a refund, even if partial, was $1,846,000 [UF 175]

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                                              15

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

1 never fully reimbursed for the charges they paid [UF 178]. Olympic did not know, at its

2 deposition, the total amount consumers had been refunded [UF 174]. However, the customer

3 service database appears to show that consumers were issued approximately $2,875,000 in

4 refunds and telephone credits [UF 171].

5      If one assumes that each of the approximately 257,000 billed consumers cashed a

6 solicitation check for $3 50, then the aggregate amount of the checks is approximately $899,500.

7      Using these figures, the unreimbursed consumer injury is approximately $23,225,500.

8

**VII.   THE INDIVIDUAL DEFENDANTS PROFITED FROM THEIR DECEPTIVE**
9 **PRACTICES**.

10      Eisenberg and Hebard profited from their EPV venture. Financial records and

11 defendants' own depositions show the amount of money they each contributed, and the amount

12 they, or their entities, received. John Keida, a certified public accountant, prepared a financial

13 accounting of the EPV business venture [UF 17, 180]. Records from defendants' banks in

14 Seattle and North Carolina, as well as an electronic accounting prepared by Keida, show that

15 Eisenberg, French Dreams, and Don Reese's predecessor contributed $285,000 to the EPV

16 venture; French Dreams received $1,469,376 from EPV and Cyberspace, giving a net return

17 $1,184,376 [UF 184]. Similarly, Hebard, through one of his companies, Intec [UF 21], invested

18 $340,000 in the EPV venture; Hebard's investment account and one of his companies received

19 $1,524,376 from EPV and Cyberspace, giving Hebard the same net return as Eisenberg,

20 $1,184,376 [UF 185].

21 **VIII.   SUMMARY JUDGMENT IS APPROPRIATE**.

22      **A.      *The Standard For Granting Summary Judgment*.**

23      Summary judgment is appropriate when the moving party shows that there is "no genuine

24 issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

25 Rule 56(c), Fed. R. Civ. P.  Summary judgment is proper when a rational trier of fact would not

26 be able to find for the nonmoving party on the claims at issue. *Matsushita Elec Indus. Co. v*

27 *Zenith Radio Corp* , 475 U.S. 574 (1986). Only disputes over facts that might affect the outcome

28 of this litigation will properly preclude summary judgment. *Anderson v Liberty Lobby, Inc* , 477

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                                    16

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1   U S. 242, 248 (1986).  Thus, any opposition to this motion must set forth evidence that is
2   significantly probative of any fact that is claimed to be disputed.  *SEC v. Murphy*, 626 F.2d 633,
3   640 (9th Cir. 1980) (citations omitted).  Because defendants cannot come forward with such
4   evidence, the Commission is entitled to summary judgment against the named defendants.

5       **B.    *Jurisdiction And Venue Requirements Are Met.***

6       This Court has jurisdiction under section 13(b) of the FTC Act, which authorizes the
7   Commission to seek, and the district courts to grant, permanent injunctions against any actions
8   that violate any laws enforced by the Commission.  *FTC v  Pantron I Corp.*, 33 F.3d 1088, 1095
9   (9th Cir. 1994)  In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1345
10  over cases brought by the Commission, which is an agency of the United States government
11  authorized to bring suit.  Because defendants operated their deceptive marketing campaign on a
12  nationwide level, their practices are "in or affecting commerce," as required by Section 4 of the
13  FTC Act, 15 U.S.C. §44.  Venue is proper because the conduct at issue arose in this district when
14  the individual and corporate defendants transacted business at 2722 Eastlake Avenue East,
15  Seattle, Washington.  28 U.S.C. § 1391(b)

16      **C.    *Defendants' Deceptive Business Practices Violated The FTC Act.***

17      **1.    The FTC Act's Deception Standard.**

18      Section 5 of the FTC Act prohibits deceptive representations to consumers  An act or
19  practice is deceptive if: 1) there is a representation, omission, or practice that is likely to mislead
20  consumers acting reasonably under the circumstances, and 2) the representation, omission, or
21  practice is material, *i e.*, it involves information important to consumers and therefore is likely to
22  affect their decision.  *Pantron I Corp* , 33 F.3d 1088, 1095.  *See also, Southwest Sunsites, Inc  v*
23  *FTC*, 785 F.2d 1431 (9th Cir. 1986); *FTC v  American Standard Credit Sys  Inc* , 874 F. Supp.
24  1080, 1088 (C.D. Cal. 1994).  The Commission need not prove that every consumer actually
25  relied upon the misrepresentations to prevail.  *FTC v  Amy Travel Serv  Inc* , 875 F.2d 564, 573-
26  574 (7th Cir. 1989)  It is sufficient to show that misrepresentations were widely disseminated and
27  caused actual consumer injury  *See FTC v  Kitco of Nevada, Inc* , 612 F. Supp. 1282, 1293-1294
28  (D. Minn. 1985).  Such a showing creates a presumption of actual reliance.  *FTC v. Wilcox*, 926

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                                    17

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1   F. Supp. 1091, 1105 (S.D. Fla. 1995).  Once this presumption is established, the burden shifts to

2   the defendants to prove an absence of reliance.  *Id*

3        **2.**      **Defendants' Representations Are Deceptive Under FTC Law.**

4      As set forth in detail in Section IV B above, the defendants violated Section 5 of the FTC

5   Act in three ways.  First, defendants represented that consumers who received defendants'

6   charges on a bill were legally obligated to pay for those charges, when, in fact, consumers had

7   not agreed to be charged and were not legally obligated to pay defendants' charges.  These

8   representations came in the form of the presentation of the EPV subsidiaries' charges on the

9   Olympic bill page, and also in the form of statements by Eisenberg and Hebard's CSRs to

10   consumers that consumers must pay the EPV charges on their bills.  These representations were

11   false: consumers who did not agree to the fine-print disclosures on the back the solicitation check

12   were not legally obligated to pay Olympic's charges.  This is standard hornbook law  For

13   example, Section 211 of the *Restatement (Second) of Contracts* concludes that a term is not part

14   of an agreement when one party to the agreement has reason to know that the party manifesting

15   assent would not do so if he knew that the writing contained the particular term.

16      The conclusion reached in the Restatement applies precisely to the situation consumers

17   were confronted with by the EPV subsidiaries' solicitation checks:  consumers endorsed the

18   check without knowing the terms attached to their endorsement.  The fact that they did not know

19   the terms resulted from the inconspicuous manner in which Eisenberg and Hebard presented

20   these terms.  And based on the overwhelming number of consumer complaints Eisenberg and

21   Hebard received on this point, it is easy to conclude that they had reason to know that consumers

22   were not aware of the consequences of signing the solicitation check.  Hebard conceded this

23   point in his deposition [UF 168].  Eisenberg and Hebard's representations that consumers were

24   legally obligated to pay are deceptive in light of this concession.

25      Second, defendants represented to consumers that defendants' solicitation check was a

26   refund, rebate, receivable, or other payment for services based on a prior or ongoing business

27   relationship, when in fact, the solicitation check was not based on a prior or ongoing business

28   relationship.  This representation was made in the invoice-like form attached to the solicitation

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L          18

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1   check, which included fields such as "Invoice Number", "Account Number", and "Discount
2   Taken." This representation was also made on the face of the check itself, where the small
3   amount of the check and the payee's telephone number, which consumers are likely to assume
4   that the payor has because there is a prior or existing business relationship, combined to present a
5   representation that the check was based on a prior or ongoing business relationship. However,
6   defendants' solicitation check was used to initiate a business relationship with recipients of the
7   check [UF 74]. Therefore, the checks' representations to the contrary was false. This falsity
8   renders deceptive Eisenberg and Hebard's representation that their check was a payment based
9   on a prior or ongoing business relationship.

10         Eisenberg and Hebard's third actionable representation was that consumers who received
11   defendants' solicitation check could cash or deposit the check. This representation is deceptive
12   because Eisenberg and Hebard failed to disclose clearly and conspicuously the material
13   conditions associated with cashing or depositing the check, such as that doing so would sign up
14   the consumer for defendants' Internet-related services, and would result in defendants' placing a
15   monthly charge on the consumer's telephone bill for these services. The disclosures that
16   Eisenberg and Hebard did provide as to the consequences of cashing or depositing their check
17   were insufficient.

18         Eisenberg and Hebard's marketing material was made up of several parts, including the
19   check, the attached invoice-like form, and the statements on the back of each. When the
20   representations at issue involve advertising claims, as in the instant case, the deceptiveness of the
21   representations is assessed by judging the advertising "as a whole, without emphasizing isolated
22   words or phrases apart from their context." *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3rd Cir.
23   1976), *cert denied*, 430 U.S. 983 (1977). *See also, In the Matter of Standard Oil Co of Calif.*,
24   84 F T C. 1401, 1471 (1974), *aff'd as modified*, 577 F.2d 653 (9th Cir. 1978), *reissued*, 96 F.T.C.
25   380 (1980) ("In evaluating advertising representations, we are required to look at the complete
26   advertisement and formulate our opinions on them on the basis of the net general impression
27   conveyed by them and not on isolated excerpts ") In this case, the implied representations on the
28   front of the check ("This is a valid check that you may cash or deposit") and on the front of the

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                                    19

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

1  attached invoice-like form ("This check is a payment based on a prior or ongoing business
2  relationship) overwhelm the fine-print text on the back ("Endorsement and deposit by payee
3  constitute a valid request for service described hereon.").

4    Defendants may argue that their solicitation checks were not deceptive because the back
5  of the check and the back of the invoice-like form explained the consequences of cashing or
6  depositing the check. However, as established above, this applies an improper standard. The
7  disclosures cannot be assessed in a vacuum; rather, their effectiveness must be judged in the
8  context of the entire solicitation. The mere presence of a disclosure is not a cure-all for deceptive
9  representations elsewhere in the advertising material. In other FTC actions, fine print disclosures
10  and footnotes have been held inadequate to remedy deceptive characterizations elsewhere in the
11  advertising material. Fine print has been deemed a reasonable medium for disclosing
12  qualifications of only limited relevance. *See, e.g., Litton Industries v FTC*, 97 F.T.C. 1 (1981),
13  *aff'd as modified*, 676 F.2d 364 (9th Cir. 1982); *In the Matter of Stouffer Foods Corp*, 118 F.T.C.
14  746 (1994); *In the Matter of Giant Food, Inc*, 61 F.T.C. 326 (1962).

15    The inadequacy of defendants' fine print disclosures is established above in Section IVB.
16  Defendants' solicitation checks included representations that the check was based on a prior or
17  ongoing business relationship and that recipients could cash the check without agreeing to
18  material conditions. These representations were made on the front of the check and the front of
19  the invoice-like form. The disclosures appeared within nine lines and thirteen lines of fine print
20  on the back of the check and invoice-like form respectively, the billing disclosure – arguably the
21  most material – was in the middle of the text, and was not set off by a bold font or larger type
22  size  These lay-out choices indicate that the disclosures were not designed to give consumers a
23  reasonable opportunity to assess the merits of Eisenberg and Hebard's offer. Moreover, these
24  inconspicuous disclosures cannot save the representations made elsewhere from being adjudged
25  deceptive.

26    **3. Defendants' Deceptive Representations Were Material**.

27    Defendants' representations described above are material because they involved
28  information which affected consumers' choices and decision-making. *Affiliated Ute Citizens v*

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L       20      Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1   *U S.*, 406 U.S. 128, 153-154 (1972); *In the Matter of Cliffdale Assocs* , 103 F.T.C. 110, 165
2   (1984). Specifically, the defendants' first representation induced consumers to pay money that
3   they did not owe, and the second and third representations caused consumers to ensnare
4   themselves in a business relationship with defendants without the benefit of a clear and
5   conspicuous description of what created the relationship and what the consequences of that
6   relationship were. Defendants' deceptive representations were the very foundation of their
7   business operations. The boxfuls of consumer complaints, the deluge of complaint calls to
8   defendants' toll-free customer service line, and the correspondence received by defendants from
9   federal and state government agencies and telephone companies nationwide, as well as the
10  illustrative consumer declarations and deposition testimony and defendants' customer service
11  database indicate that defendants' misrepresentations injured more than 257,000 consumers
12  throughout the United States.

13      **D.      *Injunctive and Monetary Relief Against All Defendants Is Appropriate.***

14      **1.      Issues Of Injunctive Relief Have Already Been Resolved.**

15          Five of the seven defendants answered the FTC's Complaint and are participating in this
16  litigation  Orders of default have been entered against the remaining two, Cyberspace.com and
17  EPV  The five participating defendants have agreed to Stipulated Permanent Injunctions that
18  were entered by the Court on October 23, 2000. These Permanent Injunctions provide all of the
19  conduct relief sought by the FTC. The FTC requests the Court to enter identical injunctive relief
20  against the two defaulting defendants. The only remaining issue concerns the monetary amount
21  to be awarded to address consumer injury and disgorgement.

22      **2.      The Court Should Order Equitable Monetary Relief To Remedy
                  Defendants' Violations Of The FTC Act.**

23

24          For the Commission to recover a monetary judgment for consumer injury and

25  disgorgement at summary judgment, it "must show that its calculations reasonably approximated

26  the amount of customers' net losses, and then the burden shifts to the defendants to show that

27  those figures were inaccurate " *FTC v  Febre*, 128 F.3d 530, 534 (7th Cir. 1997) (citing *SEC v*

28  *Lorin*, 76 F.3d 458, 462 (2nd Cir. 1996) and *HUD v  Cost Control Mktg. & Sales Mgmt  Of Va* ,

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                          21

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms. Guerard)

1  *Inc.*, 64 F.3d 920, 927 (4th Cir. 1995). In *FTC v Febre*, the court award equaled the amount
2  consumers paid for deceptive business opportunity programs less the amount consumers received
3  in refunds. The Commission is asking for a similar calculation in this case. the amount
4  consumers were billed less the amount they received in refunds and credits and less the aggregate
5  amount consumers received from the solicitation checks.

6      Additionally, Section 13(b) of the FTC Act "permits a district court to order a defendant
7  to disgorge illegally obtained funds." *FTC v Gem Merchandising*, 87 F.3d 466, 470 (11th Cir.
8  1996); *see also Pantron I Corp* , 33 F.3d at 1103, n. 34 (district court may order disgorgement of
9  unjust enrichment when it is not possible to reimburse all of the injured consumers). Otherwise,
10 a defendant could retain the ill-gotten gains "simply by keeping poor records," thus undermining
11 the deterrence function of Section 13(b). *Gem Merchandising*, 87 F.3d at 470. *See Febre*, 128
12 F.3d at 535 (when the defendants' record-keeping prevents distinguishing lawful gains from the
13 unlawful, the risk falls on the wrongdoer whose conduct created the uncertainty) (citations
14 omitted).

15     To obtain monetary relief against Eisenberg and Hebard, the Commission must show that
16 the they had some knowledge of the wrongful acts or practices, were recklessly indifferent to the
17 truth, or had an awareness of a high probability of fraud coupled with an intentional avoidance of
18 the truth. *FTC v Publishing Clearing House, Inc* , 104 F.3d 1168, 1170 (9th Cir. 1997);
19 *American Standard Credit Sys. Inc* , 874 F. Supp. 1080, 1089. The record is replete with
20 evidence sufficient to hold Eisenberg and Hebard individually liable for consumer redress and
21 disgorgement. As was indicated in Sections III, IV, and V above, Eisenberg and Hebard
22 distributed among themselves equal amounts of control over the EPV venture, and they exercised
23 that control in all aspects of the business: they collaborated on the design and mailing schedule
24 of the solicitation checks, the billing mechanism, the hiring of outside vendors, and the handling
25 of consumer complaints and government inquiries and investigations. They participated in daily
26 conference calls and email exchanges regarding the business. There was no one else within the
27 EPV venture with the authority to overrule Eisenberg and Hebard. Moreover, Eisenberg and
28 Hebard knew of the various State investigations, the threats from telephone companies to

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                                          22

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

1 suspend billing, and the high volume of consumer complaints. There is virtually no aspect of this
2 operation which Eisenberg and Hebard did not oversee. There is overwhelming support for the
3 assertion that Eisenberg and Hebard controlled the business practices of the EPV venture and
4 knew that the solicitation check was designed in such a way that consumers were being deceived
5 into paying monthly charges to EPV. The predicate for individual liability is satisfied in this
6 case.

7      As detailed in Section VI, the consumer injury caused by defendants' conduct was at least
8 $23,225,500. Plaintiff therefore seeks a monetary award against all of the defendants, jointly and
9 severally, for $23,225,000 in consumer redress and disgorgement of illegally obtained funds

10 **IX.   CONCLUSION.**

11      For the foregoing reasons, as set forth in this motion, memorandum, and supporting
12 exhibits, the Commission requests that the Court grant summary judgment against all defendants
13 and in favor of the FTC

14
   Dated: March 7, 2002

15                                          _GDurham for CG_
                                           Collot Guerard, Esq.
16

17                                         Michael Goodman, Esq.
                                           Federal Trade Commission
18                                         600 Pennsylvania Avenue, NW
                                           Washington, DC 20580
19                                         202-326-3338 (Ms. Guerard)

20

21

22

23

24

25

26

27

28

FTC's Motion for Summary Judgment
and Supporting Memorandum of
Points and Authorities
C00-1806-L                           23            Federal Trade Commission
                                                   600 Pennsylvania Ave , NW
                                                   Washington, DC 20580
                                                   202-326-3338 (Ms  Guerard)

1

## CERTIFICATE OF SERVICE

2

3      The undersigned hereby certifies that on March 7, 2002, a copy of the FTC's Motion for

4  Summary Judgment, Supporting Memorandum, Proposed Order, Statement of Counsel Pursuant

5  to Rule 37(h), and Exhibits was served via overnight delivery service, postage prepaid, upon the

6  parties listed below:

7

8  Ernest Leonard, Esq.
   Friedman & Feiger
9  5301 Spring Valley Road, Suite 200
   Dallas, Texas 75254
10
   Jane Jacobs, Esq.
11 Klein, Zelman
   485 Madison Avenue, 15th Floor
12 New York, New York  10022

13

14

15                       Collot Guerard
                         Attorney for Plaintiff
16

17

18

19

20

21

22

23

24

25

26

27

28

FTC's Motion for Summary Judgment                          Federal Trade Commission
and Supporting Memorandum of                               600 Pennsylvania Ave , NW
Points and Authorities                                     Washington, DC 20580
C00-1806-L                        24                   202-326-3338 (Ms  Guerard)