CC: TO JUDGE _____ PM

Honorable Robert S. Lasnik

_____ FILED _____ ENTERED

_____ LODGED _____ RECEIVED

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**  MAR 25 2002  PM

AT SEATTLE
CLERK U S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| **Plaintiff,** | **Case No. C00-1806-L** |
| **v.** | |
| **CYBERSPACE.COM, LLC, et al,** | **FTC OPPOSITION TO EISENBERG DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **Defendants.** | |

CV 00-01806 #00000148

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms. Guerard)



# TABLE OF CONTENTS

TABLE OF AUTHORITIES. .. ............  ................. .......... ... ........... ........... ... ........ .... ........iii

I.      SUMMARY OF FTC OPPOSITION. ............  ......   ............  ...... 1

II.     AMPLE ADMISSIBLE EVIDENCE SUPPORTS EACH OF THE FTC'S
        COMPLAINT ALLEGATIONS. . ......  ....  ....................... ....1

        A.     The Count I Charge Is Supported.    .....  .......  .............. ......2

               1.     Defendants Made The "Obligated to Pay" Representation. ...  ..  ......2

               2.     The "Obligated to Pay" Representation Is False. ........  ............3

               3.     The FTC Has Sufficient Admissible Evidence on Count I. ........... 5

        B.     The Count II Charge Is Supported. ...............  ......  .............5

        C.     The Count III Charge Is Supported. ..............  .....................8

               1     The Disclosures Were Not Clear And Conspicuous. ................. 8

               2.     The YP-Net Settlement Does Not Support Eisenberg's Argument.  .....9

               3.     The Fine Print On The "Chase" Solicitation Check Deceived The
                      Eisenberg Legal Team ......  ...............  ......  .........10

        D.     The FTC Has Numerous Categories Of Evidence Showing That Defendants'
               Representations Were Likely To Deceive Reasonable Consumers.   ....... ..10

IV.     EISENBERG MISSTATES FTC LAW AND RAISES BOGUS DEFENSES. .......16

        A.     Eisenberg Misstates and Misapplies FTC Deception Law. ................ 16

        B.     Advice Of Counsel Is Not A Defense In An FTC Case. ...........  ......  19

        C      Refunds Do Not Cure Deception. ........  ................  ......  ...19

IV.     EISENBERG WAS PERSONALLY INVOLVED IN THE EPV MARKETING
        MATERIAL. .......  .......  .........  ........  .......  ...............20

V.      CONCLUSION. .....  ........................ ................. .....22

FTC's Opposition to Eisenberg
Defendants' Motion for Summary Judgment
C00-1806-L
March 25, 2002– ii

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

1

# TABLE OF AUTHORITIES

2

3

4
Cases

5
*American Home Products Corp v FTC,*
695 F 2d 681 (3rd Cir. 1982) .... ...  ......  .... ............................................. ........ ... .......................7
6

7
*Beneficial Corp v FTC,*
542 F.2d 611, 617 (3rd Cir. 1976),
8
*cert denied,* 430 U.S. 983...................................................... ... ....  ....  ......................................... . .7

9
*FTC v Amy Travel,*
875 F.2d 564, 575 (7th Cir. 1989)................  ...  ....  ....  ... .................................................. .... 19
10

11
*FTC v Colgate-Palmolive Co.,*
380 U.S. 374 (1965).................................................................... ....  .....   .... .... ...........................7

12
*FTC v Fax Corp. of America, Inc ,*
1990-2 Trade Cas. (CCH) ¶ 69,227 (D.N.J. 1990). . ... ........................................ ...... ...  . ....19
13

14
*FTC v Figgie Int'l, Inc ,*
994 F.2d 595 (9th Cir. 1993)........................................................ .... ...............12, n. 11; 17
15

16
*FTC v Five-Star Auto Club, Inc.,*
97 F.Supp.2d 502, 528 (S.D.N Y. 2000) ...... .................................................. .... .... .... ...........7

17
*FTC v Gill,*
265 F 3d 944, 950 (9th Cir. 2001)........................................... ...  .... .  .... ..........................16; 19, n 19
18

19
*FTC v Pantron I Corp ,*
33 F.3d 1088 (9th Cir. 1994).................................................................. . ....  ... ......1, n. 2; 20
20

21
*FTC v Patriot Alcohol Testers, Inc ,*
798 F Supp. 851, 855 (D.Mass. 1992)................................................................ ....  ..... ..............7

22
*FTC v Wilcox,*
926 F. Supp. 1091, 1100 (S.D. Fla. 1995)..................... ....  .... ........ .... ....  ......................20
23

24
*General Ins Co of Am v Fort Lauderdale P'ship ,*
740 F. Supp. 1483 (W.D. Wash 1990).. .... ...... ..... ....   ... ....  . ...  .... ..... .......................................4
25

26
*Golenia v. Bob Baker Toyota,*
915 F Supp 201 (S.D. Cal. 1996)........................................................................ ......  ........................3

27
*Montgomery Ward & Co v FTC,*
379 F.2d 666 (7th Cir.).. ...... ....  ................................... .... ... ...... .......... ................................20
28

FTC's Opposition to Eisenberg Defendants'
Motion for Summary Judgment
C00-1806-L
March 25, 2002– iii

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

*Nat'l Bank v Equity Investors,*
81 Wash.2d 886, 506 P.2d 20 (1973)... ... . ......................................................  ................................4

*Orkin Exterminating Co v FTC,*
849 F 2d 1354, 1368 (11th Cir. 1988). ...... .... ... ... . ...................................... .. . . .... ...... .....19

*Removatron Intern. Corp v. FTC,*
884 F 2d 1489, 1496 (1st Cir. 1989).. . .... .... .................................................. .... .... ....... .....7

*Skagit State Bank v Rasmussen,*
109 Wash.2d 377, 745 P.2d 37 (1987)............. ... ....... .. ................................................... ....... ... 4

Statutes

15 U.S.C. 45(a).......................................................... ...  ...  ...  ... .  ....  .....................................16

145 U.S.C. 45(n) ... ...  ..... ...  ....  ......  ......  ........................................................ ...  ....  .... 17, n. 16

FTC's Opposition to Eisenberg Defendants'
Motion for Summary Judgment
C00-1806-L
March 25, 2002– iii

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

1  I.    **SUMMARY OF FTC OPPOSITION.**

2      The motion for summary judgment by defendants Ian Eisenberg, French Dreams, and

3  Olympic Telecommunications, Inc. ("Eisenberg defendants" or "Eisenberg") reflects a

4  misunderstanding of the FTC's complaint, a misrepresentation of facts; and a misstatement of the

5  applicable FTC law.  Contrary to Eisenberg's assertion that "there is no competent evidence that

6  defendants' practices were deceptive or violated the FTC Act" [Eisenberg motion, p. 2, l. 3-4],

7  the admissible evidence in support of the FTC's three complaint counts is extensive.  The Court

8  should deny Eisenberg's summary judgment motion.  Moreover, the FTC's motion for summary

9  judgment shows there is no genuine issue of material fact and that it is entitled to judgment as a

10  matter of law.  Summary judgment should be entered in the Commission's favor.[1]

11  II.   **AMPLE ADMISSIBLE EVIDENCE SUPPORTS EACH OF THE FTC'S
       COMPLAINT ALLEGATIONS.[2]**

12

---

13    [1]  In support of its motion for summary judgment, the FTC filed eight volumes of exhibits, consisting of,
14  *inter alia*, deposition excerpts, sworn affidavits and declarations, and documents received during discovery from
defendants and third parties  The FTC is submitting additional exhibits in support of its Oppositions to the
15  defendants' two motions for summary judgment  In its Oppositions, the FTC references both the Volume Number
("Vol ") and the exhibit number ("Ex ") when describing a document, deposition, or declaration

16

17    In addition, the declaration of attorney Michael Goodman sets forth as an Exhibit List the exhibits, by
volume number and exhibit number, on which the FTC is relying in its motion for summary judgment and its
oppositions to defendants' summary judgment motions.  The declaration is Vol IX, Ex 315, and the list of exhibits
18  is at ¶¶ 10-21

19    [2]  An incorrect statement early in the Eisenberg motion is one of many examples that show that Eisenberg
misunderstands the FTC's evidence and law  Eisenberg states that the FTC has not alleged material
20  misrepresentations [Eisenberg motion, p 1, l. 8-9].  This is inaccurate  All three complaint counts arise from
defendants' material misrepresentations  Under FTC deception law, the FTC must show that a representation or
21  omission is likely to mislead consumers acting reasonably under the circumstances and that the representation or
omission is material– *i e* , is important to consumers and therefore likely to affect their decision  *FTC v  Pantron I*
22  *Corp* , 33 F 3d 1088, 1095 (9th Cir 1994)  *See FTC motion for summary judgment*, pp  20-21.

23    Eisenberg repeatedly references only Cyberspace in his motion, as if Cyberspace were the only entity
sending out promotions·  "Cyberspace's first marketing venture was an electronic yellow pages promotion *similar to*
24  *that of yp net* " [Eisenberg motion, p  3, l. 2, affidavit at ¶ 8]  The motion and affidavit are inaccurate  The initial
promotion was by Essex Enterprises, one of the four subsidiaries owned by defendant Electronic Publishing
25  Ventures ("EPV") [Vol  IV, Ex  260, *H Depo*, p  25, l. 8-11; Vol IX, Ex. 260, p. 62, l. 8-10; Vol. IX, Ex  264, *R
Depo*, p. 26, l  1 13-18]

26

Plaintiff's Opposition to Eisenberg Defendants'
27  Motion for Summary Judgment
C-00-1806-L
28  March 25, 2002                                   1

Federal Trade Commission
600 Pennsylvania Ave  NW
Washington, DC 20580
202-326-3338 (Ms. Guerard)

1     **A.     The Count I Charge Is Supported.**

2     **1.     Defendants Made The "Obligated to Pay" Representation.**

3         Eisenberg appears to concede that defendants made the representation alleged in Count I:

4     that consumers who received defendants' charges on a bill are legally obligated to pay for those

5     charges  As stated in Eisenberg's motion, "Once subscribers negotiated the check, Cyberspace

6     was entirely within its rights to represent to subscribers that the subscriber was legally obligated

7     to pay for those charges." [Eisenberg motion, p. 16, l. 15-17]   According to Eisenberg, this

8     representation was true.  Eisenberg maintains that consumers were legally obligated to pay

9     because the terms of the offer were "clearly" disclosed on the back of the check and invoice-like

10

11

12

---

13         The Eisenberg motion and affidavit also incorrectly state that Don Reese introduced Eisenberg to Hebard
      [Eisenberg motion, p. 3, l. 4-5; affidavit, ¶ 6]  This is inaccurate. Both Eisenberg and Hebard testified at their
14    respective depositions that they met each other through Gene Hirai [Vol. IX, Ex 262, *E Depo.*, p. 218, l 16, Vol IV,
      Ex. 260, *H Depo*, p  23, l 2; Vol IX, Ex. 260, p 64, l. 5].
15
          Eisenberg inaccurately states that the solicitation check was an idea urged upon him by Don Reese
16    [Eisenberg motion, p. 3, l 1-4, affidavit, ¶ 5]  In fact, it was Eisenberg's idea to use the solicitation check
      Eisenberg, in his capacity as President of defendant Olympic Telecommunications, Inc , testified that when he saw
17    the YP-Net check he thought it was "creative" and that the method of gaining customers through a check was
      "interesting " [Vol IX, Ex 261, p  82, l 5-11, p  82, l  17 - p  83, l  3, p. 83, l. 10 - p  84, l. 8]  Reese confirms that
18    Eisenberg said he thought the YP-Net solicitation check was a "great idea " [Vol. IX, Ex. 264, p  32, l  14 - p  33, l
      2].  Hebard testified that the check idea was Eisenberg's [Vol. IX, Ex  260, p  60, l 2-12]
19
          The motion and affidavit inaccurately state that Eisenberg lacked "direct marketing experience." [Motion,
20    p  3, l 2-3, affidavit, ¶ 5]   In fact, Eisenberg testified that he owned Pacific Rim, which he described as an
      advertising agency [Vol IX, Ex 262, p  216, l  1-10]  Also, Eisenberg used direct mail pieces to market audiotext
21    services offered by his company, Common Concerns [Vol  IX, Ex  264, *R Depo*, p  116, l. 9-11]. It is inaccurate to
      state that Eisenberg lacked direct marketing experience
22
          An additional factual defect in the Eisenberg motion and affidavit concerns the mailings by Cyberspace
23    The motion makes certain assertions about the volume and dates of Cyberspace mailings and response rates
      [Eisenberg motion, p. 4-5] by relying on Eisenberg's affidavit, ¶¶ 23-25.  However, the affidavit does not reflect
24    personal knowledge by Eisenberg.  Eisenberg references a draft letter from attorney Lew Rose to the FTC with
      mailing statistics, which Eisenberg states he cannot verify, and an unseen affidavit by Hebard, as the basis for the
25    Cyberspace mailing statistics  Moreover, in responding to a request for admission, Eisenberg stated he did not know
      if the number in the attachment to the Lew Rose letter to the FTC was correct [Vol. III, Ex  256, E Adm 47].
26
      Plaintiff's Opposition to Eisenberg Defendants'                                              Federal Trade Commission
27    Motion for Summary Judgment                                                                  600 Pennsylvania Ave  NW
      C-00-1806-L                                                                                   Washington, DC 20580
28    March 25, 2002                                      2                                         202-326-3338 (Ms  Guerard)

1  form, and on an insert [3]  However, defendants' inconspicuous fine-print disclosures are an

2  insufficient basis for this obligation.

3  **2.    The "Obligated to Pay" Representation Is False**.

4  Consumers who cashed or deposited defendants' checks were not legally obligated to pay

5  the EPV charges on their telephone bill  It does not matter how understandable terms of an offer

6  are, if the terms are not noticed.  Under FTC law, consumers are not bound to the terms of an

7  offer where they are not able to knowingly agree to the offer because the terms are inconspicuous

8  [FTC motion for summary judgment, p. 18].

9  Eisenberg's two cited cases are not on point [Eisenberg motion, p. 16, l. 13-14].  In

10  *Golenia*, the court held that a contract clause was enforceable despite plaintiff's argument that he

11  had not read the contract, "given the bold-faced all-caps admonition in the agreement not to sign

12  it prior to reading and understanding its terms." *Golenia v  Baker Toyota*, 915 F. Supp. 201, 204

13  (S.D. Cal. 1996). Here, there were no bold-faced all-caps admonitions to read what one

14  consumer deponent characterized as "legalese" and "mumbo jumbo" [Vol. V, Ex. 266, *Coram*

15  *Depo*, p  55, l. 25 - p  54, l. 7]; nor was there anything on the face of the check or the invoice-like

16  form to warn consumers of the financial consequences of cashing or depositing the check [*See*

17  *sample checks at* Vol. VIII, Exs. 61-65].  When asked about a specific check and invoice-form

18  [Vol. VIII, Ex. 62, H 8231], Hebard agreed that there was nothing on the front that reflected the

19  product being sold or the price of the product [Vol. IX, Ex. 260, p. 80, l. 24 - p. 81, l. 8]

20  Consumers do not expect that a contract will be in fine print on the back of a check, as pointed

21

22

23  [3]  Not all the mailings included the insert  Eisenberg testified, ". . . there's some sort of an issue with
people getting checks without inserts, that the mail house did something wrong" [Vol IV, Ex. 262, p  108, l  21-23]
On one day alone, Eisenberg personally focused on complaints from two consumers who apparently received

24  solicitation checks without the inserts  Eisenberg told Diane Capasso, who worked for Hebard, to handle each
complaint [Vol. II, Exs  153, 154, *discussed at* Vol. IV, Ex. 262, *E Depo*, p. 108, l. 6 - p  109, l  18, p  110, l. 11 - p

25  111, l  23]. Hebard also acknowledged that some checks were mailed without inserts [Vol. III, Ex  252, H Adm
224]

26

1   out by several deponents. Ms. Schoomer, whose company already had Internet access, stated

2   "we're not expecting to receive a check and that check be a contract " [Vol. IX, Ex. 268, p. 44, l.

3   2-3]. Mr. Coram, who did not have a computer and thus could not use defendants' services,

4   testified that "I don't think I would enter into an agreement via a check . . . All the other

5   agreements that I have here are . . . not on the back of a check." [Vol IX, Ex. 266, p. 38, l 16-

6   21]. He explained that the contracts he has are "not that small of print. It's not confined to that

7   size paper or anything " [Vol. IX, Ex. 266, p. 54, l. 13-17].

8          The other case Eisenberg cites, *General Insurance*, is equally unavailing  First, the court

9   relies on Washington state law, which is not controlling in a FTC case based on deception.

10  Second, even if Washington law were applicable, two cases cited in *General Insurance* support

11  the FTC's position.  In one case, *National Bank v. Equity Investors*, 81 Wash.2d 886, 912-13,

12  506 P 2d 20 (1973), the court held that "one cannot, in the absence of fraud, deceit or coercion be

13  heard to repudiate his own signature voluntarily and knowingly fixed to an instrument whose

14  contents he was in law bound to understand "  The FTC contends that the checks, with their

15  invoice-like forms, deceived consumers. *National Bank* supports the FTC's position, not

16  Eisenberg's, because deceit resulted in consumers' cashing or depositing defendants' checks

17  without knowing about defendants' terms buried in inconspicuous print. As the deponents

18  testified, one doesn't expect a contract to be printed in fine print on the back of a check.

19         In the second case cited in *General Insurance*, *Skagit State Bank v. Rasmussen*, 109

20  Wash.2d 377, 382-84, 745 P.2d 37 (1987), the court stated that the relevant inquiry included

21  whether the document was plain and unambiguous and whether the party was a victim of fraud,

22  deceit, or coercion. The EPV consumers were victims of defendants' deceptive marketing

23  practices. The marketing material was not plain and unambiguous. The two cases relied on by

24  *General Insurance* support the FTC's position that the EPV consumers were not obligated to pay

25  defendants' charges because there was deception and therefore no agreement.

26

27  Plaintiff's Opposition to Eisenberg Defendants'                    Federal Trade Commission
    Motion for Summary Judgment                                       600 Pennsylvania Ave NW
    C-00-1806-L                                                       Washington, DC 20580
28  March 25, 2002                          4                         202-326-3338 (Ms Guerard)

1      ### 3.      The FTC Has Sufficient Admissible Evidence on Count I.

2      The FTC has ample admissible evidence to show that defendants represented to

3    consumers that they were obligated to pay defendants' charges. This representation was made on

4    the Olympic billing page, which included the name of the EPV subsidiary and the amount and

5    date of the charge. Examples of the Olympic billing page are: Vol. V, Ex. 268, p. CLS 15018;

6    Vol. V, Ex. 266, p. H 6634; Vol V, Ex. 267, p. CJR 15208; Vol. VI, Ex. 272, p. H 7828.

7    Defendants' customer service representatives ("CSRs") also made this representation when they

8    told consumers who called about unexplained charges that they had to pay. According to

9    declarant Epstein, a CSR "insisted that I was obligated to pay the other month's charge since I

10    had endorsed and deposited her company's promotional check." [Vol. VI, Ex. 275, ¶ 8].

11    Declarant Hunter requested a refund and was told that cashing the check "had obligated my

12    company to pay the charges." [Vol. VI, Ex. 282, ¶ 7].  One CSR told declarant Rutkowski that

13    his company "was obligated to pay the charges." [Vol. VI, Ex. 289, ¶ 7].  Deponent Robrecht

14    testified that a Cyberspace representative told him that his company was responsible for the

15    charges and that the CSR "led me to believe that I owed this Internet service bill and that they

16    were not going to remove the charges." [Vol. V, Ex. 267, p. 21, l. 7 - p. 22, l. 1; p. 22, l. 9-15].[4]

17      ### B.      The Count II Charge Is Supported.

18    Contrary to Eisenberg's "no evidence whatsoever" claim, there is more than enough

19    admissible evidence to support Count II, which alleges that defendants' representation that the

20    solicitation check is a refund, rebate, receivable, or other payment for services based on a prior or

21    ongoing business relationship is deceptive [Eisenberg motion, p. 17, l. 3-5]. The check, which

22

23

24    [4] *See also the following 13 declarations in Volume VI* Ex 270, Achey Dec, ¶ 5, Ex 271, Addor Dec, ¶ 5, Ex 276, Ewing Dec, ¶ 8, Ex 278, Glass Dec, ¶¶ 4, 6, Ex 280, Hicks Dec, ¶ 4, Ex 283, Hussain Dec, ¶ 6, Ex 285,

25    Leigh Dec, ¶ 5, Ex 287, Madden Dec, ¶ 7, Ex 288, Rostvold Dec, ¶ 7; Ex 290, Santos Dec, ¶ 6, Ex 291, Shedivy Dec, ¶ 5, Ex 296, W Wood Dec, ¶ 8, Ex 298, Yang Dec, ¶ 7. *Also see the following two depositions in Volume V*

26    Ex 267, *Robrecht Depo*, p 21, l 7-17; p 22, l 9-15, Ex 268, *Schoomer Depo*, p 35, l. 19 - p 36, l 1

Plaintiff's Opposition to Eisenberg Defendants'
27    Motion for Summary Judgment
C-00-1806-L
28    March 25, 2002                                          5

Federal Trade Commission
600 Pennsylvania Ave. NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

1  includes the recipient's name, address and telephone number, attached to an invoice-like form,

2  with its various columns and descriptors such as "invoice number", "reference number" and

3  "account number", represents to consumers that the check is based on some prior or ongoing

4  relationship.  Examples of the form are: Vol. I, Ex. 68, H 8805; Vol. VI, Ex. 279, FTC 1696,

5  Vol. VI, Ex. 287, E 25355; Vol  VI, Ex. 289, H 6876.  The small amount of the check, coupled

6  with the invoice-like form, and the complete absence of any explanation of the offer on the front

7  of the check or the front of the form, led many consumers to understand that the check was a

8  refund, rebate, or some other kind of payment based on a prior or existing relationship.

9       Numerous consumers support the FTC's analysis,[5] as does deposition testimony by Don

10  Reese and by Hebard. Don Reese testified that a "common claim" from consumers was that they

11  thought the check was some sort of refund [Vol. V, Ex. 264, p. 102, l. 12-15].  Hebard testified

12  that he assumed his office responded to complaints from consumers who thought the check was

13  some kind of refund or rebate [Vol. IV, Ex. 260, p. 126, l. 23-25].  A refund typically comes only

14  from a company with which a person has had, or has, a business relationship.  Declarant Shedivy

15  states the company's bookkeeper thought the check "was a payment from one of my company's

16  cash customers." [Vol. VI, Ex. 291, ¶ 7].  Declarant Gregory's husband thought the $3.50 check

17  was a rebate for a book he had ordered [Vol. VI, Ex. 279, ¶ 7].  Deponent Schoomer explained

18  that her company had never received a rebate or refund from someone they were not already

19  doing business with, and that if they received a rebate check "it's an assumption that we've

20

21

---

22       [5] *E g*, Deponent Robrecht, who had been an accountant for 30 years, thought the Cyberspace check was a rebate check because of "the amount of the check, $3 50" [Vol  V, Ex 267, p  44, l  13-24]  *See also the following declarations, all of which are in Volume VI*  Ex  270, Achey Dec, ¶ 3, Ex  271, Addor Dec, ¶ 3, Ex. 273, Clifton Dec, ¶ 6; Ex  274, Davis Dec, ¶ 9; Ex  275, Epstein Dec, ¶¶ 6, 11, Ex  276, Ewing Dec, ¶¶ 7, 10, Ex. 278, *Glass Dec*, ¶ 7, Ex  280, Hicks Dec, ¶¶ 5, 8, Ex  281, Hoadley Dec, ¶ 8, Ex  282, Hunter Dec, ¶ 8, Ex  284, Katz Dec, ¶¶ 6, 10, Ex  286, Loepkey Dec, ¶ 7, Ex  289, Rutkowski Dec, ¶ 9, Ex  290, Santos Dec, ¶ 7; Ex  292, Silva Dec, ¶ 9, Ex  295, R. Wood Dec, ¶ 8, Ex  296, W  Wood Dec, ¶ 9, *and the following depositions, which are in Volume V·*  Ex  266, *Coram Depo*, p  57, l  18-25, Ex  268, *Schoomer Depo*, p. 69, l  10 - p. 70, l  4

---

Plaintiff's Opposition to Eisenberg Defendants'
Motion for Summary Judgment
C-00-1806-L
March 25, 2002                              6

Federal Trade Commission
600 Pennsylvania Ave  NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1   already got a relationship with that company." [Vol. IX, Ex. 268, p. 68, l. 6-8; p. 69, l. 4-7; *see*
2   *also*, p. 116, l. 9-21].

3        Eisenberg's argument that the word "rebate" appears on only a few versions of the check
4   stub is without legal merit [Eisenberg motion, p. 17, l. 5-8]. Under FTC law, the court must
5   consider the entire solicitation – in this case, the check for the small amount, with the consumer's
6   telephone number, and the appearance of the attached invoice-like form and its business-like
7   categories. Eisenberg tries to isolate the check from its attachment, but it is well-settled FTC law
8   that the solicitation is to be taken as a whole, not parsed into separate parts. *See, e.g.,*
9   *Removatron Intern Corp. v FTC*, 884 F.2d 1489, 1496 (1st Cir. 1989) ("The tendency of the
10  advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated
11  words or phrases apart from their context") (quoting *Beneficial Corp. v. FTC*, 542 F.2d 611, 617
12  (3rd Cir. 1976), *cert. denied*, 430 U.S. 983)); *see also FTC v. Five-Star Auto Club, Inc.*, 97
13  F.Supp.2d 502, 528 (S.D.N.Y. 2000); *FTC v. Patriot Alcohol Testers, Inc* , 798 F.Supp. 851, 855
14  (D.Mass. 1992). Moreover, the "net general impression" analysis under FTC law necessarily
15  permits the Court to look beyond the text of a solicitation to "the message conveyed visually" by
16  the solicitation's overall presentation.[6] *American Home Products Corp. v. FTC*, 695 F.2d 681,
17  688 (3rd Cir. 1982) (citing *FTC v. Colgate-Palmolive Co* , 380 U.S. 374, 385 (1965)). Without
18  this emphasis on a solicitation's net impression, "the Commission would have limited recourse
19  against crafty advertisers whose deceptive messages were conveyed by means other than, or in
20  addition to, spoken words." *Id.* The same is true for printed words. Inconspicuous fine print is
21  but one way for such "crafty advertisers" to deceive consumers. The deception standard is broad
22  enough to address solicitations that create a deceptive impression while burying material
23  disclosures in inconspicuous fine print.

24

25        [6] Nowhere in his motion does Eisenberg address the front of the invoice-form, which is an integral part of
26  the defendants' marketing piece

Plaintiff's Opposition to Eisenberg Defendants'          Federal Trade Commission
27  Motion for Summary Judgment                              600 Pennsylvania Ave NW
    C-00-1806-L                                              Washington, DC 20580
28  March 25, 2002                    7                      202-326-3338 (Ms Guerard)

1    **C.    The Count III Charge Is Supported.**

2    Eisenberg also argues, incorrectly, that there is "no evidence to support" Count III, which

3    alleges that defendants failed to disclose clearly and conspicuously the consequences of cashing

4    or depositing the solicitation check [Eisenberg motion, p. 18, l. 11-12].

5    **1.    The Disclosures Were Not Clear And Conspicuous.**

6    It is telling that all three consumer deponents indicated that they, or employees at their

7    companies, had not read the disclosure statement–presumably because it was not conspicuous.[7]

8    Whether or not the deponents would have understood the disclosure had they read it is irrelevant.

9    They or the other employees did not read the statement because it was not conspicuous enough to

10    be seen.

11    Ample admissible evidence shows that consumers and businesses deposited the checks

12    because they did not see the fine print disclosures–i.e., the disclosures were not "conspicuous",

13    even if they were understandable to someone who had as much time as he or she needed to study

14    them in a deposition.  According to Don Reese, the number one complaint was from consumers

15    who did not know why they were being charged by Olympic on behalf of the EPV subsidiaries

16    [Vol. IX, Ex. 264, p. 66, l. 11-19].  This is borne out by consumer declarations and depositions.[8]

17

18

19    _____

20    [7] One of the deponents used a magnifying glass at his deposition to read the fine print on the back of a
sample Cyberspace check [Vol IX, Ex 267, *Robrecht Depo*, p. 78, l 23 - p  80, l 5].

21    [8] *See the following declarations, all of which are in Volume VI·*  Ex 270, Achey Dec, ¶ 4, Ex. 271, Addor
Dec, ¶ 5; Ex 272, Brynn Dec, ¶ 4, Ex 273, Clifton Dec, ¶ 3; Ex 274, Davis Dec, ¶ 5; Ex 275, Epstein Dec, ¶ 3, Ex
22    276, Ewing Dec, ¶ 6; Ex 277, Fanning Dec, ¶ 3, Ex 278, Glass Dec, ¶¶ 3, 4, Ex 279, Gregory Dec, ¶ 3, Ex 280,
Hicks Dec, ¶ 3; Ex 281, Hoadley Dec, ¶ 4; Ex 282, Hunter Dec, ¶ 4; Ex 283, Hussain Dec, ¶ 3; Ex. 284, Katz Dec,
23    ¶ 4, Ex 285, Leigh Dec, ¶ 3, Ex 286, Loepkey Dec, ¶ 4, Ex 287, Madden Dec, ¶ 5, Ex. 288, Rostvold Dec, ¶ 4, Ex
289, Rutkowski Dec, ¶ 3, Ex. 290, Santos Dec, ¶ 3, Ex 291, Shedivy Dec, ¶ 3, Ex 292, Silva Dec, ¶ 3, Ex. 293,
24    Stephan Dec, ¶ 4, Ex 294, Tucker Dec, ¶ 3, Ex. 295, R. Wood Dec, ¶ 3, Ex 296, W. Wood Dec, ¶ 8, Ex 298, Yang
Dec, ¶ 4. *See also the following deposition excerpts, which are in Volume V*  Ex 266, *Coram Depo*, p. 16, l. 13 -
25    p  17, l  1, Ex. 267, *Robrecht Depo*, p  14, l. 9-15; p. 17, l. 7-17, p  21, l. 1-9; Ex. 268, *Schoomer Depo*, p. 32, l. 18 -
p  33, l  6, p  34, l  16 - p  35, l. 5

26

1   Consumers did not know why they were being billed because they had not seen the
2   disclosures—they had deposited the checks without noticing the inconspicuous fine print.

3         Defendants' own records show that consumers did not realize they were signing up for
4   Internet-related services when they cashed defendants' check.  For instance, Exhibit 95, the
5   booklet provided by Eisenberg and Hebard to potential buyers of the EPV subsidiaries, states that
6   the company "*believes that a number of customers sign up for the* [a word is missing in the
7   original] *without realizing that when they deposit the check, that they have ordered Internet*
8   *service* [Vol. II, Ex. 95, E 20094 emphasis supplied].  Hebard agreed that sentence would make
9   sense if the word "product" were inserted for the missing word [Vol. IV, Ex. 260, p. 182, l. 10-
10  17].  Exhibit 74, E 20717 (Vol. I), an email sent to Eisenberg and Hebard in November 1999,
11  includes as a possible answer to a reporter's question: "We have processed hundreds of
12  thousands of dollars of refunds for customers who cashed the check without reading the insert or
13  the disclosures on its face and signature block (this may be the wrong message to send)."  Don
14  Reese sent an email to Eisenberg and Hebard in December 1999 in which he opined that the only
15  reason the solicitation checks were being cashed was because the accounts receivables
16  department "does not pay attention."  At his deposition, Reese explained that he was saying that
17  the accounts receivable departments did not know what the check represented, and that "very few
18  people, very few people who cashed the check knew that they were signing up for internet
19  service." [Vol. II, Ex. 163, Vol. V, Ex. 264, p. 64, l. 16-20; p. 65, l. 17 - p. 66, l. 9; p. 182, l. 5-
20  23].

21        **2.      The YP-Net Settlement Does Not Support Eisenberg's Argument**.

22        The settlement in *FTC v  YP.Net, Inc.* is not on point. [Eisenberg motion, p. 17, l. 24 - p.
23  18, l. 1, p  18, fn. 22].  First, a settlement reached in an unrelated matter is irrelevant to the action
24  before this Court.  Second, Eisenberg incorrectly describes the settlement, even if it were
25  relevant.  Contrary to the claim made by Eisenberg, the FTC **did not** take the position that a

26

1  check promotion is not deceptive if disclosures are on the front of the check [Jacobs Declaration,

2  Ex. A, p. 5].   The settlement allowed YP.Net to use check promotions only if two conditions

3  were met   1) certain disclosures were on the front of the check, **and** 2) those disclosures were

4  *clear and conspicuous*.  The mere presence of a disclosure, even on the front of a check, will not

5  cure deceptive representations.  Only **clear and conspicuous** disclosures can possibly mitigate

6  deception.  Defendants' fine-print disclosures hidden on the back of the solicitation fall short of

7  this standard.

8        **3.**     **The Fine Print On The "Chase" Solicitation Check Deceived The Eisenberg Legal Team.**

9

10        Eisenberg argues that a solicitation check from Chase Bank shows that "one of the

11  nation's largest financial institutions" decided that disclosures on the back of a check were more

12  clear and conspicuous than placing them on the front [Eisenberg motion, p. 18, l. 7-10].  The

13  check deceived the Eisenberg lawyers, who thought the check was from Chase Bank.  It was not

14  Fine print on the back of the form attached to the check disclosed that MemberWorks was the

15  true offeror of this promotion.[9]  The MemberWorks check deceived the Eisenberg legal team,

16  just as the EPV checks deceived thousands of consumers.

17        **D.**     **The FTC Has Numerous Categories Of Evidence Showing That Defendants' Representations Were Likely To Deceive Reasonable Consumers.**

18        Eisenberg incorrectly states the FTC has only two categories of evidence to show likely

19  deception:  consumer complaints, which defendants argue may not be considered for the truth of

20  the matter, and the Starnet records, which Eisenberg claims, without explanation, are

21  inadmissible [Eisenberg motion, p 9, l. 1-5].  Both points are incorrect.  Moreover, the FTC has

22

23

24  _____

25  [9] MemberWorks is hardly an exemplary model  It hid its name in fine print.  Moreover, four states have taken legal action against MemberWorks for its telemarketing practices.  *See Declaration of Michael Goodman*, Vol IX, Ex 315, ¶¶ 2-9 and attached settlements and assurances of voluntary compliance

26

27  Plaintiff's Opposition to Eisenberg Defendants'                    Federal Trade Commission
   Motion for Summary Judgment                                    600 Pennsylvania Ave  NW
   C-00-1806-L                                                    Washington, DC 20580
28  March 25, 2002                      10                        202-326-3338 (Ms  Guerard)

1  submitted numerous categories of evidence to support its allegations that defendants deceived
2  consumers.

3       First, the FTC submitted examples of defendants' solicitation checks and invoice-forms
4  [Vol. VIII, Exs. 61-65] and the Olympic billing page [Vol. V, Ex. 268, CLS 15018; Vol. V, Ex.
5  266, H 6634; Vol. V, Ex 267, CJR 15208; Vol. VI, Ex. 272, H 7828; Vol. VI, Ex 281, H 7863;
6  and Vol. VI, Ex. 284, H 7803], which make the representations alleged in the complaint.

7       Second, the FTC submitted excerpts from three consumer depositions, each of which
8  shows that the deponents, or their employees, deposited the solicitation checks, either because
9  they thought it was a rebate or refund, or because they did not notice the disclosures, presumably
10 because they were not conspicuous·

11       In response to a question from Eisenberg's counsel, deponent Coram stated his brother
         thought it was a rebate check for the telephone [Vol. V, Ex. 266, p. 57, l. 18-25]
12
         Deponent Robrecht testified that the $3 50 check "appeared to me to be a rebate check,
13       which I subsequently deposited into our operating account." [Vol. V, Ex. 267, p 9, l 10-
         12; see also, p. 44, l. 13-24].
14
         Deponent Schoomer responded "yes" to the question "you assumed it was a rebate or a
15       refund?" [Vol. V, Ex. 268, p 69, l 10 - p. 70, l. 4; see also, Vol. IX, p. 63, l. 11 - p. 64, l.
         13].
16
   The fact that had these deponents read the statement they would have understood it and not
17
   deposited the check is irrelevant. They or their employees did not read the statement because it
18
   was not conspicuous enough to be seen.
19
        Third, the FTC submitted the sworn declarations of 28 consumers supporting the FTC's
20
   complaint allegations   Some consumers thought the solicitation check was a rebate, refund, or
21
   payment based on a prior or ongoing business relationship; others did not understand the purpose
22
   of the check because the consequences of cashing or depositing the check were not disclosed in a
23
   clear and conspicuous manner [Vol. VI, Ex. 270-298].
24
        Fourth, the FTC has copied from defendants hundreds of consumer complaints, a few of
25
   which are included in the eight volumes of exhibits the FTC submitted in support of its motion
26

1  for summary judgment.[10]  Consumer complaints may be considered for the truth of the matter, as

2  well as to show that defendants were on notice that consumers were deceived.[11]

3      Fifth, testimony and documents from defendants themselves support the complaint

4  allegations and show that consumers were deceived because they did not notice the

5  disclosures–presumably because they were not conspicuous.  For instance:

6      * Hebard testified that he assumed that consumers who deposited the check and

7      did not want the service "had not read any of the portions of the promotion." [Vol. IV,

8      Ex 260, p 127, l. 17-20].  Later, when asked if it was his experience that some

9      consumers did not read the disclosure on the back of the check, Hebard responded that he

10     understood that "some consumers hadn't read the promotion at all." [Vol. IV, Ex. 260, p.

11     131, l 14-18].

12

13  [10]  The FTC summary judgment exhibits include the following consumer complaints, which are just a small sample of the "boxloads" of consumer complaints defendants received  *See* declaration of Alexandra Magill, Vol

14  VI, Ex 305, ¶ 2-3. These complaints were used in the depositions  For instance, Fena Hasbrook's complaint to the Federal Communications Commission was forwarded to defendant Olympic  Ms Hasbrook, officer manager,

15  complained that the owner of the business "thought the small amount was for a refund she had submitted  Most people are very busy and do [sic] don't read all the mail from cover to cover  In this case, she didn't think it

16  necessary to read what accompanied the check because she thought it to be her refund" [Vol. I, Ex  77 at E 25304] Lucille Daub also wrote the FCC, which forwarded her complaint to Olympic  Ms Daub explained that neither she

17  nor her husband recalled the check, "but we apparently did cash it, thinking it was some sort of refund " [Vol. II, Ex 135 at H 7417]. Pam Ritter of Carolina Mop wrote directly to Olympic asking for a refund of $123 40 less the $3 50

18  check  She stated that "we did not knowingly open this account" and that an employee had questioned the check but did not read the back of the check  "In fact, I doubt any of us would have taken the time to read the BACK OF A

19  CHECK!" [Vol VIII, Ex  136 at H 7499]  The complaint of Malon Metz eventually reached Eisenberg personally. Metz stated he had been with the postal service for 20 years and "this is the most underhanded marketing tool I've

20  seen in years " [Vol II, Ex  153 at DR 6806-07]  Another complaint that reached Eisenberg was from Daniel Underhill, who wrote "I scratched my head for the longest time trying to figure out who the heck I had invoiced for

21  $3 50 or for what rebate I was receiving this check "  He then pointed out that "you are clearly banking on the notion that most people won't examine too closely as to what the check is for and who it is from and will just cash it with

22  their next bank deposit " [Vol II, Ex  154, DR 6454]

23  [11]  Eisenberg incorrectly states that consumer complaints have never been admitted into evidence for the truth of the matter, citing *FTC v  Figgie International, Inc* , 994 F 2d 595 (9th Cir. 1993)  In fact, in *Figgie* the Ninth

24  Circuit approved the District Court's admission, under Federal Rules of Evidence 803(24) and 1000, of the declaration of an FTC investigator summarizing 127 consumer complaints to show the truth of the matter  Over the

25  objection of Figgie, who argued that consumer complaints were hearsay, the court held that the letters were admissible to prove the prices paid by consumers  994 F 2d at 608-610

26

* Ex. 95, E 20094 (Vol. II), the written presentation Eisenberg and Hebard distributed to potential buyers of the EPV venture, explains that consumers deposited the solicitation checks without realizing that they were signing up for Internet service

* The sample answer to a reporter's question states that defendants provided hundreds of thousands of dollars of refunds to customers who cashed the check "without reading the inserts or the disclosures on its face and signature block." [Vol. I, Ex. 74, E 20717].[12]

* Don Reese notified Eisenberg and Hebard in December 1999 that, in his opinion, the only reason that the solicitation checks were being cashed by recipients is that the accounts receivables department "does not pay attention" [Vol. II, Ex. 163; Vol. V, Ex. 264, *R Depo*, p. 64, l. 16-20; p. 65, l. 17 - p. 66, l 9]. Reese testified that he was saying that the accounts receivable departments did not know what the check represented. He knew this from the number of complaints, comments from the customer service representatives and their supervisors, the LEC complaints, and what he heard consumers saying when he listened to the consumers speaking with Olympic's CSRs [Vol. V, Ex. 264, p. 182, l. 5-23].

Sixth, less than one percent of billed consumers used defendants' Internet access service [Vol. VI, Ex. 302, Tobin Dec, ¶ 42]. This shows that consumers did not knowingly sign up for defendants' internet access  Consumers did not know they were signing up for Internet access because the terms of the offer were contained in minuscule print on the back of the solicitation.

Starnet invoice records show that approximately 2000 different EPV consumers used defendants' service to access the Internet between June 1999 and September 2000; during the

---

[12]  Hebard testified in considerable detail about this document, which came from his financial officer, agreeing with all of the answers–except he stated that he did not know that consumers cashed the check without reading the insert, the kind of answer one would expect from a defendant at a deposition [Vol IX, Ex 260, p. 109, l 9 - p  113, l. 5]

Plaintiff's Opposition to Eisenberg Defendants'
Motion for Summary Judgment
C-00-1806-L
March 25, 2002                                          13

Federal Trade Commission
600 Pennsylvania Ave  NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1  same period, defendants' customer service database shows that Olympic billed approximately

2  247,000 different customers on behalf of the EPV venture [Vol. VI, Ex. 302, Tobin Dec, ¶ 19] [13]

3  Depending on the sample measured, surveys show that most consumers who have Internet access

4  log on to the internet. For instance, according to a survey of Internet usage habits by the Yankee

5  Group, in 1998 approximately 100% of the surveyed households capable of accessing the

6  Internet did so at least one time in a given month; in 2000, approximately 98% logged on.[14]

7      Deposition testimony and other documents confirm the low usage. Hebard admitted that

8  it was brought to his attention that very few billed consumers were actually logging on to the

9  Internet using the EPV software; that potential buyers had expressed concern that so few EPV

10  consumers had actually logged on; and that he himself was concerned that so few EPV

11  consumers were logging on [Vol III, Ex. 252, H Adm 274-276].[15]  Eisenberg and Hebard

---

[13]  Eisenberg makes two incorrect arguments about the Starnet invoices  First, Eisenberg states, without explanation, that the records are inadmissible  The FTC disagrees  The records [Vol I, Ex  4] were authenticated by Starnet at its Rule 30(b)(6) deposition [Vol IX, Ex 265 (Malecki), p  40, l  4-25, (Van Deren), p  35, l  3-21] Eisenberg and Hebard both admitted that they, or their employees, received the Starnet invoices [Vol  III, Ex  256, E Adm 119, 121; Ex  251, H Adm 99, 101]  They are admissible as business records under Rule 803(6) of the Federal Rules of Evidence  *See declaration of Tom Van Deren*, Vol  IX, Ex  312, ¶¶  2, 5-11

    Second, Eisenberg erroneously implies that defendants paid Starnet for each EPV customer, regardless of whether that consumer accessed Internet [Eisenberg motion, p  7, l  7-8]  It is true that they paid Starnet for each customer–but just for the email and web page accounts  Defendants paid Starnet for Internet access only if the consumer logged on  According to Tom Van Deren, Starnet's Manager of Sales and Marketing, defendants paid Starnet $ 25 for each email account and $ 20 for each web page account [Vol IX, Ex  312, Van Deren Dec, ¶ 11] However, defendants paid Starnet only if the consumer logged onto the Internet [Vol  V, Ex  265, *Starnet Depo (Van Deren)*, p  25, l  18 - p. 26, l  21, *see also testimony of Don Reese* Vol  V, Ex  264, p  185, l  25 - p  189, l  18]

[14]  Vol. IX, Ex  314, ¶ 4 [Declaration of Robert Lancaster, Yankee Group Research]  *See also the declaration from* Barbara Jarzab, Nielsen/NetRatings showing that in September, 2000, approximately 60% of people who had access to the Internet from their homes logged on to the Internet [Vol  IX, Ex  316, ¶ 3]  By contrast, in September, 2000, defendants billed approximately 15,000 consumers [Vol. VI, Ex. 302, Tobin Dec ¶ 18], there were 56 EPV consumers who logged on during that period [Ex  302, Tobin Dec, ¶ 41]  Finally, according to an informal survey by the Executive Director of the Washington Association of Internet Service Providers, based in the State of Washington, the number of consumers who have access to the Internet and do not log on is almost too small to measure [Vol  IX, Ex  313, ¶ 4].

[15]  Hebard's deposition testimony is consistent with his admissions. Hebard explained that some of the potential buyers were concerned about the quality of the business if consumers were not logging on and using the

Plaintiff's Opposition to Eisenberg Defendants'
Motion for Summary Judgment
C-00-1806-L
March 25, 2002      14

Federal Trade Commission
600 Pennsylvania Ave  NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1  discussed this low usage in conference calls in which Reese participated [Vol. V, Ex. 264, *R*
2  *Depo*, p. 108, l. 6-23]. Hebard confirmed that he discussed usage issues with Eisenberg [Vol IV,
3  Ex. 260, *H Depo*, p. 143, l 5-15]. In September 1999, Hebard sent an email to Don Reese and
4  Eisenberg, in which he commented upon a previous email from Reese. In his email, Hebard
5  states "our churn factor has to do with *no usage*, not whether we are the best ISP." [Vol. II, Ex.
6  181, p. 1 (emphasis added)]. Reese testified that Hebard was explaining that "people are
7  canceling because they don't know that they are users. They don't know that they're subscribing
8  to the service." [Vol. V, Ex. 264, *R Depo*, p. 192, l. 1-3; l. 11-22]. In a different email, Hebard
9  suggested going to Starnet "and beg them to bill us for more users " [Vol. I, Ex. 81, DR 5070].
10 In their written presentation to potential buyers, Eisenberg and Hebard stated that a number of
11 consumers deposit the check "without realizing that when they deposit the check, that they have
12 ordered Internet service." [Vol. II, Ex. 95, E 20094]. Eisenberg and Hebard received copies of an
13 email in February 2000 in which Don Reese stated that not one of the subscribers on a list from
14 an auditor "has ever logged on to our Radius Server." [Vol. VIII, Ex. 83, DR 4683; Vol V, Ex.
15 264, *R Depo*, p. 112, l. 19-25; p. 113, l. 4-19]. Hebard testified that Reese seems to be saying
16 that not a single one of the consumers had logged on to the radius server [Vol. IV, Ex. 260, *H*
17 *Depo*, p 152, l. 12-25; p. 153, l. 21 - p. 154, l. 11]. Jeff Fritz, Hebard's financial officer, notified
18 Eisenberg and Hebard in November 1999 that the Starnet/Megapop invoice for October showed
19 there were only 75 unique log-ons [Vol. I, Ex. 80, E 20728; Vol IV, Ex. 260, *H Depo*, p. 141, l.
20 11-14, p. 143, l 2-7]. Hebard thought 75 was a low number [Ex. 260, *H Depo*, p. 143, l. 7]. In
21 October 1999, defendants' database shows that they billed approximately 74,000 customers [Vol
22 VI, Ex. 302, Tobin Dec, ¶ 17] Although usage by EPV subscribers was low, Eisenberg and
23 Hebard never deferred billing consumers until they had logged on to the Internet [Vol. IV, Ex.
24 260, *H Depo*, p. 155, l. 25 - p. 156, l. 3; Vol. IV, Ex. 262, *E Depo*, p. 167, l. 7-17] Eisenberg
25
26 service [Vol IV, Ex. 260, p 157, l. 2-11]

1   recalls a suggestion was made to discontinue billing consumers after a certain period if those
2   subscribers had not logged on to the Internet, but that suggestion was not acted upon [Vol. IV,
3   Ex. 262, *E Depo*, p. 172, 1 17-23].

4       Ample admissible evidence exists to support the FTC's three complaint counts.
5   Therefore, Eisenberg's motion for summary judgment should be denied. Moreover, the evidence
6   the FTC has submitted in support of its motion for summary judgment shows that no genuine
7   issue of material fact exists.

8   **IV.   EISENBERG MISSTATES FTC LAW AND RAISES BOGUS DEFENSES.**

9       **A.   Eisenberg Misstates and Misapplies FTC Deception Law.**

10      Applying the proper legal standard established by the FTC Act is clearly a central
11  component of this case. Eisenberg's summary judgment motion is based on the wrong legal
12  standard. Section 5(a) of the FTC Act prohibits, *inter alia*, "unfair or deceptive acts or practices
13  in or affecting commerce." 15 U S.C § 45(a) The legal standard for "deception" is distinct
14  from the legal standard for "unfairness." In attempt to raise the standard of what the FTC must
15  prove, the Eisenberg defendants' motion combines the two standards and misstates the FTC's
16  burden in this action.

17      This case concerns *deceptive* business practices. The proper "deception" standard of the
18  FTC Act involves only a showing of a representation, omission, or practice that is likely to
19  mislead a consumer acting reasonably about a material fact. *See, e.g , FTC. v. Gill*, 265 F.3d
20  944, 950 (9th Cir. 2001) (citations omitted). The Eisenberg defendants attempt to add to this
21  burden by arguing that the FTC must also show that the injury to consumers was not reasonably
22  avoidable [Eisenberg Memo, p. 1, l. 15 - p. 2, 1 1, p. 15, l. 16-23]. The Eisenberg defendants

23
24
25
26

27  Plaintiff's Opposition to Eisenberg Defendants'                     Federal Trade Commission
    Motion for Summary Judgment                                          600 Pennsylvania Ave. NW
    C-00-1806-L                                                          Washington, DC 20580
28  March 25, 2002                              16                       202-326-3338 (Ms Guerard)

1   borrow this added hurdle from the FTC's "unfairness" standard; it has no role in the FTC's

2   "deception" standard.[16]

3          At one point, Eisenberg incorrectly argues FTC must show that defendants caused harm

4   to reasonable "relying" consumers [Eisenberg motion, p. 20, l. 16-17].  It is unclear what is

5   meant by "relying" consumers, but under applicable law, the FTC does not need to show reliance

6   by consumers [FTC motion for summary judgment, p. 17-18].  "It is well established with regard

7   to Section 13 of the FTC Act (which gives district courts the power to order equitable relief) that

8   proof of individual reliance by each purchasing customer is not needed." *FTC v. Figgie*

9   *International, Inc* , 94 F.2d 595, 605 (9th Cir. 1993).

10         Eisenberg also argues that approximately 257,000 consumers who deposited the check

11  and were billed acted unreasonably because "up to ninety five percent of all recipients necessarily

12  understood and declined the offer." [Eisenberg motion, p. 20, l. 3-14].[17]  The argument fails from

13  its own deficiencies.  First, there is no evidence showing how many consumers simply discarded

14  the envelope, either before or after they opened it.[18]  The relevant inquiry is how many consumers

15  who opened the envelope noticed the disclosures  Defendants' consultant, Dr. Howard Beales,

16  agrees:

17

18

19     [16]  The FTC unfairness standard is set forth in Section 5(n) of the FTC Act, which states that an "unfair" act
       or practice is one which "causes or is likely to cause substantial injury to consumers which is not reasonably
20     avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."
       15 U S C  §45(n)

21
       [17]  Eisenberg contends that there were approximately 225,000 Cyberspace customers who were billed,
22     citing a draft Lew Rose letter to the FTC he supposedly saw and a declaration he understood defendant Hebard was
       going to file in support of Hebard's motion for summary judgment [Eisenberg motion, p 4, l 19 - p. 5, l 5]
23     However,  defendants' customer service database for all four EPV subsidiaries contains billing records for
       approximately 257,000 consumers who were billed by defendants [Vol VI, Ex 302, Tobin Dec, ¶ 8].

24
       [18]  Erard Moore testified that he never learned the response rate for the Cyberspace solicitation  He did
25     testify that industry statistics suggested that the response rate for direct mail solicitations was between 1/4 and 5%
       [Vol X, Ex 269, p. 160, l 3-13]
26

1  A key question here was did—**would people have read it at all in the first place? Or**
2  **would they have simply deposited the check**? A mall intercept study is very difficult to
   get at—it's very difficult to get at that question in a mall intercept study. [Emphasis
3  supplied]. [Vol. IX, Ex. 306, p 34, l. 18 - p. 36, l. 14].

4  Defendants claim there is a distinction between businesses and consumers, and that

5  businesses should be held to a higher standard because it is "fair" to presume that they have more

6  business knowledge and savvy than the average consumer [Eisenberg motion, p. 19, l. 8-9].[19]

   According to Dr. Beales, the issue is the same with respect to both consumers and businesses.
7
   [Vol. IX, Ex. 306, p. 34, l. 18 - p. 36, l 14]:   can they even find the inconspicuous disclosures,
8
   or do they simply deposit the check without realizing that they are being signed up for internet-
9
   related services to be charged monthly to their telephone bills?[20]
10
11  Consumers are not unreasonable if they cannot find the terms of an offer buried in myriad

12  lines of fine print on the back of a $3 50 check which, with its attached invoice-like form,

   appears to be a rebate or payment for services. As several deponents testified, they did not
13
   expect the terms of a contract to be in small print on the back of a check. Defendants' tiny print
14
   disclosures did not alert approximately 257,000 consumers that cashing or depositing the check
15
   would sign them up for a service that they did not know they were ordering, did not want, and, in
16

17

18

19

20

_____

21  [19]  Defendants state that the FTC has "informally" advised that it considers the fact that the promotion was
   targeted to businesses as evidence of deceptive intent [Eisenberg motion, p. 18, l 19-21]. First, defendants make this
22  bald assertion without citation, so the FTC cannot respond   Second, the FTC does not "informally advise"
   defendants   The FTC does contend that many businesses simply deposited the checks, thinking that they were a
23  rebate or refund or payment for some service, or because they did not see the inconspicuous terms of the offer

24  [20]  Eisenberg's argument that businesses are more "savvy" than consumers and less likely to be deceived is
   undercut by his own counsel's experience with the "Chase" check   Counsel who is litigating a deceptive solicitation
25  check case should have been even more "savvy" than the average business—yet the Eisenberg legal team did not see
   the fine print that explained the check was not from Chase but from MemberWorks
26

27  Plaintiff's Opposition to Eisenberg Defendants'                    Federal Trade Commission
   Motion for Summary Judgment                                        600 Pennsylvania Ave  NW
   C-00-1806-L                                                        Washington, DC 20580
28  March 25, 2002                         18                202-326-3338 (Ms  Guerard)

1  many cases, could not even use because they had no computer.[21]   These consumers collectively

2  paid about $28 million dollars to defendants [Vol. VI, Ex. 302, *Tobin Dec*, ¶ 8].

3      **B.**    **Advice Of Counsel Is Not A Defense In An FTC Case.**

4      Eisenberg references the role legal counsel played in reviewing the EPV subsidiaries'

5  marketing material [Eisenberg Memo, p 7, l. 11-15]. "Advice of counsel" neither inoculates a

6  defendant's business practices against a finding that those practices are deceptive nor shields an

7  individual defendant from a finding that he is individually liable for the deceptive practices of

8  corporate defendants. *See, e g , FTC v Amy Travel*, 875 F.2d 564, 575 (7th Cir. 1989)

9  ("Obtaining the advice of counsel did not change the fact that the business was engaged in

10  deceptive practices. . . [R]eliance on advice of counsel was not a valid defense on the question

11  of knowledge; counsel could not sanction something that the defendants should have known was

12  wrong."); *Orkin Exterminating Co v FTC*, 849 F.2d 1354, 1368 (11th Cir. 1988) (Reliance upon

13  counsel "irrelevant" to an action brought pursuant to section 5); *FTC v. Fax Corp of America,*

14  *Inc* , 1990-2 Trade Cas. (CCH) ¶ 69,227 (D.N.J. 1990) ("A claim by defendants that they relied

15  on the advice of counsel does not constitute a defense to allegations that they violated Section 5

16  of the FTC Act.").

17      **C.**    **Refunds Do Not Cure Deception.**

18      In an apparent attempt to distract the Court from the true issue in this case– defendants'

19  deceptive solicitation checks – Eisenberg argues that the EPV venture offered a money-back

20  guarantee in their fine-print disclosures and provided a partial or full refund to thousands of

21

22      [21] Eisenberg states that some consumers and businesses who had high-speed access would nonetheless pay

23  $19 95 or $29.95 for a Cyberspace email address [Eisenberg motion, n 6, affidavit, ¶ 13]  Eisenberg is unable to point to a single such consumer. The hypothetical existence of satisfied customers has no bearing on the issue of whether defendants' business practices were deceptive under Section 5 of the FTC Act  Satisfied customers are not a

24  valid defense to an allegation of deception under Section 5  *See, e g , FTC v Amy Travel*, 875 F 2d 564, 574 (7th Cir 1989) (The existence of some satisfied customers "is not relevant to determining whether consumers were

25  deceived "), *FTC v Gill*, 71 F.Supp 2d 1030, 1049 n 21 (C D. Cal 1999), *aff'd* 265 F 3d 944 (9th Cir 2001) ("Even

26  assuming that defendants do have thousands of satisfied consumers, it does not excuse their violations of the law.").

Plaintiff's Opposition to Eisenberg Defendants'                     Federal Trade Commission

27  Motion for Summary Judgment                            600 Pennsylvania Ave  NW

    C-00-1806-L                                     Washington, DC 20580

28  March 25, 2002                      19                   202-326-3338 (Ms. Guerard)

1   consumers who challenged defendants' charge on their telephone bills [Eisenberg motion, p. 5, l.

2   11 - p. 6, l. 28].  This argument is irrelevant.  A money-back guarantee or a refund does not cure

3   business practices that are deceptive under Section 5 of the FTC Act.  *See, e g., FTC v. Pantron I*

4   *Corp*, 33 F 3d 1088, 1103 (9th Cir. 1994) (the existence of a money-back guarantee is not a

5   defense); *Montgomery Ward & Co  v. FTC*, 379 F.2d 666, 671 (7th Cir. 1967) (allowing a defense

6   based on a money-back guarantee policy would make the false advertising prohibitions of the

7   FTC Act "a nullity"); *FTC v. Wilcox*, 926 F.Supp  1091, 1100 (S.D. Fla. 1995) (In holding that

8   defendants' refunds were irrelevant, the court quoted a passage from an FTC brief: "Whatever

9   care defendants may have shown to soothe some complaining consumers . . . does not undo the

10  deception by which the payment was obtained in the first place.").

11          In sum, under the deception standard, the FTC is not required to show consumers could

12  have avoided injury  Moreover, neither advice of counsel nor a money back guarantee is a

13  defense to a Section 5(a) violation.

14  **IV.     EISENBERG WAS PERSONALLY INVOLVED IN THE EPV MARKETING**
            **MATERIAL.**

15
            In his motion, Eisenberg suggests that he was uninvolved in the marketing end of the
16
    EPV venture by stating that Hebard "obtained the mailing lists, created the promotions, had
17
    attorneys specializing in direct marketing review the materials, and arranged for mailing."
18
    [Eisenberg motion, p  4, l. 1-2; affidavit, ¶10].  Eisenberg also states that he did not see many of
19
    the promotions before they were mailed [affidavit, ¶ 15].  The facts show otherwise.  Eisenberg
20
    was deeply involved in the marketing material, and he reviewed it before it was mailed.  The
21
    solicitation check was his idea (n. 2, *supra* and Vol. V, Ex. 264, *R Depo*, p. 44, l. 13-23].  People
22
    working for Hebard faxed proposed solicitation checks and inserts to Eisenberg for his review
23
    and approval [Vol. IV, Ex. 260, *H Depo*, p. 91, l. 21 - p. 92, l. 13].  Hebard and his Director of
24
    Production, Buff Warne [Vol. IV, Ex. 260, *H Depo*, p  89, l. 25 - p  90, l. 1], asked Eisenberg to
25

26

27  Plaintiff's Opposition to Eisenberg Defendants'                          Federal Trade Commission
    Motion for Summary Judgment                                             600 Pennsylvania Ave  NW
    C-00-1806-L                                                             Washington, DC 20580
28  March 25, 2002                        20                        202-326-3338 (Ms. Guerard)

1  review solicitations before they were mailed [Vol. I, Ex. 68, H 8806, Vol. IV, Ex. 260, *H Depo*,
2  p. 92, l. 5-13].

3      a.    Vol II, Ex. 146, H 8801, which is a draft Cyberspace solicitation check, includes a
4             post-it with the message "Ian, This is a rough draft of the all in one check design.
5             Chris said he thinks insert should be laid out as rules without art & to ask
6             you--your thoughts?? Please advise. Buff" [Vol. IV, Ex 262, *E Depo*, p. 79, l. 20
7             - p. 80, l 11].

8      b.    Vol. II, Ex. 146, H 8802, includes a handwritten note: "Ian, this is the consumer
9             version of our check piece. Please review and advise any changes." [Vol. IV, Ex.
10            262, *E Depo*, p 80, l. 19-25].

11     c    Vol. I, Ex. 68, H 8806, includes a handwritten note to Ian with instructions
12            "please read and OK" [Vol. IV, Ex. 262, *E Depo*, p. 81, l. 15 - p. 82, l. 3].

13     d.    Vol VIII, Ex. 147 is an email to "Ian" from Buff Warne asking for Eisenberg's
14            comments on the consumer insert "Speak now or forever hold your peace
15            Buff" Eisenberg responded and told Buff to "go ahead." [Vol. IV, Ex. 262, *E*
16            *Depo*, p. 84, l. 9 - p. 85, l. 16].

17 Eisenberg discussed the marketing material with Hebard by telephone [Vol. III, Ex. 256, E Adm
18 45, 46; Ex 251, H Adm 29, 30, 31, 32, Vol. V, Ex. 264, *R Depo*, p 59, l. 15-23]. Eisenberg and
19 Hebard communicated their decisions regarding the marketing material to those working on the
20 marketing material by telephone, email, letter, post-it, and in person [Vol. IV, Ex. 262, *E Depo*,
21 p. 179, l 19-25].

22     Eisenberg was also personally involved in deciding the quantities of solicitation checks to
23 mail [Vol. IV, Ex. 260, *H Depo*, p. 95, l. 20 - p. 96, l. 6; p. 97, l. 2-4; Vol. IV, Ex. 262, *E Depo*,
24 p. 85, l. 17 - p 86, l. 2; Vol. V, Ex 264, *R Depo*, p. 67, l. 7-12]. Eisenberg wanted to market

25

26

27 Plaintiff's Opposition to Eisenberg Defendants'           Federal Trade Commission
    Motion for Summary Judgment           600 Pennsylvania Ave NW
    C-00-1806-L           Washington, DC 20580
28 March 25, 2002    21           202-326-3338 (Ms Guerard)

1 | aggressively by sending out more mail, and he sometimes made the decision on the quantity to

2 | mail [Vol. II, Ex. 148, Vol. IV, Ex. 262, *E Depo*, p. 86, l. 6-7; p. 87, l. 9-24].

3 |      In short, Eisenberg's protestations regarding his limited involvement in the marketing

4 | material associated with the EPV venture are not accurate.

5 | **V.**    **CONCLUSION.**

6 |      The FTC has submitted admissible evidence with respect to each complaint count

7 | sufficient to defeat Eisenberg's motion for summary judgment. The motion should be denied.

8 | Moreover, the FTC's evidence is so overwhelming that there is no genuine issue of material fact

9 | As shown in its motion for summary judgment, the FTC is entitled to a judgment as a matter of

10 | law. Therefore, summary judgment should be granted in favor of the FTC.

11

12

13 |                  Respectfully submitted,

14 |                  COLLOT GUERARD

15

16 |                  MICHAEL GOODMAN
                 Federal Trade Commission

17 |                  600 Pennsylvania Ave. NW, Suite 238
                 Washington, DC  20580

18 |                  202-326-3338 (office)
                 202-326-3395 (fax)

19 |                  cguerard@ftc.gov (email)

20 | March 25, 2002

21

22

23

24

25

26

27 | Plaintiff's Opposition to Eisenberg Defendants'
Motion for Summary Judgment
C-00-1806-L

28 | March 25, 2002

Federal Trade Commission
600 Pennsylvania Ave NW
Washington, DC 20580
202-326-3338 (Ms. Guerard)

1

## CERTIFICATE OF SERVICE

2       The undersigned hereby certifies that on the 25 day of March, 2002, a copy of the FTC's
Opposition to Eisenberg Defendants' Motion for Summary Judgment was served via overnight

3  delivery service, postage prepaid, upon the parties listed below:

4

Ernest Leonard, Esq.

5  Friedman & Feiger
5301 Spring Valley Road, Suite 200

6  Dallas, Texas 75254

Jane Jacobs, Esq.

7  Klein, Zelman
485 Madison Avenue, 15th Floor

8  New York, New York  10022

9

Collot Guerard
10  Attorney for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Plaintiff's Opposition to Eisenberg Defendants'                Federal Trade Commission
27  Motion for Summary Judgment                   600 Pennsylvania Ave  NW
C-00-1806-L                              Washington, DC 20580
28  March 25, 2002                     202-326-3338 (Ms  Guerard)