1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HONORABLE ROBERT S. LASNIK**

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

APR 1 6 2002 MR

AT SEATTLE
CLERK U S. DISTRICT COURT
BY WESTERN DISTRICT OF WASHINGTON
DEPUTY

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | **Case No. C00-1806-L** |
| **Plaintiff,** | **FTC REPLY TO EISENBERG** |
| **v.** | **DEFENDANTS'** |
| | **OPPOSITION TO FTC** |
| **CYBERSPACE.COM, LLC, et al,** | **MOTION FOR SUMMARY** |
| | **JUDGMENT** |
| **Defendants.** | |

CV 00-01806 #00000175

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

# ORIGINAL

175

## I.      INTRODUCTION.

The Federal Trade Commission's Motion for Summary Judgment ("FTC Motion") is divided into several sections that set forth what the FTC must prove to win summary judgment. The primary sections describe defendants' business practices (pp. 5-8), explain what representations defendants made and why their representations are deceptive under the FTC Act (pp. 8-11, 19-22), establish the individual defendants' control of and participation in defendants' business practices (pp 11-13), show that the individual defendants knew that their solicitation checks were deceiving consumers nationwide (pp. 13-17), and set forth the amount of consumer injury (pp 17-18).

The Eisenberg defendants' opening salvo in their Opposition to the FTC's Motion ("Eisenberg Opposition") is that the FTC should lose its Motion because it has submitted too much documentation [1]  Eisenberg argues that the breadth of the FTC's evidence alone suggests that there must be a genuine issue of material fact somewhere in the exhibits.  Eisenberg uses the remainder of his Opposition to quibble with some of the evidence submitted by the FTC.  In doing so, Eisenberg has failed to submit admissible evidence of his own that can establish a genuine issue of material fact in response to the FTC Motion  As a result, and as will be shown below, the FTC is entitled to summary judgment because, based on the evidence submitted, this Court can conclude, as a matter of law, that defendants' business practices were likely to deceive reasonable consumers and that these practices caused millions of dollars of injury to consumers.[2]

## II.     DEFENDANTS' BUSINESS PRACTICES, THE FTC ACT'S "DECEPTION" STANDARD, AND THE EVIDENCE PRESENTED.

### A.      *There Is No Genuine Dispute Concerning: 1) How And When Defendants Marketed Their Services, 2) How Many Checks Defendants Mailed To Consumers, Or 3) How Many Consumers Were Billed By Olympic On Behalf Of The EPV Subsidiaries.*

---

[1]  Elsewhere, Eisenberg suggests that the FTC has not submitted enough documentation  *See* note 12, *infra*

[2]  The Eisenberg Opposition does not address three sections of the FTC Motion  jurisdiction, venue, and the individual defendants' control of, and participation in, defendants' business practices  The FTC's discussion of these sections is at pages 2-4 and 11-13 of its Motion  Accordingly, there is no genuine issue of material fact on these points

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L                          1

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

1    Eisenberg does not present any evidence to dispute that Eisenberg and Hebard began their
2   business venture in the fall of 1998 and modeled their offering based on solicitation checks used
3   by a company that did business with defendant Olympic, a company owned and controlled by
4   Eisenberg [Ex 260, *H Depo*, p  26, l. 3-10; Ex. 261, *O Depo*, p. 72, l. 24 - p. 74, l. 25; Ex  260, *H*
5   *Depo*, p  24, l. 15-19; p. 27, l. 14-20; p. 28, l. 1-2].  Eisenberg agrees with the FTC that
6   defendants' subsidiaries mailed over four million solicitation checks between the fall of 1998 and
7   the summer of 2000 [Eisenberg Opp., p. 12; Vol. XII, Ex. 318, Olympic Interrogatory Response
8   5].  Olympic recently stated that it billed 267,480 consumers on behalf of three of the four
9   subsidiaries [Vol. XII, Ex. 318, Olympic Interrogatory Response 6].[3]  The Eisenberg Opposition
10  does not raise a genuine issue of material fact regarding how and when defendants marketed their
11  services, how many checks were mailed, or how many consumers Olympic billed on behalf of
12  defendants.

        **B.**     ***Eisenberg's Opposition Does Not Raise A Genuine Dispute Concerning The
Representations On Olympic's Billing Page And By Defendants' Customer
Service Representatives That Consumers Were Obligated To Pay (Count I)***

    In its Motion, the FTC presented examples of Olympic's billing page [Ex  268, p. CLS
15018; Ex. 266, p. H 6634; Ex. 267, p  CJR 15208 (all in Vol  V), Vol. VI, Ex  272, p. H 7828]
to support its argument that the billing page represented to consumers that they were obligated to
pay the charge presented on the bill page.  The FTC also asserted that defendants' Customer
Service Representatives ("CSRs") reiterated this representation [*See, e g* , Ex. 275, Epstein Dec,
¶ 8; Ex. 282, Hunter Dec, ¶ 7; Ex. 289, Rutkowski Dec, ¶ 7 (all in Vol. VI); Vol. V, Ex. 267,
*Robrecht Depo*, p  21, l. 7 - p. 22, l. 1; p. 22, l. 9-15].

    The Eisenberg Opposition does not dispute that Olympic's billing page represented to
consumers that they were obligated to pay charges placed on consumers' telephone bills on
behalf of the EPV subsidiaries or that defendants' CSRs told consumers who inquired about the
Olympic charge that those consumers were obligated to pay this charge.  In his own Summary

---

27    [3]  The FTC had estimated that Olympic billed 257,000 consumers based on defendants' customer service
28  database [FTC Motion, pp. 5-6].  The FTC is willing to accept this updated figure for the purpose of its Reply to the
Eisenberg Opposition  Defendants' statement of billed consumers will be a subject explored at the FTC's upcoming
deposition of Olympic

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L                    2

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1  Judgment Motion, Eisenberg takes the position that "Once subscribers negotiated the check,

2  Cyberspace[4] was entirely within its rights to represent to subscribers that the subscriber was

3  legally obligated to pay for those charges." [Eisenberg SJ Motion, p. 16, l. 15-17]  Eisenberg

4  takes issue with the FTC's consumer declarations supporting Count I [Eisenberg Opp., p. 4].

5  However, as shown at pp 5-7 *infra*, Eisenberg's attack on the consumer declarations is

6  unpersuasive. Eisenberg has failed to present a genuine issue with respect to Count I.

**C.      Eisenberg Does Not Dispute The Materiality Of Defendants' Representations To Consumers.**

The FTC has asserted that defendants' representations were material [FTC Motion, pp. 21-22]  A showing that the representations that deceived consumers were material is a component of the FTC's burden under the "deception" standard of the FTC Act [FTC Motion, p. 19].  The FTC's Complaint alleges that defendants represented that consumers were obligated to pay defendants' charges; that defendants' solicitation check was a rebate, refund, or other payment based on a prior or ongoing business relationship; and that consumers could cash or deposit defendants' check  The Eisenberg Opposition does dispute that defendants made the alleged representations, but it does not disagree that, if the representations were made, or information was omitted, such representations or omissions were material  Accordingly, there is no genuine issue of material fact on this point.

**D.      Eisenberg Does Not Present Any Usage Data To Counter The Data Submitted By The FTC.**

20  One basis for the FTC's assertion that defendants' checks were likely to deceive

21  reasonable consumers is the usage data provided by Starnet, one of defendants' Internet Service

22  Providers ("ISPs")[5]  Starnet's invoices reflected how many of the consumers billed by

23  defendants logged on to the Internet using defendants' passwords [Vol. I, Ex. 4; Vol. V, Ex. 265,

24  *Starnet Depo* (Malecki), p. 91, l. 23 - p. 92, l. 15].  The FTC has shown that the Starnet invoices

---

[4]  From the face of Eisenberg's summary judgment motion, it appears that he uses the term "Cyberspace" to refer either to all subsidiaries of defendants' venture or to the three subsidiaries that marketed Internet access

[5]  Eisenberg agrees that defendants switched from one ISP to another during the course of their business venture [Eisenberg Opp , p  17], and he does not dispute that Starnet was defendants' ISP from June 1999 through the end of the venture in the fall of 2000 [Vol XII, Ex 262, *E Depo*, p  164, l  8-11]

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L                    3

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1    are authenticated and admissible evidence of usage by consumers billed by defendants from June

2    1999 through October 2000 [FTC Opposition to Eisenberg SJ, p. 14, note 13]   These invoices

3    were authenticated by Starnet at its deposition,[6] and they are admissible as business records based

4    on testimony provided by Starnet's deposition representatives and by a declaration from one of

5    these representatives.[7]  Defendants paid these invoices [Ex. 260, *H Depo*, p. 138, l. 19 - p. 139, l.

6    11].  Eisenberg has never provided any usage data of his own to rebut the Starnet data,[8] and he

7    has never introduced evidence to show that the Starnet invoices were inaccurate or incomplete.

8    The Starnet invoices show that only about 2000 consumers who were being billed by defendants

9    logged on [Vol. VI, Ex. 302, Tobin Dec, ¶¶ 34-35].

10       **E.    *The Eisenberg Defendants' References To The FTC's Pay-Per-Call Rule Are
             Irrelevant In An Action That Does Not Involve 900-Numbers*.**

11

12           In an attempt to obfuscate the true issue in this case– whether consumers who thought

     defendants' check was a check rather than a contract were reasonable in their interpretation–

13   Eisenberg injects an unrelated FTC Rule into his Opposition. Eisenberg borrows one sentence

14   from one provision of the unrelated Pay-Per-Call Rule with the mistaken hope that this reference,

15   without citation, will create a genuine issue about a material fact in this case [Eisenberg Opp., p.

16   24].[9]  Eisenberg suggests that defendants' fine-print disclosure cannot be deceptive if it may

17

18

19

20
          [6] The invoices are authenticated by both of Starnet's deposition representatives at Vol IX, Ex 264, *Starnet*
21   *Depo* (Malecki), p 40, l 4-8, and *Starnet Depo* (Van Deren), p 35, l 3-5

22        [7] Starnet employee Tom Van Deren establishes that the Starnet invoices are business records at Vol IX,
     Ex 264, *Starnet Depo* (Van Deren), p 35, l 3-21, and at Vol IX, Ex 312, Van Deren Dec, ¶¶ 2, 5-10
23
          [8] Neither does Eisenberg challenge two of three declarations submitted by the FTC from people with
24   knowledge regarding typical monthly usage rates among consumers with Internet access  These declarations establish
     that the usage rate among people billed by defendants was dramatically lower than the norm. The Declaration of
25   Gary Gardner, Executive Director of the Washington Association of Internet Service Providers, states that, based on
     an informal survey of 37 ISPs that are based in or operate in Washington State, the number of consumers who sign
26   up for Internet access yet do not use the service is less than one percent [Vol IX, Ex 313, Gardner Dec, ¶¶ 1-5].
     The Declaration of Barbara Jarzab, Vice President and Chief of Measurement Science for NetRatings, which collects
27   Internet usage information, states that services provided by her company reflect usage rates between 60 3 and 62 7
     percent [Vol IX, Ex 316, Jarzab Dec, ¶¶ 1-3]

28        [9] Eisenberg does not mention that the Pay-Per-Call Rule prohibits "any audio, video or print technique
     that is likely to detract significantly from the communication of the disclosures "  16 CFR § 308.3(a)(5).

FTC Reply to Eisenberg Defendants'                                        Federal Trade Commission
Opposition to FTC Motion for                                             600 Pennsylvania Ave , NW
Summary Judgment– C00-1806-L                    4                        Washington, DC 20580
                                                                         202-326-3338 (Ms Guerard)

1  satisfy the Pay-Per-Call Rule.[10]  Eisenberg's argument is unavailing.  Defendants' fine-print

2  disclosure that their check is also a contract violates the FTC Act because it was not clear and

3  conspicuous.  Eisenberg's reference to the unrelated Rule raises no genuine issue of material fact

4  **F.**   ***Eisenberg's Attack On Consumer Declarations Is Overbroad And Inaccurate.***

5  The consumer declarations submitted by the FTC in support of its Motion show the wide

6  variety of circumstances in which consumers received defendants' check as well as the

7  consistency of consumers' interpretation of defendants' check.  Eisenberg has argued that the

8  consumers' declarations should not be considered in assessing the FTC's Motion.  First,

9  Eisenberg argues that none of the declarations is admissible because "the declarants are

10 unavailable for trial." [Eisenberg Opp., p. 12, 1 2-3].  There has been no showing that the

11 consumer declarants are unavailable for trial  This argument for the exclusion of consumers'

12 statements has no merit.

13 Second, Eisenberg proposes that the FTC added documents to consumers' declarations

14 after they were signed [Eisenberg Opp., p. 11].  This is not accurate.  As to several consumers,

15 there can be no dispute that the documents attached to their declarations are simply copies of

16 their telephone bills reflecting defendants' charge [*See, e g* , Vol. VI, Attachments to Exs. 273,

17 279, 290]  In other cases, attachments include copies of complaint letters that consumers wrote

18 to defendants or regulatory agencies to protest the Olympic charge [*See, e g* , Attachments to Vol

19 VI, Exs. 270, 278, 298].  In some cases, consumers provided copies of their telephone bills and

20 complaint letters to the FTC; in many other cases, the FTC received copies of these documents

21 and other related correspondence from defendants in discovery, arranged for bates-stamping with

22 either an "E" or "H" to designate which defendant produced which documents, and provided the

23 bates-stamped copies to consumers the FTC contacted about their transactions with defendants,

24 for their review [*See, e g* , Vol VI, Attachments to Exs. 271, 279, 290].[11]

25

26  [10] Moreover, support for the Eisenberg defendants' references to the Pay-Per-Call Rule comes in the form
of an inadmissible hearsay statement attached to Eisenberg attorney Joel Dichter's declaration  Statements made five
27  years ago at a public workshop affiliated with an unrelated Rule simply do not create a genuine issue as to any
material fact in this case

28  [11] The FTC often contacted consumers whose complaints were produced from defendants' business
premises, so that defendants could not later argue that they had not seen the complaints at issue

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L                    5

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1    Third, Eisenberg notes that the consumers who were deposed or who submitted

2 declarations in this matter were "hand-picked by the FTC." [Eisenberg Opp., p. 12, l. 12,

3 emphasis omitted]  This is a red herring.[12]  Defendants produced boxes of consumer complaints

4 from their files.  The FTC bates-stamped and copied all documents in defendants' files relating to

5 a complaining consumer.  The FTC provided copies of the bates-stamped documents to

6 consumers for them to review in preparing their declarations

7    Fourth, Eisenberg argues that the declarations are inadmissible for their truth [Eisenberg

8 Opp., p 12].  There are two bases to support admission of these consumer declarations  First,

9 they are admissible under Federal Rule of Evidence 807 because they have circumstantial

10 guarantees of trustworthiness, they are offered as evidence of material facts, they are more

11 probative than other evidence, and the interests of justice will be served by their admission  This

12 is so because they are sworn statements that reveal a variety of experiences with common

13 elements.  There is no better evidence of consumers' interpretation of defendants' checks than

14 sworn statements from consumers themselves  The interests of justice are served by accepting

15 consumers' statements of their experiences  The consumer declarations are also admissible to

16 show that defendants had notice that consumers were reporting that they had considered

17 defendants' check to be merely a check without any fine-print contractual consequences.

18    The FTC is submitting declarations and depositions of consumers to establish the

19 likelihood of deception caused by defendants' checks and the reasonableness of consumers who

20 were deceived.  The declarations and depositions reveal the wide variety in the circumstances

21 under which consumers signed or stamped defendants' checks, and the consistency in how

22 consumers interpreted defendants' checks. Consumers thought defendants' check was a check[13],

23

24 ───────────────────

[12] Eisenberg's proposal that the FTC has submitted too few declarations and depositions is similarly

25 unavailing  There is no particular threshold number of injured consumers that the FTC must produce to prevail in
showing that defendants' business practices were deceptive

26 [13] Consumers from California to Pennsylvania to Florida reported the same interpretation of defendants'

27 check  that it was a check [Ex 271, Addor Dec, ¶ 3, Ex 270, Achey Dec, ¶ 3, Ex. 295, R. Wood Dec, ¶¶ 2, 7, 8 (all
in Vol VI)]  Consumers from the ages of 42 to 79 reported that they interpreted defendants' check as a check [Vol

28 VI, Ex 284, Katz Dec, ¶ 6, Vol. VI, Ex 275, Epstein Dec, ¶¶ 3, 9].  Consumers who received the check at home and
employees of a business that receives 12-15 checks daily interpreted defendants' check as a check [Vol  VI, Ex  280,
Hicks Dec, ¶¶ 3, 5, Vol  VI, Ex  274, Davis Dec, ¶¶ 3, 9]

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L          6

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1  they did not think the check was a contract.  Consumers did not see the fine print on the back of
2  the check.  The combination of variety in circumstances and consistency in interpretation is
3  submitted to show that consumers who were deceived were reasonable in their interpretation.

4        Eisenberg attacks consumers' declarations and depositions as being insufficient in
5  number.  However, these consumers are illustrative of consumers' interpretations  Moreover,
6  this attack on the sufficiency does not create a genuine issue regarding a material fact.

7        **G.**    *Other Evidence Corroborates Don Reese's Testimony.*

8        In his Opposition, Eisenberg accuses Don Reese of perjury [Eisenberg Opp., p. 5].  The
9  basis for this accusation, according to a footnote, is that Mr. Reese denied being an officer of
10 several of Eisenberg's companies.  After Mr. Reese's deposition, Eisenberg submitted documents
11 with his summary judgment motion purporting to show that Mr. Reese was a corporate officer in
12 more companies than he recalled at his deposition.  Based in part on this purported discrepancy,
13 the Eisenberg defendants posit that Mr. Reese cannot be trusted.  Moreover, testimony from Lia
14 Yagelowich, who still works for Eisenberg, shows that she was also named as a corporate officer
15 of Eisenberg's companies more often than she could recall or knew about [Vol. XII, Ex. 263,
16 *Yagelowich Depo*, p. 30, l. 7 - p  40, l. 14; p. 47, l. 10 - p. 48, l. 14, p. 53, l. 4 - p  54, l 6].[14]

17       Eisenberg's attacks on Mr. Reese are undermined by the fact that testimony from
18 defendants and third parties, documents, and consumer declarations and depositions regarding
19 defendants' business practices corroborate his testimony.  Moreover, the purported ill-will
20 between Mr. Eisenberg and Mr. Reese, which apparently manifested itself in April 2001 as
21 described in the Eisenberg Opposition, certainly cannot taint emails Mr. Reese sent to
22 participants in defendants' business venture prior to that time.  Eisenberg's attack on Mr. Reese's

23
24
25
26

27     [14]  The FTC is not accusing Ms  Yagelowich of perjuring herself on this point, her deposition excerpts are
offered to show the defendants' corporate officers did not necessarily know that they were officers or employees of
28 Eisenberg companies  Ms  Yagelowich did concede at her deposition that at the time she signed a sworn affidavit
filed in Court stating that she was an employee of French Dreams, she was not in fact a French Dreams employee
[Vol XII, Ex  319, p  19, l 2 - p. 21, l. 20]

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L       7       

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1   testimony does not create a genuine issue about a material fact because other evidence
2   corroborates his testimony.[15]

3   ## III.   THE REASONABLE CONSUMER.

4   All parties to this litigation appear to agree that the proper analysis of "deceptive"
5   business practices under the FTC Act applies a "reasonable consumer" standard [16]   Determining
6   whether consumers were "reasonable" in their interpretation of defendants' checks and billing
7   page is a matter of law, not a matter of fact, for the Court.  The FTC has presented evidence that
8   consumers nationwide, young and old, were deceived by defendants' check, and were injured as
9   a result.  As established by the FTC, among the consumers who were deceived and injured by
10   defendants were individuals who had no computer or already had Internet access and therefore
11   had no use for defendants' services, individuals who signed defendants' check because they
12   thought it was a refund or rebate requested from another company, small businesses who stamp
13   and deposit every incoming check as a matter of company policy, and small businesses who
14   thought defendants' check was a payment from a customer [FTC Motion, pp. 9-10]   In other
15   cases, defendants billed small businesses who simply did not realize that a check for $3.50
16   received in the mail might turn out to be a contract [*See, e g*, Vol. VI, Ex. 273, Clifton Dec, ¶ 6,
17   Vol. VI, Ex. 275, Epstein Dec, ¶ 6].

18   To support its assertion that defendants' business practices deceived reasonable
19   consumers, the FTC has shown that of the 248,878 consumers billed by Olympic for defendants'
20   Internet service[17], approximately 99% of those consumers never used the service that defendants

21
22

23   [15] The Eisenberg Opposition's suggestion that Mr Reese was motivated by a desire to avoid being named
in the FTC's action is unpersuasive  The FTC did not name any employee or officer other than the two individuals
24   who owned and controlled defendants' business  Thus, the FTC did not name John Biddinger, Lia Yagelowich, or
John Gravenkamper

25   [16] However, despite clarification regarding the FTC Act's "deception" standard provided by the FTC in its
26   Opposition to the Eisenberg SJ motion, Eisenberg persists in arguing for an incorrect legal standard by referencing
what consumers could do to "reasonably avoid harm" caused by defendants' business practices [Eisenberg Opp , p
27   25]  A showing that the harm be "reasonably avoidable" is not a part of the legal analysis in a deception case

28   [17] This number represents the total number of consumers billed by Olympic, as stated in its Interrogatory
Response, less the number of consumers billed on behalf of Essex, which did not offer Internet service  Splashnet
customers were billed by Integretel

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L                    8

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1  billed them for [FTC Motion, pp. 7-8]. The FTC has shown that defendants never included a
2  disclosure on the front of their solicitation check explaining that their check was actually a
3  contract [Vol XII, Ex. 260, *H Depo*, p 125, l 1-23; p. 126, l. 6-8]. The FTC has shown that
4  defendants' CSRs told consumers they were obligated to pay defendants' charges [FTC Motion,
5  p 9]. The FTC has shown that some consumers who signed defendants' check did so because
6  they thought it was a refund, rebate, or other payment from a prior or ongoing business
7  relationship [FTC Motion, p. 10]. The FTC has shown that some of the consumers who signed
8  or stamped defendants' check did so because they thought the check was simply a check [FTC
9  Motion, p. 9]  On the basis of this factual proof, the Court can conclude, as a matter of law, that
10  consumers who signed or stamped defendants' checks without realizing that defendants had
11  inserted a contract in fine print on the back of their checks were reasonable in their interpretation.

12     To rebut the FTC's factual proof that reasonable consumers were deceived by defendants'
13  business practices, the Eisenberg Opposition relies on two arguments: that some of the FTC's
14  evidence is inadmissible, and that the approximately 267,000 consumers who signed or stamped
15  defendants' checks either were unreasonable for failing to notice the fine-print contract on the
16  back of the checks or were reasonable for agreeing to pay for a service that they did not use,
17  want, or need.[18] The FTC has already shown that its evidence is admissible. On the latter point,
18  Eisenberg's argument that most of the 267,000 consumers who signed or stamped defendants'
19  check without considering the fine print terms were unreasonable is unpersuasive. Eisenberg's
20  alternate argument that most of the 267,000 consumers who signed or stamped defendants' check
21  with awareness of the contractual consequences and did not use defendants' services were
22  reasonable is baseless and unpersuasive.

23     As in all "deception" cases brought by the FTC, in this case, the Court ultimately must
24  determine whether consumers were reasonable in their interpretation of defendants'
25  representations. In this case, consumers interpreted defendants' check as a valid check.
26  Consumers did not interpret defendants' check as a contract. To support the reasonableness of

27

28  _____

[18] In his Opposition, Eisenberg abandons the speculation in Eisenberg's Affidavit in support of summary
judgment that some consumers might pay defendants for an "@cyberspace com" email address

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L                    9

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

1  this interpretation, the FTC has submitted evidence that includes samples of the check itself,
2  consumers' statements regarding their interpretation of the check, and statements from
3  defendants regarding consumers' interpretation that the check was simply a check.  To counter
4  the reasonableness of this interpretation, Eisenberg challenges the admissibility of some of the
5  FTC's evidence.  Because the reasonableness of consumers' interpretation is a matter of law and
6  because Eisenberg has failed to show that there is a genuine issue for trial, the Court should
7  conclude that consumers' interpretation of defendants' check was reasonable.

8  **IV.    NOTICE**

9      The Eisenberg Opposition claims that there is no admissible evidence that Eisenberg
10  knew of defendants' deceptive business practices  In making this argument, Eisenberg relies on
11  his own declaration in which he states that he did in fact listen to his CSRs respond to consumer
12  complaint calls on fewer than ten occasions.  Eisenberg has admitted to having actual notice of at
13  least some consumer complaints (submitted by telephone and email) regarding the EPV
14  subsidiaries [Vol. IV, Ex  261, *O Depo*, p. 170, l. 14-18, p. 171, l. 4-8; Ex  262, *E Depo*, p. 108,
15  l. 8 - p. 110, l. 1; Vol. II, Ex. 154].  Moreover, Eisenberg controls the business practices of
16  defendant Olympic, the primary recipient of telephonic consumer complaints [Vol. III, Ex. 256,
17  Eisenberg Adm 24].  Eisenberg spent five days a week, eight to nine hours per day working in
18  the same building as Olympic [Vol. IV, Ex. 262, *E Depo*, p. 34, l. 20 - p. 35, l. 3]  Eisenberg
19  quibbles with the FTC's portrayal of the eight state investigations of defendants' business
20  practices, but he does not deny that he knew of these investigations, including the Wisconsin
21  investigation, which concluded that EPV, Essex, and Cyberspace violated Wisconsin trade
22  practice law [Vol  II, Ex  86].

23  **V.    INJURY**

24      In its Motion, the FTC showed that unreimbursed consumer injury caused by defendants'
25  deceptive business practices totaled $23,225,500  The FTC arrived at this determination by
26  relying exclusively on defendants' own data [Vol. VI, Ex. 302, Tobin Dec, ¶¶ 2-6, 16, 20-32] [19]

27

28      [19]  Eisenberg challenges the FTC's determination of consumer injury by arguing that FTC staff lacked the
"formal training" to calculate totals from data contained in defendants' customer service database and that FTC staff
could not analyze the database as it was used by defendants  No formal training is needed to add and subtract billing

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L                    10

Federal Trade Commission
600 Pennsylvania Ave , NW
Washington, DC 20580
202-326-3338 (Ms Guerard)

1    Subsequent to the filing of the FTC's Motion, defendant Olympic responded to FTC
2    Interrogatories that sought information about, *inter alia*, consumer injury.  Based on this new
3    information, the FTC has revised its determination of consumer injury, again by relying
4    exclusively on defendants' data.  The unreimbursed consumer injury in this case now totals
5    $24,208,235.92.  The FTC arrived at this figure by totaling the amount billed by Olympic and
6    subtracting the amounts provided to consumers in credits and refund checks and subtracting the
7    amount in solicitation checks cashed or deposited by consumers [20]

8        Eisenberg contends that the $1.2 million profit that the FTC has traced to him "was more
9    than consumed by expenses," and he suggests that he used the $1.2 million to pay the costs of
10   specifically-listed employees who worked on the EPV venture [Eisenberg Opp., pp. 21-22]
11   Defendants' own records show that Cyberspace reimbursed Eisenberg for the salaries of his
12   listed employees when they worked for the EPV venture [Vol. XII, Ex. 317, Crowley Dec, ¶¶ 6-
13   9].  Cyberspace paid Lia Yagelowich $15,000 for whatever she did as president of Cyberspace.
14   [Vol. XII, Ex. 317, ¶ 10].

15       More importantly, Eisenberg's attempt to reduce his profits to a figure less than zero is
16   irrelevant.  As described above and in its Motion, the FTC has determined that defendants'
17   business practices caused over $24 million in consumer injury.  Eisenberg's Opposition does not
18   provide evidence to dispute this determination, although it does make unsupported references to
19   chargebacks and bad debt.  The FTC has shown that Eisenberg had notice of defendants'
20   deceptive practices, so he will be personally liable for this judgment amount.  This true
21   regardless of how much Eisenberg did or did not receive in personal profits.

22
23
24
25

26   data provided by defendants, nor is it necessary to use defendants' database as they used it to calculate consumer
27   injury

28   [20] Olympic billed $29,318,038 39  Consumers received $3,091,302 47 in credits and $1,119,000 in refund
     checks  Consumers received $899,500 by cashing defendants' checks.  Total unreimbursed injury therefore totals
     $24,208,235 92.

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L                  11

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

1  **VI.    CONCLUSION.**

2         For the foregoing reasons, as set forth in this Reply to the Eisenberg defendants'

3  Opposition to the FTC Motion for Summary Judgment, and supporting exhibits, the Commission

4  requests that the Court grant summary judgment against all defendants and in favor of the FTC.

5

6  Dated: *April 16, 2002*                    *E Durham for CG*

7                                             Collot Guerard
                                             Michael Goodman
8                                             Federal Trade Commission
                                             600 Pennsylvania Avenue, NW
9                                             Washington, DC 20580
                                             202-326-3338 (Ms. Guerard)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L                     12                     Federal Trade Commission
                                                                       600 Pennsylvania Ave., NW
                                                                       Washington, DC 20580
                                                                       202-326-3338 (Ms  Guerard)

1

## CERTIFICATE OF SERVICE

2    The undersigned hereby certifies that on the 18th day of April, 2002, a copy of FTC Reply
to Eisenberg Defendants' Opposition to FTC Motion for Summary Judgment was served via
3 overnight delivery service, postage prepaid, upon the parties listed below:

4

Ernest Leonard, Esq.
5 Friedman & Feiger
5301 Spring Valley Road, Suite 200
6 Dallas, Texas 75254

7 Jane Jacobs, Esq
Klein, Zelman
8 485 Madison Avenue, 15th Floor
New York, New York  10022

9

10            Michael Goodman

11            Attorney for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FTC Reply to Eisenberg Defendants'
Opposition to FTC Motion for
Summary Judgment– C00-1806-L     13

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
202-326-3338 (Ms  Guerard)

## DECLARATION OF JOHN A. CROWLEY
### PURSUANT TO 28 U.S.C. § 1746

1.      My name is John A. Crowley.  I am employed by the Federal Trade

Commission in Washington, D.C. as a Senior Attorney.  In addition to my law

degree, I have a B.S. in Accounting and worked as an accountant for

approximately ten years.  As part of my duties and responsibilities for the Federal

Trade Commission, Bureau of Consumer Protection, I provide forensic accounting

assistance to trial attorneys and investigators and have done so for more than 20

years.  I have testified in Federal court both as a fact witness and on some

occasions as an expert.

2.      I have previously submitted a declaration  in support of the FTC's

Motion for Summary Judgement.  My declaration is Exhibit 300 in Volume 6.

3.      Commission staff provided me with a copy of a document dated April

10, 2002 entitled Declaration of Ian Eisenberg in Opposition to Plaintiff's Motion

for Summary Judgement (Eisenberg Declaration).

4.      Paragraphs 19, 20, 21 and 22 of the Eisenberg declaration contain

statements relating to the payment of indirect expenses and overhead items by the

by the "EFO defendants" which were not fully allocated to or reimbursed by the

"EPV" ventures.

5.      Specifically, paragraph 20 contains a listing of "EFO" employees who

spent time on the "EPV" ventures. The paragraph implies that the time of these persons was not included in the expense reimbursements received from the "EPV" ventures.

6.     I examined hard copies of documents received from John Keida, who performed accounting work for Electronic Publishing Ventures, LLC ("EPV") and the EPV subsidiaries. A number of true and correct copies of these documents are attached to my declaration and are Bates stamped "JK." The FTC also received copies of bank statements related to the venture from First Union Bank. These documents are Bates stamped "FU."    True and correct copies of relevant documents are attached to my declaration.

7.     My examination of the documents produced by Mr. Keida has provided some materials which bear directly on the Eisenberg declaration statements.

8.     Documents contained in a folder produced by John Keida marked "US Network Files" include copies of checks from Cyberspace.com, LLC to US Network Services for services provided by the "EFO" defendants. One of the attachments to the Cyberspace  check payments is a detailed listing of charges for "EFO" employee time devoted to Cyberspace activities. The summary sheets contain a specific percentage of the employee time allocated to Cyberspace. The employees listed bear the same first names and last initials as the employees listed

in paragraph 20 of the Eisenberg declaration. The supporting documents contain a month-by-month analysis of wages for a number of months during the period from January 1999 through June 2000. The analyses contain a listing of "Rate/Mo" for each of the listed employees. Next to this amount is a percentage which is the amount charged to Cyberspace on a monthly basis for the individual employees' time. The percentages vary by employee and range from a high of 75% to a low of 5% (JK 729-736).

9.     The analyses and allocations of employee time contained in JK 729-736 and the accompanying Cyberspace payment checks lead me to conclude that, contrary to the implication of paragraph 20 of the Eisenberg declaration, the time spent by "EFO defendant" employees was allocated based on time spent on Cyberspace matters and that Cyberspace did reimburse the "EFO" defendants for their employees time.

10.     Paragraph 20 of the Eisenberg declaration also states that Lia Yagelowich devoted time to EPV-related work. However, Mr. Eisenberg does not mention that Ms. Yagelowich received compensation from Cyberspace in the amount of $15,000.00 in the form of two $7,500.00 checks (JK 737-740). The files contain the original of one of these checks, number 1323. A copy of the front and back of this check is included with this declaration (JK 741-742). The documents provided by Mr. Keida do not contain a copy the second check, number

1342.  However an examination of the First Union Bank statements reveals that this check was negotiated on August 9, 1999 (FU16451-16454 at 16452).

11.   My examination of the documents relating to Lia Yagelowich leads me to conclude that Ms. Yagelowich did receive compensation from the EPV defendants.

12.   Additionally, the Eisenberg declaration does not provide any support other than Mr. Eisenberg's assertions for his claim that expenses should be deducted from the payments he received.  To the contrary, the documents attached to my declaration show that employee time was allocated to EPV matters according to a definite pattern and that Cyberspace paid the "EFO" employees who worked on Cyberspace matters.

10.   It is my conclusion that the statements regarding unreimbursed expenses in the Eisenberg declaration require additional examination and documentation to determine the validity of the statements.

I declare under penalty of perjury that the foregoing statement is true and correct.

Executed on April 15, 2002, at Washington, D.C.

JOHN A. CROWLEY

4

1500

**CYBERSPACE.COM LLC.**
110 WEST 9TH STREET 588
WILMINGTON, DE 19801
888-285-5196

66-21/530
BRANCH 05455

DATE _12-22-9C_

PAY TO THE
ORDER OF _US Network Service_ | $ _12 317.63_

_Twelve thousand three seventeen and_ ⁶³/₁₀₀ DOLLARS

**First Union National Bank**
R/T 053000219

OR _____                                      MP

⑈"0000 1500"⑈ ⑊053000 2 19⑊ 200000 1998478⑈"



JK-0000729

**CYBERSPACE.COM PROJECT**

| NAMES | RATE/MO | | Jan 99 | Feb 99 | Mar 99 | Apr 99 | May 99 | Jun 99 | Jul 99 | Aug 99 | Sep 99 | Oct 99 | Nov 99 | Dec 99 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SOON L | 5,273.46 | 75% | 3,955.10 | 3,955.10 | 3,955.10 | 3,955.10 | 3,955.10 | 3,955.10 | 3,955.10 | 3,955.10 | 3,955.10 | | | | 35,595.86 |
| ANDREW K | 5,296.88 | 50% | 2,648.44 | 2,648.44 | 2,648.44 | 2,648.44 | 2,648.44 | 2,648.44 | 2,648.44 | 2,648.44 | 2,648.44 | | | | 23,835.97 |
| BOB A | 4,218.75 | 30% | 1,265.63 | 1,265.63 | 1,265.63 | 1,265.63 | 1,265.63 | 1,265.63 | 1,265.63 | 1,265.63 | 1,265.63 | | | | 11,390.63 |
| KATIE M | 2,671.50 | 25% | | | | | 667.88 | 667.88 | 667.88 | 667.88 | 667.88 | | | | 3,339.38 |
| FRED W | 2,343.77 | 25% | | | | | 585.94 | 585.94 | 585.94 | 585.94 | 585.94 | | | | 2,929.71 |
| BRIAN M | 5,155.27 | 10% | | | | | 515.63 | 515.63 | 515.63 | 515.63 | 515.63 | | | | 4,640.64 |
| ANDREW T | 3,140.65 | 5% | | | | | 157.03 | 157.03 | 157.03 | 157.03 | 157.03 | | | | 785.16 |
| ALEX | 5,052.50 | 25% | 515.63 | 515.63 | 515.63 | 515.63 | 1,265.63 | 1,265.63 | 1,265.63 | 1,265.63 | 1,265.63 | | | | 6,328.13 |
| STAFFORD | 6,281.83 | 20% | | | | | 1,256.37 | 1,256.37 | 1,256.37 | 1,256.37 | 1,256.37 | | | | 6,281.83 |
| TOTAL WAGES | - | | 8,384.79 | 8,384.79 | 8,384.79 | 8,384.79 | 12,317.63 | 12,317.63 | 12,317.63 | 12,317.63 | 12,317.63 | 0.00 | 0.00 | 0.00 | 95,127.90 |

Handwritten notes:

O4 (illegible) Alvin Pass through Expenses

Invoices to 'hirag' 6,115.10

| Month | Amt |
|---|---|
| 1-99 | 8,385 |
| 2-99 | 8,385 |
| 3-99 | 8,385 |
| 4-99 | 8,385 |
| 5-99 | 12,318 |
| 6-99 | 12,318 |

58,176

6115.10

OCT. 99   POSTED

JK-0000730

**CYBERSPACE. COM LLC.**
110 WEST 9TH STREET 588
WILMINGTON, DE 19801
888-285-5196

1637

66-21/530
BRANCH 05455

DATE _4·10·00_

PAY TO THE
ORDER OF _US network Services_ | $ _39472.22_

_Thirty nine thousand four seventy two & 00/100_ ____ DOLLARS

**FIRST UNION** First Union National Bank
R/T 053000219



OR _____

⑆00001637⑆ ⑉053000219⑉ 200000199847 8⑈

POSTED

JK-0000731

## CYBERSPACE.COM PROJECT

| N A M E S | RATE / MO | | Jan-00 | Feb-00 | Mar-00 | Apr-00 |
|---|---|---|---|---|---|---|
| SOON L. | 5,273.46 | 75% | 3,955.10 | 3,955.10 | 3,955.10 | |
| ANDREW K. | 5,826.58 | 50% | 2,913.29 | 2,913.29 | 2,913.29 | |
| BOB A. | 4,218.75 | 30% | 1,265.63 | 1,265.63 | 1,265.63 | |
| MELINDA K. | 3,281.25 | 30% | 984.38 | 984.38 | 1,312.50 | |
| BRIAN M. | 5,156.27 | 40% | 2,062.51 | 2,062.51 | 2,062.51 | |
| ANDREW T. | 3,454.70 | 5% | 172.74 | 172 74 | 172.74 | |
| ALEX | 5,062 50 | 25% | 1,265.63 | 1,265.63 | 1,265.63 | |
| DAMON | 4,537 51 | 20% | 907.50 | 907.50 | 907.50 | |
| ROBERT D. | 3,375.00 | 60% | 2,025.00 | 2,025.00 | 2,531.25 | |
| Brian Short | 7,581.56 | 15% | 1,137.23 | 1,137.23 | 1,137.23 | |
| Michelle F. | 2,535.00 | 25% | 633.75 | 633 75 | 633.75 | |
| Mane T. | 1,901.25 | 25% | 475.31 | 475.31 | 475.31 | |
| Neil R. | 3,328.14 | 15% | 499 22 | 499.22 | 499.22 | |
| | | | | | | |
| TOTAL WAGES | | | 18,297.27 | 18,297.27 | 19,131 65 | 0.00 |
| | | | | | | |
| PAYMENT RECEIVED | | | | | | |
| | | | | | | |
| BALANCE DUE | | | 18,297.27 | 18,297.27 | 19,131 65 | 0.00 |

Note changing in the month of March
Melinda 40%, robert D 75%

JK-0000732

| May-00 | Jun-00 | Jul-00 | Aug-00 | Sep-00 | Oct-00 | Nov-00 |
|---|---|---|---|---|---|---|
| 0 00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | 12,317.63 | | |
| 0.00 | 0.00 | 0.00 | 0.00 | (12,317.63) | 0.00 | 0.00 |

JK-0000733

| Dec-00 | | TOTALS |
|---|---|---|
| | | 11,865 29 |
| | | 8,739.87 |
| | | 3,796.88 |
| | | 3,281.25 |
| | | 6,187.52 |
| | | 518.21 |
| | | 3,796.88 |
| | | 2,722.50 |
| | | 6,581.25 |
| | | 3,411.70 |
| | | 1,901 25 |
| | | 1,425.94 |
| | | 1,497.66 |
| 0.00 | 0.00 | 55,726.19 |
| | | 12,317.63 |
| 0.00 | 0.00 | 43,408.56 |

JK-0000734

**CYBERSPACE. COM LLC.**
110 WEST 9TH STREET 588
WILMINGTON, DE  19801
888-285-5196

1612

66-21/530
BRANCH 05455

DATE 3-9-02

PAY TO THE
ORDER OF  US Network                                    $ 36,594.54

Thirty Six Thousand five Ninety four & 54/00 —         DOLLARS

**First Union National Bank**
R/T 053000219

FOR _____

⑈0000 1612⑈ ⑆053000219⑆ 200000 1998478⑈

POSTED

CYBERSPACE.COM PROJECT

| NAMES | RATE/MO | | Jan-00 | Feb-00 | Mar-00 | Apr-00 | May-00 | Jun-00 | Jul-00 | Aug-00 | Sep-00 | Oct-00 | Nov-00 | Dec-00 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SCOTT L | 5,273.46 | 75% | 3,955.10 | 3,955.10 | | | | | | | | | | | 7,910.19 |
| ANDREW K. | 5,826.58 | 50% | 2,913.29 | 2,913.29 | | | | | | | | | | | 5,806.58 |
| BOB A | 4,218.75 | 30% | 1,265.63 | 1,265.63 | | | | | | | | | | | 2,531.25 |
| MELINDA K. | 3,281.25 | 30% | 984.38 | 984.38 | | | | | | | | | | | 1,968.77 |
| BRIAN M | 5,156.27 | 40% | 2,062.51 | 2,062.51 | | | | | | | | | | | 4,128.02 |
| ANDREW T | 3,454.70 | 5% | 172.74 | 172.74 | | | | | | | | | | | 345.47 |
| ALEX | 5,062.50 | 25% | 1,265.63 | 1,265.63 | | | | | | | | | | | 2,531.25 |
| DAMON | 4,537.51 | 20% | 907.50 | 907.50 | | | | | | | | | | | 1,815.00 |
| ROBERT D | 3,375.00 | 60% | 2,025.00 | 2,025.00 | | | | | | | | | | | 4,050.00 |
| Brian Short | 7,581.56 | 15% | 1,137.23 | 1,137.23 | | | | | | | | | | | 2,274.47 |
| Michelle F | 2,535.00 | 25% | 633.75 | 633.75 | | | | | | | | | | | |
| Mona T | 1,901.25 | 25% | 475.31 | 475.31 | | | | | | | | | | | |
| Neil R | 3,328.14 | 15% | 499.22 | 499.22 | | | | | | | | | | | 998 |
| TOTAL WAGES | | | 18,297.27 | 18,297.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 36,594.54 |
| PAYMENT RECEIVED | | | | | | | | | | | 12,317.63 | | | | 12,317.63 |
| BALANCE DUE | | | 18,297.27 | 18,297.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (12,317.63) | 0.00 | 0.00 | 0.00 | 24,276.91 |

JK-0000736

1323

**CYBERSPACE.COM LLC.**
110 WEST 9TH STREET 588
WILMINGTON, DE 19801
888-285-5196

66-21/530
BRANCH 05455

DATE _7-2-99_

PAY TO THE
ORDER OF _Lia Yagelowich_ _____ | $ 7500.00

_Seven thousand fife hundred and no/100_ _____ DOLLARS

**First Union National Bank**
R/T 053000219

**FIRST
UNION**

FOR _____

⑆0000 1323⑆ ⑉053000 219⑈ 20000 1998478⑆

POSTED
7-2-99

**Marsha**

| | |
|---|---|
| **From:** | DonR@usnetwork com |
| **Sent:** | Monday, June 21, 1999 1 59 PM |
| **To:** | mkaslowski@intecinvest com |
| **Subject:** | Lia |

Marsha,

Please compensate Lia in the amount of $15,000 for her role as President of Cyberspace   She should receive two installments each for $7500 - one on July 1st and the second on August 1st

Thank you,
Don M  Reese

6 00 5. 10

POSTED
7-1-99

**CYBERSPACE.COM LLC.**
110 WEST 9TH STREET 588
WILMINGTON, DE 19801
888-285-5196

1342

66-21/530
BRANCH 05455

DATE _8-3-99_

PAY TO THE
ORDER OF _Lia Yagelowich_   $ _7500.00_

_Seven thousand five hundred and_ no/100 ~~~~ DOLLARS

**FIRST UNION**   First Union National Bank
R/T 053000219

FOR _____

⑈"0000⅃342⑈" ⑊"053000219⑊" 20000019984 78⑈"

ENTERED
8-3-99

JK-0000739

Marsha

| From: | DonR@usnetwork com |
| Sent: | Monday, June 21, 1999 1.59 PM |
| To: | mkaslowski@intecinvest com |
| Subject: | Lia |

Marsha,

Please compensate Lia in the amount of $15,000 for her role as President of Cyberspace  She should receive two installments each for $7500 - one on July 1st and the second on August 1st.

Thank you,
Don M. Reese

6005.10
ENTERED
8-3-99

JK-0000740

**CYBERSPACE.COM LLC.**
110 WEST 9TH STREET 588
WILMINGTON, DE 19801
888-285-5196

JK-0000741

1323

66-21/530
BRANCH 05456

PAY TO THE
ORDER OF _Lia Yagelowich_

DATE _7-2-99_

050044747 07-13-99 693

$ _7500.00_

Seven thousand five hundred and no/100 —————— DOLLARS

First Union National Bank
R/T 053000219

FOR _____

A. Yager

⑆000013 23⑆ ⑈053000219⑈ 200000199847 8⑆        ⑇0000750000⑇

---

JK-0000742

0310000  0530-0020-6
050044747 0530-0020-6
050044747 07-13-99

RESERVE BANK RESERVE BANK

0162-6     07131999
WILKESBORO NC

1250000024

DO NOT SIGN / WRITE / STAMP BELOW THIS LINE
FOR FINANCIAL INSTITUTION USAGE ONLY

ENDORSE HERE
X
For deposit only
9/9-31-386

Commercial Checking

01    2000001998478 001 140        23  34           Replacement Statement        001

CYBERSPACE.COM LLC
6 HUTTON CENTRE SUITE 1100                CB
SANTA ANA CA  92707

Commercial Checking                                  7/31/1999 thru 8/31/1999

Account number:        2000001998478
Account holder(s):     CYBERSPACE.COM LLC

Taxpayer ID Number:    911921906

Account Summary

| | | |
|---|---|---|
| Opening balance 7/31 | $144,951.71 | |
| Deposits and other credits | 570,239.66 + | |
| Checks | 367,393.21 - | |
| Other withdrawals and service fees | 241,801.40 - | |
| Closing balance 8/31 | $105,996.76 | |

Deposits and Other Credits

| Date | Amount | Description | |
|---|---|---|---|
| 8/09 | 174,091.75 | FUNDS TRANSFER (ADVICE 990809028885) RCVD FROM  ASIA EUROPE AMERI/ ORG=OLYMPIC TELECOMMUNICATIONS INC  RFB=        OBI=JUL 28-JUL 30    $174 REF=                         04:54PM | 00990809028885 |
| 8/12 | 3.50 | COUNTER DEPOSIT | 00003513496663 |
| 8/16 | 10.50 | COUNTER DEPOSIT | 00003514836936 |
| 8/16 | 174,860.84 | FUNDS TRANSFER (ADVICE 990816025685) RCVD FROM  ASIA EUROPE AMERI/ ORG=OLYMPIC TLECOMMUNICATIONS INC  RFB=        OBI=AUG 4-AUG 6 REF=                         03:17PM | 00990816025685 |
| 8/18 | 17.50 | COUNTER DEPOSIT | 00003515946620 |
| 8/19 | 95.50 | COUNTER DEPOSIT | 00003711644294 |
| 8/23 | 146,595.74 | FUNDS TRANSFER (ADVICE 990823028398) RCVD FROM  ASIA EUROPE AMERI/ ORG=OLYMPIC TELECOMMUNICATION INC  RFB=        OBI=AUG 10 -AUG 13 $1465 REF=                         04:39PM | 00990823028398 |
| 8/25 | 52.50 | COUNTER DEPOSIT | 00003713625933 |
| 8/25 | 52.50 | COUNTER DEPOSIT | 00003713625959 |
| 8/25 | 3,125.37 | CK# 340943 RETURNED FORGED ITEM COUNTERFEIT | 00000366201011 |

Deposits and Other Credits continued on next page.

FIRST UNION NATIONAL BANK ,  FIRST UNION DIRECT SALES - NC                page 1 of 4

FU-0016451

Commercial Checking

02    2000001998478 001 140       23  34          Replacement Statement      001

Deposits and Other Credits continued

| Date | Amount | Description | |
|------|--------|-------------|--|
| 8/30 | 71,274.06 | FUNDS TRANSFER (ADVICE 990830028850)<br>RCVD FROM  ASIA EUROPE AMERI/<br>ORG=OLYMPIC TELECOMMUNICATIONS INC<br>RFB=                           OBI=AUG 3- AUG 20 $71274<br>REF=                                        04:01PM | 00990830028850 |
| 8/31 | 59.90 | COUNTER DEPOSIT | 00003511568054 |

Total    $570,239.66

Checks

| Number | Amount | Date posted | Number | Amount | Date posted | Number | Amount | Date posted | |
|--------|--------|------|--------|--------|------|--------|--------|------|--|
| 1337 | 648.04 | 8/02 | 1346 | 78,057.00 | 8/11 | 1354 | 4,984.74 | 8/23 | 7810117314 3717831022 3517250538 |
| 1338 | 500.00 | 8/13 | 1347 | 1,208.00 | 8/11 | 1355 | 55.00 | 8/19 | 3718486120 3718002298 3711336859 |
| 1339 | 9,777.00 | 8/09 | 1348 | 1,183.03 | 8/16 | 1356 | 85.15 | 8/25 | 3716654355 7611594749 3518315867 |
| 1340 | 1,067.50 | 8/11 | 1349 | 62,304.00 | 8/16 | 1358* | 5,000.00 | 8/30 | 3718003436 3514381396 3714299711 |
| 1341 | 40,214.26 | 8/11 | 1350 | 62,304.00 | 8/25 | 1359 | 5,000.00 | 8/30 | 3717824350 3811324604 7713508910 |
| 1342 | 7,500.00 | 8/09 | 1351 | 62,304.00 | 8/25 | 1360 | 717.91 | 8/24 | 7811987970 3811324603 3712877964 |
| 1343 | 5,000.00 | 8/09 | 1352 | 291.36 | 8/20 | 1362* | 4,088.69 | 8/31 | 7811987546 3711970513 3511217775 |
| 1345* | 980.73 | 8/09 | 1353 | 14,122.80 | 8/20 | Total | $367,393.21 | | 7811987545 7814621875 |

*Indicates a break in check number sequence

Other Withdrawals and Service Fees

| Date | Amount | Description | |
|------|--------|-------------|--|
| 8/04 | 1,371.74 | DISBURSEMENT FUNDING | 00000000000308 |
| 8/05 | 2,266.00 | DISBURSEMENT FUNDING | 00000000000303 |
| 8/06 | 4,025.00 | DISBURSEMENT FUNDING | 00000000000301 |
| 8/09 | 5,264.00 | DISBURSEMENT FUNDING | 00000000000300 |
| 8/10 | 2,280.50 | DISBURSEMENT FUNDING | 00000000000287 |
| 8/11 | 2,339.95 | COMMERCIAL SERVICE CHARGES FOR JULY 1999 | 00000000000000 |
| 8/11 | 3,730.60 | DISBURSEMENT FUNDING | 00000000000308 |
| 8/12 | 2,753.00 | DISBURSEMENT FUNDING | 00000000000305 |
| 8/13 | 1,781.50 | DISBURSEMENT FUNDING | 00000000000308 |
| 8/16 | 14,939.00 | DISBURSEMENT FUNDING | 00000000000310 |
| 8/17 | 1,837.50 | DISBURSEMENT FUNDING | 00000000000301 |
| 8/17 | 100,000.00 | CCSC C52354 TRANSFER TO 2000001998229 | 00000639301003 |
| 8/18 | 3,185.00 | DISBURSEMENT FUNDING | 00000000000303 |
| 8/19 | 3,402.01 | DISBURSEMENT FUNDING | 00000000000306 |
| 8/20 | 6,377.13 | DISBURSEMENT FUNDING | 00000000000302 |

Other Withdrawals and Service Fees continued on next page.

FIRST UNION NATIONAL BANK ,   FIRST UNION DIRECT SALES - NC                    page 2 of 4

FU-0016452

Commercial Checking

03    2000001998478 001 140        23  34            Replacement Statement        001

Other Withdrawals and Service Fees continued

| Date | Amount | Description | |
|------|--------|-------------|---|
| 8/23 | 6,468.60 | DISBURSEMENT FUNDING | 00000000000306 |
| 8/24 | 19,639.01 | DISBURSEMENT FUNDING | 00000000000309 |
| 8/25 | 15,457.72 | DISBURSEMENT FUNDING | 00000000000307 |
| 8/26 | 403.90 | DISBURSEMENT FUNDING | 00000000000304 |
| 8/27 | 8,723.32 | DISBURSEMENT FUNDING | 00000000000302 |
| 8/30 | 15,171.00 | DISBURSEMENT FUNDING | 00000000000309 |
| 8/31 | 20,384.92 | DISBURSEMENT FUNDING | 00000000000309 |
| Total | $241,801.40 | | |

Daily Balance Summary

| Dates | Amount | Dates | Amount | Dates | Amount |
|-------|--------|-------|--------|-------|--------|
| 08/02 | 144,303.67 | 08/12 | 150,563.64 | 08/23 | 250,712.05 |
| 08/04 | 142,931.93 | 08/13 | 148,282.14 | 08/24 | 230,355.13 |
| 08/05 | 140,665.93 | 08/16 | 244,727.45 | 08/25 | 93,434.63 |
| 08/06 | 136,640.93 | 08/17 | 142,889.95 | 08/26 | 93,030.73 |
| 08/09 | 282,210.95 | 08/18 | 139,722.45 | 08/27 | 84,307 41 |
| 08/10 | 279,930.45 | 08/19 | 136,360.94 | 08/30 | 130,410.47 |
| 08/11 | 153,313.14 | 08/20 | 115,569.65 | 08/31 | 105,996.76 |

EFFECTIVE SEPTEMBER 1, 1999, THE EARNINGS CREDIT RATE WILL BE
DETERMINED BY THE AVERAGE POSITIVE COLLECTED BALANCE LESS
RESERVE REQUIREMENT AND COMPENSATING BALANCES.

FU-0016453

Commercial Checking

04    2000001998478 001 140    23 34    Replacement Statement    001

Customer Service Information

For questions about your statement
or billing errors, contact us at:    Phone number    Address

Business Checking, CheckCard & Loan
Accounts    1-800-566-3862 FIRST UNION NATIONAL BANK
Commercial Checking & Loan Accounts    1-800-222-3862 CHARLOTTE NC  28288-0851
TDD (For the Hearing Impaired)    1-800-835-7721

Commercial Credit Card & Inquiries    1-800-704-0883 FIRST UNION CARD PRODUCTS
                                                   POST OFFICE BOX 563966
                                                   CHARLOTTE NC  28256-3966
                                                   24 HOURS A DAY, 365 DAYS A YEAR

In Case of Errors or Questions About Your Electronic Transfers:  Telephone us at
1-800-704-0883 or Write us at FIRST UNION CARD PRODUCTS, POST OFFICE BOX 563966, CHARLOTTE
NC  28256-3966, as soon as you can, if you think your statement or receipt is wrong or if
you need more information about a transfer on the statement or receipt.  We must hear from
you no later than 60 days after we sent you the FIRST statement on which the error or
problem appeared.
1. Tell us your name and account number (if any).
2. Describe the error or the transfer you are unsure about, and explain as clearly as you
   can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly.  If we take more
than 10 business days to do this, we will credit your account for the amount you think is
in error.  You will have use of the money during the time it takes us to complete our
investigation.

FU-0016454

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br>                              **Plaintiff,**<br><br>                    **v.**<br><br>**CYBERSPACE.COM, LLC, et al,**<br><br><br>                              **Defendants.** | **Case No. C00-1806-L** |

**PLAINTIFF'S INTERROGATORIES**
**PURSUANT TO FED. R. CIV. P. 33**
**TO DEFENDANT OLYMPIC TELECOMMUNICATIONS, INC.**

To. Defendant Olympic Telecommunications:

Plaintiff Federal Trade Commission hereby propounds the following interrogatories to

defendant Olympic Telecommunications, pursuant to Rule 33 of the Federal Rules of Civil

Procedure. The following interrogatories are to be answered within 14 days from the date of

service

**I.          INSTRUCTIONS**

1.          Pursuant to Rule 33 of the Federal Rules of Civil Procedure, you are to respond to
each of these interrogatories separately and fully, and under oath.

2.          For each interrogatory answer, identify each person who provided any of the
information set forth in the answer.

Interrogatories to Olympic-revised
March 19, 2002

3.      In answering these interrogatories, unless otherwise specified, you are to furnish all information known to you at the time of your answering, regardless of whether this information is possessed by you or your employees, agents, representatives, affiliated corporations, investigators, or by your attorneys or their employees, agents, representatives or investigators.

4      These interrogatories shall, to the fullest extent permitted by law, be deemed continuing, so as to require you, without further request from plaintiff, to provide supplemental answers within 15 days of acquiring any additional information, knowledge or belief pertaining to the subject matter of any interrogatory.

5      If you cannot answer any of the following interrogatories in full after exercising due diligence to secure the full information to do so, so state and answer to the extent possible, specifying your inability to answer the entire interrogatory, stating whatever information or knowledge you have concerning the unanswered portion and detailing what you did in attempting to secure the unknown information. If you do not have the information required to answer any of these interrogatories but you do know the name of person or entity that may have such information, the name, address and telephone number and the nature of the information known by such person or entity shall be disclosed in your answer to the interrogatory.

6.      If any information called for by any interrogatory is being withheld under a claim of privilege, state with respect to such interrogatory the following:

        a. the basis for withholding the information;

        b. the identity of all persons who possess the information; and

        c. the date and place of, and the identity of, all persons involved in any communications that bear on the information called for by the interrogatory.

7.      For each and every answer to these interrogatories, state all the facts relied upon, and provide the evidentiary basis (identifying documents, witnesses, and other sources) for each fact identified.

8.      When identifying a person or non-corporate entity, including but not limited to any partnership, joint venture, sole proprietorship or any other unincorporated association, state the person or entity's full name, last known address, and last known office and home telephone numbers. Once a person or entity has been identified in accordance with this paragraph, only the name of that person or entity need be listed in response to subsequent interrogatories requesting the identification of that person or entity.

9.      When identifying a corporation, limited liability company, or other business entity (collectively, "corporation"), state the corporation's name, last known address, last known

telephone number, state of incorporation, date of incorporation, date of dissolution (if applicable), and all names under which it has done business. Once a corporation has been identified in accordance with this paragraph, only the name of that corporation need be listed in response to subsequent interrogatories requesting identification of that person.

10.     When identifying a document, state the type of document, date, author, addressee, title, serial or file number, its present location, the name and address of its custodian, and the substance of the contents. If a document has been destroyed, state when and where it was destroyed, identify the person who destroyed it, and the person or persons who directed the destruction.

11.     A question that seeks information contained in or information about or identification of any documents may be answered by providing a copy of such document for inspection and copying or by furnishing a copy of such a document without a request for production.

12.     Provide all responsive information for the entire period of time specified by an interrogatory. If certain information responsive to an interrogatory applies only to part of the period of time specified by the interrogatory, state the dates between which such information applies.

13.     The singular form of a noun or pronoun shall be considered to include within its meaning the plural form of the noun or pronoun so used and vice versa; the use of the masculine form of a pronoun shall be considered to include within its meaning the feminine form of the pronoun so used and vice versa; and the use of any tense of any verb shall be considered to include within its meaning all other tenses of the verb.

14.     Whenever it is necessary to bring within the scope of these interrogatories information that otherwise might be construed to be outside their scope, "any" should be understood to include and encompass "all"; and "all" should be understood to include and encompass "any"; and "or" should be understood to include and encompass "and," and "and" should be understood to include and encompass "or."

15.     The use of the words "include(s)" and "including" shall be construed to mean without limitation.

16.     The terms "present" or "presently" refer to the date of service of these interrogatories.

17.     The applicable time period to which these interrogatories apply is from January 1, 1998 to present, unless otherwise specified by the interrogatory.

18.     Plaintiff will move at the commencement of trial to preclude you from presenting

evidence regarding responsive matters you have failed to set forth in your answers to these interrogatories.

## II.    DEFINITIONS

1.      The term "defendants" means any one or more than one of the following parties: Cyberspace.com, LLC; Electronic Publishing Ventures, LLC; Coto Settlement; French Dreams, NV; Olympic Telecommunications, Inc.; Ian Eisenberg; and Chris Hebard.

2.      The term "corporate defendants" means Cyberspace.com, LLC; Electronic Publishing Ventures, LLC, Coto Settlement; French Dreams, NV; and Olympic Telecommunications, Inc.

3.      The term "individual defendants" means Ian Eisenberg and Chris Hebard.

4.      The term "Olympic" means Olympic Telecommunications, Inc.; the term "French Dreams" means French Dreams, NV; the term "Coto" means Coto Settlement; the term "Cyberspace" means Cyberspace.com, LLC; and the term "EPV" means Electronic Publishing Ventures, LLC.  The term "EPV subsidiaries" includes all subsidiaries of EPV that were engaged in the marketing and sale of Internet-related services.

5.      The term "consumer" includes individuals and business entities.

6.      The term "person" includes individuals and business entities.

7.      The term "present" means up to and including the date of your response to these Interrogatories.

8.      The term "approximately" means within five percent (5%) of any number stated in a specific interrogatory.

9.      The term "LEC" means Local Exchange Carrier from which telephone line subscribers receive local dial tone service.

10.     The term "detail records" means records of the monthly charges for consumer who was billed by any of the EPV subsidiaries.

11.     The term "solicitation check" means any check that, if deposited or cashed by a consumer or business, obligates the consumer or business to pay for goods or services sold by any defendant.

12.     The term "marketing material" means all printed material, including the envelope, inserts, flyers, solicitation checks, and any other material sent to consumers that described

services offered by any of the EPV subsidiaries.

13.    The term "computer records" means any type of data stored electronically including but not limited to any data stored on disc or on tape.

14.    The term "communication" means any contact, whether oral or written, formal or informal, at any time or place, and under any circumstances whatsoever, whereby information of any kind or nature was transmitted, transferred or recorded.

15.    The term "you" or "your" means the person to whom these Interrogatories are directed.

16.    "Document" has the full extent of its meaning as provided in Rules 26 and 34 of the Federal Rules of Civil Procedure and includes the original or a copy of the original and any nonidentical copy, regardless of original location, of any recorded, written, printed, typed, or other graphic material of any kind, variety, type or character including, by way of example but not limited to, the following: books; records; contracts; agreements; invoices; orders; bills, certificates; bills of sale; certificates of title; financing statements; instruments; expense accounts; canceled checks; bank statements; bank books; receipts; disbursement journals; tax returns; financial statements; check stubs; promissory notes; resumes; address books; appointment books; telephone logs; worksheets; pictures, income statements; profit and loss statements; balance statements; deposit slips; credit card receipts; records or notations of telephone or personal conversations; conferences; intra office communications; postcards; letters; telexes; partnership agreements; articles of incorporation; mailing lists; catalog price lists; sound, tape and video records; memoranda (including written memoranda of telephone conversations, other conversations, discussions, agreements, acts and activities); minutes, manuals, diaries; calendar or deskpads; scrapbooks; notebooks; correspondence; bulletins; circulars; policies; forms; pamphlets; notices; statements; journals; letters; telegrams; reports; interoffice communications, photostats; microfilm; microfiche, maps; deposition transcripts; email messages; drawings; blueprints; photographs; negatives; and any other data, information, or statistics contained within any data storage modules, tapes, discs, or any other memory device (including on any computer) or any other information retrievable on storage systems, including computer-generated reports and printouts.

17.    The term "Data Dump" means the thirteen Text Files included in the CDROM sent by Deena Burgess to the FTC on September 24, 2001. The disc was referred to as the "entire database from Cyberspace," in the letter accompanying the CDROM.

18.    The term "Data Field" means an element, generally of a Table, that contains a specific type of information. In the thirteen Text Files that make up the Data Dump, the alpha-numeric terms enclosed in quotations and separated by commas in the first lines of each Text File represent the Data Field Names. For instance, in Attachment 1a through 1c, the Data Field Names are circled for three of the thirteen Text Files provided in the Data Dump.

19.     The term "Data" means a gathered body of facts. In each of the Text Files making up the Data Dump, the alpha-numeric items that are separated by commas and included in the second through last lines are individual pieces of data. They correspond to a particular Data Field according to the "place" they hold. "Places" are separated by commas.

20.     The term "Record" means a collection of data about a person, place, event or some other item. In the Text Files that make up the Data Dump, each "line," from the second through the last, is an individual record. "Lines" are separated by hard returns. For instance, in Attachment 1a through 1c, a record is circled in each of three of the Text Files provided in the Data Dump.

## III.   INTERROGATORIES TO OLYMPIC TELECOMMUNICATIONS

1.     Describe each electronic database used by Olympic employees in connection with the business activities of the EPV subsidiaries.

2.     Describe each type of report Olympic created based on the information in each database described in your response to Interrogatory # 1.

3.     Identify all types of records created, maintained, and/or used by Olympic employees in connection with the business activities of the EPV subsidiaries.

4.     State the number of consumer complaints, whether in writing, by email, or by telephone, from all sources, that Olympic received with respect to the EPV subsidiaries.

5.     State the billing dates between which Olympic billed for the EPV subsidiaries.

6.     State the number of consumers billed by Olympic on behalf of each EPV subsidiary, or in the alternative, state the number of distinct ANIs or BTNs (i.e., telephone numbers) you forwarded to the LECs for billing on behalf of each EPV subsidiary

7.     State the aggregate amount consumers were billed by Olympic on behalf of each EPV subsidiary, or in the alternative, state the aggregate amount billed by Olympic on behalf of all the EPV subsidiaries

8.     State the aggregate amount of full refunds received by consumers who were billed by Olympic on behalf of the EPV subsidiaries.

9.     State the aggregate amount of partial refunds received by consumers who were billed by Olympic on behalf of the EPV subsidiaries.

10.     Identify the aggregate amount in refunds that customer service representatives

entered into the database used by Lia Yagelowich to issue refund checks to customers of the EPV subsidiaries.

11.     Identify the aggregate amount in telephone credits provided by Olympic to customers of the EPV subsidiaries.

12.     Identify the aggregate amount in telephone credits provided by the telephone companies to customers of the EPV subsidiaries.

13      Identify all LECs that stopped placing charges from the EPV subsidiaries on telephone bills, and explain the reason given for discontinuing placement of the EPV charges on telephone bills.

14.     Attachment 2 lists and numbers the thirteen Text Files in the "Data Dump" as defined above.  Describe what information was put into each Text File, and the source of that information.

15.     Attachment 3 includes all Data Fields provided in the thirteen Text Files that are in the Data Dump.  Explain what each Data Field represents.  In instances where the data included in the field were coded against descriptive values, include in your answer a key or other reference that defines the values for each of the codes or numbers.  For example, in the "Cancel_Log txt" file (# 2 on Attachment 3a), for the "Data Field" called "OptionID" (# 2 c), the data are numbers ranging from 1 to 30.  Please provide a description of what each of these numbers represents.

16      Identify all persons, or category of persons, who had access to read or write to the Customer Service Database

17      Describe all parts of the Customer Service Database the person or category of persons identified in your response to Interrogatory 17, had access to and whether the access was read-only access or whether they could add information to, delete from, or modify information in the database.

18      Identify all types of reports created by employees or other persons who had access to the Customer Service Database.

19.     Identify by name which EPV subsidiaries had their billing information and refund information included in Olympic's Customer Service Database.

20.     Exhibits 53 and 54 to the Hebard deposition are each entitled "Collateral Assignment of Billing Services Agreement."  For each of these documents, state the date and amount of each promissory note referenced in each Collateral Assignment, state the purpose of each Collateral Assignment, and state the reason for each loan made available by the Lender to

the Borrower. (Note: Olympic agreed to the Collateral Assignments in documents entitled "Agreement and Consent to Agreement" E 24060-63 and H 5321-24, which are attached).

Respectfully submitted,

Collot Guerard

Michael Goodman
Attorneys for the Plaintiff
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave. NW
Washington, DC 20580
202-326-3338 (office)
202-326-3395 (facsimile)
cguerard@ftc.gov

March 19, 2002

Source: Cancel_Log.txt

"CancelID","csuid","OptionID","CancelDate","RequestDate","CSID"   } Data Field Names
1,30573,1,1999-05-07 06:33:00,2000-02-29 09:15:00,1
2,15776,1,1999-05-04 12:54:00,2000-02-29 09:15:00,1   } Record
3,16245,1,1999-05-04 12:56:00,2000-02-29 09:15:00,1
4,16509,1,1999-05-04 12:58:00,2000-02-29 09:15:00,1
5,16629,1,1999-05-04 12:58:00,2000-02-29 09:15:00,1
6,16657,1,1999-05-04 12:58:00,2000-02-29 09:15:00,1
7,16783,1,1999-05-04 12:59:00,2000-02-29 09:15:00,1
8,16948,1,1999-05-04 13:00:00,2000-02-29 09:15:00,1
9,17078,1,1999-05-04 13:01:00,2000-02-29 09:15:00,1
10,17340,1,1999-05-04 13:02:00,2000-02-29 09:15:00,1
11,19311,1,1999-05-04 13:12:00,2000-02-29 09:15:00,1
12,21317,1,1999-05-04 13:24:00,2000-02-29 09:15:00,1
13,21706,1,1999-05-04 13:26:00,2000-02-29 09:15:00,1
14,22395,1,1999-05-04 13:30:00,2000-02-29 09:15:00,1
15,22889,1,1999-05-04 13:33:00,2000-02-29 09:15:00,1
16,23194,1,1999-05-04 13:35:00,2000-02-29 09:15:00,1
17,23711,1,1999-05-04 13:38:00,2000-02-29 09:15:00,1
18,24607,1,1999-05-04 13:43:00,2000-02-29 09:15:00,1
19,28985,1,1999-05-04 14:19:00,2000-02-29 09:15:00,1
20,30456,1,1999-05-04 15:10:00,2000-02-29 09:15:00,1
21,30457,1,1999-05-04 15:31:00,2000-02-29 09:15:00,1
22,30458,1,1999-05-04 15:37:00,2000-02-29 09:15:00,1
23,30459,1,1999-05-04 15:49:00,2000-02-29 09:15:00,1
24,30460,1,1999-05-04 15:49:00,2000-02-29 09:15:00,1
25,30461,1,1999-05-04 16:07:00,2000-02-29 09:15:00,1
26,30462,1,1999-05-05 06:29:00,2000-02-29 09:15:00,1
27,30463,1,1999-05-05 06:50:00,2000-02-29 09:15:00,1
28,30464,1,1999-05-05 07:39:00,2000-02-29 09:15:00,1
29,30465,1,1999-05-05 07:43:00,2000-02-29 09:15:00,1
30,30466,1,1999-05-05 07:49:00,2000-02-29 09:15:00,1
31,30467,1,1999-05-05 07:55:00,2000-02-29 09:15:00,1
32,30468,1,1999-05-05 08:02:00,2000-02-29 09:15:00,1
33,30469,1,1999-05-05 08:04:00,2000-02-29 09:15:00,1
34,30470,1,1999-05-05 08:25:00,2000-02-29 09:15:00,1
35,30471,1,1999-05-05 08:27:00,2000-02-29 09:15:00,1
36,30472,1,1999-05-05 08:27:00,2000-02-29 09:15:00,1
37,30473,1,1999-05-05 08:34:00,2000-02-29 09:15:00,1
38,30474,1,1999-05-05 09:01:00,2000-02-29 09:15:00,1
39,30475,1,1999-05-05 09:03:00,2000-02-29 09:15:00,1
40,30476,1,1999-05-05 09:07:00,2000-02-29 09:15:00,1
41,30477,1,1999-05-05 09:11:00,2000-02-29 09:15:00,1
42,30478,1,1999-05-05 09:20:00,2000-02-29 09:15:00,1
43,30479,1,1999-05-05 09:24:00,2000-02-29 09:15:00,1
44,30480,1,1999-05-05 09:29:00,2000-02-29 09:15:00,1
45,30481,1,1999-05-05 09:33:00,2000-02-29 09:15:00,1
46,30482,1,1999-05-05 09:44:00,2000-02-29 09:15:00,1
47,30483,1,1999-05-05 09:49:00,2000-02-29 09:15:00,1
48,30484,1,1999-05-05 09:56:00,2000-02-29 09:15:00,1
49,30486,1,1999-05-05 10:09:00,2000-02-29 09:15:00,1
50,30488,1,1999-05-05 10:33:00,2000-02-29 09:15:00,1
51,30490,1,1999-05-05 10:52:00,2000-02-29 09:15:00,1
52,30492,1,1999-05-05 11:01:00,2000-02-29 09:15:00,1
53,30493,1,1999-05-05 11:12:00,2000-02-29 09:15:00,1
54,30494,1,1999-05-05 11:19:00,2000-02-29 09:15:00,1
55,30495,1,1999-05-05 11:22:00,2000-02-29 09:15:00,1
56,30496,1,1999-05-05 11:38:00,2000-02-29 09:15:00,1
57,30497,1,1999-05-05 11:46:00,2000-02-29 09:15:00,1
58,30498,1,1999-05-05 11:51:00,2000-02-29 09:15:00,1
59,30499,1,1999-05-05 12:09:00,2000-02-29 09:15:00,1
60,30500,1,1999-05-05 12:50:00,2000-02-29 09:15:00,1

Attachment 1a

Source: Cancelled_User_Log.txt

"CancelID","CSUID","CSU_Action","CSU_LineType","CSU_UserName","CSU_UserPass","CSU_AddDate","CSU_EditDate","CSU_Deletedate","CSU_Requestdate","CSU_ANI","CSU_ChkNumber","CSU_DateCashed","CSU_SourceFile","CSU_FullName","CSU_Coname","CSU_Address","CSU_City","CSU_State","CSU_Zip","CSU_Zip4","CSU_Megapop","siteid"
*Field Names*

1,89698,"CREATE ACCOUNT","Analog or 1B ISDN","great10","w2387267",1999-09-19 00:00:00,,1999-10-26 15:46:00,,"2012160003",2387267,,"990903.TXT","","GREAT WALL RESTAURANT","239 CENTRAL AVE","JERSEY CITY","NJ","07307","",True,1
*Data Field* →

2,114407,"CREATE ACCOUNT","Analog or 1B ISDN","mecca22","h2886988",1999-09-19 00:00:00,,1999-11-02 12:16:00,,"2012222829",2886988,,"990928.TXT","","MECCA HALAL MEAT WHOLESALE","3019 JOHN F KENNEDY BLVD","JERSEY CITY","NJ","07306","",True,1

3,105980,"CREATE ACCOUNT","Analog or 1B ISDN","grand216","b2882370",1999-09-19 00:00:00,,1999-10-14 14:14:00,,"2012223800",2882370,,"990921.TXT","","GRAND BAKERY","738 WILLOW AVE","HOBOKEN","NJ","07030","",True,1
*Record* →

4,73172,"CREATE ACCOUNT","Analog or 1B ISDN","patel27","c2137344",1999-09-19 00:00:00,,1999-10-21 14:22:00,,"2012227572",2137344,,"990823.TXT","","PATEL CASH & CARRY","782 NEWARK AVE","JERSEY CITY","NJ","07306","",True,1
5,71522,"CREATE ACCOUNT","Analog or 1B ISDN","prince23","e2137346",1999-09-19 00:00:00,,1999-10-21 08:08:00,,"2012228734",2137346,,"990820.TXT","","PRINCE ELECTRONICS","787 NEWARK AVE APT 2","JERSEY CITY","NJ","07306","",True,1
6,95204,"CREATE ACCOUNT","Analog or 1B ISDN","miami25","e2635372",1999-09-19 00:00:00,,1999-11-04 09:06:00,,"2012234855",2635372,,"990914.TXT","","MIAMI EXPRESS INC","406 32ND ST","UNION CITY","NJ","07087","",True,1
7,78202,"CREATE ACCOUNT","Analog or 1B ISDN","nail201","a2132365",1999-09-19 00:00:00,,1999-11-08 12:45:00,,"2012242208",2132365,,"990825.TXT","","NAIL GALLERY","1550 LEMOINE AVE STE 2","FORT LEE","NJ","07024","",True,1
8,51738,"CREATE ACCOUNT","Analog or 1B ISDN","cliffs21","id1015853",1999-08-19 00:00:00,,1999-11-08 08:46:00,,"2012242302",1015853,,"990726.TXT","","CLIFFSIDE UPHOLSTERY","14 DEMPSEY AVE # A","EDGEWATER","NJ","07020","",False,1
9,73200,"CREATE ACCOUNT","Analog or 1B ISDN","genera25","l2132215",1999-09-19 00:00:00,,1999-11-09 08:08:00,,"2012245335",2132215,,"990823.TXT","","GENERAL NUTRITION CTR","1475 BERGEN BLVD","FORT LEE","NJ","07024","",True,1
10,81949,"CREATE ACCOUNT","Analog or 1B ISDN","vip27","e2381694",1999-09-19 00:00:00,,1999-11-10 15:18:00,,"2012245377",2381694,,"990827.TXT","","VIP CLEANERS INC","1341 16TH ST","FORT LEE","NJ","07024","",True,1
11,120127,"CREATE ACCOUNT","Analog or 1B ISDN","sophia26","s2882183",1999-10-08 00:00:00,,1999-11-08 12:35:00,,"2012246369",2882183,,"990930.TXT","","SOPHIAS BUILDERS","1058 DEARBORN RD # S","FORT LEE","NJ","07024","",True,1
12,108330,"CREATE ACCOUNT","Analog or 1B ISDN","avas22","o2783829",1999-09-19 00:00:00,,1999-11-05 06:15:00,,"2012294720",2783829,,"990922.TXT","","AVAS CORP","55 RUTA CT","SOUTH HACKENSACK","NJ","07606","",True,1
13,90102,"CREATE ACCOUNT","Analog or 1B ISDN","pho38","a1513919",1999-09-19 00:00:00,,1999-10-29 07:39:00,,"2012391988",1513919,,"990903.TXT","","PHO THANH HOAI RESTAURANT","249 NEWARK AVE","JERSEY CITY","NJ","07302","",True,1
14,108825,"CREATE ACCOUNT","Analog or 1B ISDN","bolan33","t2633256",1999-09-19 00:00:00,,1999-10-28 11:10:00,,"2012397330",2633256,,"990922.TXT","","BOLAN TRADING CO","70 HUDSON ST STE 1","HOBOKEN","NJ","07030","",True,1
15,96816,"CREATE ACCOUNT","Analog or 1B ISDN","sung40","a2881987",1999-09-19 00:00:00,,1999-10-07 10:21:00,,"2012421004",2881987,,"990915.TXT","","SUNG & ASSOC","2024 CENTER AVE","FORT LEE","NJ","07024","",True,1
16,99510,"CREATE ACCOUNT","Analog or 1B ISDN","a660000","u2892536",1999-09-19 00:00:00,,1999-10-19 12:26:00,,"2012610264",2892536,,"990916.TXT","","A K PLUMBING & HEATING INC","440 HOLLY AVE","PARAMUS","NJ","07652","",True,1
17,114544,"CREATE ACCOUNT","Analog or 1B ISDN","nail166","l2784610",1999-09-19 00:00:00,,1999-10-15 16:54:00,,"2012612060",2784610,,"990928.TXT","","NAIL

Attachment 1b

**Source: Credit_Record_Log.txt**

"ani","fullname","coname","address","city","state","zip","totalbilled","totalc
edited"

  Data Field Names

"2052512721","","MR KING FURNITURE","1816 3RD AVE
N","BIRMINGHAM","AL","35203",5990,5990
"2052515600","","6TH AVENUE FLEA MARKET","2924 AVENUE
T","BIRMINGHAM","AL","35208",17970,17970
"2053236500","","STORE ON HIGHLAND","2608 HIGHLAND AVE S #
B","BIRMINGHAM","AL","35205",11980,11980
"2053244715","","STACY CLAIRE BOYD INC","2825 3RD AVE
S","BIRMINGHAM","AL","35233",11980,11980

  ] Record

"2053840151","","CULLMAN INDUSTRIES OF ARLEY","PO BOX
274","ARLEY","AL","35541",5990,5990
"2053843317","","FREEMAN LOGGING CO","6171 FALL CITY
RD","JASPER","AL","35503",5990,5990
"2054253532","","FUTURE ELECTRIC & CONSTRUCTION","425 4TH AVE
N","BESSEMER","AL","35020",11980,11980
"2054262017","","4TH AVENUE FARMERS MARKET","830 4TH AVE
N","BESSEMER","AL","35020",11980,11980
"2054284000","","UNR ROHN INC","PO BOX 1470","BESSEMER","AL","35021",5990,5990
"2054971440","","ITS A SMALL WORLD","1285 HUEYTOWN RD #
D","BESSEMER","AL","35023",11980,11980
"2055534174","","GRAMMER MARINE","10543 DAIMLER BENZ
BLVD","VANCE","AL","35490",11980,11980
"2055534794","","UNIVERSITY CAR WASH PRO DETAIL","2320 UNIVERSITY BLVD
E","TUSCALOOSA","AL","35404",5990,5990
"2055998000","","ONEAL STEEL INC","PO BOX
2623","BIRMINGHAM","AL","35202",17970,17970
"2056312564","","TAYLOR SILK SCREEN","5992 TOMMY TOWN RD","MT
OLIVE","AL","35117",11980,11980
"2056488456","","E TS PLACE","4657 BRENTS CUTOFF
RD","DORA","AL","35062",11980,11980
"2057804723","","CANNS & CO","3601 COMMERCE
AVE","FAIRFIELD","AL","35064",23960,23960
"2059253500","","C & A TIRE CO","3125 ALEMEDA AVE
SW","BIRMINGHAM","AL","35221",5990,5990
"2059420050","","WYATT SAFETY SUPPLY CO","PO BOX
1934","BIRMINGHAM","AL","35201",5990,5990
"2059425305","","SALLY BEAUTY SUPPLY","210 GREEN SPRINGS
HWY","HOMEWOOD","AL","35209",5990,5990
"2059883055","","MAUK ADVERTISING SPECIALITIES","2415 VALLEYDALE
RD","BIRMINGHAM","AL","35244",5990,5990
"2059888169","","ASCO VALVE","500 CHASE PARK
S","BIRMINGHAM","AL","35244",11980,11980
"2059958259","","FRAMIN SHOPPE","510 CAHABA PARK
CIR","BIRMINGHAM","AL","35242",11980,11980
"2062320842","","ISLAND SECURITY SYSTEMS INC","PO BOX 265","MERCER
ISLAND","WA","98040",11980,11980
"2062431424","","STOP BY CORNER","14857 PACIFIC HWY
S","SEATTLE","WA","98168",11980,11980
"2062448020","","FUEL TANK INSTALLATION CO","11536 SEOLA BEACH DR
SW","SEATTLE","WA","98146",11980,11980
"2063231838","","EDUCATIONAL REFERRAL SVC","2222 EASTLAKE AVE
E","SEATTLE","WA","98102",11980,11980
"2065236210","","ODYSSEY II HAIR DESIGNS","8515 35TH AVE NE #
B","SEATTLE","WA","98115",11980,11980
"2065254770","","NW CULTURE & HERITAGE OBSERVER","444 NE RAVENNA BLVD #
301D","SEATTLE","WA","98115",11980,11980

Attachment 1c

**Data Dump File Names**

1. Billing_log.txt

2. Cancel_Log.txt

3. Cancelled_User_Log.txt

4. Check_Images.txt

5. Credit_Record_Log.txt

6. CustServ_Credit_Log.txt

7. Customer_Service_Notes.txt

8. LEC_Credit_Log.txt

9. Refund_Log.txt

10. Refund_Status_Codes.txt

11. Unbillable_Log.txt

12. User_Information_History.txt

13. User_Information.txt

Attachment 2

**Data Dump Field Names**
1. Billing_log.txt
   a. BillingID
   b. Ani
   c. ChargeDate
   d. Amount
   e. Unbillable
   f. siteid

2. Cancel_Log.txt
   a. CancelID
   b. csuid
   c. OptionID
   d. CancelDate
   e. RequestDate
   f. CSID

3. Cancelled_User_Log.txt
   a. CancelID
   b. CSUID
   c. CSU_Action
   d. CSU_LineType
   e. CSU_UserName
   f. CSU_UserPass
   g. CSU_AddDate
   h. CSU_EditDate
   i. CSU_Deletedate
   j. CSU_Requestdate
   k. CSU_ANI
   l. CSU_ChkNumber
   m. CSU_DateCashed
   n. CSU_SourceFile
   o. CSU_FullName
   p. CSU_Coname
   q. CSU_Address
   r. CSU_City
   s. CSU_State
   t. CSU_Zip
   u. CSU_Zip4
   v. CSU_Megapop
   w. siteid

Attachment 3a

9. Refund_Log.txt
   - a. RID
   - b. billingid
   - c. RequestDate
   - d. Credit
   - e. CheckAmount
   - f. Statusid
   - g. RefundDate
   - h. Note
   - i. CSID
   - j. Void

10. Refund_Status_Codes.txt
    - a. Statusid
    - b. Status

11. Unbillable_Log.txt
    - a. ULID
    - b. Ani
    - c. ChargeDate
    - d. ChargeAmount
    - e. DateAdd

12. User_Information_History.txt
    - a. HID
    - b. CSUID
    - c. CSU_Action
    - d. CSU_LineType
    - e. CSU_UserName
    - f. CSU_UserPass
    - g. CSU_AddDate
    - h. CSU_EditDate
    - i. CSU_Deletedate
    - j. CSU_Requestdate
    - k. CSU_ANI
    - l. CSU_ChkNumber
    - m. CSU_DateCashed
    - n. CSU_SourceFile
    - o. CSU_FullName
    - p. CSU_Coname
    - q. CSU_Address
    - r. CSU_City

Attachment 3c

s. CSU_State
t. CSU_Zip
u. CSU_Zip4
v. csu_Megapop
w. status
x. csu_hotbucks
y. csu_hotbucks_amount
z. csu_logon
aa. siteid

13. User_Information.txt
    a. CSUID
    b. CSU_Action
    c. CSU_LineType
    d. CSU_UserName
    e. CSU_UserPass
    f. CSU_AddDate
    g. CSU_EditDate
    h. CSU_Requestdate
    i. CSU_Deletedate
    j. CSU_ANI
    k. CSU_ChkNumber
    l. CSU_DateCashed
    m. CSU_SourceFile
    n. CSU_FullName
    o. CSU_Coname
    p. CSU_Address
    q. CSU_City
    r. CSU_State
    s. CSU_Zip
    t. CSU_Zip4
    u. CSU_Megapop
    v. status
    w. csu_hotbucks
    x. csu_hotbucks_amount
    y. csu_hotbucks_time
    z. csu_hotbucks_C
    aa. csu_logon
    bb. siteid

Attachment 3d

## AGREEMENT
## AND
## CONSENT TO ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby acknowledges and consents to the Collateral Assignment of Billing Services Agreement dated as of November 1, 1998 by and among CYBERSPACE.COM, LLC, ELECTRONIC PUBLISHING VENTURES, LLC (the *"Assignment"*) and enters into this Agreement and Consent to Assignment (this *"Agreement"*) as of November 1, 1998. All terms defined in the Assignment are used herein with the same meanings. Olympic hereby further agrees as follows in favor of the Lender:

1. Olympic hereby consents to the foregoing Assignment and agrees to the terms thereof, notwithstanding any contrary terms in the Billing Services Agreement. Olympic agrees that, in the event that the Lender delivers written notice to Olympic that it is exercising its rights under the Assignment, Olympic shall perform for the Lender all or such portion of Olympic's obligations and undertakings under the Billing Services Agreement as Lender may direct, notwithstanding any contrary instruction, direction or request from the Borrower; provided that any outstanding defaults under the Billing Services Agreement shall be cured and Olympic receives the compensation for such performance as provided in the Billing Services Agreement. It is expressly understood that the Lender neither assumes, nor has any obligation to Olympic to exercise the Lender's rights under the Assignment or to declare an Event of Default under the Loan, but that the option to exercise such rights or declare a default rests in the sole and absolute discretion of the Lender as provided therein. In the event the Lender exercises its rights under the Assignment, Olympic agrees that the Lender will have no personal obligations or liabilities under the Billing Services Agreement or the Assignment, and the sole right and remedy of Olympic as against the Lender under the Billing Services Agreement or this Agreement shall be an enforcement of Olympic's contract rights.

2. Other than for services related to Billings that have not yet been settled by the telephone companies, or related to reserves, Olympic is not currently aware of any known claim, counterclaim, right of set-off, defense or like right against the Borrower or the Lender and Olympic has been paid all amounts due for its work as of this date. Except to the extent possible under the terms of the Billing Services Agreement, Olympic agrees to make no amendments to the existing terms of the Billing Services Agreement without the prior written consent of the Lender.

3. In addition to the foregoing, Olympic agrees not to terminate, or to permit the termination of, the Billing Services Agreement and agrees not to cease to perform its work thereunder for any reason (including, but not limited to, the Borrower's failure to make any payments to Olympic) without giving written notice to the Lender of such intention to terminate or cease performing its work at least thirty (30) days prior thereto. Notwithstanding the foregoing, in the event that: 1) any of the local telephone companies ("LECs") fail to continue to remit receivables pursuant to Olympic's underlying billing and collections agreement; or 2) any of the LECs terminate their billing and collections agreement for any reason; or 3) there is a regulatory action taken against Olympic; or 4) a

{00011701.11}                                                                                    |

change in regulatory policy affecting Olympic's billing services, Olympic reserves the right to terminate the Billing Services Agreement upon thirty (30) days notice to Lender.

4. Olympic shall provide the Lender, at cost, a copy of any reports or information which is or should be within Olympic's possession, custody or control regarding the Billing Services Agreement, that Olympic is required to provide to Borrower under the Billing Services Agreement, as Lender may reasonably request.

5. Borrower Account. Notwithstanding any provision to the contrary in the Billing Services Agreement, Olympic agrees to the following procedures:

a.    Olympic will establish a separate segregated bank account for deposit of all amounts collected on behalf of Borrower under the Billing Services Agreement (the *"Borrower Account"*). Olympic shall have the right to draw on this account to the same extent that it had under the Billing Services Agreement prior to the execution of this instrument.

b.    Any payments from third parties paid to Olympic will be transferred to the Borrower Account within seven (7) business days of its receipt by Olympic.

c.    Olympic hereby grants Lender a security interest in the Borrower Account to secure its obligations to Lender under this Agreement and to Borrower under the Billing Services Agreement. Said security interest shall, however, exclude billing and collection fees and reimbursements properly payable to Olympic pursuant to the terms of the Billing Services Agreement. Olympic will execute financing statements requested by Lender evidencing its obligations hereunder.

d.    The Borrower Account will be identified as "Reserve Account for the benefit of Cyberspace.com, LLC."

6. In the event the Lender exercises its rights under the Assignment, Olympic agrees to extend to the Lender any rights of indemnity which the Borrower may have against Olympic under _____ _____ Lender and Borrower agree, jointly and severally, to indemnify and hold Olympic harmless (including reasonable attorneys fees) from any claim, suit or liability arising out of any dispute between Lender and Borrower or related to its performance hereunder.

7. Upon the occurrence of any breach of any of the Billing Services Agreement by the Borrower or any receipt by Olympic of notice from any person of any claimed breach by the Borrower of any of the Billing Services Agreement, Olympic shall promptly notify the Borrower and Lender in writing of each such breach, by certified United States mail, return receipt requested, postage prepaid, addressed as follows:

If to Borrower:

Cyberspace.com, LLC
110 West 9th Street, Suite 588

{00031701;1}

E-0024061

Wilmington, DE 19805
Attention: _____
Telephone: (___) _____
Facsimile: (___) _____

If to the Lender:

Electronic Publishing Ventures, LLC
Griffin Towers
6 Hutton Center, Suite 1100
Santa Ana, CA  92707
Attention:  Wayne Chia
Telephone: (714) 445-0500
Facsimile:  (714) 445-0510

8.    This Agreement shall be governed by, construed in accordance with and enforceable under the laws of the State of New York and applicable federal law without regard to choice of law rules.

*[Signature on following page.]*

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be duly
executed and delivered by its officers hereunto duly authorized as of the date first above
written.

WITNESS:

OLYMPIC TELECOMMUNICATIONS,
INC.:

By: _____

Name: _Len Eisenhans_

Title: _Pres_

H \WP\HOME\EP\BSERV-cb.2

E-0024063



# AGREEMENT
# AND
# CONSENT TO ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby acknowledges and consents to the Collateral Assignment of Billing Services Agreement dated as of July 2, 1999 by and among ESSEX ENTERPRISES, LLC, ELECTRONIC PUBLISHING VENTURES, LLC (the *"Assignment"*) and enters into this Agreement and Consent to Assignment (this *"Agreement"*) as of July 2, 1999. All terms defined in the Assignment are used herein with the same meanings. Olympic hereby further agrees as follows in favor of the Lender:

1. Olympic hereby consents to the foregoing Assignment and agrees to the terms thereof, notwithstanding any contrary terms in the Billing Services Agreement. Olympic agrees that, in the event that the Lender delivers written notice to Olympic that it is exercising its rights under the Assignment, Olympic shall perform for the Lender all or such portion of Olympic's obligations and undertakings under the Billing Services Agreement as Lender may direct, notwithstanding any contrary instruction, direction or request from the Borrower; provided that any outstanding defaults under the Billing Services Agreement shall be cured and Olympic receives the compensation for such performance as provided in the Billing Services Agreement. It is expressly understood that the Lender neither assumes, nor has any obligation to Olympic to exercise the Lender's rights under the Assignment or to declare an Event of Default under the Loan, but that the option to exercise such rights or declare a default rests in the sole and absolute discretion of the Lender as provided therein. In the event the Lender exercises its rights under the Assignment, Olympic agrees that the Lender will have no personal obligations or liabilities under the Billing Services Agreement or the Assignment, and the sole right and remedy of Olympic as against the Lender under the Billing Services Agreement or this Agreement shall be an enforcement of Olympic's contract rights.

2. Other than for services related to Billings that have not yet been settled by the telephone companies, or related to reserves, Olympic is not currently aware of any known claim, counterclaim, right of set-off, defense or like right against the Borrower or the Lender and Olympic has been paid all amounts due for its work as of this date. Except to the extent possible under the terms of the Billing Services Agreement, Olympic agrees to make no amendments to the existing terms of the Billing Services Agreement without the prior written consent of the Lender.

3. In addition to the foregoing, Olympic agrees not to terminate, or to permit the termination of, the Billing Services Agreement and agrees not to cease to perform its work thereunder for any reason (including, but not limited to, the Borrower's failure to make any payments to Olympic) without giving written notice to the Lender of such intention to terminate or cease performing its work at least thirty (30) days prior thereto. Notwithstanding the foregoing, in the event that: 1) any of the local telephone companies ("LECs") fail to continue to remit receivables pursuant to Olympic's underlying billing and collections agreement; or 2) any of the LECs terminate their billing and collections agreement for any reason; or 3) there is a regulatory action taken against Olympic; or 4) a

:rRC3317ZR1:11

change in regulatory policy affecting Olympic's billing services, Olympic reserves the right to terminate the Billing Services Agreement upon thirty (30) days notice to Lender.

4. Olympic shall provide the Lender, at cost, a copy of any reports or information which is or should be within Olympic's possession, custody or control regarding the Billing Services Agreement, that Olympic is required to provide to Borrower under the Billing Services Agreement, as Lender may reasonably request.

5. Borrower Account. Notwithstanding any provision to the contrary in the Billing Services Agreement, Olympic agrees to the following procedures:

   a. Olympic will establish a separate segregated bank account for deposit of all amounts collected on behalf of Borrower under the Billing Services Agreement (the *"Borrower Account"*). Olympic shall have the right to draw on this account to the same extent that it had under the Billing Services Agreement prior to the execution of this instrument.

   b. Any payments from third parties paid to Olympic will be transferred to the Borrower Account within seven (7) business days of its receipt by Olympic.

   c. Olympic hereby grants Lender a security interest in the Borrower Account to secure its obligations to Lender under this Agreement and to Borrower under the Billing Services Agreement. Said security interest shall, however, exclude billing and collection fees and reimbursements properly payable to Olympic pursuant to the terms of the Billing Services Agreement. Olympic will execute financing statements requested by Lender evidencing its obligations hereunder.

   d. The Borrower Account will be identified as "Reserve Account for the benefit of Cyberspace.com, LLC."

6. In the event the Lender exercises its rights under the Assignment, Olympic agrees to extend to the Lender any rights of indemnity which the Borrower may have against Olympic under the Billing Services Agreement. Lender and Borrower agree, jointly and severally, to indemnify and hold Olympic harmless (including reasonable attorneys fees) from any claim, suit or liability arising out of any dispute between Lender and Borrower or related to its performance hereunder.

7. Upon the occurrence of any breach of any of the Billing Services Agreement by the Borrower or any receipt by Olympic of notice from any person of any claimed breach by the Borrower of any of the Billing Services Agreement, Olympic shall promptly notify the Borrower and Lender in writing of each such breach, by certified United States mail, return receipt requested, postage prepaid, addressed as follows:

   If to Borrower:

   Essex Enterprises, LLC
   1013 Centre Road

Wilmington, DE 19805
Attention: _____
Telephone: (__) _____
Facsimile: (__) _____

If to the Lender:

Electronic Publishing Ventures, LLC
Griffin Towers
6 Hutton Center, Suite 1100
Santa Ana, CA  92707
Attention:  Wayne Chia
Telephone: (714) 445-0500
Facsimile:  (714) 445-0510

8.   This Agreement shall be governed by, construed in accordance with and enforceable under the laws of the State of New York and applicable federal law without regard to choice of law rules.

*[Signature on following page.]*

H-0005323

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be duly executed and delivered by its officers hereunto duly authorized as of the date first above written.

WITNESS:

_SETY HANJYAWSKY_

OLYMPIC TELECOMMUNICATIONS, INC.:

By: _____

Name: _Don M. Ross_

Title: _CO_

R:\WP\HOME\EP\BSERV-cb.2

{000}11701;11

H-0005324

## CERTIFICATE OF SERVICE

This is to certify that Plaintiff's Interrogatories to Defendant Olympic Telecommunications, Inc were served on March 19, 2002, upon counsel for the defendants as follows:

Ernest Leonard, Esq.
Friedman & Feiger
5301 Spring Valley Road, Suite 200
Dallas, TX 75254
*Counsel for Chris Hebard and Coto Settlement*

Jane Jacobs, Esq.
Klein, Zelman
485 Madison Avenue, 15th Floor
New York, New York 10022
*Counsel for Ian Eisenberg, French Dreams, & Olympic Telecommunications*

By Facsimile and Federal Express, Postage Pre-Paid

Collot Guerard
Counsel for the Plaintiff
Federal Trade Commission

```
*********************
***   TX REPORT   ***
*********************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 2303 |
| CONNECTION TEL | 89727765313 |
| SUBADDRESS | |
| CONNECTION ID | |
| ST. TIME | 03/19 14:37 |
| USAGE T | 09'01 |
| PGS. SENT | 27 |
| RESULT | OK |



UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Marketing Practices

Collot Guerard
Attorney

Direct Dial
202-326-3338

**To:** Jane Jacobs, Ernest Leonard

**Fax #:** 212-753-8101, 972-776-5313

**Re:** Revised Interrogatories to Olympic

**Date:** March 19, 2002

# FACSIMILE

```
*********************
***   TX REPORT   ***
*********************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 2302 |
| CONNECTION TEL | 82127538101 |
| SUBADDRESS | |
| CONNECTION ID | |
| ST. TIME | 03/19 14:23 |
| USAGE T | 13'03 |
| PGS. SENT | 27 |
| RESULT | OK |

UNITED STATES OF AMERICA
### FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Marketing Practices

Collot Guerard
Attorney

Direct Dial
202-326-3338

**To:**   Jane Jacobs, Ernest Leonard
**Fax #:**  212-753-8101, 972-776-5313
**Re:**   Revised Interrogatories to Olympic
**Date:**  March 19, 2002

# FACSIMILE

1

**HONORABLE ROBERT S. LASNIK**

2

3                               Jnlerroce

4

5

6

7

8                  **UNITED STATES DISTRICT COURT**
                 **WESTERN DISTRICT OF WASHINGTON**
9                          **AT SEATTLE**

10

11   FEDERAL TRADE COMMISSION,            NO.  C00-1806L

12            Plaintiff,                  **RESPONSES TO FIRST SET OF**
                                         **INTERROGATORIES  TO**
                                         **DEFENDANT OLYMPIC**
13        vs                             **TELECOMMUNICATIONS**

14   CYBERSPACE COM LLC, *et al.*,

15            Defendants

16   RESPONSE TO INTERROGATORY NUMBER ONE

17   Defendant objects to this interrogatory as vague, ambiguous, and overbroad  Defendant is not

18   able to answer this because to determine what every database does and how it is used would

19   require over 72 hours of review of code, most of which is currently unavailable, by experienced

20   programmers  It would be difficult, time consuming, and expensive

21   RESPONSE TO INTERROGATORY NUMBER TWO

22   Defendant objects to this interrogatory as vague, ambiguous, and overbroad  Defendant is not

23   able to answer this because to determine what every database does and how it is used would

24   require  over 72 hours of review of code, most of which is currently unavailable by experienced

25   programmers  It would be difficult, time consuming, and expensive  Without waiving said

26   objection, defendant responds as follows  Olympic created a number of reports including

27   unbillable/reject reports, recourse reports, BIC/LEC adjustment reports

28   RESPONSE TO INTERROGATORY NUMBER THREE

Defendant objects to this interrogatory as vague, ambiguous, and overbroad  Defendant is unable

---

RESPONSES TO FIRST SET OF INTERROGATORIES  TO DEFENDANT OLYMPIC TELECOMMUNICATIONS

to respond to this interrogatory because it is simply too vague.  If Plaintiff further identifies what specific reports, and/or which of the business activities of the four subsidiaries the interrogatory is directed to, then defendant might be able to provide additional information

RESPONSE TO INTERROGATORY NUMBER FOUR

Defendant objects to this interrogatory as vague, ambiguous, and overbroad   Defendant is unable to provide the responsive information to this interrogatory because the interrogatory requests information which was contained in written comments to the database in which csr's wrote concerning persons who called concerning the services provided.  In order to answer this interrogatory Olympic would be required to hire persons to review thousands of entries in a specific field of a computer program   Such a requirement is overly burdensome especially in light of the fact that Defendant has previously provided the database, and the information requested is equally available to Plaintiff by review of the database

RESPONSE TO INTERROGATORY NUMBER FIVE

Cyberspace 2/15/99 -9/22/00

Essex 12/09/98- 7/7/00

Surfnet 8/15/98 - 7/7/00

Splashnet - Olympic is unable to answer the interrogatory as to this entity, as Olympic did not perform billing for Splashnet

RESPONSE TO INTERROGATORY NUMBER SIX

Cyberspace 228,704

Essex 18,602

Surfnet 20,714

Splashnet - Olympic is unable to answer the interrogatory as to this entity, as Olympic did not perform billing for Splashnet

RESPONSE TO INTERROGATORY NUMBER SEVEN

Cyberspace $26,248,929.58

1999 571,838 $13,941,505 61

2000 451,952 $12,307,423 97

Essex (YP com) $1,889,604 15

1   Surfnet $1,179,504 66

2   Splashnet - Olympic is unable to answer the interrogatory as to this entity, as Olympic did not

3   perform billing for Splashnet

4   RESPONSE TO INTERROGATORY NUMBER EIGHT.

5   Defendant objects to this interrogatory as vague, overbroad and burdensome   Refunds were

6   provided by the individual entities, by Pinnacle, by Integretel, and by the LECs   It would take a

7   team of people to reconstruct this information. In addition, much of the requested information is

8   not within the control of defendant, but rather in the control of other entities, such as the LECs

9   RESPONSE TO INTERROGATORY NUMBER NINE

10   Defendant objects to this interrogatory as vague, overbroad and burdensome.  Refunds were

11   provided by the individual entities, by Pinnacle, by Integretel, and by the LECs   It would take a

12   team of people to reconstruct this information   In addition, much of the requested information is

13   not within the control of defendant, but rather in the control of other entities, such as the LECs

14   RESPONSE TO INTERROGATORY NUMBER TEN

15   Defendant objects to this interrogatory as vague, overbroad and burdensome   In order to

16   separate what refunds were provided by whom, defendant would need to hire a team of people to

17   reconstruct this information   Defendants provided Plaintiffs with the database at issue   The

18   information of which is equally available to them

19   RESPONSE TO INTERROGATORY NUMBER ELEVEN

20   Cyberspace $1,228,225 20

21   Yellow-Pages Com $13,486 20

22   Surfnet $150,147 89

23   Splashnet - Olympic is unable to answer the interrogatory as to this entity, as Olympic did not

24   perform billing for Splashnet

25   RESPONSE TO INTERROGATORY NUMBER TWELVE

26   Cyberspace $1,268,318 24

27   Essex $448,883 47

28   Surfnet $22,241,47

Splashnet - Olympic is unable to answer the interrogatory as to this entity, as Olympic did not

1   perform billing for Splashnet

2   These figures reflect data received from the LECS and Billing Concepts up until the entities

3   stopped sending adjustment data   In addition it fails to reflect changes which might have occurred

4   after defendant stopped processing the data

5   RESPONSE TO INTERROGATORY NUMBER THIRTEEN

6   Throughout the time period during which the EPV subsidiaries operated Mr  Don Reese routinely

7   dealt with issues raised by the LECs concerning billing   As was common throughout the industry

8   at the time, various LEC's would require that Mr  Reese provide action plans to address issues

9   they perceived as problems, and for which they might have temporarily suspended placement of

10   charges on telephone bills   Other than being aware that Mr  Reese regularly addressed these

11   issues, there is no specific list of when such actions took place by the LECs and what actions Mr

12   Reese took to address the problem

13   RESPONSE TO INTERROGATORY NUMBER FOURTEEN

14   Defendant objects to this interrogatory as being overbroad   Defendant is unable, without

15   spending hundreds of  hours, for which it would likely to have to hire outside personnel with

16   specialized training, to determine the exact origin of the information identified in the data dump

17   Without waiving said objections, defendant responds as follows   The information contained in the

18   thirteen data dump files represents an exact duplicate of that which was contained in the MS SQL

19   7 0 database system, which drove the Customer Support department

20   RESPONSE TO INTERROGATORY NUMBER FIFTEEN

21   Defendant objects to this interrogator as being overbroad, and burdensome.  Defendant does not

22   have any information concerning the contents of the fields identified in the interrogatory and is

23   unable to respond without spending hundreds of hours of specially trained personnel investigating

24   the matter

25   RESPONSE TO INTERROGATORY NUMBER SIXTEEN

26   Don Reese, all customer service representatives, all accounting department personnel, all Pinnacle

27   personnel involved in providing customer service, all outsourced customer service personnel.

28   RESPONSE TO INTERROGATORY NUMBER SEVENTEEN

All persons with access could both read and write to the records.

1 RESPONSE TO INTERROGATORY NUMBER EIGHTEEN:

2 Defendant objects to this interrogatory as vague, ambiguous, overbroad and burdensome.

3 Defendant is unable to respond to this interrogatory because the interrogatory asks for reports

4 which would not have been created by companies under the control of Olympic, and Olympic

5 would have no information concerning the nature of such reports   In addition it would take

6 significant resources to do the research to respond to this interrogatory

7 RESPONSE TO INTERROGATORY NUMBER NINETEEN.

8 All subsidiaries except Splashnet which was billed through Integretel  .

9 RESPONSE TO INTERROGATORY NUMBER TWENTY

10 Defendant objects to this interrogatory as calling for attorney client and work product doctrine

11 protected information

12 Dated  April 2, 2002

Kathryn S  Diemer, Esq
Campeau Goodsell Diemer, L C
Attorneys for Defendant Olympic

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PRESIDING OFFICIAL COPY

# OFFICIAL TRANSCRIPT PROCEEDING

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHWESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **MATTER NO.** | **X010009    CIVIL NO. C00-1806-L** |
| **TITLE** | **FTC v. CYBERSPACE.COM, LLC, ET AL.** |
| **PLACE** | **FEDERAL TRADE COMMISSION**<br>**915 SECOND AVENUE, SUITE 2896**<br>**SEATTLE, WASHINGTON** |
| **DATE** | **FEBRUARY 7, 2002** |
| **PAGES** | **1 THROUGH 137** |

## COURT DEPOSITION OF LIA YAGELOWICH

**FOR THE RECORD, INC.**
**603 POST OFFICE ROAD, SUITE 309**
**WALDORF, MARYLAND  20602**
**(301)870-8025**

```
 1                    UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF WASHINGTON
 2

 3   FEDERAL TRADE COMMISSION,              )
                           Plaintiff,       )
 4                                          )
                    v.                      ) Case No. C00-1806-L
 5                                          )
     CYBERSPACE.COM, LLC,                   )
 6   FRENCH DREAMS,                         )
     COTO SETTLEMENT,                       )
 7   Electronic Publishing Ventures, LLC,  )
     Olympic Telecommunications, INC.,      )
 8   IAN EISENBERG,                         )
     and                                    )
 9   CHRIS HEBARD,                          )
                           Defendants.      )
10

11

12

13

14

15                                Thursday, February 7, 2002

16
                                  909 First Avenue
17                                Suite 90
                                  Seattle, Washington
18

19

20

21

22

23
             The above-entitled matter came on for deposition
24   pursuant to notice, at 9:00 a.m.

25
```

For The Record, Inc.
Waldorf, Maryland
(301) 870-8025

```
 1   APPEARANCES:
     ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 2            Mr. Michael A. Goodman, Attorney
              Ms. Collot Guerard, Attorney
 3            600 Pennsylvania Avenue NW
              Washington, DC  20580
 4            (202) 326-3071

 5
     ON BEHALF OF THE DEPONENT:
 6            Kathryn S. Diemer, Attorney
              Campeau Goodsell Diemer
 7            38 W. Santa Clara Street
              San Jose, CA  95113
 8            (408) 295-9555

 9   ON BEHALF OF CHRIS HEBARD:
              Mr. Ernest Leonard, Attorney
10            Friedman & Feiger
              5301 Spring Valley Road, Suite 200
11            Dallas, TX  75240
              (972) 788-1400
12
     ALSO PRESENT:
13            Mr. Ian Eisenberg

14

15

16

17

18

19

20

21

22

23

24

25
```

For The Record, Inc.
Waldorf, Maryland
(301) 870-8025

```
1                    P R O C E E D I N G S

2                  (The witness was duly sworn.)

3    ` `                      LIA YEGELOWICH

4    having been first duly sworn, was examined and testified as

5    follows:

6                            EXAMINATION

7    BY MS. GUERARD:

8         Q.    Could you state your name for the record, please.

9         A.    My name is Lia, spelled L-I-A.  Last name is

10   Yagelowich, spelled Y-A-G-E-L-O-W-I-C-H.

11        Q.    Ms. Yagelowich, my name is Collot Guerard.  I'm an

12   attorney for the Federal Trade Commission.  I will be asking

13   you questions, and the reporter is going to be taking down my

14   questions and your answers.  Okay?

15        —A.   Okay.

16        Q.    To make it easier for the reporter, do you agree to

17   let me finish asking my questions before you start answering

18   the question?

19        A.    Okay.

20        Q.    Because she can only take down verbal answers, try

21   to answer verbally.  Don't shake your head or nod your head.

22   Okay?

23        A.    Okay.

24        Q.    Do you agree that if you don't understand a

25   question, you will ask me to repeat or to rephrase it?
```

19

```
 1        A.    I don't remember.

 2        Q.    Do you know whether you have been employed by

 3    French Dreams?

 4        A.    No.

 5        Q.    Have you heard of the company French Dreams?

 6        A.    Yes.

 7        Q.    What is your understanding of what that company is?

 8        A.    What do you mean, "understanding"?

 9        Q.    What is French Dreams?

10        A.    It's a company.

11        Q.    What does it do?

12        A.    I don't know too much about it.

13        Q.    What do you know about it?

14        A.    It's just a company.

15       —Q.    Who owns the company?

16        A.    Mr. Eisenberg.

17        Q.    Were you ever employed by French Dreams?

18        A.    No.

19              (Exhibit Number 166 was marked for

20                  identification.)

21    BY MS. GUERARD:

22        Q.    I'm showing you an affidavit that is marked Exhibit

23    166.  I'll let you read the whole affidavit, but could you

24    first of all look at Page 2 of the affidavit.  Do you

25    recognize that signature?
```

1        A.    Yeah, it look like my signature.

2        Q.    Is that your signature?

3        A.    I guess.

4        Q.    You can read the whole document, but I particularly

5    want you to read Paragraph 1 of Page 1. Can you read for the

6    record what it says, the first sentence?

7                 MS. DIEMER: Have you had an opportunity to

8    read the document?

9                 THE WITNESS: No, I haven't.

10       Q.    Please read the document.

11       A.    (Reading document.) Can I talk?

12       Q.    Sure.

13                 (Pause in the proceeding.)

14

15       Q.    Have you had an opportunity to talk to your lawyer?

16       A.    Yes.

17       Q.    Have you had an opportunity to review the exhibit

18   that's marked 166? Have you been able to read the exhibit

19   that's marked 166?

20       A.    Yes, I read it.

21       Q.    Do you see the statement, "I am employed by French

22   Dreams"?

23       A.    Yes, I saw that.

24       Q.    Did you sign this declaration?

25       A.    I might have.

1      Q.    Well, if you didn't sign it, did somebody else sign

2    it?

3      A.    It's definitely my signature.

4      Q.    Did you understand the declaration when you signed

5    it?

6      A.    No.

7      Q.    Did you write this declaration?

8      A.    No.

9            MS. DIEMER:  Objection -- Lia -- Objection.

10   Don't answer that question.  Who writes a declaration is

11   totally within the attorney-client privilege.  It's an

12   inappropriate question.

13     Q.    Was the declaration accurate when you signed it?

14     A.    I don't know.

15     Q.    At the time you signed the declaration, were you

16   employed by French Dreams?

17     A.    No.

18     Q.    Why did you sign a declaration saying you were

19   employed by French Dreams if that was inaccurate?

20     A.    I don't know.

21     Q.    Do you recognize the name Electronic Publishing

22   Ventures?

23     A.    What do you mean, "recognize"?

24     Q.    Have you seen the name Electronic Publishing

25   Ventures before, EPV?

```
 1        Q.    You're on the second floor.  Okay.

 2        A.    On the second floor now.

 3   `    Q.    So you are on the same floor as Mr. Eisenberg?

 4        A.    Now?

 5        Q.    Yes.

 6        A.    Yes.

 7        Q.    Do you know whether you were an officer of any of

 8   Mr. Eisenberg's companies?

 9        A.    Just Mr. Eisenberg company?

10        Q.    Well, any companies that are affiliated with

11   Mr. Eisenberg.

12        A.    An officer.  The only one I know is I was the

13   president one time.  That's all.

14        Q.    Do you know who Don Reese is?  You know he is a

15   man, but do you know Don Reese?

16        A.    Don Reese?

17        Q.    Yes.

18        A.    Yeah.

19        Q.    Where did he used to work?

20        A.    Payroll Masters.

21        Q.    Did he work for any of Mr. Eisenberg's other

22   companies?

23        A.    (Shaking head negatively.)

24        Q.    What did Don Reese do at the Eastlake facility?

25        A.    I don't know.
```

1       Q.   Did you ever talk with Don Reese?

2       A.   Yes.

3       Q.   This is an exhibit that was marked in a previous

4    deposition.  It is Exhibit 113.  It's Bates-stamped E-20368

5    through 20360.

6            MS. DIEMER:  This is one of the ones that has

7    nonconsecutive numbering, isn't it?

8            MS. GUERARD:  I think so.

9            MS. DIEMER:  So it's E-0020368, and E-0020365,

10   E-0023964 and E-0020360.

11      Q.   If you could, turn to the second page, which is

12   20365.  Do you have that page in front of you?

13      A.   E-0020365?

14      Q.   Yes.

15      A.   Yes.

16      Q.   Could you read that page to yourself.

17      A.   (Reading document.)

18      Q.   Did you participate in a board of directors meeting

19   for Olympic Telcom on October 14th, if you remember?

20      A.   I don't remember.  I might be.

21      Q.   Did you become assistant secretary of Olympic

22   Telcom?

23      A.   It said on the paper.

24      Q.   Before you saw this paper, did you know that you

25   were an assistant secretary of Olympic?

```
 1        A.    I don't remember.

 2        Q.    So you don't know whether you were, before seeing

 3   this?

 4        A.    (Nodding head affirmatively.)

 5        Q.    Did you have any duties as the assistant secretary

 6   of Olympic Telecommunications?

 7        A.    What kind of duties?

 8        Q.    I don't know.  I'm asking you.  Did you do anything

 9   as assistant secretary of Olympic Telcom?

10        A.    I don't remember.  I don't think so.

11        Q.    Do you know whether you were -- you said were

12   president of a company.  What company were you president of?

13        A.    Cyberspace.

14        Q.    Do you know if you were ever a secretary of

15   Cyberspace?

16        A.    No, I don't.

17        Q.    Were you told that you were secretary of

18   Cyberspace?

19        A.    I don't remember.

20        Q.    I'm going to show you what is marked as Exhibit

21   143.  For the record it's a Corporate Resolution,

22   Cyberspace.com.  It is Bates-stamped H-5006 through 5007.  Do

23   you have the document in front of you?

24        A.    Yes.

25              MS. DIEMER:  I just want for the record to
```

```
 1    point out that this is the document where we have some
 2    concerns about why it's stamped weirdly and there seems to be
 3    parts cut off and issues about the document itself, which you
 4    have very clearly said in previous depositions that you have
 5    no idea if the original is like that either.
 6                   MS. GUERARD:  Right.
 7         Q.   Would you like to read this document because I want
 8    to ask you some questions about it.  Okay?
 9         A.   Yes.  (Reading document.)
10         Q.   Did you know, prior to reading this document, that
11    you were the secretary of Cyberspace?
12         A.   I don't remember.
13         Q.   Is that your signature that's on Page 5007?
14         A.   You mean 8005007?
15         Q.   Correct.
16         A.   I see this number.
17         Q.   We are just using the H numbers.
18         A.   Okay.  Yeah.
19         Q.   Did you type this document?
20         A.   I don't remember.
21         Q.   Did you attend a board of directors meeting on
22    October 16th, 1998?
23         A.   I don't remember.  I might.
24         Q.   What did you do as secretary for Cyberspace, if
25    anything?
```

```
 1        A.    I don't remember.
 2        Q.    Do you remember when you became president of
 3   Cyberspace?
 4        A.    When?
 5        Q.    Yes.
 6        A.    No, I do not recall.
 7        Q.    Do you think it was sometime in June or July of
 8   1999?
 9        A.    I don't remember at all.
10        Q.    Who asked you to be president of Cyberspace?
11        A.    Who asked me?  I don't know, actually.
12        Q.    What were you told you would be doing as president
13   of Cyberspace?
14        A.    What I was told?
15        Q.    What were you told that you would do as president
16   of Cyberspace?
17        A.    I don't think anybody told me anything.
18        Q.    Did you do anything as president of Cyberspace?
19        A.    I don't know.
20        Q.    What do you recall doing as president of
21   Cyberspace?  Maybe you did nothing, but I'm just asking you.
22        A.    I don't know.
23        Q.    You don't recall doing anything?
24              MS. DIEMER:  I think that misstates what she
25   just said.
```

```
1        Q.    What do you remember doing as president of

2   Cyberspace?

3        A.    I don't remember.

4        Q.    I want to try and figure out when you became

5   president of Cyberspace, so I'm going to show you a document

6   to see if that helps refresh your recollection.  Maybe it

7   will, and maybe it won't.

8                    (Exhibit Number 167 was marked for

9                     identification.)

10

11                   MR. LEONARD:  Apparently this was

12  inadvertently produced.  It appears to be an e-mail from Gene

13  Hirai.  It's a communication with an Arent Fox attorney.  I'm

14  going to object to this document being used in this

15  deposition, any questions being asked about it.

16                   MS. GUERARD:  Also this was produced by the

17  Hebard defendants, your clients, and you never produced a

18  privilege log.

19                   MR. LEONARD:  I understand.  If it was

20  produced, like your Bates labeled it is, that is in fact true

21  that it was produced inadvertently.

22                   MS. DIEMER:  I would join in the

23  attorney-client privilege and work-product doctrine

24  objection.

25       Q.    Does this document refresh your recollection as to
```

1    when you became president of Cyberspace?

2         A.    No, it does not.

3         Q.    Did you read it?

4         A.    No, I have not.

5         Q.    Why don't you just read it and see if it refreshes

6    your recollection.  I should state for the record that this

7    is an e-mail -- printout of an e-mail, an e-mail exchange

8    dated June 21st, 1999.

9         A.    (Reading document.)

10             MR. LEONARD:  I object again that this is a

11   privileged communication.  It looks like it's my client's

12   privilege.  I'm going to request -- although I can't instruct

13   -- but I'm going to request that this witness not answer

14   questions regarding this document.

15             MS. DIEMER:  I believe that it is

16   inappropriate to have the witness answer questions about

17   attorney-client-privileged communications, even if

18   inadvertently provided in this matter, and I instruct the

19   witness not to answer based on the attorney-client privilege.

20        Q.    Ms. Yagelowich, aside from this document, do you

21   have any independent recollection of when you became

22   president of Cyberspace?

23        A.    No, I don't.

24        Q.    Do you know how long you were president of

25   Cyberspace?

```
 1        A.   No, I don't.

 2        Q.   Do you know how much you were paid as president of

 3   Cyberspace?

 4             MS. DIEMER:  I have to say that I object to

 5   that question on the basis that it is an inappropriate

 6   invasion of her personal privacy.  Is there some reason that

 7   you need to know that piece of information that would

 8   overcome the personal-privacy objection?

 9             MS. GUERARD:  That she is being paid as an

10   officer of a company that the FTC has sued.

11             MS. DIEMER:  That she is being paid, yes.  How

12   much she is being paid, no.

13             MS. GUERARD:  Well, I believe there are

14   documents in here that indicate that she was paid $15,000.  I

15   was trying to see if I could get some other way of refreshing

16   her recollection because if she recalls that she was paid

17   $15,000 on two different dates, then that might help her

18   recall when she became president of Cyberspace.

19             MS. DIEMER:  Right, but the problem is how

20   much somebody makes is specifically very private information

21   that's not usually available and shouldn't be in a public

22   record.  If you want to ask her if she remembers if she was

23   paid, that's fine, but I don't know if she needs to answer

24   how much she was making.

25             MS. GUERARD:  I'm not asking how much she was
```

1   making generally; just as president of Cyberspace.

2            MS. DIEMER:  I think that the protection --

3   actually the consumer-protection laws, throughout the 9th

4   Circuit and particularly in Washington and California,

5   specifically prohibit questions about that type of private

6   information, confidential, personal information unless it's

7   very germane to the case.  I don't see that you have given me

8   a reason that's particularly germane that's going to lead to

9   discovery that's sufficient to invade her personal privacy in

10  that manner.

11           MS. GUERARD:  No, I respectfully disagree with

12  you.

13               (Exhibit Number 168 was marked for

14               identification.)

15  BY MS. GUERARD:

16      Q.   For the record I show you an exhibit that is marked

17  168.  It is DR-6333, and it appears to be a printout of an

18  e-mail exchange dated July 1st, 1999.

19           Could you look at this read the document and

20  see if it refreshes your recollection as to when you became

21  president of Cyberspace.

22      A.   (Reading document.)

23      Q.   When you finish reading the document, look at me.

24  That way I'll know you are finished.  Take your time.

25      A.   I'm almost done.  (Reading document.)

```
 1          Q.   Did you finish reading the document?
 2          A.   Yes.
 3          Q.   Does this remind you as to when you became
 4    president of Cyberspace?
 5          A.   No.
 6          Q.   The fact that you were going to be paid on July
 7    1st, '99, doesn't remind you?
 8          A.   No, I don't remember.
 9          Q.   Did you ever stop being president of Cyberspace?
10          A.   I think so.
11          Q.   Did you resign?
12          A.   I don't remember resigning.
13          Q.   Why did you stop being president of Cyberspace?
14          A.   It's been a long time.  I don't remember.
15          Q.   That's all right.  I'm showing you for the record a
16    document that's marked Exhibit 54.  It is E-24069 through
17    E-24073.  It's entitled, "Collateral Assignment of Billing
18    Services Agreement."  It appears to be dated on the front
19    page as November 1st, 1998.
20               You are welcome to read this whole document.
21    You don't need to read the whole document.  I think I can ask
22    you some questions about the document, but if you want to
23    read it, you can.
24          A.   I would love to read it because I do not remember.
25          Q.   Now, could I just ask you one question?
```

```
 1       A.    Yeah.

 2       Q.    If you go to E-24073, do you recognize your

 3   signature on that page?

 4       A.    Yes.

 5       Q.    Do you see the word "President" under there?

 6       A.    Yes.

 7       Q.    Do you know what you were president of when you

 8   signed this document?

 9       A.    I don't know.

10       Q.    Do you have any recollection of signing this

11   document?

12              MS. DIEMER:  Do you need to read it?

13              THE WITNESS:  I want to read it first.  It's

14   been a long time.  I don't remember.  (Reading document.)

15       Q.    Ms. Yagelowich, this document makes reference to a

16   promissory note.  Would it help you if you saw the promissory

17   note?  I'm not going to be asking you questions about the

18   document.  This makes reference to a promissory note on

19   24069.

20              If it would help you in your reading to see

21   that promissory note, I'm delighted to give it to you.

22       A.    Sure.

23       Q.    I'll hand the witness what is marked as Exhibit 58.

24   It's E-23911 through 23914.  If you could look at that

25   exhibit and particularly at Page 23913, is that your
```

1      Q.    Who is John Gravenkamper?

2      A.    I don't know.

3      Q.    Did you ever meet him?

4      A.    I don't think so.

5      Q.    Do you know if he was a friend of Mr. Eisenberg's?

6      A.    I don't know.

7      Q.    I'm going to show you a document to see if it

8   refreshes your recollection as to when you stopped being

9   president of Cyberspace.

10                (Exhibit Number 169 was marked for

11                identification.)

12   BY MS. GUERARD:

13      Q.    Did you get a chance to look at Exhibit 169, which

14   for the record is Bates-stamped E-25037 and is entitled,

15   "Minutes of Special Board of Directors Meeting of

16   Cyberspace.com"?  If you could look at the document and then

17   look up at me and let me know when you are finished reading

18   it.

19      A.    (Reading document.)  Okay.

20      Q.    Does this refresh your recollection as to when you

21   stopped being president of Cyberspace?

22      A.    No, it doesn't.

23      Q.    Did you sign this document?

24      A.    It has my signature.

25      Q.    At the time you signed it, were you secretary of

1    Cyberspace?

2         A.   I guess so.

3    `` Q.   Did you know that you were secretary of Cyberspace?

4         A.   Did I know?  I don't remember.

5         Q.   Do you remember signing any contracts on behalf of

6    Cyberspace as president of Cyberspace?

7         A.   I don't know.

8         Q.   You don't know, or you don't remember?

9         A.   I don't remember.

10        Q.   Do you remember signing any responses to attorney

11   generals, state attorney generals, on behalf of Cyberspace?

12        A.   I don't know.

13        Q.   You don't remember, or you don't know if you did?

14        A.   I don't know if I did.

15        Q.   Do you remember signing any credit applications for

16   Cyberspace?

17        A.   Credit applications?

18                 MS. DIEMER:  Do you understand what

19   Ms. Guerard means?

20                 THE WITNESS:  I don't know.  Credit

21   applications?  I'm trying to figure out what "credit

22   applications" --

23        Q.   Well, an application to get credit from a company.

24   Do you remember signing any credit applications for

25   Cyberspace?

53

1      Q.   If somebody asks you to sign documents, do you

2  normally sign them?

3      A.   Probably.

4      Q.   I show you what has been previously marked as

5  Exhibit 145.  It's also H-5292, and it's an application for

6  employer identification number on behalf of Electronic

7  Publishing Ventures.  Do you have the document in front of

8  you?

9      A.   Yes.

10      Q.   Do you recognize this document?

11           MS. DIEMER:  Do you need to look at it?

12           THE WITNESS:  Yes.  (Reading document.)  Can

13  you tell me what it says?

14      Q.   On 17C?

15      A.   Yeah.

16      Q.   It looks to me like it's "9/25/98."  And then it

17  says, "City and state where filed."  It looks like "UT,"

18  which stands for Utah.  Then underneath -- next to that it

19  says, "91, 1929168" -- or "9."  One of those two.

20           MS. DIEMER:  Or 3.  Mine looks more like a 3.

21           THE WITNESS:  This is for -- okay.

22      Q.   Looking at 145, do you recognize the signature

23  that's in the lower left-hand corner?

24      A.   Do I recognize that?

25      Q.   Yes.  The signature here.

```
1        A.    Yes.

2        Q.    Is that your signature?

3        A.    It look like it.

4        Q.    At the time you signed this document, were you

5   secretary of Electronic Publishing Ventures?

6        A.    I don't remember.

7        Q.    At the time you signed this document, was

8   Electronic Publishing Ventures located at 2722 Eastlake

9   Avenue?

10       A.    I don't know.

11       Q.    Did you sign this document on October 21st, 1998?

12             MS. DIEMER:  Objection.  Assumes facts not in

13   evidence.

14             THE WITNESS:  I don't know.  It said over

15   there in document.

16       Q.    It says the date?  Is that your handwriting next to

17   the date?

18       A.    I'm not sure actually.

19       Q.    What about the printed "Lia Yagelowich, Secretary"

20   above your signature?

21       A.    I think that's my handwriting.  I cannot tell.

22   It's not clear.

23       Q.    Do you know whether you signed any billing service

24   agreements on behalf of Cyberspace?

25       A.    I don't remember.
```

```
 1   C E R T I F I C A T I O N   O F   R E P O R T E R

 2

 3   DOCKET/FILE NUMBER:  Case No. C00-1806-L

 4   CASE TITLE:    Federal Trade Commission v. Cyberspace.com,

 5   LLC., et al.

 6   DATE:    February 7, 2002

 7

 8

 9

10

11          I HEREBY CERTIFY that the transcript contained

12   herein is a full and accurate transcript of the notes taken

13   by me at the deposition on the above cause to the best of my

14   knowledge and belief.

15

16                         DATED:  February 13, 2002

17

18

19

20                         Toni L. Ziomas, C.S.R.

21

22

23

24

25
```

For The Record, Inc.
Waldorf, Maryland
(301) 870-8025

PRESIDING OFFICIAL COPY

# OFFICIAL TRANSCRIPT PROCEEDING

# UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **MATTER NO.** | **X010009    CIVIL NO. C00-1806-L** |
| **TITLE** | **FTC v. CYBERSPACE.COM, LLC, ET AL.** |
| **PLACE** | **FEDERAL TRADE COMMISSION** <br> **915 SECOND AVENUE** <br> **SUITE 2896** <br> **SEATTLE, WASHINGTON** |
| **DATE** | **FEBRUARY 4, 2002** |
| **PAGES** | **1 THROUGH 209** |

## COURT DEPOSITION OF CHRIS HEBARD

**FOR THE RECORD, INC.**
**603 POST OFFICE ROAD, SUITE 309**
**WALDORF, MARYLAND  20602**
**(301)870-8025**

```
 1                   UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF WASHINGTON
 2

 3   FEDERAL TRADE COMMISSION,                )
                          Plaintiff,          )
 4                                            )
                      v.                      )  Case No. C00-1806-L
 5                                            )
     CYBERSPACE.COM, LLC,                     )
 6   FRENCH DREAMS,                           )
     COTO SETTLEMENT,                         )
 7   ELECTRONIC PUBLISHING VENTURES, LLC,     )
     OLYMPIC TELECOMMUNICATIONS, INC.,        )
 8   IAN EISENBERG,                           )
     and                                      )
 9   CHRIS HEBARD,                            )
                          Defendants.         )
10

11

12

13

14

15

16

17
                         Monday, February 4, 2002
18

19                       915 Second Avenue
                         Suite 2896
20                       Seattle, Washington

21

22

23

24
             The above-entitled matter came on for deposition
25   pursuant to notice, at 9:00 a.m.
```

For The Record, Inc.
Waldorf, Maryland
(301) 870-8025

```
 1   APPEARANCES:
     ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 2              Mr. Michael A. Goodman, Attorney (Telephonically)
                Ms. Collot Guerard, Attorney
 3              Ms. Julie Brof
                600 Pennsylvania Avenue NW
 4              Washington, DC  20580
                (202) 326-3071
 5

 6   ON BEHALF OF THE DEPONENT:
                Mr. Ernest Leonard, Attorney
 7              Friedman & Feiger
                5301 Spring Valley Road, Suite 200
 8              Dallas, TX  75240
                (972) 788-1400
 9
     ON BEHALF OF Ian Eisenberg:
10              Jane B. Jacobs, Attorney
                Klein, Zelman, Rothermel & Dichter
11              485 Madison Avenue
                New York, New York 10022
12              (212) 935-6020

13              Kathryn S. Diemer, Attorney
                Campeau Goodsell Diemer
14              38 W. Santa Clara Street
                San Jose, CA  95113
15              (408) 295-9555

16   ALSO PRESENT:
                Mr. Ian Eisenberg
17

18

19

20

21

22

23

24

25
```

For The Record, Inc.
Waldorf, Maryland
(301) 870-8025

```
1                    P R O C E E D I N G S

2                    (The witness was duly sworn.)

3                         CHRIS HEBARD

4    having been first duly sworn, was examined and testified as

5    follows:

6                         EXAMINATION

7

8                    MS. GUERARD:   This is a deposition pursuant to

9    federal rules of civil procedure for all purposes allowed

10   under those rules, and all objections except as to the form

11   of the question are preserved, if that's acceptable to

12   counsel.

13                   MR. LEONARD:   And responsiveness.

14   BY MS. GUERARD:

15       Q.   Mr. Hebard, would you state your name, your Social

16   Security number, your date of birth, your current residence

17   and office address, please, for the record.

18       A.   My name is Christopher Hebard.  Do you want me to

19   spell that?

20       Q.   No.

21       A.   My Social Security number is 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.  My place

22   of residence is 3433 Colony Plaza, Newport Beach, California.

23   I have no office any longer.

24       Q.   Date of birth?

25       A.   October 28th, 1952.
```

1       Q.   What does "build a portal" mean?

2       A.   A Web portal where people would visit and then buy

3    other products through other places.

4       Q.   Were you also interested in increasing usage

5    because you were trying to sell the company?

6       A.   Well, the issue of Internet usage came up in some

7    of the discussions that we had with prospects of buying the

8    company.

9       Q.   Were some of those prospects concerned that there

10   was very low usage of the service in relation to the number

11   of people that were being billed?

12              MS. JACOBS:  Object to the form of the

13   question on vagueness and assumes facts not in evidence.

14       Q.   You can go ahead and answer the question.

15       A.   When this issue came to our attention while we were

16   being looked at for an acquisition, we did spend some time

17   trying to understand better what the usage numbers were for

18   us and within the industry.

19       Q.   Prior to this time, did you not really care whether

20   people were using your service?

21       A.   No.  I mean prior to this time, like any other

22   vendor bill, the bills for MegaPOP seemed quite large, and

23   that was about as far as I had looked at it.

24       Q.   Did you review the invoices for MegaPOP?

25       A.   No.

```
 1        Q.    How do you know the bills for MegaPOP were quite
 2    large?
 3        A.    Well, I mean I would know by looking at a sheet as
 4    to what bills were being paid, what the total dollars were
 5    being paid by vendor.
 6        Q.    Was MegaPOP the Internet service provider you were
 7    using to offer the service to Cyberspace, Splash, and Surfnet
 8    customers?
 9        A.    Ultimately, yes.  Not initially.
10        Q.    Initially was it Interlync?
11        A.    Yes.
12                    (Exhibit Number 79 was marked for
13                     identification.)
14    BY MS. GUERARD:
15        Q.    I show you a document which is marked 79-Hebard.
16    It's Bates-stamped DR-6693.  It appears to be a series of
17    e-mails dated between February 20th and February 22nd.
18                    I would like you to focus on the middle part.
19    Do you recognize what this e-mail is talking about?
20        A.    It appears to be talking about the Cyberspace CD.
21        Q.    What is the Cyberspace CD?
22        A.    It's the fulfillment CD that allows you to
23    configure your computer to access the Internet.
24        Q.    Is it saying that there were 4,271 CDs that were
25    sent to the mailing house but that there was zero usage?
```

1      Q.   My question is:  Did you ever put the statement
2   that is on the back of the check on the front of the check?
3   I believe your answer is no.

4      A.   If you are asking whether or not the endorsement
5   paragraph ever was put on the front of the check --

6      Q.   Was ever put on the front of the check.

7      A.   I'm sure that it would not be.  It would not be
8   logical for it to be there.

9      Q.   Well, were the terms of the offer put on the front
10  of the check?

11     A.   The terms of the offer on at least some of the
12  promotions, if not all of them, were on the stub of the check
13  as well as on an additional insert.

14     Q.   Now, isn't it correct that the terms of the offer
15  were on the back of the stub and not on the front of the
16  stub?

17     A.   Yes, it would be in the same place where all the
18  information pertaining to the promotion and the endorsement,
19  which was an agreement for services, was all located in the
20  same place.

21     Q.   And that was on the back of the check or on the
22  back of the stub?

23     A.   Correct.

24     Q.   Did you ever consider putting the terms and
25  agreement on the front of the stub?

1        A.    Well, I think we put things like Internet services

2   offer was one of the approaches we used at one time.  We used

3   different -- we had different copy disclosures that were

4   either tested or continued based upon what counsel was

5   suggesting to us at that time.

6        Q.    Mr. Hebard, did you ever put the terms of the offer

7   on the front of the check stub?

8        A.    No, I don't believe so.

9        Q.    You indicated, I believe, that your organization

10  was responsible for providing responses to written inquiries;

11  is that correct?

12       A.    Intercon would have provided responses.

13       Q.    And you previously testified Intercon was your

14  company, correct?

15       A.    Yes, it was mine.

16       Q.    How did the written inquiries get to your office?

17  Did some of them come from Olympic?

18       A.    Some of them could have come from Olympic.

19       Q.    Do you know whether one of the kinds of

20  complaints -- now, I'm talking about the written complaints,

21  not the telephone complaints -- one of the kinds of written

22  complaints that were received by your office and to which

23  your office responded concerned consumers who thought the

24  solicitation check was some kind of a refund or a rebate?

25       A.    I would assume so.

1        C E R T I F I C A T I O N   O F   R E P O R T E R

2

3    DOCKET/FILE NUMBER:  Case No. C00-1806-L

4    CASE TITLE:    Federal Trade Commission v. Cyberspace.com,

5    LLC., et al.

6    DATE:    February 4, 2002

7

8

9

10

11            I HEREBY CERTIFY that the transcript contained

12    herein is a full and accurate transcript of the notes taken

13    by me at the deposition on the above cause to the best of my

14    knowledge and belief.

15

16                            DATED:  February 13, 2002

17

18

19

20                            Toni L. Thomas, C.S.R.

21

22

23

24

25


For The Record, Inc.
Waldorf, Maryland
(301) 870-8025

PRESIDING OFFICIAL COPY

# OFFICIAL TRANSCRIPT PROCEEDING

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHWESTERN DISTRICT OF WASHINGTON

MATTER NO.       X010009    CIVIL NO. C00-1806-L

TITLE             FTC v. CYBERSPACE.COM, LLC, ET AL.

PLACE            915 SECOND AVENUE
                     SUITE 2896
                     SEATTLE, WASHINGTON

DATE              FEBRUARY 6, 2002

PAGES            1 THROUGH 227

COURT DEPOSITION OF IAN EISENBERG

(ON HIS OWN BEHALF)

FOR THE RECORD, INC.
603 POST OFFICE ROAD, SUITE 309
WALDORF, MARYLAND 20602
(301)870-8025

```
1

2                    UNITED STATES DISTRICT COURT

3            FOR THE WESTERN DISTRICT OF WASHINGTON

4   FEDERAL TRADE COMMISSION,    )
                                 )
5                    Plaintiff,  )
                                 )
6        vs.                     )   Case No. C00-1806-L
                                 )
7   CYBERSPACE.COM, LLC,         )
    FRENCH DREAMS,               )
8   COTO SETTLEMENT,             )
    ELECTRONIC PUBLISHING        )
9   VENTURES, LLC,               )
    OLYMPIC TELECOMMUNICATIONS,  )
10  INC.,                        )
    IAN EISENBERG,               )
11  and                          )
    CHRIS HEBARD,                )
12                               )
                 Defendants.     )
13

14                              Wednesday, February 6, 2002

15

16                              915 Second Avenue

17                              Suite 2896

18                              Seattle, Washington

19

20       The above-entitled matter came on for deposition

21  pursuant to notice, at 9:00 a.m.

22

23

24

25
```

```
1    APPEARANCES:

2    ON BEHALF OF THE FEDERAL TRADE COMMISSION:
          Ms. Collot Guerard
3         Mr. Michael A. Goodman
     ``   Federal Trade Commission
4         Bureau of Consumer Protection
          600 Pennsylvania Avenue., NW
5         Washington, DC 20580

6
     ON BEHALF OF THE EISENBERG DEFENDANTS:
7         Ms. Jane B. Jacobs
          Klein, Zelman, Rothermel & Dichter
8         485 Madison Avenue
          New York, New York, 10022
9         (212) 935-6020

10        Ms. Kathryn S. Diemer
          Campeau Goodsell Diemer
11        38 West Santa Clara Street
          San Jose, California 95133
12        (408) 295-9555

13   ON BEHALF OF CHRIS HEBARD:
          Mr. Ernest Leonard
14        Friedman & Feiger
          5301 Spring Valley Road 200
15        Dallas, Texas 75240
          --(972) 788-1400
16

17

18

19

20

21

22

23        .

24

25
```

```
 1
 2                   P R O C E E D I N G S
                                          (9:00 a.m.)
 3                   (The witness was duly sworn.)
 4                        IAN EISENBERG
 5     having been first duly sworn, was examined and
 6     testified as follows:
 7                        EXAMINATION
 8                     BY MS. GUERARD:
 9
10     BY MS. GUERARD:
11          Q    This is a deposition of defendant Ian
12     Eisenberg under the Federal Rules of Civil Procedure
13     for all purposes allowed by those rules.  All
14     objections except as to the form of the question are
15     reserved if that's acceptable to counsel.
16               MS. JACOBS:   Yes.
17               MR. LEONARD:   And the responsiveness of the
18     answer.  And I don't know, did we make that stipulation
19     yesterday in the beginning of the deposition?
20               MS. GUERARD:   I'm not certain.
21               MR. LEONARD:   Can we make an agreement that
22     the same stipulations would apply?
23               MS. GUERARD:   Yes.
24               MR. LEONARD:   Thank you.
25               MS. GUERARD:   I don't have any objection to
```

1      Q      What does -- ISP stands for internet service

2    provider?

3      A      Yes.

4      Q      What does Starnet provide to the EPV

5    subsidiaries?

6      A      I believe that Starnet provided ISP services

7    to the EPV subsidiaries.

8      Q      And did there come a time when you and

9    Mr. Hebard stopped doing business with Interlync and

10   began doing business with Starnet?

11     A      I believe so.

12     Q      And what was the reason that you stopped

13   doing business with Interlync?

14     A      I believe their coverage wasn't very, very

15   robust.

16     Q      You mean it wasn't as wide?  They didn't have

17   as good -- many local dial-up numbers as Starnet?

18     A      I believe so.

19     Q      Is there any other reason that you switched

20   from Interlync to Starnet?

21     A      I don't recall.

22     Q      Did you see any invoices from Interlync?

23     A      I don't recall.

24     Q      Did Interlync charge the EPV subsidiaries for

25   the services that it provided to the EPV subsidiaries?

1

2          C E R T I F I C A T I O N   O F   R E P O R T E R

3

4     DOCKET/FILE NUMBER:  Case No. C00-1806-L

5     CASE TITLE:  FTC vs. Cyberspace.com, LLC, et al.

6     DATE: February 6, 2002

7

8

9

10

11          I HEREBY CERTIFY that the transcript

12    contained herein is a full and accurate transcript

13    of the notes taken by me at the deposition on the

14    above cause to the best of my knowledge and belief.

15

16                    DATED: 2|20|02

17

18                    *Jacqueline L. Bellows*

19                    JACQUELINE L. BELLOWS, CCR

20

21

22

23

24

25

                      For the Record, Inc.
                      Waldorf, Maryland
                      (301) 870-8025